IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------------x
```

| | | |
|---|---|---|
| CHARLES A. GILMAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| --against-- | : | C.A. No. |
| | : | |
| PAUL S. OTELLINI, CRAIG R. BARRETT, D. JAMES | : | |
| GUZY, SR., DAVID S. POTTRUCK, JANE E. SHAW, | : | |
| DAVID B. YOFFIE, CHARLENE BARSHEFSKY, | : | |
| JAMES D. PLUMMER, SUSAN L. DECKER, | : | |
| CAROL BARTZ, JOHN J. DONAHOE, and | : | JURY TRIAL DEMANDED |
| FRANK D. YEARY, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| --and-- | : | |
| | : | |
| INTEL CORP., | : | |
| | : | |
| Nominal Defendant. | : | |

```
--------------------------------------------------------------x
```

## SHAREHOLDER'S DEMAND-MADE DERIVATIVE COMPLAINT

Plaintiff, through his undersigned attorneys, alleges the following on information and belief, except as to those matters which are personal to Plaintiffs, which are alleged on personal knowledge:

## NATURE OF THE ACTION

1.      This derivative action is brought by a long time shareholder of nominal defendant Intel Corp. ("Intel" or "the Company"), for the benefit of Intel, which has now paid in settlement or been fined $2.7 *billion* this year due to violations of American and European antitrust laws. Attempts made over 18 months to obtain action against the Intel officers and directors named

1

herein by the Intel Board of Directors (the "Board") via demand letters, and one in-person meeting with counsel for the Audit Committee, have proved fruitless. Indeed, shareholder demands have been met with outright hostility which can only bespeak bad faith. In the face of facts strongly supporting a multi-year antitrust scheme approved and implemented by Intel's most senior executives, including CEO Paul S. Otellini ("Otellini"), the Intel Board: (a) refused to appoint an independent committee of directors empowered to review the charges and take remedial action; (b) refused outright *to perform any investigation at all*; (c) asked the Audit Committee of the Board to "respond" to the demand, with full knowledge that in previous litigation involving many of these same matters, a majority of the Audit Committee members (without any investigation) informed this Court that they had concluded that the underlying claims exhibited an "utter lack of merit";[1] (e) have attempted to run out the statute of limitations so that no claims could ever be personally asserted against them; and (f) refused to enter into tolling agreements in the hope that the limitations period will indeed expire. Fiduciaries acting in good faith would have entered into tolling agreements so that meritorious claims could be preserved. In sum, the Board members have not acted independently with regard to the shareholder demands, but rather have responded as would guilty parties seeking to evade responsibility. Thus, all possible efforts to obtain action prior to initiating this suit have been made, as required under Fed. R. Civ. P. 23.1, and Delaware law.

2.      The antagonism of Intel's Board of Directors to the shareholders' demand is readily explained by growing evidence that the antitrust scheme, which spanned three continents, and which has so far led to over $1 billion in fines, was personally directed by CEO Otellini and

---

[1]  Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Consolidated Complaint or, in the Alternative, to Stay this Action, dated September 5, 2008, pp. 21-23, filed in *In re Intel Corp. Derivative Lit.,* C.A. No. 08 CV 93 (JJF) (D. Del.).

by Intel's former Board Chairman, Craig R. Barrett ("Barrett"). Indeed, in an action recently filed in this Court by the New York State Attorney General, numerous instances of direct involvement by Otellini and Barrett in unlawful activities are detailed.[2]

3. The Intel Board of Directors, directly and through its Audit Committee, is charged with monitoring, investigating, and remediating any unlawful acts committed by Intel or its executives. The Audit Committee charter describes its general function as follows: "The purpose of the Audit Committee is to represent and assist the Board of Directors in its general oversight of the company's accounting and financial reporting processes, audits of the financial statements, internal control and audit functions, *and compliance with legal and regulatory requirements and ethical standards adopted by the company.*"

4. The Audit Committee also "reviews matters related to the corporate compliance activities of the company, including the review of reports from the company's Ethics and Compliance Oversight Committee [ECOC] and other related groups."

5. Intel's corporate Code of Conduct stresses compliance with antitrust laws, and notes that: "Violating antitrust laws is a serious matter and could place both the company and the individual at risk of substantial criminal penalties."

6. The ECOC, on a quarterly basis, "invites various organizations within Intel to assess and report on ethics and compliance in their respective businesses. Each organization completes an ethics and compliance self-assessment that covers four major areas: *legal and regulatory risks and supporting compliance programs;* ethics and Code of Conduct activities and tone; internal control environment and activities; and business continuity planning and preparedness. *Legal and regulatory risk areas are also reviewed against the Federal Sentencing*

---

[2] The factual allegations contained in the November 4, 2009 Complaint in *State of New York v. Intel Corp.*, C.A. No. 1:09-cv-00827 (unassigned), are incorporated by reference herein.

*Guidelines. The ECOC reviews the self-assessment reports, and provides feedback and recommendations that are tracked to closure.*[3] (emphasis added).

7.      Through its receipt and review of ECOC reports, the Audit Committee would have known not only of the allegations against Intel by various private parties and regulatory authorities in several nations, but also that the allegations had a strong basis in fact, and that they threatened Intel with large fines and large private damages awards, which might even imperil the Company's existence.  Nonetheless, neither the Audit Committee nor the Board called a halt to the unlawful actions of Intel's senior executives, and its members made common cause with the wrongdoers in seeking to stymie any investigatory or remedial efforts.  The actions of the Board members went far beyond conscious inaction, but included affirmative statements to this Court that the underlying claims were utterly without merit, while simultaneously telling Plaintiffs herein that they had never investigated such claims (which was false, as the ECOC's primary purpose was to investigate and report to them on these claims).  Thus, depending on the context, the so-called independent directors claimed they knew all about the antitrust allegations and that they were meritless, or that they knew nothing about the facts or merits of these claims.  Their misconduct has been further aggravated by attempts in the previous "demand futile" shareholder action by plaintiff Martin Smilow (the "Smilow Action") to spuriously invoke the statute of limitations so as to evade answering to the charges, and to "run out" the statute by foot-dragging and inaction in reaction to shareholder demands.

8.      This action is necessary to protect Intel and its shareholders from the actions of its senior executives, as well as from a Board of Directors that is all too happy to aid and abet them in a cover-up of their misconduct.  Allegations and factual evidence of inexcusable wrongdoing

---

[3]  Intel 2008 Corporate Responsibility Report, p. 24.

have mounted in private and governmental actions in Japan, South Korea, the United States and the European Union. Although further harm may result from pending actions, the most serious repercussion for Intel to date has been the $*1.45 billion* fine imposed on May 13, 2009 by the European Commission ("EC").[4]  In addition, an agreement recently reached with rival AMD requires a payment of $1.25 billion.

9.      The EC ruling was the culmination of many years of investigation involving a review of, among other things, interviews, testimony and documents, some voluntarily produced, and some obtained by raids on Intel corporate headquarters. In imposing the largest fine ever levied by the EC, the Commission stated: "Intel has not convincingly argued or forwarded any convincing evidence showing negligence on its part *and the Commission has found Intel to have engaged in a strategy of exclusion*..." EC Dec., p. 591, ¶ 1791.

10.      Specifically, the EC determined that Intel's executives had "engaged in two specific forms of illegal practice. First, Intel gave wholly or partially hidden rebates to computer manufacturers on condition that they bought all, or almost all, their x86 CPUs from Intel. Intel also made direct payments to a major retailer on condition it stock only computers with Intel x86 CPUs. Such rebates and payments effectively prevented customers - and ultimately consumers - from choosing alternative products. Second, Intel made direct payments to computer manufacturers to halt or delay the launch of specific products containing competitors' x86 CPUs and to limit the sales channels available to these products. The Commission found that these practices constituted abuses of Intel's dominant position on the x86 CPU market that harmed

---

[4]   The factual allegations and conclusions contained in the May 13, 2009 EC decision, Case Comp/C-3 /37.990/Intel, are incorporated herein by reference.

consumers throughout the EEA. By undermining its competitors' ability to compete on the merits of their products, Intel's actions undermined competition and innovation."[5]

11.     The EC action came in the wake of similar allegations and governmental enforcement actions in Japan and South Korea. In the course of the EC investigation, Intel's senior managers and Board members would have become privy to the knowledge that "the jig was up." They would have known that regulatory authorities who were determined to hold Intel to account had come into possession of direct and compelling evidence of wrongdoing. (Indeed, the EC Decision contains numerous examples of direct involvement in unlawful activities by Intel "senior executives," whose exact identities have been redacted from the decision at the insistence of Intel.). Instead of taking immediate remedial action that would have avoided or reduced the $1.45 billion fine, Intel's Board decided to stonewall the investigation, once again deriding compelling allegations as unfounded.

12.     Further harm to Intel as a result of the arrogance of its fiduciaries may come next from consumer class actions pending in this District and in California state court; and by dint of the recently-filed New York State action for treble damages brought on behalf of the State, certain assignor OEM's, and certain direct purchasers.

13.     It is the plain intention of Intel's Board members and senior managers that any damages, settlements or fines will be paid by Intel's innocent shareholders, and that the individual wrongdoers will completely escape responsibility. This action is brought so as not to allow that to happen: Plaintiff is pursuing these claims so that individual responsibility cannot be evaded, and to ensure that necessary remedial measures are taken to prevent a recurrence of this type of activity.

---

[5]  EC press release dated May 13, 2009, available at
http://europa.eu/rapid/pressReleasesAction.do?reference=IP/09/745

14. This action is also interposed now to prevent Intel's Board members from continuing to seek refuge from liability by hiding behind the statute of limitations. Although no limitations period has yet run, without the prompt assertion of these claims, limitations periods may soon run, allowing defendants to evade all personal responsibility for their bad faith misconduct.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs and the dispute is between citizens of different states. This action is not brought collusively to confer jurisdiction on this Court.

16. This action also falls under this Court's ancillary jurisdiction, as many of the claims asserted herein are substantially related to claims asserted under the federal antitrust laws in this Court against Intel in *State of New York v. Intel Corp.*, Civ. No. 09-827-JJF, and by consumers in the *Paul* action, Civ. No. 05-485-JJF, both consolidated in *In re Intel Corp. Microprocessor Antitrust Lit.*, MDL No. 05-1717-JJF (D. Del) (the "AMD Litigation").

17. Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391 because Intel is incorporated in Delaware, and because acts and offenses pertinent to the claims for relief stated herein were committed in the State of Delaware.

## THE PARTIES

### Plaintiff

18. Plaintiff Charles A. Gilman ("Gilman") is an Intel shareholder and has continuously held Intel shares since at least 1996. Gilman will fairly and adequately represent the interest of Intel in this litigation. Prior to initiating this action, Gilman joined in a demand

7

made by another Intel shareholder, also represented by derivative counsel, and incorporated by reference in his demand all communications made pursuant to that first demand.[6] Gilman is a citizen of Maryland.

### Defendants

19.     Nominal Defendant Intel is a Delaware corporation with its principal executive offices at Santa Clara, California. It conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. Intel and its subsidiaries design, produce, and sell a variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries worldwide.

20.     Defendant Paul S. Otellini ("Otellini") is presently Intel's President and Chief Executive Officer, and a member of its Board of Directors. Otellini has been President and CEO since 2005; was President and Chief Operating Officer from 2002 to 2005; and a director since 2002. Otellini is a citizen of California.

21.     Defendant Craig R. Barrett ("Barrett") was an Intel director from 1974 until his retirement from the Board in May 2009. Barrett was Intel's CEO from 1998-2005, and Chairman of the Board from 2005 through May 2009. Barrett is a citizen of Arizona.

22.     Defendant D. James Guzy, Sr. ("Guzy") was a director of Intel from 1969 through May 2008. Guzy served as a member of Intel's Audit Committee from at least 2001 through his retirement in May 2008. Guzy is a citizen of Nevada.

23.     Defendant David S. Pottruck ("Pottruck") is presently an Intel director, and has been a director since 1998. Pottruck served as a member of Intel's Audit Committee from in or about May 2006 through in or about May 2008. Pottruck is a citizen of California.

---

[6] A copy of Plaintiff Gilman's demand letter is attached hereto as Exhibit C.

24.     Defendant Jane E. Shaw ("Shaw") has served as a Board member since 1993, and as Board Chairman since May 2009. Shaw served as a member of Intel's Audit Committee from in or about May 2002 through in or about 2009. Shaw is a citizen of California.

25.     Defendant David B. Yoffie ("Yoffie") is presently an Intel director, and has been a director since 1989. Yoffie is a citizen of Massachusetts.

26.     Defendant Charlene Barshefsky ("Barshefsky") is presently an Intel director, and has been a director since 2004. Barshefsky is a citizen of the District of Columbia.

27.     Defendant James D. Plummer ("Plummer") is presently an Intel director, and has been a director since 2005. Plummer served as a member of Intel's Audit Committee from in or about May 2004 through at least 2009. Plummer is a citizen of California.

28.     Defendant Susan L. Decker ("Decker") is presently an Intel director, and has been a director since 2006. Decker served as a member of Intel's Audit Committee from in or about May 2009 through in or about 2009. Decker is a citizen of California.

29.     Defendant Carol Bartz ("Bartz") was an Intel director from January 2008 through March 2009. Bartz served as a member of Intel's Audit Committee from in or about January 2008 through in or about March 2009. Bartz is a citizen of California.

30.     Defendant John J. Donahoe ("Donahoe") is presently an Intel director, and has been a director since March 2009. Donahoe serves as a member of Intel's Audit Committee. Donahoe is a citizen of California.

31.     Defendant Frank D. Yeary ("Yeary") is presently an Intel director, and has been a director since March 2009. Yeary serves as a member of Intel's Audit Committee. Yeary is a citizen of California.

32.     The claims asserted herein against the present and former Intel officers and

9

directors named above are divided into three types:

(a) *Active Misconduct Claims*. These claims are brought against those persons who were officers and/or directors during the period in which it has been alleged Intel's executives engaged in active violations of the European, Japanese, South Korean and United States antitrust laws, and the Board of Directors failed in bad faith to rein in, ameliorate or countermand such misconduct, or to ensure cooperation with regulatory authorities. Such claims, which pertain to the period 2001 through 2007, are brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, and Decker.

(b) *EC Regulatory Claims*. These claims are brought against those persons who were officers and/or directors during the period from which the EC began investigating Intel's conduct in Europe through the imposition of the record fine in May 2009. During this period, the relevant defendants failed to ensure that full and complete cooperation was provided to regulatory authorities; failed to hold accountable any person who engaged in unlawful misconduct; failed to take necessary remedial actions; and failed to work to with the EC on remedies or resolutions of the charges which would have reduced or even eliminated the EC fine. Such claims are brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, Decker and Bartz.

(c) *Claims Related to Failure to Take Remedial Measures*. These claims are brought against those persons who are presently Intel directors and who are consciously and in bad faith refusing to thoroughly investigate and address

10

executive wrongdoing; attempting to stymie and defeat legitimate claims against directors and officers through efforts to cause such claims to lapse by dint of the statute of limitations; and failing in bad faith failing to enact necessary therapeutic and remedial measures.

## FACTUAL ALLEGATIONS

### INTEL'S ANTICOMPETITIVE SCHEME

#### A.    THE MARKET

##### 1.    x86 Microprocessor Technology

33.    A microprocessor is a computer central processing unit ("CPU") – the "brains" of the computer – which is manufactured on a single, tiny wafer, or "chip." Such chips consist of materials called semiconductors, called such because of physical properties which allow the rapid, controlled flow or "conducting" of electrons through miniature pathways called circuits. The manufacture of microprocessors is a highly specialized and costly process which takes place in factories called "fabs." The planning and construction of a single fab costs billions of dollars. Manufacture involves, among other highly complicated operations, the etching (using lasers) of circuitry into the chip on the model of a specially designed microarchitecture.

34.    This microarchitecture, however, serves only to implement what from the computer user's perspective is a more significant attribute of the microprocessor, *i.e.,* its "instruction set." The instruction set provides the basic building blocks – the architecture – of the language that directs the computer's operations, and that supports each of the software programs written to run on that computer.

35.    The CPUs at issue here are known as "x86" CPUs, in reference to the specific instruction set that the CPU recognizes. The x86 instruction set derives its name from the model

numbers of Intel processors initially introduced in the late 1970's. This model set is now ubiquitous in desktop and notebook computers, and widespread in servers and workstations. The initial prominence of the x86 instruction set was largely due to the fact that it was chosen by IBM in the early 1980s, together with Microsoft's PC operating system, as one of the standard components of what became known as IBM-compatible PCs. Generally speaking, a specific version of software (including operating systems and/or applications) can be run only on machines that recognize a specific instruction set.

36.     It was not IBM's intention, however, that Intel be the sole source of x86 microprocessors for its products. IBM arranged that AMD – which at that time produced microprocessors with a competing architecture – would also be able to manufacture x86 microprocessors as a second source of supply. Intel, however, proved reluctant to share the intellectual property which underlay the x86 instruction set, until it was compelled to do by an arbitration award and a subsequent 1995 settlement with AMD. The settlement set the stage for AMD to morph from a low-margin "clone" manufacturer – an imitator – into a true competitor. The settlement secured AMD a shared interest in the x86 instruction set, but AMD was now required to develop its own microarchitecture in order to implement that instruction set in its own microprocessor products. When AMD attempted to do so, in the late 1990s, its efforts were met with remarkable success. Intel's anticompetitive reaction to that success is what gives rise to this action.

### 2.     The x86 Microprocessor Market

37.     Microprocessors are not sold directly for final use to businesses or consumers but as components – generally the most expensive and most important components – of desktop, mobile, and server computers. Those computers, in turn, are manufactured by Original

Equipment Manufacturers ("OEMs"). The OEMs are therefore Intel's largest and most important customers. During the relevant period, the top 10 OEMs accounted for a large and increasing share of microprocessor sales worldwide -- approximately 70%.

38.     It is not merely their size, but their strategic importance as "gatekeepers" to the lucrative commercial segment of the computer market which make the top OEMs – most prominently Dell, HP, and IBM – Intel's most important customers. For example, the highest margins are earned on server microprocessor products, and these are sold almost entirely through a handful of major OEMs. There are other avenues of distribution, but these are shrinking, as a result of OEM consolidation and other factors. Distribution through channels other than the OEMs serves principally to reach smaller, less profitable customers.

39.     Moreover, the production volumes and the brand awareness, as well as market credibility and experience which a microprocessor firm needs depend on close cooperation with OEMs. Without detailed feedback and market intelligence from major OEMs, a microprocessor firm cannot adequately plan or test its products, for it is the OEMs who have the depth of customer and market knowledge required. Nor will any microprocessor firm be able to develop a strong and credible brand without the continuing support and cooperation of major OEMs.

### 3.     **Intel's Monopoly Power**

40.     Intel is a durable and extraordinarily powerful monopoly. For over a decade, it has had extremely high market shares, measured at approximately 80-90% by revenue and 75% by unit volume. All major computer manufacturers depend on Intel in a variety of ways and are reliant on it for microprocessors, because AMD is, and in the foreseeable future will remain, unable to fulfill more than a small share of their requirements.

13

41.     Intel's monopoly power is protected by the extremely high barriers to entry into the x86 microprocessor market. First, design and manufacture of microprocessors requires access to intellectual property which only Intel and AMD have, so that substantial licensing issues would arise for any potential entrant. Second, manufacturing facilities for microprocessors ("fabs") cost billions of dollars to design and construct (not to mention a great deal of time and regulatory approval). Third, this is an industry characterized by economies of scale, so that smaller manufacturers are at a cost disadvantage and often have difficulty achieving profits.

42.     Intel is extremely profitable; in contrast, the margins of its primary customers, the "top tier" OEMs, tend to be thin – often in low single digits. This enables Intel to directly affect OEMs' bottom-line quarterly profits, by favoring certain OEMs with lower prices and other subsidies, while punishing others.

43.     Intel's profits on its microprocessors reflect its monopoly power, as the OEMs that are compelled to do business with it well know. A May 2002 internal HP document, comparing Intel's profitability with the narrow profit margins of OEMs, noted that "Intel has margins of a monopoly."

44.     Michael Dell, founder and CEO of Dell, Intel's largest customer, pointed out in a February 2004 internal email that not even Microsoft could exercise the pricing power which Intel has displayed: "[Intel] profits in the 2nd half of 2001 were $1.397B on revenues of $13.528B. In the 2nd half of 2003 they were $4.885B on revenues of $16.574B. In other words their sales went up 22.5% and their profits went up 350%! Or said another way their revenues went up $3.046B and their profits went up $3.488B!! Not even Microsoft can do that. In other words these guys have massive operating leverage."

14

45.    OEMs also depend on Intel in such vital matters as allocation of products, marketing support, and access to technical information. An internal 2002 HP document presentation slide noted that "[r]egardless of [s]cenario, Intel's [m]onopoly [will] [l]ikely [be] [s]ustained" because of Intel's: □

Relationships - PC manufacturers, distributors, ISVs [Independent Software Vendors],

BIOS [Basic Input/Output System] suppliers, etc. - Exerts substantial influence over PC manufacturers and their channels of distribution through the 'Intel Inside' brand program and other marketing programs □

Technology - Design capabilities for microprocessors, memory, chip sets, etc. □

Resources - Manufacturing, R&D, Marketing

\* \* \*

Control of industry standards- Intel has been able to control x86microprocessor and PC system standards; can dictate type of products market requires of Intel's competitors

Intel has also created alliances with major OEMs which give it substantial leverage over these OEMs. Because OEMs rely on Intel's active participation in these alliances in the form of funding, marketing, and intellectual property, OEMs cannot easily disregard Intel's wishes.

46.    At the highest levels, Intel routinely takes steps to make its displeasure felt when it feels threatened by OEM actions – even when those actions appear to be routine commercial behavior. Intel's customers are constantly reminded where their primary loyalty should lie. For example, in March 2006, Intel's CEO Paul Otellini received a courtesy "heads-up" from an HP executive that HP was sponsoring an advertisement featuring HP's relationship with AMD and the theme of customer choice. Otellini reacted: "So, …why did you feel compelled to do this? It is certainly insulting to us and I do not see how it helps you…. If we are your key partner, this is nothing but a slap at us … I really don't want to get in a pissing contest over this … But running

15

an ad touting 10 years with amd [sic] and 'choice' is not the behavior of someone who wants to bring our two companies together."

47.      Similarly, in November, 2004, Otellini directly expressed his displeasure at increases in IBM's AMD Opteron server sales to a senior IBM executive and reminded him of IBM's reliance on Intel: "I just saw the [sales] tracker data for Q3 …. IBM opteron shipments in 2P [dual-processor servers] doubled from 3.5Ku [thousand units] to 7. 5Ku … IBM was the fastest growing opteron system seller!! … It is a bit disheartening to see IBM outgrow both Sun and HP in Opteron shipments given our current engagement."

### 4.      The Threat From AMD's New Products

48.      In the late 1990s, Intel and AMD each began developing a new generation of microprocessor products. Both were intended to increase processing speed by enabling computers to address larger chunks of data at one time – in technical terms, to make the transition from 32-bit to 64-bit computing.

49.      Intel (working together with HP) planned a new, more advanced microprocessor product named Itanium, directed primarily at powerful, high-end servers or computers. Itanium would not be "backwards compatible" with the thousands of software applications and operating systems which Intel's corporate customers currently used. In other words, if a corporate customer wanted to use Intel's Itanium product, it would require it to make large new investments in software and programming, as well as computer hardware. For these and other reasons, Itanium was not well received by either the OEMs or their customers.

50.      At the same time, AMD was bringing its new products – including the Athlon microprocessor for PCs and the Opteron server microprocessor—to market. These products represented AMD's first attempt at competing directly with Intel in the high-end segments of the

market and had cost billions of dollars to develop. Opteron garnered virtually unanimous industry acclaim; AMD had succeeded with an innovative product design yielding performance advantages which effectively "leapfrogged" Intel. According to one publication, for example, tests performed by HP in 2004 for data-intensive applications showed that Opteron's performance was "anywhere from 40% all the way up to several hundred percent" over Intel's latest competitive product.

51.    Moreover, Opteron was much more energy-efficient than Intel's competing chip. This was a major consideration for the administrators of corporate data centers, where the amounts of electricity used and heat generated were critical factors. AMD engineers had also succeeded in developing a "Direct Connect Architecture" which enabled more efficient processing of information – a microprocessor's basic task. By connecting processors more directly with each other and with processor memory, AMD design architects accomplished the equivalent of providing six lanes, instead of two, for busy highway commuters, thereby achieving a higher performance data flow throughout the chip. The value of this architectural breakthrough would increase as chips were designed to have multiple centers or "cores" for data processing.

## 5.    AMD Begins To Gain OEM And Customer Approval

52.    AMD's other task, however – using these products to enter the lucrative business segment of the market – was not one it could accomplish alone; that road led through the major OEMs. The business segment of the market included not only medium and small business customers, but also large enterprise customers – the Fortune 500 companies – which purchase expensive server computers. As noted, AMD was helped by the fact that Intel's attempt to capture the high-end computing market with its Itanium product met with little enthusiasm from

17

corporate purchasers. Those customers now had an AMD alternative which would allow them to achieve higher performance with AMD products, but continue to use their legacy 32-bit software, and make the transition to 64-bit computing on a schedule of their own choosing.

53. By late 2004, Fortune Magazine was reporting on some initial success in AMD's enterprise strategy: "By employing its own chip-design innovations and exploiting strategic missteps by Intel, AMD has built alliances with the likes of Microsoft, Hewlett-Packard, Sun, Fujitsu, and IBM. These tech powers mostly ignored AMD before, but now they see the chipmaker as a means to build market share by helping customers lower the cost of their IT operations. Almost overnight, AMD has become a major supplier of chips to the high-priced and high-margin world of servers, the big machines that power the internet and corporate networks." (p. 38.)

54. For Intel, AMD's opportunity was a competitive threat. Genuine competition with respect to server computers, which were generally sold to enterprise and government customers, would erode Intel's monopoly profits. And if large enterprise customers began to purchase AMD server products, they would consider purchases of AMD desktops and notebooks as well.

55. What made the situation critical beginning in 2002-03, as shown in internal Intel documents, was that Intel had recognized that it would be years before it was able to itself design and develop x86 products genuinely competitive with those AMD was already marketing. In the industry parlance, Intel had a "big competitive hole" in its product development "roadmap."

## B.     INTEL'S EXERTION OF MONOPOLY POWER

### 1.     Intel Seeks To Limit AMD's Advances

18

56.     Faced with AMD's advances, Intel took steps to ensure that consumers would have limited opportunity to buy AMD's products. It accomplished this by bribing or coercing OEMs either not to offer, or to severely limit, AMD CPUs. This took place in the context of regular quarterly "negotiations" between OEMs and Intel – in which each OEM was in the position of one among several competitors, and Intel was, with respect to each of them, in the position of its essential and irreplaceable supplier. Because Intel possessed monopoly power and important resources as described above – advance knowledge of technical developments, ability to control supply, and above all, the ability to grant or withhold "rebate" payments and marketing money – Intel was in a position in which it could virtually dictate the terms of its deals.

57.     Intel's customers understood Intel's power and its strategy. As an internal HP document concluded in November, 2003: "[I]n this market, Intel dictates the rules of the game … and most of their actions can be understood in the context of keeping their distribution outlets (their customers) in line."

58.     Intel's acts and objectives were therefore radically different from legitimate marketing of its own products. Instead, Intel eliminated opportunities for AMD to gain sales, even when Intel's own sales would not directly benefit consumers. For example, Intel paid HP, as part of a 2002 agreement between the companies, to delay the launch of AMD-based commercial desktop PCs for a six-month period in Europe and for a period of at least two months in Latin America. And Intel repeatedly pressured OEMs to guarantee it specified market shares of their sales, to ensure that the OEMs' marketing decisions would be controlled by Intel, rather than be responsive to consumer demand.

19

59.     Thus, Intel entered into an agreement with HP which "capped" AMD's share of the commercial desktop segment at 5% of HP's worldwide sales. The "cap" provision was suppressed and kept secret, but numerous drafts, subsequent emails, and testimony confirm that it was central to the agreement and was observed by HP and enforced by Intel. In another 2006 agreement with HP, Intel effectively ensured that its share of HP's over-all sales would increase and AMD's would decrease. In all cases, however, Intel attempted to erase the most obvious traces of its anticompetitive scheme, by eliminating crucial but flagrantly objectionable provisions (such as the 5% cap) from written agreements (while nevertheless subsequently enforcing them), or altering language so that agreements about market shares were camouflaged as agreements regarding volume targets. The email request of the Intel executive who negotiated a 2006 deal with HP is typical: "Could you also take the mss [market segment share] references off and just leave everything at volume targets. Our counsel is very picky on that stuff ..."

60.     Intel sought and frequently reached such agreements despite its awareness of "antitrust risk." In the context of Intel's negotiations with NEC, a Japanese OEM, an Intel executive in December of 2002 asked for new documentation because "[t]he original email minutes from [the] May meeting shows [sic] MSS target, and we can't use it ... where it exposes us to anti-trust risk."

61.     The basic *quid pro quo* which Intel sought was invariably clear: exclusion of competition was rewarded with valuable inducements, which were withheld if the OEMs cooperation was not forthcoming. This conditionality was Intel's basic *modus operandi,* as illustrated by the following exchange in May of 2002 between two Intel executives reacting, during negotiations with Sony, to the news that Intel was "getting hammered in the value segment" by AMD in the marketplace. The first executive inquired: "Can [another Intel

20

representative] discreetly hint to Sony that the Corp Marketing dollars are at risk if Intel's MSS with Sony in the value segment does not improve?" The second responded: "We should not be shy about our unhappiness with our current MSS. Intimating that the program is in jeopardy if they don't get their act together and work with us on this is clearly ok."

62.     A favorite Intel code word for the degree of exclusivity Intel desired from the OEMs was "alignment." If they were not "aligned," OEMs could not expect favorable treatment from Intel with respect to rebates, technological development, pricing concessions, priority in obtaining supplies of scarce parts, or marketing funds. As one Intel executive reported to another in April, 2002 regarding negotiations with Sony: "I also told him that Intel ... would really have to make sure Sony and Intel are well 'Aligned' before we commit to doing this kind of comarketing program.... If we can get [Sony] to agree on better alignment (MSS recovery in US NB [United States notebook computers], No more surprises), then, we can move forward with co-marketing discussion. If not, we may have to think about alternatives."

63.     Similarly, a top HP executive reported back from a conversation with Intel's then-COO Paul Otellini concerning Intel's reaction to the news that HP was considering launching an AMD-based PC directed at commercial customers: "I talked to Paul Otellini last night [who asked whether] we have a transactional relationship or a partnership? If we go with AMD on the commercial desktop, Intel equates this to a transactional relationship, and therefore we are foregoing the benefits of price pull-forwards [pricing concessions] to level the direct/indirect playing field."

64.     Intel forced OEMs to choose between having a "strategic" or a "transactional" relationship with Intel. In Intel's parlance, a "strategic" relationship was one with a high degree of exclusivity or "alignment." An OEM which opened itself to a relationship with another

21

microprocessor supplier – AMD – was regarded as desiring only a "transactional" relationship with Intel, and Intel made clear in such cases that this would not be in the OEM's own best interest. Thus, in April 2002, one Intel executive wrote to his counterpart at HP during HP's merger with Compaq, reacting to a telephone conference between the CEOs of Intel and HP in which HP indicated that it might develop products based on AMD's new microprocessor product, code-named "Hammer": "[Intel's] Craig [Barrett] came away believing Compaq was leading HPAQ to a transactional vs. a strategic relationship with Intel. Not interested in partner of choice relationship. [Intel was] [v]ery disappointed in the response on Hammer and why this is in Compaq's best strategic interest."

65.     Intel often cloaked its exclusionary transactions with OEMs in the language of pricing, using terms such as "CAP" ("Customer Authorized Price") or "ECAP" ("Exception to Customer Authorized Price"). In fact, although Intel often exerted considerable effort to retroactively justify its payments to OEMs in such terms, these "rebates" bore no genuine relationship to pricing based on volume-related cost savings or genuine efforts to meet specific competitive offers. The purpose and effect of these payments – of which Intel executives were always mindful – was to induce OEMs to exclude competition. When it became too difficult to accomplish this using "ECAPs" – purported discounts which were to be calculated on a product by product basis – Intel found other methods, such as lump-sum payments, to reach its goal of "strategic alignment."

66.     For example, Intel for years paid Dell lump-sum rebates known initially at Intel and Dell as "MOAP," an acronym for "Mother of all Programs," and later renamed "MCP," short for "Meet Competition Program." In an October 2003 internal Intel email regarding Intel's negotiations with Toshiba, Intel executives considered abandoning the burdensome "ECAP"

22

method of "justifying" rebate payments and adopting a "dell like moap [mother of all programs]" method of payment, which facilitated increasing the size of the payments necessary to purchase Toshiba's cooperation (referred to as "the incremental cost of getting them competitive"): "With [Toshiba] I think we are at the end of the rope wrt [with respect to] product by product ecaps – too painful across the product line; I think we have to take them to a dell like moap program – the incremental cost of getting them competitive could be buried into the overall moap program .... and then we can use the moap program to drive strategic alignment."

67.    In short, Intel first determined what payment or other benefit was necessary to enlist an OEM's cooperation in excluding AMD, and then sought to camouflage it with an apparently procompetitive "structure." As Dell's lead negotiator with Intel put it in a December 7, 2004 email to his Intel counterpart, explaining that Michael Dell wanted an additional $400 million rebate payment from Intel: "This is really easy.... MSD [Michael Dell] wants $400M [million] more. I've been trying to figure out the structure...." Intel's objective throughout was not to eliminate AMD entirely, but to crush an unprecedented threat to its monopoly power. As internal Intel emails show, Intel understood that not all market segments were vital to the maintenance of its monopoly power. "[L]ow cost/low value" output by AMD did not threaten the sources of Intel's monopoly profits, which included its – until 2002-03 – unchallenged position in the high value, high-priced corporate segment.

68.    As a 1998 email exchange among Intel's top executives shows, Intel's strategic priority was "to avoid losing any SMB [small business] or corp skus [stock-keeping units]." At that time, Intel was concerned about AMD's success in the retail market because it was "strengthening their position for movement to high end skus and entry into the business segment."

69.     Intel knew that if it could exclude AMD from the most lucrative segments of the microprocessor business, AMD could never become a genuine threat. For AMD to make sales was not sufficient; if it were to challenge Intel's monopoly power, it would have to make substantial high-value sales to major corporate customers. Only by raising the average selling price of its products could AMD challenge Intel's leadership. Intel therefore argued to OEMs that Intel would "continue to pigeon hole AMD to the bottom 10% of segment...." Intel's Paul Ottellini believed that AMD units which were sold on "the backstreets of beijing [sic] are wonderful.... [T]here is really no question that in the long run, I would like to see amd [sic] output spread round the world as a low cost/low value, unbranded brand..." Accordingly, in the following years, Intel focused on barring AMD's access to this vital high ground – the corporate market and its gatekeepers, the major OEMs.

## 2.     OEMS' Reasons For Collaborating With Intel

70.     During the relevant period, OEMs understood that they would benefit from increased competition in the microprocessor market. If a competitor such as AMD could establish itself as a genuine alternative to Intel, they (and consumers) would enjoy more choices, lower prices, and better products. Nevertheless, they frequently decided, when faced with the array of incentives and threats which Intel brought to bear, to collaborate with Intel in restricting their purchases from AMD.

71.     There were several reasons for this. The most basic was that the payments for the exclusivity that Intel provided could make the difference between profit or loss for an OEM or a segment of its business. In 2002-2004, for example, HP's business desktop unit depended significantly on Intel rebate payments for its financial success. In September 2004, HP executives considered whether to continue to adhere to a deal they had struck with Intel in 2002

to limit HP's marketing of AMD-based commercial desktop PCs by, among other things, agreeing to sell AMD-based PCs directly only, rather than through distributors. A senior HP executive vetoed the plan, on the ground that Intel would detect any cheating and that Intel's rebate payments were essential for the HP division involved to "make it financially."

72.     Dell's profitability also came to depend on Intel rebate payments. This was dramatically illustrated by internal Intel emails in April, 2004, arising from Dell's need to finalize its earnings forecast for the coming quarter. Essentially, Dell asked Intel for an additional $100 million; without it, as an Intel executive reported, Dell would "readjust their margin guidance downward ..." In other words, Dell would advise investors that it expected lower earnings.

73.     As Dell and HP both learned, once an OEM accepted Intel rebate payments as a substitute for marketing AMD-based products, it became very difficult to break the habit. Dell on several occasions assessed whether purchasing from AMD would be likely to improve its profitability. Dell's estimates of Intel's likely reaction, however, loaded the scales against AMD, because Dell assumed – with good reason – that the reaction could well be severe and disproportionate. In a February 27, 2003 internal Dell document, for example, it was assumed that "aggressive" purchases by Dell from AMD could result in "[r]etaliatory [rebate] reductions [by Intel that] could be severe and prolonged with impact to all LOBs [lines of business]." Another Dell document from March 2003 concluded that "[a]nticipated Intel response wipes out all potential opinc [operating income] upside from going with AMD."

74.     Moreover, Intel did not hesitate to threaten severe punishment for OEMs which marketed AMD in ways that Intel disapproved. Even large and powerful firms, such as IBM, took those threats very seriously. In 2003, for example, one IBM executive expressed doubts

about the advisability of a proposed deal with AMD which would involve IBM marketing assistance, because Intel retaliation could severely damage IBM's multi-billion dollar business in low-end, industry standard servers, its "x-series" line: "It became clear to me that if we did all that on the marketing side [for AMD], Intel would kill our x-Series business." Later, in 2005, a senior IBM executive faced a similar issue: Key IBM customers wanted IBM to expand its line of AMD products, but a negative Intel reaction would put IBM in a "very difficult spot." The executive wrote: "I understand the point about the accounts wanting a full AMD portfolio. The question is, can we afford to accept the wrath of Intel...? It is a very hard question to deal with."

75. Intel repeatedly used such threats to drastically raise the risks and costs of any OEM engagement with AMD. The choices the OEMs faced were skewed by Intel's willingness to use its monopoly power to retaliate against them, and their ability to use AMD products to lower their own costs and to satisfy consumer demand was held in check by their fear that Intel would strike back if they went too far. In a May 2006 "Strategy Update" document, HP carefully analyzed its relationship with Intel and concluded that the best strategy was to "[m]aintain judicious use of competitive bid situations to lower HP costs ... but not so aggressively as to risk the strategic Itanium relationship," a joint venture with Intel on which HP's future high-end server business depended.

76. The exclusionary agreements which the OEMs entered into with Intel were sometimes for terms of a year, or less. But given the stable, long-term nature of Intel's monopoly power, this did not mean that opportunities for AMD were only temporarily deferred, or that OEMs could effectively reserve freedom of action for themselves at a later date. Nor did it mean that, when new supply opportunities arose at a particular OEM, such "design competitions" could be decided by the OEMs on the merits, without taking account of Intel's monopoly power

and its willingness to use it as a weapon. Rather, while each quarter might have appeared to bring new opportunities for AMD, Intel continually refreshed the range of threats and rewards with which it confronted the OEMs, so that their incentives remained largely constant.

77.     Given these realities, OEMs' frequent choices to collaborate with Intel to restrict opportunities for AMD and consumers were to be expected. Their circumstances were essentially those which economic theorists have described as the "prisoner's dilemma." If *all* of the OEMs had been willing to deal with AMD without Intel-imposed restrictions, the resulting strengthened competition would have benefited them all, as well as consumers, by lowering their microprocessor costs. Nevertheless, there were strong –often overwhelming – incentives for any *individual* OEM to accept the pay-offs – and avoid the punishments – which Intel dealt out. On the one hand, each individual OEM's collaboration with Intel resulted in less competition and higher prices for themselves and for consumers. On the other, however, Intel used the monopoly profits thus preserved to favor complicit OEMs, and punish recalcitrant ones. By complying with Intel's anticompetitive wishes, an OEM could gain substantial rewards, while its competitors, and consumers, suffered most of the consequences.

78.     Now, however, the scheme has come unraveled and been exposed, which is the inevitable fate of such extensive wrongdoing. The defendant directors should never have provided senior management with a free hand to resort to unlawful means to squash a worrisome competitor. The $1.45 billion fine imposed by the European Commission may be just the beginning of the ruinous consequences Intel will suffer because senior executives were reckless and foolhardy, and because the Board which was charged with putting halt to their malfeasance consciously decided to turn a blind eye.

## THE EC INVESTIGATION AND THE RECORD $1.45 BILLION FINE

27

79.     In response to complaints received about potential antitrust violations, on July 12, 2005, antitrust investigators from the European Commission and officials from at least four European countries raided Intel's European offices.

80.     On July 27, 2007, the European Commission issued a press release entitled "Competition: Commission Confirms Sending of Statement of Objections to Intel." The press release stated, in relevant part:

> The European Commission can confirm that it has sent a Statement of Objections (SO) to Intel on 26th July 2007. The SO outlines the Commission's preliminary view that Intel has infringed the EC Treaty rules on abuse of a dominant position (Article 82) with the aim of excluding its main rival, AMD, from the x86 Computer Processing Unites (CPU) market.
>
> In the SO, the Commission outlines its preliminary conclusion that Intel has engaged in three types of abuse of a dominant market position. First, Intel has provided substantial rebates to various Original Equipment Manufacturers (OEMs) conditional on them obtaining all or the great majority of their CPU requirements from Intel. Secondly, in a number of instances, Intel made payments in order to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based CPU. Thirdly, in the context of bids against AMD-based products for strategic customers in the server segment of the market, Intel has offered CPU s on average below cost.
>
> These three types of conduct are aimed at excluding AMD, Intel's main rival, from the market. Each of them is provisionally considered to constitute an abuse of a dominant position in its own right. However, the Commission also considers at this stage of its analysis that the three types of conduct reinforce each other and are part of a single overall anti-competitive strategy.

81.     On February 12, 2008, Bloomberg.com reported that the European Union regulators, in furtherance of their antitrust probe, raided Intel's offices in Munich and computer retailers in the United Kingdom and Germany.  Specifically, the officials inspected the offices of Media Markt, DSG International Plc in the United Kingdom and France's PPR SA. The raids targeted' "Intel's possible links with computer retailers."  The regulator stated that "it has reason

to believe that the companies may have violated EU rules on restrictive business practices, abuse of a dominant market position, or both."

82.    On December 19, 2008, the Commission sent Intel a letter drawing Intel's attention to a number of specific items of evidence relating to the Commission's existing objections which the Commission indicated it might use in a potential final Decision. The Commission set a deadline of January 19, 2009 for Intel to provide comments on these items. That deadline was extended to January 23, 2009.

83.    Intel failed to reply to the Commission's letter of December 19, 2008 by the extended deadline of January 23, 2009. This was confirmed by Intel's counsel on January 27, 2009, after the Commission had asked Intel about the matter. Intel did not provide reasons for its failure to reply by the extended deadline.

84.    On February 2, 2009, the Commission informed Intel by letter that the Commission services had decided not to grant any further extension of the deadlines to reply to the 17 July 2008 SSO or to the Commission letter of December 19, 2008, as such an extension would not be justified given that Intel had had ample opportunity to submit such replies within the deadlines and had chosen not to do so.

85.    On February 5, 2009 Intel belatedly made a submission to the Commission in its defense. Although the Commission was not bound to consider this submission due to Intel's lack of cooperation, it nonetheless did so.  (EC Dec. pp. 34-35, ¶¶ 96-97).

86.    On May 13, 2009, the EC announced it was fining Intel €1.06 billion, the equivalent of $1.45 billion. Competition Commissioner Neelie Kroes said in connection with the announcement: "Intel has harmed millions of European consumers *by deliberately acting to keep*

*competitors out of the market for computer chips for many years.* Such a serious and sustained

violation of the EU's antitrust rules cannot be tolerated."

87.    The May 13, 2009 press release detailed the EC findings as follows:

The European Commission has imposed a fine of €1 060 000 000 on Intel Corporation for violating EC Treaty antitrust rules on the abuse of a dominant market position (Article 82) by engaging in illegal anticompetitive practices to exclude competitors from the market for computer chips called x86 central processing units (CPUs). The Commission has also ordered Intel to cease the illegal practices immediately to the extent that they are still ongoing. Throughout the period October 2002-December 2007, Intel had a dominant position in the worldwide x86 CPU market (at least 70% market share). The Commission found that Intel engaged in two specific forms of illegal practice. First, Intel gave wholly or partially hidden rebates to computer manufacturers on condition that they bought all, or almost all, their x86 CPUs from Intel. Intel also made direct payments to a major retailer on condition it stock only computers with Intel x86 CPUs. Such rebates and payments effectively prevented customers - and ultimately consumers - from choosing alternative products. Second, Intel made direct payments to computer manufacturers to halt or delay the launch of specific products containing competitors' x86 CPUs and to limit the sales channels available to these products. The Commission found that these practices constituted abuses of Intel's dominant position on the x86 CPU market that harmed consumers throughout the EEA. By undermining its competitors' ability to compete on the merits of their products, Intel's actions undermined competition and innovation. The Commission will actively monitor Intel's compliance with this decision. The world market for x86 CPUs is currently worth approximately €22 billion (US$ 30 billion) per year, with Europe accounting for approximately 30% of that.

***

The computer manufacturers concerned by Intel's conduct in the Commission's decision are: Acer, Dell, HP, Lenovo and NEC. The retailer concerned is Media Saturn Holding, owner of the MediaMarkt chain

Conditional rebates and payments

Intel awarded major computer manufacturers rebates on condition that they purchased all or almost all of their supplies, at least in certain defined segments, from Intel:

• Intel gave rebates to computer manufacturer A from December 2002 to December 2005 conditional on this manufacturer purchasing exclusively Intel CPUs

- Intel gave rebates to computer manufacturer B from November 2002 to May 2005 conditional on this manufacturer purchasing no less than 95% of its CPU needs for its business desktop computers from Intel (the remaining 5% that computer manufacturer B could purchase from rival chip maker AMD was then subject to further restrictive conditions set out below)

- Intel gave rebates to computer manufacturer C from October 2002 to November 2005 conditional on this manufacturer purchasing no less than 80% of its CPU needs for its desktop and notebook computers from Intel

- Intel gave rebates to computer manufacturer D in 2007 conditional on this manufacturer purchasing its CPU needs for its notebook computers exclusively from Intel.

Furthermore, Intel made payments to major retailer Media Saturn Holding from October 2002 to December 2007 on condition that it exclusively sold Intel-based PCs in all countries in which Media Saturn Holding is active.

Certain rebates can lead to lower prices for consumers. However, where a company is in a dominant position on a market, rebates that are conditional on buying less of a rival's products, or not buying them at all, are abusive according to settled case-law of the Community Courts unless the dominant company can put forward specific reasons to justify their application in the individual case.

In its decision, the Commission does not object to rebates in themselves but to the conditions Intel attached to those rebates. Because computer manufacturers are dependent on Intel for a majority of their x86 CPU supplies, only a limited part of a computer manufacturer's x86 CPU requirements is open to competition at any given time.

Intel structured its pricing policy to ensure that a computer manufacturer which opted to buy AMD CPUs for that part of its needs that was open to competition would consequently lose the rebate (or a large part of it) that Intel provided for the much greater part of its needs for which the computer manufacturer had no choice but to buy from Intel. The computer manufacturer would therefore have to pay Intel a higher price for each of the units supplied for which the computer manufacturer had no alternative but to buy from Intel. In other words, should a computer manufacturer fail to purchase virtually all its x86 CPU requirements from Intel, it would forego the possibility of obtaining a significant rebate on any of its very high volumes of Intel purchases.

Moreover, in order to be able to compete with the Intel rebates, for the part of the computer manufacturers' supplies that was up for grabs, a competitor that was just as efficient as Intel would have had to offer a price for its CPUs lower than its costs of producing those CPUs, even if the average price of its CPUs was lower than that of Intel.

31

For example, rival chip manufacturer AMD offered one million free CPUs to one particular computer manufacturer. If the computer manufacturer had accepted all of these, it would have lost Intel's rebate on its many millions of remaining CPU purchases, and would have been worse off overall simply for having accepted this highly competitive offer. In the end, the computer manufacturer took only 160,000 CPUs for free.

As a result of Intel's rebates, the ability of rival manufacturers to compete and innovate was impaired, and this led to reduced choice for consumers.

Rebates such as those applied by Intel are recognised in many jurisdictions around the world as anti-competitive and unlawful because the effect in practice is to deny consumers a choice of products.

Payments to prevent sales of specific rival products

Intel also interfered directly in the relations between computer manufacturers and AMD. Intel awarded computer manufacturers payments - unrelated to any particular purchases from Intel - on condition that these computer manufacturers postponed or cancelled the launch of specific AMD-based products and/or put restrictions on the distribution of specific AMD-based products. The Commission found that these payments had the potential effect of preventing products for which there was a consumer demand from coming to the market. The Commission found the following specific cases:

- For the 5% of computer manufacturer B's business that was not subject to the conditional rebate outlined above, Intel made further payments to computer manufacturer B provided that this manufacturer :

- sold AMD-based business desktops only to small and medium enterprises

- sold AMD-based business desktops only via direct distribution channels (as opposed to through distributors) and

- postponed the launch of its first AMD-based business desktop in Europe by 6 months.

- Intel made payments to computer manufacturer E provided that this manufacturer postponed the launch of an AMD-based notebook from September 2003 to January 2004.

- Before the conditional rebate to computer manufacturer D outlined above, Intel made payments to this manufacturer provided that it postponed the launch of AMD-based notebooks from September 2006 to the end of 2006.

The Commission obtained proof of the existence of many of the conditions found to be illegal in the antitrust decision even though they were not made explicit in

Intel's contracts. Such proof is based on a broad range of contemporaneous evidence such as e-mails obtained inter alia from unannounced on-site inspections, in responses to formal requests for information and in a number of formal statements made to the Commission by the other companies concerned. In addition, there is evidence that Intel had sought to conceal the conditions associated with its payments.

x86 CPUs are the main hardware component of a computer. The decision contains a broad range of contemporaneous evidence that shows that AMD, essentially Intel's only competitor in the market, was generally perceived, by computer manufacturers and by Intel itself, to have improved its product range, to be a viable competitor, and to be a growing competitive threat. The decision finds that Intel's practices did not constitute competition on the merits of the respective Intel and AMD products, but rather were part of a strategy designed to exploit Intel's existing entrenched position in the market.

88.     Publication of the text of the EC's decision was thereafter delayed for many months to accommodate Intel's request for redaction of inculpatory evidence relating to the identities of individual Intel senior executives and others. Indeed, once the EC decision was released to the public in September 2009, it was replete with references to senior executive involvement. For example: (a) three Intel executives, including a senior executive, confirmed to Hewlett-Packard that business agreements contained secret, unwritten elements;[7] and (b) in an e-mail circulated by an Intel senior executive concerning Dell's announcement that it would not use AMD chips, Dell was referred to as "the best friend money can buy".[8]

89.     Although Intel executives disingenuously claimed that it was unaware that the activities uncovered by the EC were unlawful, the EC stated:

The legal underpinning of the Commission's case is based on    a    consistent pattern of Court jurisprudence, including Case 85/76 *Hoffmann-La Roche v Commission*, Case T-203/01 *Michelin v Commission*, Case C-95/04 *British Airways v Commission*, Joined Cases T-24/93 and others, *Compagnie Maritime Belge v Commission*, and Case T-228/97, *Irish Sugar*.

---

[7]  EC Dec. p. 54, ¶ 169. *See also id.*, ¶ 170.
[8]  EC Dec. p. 71, ¶ 240.

90.     Intel's senior management would have been aware of this type of misconduct due to its direct participation and otherwise, as would Intel's Board of Directors through ECOC Reports and through their access to the non-public evidentiary record, and other systems employed at Intel to detect potential violations of law.   Nonetheless, and in bad faith, they permitted such activities so as to further short-term and short-sighted financial goals.

### ACTION BY THE NEW YORK STATE ATTORNEY GENERAL

91.     On November 4, 2009, an action against Intel was filed in this District by the Attorney General for the State of New York (the "NYAG Action"), alleging antitrust violations similar to those alleged by AMD,[9] and seeking treble damages for the State of New York and certain "assignor OEMs" who have authorized New York to pursue claims.

92.     The NYAG Action was brought after a lengthy investigation.   The NYAG Complaint asserts vast factual support for a wide-ranging scheme to violate the antitrust laws, involving Intel's relationships with Dell, Hewlett-Packard, IBM and others.

93.     Among other things, the NYAG alleges: "Intel, as it had done before when faced with a threat by AMD, decided to bribe and threaten Dell to induce it to remain exclusive.", and that:

> In September 2003, Intel's then Chairman and CEO Craig Barrett met with Michael Dell to address the basic relationship between the companies. He reported back to his Intel colleagues that he and Michael Dell "shook hands on the deal. MD [Michael Dell] agreed to quarterly mtgs ... to make sure we are aligned in our strategic issues and coordinated in spending the monies. He had no issue with the win/win nature of the agreement. *I clearly committed our long range support regardless of competition* ... Nice work you guys!" (Emphasis in original).[10]

---

[9]   The factual allegations contained in *In re Intel Corp. Microprocessor Antitrust Lit.,* MDL No. 05-1717-JJF (D. Del) (the "AMD Litigation") are incorporated herein by reference.
[10]   NYAG Cplt., ¶¶ 99-100.

94.    Later, in 2006, when Dell tried to throw off the restraints imposed by Intel so it

could carry AMD-based products:

> In September 2003, Intel's then Chairman and CEO Craig Barrett met with
> Michael Dell to address the basic relationship between the companies. He
> reported back to his Intel colleagues that he and Michael Dell "shook hands on the
> deal. MD [Michael Dell] agreed to quarterly mtgs ... to make sure we are aligned
> in our strategic issues and coordinated in spending the monies. He had no issue
> with the win/win nature of the agreement. I clearly committed our long range
> support    regardless    of    competition    ...    Nice    work    you    guys!"
> (Emphasis added).The reaction of Craig Barrett, Intel's Board Chairman, was
> unequivocal: Dell should immediately be deprived of the payments it had long
> enjoyed in return for its willingness not to offer AMD products, and should start
> paying "list prices." Barrett told Ottelini: "[T]hey have just signaled they are only
> interested in being a transaction based customer. I think you should reply in kind.
> Not a time for weakness on our part. Stop writing checks immediately and put
> them back on list prices asap." (Emphasis added).
> ***
> The direction Otellini gave his subordinates the next day was consistent with
> Barrett's advice. Intel should make clear to Dell that if Dell offered any AMD
> products all of the "mcp" payments Dell received from Intel would be at risk –
> just as Dell had always feared: "[W]e should be [pre]pared to remove all mcp and
> related programs. Post haste... then we ought to enter negotiations ..."[11]

95.    Otellini was, according to the NYAG, similarly personally involved with

enforcing exclusive arrangements with Hewlett-Packard:

> [A] top HP executive reported back from a conversation with Intel's then-
> COO Paul Otellini concerning Intel's reaction to the news that HP was
> considering launching an AMD-based PC directed at commercial customers: "I
> talked to Paul Otellini last night [who asked whether] we have a transactional
> relationship    or    a    partnership?    If    we    go    with    AMD    on    the
> commercial desktop, Intel equates this to a transactional relationship, and
> therefore we are foregoing the benefits of price pull-forwards [pricing
> concessions] to level the direct/indirect playing field."

96.    The NYAG Complaint reflects information that has been available to Intel senior

management and the Board for many years.   Nonetheless, they turned a blind eye to this

information, in bad faith disregard of their fiduciary obligations.

---

[11] NYAG Cplt.  ¶¶ 142-43.  *See also* ¶¶ 132-39, as to Otellini's direct involvement with the Dell
agreements, and ¶¶ 216, 237-38, as to Otellini's personal involvement with IBM.

## THE DEMAND REQUIREMENT HAS BEEN SATISFIED

### THE JUNE 2008 DEMAND IS MADE UPON THE BOARD

97.     Prolonged efforts to obtain action from the Intel Board of Directors to redress harm done to Intel have proved fruitless. Such efforts commenced in June 2008, almost 18 months prior to the filing of this Complaint, and have been met with an obstinate refusal by the Intel Board, which has: (a) refused to appoint an independent committee of directors empowered to review the charges and take remedial action; (b) refused outright *to perform any investigation at all*; (c) asked the Audit Committee of the Board to "respond" to the demand, with full knowledge that in previous litigation involving many of these same matters a majority of the Audit Committee members (without any investigation) informed this Court that they had already concluded that the underlying claims exhibited an "utter lack of merit"; (d) have attempted to run out the statute of limitations so that no claims could ever be personally asserted against them or anyone else; and (e) refused to enter into tolling agreements in the hope that the limitations period would indeed run out, whereas fiduciaries acting in good faith would enter into such agreements so that meritorious claims could be preserved. In sum, the Board members have not acted independently with regard to the shareholder demands, but rather have responded as would guilty parties seeking to evade responsibility. Thus, Plaintiffs have made all possible efforts to obtain action prior to initiating this suit, as required under Fed. R. Civ. P. 23.1, and Delaware law.

98.     Intel shareholder Annette Villari, by and through counsel in this action, made the initial demand upon the Board. Long time Intel shareholder and Plaintiff herein Charles A. Gilman, joined in that demand later, incorporating and adopting all demand-related communications made previously by Ms. Villari.

36

99.     The initial demand letter, by Ms. Villari, was sent on June 12, 2008.[12]  The letter

outlined the long history of accusations of antitrust violations by Intel executives and demanded

that the Board:

> thoroughly investigate all of these allegations, and bring legal action to protect the
> Company and its shareholders, including actions for breach of fiduciary duty,
> unjust enrichment and other available causes of action. The potential defendants
> include not only executives but Board members who have not conscientiously
> worked to ensure that Intel conducted its business solely through lawful means.
> The Board should also investigate and evaluate any ongoing activities that may
> violate the antritrust laws, as such conduct could expose Intel to greater scrutiny
> and harm than it already faces from past activities including, but not limited to,
> governmental enforcement actions, competitor lawsuits, and treble damage
> penalties.

> We ask finally that the Board review its own actions and those of its members
> concerning the manner in which they did or did not appropriately discharge their
> fiduciary duties with respect to the underlying claims.

## THE INTEL BOARD RESPONDS WITH HOSTILITY TO THE DEMAND AND TO THE "DEMAND FUTILITY' CLAIMS ASSERTED BY AN UNRELATED SHAREHOLDER

100.    At the same time the Intel Directors were purportedly evaluating the demand

letter, they were making assertions in a "demand futility" shareholder's derivative action pending

in this Court that are germane to the question of the Board's good faith, fair mindedness, and

independence.

101.    On February 12, 2008, several months prior to service of the initial demand, Intel

shareholder Martin Smilow ("Smilow") commenced a shareholder's derivative action in the

District of Delaware, seeking to hold present and former Board members liable for some of the

same violations referenced in the demand letter.  The legal basis for Smilow's claim was

primarily an alleged breach by the Intel directors of their duty of corporate oversight.  On August

---

[12]  A copy of this letter is attached hereto as Exhibit A.  A Supplemental letter dated June 8, 2009
is attached hereto as Exhibit B.

7, 2008, Smilow amended his complaint, essentially continuing the same allegations. The *Smilow* amended complaint asserted that Intel had suffered millions of dollars in damages, and likely would be additionally damaged as a result of pending proceedings against it.

102.     Well prior to the filing of the *Smilow* action and the delivery of the initial demand letter, Intel had been engaged with its competitor AMD in litigation over alleged antitrust violations similar to some of those referenced above. AMD filed its complaint against Intel and a foreign subsidiary of Intel on June 27, 2005. The AMD action is scheduled for trial in the spring of 2010 and, by Intel's reckoning, has involved the production and review of hundreds of millions of documents, and the examination of thousands of commercial transactions.[13]     In addition, on July 27, 2007, the European Commission (the "EC") served upon Intel a Statement of Objections containing its "preliminary conclusion that Intel has engaged in three types of abuse of a dominant market position." Intel, at that point, began preparing its formal defense to these assertions.

103.     The Intel Board of Directors, and its Audit Committee, are presumed to have fulfilled their duty to be well-informed concerning these serious matters, including: gaining a fair understanding of the allegations made; evaluating the force of the evidence supporting the contentions; and assessing the risks to Intel of both the treble damages private action, and EC regulatory proceedings. Delaware law requires that corporations such as Intel have systems in place to provide this type of quantitative and qualitative information to the Board so that it may

---

[13] *See* Intel's Motion, Pursuant to Rules 16 and 56, For a Pretrial Conference to Seek the Court's Determination of Key Issues of Law that Will Govern Completion of Preparation and Trial, dated May 8, 2009, p. 4, filed in *In re Intel Corp. Microprocessor Antitrust Lit.,* MDL No. 05-1717-JJF (D. Del).

exercise oversight and control over important litigative and regulatory threats.[14]     There is no reason to believe these systems failed during the relevant period.

104.    On September 5, 2008, the *Smilow* defendants moved to dismiss the amended complaint. The movants included three of the five members of the Intel Audit Committee: Jane E. Shaw, Susan Decker, and David S. Pottruck. Among other things, these defendants argued that numerous events and public allegations--beginning in 1987 and continuing through the spring of 2004--served to bar the *Smilow* case under Delaware's three year statute of limitations for actions sounding in breach of fiduciary duty.[15]    The defendants, while asserting that the allegations exhibited an "utter lack of merit," nonetheless maintained that demand on the Board of Directors would not be futile.[16]

105.    On September 25, 2008 and November 3, 2008, the Audit Committee requested that the first demand shareholder, a non-insider, provide facts or information in support of the demand.    This request was a bad faith delaying tactic:   the Board knew that an outside shareholder could supply no facts that would not *already be known* to the Intel Board by dint of the AMD Litigation, the proceedings initiated by the European Commission, the Request for Judicial Notice submitted in *Smilow,* and other proceedings brought by regulators in South Korea and Japan.

---

[14]  *See e.g., In re Citigroup Inc. S'holder Derivative Litig.,* 964 A.2d 106, 131 (Del. Ch. 2009)("Directors should, *indeed must under Delaware law,* ensure that reasonable information and reporting systems exist that would put them on notice of fraudulent or criminal conduct within the company. Such oversight programs allow directors to intervene and prevent frauds or other wrongdoing that could expose the company to risk of loss as a result of such conduct.")(emphasis supplied).

[15]  *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Consolidated Complaint or, in the Alternative, to Stay this Action, dated September 5, 2008, pp. 21-23, filed in *In re Intel Corp. Derivative Lit.,*C.A. No. 08 CV 93 (JJF) (D. Del.).

[16]  *Id.* at 2. The *Smilow* action was ultimately dismissed for failure to make pre-suit demand. *In re Intel Corp. Derivative Litig.,* 621 F. Supp. 2d 165 (D. Del. 2009).

Case 1:09-cv-00867-JJF  Document 1  Filed 11/13/09  Page 40 of 49 PageID #: 40

106.    On January 29, 2009, the Audit Committee wrote a letter to Plaintiff's counsel setting forth five reasons supporting its recommendation to the Intel Board that it "defer any determination regarding the demand." These five reasons may be summarized as follows: (1) the demand is premature as the matters raised are the subject of contentious litigation, and Intel could "benefit" from a judicial resolution of these questions; (2) despite years of litigation, the "factual records" in the underlying matters were not fully developed, and the Company could benefit from a fuller factual record; (3) any action taken by Intel against any alleged wrongdoers could expose Intel to liability; (4) action taken on the demand could have an unspecified adverse effect on Intel's business; and (5) action by Intel against any alleged wrongdoers could trigger large indemnity obligations.

107.    These excuses to do nothing were put forward in bad faith and demonstrate the Board's lack of independence. Arguments like these could be made in every case of corporate wrongdoing in which a shareholder has made a demand, as justification for looking the other way, and taking no remedial action. Indeed, it is the view of Intel's Board (but not the view of the Delaware courts) that the more serious the wrongdoing, the less of a duty the Board has to investigate it, remediate it, and call the wrongdoers to account.

108.    The excuses provided by the Intel Board for failing even to investigate the demand are specious for the following reasons:

### 1.    Prematurity.

The Board's *prematurity* argument was made contemporaneously with court arguments by a majority of directors (including a majority of the members of the Committee) in the *Smilow* case that any corporate action is already time-barred and *too late.* These two arguments are in conflict. As the Intel Board has taken the position that the limitations periods are actively

running on all or some of the underlying claims, it is estopped from arguing prematurity, especially as to the EU matter, where a $1.45 billion fine has already been imposed. Nor was evaluation of relating the litigation of claims with AMD "premature" as the Board had enough information to negotiate with AMD and resolve that action for a $1.25 billion payment.

### 2.   Need for a Clearer Factual Record

The Board claimed that the "factual records" in the underlying matters were not fully developed, and the Company could benefit from a fuller factual record. This argument is a variation on the first argument as to prematurity. The factual record in the EC matter is closed. The factual record in the AMD Litigation is also closed. In any event, lack of judicial resolution or lack of a full factual record are matters that could be raised by any Baord in serious legal trouble as a reason not to investigate a demand. It is clear that an abundant factual record exists, and has existed, for quite some time.

### 3.   Action By the Company Could Expose Intel to Liability

This argument is unfounded, as the derivative liability of any individual defendant to re-pay Intel, flows from corporate fines, damages, or penalties incurred in litigation *prosecuted by others*. Thus, preserving the claims asserted herein and prosecuting them essentially as "claims over" cannot *increase* Intel's liability—rather, recoveries from the individual defendants (and/or their insurers) can only *decrease* Intel's liability. There is nothing novel or extraordinary about pursuing claims against contingently liable parties: this is done all the time in federal and state court so that the defendant/claimant's exposure can be limited, not expanded. In addition, there is no possible excuse for the Intel Board to ignore or defer demands that were made for corporate governance reforms to prevent a recurrence of these types of schemes. This type of therapeutic corporate action certainly cannot enhance Intel's exposure to liability. Moreover, to the extent the Board believes the Company can never bring action to protect its interests directly (or cannot

do so in a timely manner), its best course would be to step aside and allow the corporate claims to be pursued derivatively. A decision that valuable claims should never be pursued by anyone due to the seriousness of the underlying allegations would not be a reasonable decision, and would tend to bring the demand process into disrepute. As it appears to be the Board's ultimate conclusion (unreasonable as it may be) that the nature of pending litigation precludes any Board-level investigation, review, or remedial action, the Board should concede (as is the case) that demand has been denied due to Board's interest, bias, or incapacity to act in Intel's best interests.

## 4. Action on the Demand Could Have an Adverse Effect on Business

This purported reason not to act is unfounded as well. Any demand for investigation or corporate action will involve some degree of corporate expense and disruption, but if this were enough to justify a refusal to act on a demand, then no demand would ever be addressed by any Board.

## 5. Indemnification Expenses

Any action undertaken by a corporation against an officer or director may trigger indemnification expense. The fact that litigation against fiduciaries who violate the law may be involve cost is plainly an inadequate cause to refuse to investigate a demand. This boilerplate objection can be invoked in response to any demand for shareholder action, and is certainly no reason in this case to turn a blind eye to individual wrongdoing.

108. Although derivative counsel were not in agreement with the excuses provided in the January 29, 2009 letter, action was deferred to await judicial or administrative resolution of one or more of the serious matters pending against Intel.

109. On May 13, 2009, the EC announced it was imposing a staggering €1.06 billion penalty on Intel (approximately $1.45 billion), the largest fine ever imposed by that body.

42

110.   On June 8, 2009, derivative counsel wrote to the Intel Board, expressing the view that further deferral of action on the demand was unwarranted in light of the EC decision. Counsel asked that the Committee take prompt action to protect the corporation, including determining individual liability and initiating appropriate lawsuits, and evaluating the effectiveness of Intel's corporate governance systems, so as to determine the types of corporate governance improvements sorely needed by Intel.

111.   On July 29, 2009, derivative counsel submitted a letter to the Board expressing concern over the previous invocation of a statute of limitations defense in *Smilow*, and urging immediate action to protect the Company's rights against lapse due to passage of time. Derivative counsel accordingly requested that the Committee obtain "tolling agreements from all Board members and all senior members of management during the relevant period so that all major claims may be preserved."

112.   The request for tolling agreements has been ignored, as Board members attempt to escape personal liability by "running down the clock."

113.   On August 27, 2009, derivative counsel met with counsel for the Board to again urge action, including adoption of 14 different types of remedial measures that must be employed now to protect Intel from further harm. Subsequent to this meeting, the Board has taken no action, and none is ever expected, as the Board members are hostile, biased, and have demonstrated a lack of independence.

## Independence of the Intel Audit Committee

114.   After demand was made the matter was referred to the Audit Committee (the "Committee") for review, although the Committee was never granted power to bring claims, or act independently of the entire Board (including CEO Otellini).

43

115. The Board knew that the Committee was not independent, and would render no independent recommendations.

116. Under Delaware law, a Board or Board committee that appears *ab initio* to be independent may lose that presumption if, following a demand, it fails to act in a disinterested manner.

117. On September 5, 2008, less than four months after receiving the initial demand letter from derivative counsel, the Intel director defendants (including Audit Committee Chairman Shaw and two other present Audit Committee members) stated in the motion to dismiss brief in *Smilow* that the allegations exhibited an "*utter lack of merit*," that the allegations created only the "*illusion* of a lengthy pattern of wrongdoing," and that they could not be sued due to the expiration of the applicable statute of limitations. The shareholder demand here concerns some of the same matters raised in *Smilow.*

118. The assertions in *Smilow* by a majority of the members of the Audit Committee that the claims of antitrust violations were meritless and illusory were (as evidenced by the Committee's later letter of January 29, 2009) made without due investigation, and at a time when the pertinent facts were "not yet fully developed."

119. By its very words and actions, the Audit Committee demonstrated, after receipt of a shareholder demand, that it is was not disinterested concerning that demand, and had indeed pre-judged its merits without due investigation, or the benefit of a fully developed factual record. Indeed, it is abundantly evident that the "outside" directors were taking direction from senior management as to how they should view the propriety of their actions. This "one for all, and all for one" approach is inconsistent with directorial disinterest and independence of mind.

44

### FIRST CAUSE OF ACTION

### (Breach of the Fiduciary Duty of Loyalty as to Active Misconduct Claims)

120.    Plaintiff incorporates by reference all previous allegations.

121.    This Cause of Action relates only to the Active Misconduct Claims and is brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, and Decker.

122.    During the period from in or about 2001 through 2007, Intel's executives allegedly engaged in active violations of the European, Japanese, South Korean and United States antitrust laws, and the Board of Directors failed in bad faith to rein in, ameliorate or countermand such misconduct, or to ensure cooperation with regulatory authorities.

123.    As a result of the foregoing conscious disregard of defendants' fiduciary duties, Intel has suffered fines and payments, and may be forced to pay more in fines, settlements and verdicts, including possible treble damages.

124.    Defendants are liable for any damages incurred by Intel as a result of their wrongful misconduct.

### SECOND CAUSE OF ACTION

### (Breach of the Fiduciary Duty of Loyalty as to EC Regulatory Claims)

125.    Plaintiff incorporates by reference all previous allegations.

126.    These claims are brought against those persons who were officers and/or directors during the period from which the EC began investigating Intel's conduct in Europe through the imposition of the record fine in May 2009. During this period, the relevant defendants failed to ensure that full and complete cooperation was provided to regulatory authorities; failed to hold accountable any person who engaged in unlawful misconduct; failed to take necessary remedial

actions; and failed to work with the EC on remedies or resolutions of the charges which would have reduced or even eliminated the EC fine. Such claims are brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, Decker and Bartz.

127.   Defendants are liable for any damages incurred by Intel as a result of their wrongful misconduct.

## THIRD CAUSE OF ACTION

### (Breach of the Fiduciary Duty of Loyalty as to Failure to Take Remedial Measures)

128.   Plaintiff incorporates by reference all previous allegations.

129.   These claims are brought against those persons who are presently Intel directors and who are consciously and in bad faith refusing to thoroughly investigate and address executive wrongdoing; are attempting to stymie and defeat legitimate claims against directors and officers through efforts to cause such claims to lapse by dint of the statute of limitations; and who have failed in bad faith to enact necessary therapeutic and remedial measures.

130.   Defendants herein have failed to enact crucial remedial measures including: (a) devoting greater resources to targeted compliance activities; (b) affording enhanced independence to compliance personnel; (c) implementing antitrust audit risk and training programs which proceed from an "acquiescence standpoint"; (d) conducting a full antitrust compliance program audit to ensure efficacy; (e) reviewing, implementing, or strengthening domestic and international "whistle-blower" protections; (f) increasing reliance on outside compliance experts; (g) creating or expanding the role of governmental liaison officers; (h) creating an ombudsman charged with receiving and evaluating OEM or retailer complaints of coercive practices; (i) reviewing and strengthening compliance with procedures relating to employee certifications that their actions have complied with applicable laws; (j) enhancing and

applying sanctions for non-compliance with corporate ethics and legal compliance rules; (k) reviewing and enforcing proper contracting procedures; (l) reviewing and strengthening internal reporting channels; (m) conducting an independent review of the function and efficacy of the ECOC; and (n) reviewing, revising and strengthening "crisis management" procedures.

131.    Defendants' actions and refusals to act as detailed herein are in bad faith. They have caused and will cause damages to Intel.

132.    Defendants are liable for any damages incurred by Intel, and which will be incurred by Intel, as a result of their wrongful misconduct.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Requiring the Defendants named in the Third Cause of Action herein to enact and implement the remedial, corporate governance and audit procedures as set forth in that Cause of Action;

C.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

    D.    Granting such other and further relief as the Court deems just and proper.

Dated:  Wilmington, Delaware
        November 13, 2009

BIGGS AND BATTAGLIA

BY:

Robert D. Goldberg (ID #631)
Biggs and Battaglia
921 North Orange Street
Wilmington, DE 19899
(302) 655-9677
Attorneys for Plaintiff

**OF COUNSEL**

Roy L. Jacobs
**ROY JACOBS & ASSOCIATES**
60 East 42nd Street, 46th Floor
New York, NY 10165
212-867-1156

Laurence D. Paskowitz
**PASKOWITZ & ASSOCIATES**
60 East 42nd Street—Suite 4600
New York, NY 10165
212-685-0969

## **VERIFICATION**

Charles A. Gilman, under pain and penalty of perjury under the laws of the United States, avers that as plaintiff herein he verifies that he has reviewed the foregoing Shareholder's Demand-Made Derivative Complaint, and that the allegations are true and correct to the best of his information, knowledge and belief.

Dated: November 12, 2009

Charles A. Gilman