IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------x
                                                                        :
In re Intel Corp. Derivative Litig.                                     : C.A. No. 09-cv-867 (JJF)
                                                                        :
------------------------------------------------------------------------x

**SHAREHOLDERS' DEMAND-MADE CONSOLIDATED DERIVATIVE COMPLAINT**

Plaintiffs, through their undersigned attorneys, allege as follows on information and

belief, except as to those matters that are personal to Plaintiffs, which are alleged on personal

knowledge:

**NATURE OF THE ACTION**

1.      This derivative action is brought by plaintiffs, the Louisiana Municipal Police

Employees' Retirement System ("MPERS") and Charles A. Gilman ("Gilman") (collectively,

"Plaintiffs"), who are, respectively, an institutional and an individual shareholder of nominal

defendant Intel Corp. ("Intel" or the "Company").  On November 13, 2009, Plaintiff Gilman

filed a derivative action in this Court on behalf of Intel captioned *Gilman v. Otellini, et al.*, No.

09-cv-867 (JJF) (the "*Gilman* Action").  On December 23, 2009, Plaintiff MPERS filed a

derivative action in this Court on behalf of Intel captioned *Louisiana Municipal Police*

*Employees' Retirement System v. Otellini, et al.*, No. 09-cv-993 (JJF) (the "*MPERS* Action").  By

this Court's Order dated January 15, 2009, the *Gilman* Action and the *MPERS* Action were

consolidated for all purposes pursuant to Federal Rule of Civil Procedure 42(a).

2.      This consolidated action is necessary to protect Intel and its shareholders from the

conduct of its senior executives in perpetrating a decade-long antitrust scheme, as well as the

conduct of the Company's Board of Directors (the "Board"), which consciously disregarded its

fiduciary duty to rein in that scheme.  That corporate malfeasance has already cost the Company

*billions* of dollars.  For example, on May 13, 2009, the European Commission ("EC") levied a

record $*1.45 billion* fine on the Company ("EC Action").[1]  The EC ruling was the culmination of

many years of investigation involving witness interviews, testimony and documents, some of

which was voluntarily produced, while other evidence was obtained during raids on Intel's

corporate headquarters.  In imposing the largest fine in its history, the EC stated that "Intel has

not convincingly argued or forwarded any convincing evidence showing negligence on its part

*and the EC has found Intel to have engaged in a strategy of exclusion ....*" (emphasis added)[2]

> 3.      Specifically, the EC determined that Intel's executives had:

> engaged in two specific forms of illegal practice.  First, Intel gave wholly or
> partially hidden rebates to computer manufacturers on condition that they bought
> all, or almost all, of their x86 CPUs from Intel.  Intel also made direct payments
> to a major retailer on condition it stock only computers with Intel x86 CPUs.
> Such rebates and payments effectively prevented customers – and ultimately
> consumers – from choosing alternative products.  Second, Intel made direct
> payments to computer manufacturers to halt or delay the launch of specific
> products containing competitors' x86 CPUs and to limit the sales channels
> available to those products.  The EC found that those practices constituted abuses
> of Intel's dominant position on the x86 CPU market that harmed consumers
> throughout the European Economic Area.  By undermining its competitors'
> ability to compete on the merits of their products, Intel's actions undermined
> competition and innovation.[3]

> 4.      The EC Action came in the wake of similar governmental enforcement actions in

Japan and South Korea.  In those cases, however, Intel's officers and directors (sometimes

collectively referred to herein as "Intel's Corporate Fiduciaries") were able to continue their

scheme and avoid public exposure of evidence of their wrongdoing by settling the charges (as in

the case of Japan) or by quickly agreeing to the payment of a relatively small fine (as in the case

---

[1]      The factual allegations and conclusions contained in the May 13, 2009 EC decision, Case
Comp/C-3 /37.990/Intel ("EC Decision"), are incorporated herein by reference.

[2]      EC Decision, at 511, ¶1791 (emphasis added).

[3]      EC press release dated May 13, 2009, available at
http://europa.eu/rapid/pressReleasesAction.do?reference=IP/09/745.

of South Korea).  In contrast, Intel's Corporate Fiduciaries understood that EC regulatory authorities had come into possession of direct and compelling evidence of wrongdoing and were determined to hold them to account.  In fact, the EC Decision contains numerous examples of direct involvement in unlawful activities by Intel's "senior executives," whose exact identities have been redacted from the decision *at Intel's insistence*.  Yet instead of taking immediate remedial action that would have avoided or reduced the Company's subsequent fine, the Board decided to stonewall the investigation, deriding compelling allegations as unfounded.

5.     The costly resolution of the EC Action is by no means the only price that Intel has paid as a result of the unlawful conduct of its senior executives and the Board.  In addition to the massive EC fine, Intel agreed on November 12, 2009, to pay another *$1.25 billion* to settle *In re Intel Corp. Microprocessor Antitrust Lit.,* MDL No. 05-1717-JJF (D. Del), a private antitrust lawsuit brought in 2005 by Intel's main competitor, Advanced Micro Devices, Inc. ("AMD").[4] The AMD Action concerned much of the same anticompetitive conduct that was addressed in the EC proceeding.  Significantly, the AMD settlement also required Intel to alter its cross-licensing agreements with AMD to allow AMD the freedom to produce large quantities of competing CPUs in factories not owned by AMD or an AMD affiliate – an action it was previously prohibited from taking under existing licensing arrangements.

6.     The resolution of the EC Action and the AMD Action, however, does not spell the end of Intel's troubles.  Having taken increased notice of Intel's antitrust activities, regulators in the United States have begun to assert related legal action against Intel.  For example, on

---

[4]     The factual allegations contained in the complaint filed in *Advanced Micro Devices, Inc. and AMD International Sales & Services, Ltd. v. Intel Corp. and Intel Kabushiki* Kaisha, C.A. No. 05-441 (JJF) (D. Del), subsequently consolidated for the purpose of discovery as part of *In re Intel Corp. Microprocessor Antitrust Lit.*, MDL No. 05-1717 (the "AMD Action"), are incorporated herein by reference.

November 4, 2009, the Attorney General of the State of New York filed an action against Intel in this District alleging violations of the Sherman Antitrust Act and New York State antitrust law.[5] Similarly, on December 16, 2009, the United States Federal Trade Commission ("FTC") filed an administrative action alleging that Intel's antitrust scheme violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 4, which prohibits unfair methods of competition and deceptive acts and practices in commerce.[6]

7.      As it pertains to Intel's future business prospects, the FTC Action potentially poses a more serious threat than any proceeding to date.  Rather than monetary damages, the FTC Action seeks to fundamentally restrict the methods by which Intel conducts its business. Indeed, including sub-parts, the FTC's requested relief includes forty-three (43) separate requirements and/or prohibitions to which Intel must conform when conducting future business transactions – including broad requirements to license the Company's intellectual property to direct competitors "upon such terms and conditions as the Commission may order."  As a result, if successful, the FTC Action greatly inhibits Intel's immediate profitability and may even endanger the Company's long-term survival.

8.      With that backdrop of years of running afoul of U.S. and international competition law, Plaintiffs have independently made demands upon the Board to chart a more lawful course for the Company.  Although the Board has for years been in possession of voluminous evidence from the EC Action and the AMD Action (and more recently, facts alleged in the NYAG Action and the FTC Action) – all of which chronicled an antitrust scheme

---

[5]      The factual allegations contained in the complaint filed in *State of New York v. Intel Corp.*, C.A. No. 1:09-cv-00827 (D. Del.) (the "NYAG Action"), are incorporated by reference herein.

[6]      The factual allegations contained in the complaint filed in *In the Matter of Intel Corp.*, Docket No. 9341 (2009) (the "FTC Action"), are incorporated by reference herein.

4

stretching over the past decade, approved and implemented by Intel's most senior executives – it has not acted independently with regard to those demands.  Rather, the Board has responded as would a culpable party seeking to evade responsibility.  The earliest demand on the Board was made more than nineteen (19) months ago.  Despite possessing all the information necessary to provide a meaningful response and its high duty to protect the Company, the Board stonewalled that demand.  By the time Plaintiff MPERS made a virtually identical demand in November 2009 – a week after the NYAG Action commenced and the same day that Intel settled the AMD Action – the Board unquestionably possessed sufficient information to provide an immediate response.  Not surprisingly, however, that demand has been met with the same *de facto* refusal to act.

9.      Indeed, to date the Board's only "action in response to Plaintiffs' demands has been:  (a) to refuse to appoint an independent committee of directors empowered to review the charges and take remedial action; (b) to refuse outright ***to perform any investigation at all***; (c) to ask the Board's Audit Committee to "respond" with full knowledge that, in previous litigation involving many of these same matters, a majority of the Audit Committee members (without any investigation) informed this Court that the underlying claims exhibited an "utter lack of merit";[7] (e) to attempt to run out the statute of limitations so that no claims could ever be personally asserted against individual Board members; (f) to refuse to enter into tolling agreements in the hope that the limitations period would indeed expire, whereas fiduciaries acting in good faith

---

[7]      *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Consolidated Complaint or, in the Alternative, to Stay this Action, dated September 5, 2008, at 21-23, filed in *In re Intel Corp. Derivative Lit.,* C.A. No. 08 CV 93 (JJF) (D. Del.), a case in which shareholder Martin Smilow filed a demand-futility derivative action against Defendants and the Company ("Smilow Action").

would enter into such agreements so that meritorious claims could be preserved; and (g) to claim

that the Board yet again will review Plaintiffs' allegations at a subsequent Board meeting.

10.     Such deliberate inaction contravenes the Board's express responsibility to make

concrete efforts to redress the unlawful conduct that Plaintiffs have identified.  The Board,

directly and through its Audit Committee, is charged with monitoring, investigating, and

remediating any unlawful acts committed by Intel or its executives.  Intel's corporate Code of

Conduct stresses compliance with antitrust laws, and notes that: "[v]iolating antitrust laws is a

serious matter and could place both the company and the individual at risk of substantial criminal

penalties."  Moreover, the Audit Committee's charter describes its general function as follows:

"[t]he purpose of the Audit Committee is to represent and assist the Board of Directors in its

general oversight of the company's accounting and financial reporting processes, audits of the

financial statements, internal control and audit functions, *and compliance with legal and*

*regulatory requirements and ethical standards adopted by the company*."  The Audit Committee

also must "review[] matters related to the corporate compliance activities of the company,

including the review of reports from the company's Ethics and Compliance Oversight

Committee [ECOC] and other related groups."

11.     The ECOC, on a quarterly basis, "invites various organizations within Intel to

assess and report on ethics and compliance in their respective businesses.  Each organization

completes an ethics and compliance self-assessment that covers four major areas:  legal and

regulatory risks and supporting compliance programs*;* ethics and Code of Conduct activities and

tone; internal control environment and activities; and business continuity planning and

preparedness.  Legal and regulatory risk areas are also reviewed against the Federal Sentencing

Guidelines.  The ECOC reviews the self-assessment reports, and provides feedback and recommendations that are tracked to closure."[8]

12.      Through its receipt and review of ECOC reports and other internal mechanisms to detect unlawful corporate conduct, the Board and the Audit Committee would have known of the allegations against Intel made by various private parties and regulatory authorities in several nations.  More importantly, they would have know that the allegations had a strong basis in fact and, therefore, directly threatened Intel with large fines, large private damages awards, and potential non-monetary remedial requirements that would limit Intel's ability to make future profits and that might even imperil the Company's very existence.

13.      Nonetheless, neither the Board nor the Audit Committee called a halt to the unlawful actions of Intel's senior executives.  Instead, its members made common cause with the wrongdoers in seeking to stymie any investigatory or remedial efforts.  The actions of the Board members went far beyond conscious inaction, and even extended to staking out an affirmative position with this Court that the underlying claims were "utterly without merit."  Their misconduct has been further aggravated by attempts in the Smilow Action and this case to spuriously "run out" the statute and/or by foot-dragging and inaction in reaction to shareholder demands.  As demonstrated by allegations in the NYAG Action, such antagonism is no surprise given the growing body of evidence that the antitrust scheme, which spanned three continents and has already led to more than *2.7 billion* in fines and settlements, was personally directed by Intel's CEO Paul S. Otellini ("Otellini") and by the Company's former Board Chairman, Craig R. Barrett ("Barrett").

---

[8]      Intel 2008 Corporate Responsibility Report, at 24.

14.     Going forward, the involvement of Intel's Corporate Fiduciaries in the scheme described herein most assuredly will result in harm to the Company from the recently-filed NYAG Action, the FTC Action, and by dint of consumer class actions pending in this District and other state courts.  In particular, the non-monetary remedies sought by the FTC pose a substantial threat to Intel's ability to build market share in the burgeoning graphics processor unit ("GPU") market.

15.     It is the plain intention of Intel's Corporate Fiduciaries that any damages, settlements, fines, and/or remedial measures will be paid for by Intel's innocent shareholders, and that the individual wrongdoers will completely escape responsibility.  Plaintiffs are pursuing these claims so as not to allow that to happen – and to ensure that necessary corrective actions are taken to prevent a recurrence of this type of activity.

16.     Plaintiffs cannot and should not have to wait any longer to bring this action.  They have made all reasonable efforts to obtain action prior to initiating this suit under Fed. R. Civ. P. 23.1 and Delaware law and have received the same response by the Board:  *de facto* rejection of their demands.[9]  The Board has an obligation to the Plaintiffs and all other Intel shareholders to take action.  In blatant dereliction of its duty, the Board has wrongfully chosen to do nothing.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs and the dispute is between citizens of different states.

---

[9]      *See Grossman v. Johnson*, 674 F.2d 115, 122 (1st Cir. 1982) (stating that when board of directors takes disproportionate amount of time to reply to shareholder demand, court may allow suit to proceed without awaiting formal response); *see also Mills v. Esmark, Inc.*, 91 F.R.D. 70, 73 (N.D. Ill. 1981) ("If the corporation does not respond within a reasonable period of time, the Court may be justified in presuming that the demand was futile and that the shareholder need wait no longer . . . .").

18.     This action also falls under this Court's ancillary jurisdiction, as many of the claims asserted herein are substantially related to claims asserted under the federal antitrust laws in this District Court by the State of New York, and by AMD in the AMD Litigation.

19.     This action is not brought collusively to confer jurisdiction on this Court that it otherwise would lack.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391 because Intel is incorporated in Delaware and because acts and offenses pertinent to the causes of action stated herein were committed in the State of Delaware.

## THE PARTIES

### Plaintiffs

21.     Plaintiff Louisiana Municipal Police Employees' Retirement System ("MPERS") is an institutional shareholder of Intel that currently holds approximately 110,000 shares of Intel common stock and has continuously held Intel shares since at least May 2004.  MPERS will fairly and adequately represent the interests of Intel in this litigation.  MPERS is a citizen of Louisiana.

22.     Plaintiff Charles A. Gilman ("Gilman") is an Intel shareholder and has continuously held Intel shares since at least 1996.  Gilman will fairly and adequately represent the interests of Intel in this litigation.  Gilman is a citizen of Maryland.

### Defendants

23.     Nominal Defendant Intel is a Delaware corporation with its principal executive offices in Santa Clara, California.  It conducts business both directly and through wholly-owned and dominated subsidiaries worldwide.  Intel and its subsidiaries design, produce, and sell a variety of microprocessors, flash memory devices, and silicon-based products for use in the

9

computer and communications industries worldwide.  Intel is a citizen of Delaware and California.

24.     Defendant Otellini is presently Intel's President and Chief Executive Officer, and a member of its Board of Directors.  Otellini has been President and CEO since 2005; was President and Chief Operating Officer from 2002 to 2005; and a director since 2002.  Otellini is a citizen of California.

25.     Defendant Barrett was an Intel director from 1974 until his retirement from the Board in May 2009.  Barrett was Intel's CEO from 1998-2005, and Chairman of the Board from 2005 through May 2009.  Barrett is a citizen of Arizona.

26.     Defendant D. James Guzy, Sr. ("Guzy") was a director of Intel from 1969 through May 2008.  Guzy served as a member of Intel's Audit Committee from at least 2001 through his retirement in May 2008.  Guzy is a citizen of Nevada.

27.     Defendant David S. Pottruck ("Pottruck") is presently an Intel director, and has been a director since 1998.  Pottruck served as a member of Intel's Audit Committee from in or about May 2006 through in or about May 2008.  Pottruck is a citizen of California.

28.     Defendant Jane E. Shaw ("Shaw") has served as a Board member since 1993 and as Board Chairman since May 2009.  Shaw served as a member of Intel's Audit Committee from in or about May 2002 through at least 2009.  Shaw is a citizen of California.

29.     Defendant David B. Yoffie ("Yoffie") is presently an Intel director, and has been a director since 1989.  Yoffie is a citizen of Massachusetts.

30.     Defendant Charlene Barshefsky ("Barshefsky") is presently an Intel director, and has been a director since 2004.  Barshefsky is a citizen of the District of Columbia.

31.     Defendant James D. Plummer ("Plummer") is presently an Intel director, and has

10

been a director since 2005.  Plummer served as a member of Intel's Audit Committee from in or about May 2004 through at least 2009.  Plummer is a citizen of California.

32.     Defendant Susan L. Decker ("Decker") is presently an Intel director, and has been a director since 2006.  Decker served as a member of Intel's Audit Committee from in or about May 2009 through at least 2009.  Decker is a citizen of California.

33.     Defendant Carol Bartz ("Bartz") was an Intel director from January 2008 through March 2009.  Bartz served as a member of Intel's Audit Committee from in or about January 2008 through in or about March 2009.  Bartz is a citizen of California.

34.     Defendant John J. Donahoe ("Donahoe") is presently an Intel director, and has been a director since March 2009.  Donahoe serves as a member of Intel's Audit Committee.  Donahoe is a citizen of California.

35.     Defendant Frank D. Yeary ("Yeary") is presently an Intel director, and has been a director since March 2009.  Yeary serves as a member of Intel's Audit Committee.  Yeary is a citizen of California.

36.     The claims asserted herein against the present and former Intel officers and directors named above are divided into four types:

      a.   *Active Misconduct Claims*.  These claims are brought against those persons who were officers and/or directors during the period in which it has been alleged that Intel's executives engaged in active violations of the European, Japanese, South Korean and United States antitrust laws, and the Board of Directors who failed in bad faith to rein in, ameliorate or countermand such misconduct, or to ensure cooperation with regulatory authorities.  Such claims, which pertain to the period 2001 through the present, are brought

11

against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, and Decker.

b. *EC Regulatory Claims.*  These claims are brought against those persons who were officers and/or directors during the period from which the EC began investigating Intel's conduct in Europe through the imposition of the record fine in May 2009.  During that period, the relevant defendants failed to ensure that full and complete cooperation was provided to regulatory authorities; failed to hold accountable any person who engaged in unlawful misconduct; failed to take necessary remedial actions; and failed to work with the EC on remedies or resolutions of the charges that would have reduced or even eliminated the EC fine.  Such claims are brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, Decker and Bartz.

c. *AMD Settlement Claims.*  These claims are brought against those persons who were officers and/or directors during the period in which AMD asserted claims alleging that Intel unlawfully restricted AMD's ability to compete by leveraging its monopoly power in the x86 microprocessor market through the use of exclusionary, pricing, discount, and other practices resulting in a settlement payment to AMD of $1.25 billion in November 2009.  During that period, the relevant defendants failed to rein in, ameliorate or countermand such misconduct in a manner that would have reduced or possibly eliminated the need for the settlement payment altogether.  Such claims are brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie,

Barshefsky, Plummer, Decker, and Bartz.

d. *Claims Related to Failure to Take Remedial Measures*.  These claims are

brought against those persons who are presently Intel directors and who are

consciously and in bad faith refusing to thoroughly investigate and address

executive wrongdoing; attempting to stymie and defeat legitimate claims

against directors and officers through efforts to cause such claims to lapse by

dint of the statute of limitations; and failing in bad faith to enact necessary

therapeutic and remedial measures.

## FACTUAL ALLEGATIONS

## INTEL'S ANTICOMPETITIVE SCHEME

**A.**   **THE MARKET**

   **1.**   **x86 Microprocessor Technology**

37.   A microprocessor is a computer central processing unit ("CPU") – the "brains" of

the computer – that is manufactured on a single, tiny wafer, or "chip."  Such chips consist of

materials called semiconductors, because of physical properties they possess that allow the rapid,

controlled flow or "conducting" of electrons through miniature pathways called circuits.  The

manufacture of microprocessors is a highly specialized and costly process that takes place in

factories called "fabs."  The planning and construction of a single fab costs billions of dollars.

Manufacture involves, among other highly complicated operations, the etching, using lasers, of

circuitry into the chip on the model of a specially designed micro-architecture.  That micro-

architecture, however, serves only to implement what from the computer user's perspective is a

more significant attribute of the microprocessor, *i.e.,* its "instruction set."  The instruction set

provides the basic building blocks – the architecture – of the language that directs the computer's

13

operations, and that supports each of the software programs written to run on that computer.

38.     The CPUs at issue here are known as "x86" CPUs, in reference to the specific instruction set that the CPU recognizes.  The x86 instruction set derives its name from the model numbers of Intel processors initially introduced in the late 1970s.  Generally speaking, a specific version of software (including operating systems and/or applications) can only be run on machines that recognize a specific instruction set.  The x86 instruction set is now ubiquitous in desktop and notebook computers, and widespread in servers and workstations.  The initial prominence of the x86 instruction set was due largely to the fact that it was chosen by IBM in the early 1980s, together with Microsoft's PC operating system, as one of the standard components of what became known as IBM-compatible PCs.

39.     It was not IBM's intention, however, that Intel be the sole source of x86 microprocessors for its products.  IBM arranged that AMD – which at that time produced microprocessors with a competing architecture – would also be able to manufacture x86 microprocessors as a second source of supply.  Intel, however, proved reluctant to share the intellectual property that underlay the x86 instruction set, until it was compelled to do so by an arbitration award and a subsequent 1995 settlement with AMD.  The settlement set the stage for AMD to morph from a low-margin "clone" manufacturer – an imitator – into a true competitor. The settlement secured AMD a shared interest in the x86 instruction set, but AMD was now required to develop its own micro-architecture in order to implement that instruction set in its own microprocessor products.  When AMD attempted to do so, in the late 1990s, its efforts were met with remarkable success.  Intel's anticompetitive reaction to that success is what gives rise to this action.

14

## 2.      The x86 Microprocessor Market

40.      Microprocessors are not sold directly for final use to businesses or consumers but as components – generally the most expensive and most important components – of desktop, mobile, and server computers.  Those computers, in turn, are manufactured by Original Equipment Manufacturers or "OEMs."  The OEMs are, therefore, Intel's largest and most important customers.  During the relevant period, the top 10 OEMs accounted for a large and increasing share of microprocessor sales worldwide – approximately 70%.

41.      It is not merely their size, but their strategic importance as "gatekeepers" to the lucrative commercial segment of the computer market that makes the top OEMs – most prominently Dell, HP, and IBM – Intel's most important customers.  For example, the highest margins are earned on server microprocessor products, and those are sold almost entirely through a handful of major OEMs.  There are other avenues of distribution, but they are shrinking, as a result of OEM consolidation and other factors.  Distribution through channels other than the OEMs serves principally to reach smaller, less profitable customers.

42.      Moreover, the production volumes and the brand awareness, as well as market credibility and experience that a microprocessor firm needs, depend on close cooperation with OEMs.  Without detailed feedback and market intelligence from major OEMs, a microprocessor firm cannot adequately plan or test its products, for it is the OEMs that have the depth of customer and market knowledge required.  Nor will any microprocessor firm be able to develop a strong and credible brand without the continuing support and cooperation of major OEMs.

## 3.      Intel's Monopoly Power

43.      Intel is a durable and extraordinarily powerful monopoly.  For over a decade, it has had extremely high market shares, measured at approximately 80-90% by revenue and 75%

15

by unit volume.  All major computer manufacturers depend on Intel in a variety of ways and are reliant on it for microprocessors, because AMD is, and in the foreseeable future will remain, unable to fulfill more than a small share of their requirements.

44.     Intel's monopoly power is protected by the extremely high barriers to entry into the x86 microprocessor market.  First, design and manufacture of microprocessors requires access to intellectual property that only Intel and AMD have, so that substantial licensing issues would arise for any potential entrant.  Second, "fabs" (manufacturing facilities for microprocessors) cost billions of dollars to design and construct (not to mention a great deal of time and regulatory approval).  Third, the microprocessor industry is characterized by economies of scale, so that smaller manufacturers are at a cost disadvantage and often have difficulty achieving profits.

45.     Intel is extremely profitable; by contrast, the margins of its primary customers, the "top tier" OEMs, tend to be thin – often in low single digits.  That enables Intel to directly affect OEMs' bottom-line quarterly profits, by favoring certain OEMs with lower prices and other subsidies, while punishing others.

46.     Intel's profits on its microprocessors reflect its monopoly power, as the OEMs that are compelled to do business with it know.  A May 2002 internal HP document, comparing Intel's profitability with the narrow profit margins of OEMs, noted that "Intel has margins of a monopoly."

47.     Michael Dell, founder and CEO of Dell, Intel's largest customer, pointed out in a February 2004 internal email that not even Microsoft could exercise the pricing power that Intel has displayed:

> [Intel] profits in the 2nd half of 2001 were $1.397B on revenues of $13.528B.  In the 2nd half of 2003 they were $4.885B on revenues of $16.574B.  In other words

their sales went up 22.5% and their profits went up 350%!  Or said another way their revenues went up $3.046B and their profits went up $3.488B!!  Not even Microsoft can do that.  In other words these guys have massive operating leverage.

48.     OEMs also depend on Intel in such vital matters as allocation of products, marketing support, and access to technical information.  An internal 2002 HP document presentation slide noted that "[r]egardless of [s]cenario, Intel's [m]onopoly [will] [l]ikely [be] [s]ustained" because of Intel's:

> Relationships - PC manufacturers, distributors, ISVs [Independent Software Vendors],
>
> BIOS [Basic Input/Output System] suppliers, etc. - Exerts substantial influence over PC manufacturers and their channels of distribution through the 'Intel Inside' brand program and other marketing programs
>
> Technology - Design capabilities for microprocessors, memory, chip sets, etc.
>
> Resources - Manufacturing, R&D, Marketing
>
> *       *       *
>
> Control of industry standards - Intel has been able to control x86microprocessor and PC system standards; can dictate type of products market requires of Intel's competitors.

Intel has also created alliances with major OEMs that give it substantial leverage over those OEMs.  Because OEMs rely on Intel's active participation in those alliances in the form of funding, marketing, and intellectual property, OEMs cannot easily disregard Intel's wishes.

49.     At the highest levels, Intel routinely takes steps to make its displeasure felt when it feels threatened by OEM actions – even when those actions appear to be routine commercial behavior.  Intel's customers are constantly reminded where their primary loyalty should lie.  For example, in March 2006, Otellini received a courtesy "heads-up" from an HP executive that HP was sponsoring an advertisement featuring HP's relationship with AMD and the theme of customer choice.  Otellini reacted: "So, … why did you feel compelled to do this?  It is certainly

17

insulting to us and I do not see how it helps you … If we are your key partner, this is nothing but

a slap at us … I really don't want to get in a pissing contest over this … But running an ad

touting 10 years with amd [sic] and 'choice' is not the behavior of someone who wants to bring

our two companies together."

50.     Similarly, in November, 2004, Otellini directly expressed his displeasure at

increases in IBM's AMD Opteron server sales to a senior IBM executive and reminded him of

IBM's reliance on Intel:

> I just saw the [sales] tracker data for Q3…IBM opteron shipments in 2P [dual-
> processor servers] doubled from 3.5Ku [thousand units] to 7.5Ku…IBM was the
> fastest growing opteron system seller!! … It is a bit disheartening to see IBM
> outgrow both Sun and HP in Opteron shipments given our current engagement.

### 4.     The Threat from AMD's New Products

51.     In the late 1990s, Intel and AMD each began developing a new generation of

microprocessor products.  Both were intended to increase processing speed by enabling

computers to address larger chunks of data at one time – in technical terms, to make the

transition from 32-bit to 64-bit computing.

52.     Intel (working together with HP) planned a new, more advanced microprocessor

product named Itanium, directed primarily at powerful, high-end servers or computers.  Itanium

would not be "backwards compatible" with the thousands of software applications and operating

systems that Intel's corporate customers currently used.  As a result, if a corporate customer

wanted to use Intel's Itanium product, it would require it to make large new investments in

software and programming, as well as computer hardware.  For that and other reasons, Itanium

was not well received by either the OEMs or their customers.

53.     At the same time, AMD was bringing its new products – including the Athlon

microprocessor for PCs and the Opteron server microprocessor – to market.  Those products

represented AMD's first attempt at competing directly with Intel in the high-end segments of the market and had cost billions of dollars to develop. Opteron garnered virtually unanimous industry acclaim; AMD had succeeded with an innovative product design yielding performance advantages that effectively "leapfrogged" Intel. According to one publication, for example, tests performed by HP in 2004 for data-intensive applications showed that Opteron's performance was "anywhere from 40% all the way up to several hundred percent" over Intel's latest competitive product.

54.     Moreover, Opteron was much more energy-efficient than Intel's competing chip. This was a major consideration for the administrators of corporate data centers, where the amounts of electricity used and heat generated were critical factors. AMD engineers had also succeeded in developing a "Direct Connect Architecture" that enabled more efficient processing of information – a microprocessor's basic task. By connecting processors more directly with each other and with processor memory, AMD design architects accomplished the equivalent of providing six lanes, instead of two, for busy highway commuters, thereby achieving a higher performance data flow throughout the chip. The value of this architectural breakthrough would increase as chips were designed to have multiple centers or "cores" for data processing.

**5.      AMD Begins to Gain OEM and Customer Approval**

55.     AMD's other task – using these products to enter the lucrative business segment of the market – was not one it could accomplish alone; that road led through the major OEMs. The business segment of the market included not only medium and small business customers, but also large enterprise customers – the Fortune 500 companies – that purchase expensive server computers. AMD was, as noted, helped by the fact that Intel's attempt to capture the high-end computing market with its Itanium product met with little enthusiasm from corporate purchasers.

Those customers now had an AMD alternative that would allow them to achieve higher performance with AMD products, but continue to use their legacy 32-bit software, and make the transition to 64-bit computing on a schedule of their own choosing.

56.     By late 2004, Fortune Magazine was reporting on some initial success in AMD's enterprise strategy: "By employing its own chip-design innovations and exploiting strategic missteps by Intel, AMD has built alliances with the likes of Microsoft, Hewlett-Packard, Sun, Fujitsu, and IBM.  Those tech powers mostly ignored AMD before, but now they see the chipmaker as a means to build market share by helping customers lower the cost of their IT operations.  Almost overnight, AMD has become a major supplier of chips to the high-priced and high-margin world of servers, the big machines that power the internet and corporate networks."  For Intel, AMD's opportunity was a competitive threat.  Genuine competition with respect to server computers, which were generally sold to enterprise and government customers, would erode Intel's monopoly profits.  Moreover, if large enterprise customers began to purchase AMD server products, they would consider purchases of AMD desktops and notebooks as well.

57.     What made the situation critical beginning in 2002-03, as shown in internal Intel documents, was that Intel recognized that it would be years before it would be able to design and develop its own x86 products to be genuinely competitive with those AMD was already marketing.  In the industry parlance, Intel had a "big competitive hole" in its product development "roadmap."

**B.     INTEL'S EXERTION OF MONOPOLY POWER**

   **1.     Intel Seeks to Limit AMD's Advances**

58.     Faced with AMD's advances, Intel took steps to ensure that consumers would have limited opportunity to buy AMD's products.  It accomplished that by bribing or coercing

OEMs either not to offer, or to severely limit, the use of AMD CPUs.  That took place in the

context of regular quarterly "negotiations" between OEMs and Intel – in which each OEM was

in the position of one among several competitors, and Intel was, with respect to each of them, in

the position of its essential and irreplaceable supplier.  Because Intel disposed of the monopoly

power and resources described above – advance knowledge of technical developments, ability to

control supply, and above all, the ability to grant or withhold "rebate" payments and marketing

money – Intel was in a position in which it could virtually dictate the terms of its deals.

59.     Intel's customers understood Intel's power and its strategy.  As an internal HP

document concluded in November, 2003:  "[I]n this market, Intel dictates the rules of the game

… and most of their actions can be understood in the context of keeping their distribution outlets

(their customers) in line."

60.     Intel's acts and objectives were, therefore, radically different from legitimate

marketing of its own products.  Instead, Intel eliminated opportunities for AMD to gain sales,

even when Intel's own sales would not directly benefit consumers.  For example, Intel paid HP,

as part of a 2002 agreement between the companies, to delay the launch of AMD-based

commercial desktop PCs for a six-month period in Europe and for a period of at least two

months in Latin America.

61.     Similarly, Intel repeatedly pressured OEMs to guarantee it specified market

shares of their sales, to ensure that the OEMs' marketing decisions would be controlled by Intel,

rather than responsive to consumer demand.  For example, Intel entered into an agreement with

HP that "capped" AMD's share of the commercial desktop segment at 5% of HP's worldwide

sales.  The "cap" provision was suppressed and kept secret, but numerous drafts, subsequent

emails, and testimony confirm that it was central to the agreement and was observed by HP and

enforced by Intel.  In another 2006 agreement with HP, Intel effectively ensured that its share of HP's over-all sales would increase and AMD's would decrease.  In all cases, however, Intel attempted to erase the most obvious traces of its anticompetitive scheme, by eliminating crucial but flagrantly objectionable provisions (such as the 5% cap) from written agreements (while nevertheless subsequently enforcing them), or altering language so that agreements about market shares were camouflaged as agreements regarding volume targets.  The email request of the Intel executive who negotiated a 2006 deal with HP is typical: "Could you also take the mss [market segment share] references off and just leave everything at volume targets.  Our counsel is very picky on that stuff …."

62.     Intel sought and frequently reached such agreements despite its awareness of "antitrust risk."  In the context of Intel's negotiations with NEC, a Japanese OEM, an Intel executive in December of 2002 asked for new documentation because "[t]he original email minutes from [the] May meeting shows [sic] MSS target, and we can't use it … where it exposes us to anti-trust risk."

63.     The basic *quid pro quo* that Intel sought was invariably clear:  exclusion of competition was rewarded with valuable inducements, which were withheld if the OEMs's cooperation was not forthcoming.  This conditionality was Intel's basic *modus operandi,* as illustrated by the following exchange in May of 2002 between two Intel executives reacting, during negotiations with Sony, to the news that Intel was "getting hammered [by AMD] in the value segment" of the marketplace.  The first executive inquired: "[c]an [another Intel representative] discreetly hint to Sony that the Corp Marketing dollars are at risk if Intel's MSS with Sony in the value segment does not improve?"  The second responded: "[w]e should not be shy about our unhappiness with our current MSS.  Intimating that the program is in jeopardy if

they don't get their act together and work with us on this is clearly ok."

64. A favorite Intel code word for the degree of exclusivity Intel desired from the OEMs was "alignment." If they were not "aligned," OEMs could not expect favorable treatment from Intel with respect to rebates, technological development, pricing concessions, priority in obtaining supplies of scarce parts, or marketing funds. As one Intel executive reported to another in April, 2002 regarding negotiations with Sony: "I also told him that Intel … would really have to make sure Sony and Intel are well 'Aligned' before we commit to doing this kind of comarketing program…If we can get [Sony] to agree on better alignment (MSS recovery in US NB [United States notebook computers], No more surprises), then, we can move forward with co-marketing discussion. If not, we may have to think about alternatives."

65. Intel forced OEMs to choose between having a "strategic" or a "transactional" relationship with Intel. In Intel's parlance, a "strategic" relationship was one with a high degree of exclusivity or "alignment." An OEM that opened itself to a relationship with another microprocessor supplier – AMD – was regarded as desiring only a "transactional" relationship with Intel, and Intel made clear in such cases that this would not be in the OEM's own best interest. Thus, a top HP executive reported back from a conversation with Otellini, then Intel's COO, concerning Intel's reaction to the news that HP was considering launching an AMD-based PC directed at commercial customers: "I talked to Paul Otellini last night [who asked whether] we have a transactional relationship or a partnership? If we go with AMD on the commercial desktop, Intel equates this to a transactional relationship, and therefore we are foregoing the benefits of price pull-forwards [pricing concessions] to level the direct/indirect playing field."

66. Similarly, in April 2002, one Intel executive wrote to his counterpart at HP during HP's merger with Compaq, reacting to a telephone conference between the CEOs of Intel and

HP in which HP indicated that it might develop products based on AMD's new microprocessor product, code-named "Hammer":  "[Intel's] Craig [Barrett] came away believing Compaq was leading HPAQ to a transactional vs. a strategic relationship with Intel.  Not interested in partner of choice relationship.  [Intel was] [v]ery disappointed in the response on Hammer and why this is in Compaq's best strategic interest."

67.     Intel often cloaked its exclusionary transactions with OEMs in the language of pricing, using terms such as "CAP" ("Customer Authorized Price") or "ECAP" ("Exception to Customer Authorized Price").  In fact, although Intel often exerted considerable effort to retroactively justify its payments to OEMs in such terms, those "rebates" bore no genuine relationship to pricing based on volume-related cost savings or genuine efforts to meet specific competitive offers.  The purpose and effect of those payments – of which Intel executives were always mindful – was to induce OEMs to exclude competition.  When it became too difficult to accomplish that using "ECAPs" – purported discounts that were to be calculated on a product by product basis – Intel found other methods, such as lump-sum payments, to reach its goal of "strategic alignment."

68.     For example, for years Intel paid Dell lump-sum rebates known initially at Intel and Dell as "MOAP," an acronym for "Mother of all Programs," and later renamed "MCP," short for "Meet Competition Program."  In an October 2003 internal Intel email regarding Intel's negotiations with Toshiba, Intel executives considered abandoning the burdensome "ECAP" method of "justifying" rebate payments and adopting a "dell like moap [mother of all programs]" method of payment, which facilitated increasing the size of the payments necessary to purchase Toshiba's cooperation (referred to as "the incremental cost of getting them competitive"): "With [Toshiba] I think we are at the end of the rope wrt [with respect to] product by product ecaps –

24

too painful across the product line; I think we have to take them to a dell like moap program –
the incremental cost of getting them competitive could be buried into the overall moap program
… and then we can use the moap program to drive strategic alignment."

69.     In short, Intel first determined what payment or other benefit was necessary to
enlist an OEM's cooperation in excluding AMD, and then sought to camouflage it with an
apparently procompetitive "structure."  As Dell's lead negotiator with Intel put it in a December
7, 2004 email to his Intel counterpart, explaining that Michael Dell wanted an additional $400
million rebate payment from Intel: "This is really easy … MSD [Michael Dell] wants $400M
[million] more. I've been trying to figure out the structure .…"

70.     Intel's objective throughout was not to eliminate AMD entirely, but to crush an
unprecedented threat to its monopoly power.  As internal Intel emails show, Intel understood that
not all market segments were vital to the maintenance of its monopoly power.  "[L]ow cost/low
value" output by AMD did not threaten the sources of Intel's monopoly profits, which, until
2002-03, included its unchallenged position in the high value, high-priced corporate segment.
As a 1998 email exchange among Intel's top executives shows, Intel's strategic priority was "to
avoid losing any SMB [small business] or corp skus [stock-keeping units]."  At that time, Intel
was concerned about AMD's success in the retail market because it was "strengthening their
position for movement to high end skus and entry into the business segment."

71.     Intel knew that if it could exclude AMD from the most lucrative segments of the
microprocessor business, AMD could never become a genuine threat.  For AMD to make sales
was not sufficient; if it were to challenge Intel's monopoly power, it would have to make
substantial high-value sales to major corporate customers.  Only by raising the average selling
price of its products could AMD challenge Intel's leadership.  Intel, therefore, argued to OEMs

that Intel would "continue to pigeon hole AMD to the bottom 10% of segment .…"  Otellini believed that AMD units that were sold on "the backstreets of beijing [sic] are wonderful … [T]here is really no question that in the long run, I would like to see amd [sic] output spread round the world as a low cost/low value, unbranded brand .…"  Accordingly, in the following years, Intel focused on barring AMD's access to this vital high ground – the corporate market and its gatekeepers, the major OEMs.

## 2.   <u>OEMs's Reasons for Collaborating with Intel</u>

72.    During the relevant period, OEMs understood that they would benefit from increased competition in the microprocessor market.  If a competitor such as AMD could establish itself as a genuine alternative to Intel, they (and consumers) would enjoy more choices, lower prices, and better products.  Nevertheless, they frequently decided, when faced with the array of incentives and threats that Intel brought to bear, to collaborate with Intel in restricting their purchases from AMD.

73.    There were several reasons for this.  The most basic was that the payments for exclusivity Intel provided could make the difference between profit and loss for an OEM or a segment of its business.  In 2002-2004, for example, HP's business desktop unit depended significantly on Intel rebate payments for its financial success.  In September 2004, HP executives considered whether to continue to adhere to a deal they struck with Intel in 2002 to limit HP's marketing of AMD-based commercial desktop PCs by, among other things, agreeing to sell AMD-based PCs directly only, rather than through distributors.  A senior HP executive vetoed the plan, on the ground that Intel would detect any cheating and that Intel's rebate payments were essential for the HP division involved to "make it financially."

74.    Dell's profitability also came to depend on Intel rebate payments.  This was

dramatically illustrated by internal Intel emails in April, 2004, arising from Dell's need to finalize its earnings forecast for the coming quarter.  Essentially, Dell asked Intel for an additional $100 million; without it, as an Intel executive reported, Dell would "readjust their margin guidance downward …."  In other words, Dell would advise investors that it expected lower earnings.

75.     As Dell and HP both learned, once an OEM accepted Intel rebate payments as a substitute for marketing AMD-based products, it became very difficult to break the habit.  Dell on several occasions assessed whether purchasing from AMD would be likely to improve its profitability.  Dell's estimates of Intel's likely reaction, however, loaded the scales against AMD, because Dell assumed – with good reason – that those reactions could well be severe and disproportionate.  In a February 27, 2003 internal Dell document, for example, it was assumed that "aggressive" purchases by Dell from AMD could result in "[r]etaliatory [rebate] reductions [by Intel that] could be severe and prolonged with impact to all LOBs [lines of business]."  Another Dell document from March 2003 concluded that "[a]nticipated Intel response wipes out all potential opinc [operating income] upside from going with AMD."

76.     Moreover, Intel did not hesitate to threaten severe punishment for OEMs that marketed AMD in ways of which Intel disapproved.  Even large and powerful firms, such as IBM, took those threats very seriously.  In 2003, for example, one IBM executive expressed doubts about the advisability of a proposed deal with AMD that would involve IBM marketing assistance, because Intel's retaliation could severely damage IBM's multi-billion dollar business in low-end, industry standard servers, its "x-series" line: "It became clear to me that if we did all that on the marketing side [for AMD], Intel would kill our x-Series business."  Later, in 2005, a senior IBM executive faced a similar issue:  Key IBM customers wanted IBM to expand its line

of AMD products, but a negative Intel reaction would put IBM in a "very difficult spot."  The executive wrote:  "I understand the point about the accounts wanting a full AMD portfolio.  The question is, can we afford to accept the wrath of Intel…?  It is a very hard question to deal with."

77.     Intel repeatedly used such threats to drastically raise the risks and costs of any OEM engagement with AMD.  The choices the OEMs faced were skewed by Intel's willingness to use its monopoly power to retaliate against them.  Exercising their ability to use AMD products to lower their own costs and/or to satisfy consumer demand was firmly held in check by their fear that Intel would strike back if they went too far.  In a May 2006 "Strategy Update" document, HP carefully analyzed its relationship with Intel and concluded that the best strategy was to "[m]aintain judicious use of competitive bid situations to lower HP costs … but not so aggressively as to risk the strategic Itanium relationship," a joint venture with Intel on which HP's future high-end server business depended.

78.     The exclusionary agreements into which the OEMs entered with Intel were sometimes for terms of a year or less.  But given the stable, long-term nature of Intel's monopoly power, that did not mean that opportunities for AMD were only temporarily deferred, or that OEMs could effectively reserve freedom of action for themselves at a later date.  Nor did it mean that, when new supply opportunities arose at a particular OEM, such "design competitions" could be decided by the OEMs on the merits, without taking account of Intel's monopoly power and its willingness to use it as a weapon.  Rather, although each quarter might have appeared to bring new opportunities for AMD, Intel continually refreshed the range of threats and rewards with which it confronted the OEMs, so that their incentives remained largely constant.

79.     Given those realities, OEMs's frequent choices to collaborate with Intel to restrict opportunities for AMD and consumers were to be expected.  Their circumstances were

essentially those that economic theorists have described as the "prisoner's dilemma." If *all* of the OEMs had been willing to deal with AMD without Intel-imposed restrictions, the resulting strengthened competition would have benefited them all, as well as consumers, by lowering their microprocessor costs. Nevertheless, there were strong – often overwhelming – incentives for any *individual* OEM to accept the pay-offs and avoid the punishments that Intel dealt out. On the one hand, each individual OEM's collaboration with Intel resulted in less competition and higher prices for themselves and for consumers. On the other, Intel used the monopoly profits thus preserved to favor complicit OEMs, and punish recalcitrant ones. By complying with Intel's anticompetitive wishes, an OEM could gain substantial rewards, while its competitors, and consumers, suffered most of the consequences.

80.     Now, however, the scheme has come unraveled and been exposed, which is the inevitable fate of such extensive wrongdoing. The defendant directors should never have provided senior management with a free hand to resort to unlawful means to squash a worrisome competitor. The ***$1.45 billion*** EC fine and the ***$1.25 billion*** AMD settlement may be just the beginning of the ruinous consequences Intel will suffer because senior executives were reckless and foolhardy, and the Board that was charged with putting a halt to their malfeasance consciously decided to turn a blind eye.

**THE EC INVESTIGATION AND THE RECORD $1.45 BILLION FINE**

81.     In response to complaints received about potential antitrust violations, on July 12, 2005, antitrust investigators from the EC and officials from at least four European countries raided Intel's European offices.

82.     On July 27, 2007, the EC issued a press release entitled "Competition:  EC Confirms Sending of Statement of Objections to Intel."  The press release stated, in relevant part:

The European Commission can confirm that it has sent a Statement of Objections (SO) to Intel on 26th July 2007. The SO outlines the Commission's preliminary view that Intel has infringed the EC Treaty rules on abuse of a dominant position (Article 82) with the aim of excluding its main rival, AMD, from the x86 Computer Processing Unites (CPU) market.

In the SO, the Commission outlines its preliminary conclusion that Intel has engaged in three types of abuse of a dominant market position. First, Intel has provided substantial rebates to various Original Equipment Manufacturers (OEMs) conditional on them obtaining all or the great majority of their CPU requirements from Intel. Secondly, in a number of instances, Intel made payments in order to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based CPU. Thirdly, in the context of bids against AMD-based products for strategic customers in the server segment of the market, Intel has offered CPUs on average below cost.

These three types of conduct are aimed at excluding AMD, Intel's main rival, from the market. Each of them is provisionally considered to constitute an abuse of a dominant position in its own right. However, the Commission also considers at this stage of its analysis that the three types of conduct reinforce each other and are part of a single overall anti-competitive strategy.

83.     On February 12, 2008, *Bloomberg.com* reported that EC regulators, in furtherance of their antitrust probe, raided Intel's offices in Munich and computer retailers in the United Kingdom and Germany. Specifically, the officials inspected the offices of Media Market, DSG International Plc in the United Kingdom and France's PPR SA. The raids targeted "Intel's possible links with computer retailers." The regulator stated that "it has reason to believe that the companies may have violated EU rules on restrictive business practices, abuse of a dominant market position, or both."

84.     On December 19, 2008, the EC sent Intel a letter drawing Intel's attention to a number of specific items of evidence relating to existing objections that the EC had indicated that it might use in a potential final decision. The EC set a deadline of January 19, 2009 for Intel to provide comments on those items. That deadline was extended to January 23, 2009.

85.     Intel failed to reply to the EC's letter of December 19, 2008 by the extended

deadline of January 23, 2009, a fact confirmed by Intel's counsel on January 27, 2009, after the EC had asked Intel about the matter.  Intel did not provide reasons for its failure to reply by the extended deadline.

86.     On February 2, 2009, the EC informed Intel by letter that the EC had decided not to grant any further extension of the deadlines to reply to the July 27, 2008 Statement of Objections or to the EC letter of December 19, 2008, as such an extension would not be justified because Intel had been afforded ample opportunity to submit such replies within the deadlines and had chosen not to do so.

87.     On February 5, 2009, Intel belatedly made a submission in its defense to the EC. Although the EC was not bound to consider that submission due to Intel's lack of cooperation, it nonetheless did so.[10]

88.     On May 13, 2009, the EC announced it was fining Intel *€1.06 billion*, the equivalent of *$1.45 billion*.  Competition Commissioner Neelie Kroes said in connection with the announcement:  "Intel has harmed millions of European consumers *by deliberately acting to keep competitors out of the market for computer chips for many years.*  Such a serious and sustained violation of the EU's antitrust rules cannot be tolerated." (emphasis added).

89.     The May 13, 2009 press release detailed the EC findings as follows:

> The European Commission has imposed a fine of €1 060 000 000 on Intel Corporation for violating EC Treaty antitrust rules on the abuse of a dominant market position (Article 82) by engaging in illegal anticompetitive practices to exclude competitors from the market for computer chips called x86 central processing units (CPUs).  The Commission has also ordered Intel to cease the illegal practices immediately to the extent that they are still ongoing.  Throughout the period October 2002-December 2007, Intel had a dominant position in the worldwide x86 CPU market (at least 70% market share).  The Commission found that Intel engaged in two specific forms of

---

[10]     EC Decision, at 34-35, ¶¶96-97.

illegal practice.   First, Intel gave wholly or partially hidden rebates to computer manufacturers on condition that they bought all, or almost all, their x86 CPUs from Intel.  Intel also made direct payments to a major retailer on condition it stock only computers with Intel x86 CPUs.  Such rebates and payments effectively prevented customers - and ultimately consumers - from choosing alternative products.     Second, Intel made direct payments to computer manufacturers to halt or delay the launch of specific products containing competitors' x86 CPUs and to limit the sales channels available to these products.     The Commission found that these practices constituted abuses of Intel's dominant position on the x86 CPU market that harmed consumers throughout the EEA.  By undermining its competitors' ability to compete on the merits of their products, Intel's actions undermined competition and innovation.  The Commission will actively monitor Intel's compliance with this decision.  The world market for x86 CPUs is currently worth approximately €22 billion (US$ 30 billion) per year, with Europe accounting for approximately 30% of that.

***

The computer manufacturers concerned by Intel's conduct in the Commission's decision are: Acer, Dell, HP, Lenovo and NEC. The retailer concerned is Media Saturn Holding, owner of the MediaMarket chain.

Conditional rebates and payments

Intel awarded major computer manufacturers rebates on condition that they purchased all or almost all of their supplies, at least in certain defined segments, from Intel:

- Intel gave rebates to computer manufacturer A from December 2002 to December 2005 conditional on this manufacturer purchasing exclusively Intel CPUs.

- Intel gave rebates to computer manufacturer B from November 2002 to May 2005 conditional on this manufacturer purchasing no less than 95% of its CPU needs for its business desktop computers from Intel (the remaining 5% that computer manufacturer B could purchase from rival chip maker AMD was then subject to further restrictive conditions set out below).

- Intel gave rebates to computer manufacturer C from October 2002 to November 2005 conditional on this manufacturer purchasing no less than 80% of its CPU needs for its desktop and notebook computers from Intel.

- Intel gave rebates to computer manufacturer D in 2007 conditional on this manufacturer purchasing its CPU needs for its notebook computers exclusively from Intel.

Furthermore, Intel made payments to major retailer Media Saturn Holding from October 2002 to December 2007 on condition that it exclusively sold Intel-based PCs in all countries in which Media Saturn Holding is active.

Certain rebates can lead to lower prices for consumers. However, where a company is in a dominant position on a market, rebates that are conditional on buying less of a rival's products, or not buying them at all, are abusive according to settled case-law of the Community Courts unless the dominant company can put forward specific reasons to justify their application in the individual case.

In its decision, the Commission does not object to rebates in themselves but to the conditions Intel attached to those rebates. Because computer manufacturers are dependent on Intel for a majority of their x86 CPU supplies, only a limited part of a computer manufacturer's x86 CPU requirements is open to competition at any given time.

Intel structured its pricing policy to ensure that a computer manufacturer which opted to buy AMD CPUs for that part of its needs that was open to competition would consequently lose the rebate (or a large part of it) that Intel provided for the much greater part of its needs for which the computer manufacturer had no choice but to buy from Intel. The computer manufacturer would therefore have to pay Intel a higher price for each of the units supplied for which the computer manufacturer had no alternative but to buy from Intel. In other words, should a computer manufacturer fail to purchase virtually all its x86 CPU requirements from Intel, it would forego the possibility of obtaining a significant rebate on any of its very high volumes of Intel purchases.

Moreover, in order to be able to compete with the Intel rebates, for the part of the computer manufacturers' supplies that was up for grabs, a competitor that was just as efficient as Intel would have had to offer a price for its CPUs lower than its costs of producing those CPUs, even if the average price of its CPUs was lower than that of Intel.

For example, rival chip manufacturer AMD offered one million free CPUs to one particular computer manufacturer. If the computer manufacturer had accepted all of these, it would have lost Intel's rebate on its many millions of remaining CPU purchases, and would have been worse off overall simply for having accepted this highly competitive offer. In the end, the computer manufacturer took only 160,000 CPUs for free.

As a result of Intel's rebates, the ability of rival manufacturers to compete and innovate was impaired, and this led to reduced choice for consumers.

Rebates such as those applied by Intel are recognised in many jurisdictions around the world as anti-competitive and unlawful because the effect in practice is to deny consumers a choice of products.

Payments to prevent sales of specific rival products

Intel also interfered directly in the relations between computer manufacturers and AMD. Intel awarded computer manufacturers payments - unrelated to any particular purchases from Intel - on condition that these computer manufacturers postponed or cancelled the launch of specific AMD-based products and/or put restrictions on the distribution of specific AMD-based products. The Commission found that these payments had the potential effect of preventing products for which there was a consumer demand from coming to the market. The Commission found the following specific cases:

- For the 5% of computer manufacturer B's business that was not subject to the conditional rebate outlined above, Intel made further payments to computer manufacturer B provided that this manufacturer:

  - sold AMD-based business desktops only to small and medium enterprises
  - sold AMD-based business desktops only via direct distribution channels (as opposed to through distributors) and
  - postponed the launch of its first AMD-based business desktop in Europe by 6 months.

- Intel made payments to computer manufacturer E provided that this manufacturer postponed the launch of an AMD-based notebook from September 2003 to January 2004.

- Before the conditional rebate to computer manufacturer D outlined above, Intel made payments to this manufacturer provided that it postponed the launch of AMD-based notebooks from September 2006 to the end of 2006.

The Commission obtained proof of the existence of many of the conditions found to be illegal in the antitrust decision even though they were not made explicit in Intel's contracts. Such proof is based on a broad range of contemporaneous evidence such as e-mails obtained inter alia from unannounced on-site inspections, in responses to formal requests for information and in a number of formal statements made to the Commission by the other companies concerned. In addition, there is evidence that Intel had sought to conceal the conditions associated with its payments.

x86 CPUs are the main hardware component of a computer. The decision contains a broad range of contemporaneous evidence that shows that AMD, essentially Intel's only competitor in the market, was generally perceived, by computer manufacturers and by Intel itself, to have improved its product range, to be a viable competitor, and to be a growing competitive threat. The

decision finds that Intel's practices did not constitute competition on the merits of the respective Intel and AMD products, but rather were part of a strategy designed to exploit Intel's existing entrenched position in the market.

90.     Publication of the text of the EC Decision was thereafter delayed for many months to accommodate Intel's request for redaction of incriminating evidence relating to the identities of individual Intel's senior executives and others.  Indeed, once the EC Decision was released to the public in September 2009, it was replete with references to senior executive involvement.  For example, three Intel executives, including a senior executive, confirmed to Hewlett-Packard that business agreements contained secret, unwritten elements,[11] and in an e-mail circulated by an Intel senior executive concerning Dell's announcement that it would not use AMD chips, Dell was referred to as "the best friend money can buy."[12]

91.     Although Intel executives disingenuously claimed that Intel was unaware that the activities uncovered by the EC were unlawful, the EC stated that:

> [t]he legal underpinning of the EC's case is based on a consistent pattern of Court jurisprudence, including Case 85/76 *Hoffmann-La Roche v EC*, Case T-203/01 *Michelin v EC*, Case C-95/04 *British Airways v EC,* Joined Cases T-24/93 and others, *Compagnie Maritime Belge v EC,* and Case T-228/97, *Irish Sugar.*

92.     Intel's Corporate Fiduciaries were, and still are, under a duty to prevent and remedy the antitrust violations alleged in the EC Action.  They would have been aware of the type of misconduct alleged therein due to their direct participation, through their receipt of ECOC reports, through their access to the non-public evidentiary record, and/or through other systems employed at Intel to detect potential violations of law.  Nonetheless, in bad faith disregard of their fiduciary obligations, Intel's Corporate Fiduciaries permitted such activities to occur, thereby subjecting Intel to substantial fines, penalties, and possible criminal sanctions.

---

[11]     EC Decision, at 54, ¶¶169-70.
[12]     EC Decision, at 71, ¶240.

## THE AMD LAWSUIT AND $1.25 BILLION SETTLEMENT

93.     On June 27, 2005, the AMD Action was filed in this District alleging violations of federal and state antitrust law, as well as state unfair business practices law, seeking treble damages and injunctive relief. According to the complaint filed in the AMD Action ("AMD Complaint"), the litigation was the culmination of many years of frustration on the part of AMD dating back to 1998 due to the lack of regulatory intervention against Intel's increasing monopoly power.

94.     AMD's complaint reads like an encyclopedia of Intel's global antitrust violations involving every major OEM in the world. Among the many abuses of Intel's monopoly power that were alleged to have been used in an attempt to exclude AMD from the marketplace are the following:

- Intel forced major customers into exclusive or near-exclusive deals [AMD Complaint, at ¶¶38-46];

- Intel conditioned rebates, allowances and market development funding on customers' agreement to severely limit or forego entirely purchases from AMD [*Id.* at ¶¶47-58];

- Intel established a system of discriminatory, retroactive, first-dollar rebates triggered by purchases at such high levels as to have the practical and intended effect of denying customers the freedom to purchase any significant volume of processors from AMD [*Id.* at ¶¶59-71];

- Intel threatened retaliation against customers introducing AMD computer platforms, particularly in strategic market segments [*Id.* at ¶¶72-76];

- Intel established and enforced quotas among key retailers effectively requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers, thereby artificially limiting consumer choice [*Id.* at ¶¶42, 91];

- Intel forced PC makers and technology partners to boycott AMD product launches and promotions [*Id.* at ¶¶77-84]; and

- Intel abused its market power by forcing on the industry technical standards and products that have as their central purpose the handicapping of AMD in the marketplace [*Id.* at ¶¶116-21].

95.     In summary, the AMD Complaint explains that as AMD began to gain a foothold in the x86 microprocessor market, Intel:

> deploy[ed] a host of financial and other exclusionary business strategies that in effect limit[ed] its customers' ability and/or incentive to deal with AMD. Although differing from customer to customer and segment to segment, the Intel arsenal include[d] direct payments in return for exclusivity and near-exclusivity; discriminatory rebates, discounts and subsidies conditioned on customer 'loyalty' that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements; threats of economic retaliation against those who give, or even contemplate giving, too much of their business to AMD, or who refuse to limit their AMD business to Intel-approved models, brands, lines and/or sectors, or who cooperate too closely with AMD's promotion of its competitive processors; and misuse of industry standards-setting processes so as to disadvantage AMD products in the marketplace.[13]

96.     The AMD Action was vigorously defended.  From the opening bell, Intel could not have made its position any clearer, stating in the introduction of its Answer to the AMD Complaint that "Intel has not violated any law or committed any wrongdoing.  AMD's claims against Intel are factually incorrect and contradictory."[14]  During more than four and a half years of hard-fought litigation thereafter, the parties collectively produced and received more than 200 million pages of documents and took more than 2,000 hours of deposition testimony from hundreds of witnesses.[15]

97.     With that voluminous record in hand to assess respective risks, Intel settled the AMD Action on November 12, 2009 for a staggering *$1.25 billion* payment to AMD.  In addition to that substantial amount of money, the settlement required Intel to restructure its

---

[13]     *Id.*, at ¶35.
[14]     Answer to AMD Complaint, at 1.
[15]     *See* Intel's Motion, Pursuant to Rules 16 and 56, For a Pretrial Conference to Seek the Court's Determination of Key Issues of Law that Will Govern Completion of Preparation and Trial, dated May 8, 2009, at 4, filed in the AMD Action.

patent licensing agreements with AMD to allow AMD to produce large quantities of microprocessors at facilities around the world that are not owned by AMD or an AMD affiliate – a practice from which AMD was prohibited under the terms of its prior patent licensing arrangement with Intel.  In practical effect, the removal of that restriction will allow AMD the right to freely compete in the x86 CPU market.

98.     If they had not already gained full command of the facts concerning Intel's alleged antitrust violations from its experience with the EC Action, Intel's Corporate Fiduciaries surely acquired such knowledge during the AMD settlement negotiations.  Indeed, as reported in a November 12, 2009 *New York Times* article entitled, *A.M.D. – Intel Settlement Won't End Their Woes*, Defendant Otellini confirmed that Intel's management was well aware of its alleged anticompetitive conduct but had supposedly determined that its actions were at all times lawful, stating that "[w]e have never wavered in our position that Intel did nothing outside the law … . [i]t made sense to step back and find a way to settle this [litigation]."

99.     Intel's Corporate Fiduciaries were, and still are, under a duty to prevent and remedy the antitrust violations alleged in the AMD Action.  They would have been aware of the type of misconduct alleged therein due to their direct participation, through their receipt of ECOC reports, through their access to the non-public evidentiary record, and/or through other systems employed at Intel to detect potential violations of law.  Nonetheless, in bad faith disregard of their fiduciary obligations, Intel's Corporate Fiduciaries permitted such activities to occur, thereby subjecting Intel to substantial fines, penalties, and possible criminal sanctions.

## ACTION BY THE NEW YORK STATE ATTORNEY GENERAL

100.     On November 4, 2009, the NYAG Action was commenced in this District alleging antitrust violations similar to those alleged in the AMD Action, and seeking treble

38

damages for the State of New York and certain "assignor OEMs" that have authorized New York to pursue claims.

101.    The NYAG Action was brought after a lengthy investigation.  The complaint in the NYAG Action ("NYAG Complaint") asserts vast factual support for a wide-ranging scheme to violate the antitrust laws, involving Intel's relationships with Dell, Hewlett-Packard, IBM and others.  Overall, the NYAG complaint sets forth significant evidence that:

> Intel has engaged in a systematic worldwide campaign of illegal, exclusionary conduct to maintain its monopoly power and prices in the market for x86 microprocessors.…  By exacting exclusive or near-exclusive agreements from large computer makers … in exchange for payments totaling billions of dollars, and threatening retaliation against any company that did not heed its wishes, Intel robbed its competitors of the opportunity to challenge Intel's dominance in key segments of the market. This illegal behavior was highly detrimental to consumers, competition, and innovation.[16]

102.    In just one of many detailed examples of Intel's unlawful conduct uncovered by the NYAG, the NYAG Complaint alleges that "Intel, as it had done before when faced with a threat by AMD, decided to bribe and threaten Dell to induce it to remain exclusive," further noting that:

> [i]n September 2003, Intel's then Chairman and CEO Craig Barrett met with Michael Dell to address the basic relationship between the companies. He reported back to his Intel colleagues that he and Michael Dell 'shook hands on the deal. MD [Michael Dell] agreed to quarterly mtgs … to make sure we are aligned in our strategic issues and coordinated in spending the monies. He had no issue with the win/win nature of the agreement. *I clearly committed our long range support regardless of competition* … Nice work you guys!'

(emphasis in original).[17]

103.    Similarly, the NYAG Complaint alleges that later, in 2006, when Dell tried to throw off the restraints imposed by Intel and carry AMD-based products:

---

[16]    NYAG Complaint, at ¶1.
[17]    *Id.*, at ¶¶99-100.

The reaction of Craig Barrett, Intel's Board Chairman, was unequivocal:  Dell should immediately be deprived of the payments it had long enjoyed in return for its willingness not to offer AMD products, and should start paying 'list prices.' Barrett told Ottelini: '[T]hey have just signaled they are only interested in being a transaction based customer.  I think you should reply in kind.  Not a time for weakness on our part. Stop writing checks immediately and put them back on list prices asap' (emphasis added).

*        *        *

The direction Otellini gave his subordinates the next day was consistent with Barrett's advice. Intel should make clear to Dell that if Dell offered any AMD products all of the 'mcp' payments Dell received from Intel would be at risk – just as Dell had always feared:  '[W]e should be [pre]pared to remove all mcp and related programs. Post haste … then we ought to enter negotiations .…'[18]

104.    According the NYAG Complaint, Otellini similarly enforced exclusive arrangements with Hewlett-Packard:

[A] top HP executive reported back from a conversation with Intel's then-COO Paul Otellini concerning Intel's reaction to the news that HP was considering launching an AMD-based PC directed at commercial customers: 'I talked to Paul Otellini last night [who asked whether] we have a transactional relationship or a partnership? If we go with AMD on the commercial desktop, Intel equates this to a transactional relationship, and therefore we are foregoing the benefits of price pull-forwards [pricing concessions] to level the direct/indirect playing field.'[19]

105.    Judging from Intel's *118-page* Answer to the NYAG Complaint ("NYAG Answer"), the Company conducted an exhaustive evaluation of the relevant facts, ultimately reaching the conclusion that the case had no merit.  For example, in response to the NYAG's claim that Intel has made illegal payments to OEMs:

Intel states that it negotiates with its customers and offers price reductions, in the form of rebates, or credits against the purchase price, which are beneficial to its customers. Intel states that these are not 'payments,' or 'bribes,' which are payments made to induce a party to breach a fiduciary duty. Instead, Intel's

---

[18]    *Id.*, at ¶¶142-43.

[19]    *Id.*, at ¶47; *see also id.* at ¶¶132-39, as to Otellini's direct involvement with the Dell agreements, and ¶¶216, 237-38, as to Otellini's personal involvement with IBM.

rebates are true discounts, which reduce the effective price of Intel's products to its customers.[20]

Likewise, in response to claims that Intel retaliated against OEMs that continued to do business with AMD, the NYAG Answer categorically denied that Intel's conduct constituted retaliation or bad faith with regard to any of its customers or the public:

> Intel states that it consistently competed for business, whether or not an OEM chose to use AMD.  Intel states that it did not threaten its customers that it would not compete for business or otherwise 'retaliate' if they used AMD, and in fact Intel has consistently competed in good faith to sell its products to customers, including continuing to provide competitive discounts for the business Intel retained.  Intel further states that when a customer chose to buy lower volumes of Intel microprocessors, they obviously would no longer receive rebates on microprocessors that the customer was no longer purchasing.…[21]

106.    Intel's Corporate Fiduciaries were, and still are, under a duty to prevent and remedy the antitrust violations alleged in the NYAG Action.  As demonstrated by Intel's own response to the NYAG Complaint, the NYAG Action reflects information that was and is readily available to Intel's Corporate Fiduciaries due to their direct participation, through their receipt of ECOC reports, through their access to the non-public evidentiary record, and/or through other systems employed at Intel to detect potential violations of law.  Nonetheless, in bad faith disregard of their fiduciary duties, they permitted such activities to occur, thereby subjecting Intel to substantial fines, penalties, and possible criminal sanctions.

## ACTION BY THE FTC

107.    On December 16, 2009, the FTC Action was filed with the Commission.  The FTC's complaint ("FTC Complaint") alleges that Intel violated Section 5 of the Federal Trade Commission Act by "engag[ing] in a number of unfair methods of competition and unfair practices to block or slow the adoption of competitive products and maintain its monopoly to the

---

[20]     NYAG Answer, at ¶40.
[21]     *Id.*, at ¶63.

detriment of consumers … us[ing] its market presence and reputation to limit acceptance of [competitors'] products, and us[ing] deceptive practices to leave the impression that [competitors'] products did not perform as well as they actually did" ("FTC Action").  The FTC Action came on the heels of a multi-year investigation by the FTC and extensive negotiations between Intel and the FTC, which included an unprecedented four Commission meetings.  The FTC Action is scheduled to be heard before an Administrative Law Judge on September 15, 2010.

108.   Among other things, the FTC Complaint alleges:

First, Intel entered anticompetitive arrangements with the largest computer manufacturers that were designed to limit or foreclose [the] use of competitors' relevant products.  On the one hand, Intel threatened to and did increase price, terminate product and technology collaborations, shut off supply, and reduce marketing support to OEMs that purchased too many products from Intel's competitors.  On the other hand, some OEMs that purchased 100 percent or nearly 100 percent of their requirements from Intel were favored with guarantees of supply during shortages, indemnification from intellectual property litigation, or extra monies to be used in bidding situations against OEMs offering a non-Intel product.

Second, Intel offered market share or volume discounts selectively to OEMs to foreclose competition in the relevant CPU markets.  In most cases, it did not make economic sense for any OEM to reject Intel's exclusionary pricing offers.  Intel's offer had the practical effect of foreclosing rivals from all or substantially all of the purchase by an OEM.

Third, Intel used its position in the complementary markets to help ward off competitive threats in the relevant CPU markets.  For example, Intel redesigned its compiler and library software on or about 2003 to reduce the performance of competing CPUs.  Many of Intel's design changes to its software had no legitimate technical benefit and were made only to reduce the performance of competing CPUs relative to Intel's CPUs.

Fourth, Intel paid or otherwise induced suppliers of complimentary software and hardware to eliminate or limit their support of non-Intel CPU products.

Fifth, Intel engaged in deceptive acts and practices that misled consumers and the public.  For example, Intel failed to disclose material information about the effect of its redesigned compiler on the performance of non-Intel CPUs.  Intel expressly

or by implication falsely misrepresented that industry benchmarks reflected the performance of its CPUs relative to its competitors' products.  Intel also pressured independent software vendors ("ISVs") to label their products as compatible with Intel and not to similarly label with competitors' products' names or logos, even though these competitor microprocessor products were compatible.[22]

109.    According to a December 16, 2009 FTC press release announcing the FTC Action, "Intel's anticompetitive tactics were designed to put the brakes on superior competitive products that threatened its monopoly in the CPU microchip market.  Over the last decade, this strategy has succeeded in maintaining the Intel monopoly at the expense of consumers, who have been denied access to potentially superior non-Intel CPU chips and lower prices."  The FTC's press release further quoted Richard A. Feinstein, the Director of the FTC's Bureau of Competition as saying that: "Intel has engaged in a deliberate campaign to hamstring threats to its monopoly … [i]t's been running roughshod over the principles of fair play and the laws of protecting competition on the merits.  The Commission's action today seeks to remedy the damages that Intel has done to competition, innovation, and, ultimately, the American consumer."

110.    Intel's Answer to the FTC Complaint ("FTC Answer") reflects the Company's exhaustive evaluation of the underlying facts and the conclusions Intel has drawn therefrom.  Among other conclusions, Intel completely denies that its conduct in threatening to eliminate discounts for certain OEMs amounted to retaliatory punishment for purchasing CPUs from AMD:

> [T]he Complaint alleges that Intel 'threatened' OEMs with the loss of discounts if they increased purchases from Intel competitors.  But these alleged 'threats' are nothing more than an inherent implication of procompetitive price competition:  a supplier offers a better price for more volume when negotiating with a customer that demands greater discounts by threatening to take some or all of the business at issue to another supplier.  The offer of a lower price for more volume

---

[22]    FTC Complaint, at ¶¶6-10.

necessarily implies that the lower price is contingent on the additional volume.[23]

Similarly, the FTC Answer refutes the FTC's allegation that Intel threatened OEMs with the loss

of technical collaboration for ordering from AMD, arguing that such abuses never took place:

"customers that increased their dealings with AMD continued to receive competitive discounts,

marketing assistance, and technical support from Intel."[24]   Intel also provides its analysis of the

facts in denying allegations that Intel paid OEMs to shun AMD:

> Intel states that it provides discounts, and not 'payments,' to its customers, and
> that the Complaint's mischaracterization of discounts as 'payments' is an attempt
> to disparage the most common form of legitimate competition.  Intel further states
> it engages in regular discussions with its customers on a variety of business
> issues, including joint development projects, but did not and does not threaten or
> coerce its customers.[25]

Overall, the FTC Answer demonstrates Intel's thorough review – and rejection – of the facts

alleged in the FTC Complaint.

111.    It is abundantly clear that the FTC Action poses a serious threat to Intel's short-

term profitability and ultimately may prove to have grave consequences for its long-term

viability.  According to the press release announcing the FTC Action:

> To remedy the anticompetitive damage alleged in the complaint, the FTC is
> seeking an order which includes provisions that would prevent Intel from using
> threats, bundled prices, or other offers to encourage exclusive deals, hamper
> competition, or unfairly manipulate the prices of its CPU or GPU chips.  The FTC
> also may seek an order prohibiting Intel from unreasonably excluding or
> inhibiting the sale of competitive CPUs or GPUs, and prohibiting Intel from
> making or distributing products that impair the performance – or apparent
> performance – of non-Intel CPUs  or GPUs.

The FTC's requested relief spans nearly five pages of the FTC Complaint and includes forty-

three (43) separate requirements and/or prohibitions to which Intel's future business activities

---

[23]    FTC Answer, at 4.
[24]    *Id.*, at 5.
[25]    *Id.*, at ¶51.

would be subject – including some that would allow the FTC to dictate internal management decisions.  For example, if the FTC's requested relief is granted, Intel would be required "to make available technology (including whatever is necessary to interoperate with Intel's CPUs or chipsets) to others, via licensing or other means, *upon such terms and conditions as the Commission may order.*"[26]

112.    Intel's senior management is well aware of the dire implications of the relief requested in FTC Complaint.  On December 17, 2009, *Bloomberg News* quoted A. Doug Melamed, Intel's Senior Vice President and General Counsel, in an article entitled *FTC Action May Drop Bombshell on How Intel Operates* as stating that "[t]he FTC insisted on unprecedented remedies – including the restrictions on lawful price competition and enforcement of intellectual property rights set forth in the complaint -- that would make it impossible for Intel to conduct business."  Moreover, Intel's response to the FTC Complaint cites the potentially devastating effects of the FTC's requested relief:

> [t[he relief contemplated by the Complaint would require Intel to delay or even forego product improvements unless it could simultaneously ensure that such improvements equally benefitted Intel competitors, essentially requiring Intel to design its products for the benefit of its competitors rather than for its own benefit and the benefit of consumers.
>
> *            *            *            *
>
> The Complaint seeks to turn Intel into a public utility.  Most notably, the Complaint seeks remedies that would restrict Intel's ability to innovate and develop products that benefit consumers when competitors might be disadvantaged by those innovations, and the Complaint would require that Intel affirmatively aid its competitors . . . By its Complaint, the Commission has unfortunately declared that it is prepared to become a central planner of the microprocessor industry and related industries, and that it is intent on replacing market-driven competition with its own *ad hoc* regulation of Intel's pricing, product design, marketing activities, technological collaborations, and supply decisions.[27]

---

[26]    FTC Complaint, at 22.
[27]    FTC Answer, at 5, 8.

113.    Nor has the threat to Intel's future business prospects been lost on industry analysts.  A December 17, 2009 Wells Fargo Equity Research report notes that the relief sought by the FTC is designed to restrict Intel's business practices and could result in "interference with Intel's product development, engineering activities and intellectual properties (sic) rights."  That report further warns investors that the FTC remedies present a problem for Intel's "core operations."  Additionally, a December 16, 2009 report from Oppenheimer Equity Research concludes that in the "longer term" the FTC's charges "could ultimately affect the way [Intel] competes."  That report also noted that the FTC seems intent on preventing Intel from establishing a dominant position in the market for GPUs.

114.    Many in the financial press had the same take on the FTC Action.  For example, a December 17, 2009 *Bloomberg News* article on the FTC Action reported that the FTC's preferred non-monetary remedies of "keep[ing] Intel from signing exclusive deals with computer makers and requir[ing] the company to share more of its technology with rivals" may have a greater impact on Intel's business model than fines imposed in other regulatory proceedings, further noting that the FTC's focus on the GPU market makes the action "further-reaching than cases brought by regulators in the European Union, South Korea and Japan."  Significantly, the article quoted analysts such as Bill Gorman, at PNC Institutional Investments, who predicted that such remedies could severely impede Intel's ability to build market share in the increasingly important GPU market.  Similarly, a December 16, 2009 *New York Times* article entitled *F.T.C. Says Intel Stifles Competition* quoted Howard University Law School professor Andrew Gavil observing that the FTC Action is "very significant because it is broader in scope than any of the current [Intel regulatory] cases."

115.    Intel's Corporate Fiduciaries were, and still are, under a duty to prevent and

46

remedy the antitrust violations alleged in the FTC Action.  The FTC Action reflects information

that was and is readily available to Intel's Corporate Fiduciaries due to their direct participation,

through their receipt of ECOC reports, through their access to the non-public evidentiary record,

and/or through other systems employed at Intel to detect potential violations of law.  Indeed, as

FTC Chairman Leibowitz and Commissioner Rosch made clear in a statement concerning the

FTC Action, Intel's senior management and Board have had "unprecedented" levels of

communications and "multiple meetings" with the FTC concerning the subject matter of the FTC

Action prior to the filing of a complaint.[28]  Nonetheless, in bad faith disregard of its fiduciary

duties, they permitted such activities to occur, thereby subjecting Intel to substantial fines,

penalties, and possible criminal sanctions.

**THE DEMAND REQUIREMENT HAS BEEN SATISFIED**

**THE BOARD HAS SHOWN HOSTILITY**
**TOWARD PRIOR SHAREHOLDER CLAIMS**

116.    As described more fully above, well prior to any shareholder action, Intel had

been engaged in litigation in multiple venues concerning essentially the same antitrust violations

as alleged herein.  For example, AMD filed its complaint against Intel and a foreign subsidiary of

Intel on June 27, 2005.  Prior to settling for $1.25 billion, that action was scheduled for trial in

the spring of 2010 and, by Intel's reckoning, involved the production and review of hundreds of

millions of documents, testimony from hundreds of witnesses, and the examination of thousands

of commercial transactions.  In addition, the EC's Statement of Objections was served on Intel

on July 27, 2007, containing the EC's "preliminary conclusion that Intel has engaged in three

types of abuse of a dominant market position," whereupon Intel (and the Board) began preparing

its formal defense to those assertions.

---

[28]     *See* Statement of Chairman Leibowitz and Commissioner Rosch, filed in the FTC Action,
at 1.

117.    The Board and its Audit Committee are presumed to have fulfilled their duty to be well-informed concerning those serious matters, including:  gaining a fair understanding of the allegations made; evaluating the force of the evidence supporting the contentions; and assessing the risks to Intel of both the treble damages private actions and regulatory proceedings. Moreover, Delaware law requires that corporations such as Intel have systems in place to provide that type of quantitative and qualitative information to the Board so that it may exercise oversight and control over important litigation and regulatory threats.[29]

118.    On February 12, 2008, Intel shareholder Martin Smilow commenced the Smilow Action in this District, alleging demand-futility derivative claims and seeking to hold present and former Board members liable for many of the same violations alleged herein.  The legal basis for Smilow's claim was primarily an alleged breach by the Intel directors of their duty of corporate oversight.  On August 7, 2008, Smilow amended his complaint, essentially reasserting the same allegations.  Smilow's amended complaint alleged that Intel had suffered millions of dollars in damages, and likely would be additionally damaged as a result of proceedings pending against it.

119.    On September 5, 2008, the defendants in the Smilow Action moved to dismiss the amended complaint.  The movants included three of the five members of the Intel Audit Committee:  Jane E. Shaw, Susan Decker, and David S. Pottruck.  Among other things, those defendants argued that numerous events and public allegations – beginning in 1987 and continuing through spring 2004 – served to bar the Smilow Action under Delaware's three-year

---

[29]    *See e.g.*, *In re Citigroup Inc. S'holder Derivative Litig.,* 964 A.2d 106, 131 (Del. Ch. 2009) ("Directors should, *indeed must under Delaware law,* ensure that reasonable information and reporting systems exist that would put them on notice of fraudulent or criminal conduct within the company.  Such oversight programs allow directors to intervene and prevent frauds or other wrongdoing that could expose the company to risk of loss as a result of such conduct.") (emphasis added).

statute of limitations for actions sounding in breach of fiduciary duty.[30]   The defendants, while asserting that the allegations exhibited an "utter lack of merit," nonetheless maintained that demand on the Board would not be have been futile.[31]

## THE BOARD HAS REJECTED PLAINTIFFS' DEMANDS

120.   Pursuant to Rule 23.1 and Delaware law, Plaintiffs have independently made demands upon the Board to investigate and remedy the antitrust violations underlying the private and regulatory proceedings described herein in order to prevent any further harm to the Company.   As shown below, the Board has evaded any meaningful and timely response to Plaintiffs' demands, despite already having: (1) gathered the information necessary to respond during the course of the EC Action, the AMD Action, the Smilow Action, the NYAG Action, and/or the FTC Action; (2) performed an evaluation of the merits of the various antitrust allegations alleged herein; and (3) repeatedly taken a consistent and extensively detailed public position that each and every civil and government action alleging antitrust violations is utterly without merit.   As a result, under applicable law, Plaintiffs' demands are deemed to have been rejected by the Board or, in the alternative, the Board has shown itself post-demand to be so biased and lacking in independence that is cannot ever fairly address the demands.

## The Initial Demands

121.   On June 12, 2008, Intel shareholder Annette Villari ("Villari"), by and through counsel, made a demand upon the Board.[32]   The letter outlined the long history of accusations of antitrust violations by Intel executives and demanded that the Board:

---

[30]      *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Consolidated Complaint or, in the Alternative, to Stay this Action, dated September 5, 2008, at 21-23, filed in the Smilow Action.

[31]      *Id.* at 2.   The Smilow Action was ultimately dismissed for failure to make pre-suit demand.   *See In re Intel Corp. Derivative Litig.,* 621 F. Supp. 2d 165 (D. Del. 2009).

[32]      That letter is attached as Exhibit A to the complaint filed in the *Gilman* Action.

[t]horoughly investigate all of these allegations, and bring legal action to protect the Company and its shareholders, including actions for breach of fiduciary duty, unjust enrichment and other available causes of action. The potential defendants include not only executives but Board members who have not conscientiously worked to ensure that Intel conducted its business solely through lawful means. The Board should also investigate and evaluate any ongoing activities that may violate the antitrust laws, as such conduct that could expose Intel to greater scrutiny and harm than it already faces from past activities including, but not limited to, governmental enforcement actions, competitor lawsuits, and treble damage penalties.

We ask finally that the Board review its own actions and those of its members concerning the manner in which they did or did not appropriately discharge their fiduciary duties with respect to the underlying claims.

122.    Long-time Intel shareholder and Plaintiff in this matter Charles A. Gilman joined in that demand later, incorporating and adopting all demand-related communications made previously by Ms. Villari.

123.    Such efforts by Ms. Villari and Mr. Gilman were met with an obstinate refusal by the Board, which:  (a) refused to appoint an independent committee of directors empowered to review the charges and take remedial action; (b) refused outright *to perform any investigation at all*; (c) asked the Audit Committee of the Board to "respond" to the demand, with full knowledge that in the Smilow Action involving many of the same matters, a majority of the Audit Committee members (without any investigation) informed this Court that they had already concluded that the underlying claims exhibited an "utter lack of merit"; (e) attempted to run out the statute of limitations so that no claims could ever be personally asserted against them or anyone else; and (f) refused to enter into tolling agreements in the hope that the limitations period would indeed run out, whereas fiduciaries acting in good faith would enter into such agreements so that meritorious claims could be preserved.

124.    On September 25, 2008, and November 3, 2008, the Audit Committee requested that the demand shareholder, who was not an insider, provide facts or information in support of

the demand.  That request was without merit given that the Board knew that an outsider shareholder could supply no facts that would not *already be known* to the Board by dint of the AMD Action, EC Action, the Smilow Action*,* and/or other proceedings brought by regulators in South Korea and Japan.

125.    On January 29, 2009, the Board's Audit Committee wrote a letter to counsel setting forth five reasons supporting its recommendation to the Board to "defer any determination regarding the demand."  Those five reasons can be summarized as follows:  (1) the demand was premature as the matters raised are the subject of contentious litigation, and Intel could "benefit" from a judicial resolution of those questions; (2) despite years of litigation, the "factual records" in the underlying matters were not fully developed; (3) any action taken by Intel against any alleged wrongdoers could expose Intel to liability; (4) any action taken on the demand could have an unspecified adverse effect on Intel's business; and (5) any action taken by Intel against any alleged wrongdoers could trigger large indemnity obligations.

126.    Those non-responses to do nothing beyond demonstrating the Board's:  (1) lack of independence; (2) failure to redress the Company's decade-long antitrust scheme; and (3) failure to hold management accountable for its illegal conduct.  Such arguments could be made in every case of corporate wrongdoing in which a shareholder has made a demand, as justification for looking the other way and taking no remedial action.  Indeed, the Board's view (in contrast to the view of the Delaware courts) appears to be that the more serious the wrongdoing, the less of a duty the Board has to investigate it, to remediate it, and to call the wrongdoers to account.

127.    The excuses provided by the Board for failing even to investigate the demand are specious for the following reasons:

A.    Prematurity

The Board's *prematurity* argument was made contemporaneously with conflicting court

arguments by a majority of directors (including a majority of the members of the Committee) in

the Smilow Action that any corporate action is already time-barred.  As the Board has taken the

position that the limitations periods are actively running on all or some of the underlying claims,

it is estopped from arguing prematurity, especially as to the EU Action, where a $1.45 million

fine has already been imposed.

B.    Need for a Clearer Factual Record

The Board claimed that the Company could benefit from a more complete factual record.

That argument is a variant of the prematurity argument.  The factual record in the EC Action was

complete at the time.  Similarly, the factual record in the AMD Litigation – which included

millions of pages of documents and thousands of hours of deposition testimony – was complete,

or nearly complete, at the time.  Thus, it is clear that a sufficient factual record had existed for

quite some time when demand was made.

C.    Action by the Company Could Expose Intel to Liability

That argument is absurd, as the derivative liability of any individual defendant to re-pay

Intel, flows from corporate fines, damages, or penalties incurred in litigation *prosecuted by*

*others*.  Thus, preserving the claims asserted herein and prosecuting them as "claims over"

cannot *increase* Intel's liability.  Rather, recoveries from the individual defendants (and/or their

insurers) can only *decrease* Intel's liability.  There is nothing novel or extraordinary about

pursuing claims against contingently liable parties:  It is a ubiquitous practice in federal and state

court used to limit, not expand, the defendant/claimant's exposure.  In addition, there is no

possible excuse for the Board to ignore or defer demands that were made for corporate

governance reforms to prevent a recurrence of the types of schemes alleged herein.  Therapeutic

corporate action certainly cannot enhance Intel's exposure to liability. Moreover, to the extent that the Board believes the Company can never bring action to protect its interests directly (or cannot do so in a timely manner), its best course would be to step aside and allow the corporate claims to be pursued derivatively. A decision that valuable claims should never be pursued by anyone due to the seriousness of the underlying allegations brings the entire demand process into disrepute. As it appears to be the Board's ultimate conclusion (unreasonable as it may be) that the nature of pending litigation precludes any Board-level investigation, review, or remedial action, the Board should concede (as is the case) that demand has been denied due to Board's hostility, bias and/or incapacity to act in Intel's best interests.

      D.    <u>Action on the Demand Could Have an Adverse Effect on Business</u>

That purported reason not to act is entirely specious. Any demand investigation or corporate action will involve some degree of corporate expense and disruption, but if that were enough to justify a refusal to act on a demand, then no demand would ever be addressed by any Board.

      E.    <u>Indemnification Expenses</u>

Any action undertaken by a corporation against an officer or director may trigger indemnification expense. The fact that litigation against fiduciaries that violate the law may be costly is plainly an inadequate cause to refuse to investigate a demand. That boilerplate objection can be invoked in response to any demand for shareholder action, and is certainly no reason in this case to ignore individual wrongdoing.

128. Although counsel were not in agreement with the excuses provided in Intel's January 29, 2009 letter, action was deferred to await judicial or administrative resolution of one or more of the serious matters pending against Intel.

129.    On May 13, 2009, the EC announced that it was imposing a staggering €1.06 billion penalty on Intel (approximately $1.45 billion), the largest fine ever imposed by that body.

130.    On June 8, 2009, counsel wrote to the Board, expressing the view that further deferral of action on the demand was unwarranted in light of the EC Decision.  Counsel further demanded that the Board take prompt action to protect the corporation, including determining individual liability and initiating appropriate lawsuits, and evaluating the effectiveness of Intel's corporate governance systems, so as to determine the types of corporate governance improvements sorely needed by Intel.

131.    On July 29, 2009, counsel submitted a letter to the Board expressing concern over the previous invocation of a statute of limitations defense in the Smilow Action, and urging immediate action to protect the Company's rights against lapse due to passage of time.  Counsel further requested that the Board obtain "tolling agreements from all Board members and all senior members of management during the relevant period so that all major claims may be preserved."

132.    The request for tolling agreements has been ignored, as Board members attempted to escape personal liability by "running down the clock."

133.    On August 27, 2009, derivative counsel met with counsel for the Board to urge action yet again, including the adoption of fourteen (14) different types of remedial measures that must be employed immediately to protect Intel from further harm.  Subsequent to that meeting, the Board took no action, and none is ever expected, as the Board members are hostile, biased, and have demonstrated a lack of independence.

**The MPERS Demand**

134.    On November 12, 2009, subsequent to the announcement of the NYAG Action

and on the same day as the $1.25 billion AMD settlement, Plaintiff MPERS made a demand on

the Board through counsel, outlining the litany of allegations and adverse findings against Intel

for violations of U.S. and international antitrust laws (the "MPERS Demand).  The facts

described in the MPERS Demand were substantially the same as the facts described in earlier

shareholder demands, and allegations made in the Smilow Action, the EC Action, the AMD

Action, the NYAG Action, and the FTC Action.  Plaintiff MPERS further demanded that the

Board:

> [t]horoughly investigate all of these allegations, and bring legal action to protect
> the Company and its shareholders, including actions for breach of fiduciary duty,
> unjust enrichment, and other available causes of action.  The potential defendants
> include not only executives but Board members who have not conscientiously
> worked to ensure that Intel conduct its business solely through lawful means.  The
> Board should also investigate and evaluate any ongoing activities that may violate
> the antitrust laws, as such conduct could expose Intel to greater scrutiny and harm
> than it already faces from past activities including, but not limited to,
> governmental enforcement actions, competitor lawsuits, and treble damage
> penalties.
>
> We ask that the Board review its own actions and those of its members
> concerning the manner in which they did or did not appropriately discharge their
> fiduciary duties with respect to the underlying claims.[33]

135.   On December 1, 2009, counsel for the Board wrote to MPERS claiming that the

Board would be made aware of the MPERS Demand and would "take up the matter in the near

future."

136.   In response, on Monday, December 7, 2009, MPERS's counsel wrote to counsel

for the Board, stating that they had been in communication with counsel for Mr. Gilman and had

been made aware of the Board's continuing position that prior shareholder demands were

premature for various reasons.  Accordingly, MPERS's counsel demanded assurances by Friday,

December 11, 2009 that the MPERS Demand would not be met with the same hostility afforded

---

[33]   That letter is attached hereto as Exhibit A.

prior demands.  Counsel for the Board responded simply by stating that the Board would

consider the demand at its next meeting in January, 2010.  The Board has taken no action on the

MPERS demand since that communication, and none is ever expected, as the Board members are

hostile, biased, and have demonstrated a lack of independence.

**The Demands Have Effectively Been Rejected**

137.     The Board has a duty to inform itself of all material information required to make

an objective evaluation of a shareholder demand.[34]  After completing its evaluation of a

shareholder demand, the Board has a duty to respond and cannot simply inform a shareholder

that it is looking into the allegations.[35]  The Board, however, is not entitled to an indefinite

period of time to consider a shareholder demand, but must respond in a reasonable period of

time, especially when it has already gathered the relevant factual information necessary to

evaluate the shareholder's allegations.[36]

138.     The antitrust allegations at the core of Plaintiffs' demands are virtually the same

as those alleged in:  (1) the EC action filed in July 2007; (2) the AMD Litigation filed in

November 2005; (3) the Smilow Action filed in February 2008; (4) the NYAG Action filed in

November 2009; and (5) the FTC Action filed in December 2009.  Throughout the course of

those proceedings, the Board has become extremely well-informed about the factual and legal

basis for the allegations in this matter.

139.     Moreover, the Company has clearly completed its evaluation of the merits of

---

[34]     *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

[35]     *See Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1118 (D. Del. 1985) (stating that board may not simply "brush off" demand letter).

[36]     *See Lewis v. Sporck*, 646 F. Supp. 574, 578 (N.D. Cal. 1986) (holding that complaint filed without waiting for board action was justified where board had knowledge of shareholder allegations garnered over three prior years during course of government investigation and private lawsuit); *Mills*, 91 F.R.D. at 73 (stating that board must respond to demand within reasonable time).

those claims, having consistently taken a public stance that regulators and private litigants alike have gotten their facts wrong and that Intel, it senior management, and the Board have committed no wrongdoing whatsoever. Among the Company's public statements on the matter are the following:

a.  In response to the EC's record fine of $1.45 billion against Intel, Defendant Otellini issued a May 13, 2009 press release stating that "Intel takes strong exception to this decision. We believe the decision is wrong and ignores the reality of a highly competitive microprocessor marketplace – characterized by constant innovation, improved product performance and lower prices. There has been absolutely zero harm to consumers. Intel will appeal. We do not believe our practices violated European law. The natural result of a competitive market with only two major suppliers is that when one company wins sales, the other does not.";

b.  In a November 12, 2009, *New York Times* article reporting the settlement of the AMD Action, Defendant Otellini discounted the merits of AMD's allegations, stating that "[w]e have never wavered in our position that Intel did nothing outside the law … [i]t made sense to step back and find a way to settle this [litigation].";

c.  In response to the NYAG Action, a statement on the Company's website affirmatively states that the claims in the NYAG Action are groundless: "[t]he NYAG's Complaint is grounded more in rhetoric and politics than fact and law[.] Rather than setting forth a clear statement of facts upon which its claim is based, the NYAG's allegations are deliberately inflammatory, apparently made for the political purpose of providing sound bites for media attention.";

d.  In response to the FTC Action, the Company issued a press release on December 16, 2009, calling the lawsuit "misguided" and quoting Intel Senior Vice President and General Counsel Doug Melamed as saying that "[t]he FTC's rush to file this case will cost taxpayers tens of millions of dollars to litigate issues that the FTC has not fully investigated"; and

e.  In Intel's 2008 Corporate Responsibility Report, the Company stated that "Intel is engages in a series of private litigations and regulatory investigations prompted by complaints from its primary competitor. Our position on these matters is simple: We believe that the worldwide microprocessor market is functioning normally and is highly competitive, and that our conduct has always been lawful, pro-competitive, and beneficial to consumers."

140.    Intel's 21-page Answer to the FTC Complaint, filed on December 31, 2009 ("FTC Answer"), leaves no doubt that its conclusions with respect to all alleged antitrust violations

came as the result of a comprehensive and exhaustive analysis of the alleged facts.  Indeed,

before ever responding to any of the specific numbered paragraphs of the FTC Complaint, the

FTC Answer contains a detailed *8-page* introduction assailing the FTC's allegations and its use

of the FTC Act to address alleged antitrust violations.  Furthermore, citing Supreme Court

precedent as support for its stance on alleged antitrust violations in the relevant microprocessor

market, Intel states that:

> [t]he Complaint relies on invective to paint ordinary and desirable conduct as anticompetitive exclusion.  For example, the Complaint alleges that Intel 'threatened' OEMs with the loss of discount if they increased purchases from Intel competitors.  But these alleged 'threats' are nothing more than an inherent implication of procompetitive price competition: a supplier offers a better price for more volume when negotiating with a customer that demands greater discounts by threatening to take some or all of the business at issue to another supplier.  The offer of a lower price for more volume necessarily implies that the lower price is contingent on the additional volume.  The Complaint seeks – by using words such as 'threats' and 'exclusionary' – to transform precompetitive, above-cost price reductions aimed at winning additional sales into something sinister.  But the Supreme Court has repeatedly declared such above-cost discounting to be entirely lawful.[37]

141.    Similarly, the FTC Answer staunchly defends Intel's practice of bullying OEMs

into limiting their dealings with AMD by withholding technical assistance or collaboration,

claiming that:

> In fact, customers that increased their dealings with AMD continued to receive competitive discounts, marketing assistance, and technical support from Intel.  Moreover, AMD increased its market share dramatically during the period covered by the Complaint – because of its successes in selling microprocessors for individual consumers, whose requirements are less rigorous than those of commercial customers, and its successful introduction of an innovative new product for servers in 2003.[38]

142.    The FTC Answer similarly defends in minute detail its anticompetitive conduct

with respect GPUs, stating that:

---

[37]    FTC Answer, at 4.
[38]    *Id.* at 5.

The Complaint further alleges that Intel has 'degraded' the interconnection between its microprocessors and discrete GPUs (which Intel does not sell) in an attempt to forestall a challenge to microprocessor-centric computing. This allegation is groundless. As the Complaint acknowledges, discrete GPUs connect to Intel's microprocessors through an industry standard, non-proprietary interconnection, called 'PCI Express.' Intel has done nothing to degrade the connection provided by PCI Express. Moreover, discrete GPUs are complements to Intel microprocessors, and Intel enhances the value of its microprocessors by enabling OEMs and other customers demanding high-performance graphics for their computer systems to interconnect discrete GPUs offered by Nvidia and AMD to Intel microprocessors. Indeed, Intel's main microprocessor rival, AMD, provides its own GPU solutions, and failing to maintain interconnections between its microprocessors and GPUs offered by Nvidia and AMD could place Intel at a competitive disadvantage to AMD.[39]

143. Much like the FTC Answer, the ***118-page*** NYAG Answer, filed on January 12, 2010, illustrates Intel's view of the relevant facts. At the very outset, Intel unequivocally stakes out the position that the NYAG Action has no fundamental basis in fact:

The Complaint is based on a fundamental inconsistency – it accuses Intel of overcharging customers, but the mechanism through which it claims that Intel overcharged customers is *discounting*. It takes the irrational position that price competition from the larger player in the market is anticompetitive and leads to higher, not lower prices. The Complaint also takes a highly selective approach to citation of evidence to support its theories … the Complaint regularly quotes material taken out of context and presents it in a misleading fashion. The Complaint ignores a massive amount of additional evidence, provided to the NYAG during its investigation that refutes its claims.[40]

144. The NYAG Answer further provides, in even greater detail, a virtually identical evaluation of the relevant facts as that found in the FTC Answer. Notably, however, in conjunction with mirroring the factual analysis of the FTC Answer, the NYAG Answer takes Intel's analysis one step further. In particular, the NYAG Answer concludes from the facts that AMD – and not Intel – is to blame for its own competitive disadvantage in the relevant markets. In sum, Intel's conclusion from the facts is that "AMD consistently lagged Intel in addressing the stability, quality, manageability, security, and performance concerns of corporate customers and .

---

[39]    FTC Answer, at 6.
[40]    NYAG Answer, at ¶2.

. . **these critical failures, and AMD's failure to build a competitive mobile microprocessor,**

***not alleged Intel misconduct*****, account for AMD's lack of success in the corporate segment**."

(emphasis added).[41]   Among the statements in the NYAG Answer that demonstrate that Intel's

defense is merely to blame the victim of its flagrant and longstanding antitrust violations:

- [AMD's] Opteron [microprocessor] was a year late to market and failed to reach the performance characteristics that AMD had promised. Intel denies that AMD had 'leapfrogged' Intel with its Opteron family of microprocessors.   [NYAG Answer, at ¶34.]

- AMD's highest ranking sales executive internally described AMD as 'pathetic' for 'selling processors rather than platforms and exposing a partial story, particularly in the commercial segment, that is clearly inferior to Intel's if we want to be honest with ourselves.' The same executive declared that '[i]f you look at it, with an objective set of eyes, you would never buy AMD.  I certainly would never buy AMD for a personal system if I wasn't working here.' He also declared that 'if I was a decision maker in a Fortune 500 company. I wouldn't use AMD.' He added that AMD is saddled with a reputation that 'we're cheap, less reliable, lower quality consumer type product.'  Intel states that AMD's acknowledged deficiencies in failing to meet the need of commercial customers, and not 'retaliation,' explain AMD's lack of success in the corporate desktop/mobile segment.  [NYAG Answer, at ¶36.]

- [Intel's] desktop and mobile products had significant competitive advantages in performance, platform stability, manageability and security, among other things, and therefore the purchase of an AMD-based server would not lead to a customer also purchasing desktop or mobile PCs with AMD microprocessors.  [NYAG Answer, at ¶38.]

- AMD's head of Marketing bluntly stated, '[I]f I was a decision maker in a Fortune 500 company, I wouldn't use AMD.' Indeed, AMD's then Chairman and CEO, Hector Ruiz, admitted internally that 'Our failure to penetrate commercial may have more to do with our ineptness at translatoin [sic] custmer [sic] need into actions than oiur [sic] competitors fud [fear, uncertainty, and doubt].'  [NYAG Answer, at ¶52.]

- [T]he AMD microprocessors were not competitive with Intel's microprocessors for use in corporate PCs, regardless of the net price … [redacted].  [NYAG Answer, at ¶160.]

    145.   In sum, the Company's public statements regarding the facts underlying

---

41      *Id*.

Plaintiffs' demands demonstrate not only that the Board has completed the evaluation necessary to provide a response, but that its steadfast conclusion from that analysis is that the Company and its senior management has done nothing wrong.  The **only** reasonable conclusion to draw from that fact is that the Board has tacitly rejected Plaintiffs' demands.  Any argument to the contrary is completely disingenuous, as Intel's consistent public stance is that the alleged antitrust violations in each and every regulatory and private proceeding – including the EC Action, the AMD Action, the NYAG Action, and the FTC Action – are completely without merit.  Firmly on record with that position, the Board must take the same position with this case, which is based on the same fundamental facts.

146.    The Board's failure to explicitly reject Plaintiffs' demands while simultaneously and vigorously denying identical allegations in numerous private and regulatory actions, is nothing but a transparent delay tactic.  As a result, under applicable law, Plaintiffs' complaints were properly filed under the theory that the Board has unreasonably failed to respond in a meaningful and timely manner to Plaintiffs' demands despite having gathered and evaluated the information necessary to provide such a response.

## INDEPENDENDENCE OF THE INTEL AUDIT COMMITTEE

147.    Under Delaware law, a Board or Board committee that appears *ab initio* to be independent may lose that presumption if, following a demand, it fails to act in a disinterested manner.

148.    After demand was made, the Board ostensibly referred the matter to the Audit Committee for review.  The Board knew, however, that the Audit Committee was not independent, and would render no independent recommendations.  Indeed, the Audit Committee was never granted power to bring claims or act independently of the entire Board (including

CEO Otellini).

149.    On September 5, 2008, less than four months after Ms. Villari made her demand, the Intel Director Defendants (including Audit Committee Chairman Shaw and two other present Audit Committee members) stated in the motion to dismiss brief in the Smilow Action that the allegations exhibited an "utter lack of merit," that the allegations created only the "illusion of a lengthy pattern of wrongdoing," and that they could not be sued due to the expiration of the applicable statute of limitations.

150.    Plaintiffs' demands concern many of the same matters raised in the Smilow Action.  Yet despite having concluded in the Smilow Action that those matters were meritless and illusory, a majority of the members of the Audit Committee responded to the demand by letter dated January 29, 2009, by saying that it was premature because the pertinent facts were "not yet fully developed."  As a result, by its own contradictory words and actions with regard to two separate shareholder demands, the Audit Committee demonstrated that it is was not disinterested:  It either pre-judged the merits of the former demand without due investigation or the benefit of a fully developed factual record, or speciously avoided rejecting the latter demand when the Board (including a majority of the Audit Committee) had already concluded that the claims were meritless and illusory.

151.    Moreover, given the Board's tacit admission that Plaintiff MPERS's demand will be treated similarly to prior demands, there is no reason to believe that the Audit Committee will address the MPERS Demand with any greater independence.  Indeed, it is abundantly evident that the "outside" directors were taking direction from senior management as to how they should view the propriety of their actions.  This "one for all, and all for one" approach is inconsistent with disinterest and independence of mind.  Accordingly, the Audit Committee has lost the

presumption of independence with respect to matters alleged herein.

## FIRST CAUSE OF ACTION

**(Breach of the Fiduciary Duty of Loyalty as to Active Misconduct Claims)**

152.   Plaintiff incorporates by reference all previous allegations.

153.   This Cause of Action relates only to the Active Misconduct Claims and is brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, and Decker.

154.   During the period from in or about 2001 through the present,  Intel's executives allegedly engaged in active violations of the European, Japanese, South Korean and United States antitrust laws, and the Board of Directors failed in bad faith to rein in, ameliorate or countermand such misconduct, or to ensure cooperation with regulatory authorities.

155.   As a result of the foregoing conscious disregard of the defendants' fiduciary duties, Intel has suffered substantial fines and settlement payments, and may be forced to pay more in fines, settlements and verdicts, including possible treble damages.

156.   Defendants are liable for any damages incurred by Intel as a result of their wrongful misconduct.

## SECOND CAUSE OF ACTION

**(Breach of the Fiduciary Duty of Loyalty as to EC Regulatory Claims)**

157.   Plaintiff incorporates by reference all previous allegations.

158.   These claims are brought against those persons who were officers and/or directors during the period from which the EC began investigating Intel's conduct in Europe through the imposition of the record fine in May 2009.  During that period, the relevant defendants failed to

ensure that full and complete cooperation was provided to regulatory authorities; failed to hold accountable any person who engaged in unlawful misconduct; failed to take necessary remedial actions; and failed to work with the EC on remedies or resolutions of the charges that would have reduced or even eliminated the EC fine.  Such claims are brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, Decker, and Bartz.

159.    Defendants are liable for any damages incurred by Intel as a result of their wrongful misconduct.

### THIRD CAUSE OF ACTION

**(Breach of the Fiduciary Duty of Loyalty as to AMD Claims)**

160.    Plaintiff incorporates by reference all previous allegations.

161.    These claims are brought against those persons who were officers and/or directors during the period from which AMD instituted the AMD Action against Intel until its settlement in November 2009.  During that period, the relevant defendants failed to rein in, ameliorate or countermand such misconduct in a manner that would have reduced or possibly eliminated the need for the settlement payment altogether.  Such claims are brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, Decker, and Bartz.

162.    Defendants are liable for any damages incurred by Intel as a result of their wrongful misconduct.

### FOURTH CAUSE OF ACTION

**(Breach of the Fiduciary Duty of Loyalty as to Failure to Take Remedial Measures)**

163.    Plaintiff incorporates by reference all previous allegations.

164.    These claims are brought against those persons who are presently Intel directors and who are consciously and in bad faith refusing to thoroughly investigate and address

64

executive wrongdoing; attempting to stymie and defeat legitimate claims against directors and officers through efforts to cause such claims to lapse by dint of the statute of limitations; and failing in bad faith to enact necessary therapeutic and remedial measures.

165.    Defendants herein have failed to enact crucial remedial measures including:  (a) devoting greater resources to targeted compliance activities; (b) affording enhanced independence to compliance personnel; (c) implementing antitrust audit risk and training programs that proceed from an "acquiescence standpoint"; (d) conducting a full antitrust compliance program audit to ensure efficacy; (e) reviewing, implementing or strengthening domestic and international "whistle-blower" protections; (f) increasing reliance on outside compliance experts; (g) creating or expanding the role of governmental liaison officers; (h) creating an ombudsman charged with receiving and evaluating OEM or retailer complaints of coercive practices; (i) reviewing and strengthening compliance with procedures relating to employee certifications that their actions have complied with applicable laws; (j) enhancing and applying sanctions for non-compliance with corporate ethics and legal compliance rules; (k) reviewing and enforcing proper contracting procedures; (l) reviewing and strengthening internal reporting channels; (m) conducting an independent review of the function and efficacy of the ECOC; and (n) reviewing, revising, and strengthening "crisis management" procedures.

166.    Defendants' actions and refusals to act as detailed herein are in bad faith.  They have caused and will cause damages to Intel.

167.    Defendants are liable for any damages incurred by Intel, and that will be incurred by Intel, as a result of their wrongful misconduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Requiring the Defendants named in the Fourth Cause of Action herein to enact and implement the remedial, corporate governance and audit procedures as set forth in that Cause of Action;

C.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

Dated: February 12, 2009

BIGGS & BATTAGLIA

/s/Robert D. Goldberg
Robert D. Goldberg (ID #631)
921 North Orange Street
Wilmington, Delaware 19899
(302) 655-9677
goldberg@battlaw.com

**Attorneys for Plaintiff Charles Gilman
and Louisiana Municipal Police
Employees' Retirement System**

PASKOWITZ & ASSOCIATES
Laurence D. Paskowitz
60 East 42nd Street—Suite 4600
New York, NY 10165
212-685-0969

BERMAN DEVALERIO
Jeffrey C. Block
Bryan A. Wood
Scott A. Mays
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax:(617) 542-1194

**Co-Lead Counsel for Plaintiffs**

## **VERIFICATION**

Charles A. Gilman, under pain and penalty of perjury under the laws of the United States, avers that as plaintiff herein he verifies that he has reviewed the foregoing Shareholders' Demand-Made Consolidated Derivative Complaint and that the allegations are true and correct to the best of his information, knowledge and belief.

Dated:  February 11, 2010

_____
Charles A. Gilman

## VERIFICATION

R. Randall Roche, under pain and penalty of perjury under the laws of the United States avers that as plaintiff herein he verifies that he has reviewed the foregoing Shareholder's Demand-Made Derivative Complaint, and that the allegations are true and correct to the best of his information, knowledge and belief.

Dated: February ___, 2010

_____
R. Randall Roche
General Counsel
Louisiana Municipal Police
Employees' Retirement System

1