# TAB 1

Westlaw.

Not Reported in A.2d, 1997 WL 666973 (Del.Ch.)
(Cite as: 1997 WL 666973 (Del.Ch.))

**C**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Stanley B. BARON, Plaintiff,
v.
Elliott J. SIFF, Bradford Siff, Malcolm Jozoff,
Peter Burtscher, Richard W. Firestone and Peter
Wilson, Defendants.
and
CEDETA DENTAL INTERNATIONAL, INC.,
Nominal Defendant.
No. 15152.

Oct. 17, 1997.

Robert B. Anderson of MC Carter & English,
Wilmington, Delaware. Of Counsel: Gerald Krovat-
in and David W. Fassett of Arseneault & Krovatin,
Chatham, New Jersey. Attorneys for Plaintiff.

Daniel A. Dreisbach and Drinivas M. Raju of
Richards, Layton & Finger, Wilmington, Delaware.
Of Counsel: James H. Bennett of Reiss & Starks,
New Canaan, Connecticut. Attorneys for Defend-
ants.

*MEMORANDUM OPINION*

STEELE, V.C.

*1 I grant defendants' Motion to Dismiss this pro-
posed derivative action without prejudice under
Court of Chancery Rule 23.1 on the ground that
plaintiff's Complaint fails to allege with particular-
ity facts sufficient to overcome the business judg-
ment rule and establish wrongful refusal of his pre-
suit demand. Plaintiff may file an amended Com-
plaint within sixty days.

**I. Facts**

Nominal defendant Cedeta Dental International,
Inc. ("CDI") is a Delaware corporation with its
principal place of business in Trumbull, Connectic-
ut. CDI produces a non-pharmacological alternative
to novocaine for use by dentists. Plaintiff, Stanley
Baron, is a shareholder of CDI. Defendant Elliot
Siff is CDI's Chief Executive Officer and Chairman
of its Board of Directors ("the Board"), and defend-
ant Bradford Siff is the President of CDI and a
member of the Board. The remaining four defend-
ants are members of the Board.

In a letter to the Board, drafted by counsel and
dated July 15, 1996, plaintiff accused the Siffs of
"mismanaging CDI and forfeiting its corporate op-
portunities in order to retain and entrench their con-
trol thereof in violation of their fiduciary duties to
CDI and its stockholders." [FN1] Plaintiff demanded,
among other things, that the Board remove the Siffs
as officers and directors of CDI and require them to
pay damages for the harm they had allegedly
caused.[FN2] The letter also stated: "A rejection of
these demands will be interpreted as a breach of
your fiduciary duties to the CDI shareholders and
your failure to act will indicate that you have
chosen either to ignore or ratify the Siffs' conduct."
[FN3] The Board rejected plaintiff's demand in a let-
ter drafted by counsel and dated July 24, 1996.

FN1. Compl., Ex. A at 2.

FN2. Compl., Ex. A at 4.

FN3. Compl., Ex. A at 5.

On August 13, 1996, plaintiff instituted this action.
Count I of the Complaint alleges that the Siffs pur-
posefully and knowingly breached their fiduciary
duties of care and loyalty. Count II alleges that the
Siffs recklessly and negligently breached the same
fiduciary duties. Count III alleges that all six Dir-
ectors purposefully and knowingly breached their
fiduciary duties of care and loyalty by rejecting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 666973 (Del.Ch.)
(Cite as: 1997 WL 666973 (Del.Ch.))

plaintiff's demand.[FN4]

> FN4. Wrongful refusal is not an independent cause of action. Plaintiff should have alleged that a demand was made and was wrongfully refused as part of the "substantive" claims raised in Counts I and II.

Defendants filed a Motion to Dismiss on September 30, 1996. They argue that plaintiff failed to comply with Court of Chancery Rule 23 .1 and that the Complaint fails to state a claim upon which relief can be granted. Defendants also argue that the Complaint must be dismissed at least as to the four disinterested members of the Board because they have been granted immunity from personal liability pursuant to Article Eighth of the CDI Restated Certificate of Incorporation, drafted in accordance with 8 Del. C. § 102(b)(7). Because I find that the Complaint must be dismissed for failure to comply with Rule 23.1, I do not now address the remaining arguments in defendants' motion. Should plaintiff file an amended Complaint, defendants' may renew their Motion on these grounds without further briefing, except as the amended Complaint may demand.

## II. Applicable Standard

**\*2** Rule 23.1 requires a prospective derivative plaintiff to allege in his Complaint that (1) he has made a demand on the corporation's board of directors that has been wrongfully refused or (2) that making such a demand would be futile.[FN5] Plaintiff in this action alleged that the Board wrongfully refused his demand.

> FN5. *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1216 (1996); *Levine v. Smith,* Del.Supr., 591 A.2d 194, 200 (1991).

The refusal of a demand is reviewed under the business judgment rule. That rule creates a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the

action taken was in the best interests of the company." [FN6] The presumption can be rebutted only if the party alleging wrongful refusal creates a reasonable doubt that the decision was a valid exercise of business judgment.[FN7] By making a pre-suit demand, a plaintiff concedes the independence and disinterestedness of the board.[FN8] Thus, to establish wrongful refusal, a plaintiff must plead with particularity facts that create a reasonable doubt as to the good faith or reasonableness of a board's investigation.[FN9] Mere conclusory allegations are insufficient. [FN10]

> FN6. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984).

> FN7. *Grimes,* 673 A.2d at 1219.

> FN8. *Levine,* 591 A.2d at 212.

> FN9. *Spiegel v. Buntrock,* Del.Supr., 571 A.2d 767, 777 (1990).

> FN10. *Levine,* 591 A.2d at 211.

## III. Discussion

The Complaint in the present action fails to allege adequately that the Board's refusal was wrongful. The only statement in the Complaint that could arguably fulfill the requirement is the following:

he Siffs and the Other Directors, having received notice of the Siffs' aforesaid conduct, purposefully and knowingly breached that fiduciary duty by causing the CDI Board, through counsel, to reject the Remedial Demands and, by that rejection, to endorse the Siffs' aforesaid conduct.[FN11]

> FN11. Compl. at para. 32.

This, however, is not a particularized fact; it is a conclusory allegation of the type that has been rejected by the Supreme Court.[FN12]

> FN12. *Grimes,* 673 A.2d at 1220 (rejecting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 666973 (Del.Ch.)
(Cite as: 1997 WL 666973 (Del.Ch.))

as conclusory plaintiff's allegation that "refusal could not have been the result of an adequate, good faith investigation since the Board decided not to act on the demand").

Plaintiff, however, argues that the Board's refusal letter, which is incorporated by reference in and attached to the Complaint, is also part of the pleadings. Plaintiff contends that he has satisfied the requirements of Rule 23.1 because the face of the letter establishes the wrongfulness of the Board's refusal. The letter, plaintiff notes, (1) was drafted and signed by counsel, (2) does not state that the Directors held a meeting to discuss the demand letter, (3) does not respond to each allegation in the demand letter, (4) does not mention the Board until the second to the last line, and (5) is dated nine days after the demand letter. Relying on these facts, which defendants concede are accurate, plaintiff argues that defendants either failed to investigate the demand letter altogether or inappropriately delegated the investigation to counsel .[FN13]

> FN13. Pl.'s Brf. in Opp. to Def.'s Mot. to Dis. at 8-12. Plaintiff alleged that counsel's conflicts of interest rendered him incapable of investigating the demand adequately. Because I find that the Board did not delegate its investigation responsibilities to counsel, I do not reach this issue.

It is correct that the refusal letter is a part of the pleadings to be considered for the purposes of this Motion,[FN14] however, the mere attachment of the letter does not constitute an *allegation of particularized facts* sufficient to rebut the presumption of the business judgment rule. Even if, as plaintiff argues, the face of a letter written by someone other than plaintiff could be considered an allegation of particularized facts *by* plaintiff, the facts "alleged" by the face of the refusal letter in this action do not create a reasonable doubt as to the good faith or the reasonableness of the Board's investigation, nor do they suggest that the Board delegated the investigation of plaintiff's allegations to counsel.

FN14. Court of Chancery Rule 10(c).

*3 That the refusal letter was drafted and signed by defendants' counsel does not suggest that the Board did not address plaintiff's demand. This Court recently rejected this argument in *Gagliardi v. Tri-Foods Int'l Inc.,* [FN15] where the plaintiff alleged that an officer and corporate attorney refused the plaintiff's demand without board involvement. In that case Chancellor Allen explained:

FN15. Del. Ch., 683 A.2d 1049 (1996).

> t is, however, undisputed that [plaintiff] made a pre-suit demand, that the corporation did not institute the suit, that plaintiff did and that the corporation has moved to dismiss under Rule 23.1. These undisputed facts establish the board's official response to the demand.... [FN16]

FN16. *Gagliardi,* 683 A.2d at 1054 n. 7.

It is understandable that a busy board of directors would, as plaintiff did, have counsel draft and sign a letter undoubtedly written with an eye toward complying with Rule 23.1. That the Board itself is not mentioned until the end of the letter is of no moment because the first sentence of the letter indicates that counsel was writing in his capacity as CDI's representative. There is no indication that counsel wrote the letter without the Board's input or authorization. In fact, plaintiff conceded in the Complaint that the Board responded to his demand letter, albeit through counsel.[FN17]

> FN17. Compl. at paras. 21, 32 ("By letter dated July 24, 1996, ... the CDI Board, through counsel, rejected the Remedial Demands." * * * "[T] he Siffs and the Other Directors, ... breached that fiduciary duty by causing the CDI Board, through counsel, to reject the Remedial Demands....").

There is no prescribed procedure that a Board must follow when investigating a demand under Rule 23.1.[FN18] The refusal letter's failure to state that the Board held a meeting and failure to contain a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 666973 (Del.Ch.)
(Cite as: 1997 WL 666973 (Del.Ch.))

Page 4

point-by-point response to all allegations in the demand letter does not stand for the proposition that the Board did not consider the demand before refusing it. The Board's refusal to institute a suit and Motion to Dismiss plaintiff's suit establish the Board's official response to plaintiff's demand.

> FN18. *Levine,* 591 A.2d at 214.

That the refusal letter is dated nine days after the demand letter is also insufficient to rebut the presumption that the Board adequately investigated the demand. The "amount of time needed for a response will vary in direct proportion to the complexity of the technological, quantitative, and legal issues raised by the demand." [FN19] The Board's detailed responses to several of plaintiff's allegations reveal its familiarity with the issues plaintiff raised. Furthermore, plaintiff's own demand letter must be read to concede that no more than ten days was necessary to investigate his demand. It stated: "If you do not commence these actions within ten (10) days of receipt of this letter, we will consider these demands rejected." [FN20]

> FN19. *Charal Inv. Co. v. Rockefeller,* Del. Ch., C.A. No. 14937, Chandler, V.C., (Nov. 7, 1995), slip op. at 5 (quoting *Allison v. General Motors Corp.,* D. Del., 604 F.Supp. 1106, 1117-18, *aff'd,* 3d Cir, 782 F.2d 1026 (1985)).

> FN20. Compl., Ex. A at 5.

The Complaint merely states that plaintiff's demand was refused and that the refusal was wrongful. The face of the refusal letter that is considered part of the pleadings does not, as plaintiff contends, "facially establish[]" that the Board failed to investigate plaintiff's demand altogether. Even if it did, the mere allegation that a board did not investigate a demand is insufficient to rebut the presumption of the business judgment rule.[FN21]

> FN21. *Levine,* 591 A.2d at 214-15.

Conclusion

*4 Defendants' Motion to Dismiss is *granted* without prejudice. Plaintiff may amend his Complaint within sixty days.

IT IS SO ORDERED.

Del.Ch.,1997.
Baron v. Siff
Not Reported in A.2d, 1997 WL 666973 (Del.Ch.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 2

Westlaw.

Not Reported in A.2d, 1994 WL 30542 (Del.Ch.)
(Cite as: 1994 WL 30542 (Del.Ch.))

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
BOEING CO., derivatively by J.H. Levit and Rod-
ney B. Shields, Plaintiffs,
v.
Frank SHRONTZ, Malcolm T. Stamper, Harold W.
Haynes, Robert A. Beck, Harold J. Haynes, Stanley
Hiller, Jr., George M. Keller, Lee L. Morgan,
Charles M. Piggott, George H. Weyerhaeuser, T.A.
Wilson, and David Edward Skinner, Defendants,
and
Boeing Co., a Delaware corporation, Nominal De-
fendant.
**Civ. A. No. 11273.**

Submitted: Sept. 22, 1993.
Decided: Jan. 19, 1994.

Pamela S. Tikellis, Carolyn D. Mack, and Cynthia
A. Calder, of Chimicles, Jacobsen & Tikellis,
Wilmington, for plaintiffs.

R. Franklin Balotti, Jesse A. Finkelstein, and Mi-
chael J. Feinstein, of Richards, Layton & Finger,
Wilmington, for individual defendants.

Edward P. Welch, and Andrew J. Turezyn, of Skad-
den, Arps, Slate, Meagher & Flom, Wilmington, for
nominal defendant Boeing Co.

MEMORANDUM OPINION

BERGER, Vice Chancellor.

*1 This is the decision on defendants' second mo-
tion to dismiss a derivative action brought by stock-
holders of Boeing Co. ("Boeing"). In its decision

on defendants' first motion, this Court dismissed
certain claims and held that plaintiffs would have to
satisfy Chancery Court Rule 23.1 by alleging the
basis for their contention that demand was wrong-
fully refused by the Boeing directors. *Boeing Co. v.
Shrontz,* Del.Ch., C.A. No. 11273, Berger, V.C.
(April 20, 1992). In their Second Amended Com-
plaint, plaintiffs allege that Boeing's directors failed
to act in good faith in their investigation and rejec-
tion of plaintiffs' demand. For the reasons that fol-
low, I conclude that plaintiffs have not met the de-
mand refused requirement of Chancery Court Rule
23.1 and, therefore, the Second Amended Com-
plaint must be dismissed.

I.

The derivative claims for alleged breach of fidu-
ciary duty are the same in the Second Amended
Complaint as in the earlier one. They were de-
scribed in the decision on the first motion to dis-
miss and will not be repeated here. It is sufficient to
note that the Second Amended Complaint alleges
that Boeing's directors failed to prevent and/or cor-
rect a pattern of misconduct, including criminal
activity, by officers and employees in connection
with various government contracts. On August 23,
1989, plaintiff Rodney Shields ("Shields") deman-
ded that the Boeing board of directors "promptly
institute suit against the responsible officers and
directors to recover its damages." Second Amended
Comp., Ex. A. Boeing's response was a September
21, 1989 letter from its General Counsel informing
Shields that his request would be considered on Oc-
tober 30, 1989, at the next regularly scheduled
board meeting. Following that meeting, Shields was
informed, again by letter from Boeing's General
Counsel, that "a special committee of outside board
members was established to review the matters ref-
erenced in [his] letter." *Id.* ¶ 29.[FN1]

> FN1. Plaintiffs attached the entire letter to
> the Second Amended Complaint. It reads,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1994 WL 30542 (Del.Ch.)
(Cite as: 1994 WL 30542 (Del.Ch.))

in relevant part:

> At the meeting of the Board ... on October 30, 1989, a special committee of outside board members was established to review the matters referenced in your letter. The committee will be making its determination and recommendations after this review is complete.
>
> We will keep you advised, in due course, of developments. In the meantime, if you have any questions or need any additional information, please contact [Boeing's General Counsel].

Second Amended Comp., Ex. C (letter to Shields).

Shields was never told which directors were appointed to the special committee. However, after the special committee retained the law firm of McDermott, Will & Emory (the "McDermott firm") as outside counsel to assist in the investigation, Shields was so advised. In a letter dated August 2, 1990, from Robert E. Bouma, Esquire ("Bouma") of the McDermott firm, Shields was asked to share with Bouma any information he had concerning the allegations raised in the demand. Bouma also requested a meeting with Shields' counsel. The meeting took place on August 13, 1990.

At that meeting, and in two subsequent letters, Shields' counsel requested an opportunity to address the special committee directly. Shields' counsel also requested copies of any reports or recommendations prepared by the special committee. All of those requests were denied. Finally, during a telephone conversation on April 29, 1991, an attorney from the McDermott firm told Shields' counsel that the special committee "would make a determination sometime in the near future[ ] and ... that he could not be more specific." Second Amended Complaint, ¶ 32. That conversation was followed by a letter dated May 2, 1991, from Boeing's General Counsel to Shields, advising that the special committee had:

> 2 completed its investigation into the issues raised in [the demand]. The Special Committee presented its report and recommendations to the Board at its April 29, 1991 Board Meeting. After a thorough discussion of the Special Committee's investigation, findings, and conclusions, the Board of Directors unanimously voted to reject [the] demand as not in the best interest of the Boeing Company and its shareholders.

Second Amended Comp., Ex. G. Since that time, Boeing has rejected plaintiffs' requests for information concerning the composition of, and recommendations made by, the special committee.

II.

It is settled law that directors, as part of their managerial responsibility, ordinarily make the decision whether to prosecute a corporate claim. Thus, a stockholder wishing to bring a derivative action must overcome the presumptions accorded by the business judgment rule. *Rales v. Blasband,* Del.Supr., --- A.2d ----, C.A. No. 91-166-JLL, Slip.Op. at 13-14 (Dec. 23, 1993); *Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984). This can be accomplished, in the demand refused context, by alleging facts with particularity that create a reasonable doubt as to whether demand was wrongfully refused. *Levine v. Smith,* Del.Supr., 591 A.2d 194, 210 (1991). By making demand, plaintiffs concede the independence and disinterestedness of a majority of the Boeing board. *Rales v. Blasband, supra* at 22 n. 12. Accordingly, in order to prevail, plaintiffs must raise a reasonable doubt as to the directors' good faith and/or the reasonableness of their investigation. In this case, the Boeing board of directors created a special committee to investigate the issues raised by the demand and recommend a course of action to the board. Under these circumstances, the good faith and reasonableness of both groups must be considered. *Thorpe v. CERBCO, Inc.,* Del.Ch., 611 A.2d 5, 11 (1991).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1994 WL 30542 (Del.Ch.)
(Cite as: 1994 WL 30542 (Del.Ch.))

With these legal principles in mind, I now turn to plaintiffs' arguments that both the special committee and the board acted in bad faith and unreasonably. Plaintiffs attack the special committee's conduct on three grounds: (i) it did not meet with plaintiffs' counsel during its investigation; (ii) without any explanation, the special committee reversed its position on the question of whether plaintiffs' counsel could address the committee; and (iii) counsel to the special committee misled plaintiffs' counsel at the conclusion of the special committee's investigation.

I am satisfied that these alleged facts, viewed individually or collectively, do not create a reasonable doubt as to the good faith of the special committee or the reasonableness of its investigation. Our Supreme Court has expressly rejected the argument that a special committee must allow stockholder plaintiffs the opportunity to make an oral presentation. *Levine v. Smith,* 591 A.2d at 214. As the *Levine* Court noted, the board must be informed before it makes its decision, but there is "no prescribed procedure that [it] must follow." *Id.* Here, as the correspondence attached to the Second Amended Complaint establishes, the special committee sought out any relevant information plaintiffs might have had. Its counsel met with Shields' counsel and the special committee made several written requests for plaintiffs' information. Thus, the failure to interview plaintiffs or meet with plaintiffs' counsel does not create a reasonable doubt as to the quality of the special committee's investigation.

*3 There is, likewise, no taint based upon the special committee's purportedly unexplained change of position on the question of a face-to-face meeting. Plaintiffs rely on an August 29, 1990 letter from Bouma that states, in relevant part:

The members of the [Special] Committee believe that, given the fact that our investigation is still in its early stages, it would be premature to meet with you at this time. At the appropriate stage of the investigation, we will further discuss with the Special Committee the advisability of having you

or one of your colleagues address the Committee on the matters you have mentioned. I will be in contact with you regarding the Committee's decision at that time.

Second Amended Comp., Ex. E. According to plaintiffs, the "clear import" of the August 29 letter was that the special committee would meet with plaintiffs' counsel at some future time. Pl.Ans.Br., p. 14. Plaintiffs not only complain that the special committee never met with counsel, but also that it failed to advise plaintiffs' counsel of its decision not to meet until the special committee's investigation was concluded.

Plaintiffs read far too much into the August 29 letter. It says only that the special committee will consider the advisability of having a face-to-face meeting with plaintiffs' counsel. At the end of its investigation, the special committee apparently decided that such a meeting was not advisable and plaintiffs' counsel was notified. There is nothing about this process that suggests the absence of due care or bad faith. The special committee sought out information from plaintiffs and their counsel to the extent and in the manner that the committee felt appropriate.

Finally, plaintiffs complain that their counsel was misled as to the status of the special committee's investigation during a telephone conversation on August 29, 1991. Second Amended Comp., ¶¶ 32, 35. Plaintiffs' counsel asked when the special committee would make its determination and counsel to the special committee responded that the determination would be made in the near future. In fact, on the same day that this conversation took place, the special committee was preparing to present its conclusions to the board of directors. Again, plaintiffs argue that these facts suggest bad faith, but I am not persuaded. Plaintiffs are grasping at phrases here and there as suggesting some sinister motivation. The fact is that plaintiffs were not given any inaccurate information. They simply were not given all the information they would have liked with respect to the workings of the special committee. These facts, without more, do not create a reasonable

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1994 WL 30542 (Del.Ch.)
(Cite as: 1994 WL 30542 (Del.Ch.))

doubt as to the good faith of the special committee.

The next question is whether the decision by the full board of directors to refuse the demand was wrongful. On this point, plaintiffs complain that Boeing's general counsel waited several days after the April 29 decision to notify plaintiffs and, when he did, the letter was sent to Shields rather than his counsel. In addition, as noted earlier, the board refused to identify the members of the special committee and would not give plaintiffs a copy of the special committee's report.

*4 Plaintiffs argue that this combination of facts is similar to those in *Thorpe v. CERBCO, Inc., supra,* where this Court found that plaintiffs had adequately pled wrongful refusal of demand. Plaintiffs' reliance on *Thorpe* is misplaced. In that case, the Court noted that plaintiffs could have satisfied the "demand excused" requirements of Rule 23.1 on the ground that the directors of the defendant company were interested in the challenged transaction. However, plaintiffs made demand upon the board and, as a result, had to allege wrongful refusal. In response, the CERBCO board established a special committee consisting of two directors to review plaintiffs' demand. The special committee prepared a report and submitted it to the board. Thereafter, the two members of the special committee resigned from the board of directors and the board took no action with respect to plaintiffs' demand. The *Thorpe* defendants never made a copy of the special committee's report available to plaintiffs or the general public.

The only common element between *Thorpe* and this case is that in both instances the board of directors did not disclose the contents of the special committee's report. In *Thorpe,* where the special committee members took the unusual step of resigning and the full board never took any action with respect to the demand, the failure to disclose the special committee's report does raise doubts as to its contents. The same is not true in this case, where there appears to be nothing unusual about the special committee's investigation, its report or the board's decision following review of that report.

Finally, I note that the Supreme Court in *Levine* carefully considered and rejected the argument for "limited discovery" in demand refused litigation. 591 A.2d at 208-10. Yet plaintiffs are advocating that the failure to provide a form of limited discovery evidences wrongful refusal of demand. [FN2] To accept this argument would be to undermine the discovery ruling in *Levine* and side-step the pleading requirements of Rule 23.1. I am satisfied that the failure to disclose a special committee's report to a derivative plaintiff does not, as a general proposition, evidence wrongful refusal of demand.

> FN2. As mentioned above, plaintiffs have requested, among other things, a copy of the special committee's report and the identity of that committee's members.

Based upon the foregoing, the Second Amended Complaint is dismissed. IT IS SO ORDERED.

Del.Ch.,1994.
Boeing Co. v. Shrontz
Not Reported in A.2d, 1994 WL 30542 (Del.Ch.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 3

Westlaw.

Not Reported in A.2d, 2009 WL 1204363 (Del.Ch.)
(Cite as: 2009 WL 1204363 (Del.Ch.))

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Re: FLI DEEP MARINE LLC, et al.
v.
McKIM, et al.
**C.A. No. 4138-VCN.**

Submitted: March 24, 2009.
April 21, 2009.

West KeySummary
**Corporations 101 €══190**

101 Corporations
   101IX Members and Stockholders
      101IX(A) Rights and Liabilities as to Cor-
poration
         101k190 k. Actions Between Members of
Same Corporation. Most Cited Cases

**Corporations 101 €══206(4)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of
Corporation
         101k206 Refusal of Corporation, Officers,
or Stockholders to Act
            101k206(4) k. Excuse for Failure to
Demand. Most Cited Cases
Minority shareholders who made a demand upon a
board of directors were precluded from arguing that
demand should be excused because the directors
were conflicted, in a derivative action. A sharehold-
er who chooses to make a demand upon a board in-
stead of seeking to avoid pre-suit demand concedes
the independence of a majority of the board. The
minority shareholders made demand and the al-
legedly conflicted directors promptly formed a

committee to investigate the alleged wrongdoing.
Because the allegations in the derivative complaint
were precisely those raised in their demand, they
were bound to their concession that demand was re-
quired and their derivative complaint was dis-
missed.

Laurie S. Polleck, Esquire, Jaspan Schlesinger
Hoffman LLP, Wilmington, DE.

Joseph C. Schoell, Esquire, Drinker Biddle & Reath
LLP, Wilmington, DE.

Kelly A. Green, Esquire, Klehr, Harrison, Harvey,
Branzburg & Ellers LLP, Wilmington, DE.

Michael J. Maimone, Esquire, Greenberg Traurig,
LLP, Wilmington, DE.

JOHN W. NOBLE, Vice Chancellor.

**\*1** Dear Counsel:

## I. INTRODUCTION

Minority shareholders claim to have learned of sev-
eral acts of wrongdoing by the majority sharehold-
ers. They were convinced from the outset that the
company's board was under the dominion and con-
trol of the majority shareholders and had assisted
the majority shareholders in looting the company.
Nevertheless, instead of presenting their derivative
claims on behalf of the company first to this Court
and pleading demand excusal, they inexplicably de-
cided to make a demand upon the board of direct-
ors. Following demand, the allegedly conflicted dir-
ectors promptly formed a committee charged with
the investigation of the alleged wrongdoing. After
the appointment of a special committee consisting
of two board members themselves accused of
wrongdoing, the minority shareholders concluded
that awaiting the results of an investigation was fu-
tile, and brought suit here, claiming that demand on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1204363 (Del.Ch.)
**(Cite as: 2009 WL 1204363 (Del.Ch.))**

the board was excused.

## II. BACKGROUND

Deep Marine Holdings, Inc. is a Delaware corporation headquartered in Houston, Texas. Along with its wholly owned subsidiary Deep Marine Technology, Inc., a Texas corporation also with headquarters in Houston, Texas, (together with Deep Marine Holdings, Inc., "DMT"), it provides services to the offshore oil and gas industries.

Two of DMT's minority shareholders, Bressner Partners, Ltd. and FLI Deep Marine LLC (the "Plaintiffs"), bring this stockholder derivative action against Defendants Paul McKim, Daniel Erickson, Francis Wade Abadie, Otto Candies, III, Eugene DePalma, Larry Lenig, Bruce Gilman, and John Hudgens, (collectively, the "Individual Defendants") and Nasser Kazeminy, Otto Candies, LLC, NJK Holdings Corporation, DCC Ventures, LLC and Otto Candies, Jr., (collectively, the "Controlling Shareholder Defendants," together with the Individual Defendants, the "Defendants").

The Plaintiffs allege that DMT has been exploited and looted for personal economic gain over the past four years by the Controlling Shareholder Defendants.[FN1] They additionally assert that the Controlling Shareholder Defendants caused the Individual Defendants to "ignore corporate formalities and reasonable business practices." [FN2] The Plaintiffs base a large portion of these allegations on information provided to them by a "confidential source" in the Spring of 2007.[FN3] Finally, they accuse the Individual Defendants of breaching their fiduciary duties to the Plaintiffs and DMT by failing to exercise "reasonable and prudent supervision over the management, polices, practices, controls and financial affairs of DMT." [FN4]

FN1. Compl. ¶¶ 30-53.

FN2. *Id.* at ¶ 22.

FN3. *Id.* at ¶ 30.

FN4. *Id.* at ¶ 29.

The Plaintiffs initiated this derivative action after having first made demand on the Board in a letter, dated October 10, 2008,[FN5] from Plaintiffs' counsel which stated:

FN5. Demand was made on five individuals then comprising the DMT board: Defendants McKim, Gilman, Lenig, and Erickson, along with John Ellingboe. *Id.* at ¶ 68 & Ex. G.

e write on behalf of the [Plaintiffs] to demand that the Board of Directors of DMT take immediate action to remedy serious breaches of fiduciary duty by certain employees, officers and directors of DMT and others who have diverted and/or misappropriated corporate assets (the "Individuals") causing substantial injury to the corporation. We demand that the Board establish a Special Litigation Committee to: (A) investigate these breaches, (B) take action to end any fraudulent activities, (C) bring actions to recover funds wrongfully diverted from DMT and for compensatory damages, and (D) establish procedures and processes to ensure that the wrongdoing and abuses identified herein do not reoccur.[FN6]

FN6. *Id.,* Ex. G (alleging injury totaling "millions of dollars"). The Plaintiffs acknowledge that this letter constituted a demand on the Board, (*Id.* at ¶ 68) and the Court finds it sufficient to constitute a demand under Delaware law. *See Yaw v. Talley,* 1994 WL 89019, at *7 (Del.Ch. Mar.2, 1994) ("To constitute a demand, a communication must specifically state: (i) the identity of the alleged wrongdoers, (ii) the wrongdoing they allegedly perpetrated and the resultant injury to the corporation, and (iii) the legal action the shareholder wants the board to take on the corporation's behalf.").

**\*2** The following day, in response to the Plaintiffs'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1204363 (Del.Ch.)
(Cite as: 2009 WL 1204363 (Del.Ch.))

demand letter, the Board formed a special committee to investigate the allegations asserted in the demand letter and to make a recommendation to the Board in connection with the demand. The special committee was comprised solely of Defendants Gilman and Lenig. Three weeks later, before the special committee had completed its investigation and before the Board took any action concerning the demand, the Plaintiffs commenced this action and alleged that demand on the Board was futile and should be excused.

The Plaintiffs allege that, only days before their demand, Lenig and Gilman appointed three individuals to the Board resulting in the five director board upon which demand was made. Following the Board's appointment of Lenig and Gilman to the special committee, two of the three new directors immediately resigned while the third was promptly terminated.[FN7] The Plaintiffs allege that the Board is now comprised of only Lenig and Gilman as a result. The special committee charged with investigating the allegations found in the Plaintiffs' demand letter and making a recommendation to the Board is therefore comprised of the only two remaining board members, both of whom the Plaintiffs accuse of wrongdoing, and of a disabling lack of independence by virtue of their control by Defendant Kazeminy.[FN8]

  FN7. Pls.' Mem. in Opp'n at 3.

  FN8. Compl. ¶¶ 16, 52.

The special committee has moved to dismiss the derivative complaint or, in the alternative, to stay these proceedings pending the completion of its investigation. The other Defendants join in that motion. For the reasons that follow, the Court will dismiss the complaint.

**III. DISCUSSION**

A. *Demand and Demand Futility*

A basic principle of the Delaware General Corporation Law is that the directors, and not the stockholders, manage the business and affairs of the corporation.[FN9] The decision to bring or to refrain from bringing suit on behalf of a corporation is the responsibility of the board of directors. [FN10] However, the derivative action enables shareholders, in certain circumstances, to bring suit on behalf of a corporation when those in control have refused to do so themselves. The derivative action is, in essence, a suit by the shareholders to compel the corporation to sue coupled with a suit by the corporation, controlled by the shareholders on its behalf, against those allegedly liable to it.[FN11]

  FN9. 8 *Del. C.* § 141(a).

  FN10. *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990).

  FN11. *Id.*

Court of Chancery Rule 23.1 requires that a shareholder seeking to assert a claim on behalf of the corporation first make demand on the directors to obtain the action desired, or to state with particularity the reasons for the shareholder's failure to make such effort.[FN12] The rule "is designed to give a corporation, on whose behalf a derivative suit is brought, the opportunity to rectify the alleged wrong without suit or to control any litigation brought for its benefit." [FN13] The requirement of demand effectuates the "cardinal precept" [FN14] that directors manage the business and affairs of the corporation.

  FN12. Ct. Ch. R. 23.1(a) ("The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.").

  FN13. *Lewis v. Aronson,* 466 A.2d 375, 380 (Del.Ch.1983), *rev'd on other grounds,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1204363 (Del.Ch.)
(Cite as: 2009 WL 1204363 (Del.Ch.))

473 A.2d 805 (Del.1984).

FN14. *Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

*3 Action (or inaction) of a board of directors is generally subject to review under the deferential business judgment rule, which presumes that a board is independent, and acts reasonably and in good faith.[FN15] When a derivative plaintiff seeks to avoid pre-suit demand and proceed with litigation on behalf of the corporation, this Court will ask whether these threshold presumptions of director independence and disinterestedness are rebutted by well-pleaded, particularized facts and whether the complaint presents particularized facts that otherwise create a reasonable doubt that the challenged conduct was a valid exercise of business judgment.[FN16]

FN15. *See generally Brehm,* 746 A.2d at 264 n. 66 (citing *Aronson,* 473 A.2d at 812).

FN16. *Levine v. Smith,* 591 A.2d 194, 205 (Del.1991), *overruled on other grounds, Brehm,* 746 A.2d at 244.

But, where a shareholder instead chooses to make a demand upon a board of directors, she concedes the independence of a majority of the board.[FN17] Thus, where a shareholder's demand has been refused, this Court only examines the good faith and reasonableness of the board's investigation.[FN18] The Plaintiffs in this action made pre-suit demand on DMT's board of directors. As a result, they have conclusively conceded the independence of the Board, and are precluded from now arguing that demand should be excused because the directors are conflicted.[FN19]

FN17. *See Stone v. Ritter,* 911 A.2d 362, 366-67 (Del.2006); *Charal Inv. Co., Inc., v. Rockefeller,* 1995 WL 684869, at *2

(Del.Ch. Nov.7, 1995); *Rales v. Blasband,* 634 A.2d 927, 935 n. 12 (Del.1993); *Levine,* 591 A.2d at 194; *Spiegel,* 571 A.2d at 775; *Stotland v. GAF Corp.,* 469 A.2d 421 (Del.1983); *Grimes v. Donald,* 1995 WL 54441 (Del.Ch. Jan.11, 1995); *Thorpe v. CERBCO, Inc.,* 611 A.2d 5, 10-11 (Del.Ch.1991).

FN18. *See Spiegel,* 571 A.2d at 777.

FN19. *Thorpe,* 611 A.2d at 10-11.

elaware law is quite strict as to the application of Chancery Rule 23.1. If a presuit demand is made upon the directors, the stockholder is deemed to have conceded that a failure to have made a presuit demand would not be excused. The Delaware Supreme Court has held that "once a demand has been made, absent a wrongful refusal, the shareholders' ability to initiate a derivative suit is terminated." [FN20]

FN20. *Szeto v. Schifer,* 1993 WL 513229, at *4 (Del.Ch. Nov.24, 1993) (internal citations omitted).

On this point Delaware law could hardly be clearer.[FN21] Here, the Plaintiffs made demand and, because the allegations in the derivative compliant are precisely those raised in their demand, they are bound to their concession that demand was required.[FN22]

FN21. There is an instance, pre-*Aronson,* in which a derivative plaintiff avoided the effects of a pre-suit demand. It does not, however, suggest any ambiguity as to the effect of making a demand. In *Abbey v. Computer & Commc'n Tech. Corp.,* 457 A.2d 368 (Del.Ch.1983), this Court found that a board's designation of a special litigation committee with final and absolute authority to make decisions concerning an already filed derivative complaint conceded demand excusal, despite the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1204363 (Del.Ch.)
(Cite as: 2009 WL 1204363 (Del.Ch.))

plaintiff's pre-suit demand. *Abbey* is procedurally distinguishable from this situation where the special committee in question was designated in response to the Plaintiffs' demand, prior to the filing of the derivative complaint, and was not given final and absolute authority. In *Abbey,* this Court found the board to have properly invoked the procedures outlined in *Zapata Corp. v. Maldanado,* 430 A.2d 779 (Del.1981), and the case is better read as an illustration of the distinction between a board's decision-making authority and its investigative authority. *See* DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 9.02[b][3], at 9-81 (2009) (citing *Spiegel,* 571 A.2d at 776 n. 18).

FN22. *See Grimes v. Donald,* 673 A.2d 1207, 1219-20 (Del.1996), *overruled on other grounds, Brehm,* 746 A.2d at 244.

Yet, the Plaintiffs implore the Court for exception from this well-established rule. They first argue that the present composition of the Board renders it incapable of making an independent decision regarding the desired litigation. Because both the Board and its special committee are comprised of allegedly conflicted directors Lenig and Gilman, the Plaintiffs argue that the Board's consideration of their demand is "a mockery," "pretend," "contrived," and "a farce meant to give the illusion of independence where none exists." [FN23] If the allegations in the derivative complaint are true, the Plaintiffs might well be correct. Nevertheless, this Court cannot diverge from settled law.

FN23. Pls.' Mem. in Opp'n at 1-3, 10.

Curiously, the Plaintiffs' do not make their plea for exception based on new information. Rather, they maintain that the Board lacked independence since at least the time of their demand. Indeed, the

Plaintiffs state in their demand letter that "four of the five members of the Board are not independent but are controlled by and beholden to Mr. Kazeminy." [FN24] In light of these facts, the Plaintiffs' decision to make a demand upon the Board appears improvident. The Plaintiffs ask the Court to undo the consequences of their demand; this Court will not part ways with established Delaware law to grant the Plaintiffs relief from a strategic decision they now regret.

FN24. Compl. Ex. G at 5.

**\*4** Alternatively, the Plaintiffs argue that their demand "was withdrawn" when the Board failed to comply with the terms of their demand.[FN25] The Plaintiffs argue that the special committee's failure to keep them informed as the investigation began and to pledge the completion of the investigation by October 31, 2008, (twenty-one days after demand) renders their demand a nullity.[FN26] There, of course, is no prescribed procedure that a special committee must follow when responding to a shareholder demand.[FN27] To allow Plaintiffs the ability to dictate the manner in which the Board, or its special committee, investigates their allegations would "be an unwarranted intrusion" [FN28] upon the authority our law confers on a board of directors to manage the business and affairs of the corporation. Because the Plaintiffs chose to make a pre-suit demand on the Board they are precluded from now arguing demand futility here.

FN25. Pls.' Mem. in Opp'n at 5 (citing Compl. Ex. G at 5).

FN26. *Id.* at 6.

FN27. *Levine,* 591 A.2d at 214.

FN28. *Id.*

*B. Stay or Dismissal*

Once a shareholder makes demand on the board, it must allow the board a reasonable time to investig-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 1204363 (Del.Ch.)
**(Cite as: 2009 WL 1204363 (Del.Ch.))**

ate and respond to the claim prior to filing suit.[FN29] Whether the board has taken more than a reasonable amount of time to conduct its investigation is a fact question, and one for which no strict formula exists.[FN30] Reasonable minds might differ as to what time period is necessary to conduct an investigation.[FN31] Here, the parties disagree as to this point.

> FN29. *Charal Inv. Co., Inc.,* 1995 WL 684869, at *3.

> FN30. *Id.*

> FN31. *Id.*

The Defendants inform the Court that a five month period is required for the completion of their investigation.[FN32] The Plaintiffs disagree, and assert that sufficient time has already passed for the conduct of an investigation.[FN33] Although the Court acknowledges that more time may be required to conduct the necessary investigation because of the delay and interference resulting from the intervening, and premature, filing of the Plaintiffs' derivative complaint, the special committee has offered no persuasive reason as to why its investigation would take so long. Nevertheless, the proper procedure is to dismiss the derivative complaint without prejudice, instead of staying the action and retaining jurisdiction.[FN34]

> FN32. Defs.' Br. in Supp. at 22.

> FN33. Pls.' Mem. in Opp'n at 16.

> FN34. *See Charal Inv. Co., Inc.,* 1995 WL 684869, at *4-5.

### IV. CONCLUSION

Accordingly, for the foregoing reasons, the Defendants' Motion to Dismiss the derivative complaint is granted.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

Del.Ch.,2009.
FLI Deep Marine LLC v. McKim
Not Reported in A.2d, 2009 WL 1204363 (Del.Ch.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 4

Westlaw.

Not Reported in F.Supp.2d, 2007 WL 1455904 (N.D.Cal.)
**(Cite as: 2007 WL 1455904 (N.D.Cal.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. California,
Oakland Division.
M.J. FURMAN, et al., Plaintiffs,
v.
S. Robson WALTON, et al., Defendants.
No. C 06-3532 SBA.
**Docket No. 45.**

May 16, 2007.

Mark C. Molumphy, Joseph W. Cotchett, Kelly L
Sommerfeld, Nancy L. Fineman, Niall P. McCarthy
, Cotchett Pitre & McCarthy, Burlingame, CA,
Richard D. Greenfield, Greenfield & Goodman
LLC, Easton, MD, Tina B. Nieves, Gancedo &
Nieves LLP, Pasadena, CA, for Plaintiffs.

Edward R. Reines, Weil Gotshal & Manges LLP,
Redwood Shores, CA, E. Norman Veasey, Weil,
Gotshal & Manges LLP, Wilmington, DE, Stephen
A. Radin, Weil Gotshal & Manges LLP, New York,
NY, for Defendants.

## ORDER

SAUNDRA BROWN ARMSTRONG, United
States District Judge.

**\*1** Before the Court is defendants S. Robson
Walton, Jim C. Walton, James W. Breyer, David D.
Glass, Roland A. Hernandez, H. Lee Scott, Jr., Jack
C. Shewmaker, Jose H. Villarreal, and nominal de-
fendant Wal-Mart Stores, Inc.'s (collectively
"defendants"), motion to dismiss pursuant to Feder-
al Rules of Civil Procedure 23.1 and 12(b) (6)
[Docket No. 45]. After reading and considering the
arguments presented by the parties, the Court finds
this matter appropriate for resolution without a
hearing. *See* FED. R. CIV. P. 78. For the reasons
that follow, the motion to dismiss is GRANTED.

## BACKGROUND

This is a shareholder derivative action brought by
plaintiff M.J. Furman. Furman is a shareholder of
Wal-Mart Stores, Inc, owning approximately 1,600
shares in the corporation. She seeks to bring a claim
on behalf of Wal-Mart against certain members of
Wal-Mart's Board of Directors and senior officers.
Furman alleges that the defendants breached their
fiduciary duties to the corporation by authorizing
and encouraging the systematic violation of federal
and state employment and labor laws:

> y this action, plaintiff alleges that Defendants ab-
> used their fiduciary and controlling positions at
> Wal-Mart by the reckless mismanagement of the
> Company, authorizing and encouraging the sys-
> tematic violation of federal and state civil rights,
> employment, and labor laws with respect to the
> unlawful discrimination of Wal-Mart's female
> workforce and other unlawful or otherwise im-
> proper labor and related practices.

Docket No. 1 (Compl. at ¶ 3).

By failing "to properly oversee, control and govern
Wal-Mart's business and affairs" and failing "to en-
sure Wal-Mart's compliance with applicable anti-
discrimination laws," Furman maintains severe
damage has resulted to Wal-Mart in the form of
lawsuits, market losses, loss of goodwill, and a de-
teriorating public image. Docket No. 1 (Compl. at
¶¶ 68, 76). Moreover, according to the plaintiff, this
has caused Wal-Mart's stock to underperform in
comparison to its competitors.

As required by the governing law of the state of
Delaware, on June 30, 2004, Furman made a de-
mand upon Wal-Mart's Board of Directors that they
commence action against the defendants for the
damages and injuries caused by the purported
breach of fiduciary duty. Following the recom-
mendation of the Board's Audit Committee, on
November 22, 2004, the Board informed Furman

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1455904 (N.D.Cal.)
(Cite as: 2007 WL 1455904 (N.D.Cal.))

that pursuit of this litigation would not serve the best interests of Wal-Mart and its shareholders and that it would defer final action on Furman's demand until resolution of the litigation in a class action employment discrimination case proceeding in this District___*Dukes, et al. v. Walmart Stores, Inc.,* C-01-2252 MJJ. *See* Docket No. 48, Ex. A (Refusal Letter).

In this motion to dismiss, the defendants challenge whether Furman has standing to bring a derivative action on behalf of Wal-Mart pursuant to Rule 23.1, arguing that the plaintiff has failed to allege with sufficient factual particularity that the board's refusal of her demand does not fall within the zone of the business judgment rule.

## LEGAL STANDARDS

*\*2* A shareholder derivative action is one brought by a shareholder seeking "to enforce a *corporate* cause of action against officers, directors, and third parties." *Kamen v. Kemper Fin. Servs., Inc.* 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (citation omitted) (emphasis in original). A derivative claim is one belonging to the corporation, and it is the corporation, acting through its board of directors, which must make the decision whether or not to assert the claim. *See Grimes v. Donald,* 673 A.2d 1207, 1215 (Del.1996); *Aronson v. Lewis,* 473 A.2d 805, 811-12 (Del.1984).

Federal Rule of Civil Procedure 23.1 addresses derivative actions by shareholders. This rule states that

he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

FED. R. CIV. P. 23.1.

In assessing particularity as required by Rule 23.1, the court looks to the law of the state of incorporation of the company. *See In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 989-90 (9th Cir.1999). Because Wal-Mart is a Delaware corporation, the parties agree that Delaware law controls whether Furman's complaint is factually sufficient.

A stockholder filing a derivative suit must allege either that the board of directors rejected her pre-suit demand that the board assert the corporation's claim or allege with particularity why the stockholder was justified in not having made the effort to obtain board action. *See Grimes,* 673 A.2d at 1216. "[T]he demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of the corporation." *Aronson,* 473 A.2d at 812. In this case, Furman made a demand on the board and the board had deferred making a final decision until after the completion of the *Dukes* litigation. Both parties have effectively construed this deferral as being a rejection.[FN1]

> FN1. In her response Furman correctly notes, and the defendants have not disputed, that "In their motion to dismiss, defendants now ask the Court to evaluate their decision under the 'demand refused' line of case law, effectively conceding that their letter constituted a refusal of plaintiff's demand." Docket No. 55. For instance, in their motion the defendants state that "the shareholder's standing to assert a derivative claim 'hinges upon his ability to establish that the Board's rejection of his demand was wrongful.' " Docket No. 46.
>
> Moreover, under Delaware law, a corporation may not stand neutral in the face of a shareholder's demand; it must affirmatively object to or support the continuation of the litigation. *See, e.g* ., *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 731 (Del.1988). Because the defendants certainly did not support Furman's demand, their

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1455904 (N.D.Cal.)
(Cite as: 2007 WL 1455904 (N.D.Cal.))

"deferral" is effectively an objection or rejection. In any event, the defendants have in no way suggested that their "deferral" is not effectively a rejection of Furman's demand.

If a demand is made and rejected, the board rejecting the demand is entitled to the presumption of the business judgment rule unless the stockholder can allege facts with particularity creating a reasonable doubt that the board is not entitled to the benefit of the presumption. *See Grimes,* 673 A.2d at 1220; *see also Levine v. Smith,* 591 A.2d 194, 212 (Del.1991) (the board's refusal of the demand to pursue the action is subject to judicial review according to the traditional business judgment rule).

Under the business judgment rule, a court will not substitute its judgment for that of the board, and the board's decision will be upheld unless it cannot be attributed to any rational business purpose. *See In re Walt Disney Co. Derivative Litig.,* 906 A.2d 27, 74 (Del.2006) (en banc); *Levine,* 591 A.2d at 207. A board of directors' decision will be respected by the courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose, or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available. *Brehm v. Eisner,* 746 A.2d 244, 264 n. 66 (Del.2000) (en banc). A shareholder who makes a demand concedes the disinterestedness and independence of a majority of the board to respond to the demand and waives any claim that demand is excused. *See Grimes,* 673 A.2d at 1219-20; *Rales v. Blasband,* 634 A.2d 927, 935 n. 12 (Del.1993) ("Where a demand has actually been made, the stockholder making the demand concedes the independence and disinterestedness of a majority of the board to respond").

*3 Where a shareholder's complaint is predicated on the wrongful refusal of her demand, the only issue for a trial court to determine is the application of the business judgment rule to the board's refusal

of the shareholder's demand. *See Levine,* 591 A.2d at 212-13 (Del.1991). The only relevant question is whether the directors acted in an informed manner and with due care, and in a good faith belief that their action was in the best interest of the corporation. *See id.* at 198.

**ANALYSIS**

To withstand a motion to dismiss under Rule 23.1, the plaintiff must allege particular facts which support a reasonable doubt that the board's refusal of demand is entitled to the presumption of the business judgment rule and that the board's refusal of the shareholder's demand was not made in an informed manner, with due care, and in a good faith belief that refusing to pursue the litigation demanded was in the best interest of the corporation. Furman's complaint fails to allege any such facts. *See Scattered Corp. v. Chicago Stock Exch., Inc.,* 701 A.2d 70, 77 (Del.1997) ("A plaintiff's standing to sue in a derivative suit ... must be determined on the basis of the well-pleaded allegations of the complaint"). In her complaint, Furman makes the following allegations regarding the rejection of her demand:

1. The Board's failure to act on Plaintiff's demand, and its implicit rejection of Plaintiff's demand, was not the subject of reasonable business judgment nor in the best interests of the Company. Instead, the demand was wrongfully refused, in bad faith and in an uninformed manner, without adequate investigation and analysis.

2. Furthermore, despite the Board's actual knowledge of the claims asserted by Plaintiff since at least 2001 when the Board reported the financial impact of adjudicated claims against the Company, the Board has failed to seek to recover on behalf of Wal-Mart for any of the wrongdoing alleged. There is no rational business purpose for the Board's failure to take any action on behalf of the Company for such a long period of time.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1455904 (N.D.Cal.)
(Cite as: 2007 WL 1455904 (N.D.Cal.))

3. Moreover, the Board lacked independence and impartiality to fairly consider the demand since the entire Wal-Mart Board either participated in or approved the wrongful act and omissions or recklessly disregarded the wrongs which are complained of herein or benefitted from the compensation received during the time the conduct took place. This is especially true for directors who joined the Wal-Mart Board with full knowledge of the Company's alleged pattern and practice of discrimination against female employees in promotions. Yet, rather than cause Wal-Mart to investigate and take action against the directors and executives responsible for Wal-Mart's policy of gender discrimination as described herein, they consciously failed to act in exchange for their appointments to the Wal-mart Board and the power, prestige and perquisites resulting therefrom.

Docket No. 1 (Compl.).

*4 Furman merely offers the conclusions that the demand was wrongfully refused due to bad faith and without adequate investigation and analysis, and that the Board lacked independence and impartiality to fairly consider the demand. A review of the complaint shows that it is wholly absent of any particular factual allegations buttressing these conclusions.

Examining first the allegations of paragraph 83 of the complaint, it is settled law in Delaware that a shareholder who makes a demand concedes the disinterestedness and independence of a majority of the board to respond to the demand and waives any claim that demand is excused. *See Grimes v. Donald,* 673 A.2d 1207, 1219-20 (Del.1996); *Rales v. Blasband,* 634 A.2d 927, 935 n. 12 (Del.1993). Thus the allegations in paragraph 83 and the similar allegations in the succeeding paragraphs of Furman's complaint are insufficient to withstand a Rule 23.1 motion to dismiss.

With respect to the assertions of paragraphs 81 and 82 of the complaint that the demand was wrong-

fully refused, in bad faith, and in an uninformed manner, Furman simply offers no particularized facts in her complaint supporting these contentions. Nonetheless, in her opposition to the present motion, she makes three arguments that these allegations are sufficiently particular to withstand a motion to dismiss under Rule 23.1.

First, Furman contends the defendants failed to consider all the claims articulated in her demand by limiting their consideration to the *Dukes* litigation. Furman argues that her demand letter covered not only alleged discrimination against female employees, as is being contested in *Dukes,* but also violations of the Fair Labor Standards Act and state law for forcing employees to work off the clock and miss meal breaks. By limiting the analysis to *Dukes,* Furman maintains the response to her demand failed to account for the potential liabilities of actions being pursued on these other grounds.

An examination of the response letter to Furman's demand does not bear this out.[FN2] Both the demand letter and the response letter focus on the potential exposure of liability Wal-Mart faces in the *Dukes* litigation. In the epistolatory exchanges concerning Furman's demand, the *Dukes* case is the only action mentioned by name. However, the response letter repeatedly relates that the Audit Committee and the Board of Directors contemplated the *Dukes* litigation *and* other proceedings. In fact, six times the letter uses the phrase "the Dukes case and other proceedings" or similar locution. *See* Docket No. 48, Ex. A. For instance, the letter tells that the "Audit Committee takes ... and has actively been monitoring-and continues to monitor on an ongoing basis-Wal-Mart's compliance with employment law obligations and Wal-Mart's defense in the Dukes litigation and other proceedings against Wal-Mart involving the allegations in your letter." Docket No. 48, Ex. A. It also states that

> FN2. This letter may be considered without converting this motion to dismiss into a motion for summary judgment under the "incorporation by reference" doctrine.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1455904 (N.D.Cal.)
(Cite as: 2007 WL 1455904 (N.D.Cal.))

Under this doctrine, a court may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *In re Silicon Graphics Inc. Sec. Litig.* ., 183 F.3d 970, 986 (9th Cir.1999) (citation omitted). The contents of this letter are alleged in Furman's complaint, and neither party questions its authenticity. Moreover, Furman has not objected to the Court's consideration of this document.

5 The remedial action that the Audit Committee would recommend at this time, if it believed that the allegations in the Dukes case and other proceedings and in your demand had merit, would not include commencing a public litigation because that action likely would be deemed an admission of the allegations in the Dukes case and in other proceedings.
ocket No. 48, Ex. A.

Second, Furman further contends that even if her demand letter is construed as focusing solely on discrimination against female employees, it was not a reasonable exercise of business judgment to defer investigating this practice until the completion of the *Dukes* litigation. Because the *Dukes* action may take years to resolve, it is Furman's position that deferring potential claims against the defendants risks running the statute of limitations on potential claims Wal-Mart may have against its directors. To address this concern, "the defendants on whose behalf this brief is submitted represent that, for one year following the Wal-Mart Board's final determination concerning plaintiff's demand, they will not assert any statute of limitations defense that did not exist on the date this action was filed in any action asserting the claims stated in plaintiff's demand." Docket No. 66, at 13. Therefore, the potential expiration of Wal-Mart's claims against the defendants is no longer an extant consideration.

As a final matter, Furman argues that one of the main reasons cited by the board for not acting on her demand is now moot. The refusal letter speaks of deferring action on Furman's request until appellate review of the class certification order in *Dukes*. Since the Ninth Circuit affirmed the decision to allow class certification, this reason for deferral no longer exists.

The defendants respond that the *Dukes* appeal is not over: Wal-Mart has filed a motion for rehearing *en banc* of the class certification issue, and will seek Supreme Court review if the Ninth Circuit's panel decision is not reversed. Moreover, the defendants maintain that the class certification issue was only one of many reasons for deferring a final determination on Furman's demand. The Audit Committee and the Board also expressed concern that Wal-Mart pursuing legal action against its directors for failing to abide by employment and labor laws would in effect be an admission in the *Dukes* case and in other actions. This would expose Wal-Mart to substantial liabilities for damages in those cases and would not be in the best interests of the corporation.

Thus, none of the three arguments proffered by Furman does anything to ameliorate the lack of facts supporting her contention that the board's decision to reject her demand was not a rational business decision. And unless particularized facts are alleged showing that the business judgment rule does not protect the board's decision not to sue pursuant to a shareholder's demand, which has not been done here, a motion to dismiss an action filed by a shareholder whose demand has been rejected, must be granted. *See Speigel v. Buntrock,* 571 A.2d 767, 777 (Del.1990). The factual allegations of the complaint are insufficient to overcome the presumption of the business judgment rule.

### CONCLUSION

*6 Accordingly, the defendants' motion to dismiss [Docket No. 45] is GRANTED and the plaintiff's complaint is DISMISSED. The Clerk of Court is directed to close the case file and any pending mat-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2007 WL 1455904 (N.D.Cal.)
**(Cite as: 2007 WL 1455904 (N.D.Cal.))**

ters related to it.

IT IS SO ORDERED.

N.D.Cal.,2007.
Furman v. Walton
Not Reported in F.Supp.2d, 2007 WL 1455904
(N.D.Cal.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 5

Westlaw.

Not Reported in F.Supp.2d, 2007 WL 2460610 (D.Ariz.)
(Cite as: 2007 WL 2460610 (D.Ariz.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Arizona.
In re VISTACARE, INC., DERIVATIVE LITIGA-
TION,
George Palmetto, et al., Plaintiffs,
v.
David A. Freeman, et al., Defendants.
**No. CIV 04-1740-PHX-RCB.**

Aug. 23, 2007.

Franklyn Russell Mead, Jr., Richard Glenn Himel-
rick, Salvador Ongaro, Tiffany & Bosco PA,
Phoenix, AZ, Nadeem Faruqi, Faruqi & Faruqi
LLP, New York, NY, for Miriam Crescente derivat-
ively on Behalf of Vistacare, Inc.

ORDER

ROBERT C. BROOMFIELD, Senior United States
District Judge.

**I. Introduction**

*1 On August 20, 2004, Plaintiffs George Palmetto,
et al., filed a derivative lawsuit against Defendants
David A. Freeman, et al., seeking to stand in the
shoes of VistaCare, Inc. ("VistaCare") and bringing
claims held by VistaCare. Complt. (doc. 1). On
November 23, 2005, Defendants Freeman, Perry G.
Fine, William J. McBride, Pete A. Klisares, David
W. Faeder, and Geneva B. Johnson ("Individual
Defendants") filed a motion to dismiss the case due
to a lack of personal jurisdiction. Mot. Lack of P.
Jurisdiction (doc. 17). Thereafter, all the defendants
filed a motion to dismiss Plaintiffs' consolidated de-
rivative complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6). Mot. (doc. 20).[FN1]

FN1. In the case at bar, the defendants are

Richard R. Slager, Mark E. Liebner, Pete
A. Klisares, David W. Faeder, Perry G.
Fine, Ronald A. Matricaria, William J.
McBride, Geneva B. Johnson, and David
A. Freeman ("Defendants"). All of the de-
fendants, except for Liebner and Freeman,
are the "Director Defendants." The nomin-
al defendant is VistaCare, Inc. ("VistaCare").

On November 30, 2005, and upon stipulation by the
parties, the Court ordered Defendants' motion to
dismiss for lack of personal jurisdiction stayed
pending resolution of Defendants' motion to dis-
miss pursuant to Fed.R.Civ.P. 12(b)(6). Order (doc.
26). In addition, the Court determined a specific
briefing schedule for Defendants' motion to dismiss
for lack of personal jurisdiction, should Defendants'
motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)
be denied in whole or in part. *Id.* Following the
Court's order, Defendants' motion to dismiss pursu-
ant to Fed.R.Civ.P. 12(b)(6) was fully briefed on
February 9, 2006. Reply (doc. 39).[FN2] Having
carefully considered the arguments presented by the
parties, the court now rules.

FN2. In their Reply, Defendants made a re-
quest for oral argument on this matter.
(doc. 39). Such request is untimely, pursu-
ant to Local Rule 7.2(f). Thus, the Court
shall deny Defendants' request.

**II. Background Facts**

VistaCare is one of the leading providers of hospice
services in the United States. VistaCare receives
most of its revenue from Medicare, whose pay-
ments are subject to an annual "cap." Generally, the
total cap for any specific site is calculated by mul-
tiplying the fiscal-year per-patient cap amount by
the number of first-time, Medicare-eligible patients
enrolled during the cap year, and then adjusting for
several factors. If Medicare pays for services during

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2460610 (D.Ariz.)
(Cite as: 2007 WL 2460610 (D.Ariz.))

the fiscal years beyond the cap amount, it may seek repayment of the excess.

From about November 2003 to August 2004, Vista-Care consistently reported financial growth. However, on August 5, 2004, VistaCare issued a press release announcing its second quarter financial results for the quarter ending June 30, 2004. In that release, VistaCare revised downward its financial projections for the remainder of 2004, in part because it increased reserves against future Medicare cap reimbursements. By the following day's closing, the price of VistaCare's stock decreased by 18%. Thereafter, a press release dated December 6, 2004, revealed that VistaCare faced the accrual of an additional $7.8 million for the Medicare cap, resulting in a net loss for the quarter of $6.2 million. In response to these actions, Plaintiffs filed this litigation.

## III. Standard of Review

A Rule 12(b)(6) motion to dismiss is proper where there is either a "lack of a cognizable legal theory" or the absence of sufficient facts alleged to support a cognizable legal theory. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). Such a motion may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

  2 In deciding such a motion, all material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them ... Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory.

*Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.2001) (internal citations omitted). The parties agree that Delaware law applies in this matter. Mot. (doc. 20) at 2-3; Resp. (doc. 32) at 4.

## IV. Discussion-Demand Futility

The decision to bring a lawsuit in the name of a corporation is a responsibility that rests with the board of directors. *See Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del.1990). If the majority of the board can weigh the pros and cons of bringing suit without being controlled by outside forces, the board is entitled to decide whether to initiate a lawsuit. *Id.* at 773-74. This holds true even if meritorious claims are made in a demand; a board may forego litigation if, in exercising its business judgment, the board decides that it is best for the company not to do so. *Id.* at 777. Because derivative suits brought by shareholders "challenge the propriety of decisions made by directors pursuant to their managerial authority, [courts] have repeatedly held that the stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim." *Rales v. Blasband*, 634 A.2d 927, 933 (Del.1993).

Delaware Chancery Court Rule 23.1 ("Rule 23.1") provides that a derivative complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Here, Plaintiffs concede that they never made a demand on VistaCare's board, claiming that to do so would have been "futile." Complt. (doc. 1) at ¶ 61. Thus, Plaintiffs must plead with particularity facts sufficient to support their futility assertion. *See Aronson v. Lewis*, 473 A.2d 805, 815 (Del.1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 254 (Del.2000). Demand futility is judged at the time the plaintiff filed the complaint. *See Harris v. Carter*, 582 A.2d 222, 229-30 (Del. Ch.1990).

The burden to establish demand futility is "more onerous than that required to withstand a Rule 12(b)(6) motion to dismiss." *Levine v. Smith*, 591 A.2d 194, 207 (Del.1991), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 254

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Not Reported in F.Supp.2d, 2007 WL 2460610 (D.Ariz.)**
**(Cite as: 2007 WL 2460610 (D.Ariz.))**

(Del.2000). "What the pleader must set forth are particularized factual statements that are essential to the claim." *Brehm,* 746 A.2d at 254. Conclusory language "does not comply with these fundamental pleading mandates." *Id.* However, a plaintiff is not required to plead evidence inasmuch as discovery is foreclosed. *See Levine,* 591 A.2d at 207. In any event, if a plaintiff fails to meet these stringent requirements, the complaint must be dismissed even if it pleads otherwise meritorious claims. *See Kaufman v. Belmont,* 479 A.2d 282, 286 (Del. Ch.1984).

*\*3 Actions that may be challenged by a derivative lawsuit fall into one of two categories: (1) an affirmative act undertaken by the directors; or (2) no specific board action is challenged. *See Rales,* 634 A.2d at 933-34. Where a shareholder, such as in the case at bar, does not challenge a specific action or decision of the board, demand may be excused where the complaint raises a reasonable doubt that a majority of the board's directors are disinterested and independent. *Id.* at 930. Under this test, a shareholder establishes that demand would have been futile only if a majority of the board: (1) faces a substantial likelihood of liability under the specific facts alleged in the derivative complaint; or (2) is controlled by one or more directors who face a substantial likelihood of liability. *Id.* at 936-37.

In the case at bar, Plaintiffs allege that Defendants caused VistaCare's shares to trade at artificially inflated levels through the issuance of false and misleading statements, and failed to supervise VistaCare so as to properly reserve for the company's Medicare reimbursements. Complt. (doc. 1) at ¶¶ 8-10. The parties do not dispute that Plaintiffs are not challenging an affirmative act by the board, and, thus, must establish demand futility under the test set forth in *Rales.*

**A. Substantial Likelihood of Liability**

In their motion to dismiss, Defendants assert that Plaintiffs have failed to plead particularized facts to create a reasonable doubt that four VistaCare directors-a majority-could independently consider a litigation demand. Mot. (doc. 20) at 5. A director is not independent only if particularly pled facts demonstrate that "a corporate decision [on the demand] will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales,* 634 A.2d at 936. The key inquiry "is whether the plaintiffs have pled facts that show that ... [the] directors face a sufficiently substantial threat of personal liability to compromise their ability to act impartially on a demand ." *Guttman v. Huang,* 823 A.2d 492, 503 (Del. Ch.2003). To plead a substantial threat of personal liability, Plaintiffs must set forth particularized facts showing that a defendant either: (1) "personally profited from stock sales while in knowing possession of material, non-public information[;]" or (2) "committed a non-exculpated breach of fiduciary duty by failing to oversee the company's compliance with legally mandated accounting and disclosure standards." [FN3] *Guttman,* 823 A.2d at 503. Here, Defendants assert that Plaintiffs do not allege a single particularized fact that supports either of these two possibilities. Mot. (doc. 20) at 6.

> FN3. This type of claim is also known as a *Caremark* claim, named in reference to *In re Caremark Int'l Derivative Litig.,* 698 A.2d 959, 967 (Del. Ch.1996).

First, Defendants argue that Plaintiffs' insider trading 9 allegations fail to establish the necessary particularized facts required to show demand futility. *Id.* at 6-7. "[P]laintiffs generally proffer that two directors, Slager and Fine, purportedly engaged in 'illegal insider trading.' " [FN4] *Id.* at 6. Specifically, Defendants assert that Plaintiffs fail to raise any facts regarding information that the directors acquired and knew showing that the stock sales were "entered into and completed on the basis of, and because of adverse material non-public information ." *Id.* "Given that Slager and Fine do not face personal liability for insider trading, it cannot be said that they were unable to consider a litigation demand." *Id.* at 7.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2460610 (D.Ariz.)
(Cite as: 2007 WL 2460610 (D.Ariz.))

> FN4. Defendants note that the Complaint identifies a third director who sold stock-Freeman-but he was not a member of VistaCare's board when Plaintiffs filed this action. Mot. (doc. 20) at 6. Thus, he is not relevant to the demand futility analysis. *See Harris,* 582 A.2d at 230.

*4 Moreover, Defendants note, and Plaintiffs do not dispute in their response, that all of the stock sales made by Slager and Fine were non-discretionary sales made pursuant to a "10b5-1 stock trading plan." Mot. (doc. 20) at 7. They maintain that under 10b5-1 plans, sellers cannot deviate from the plan by changing the amount, price or timing of their sale. 17 C.F.R. § 240.10b5-1(c)(1)(i)(C) (2005). Accordingly, Defendants argue that the timing of such trades cannot be deemed suspicious since they eliminate the ability to time stock sales based upon inside information. Mot. (doc. 20) at 7.

Second, Defendants assert that Plaintiffs have not pled facts that indicate that a majority of Vista-Care's board committed an actionable breach of fiduciary duty. *Id.* at 7-9. Delaware law limits the fiduciary breaches for which a director may be liable to a company. Section 102(b)(7) of the Delaware General Corporation Law permits shareholders to ratify a charter provision insulating directors from liability for all fiduciary breaches that result from mistake or negligence. 8 Del. C. § 102(b)(7). The parties do not dispute that VistaCare's shareholders have approved such a provision. Mot. (doc. 20) at 7; Resp. (doc. 32) at 17. Hence, only fiduciary breaches involving intentional misconduct, bad faith or disloyalty can form the basis of a cause of action against the directors. *See Malpiede v. Townson,* 780 A.2d 1075, 1094-95 (Del.2001). In order to show the requisite bad faith, a plaintiff must demonstrate that a defendant "allowed a situation to develop and continue which exposed the corporation to enormous [ ] liability and that in so doing they violated a duty to be active monitors of corporate performance." *Caremark,* 698 A.2d at 967.

Here, Defendants contend that the core of Plaintiffs'

allegations is that the directors permitted VistaCare to wrongly predict the amount of Medicare cap reimbursements it would owe. Mot. (doc. 20) at 7-8. However, they maintain that Plaintiffs merely assert without factual support that Defendants knowingly participated in the alleged wrongdoing. *Id.* at 8. "[P]laintiffs do not allege how any director was involved in VistaCare's efforts to estimate reserves for future Medicare cap payments. Plaintiffs do not identify a single corporate document, conversation, or board meeting that purportedly appraised any board member, much less a majority, that additional reserves for future Medicare cap assessments were necessary." *Id.* For these reasons, Defendants argue that none of VistaCare's directors face a substantial likelihood of being found liable to VistaCare for intentionally breaching their fiduciary duty. *Id.* at 9.

Third, Defendants assert that Plaintiffs' remaining arguments for demand futility are generalized statements applicable to any director of a public company and, thus, are irrelevant. Mot. (doc. 20) at 9. Specifically, Defendants assert that Plaintiffs' claims that (1) the Director Defendants engaged in the alleged wrongdoing to "protect and enhance" their positions, and (2) that demand is futile because Defendants would have to "sue themselves," resulting in a loss of insurance and/or personal liability in excess of insurance coverage limits, are arguments that have been consistently rejected by courts. *Id.* (citing *Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988); *Lewis v. Straetz,* 1986 WL 2252, at *4-*5 (Del. Ch. Feb. 12, 1986); *Brehm,* 746 A.2d at 257 n. 34; *Aronson,* 473 A.2d at 818; *Decker v. Clausen,* No. Civ. A. Nos. 10.684, 10,685, 1989 WL 133617, at *2 (Del. Ch. Nov. 6, 1989)). Defendants maintain that such "boilerplate allegations" do not sufficiently plead demand futility. *Id.*

*5 In response to Defendants' arguments, Plaintiffs assert that they have met their burden for demonstrating demand futility in this case. Resp. (doc. 32) at 5. "[P]laintiffs' burden here is not to prove wrongdoing or demonstrate that they are likely to win on the merits; rather, plaintiffs' burden at the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2460610 (D.Ariz.)
**(Cite as: 2007 WL 2460610 (D.Ariz.))**

pleading stage is only to allege particularized facts which, if true, would give a reasonable shareholder reason to doubt the ability of four of the seven members of the VistaCare Board to consider a demand." *Id.*

First, Plaintiffs maintain that Defendants Slager and Fine are directly interested in the insider trading allegations in the Complaint because each of them received a personal financial benefit from those transactions. *Id.* at 7. Moreover, Plaintiffs allege that Slager and Fine knowingly traded large percentages of their holdings in VistaCare while in possession of undisclosed material adverse information, in order to personally profit from the artificially inflated price of the company's stock. *Id.* at 7-8. Plaintiffs note that in the Complaint, they stated:

s a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding the improper accounting. While in possession of this material adverse non-public information regarding the Company ...

lager sold 116,000 shares of VistaCare stock for proceeds of $3,949,288.67, which represents more than ten times the total compensation paid to Slager during FY:03 ....he sold 36% of his total holdings during the Relevant Period; and

ine sold 41,500 shares of VistaCare stock for proceeds of $1,125,012.60 .... he sold 57% of his total holdings during the Relevant Period. Because these defendants received personal financial benefits from the challenged insider trading transactions, these defendants are interested and demand upon them is futile.

Complt. (doc. 1) at ¶ 67(a)(i)-(ii). Under "the standard set forth in" *Zimmerman v. Braddock,* No. 18473-NC, 2005 WL 2266566, at *8 (Del. Ch. Sept. 8, 2005), Plaintiffs argue that they have ad-

equately alleged that Slager and Fine had knowledge of material information that formed the basis of their trades, subjecting them to a "substantial likelihood of liability and rendering them incapable of impartially evaluating a demand to commence and vigorously prosecute this action." Resp. (doc. 32) at 8.

Second, Plaintiffs argue that Defendants McBride, Klisares and Matricaria, all members of the Audit Committee, lack independence and are interested because they face a substantial likelihood of liability for their involvement in the dissemination of false and misleading statements. *Id.* Plaintiffs assert that there is "no doubt" that the press releases, Forms 10-Q and Form 10-K issued during the relevant period were false and misleading. *Id.* They base this assertion on the Honorable Frederick J. Martone's finding that "similar facts alleged by plaintiffs in a related class action demonstrate the falsity of these statements." *Id.* (citing *In re Vista-Care Inc. Sec. Litig.,* No. 04-CV-1661-PHX-FJM, Order at 3 (D.Ariz. Aug. 18, 2005)).

*6 Plaintiffs note that the Audit Committee Charter defines the Audit Committee's responsibilities as:

.. assist[ing] the Board of Directors in fulfilling its responsibility for oversight of the quality and integrity of the accounting, auditing, and reporting practices of the company, and such other duties as directed by the Board. The Committee's role includes a particular focus on the qualitative aspects of financial reporting to shareholders, and on the company's processes to manage business and financial risk, and for compliance with significant applicable legal, ethical, and regulatory requirements.

Complt. (doc. 1) at ¶ 67(c). Plaintiffs maintain that to accomplish this role, the Charter expressly requires the Audit Committee to evaluate the "[s]tatus of significant accounting estimates and judgments (e.g., reserves) and special issues (e.g., major transactions, related party transactions, accounting 9 changes)," to conduct a "[r]eview of the Annual

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2460610 (D.Ariz.)
(Cite as: 2007 WL 2460610 (D.Ariz.))

Report on Form 10-K and proxy statement, including MD & A," to "[d]iscuss earnings press releases and other financial information and earnings guidance provided to analysts and rating agencies," to conduct a "[r]eview of Quarterly Reports on Form 10-Q, including MD & A," and to conduct an "[a]ssessment of internal control" at least annually. *Id.*

Plaintiffs argue that "[d]espite their duties to ensure that VistaCare issued proper financial statements and guidance and their personal review of those statements, the members of the Audit Committee allowed the false press releases and financial statements and even recommended to the Board to include the false financial statements in VistaCare's Form 10-K filed with the SEC for the Fiscal Year 2003." Resp. (doc. 32) at 9-10. Thus, they assert that any demand on the members of the Audit Committee would have been futile, because the members were actively involved in the review and dissemination of all of the statements Plaintiffs allege were false and misleading. *Id.* at 10....

**B. Control of a Majority of the Board by an Interested Director**

Defendants contend that their motion to dismiss should be granted because Plaintiffs have failed to show that any interested director controlled a majority of the directors on the VistaCare board. Mot. (doc. 20) at 10. At the outset, Defendants maintain that because Plaintiffs have not shown that any director lacks independence, the issue of control is irrelevant. *Id.* Moreover, Defendants argue that Plaintiffs have not produced any facts that establish that any director controlled or "dominated" the board. *Id.* They contend that any arguments asserting that such domination existed because (1) the directors, who were members of the Nominating and Corporate Governance Committee, "singularly control the other defendants' awards and positions [,]" or (2) the directors held professional relationships with each other, are irrelevant. *Id.* Defendants argue that Plaintiffs do not, and cannot, allege any

facts demonstrating that any interested director controlled other directors. *Id.* at 11.

*7 In contrast, Plaintiffs again assert that they have met their burden for demonstrating demand futility in this case. Resp. (doc. 32) at 5. First, Plaintiffs argue that Defendant Slager is controlled by the members of the Compensation Committee due to his employment as President, Chairman and Chief Operating Officer ("CEO") of VistaCare. *Id.* at 6. They contend that Slager cannot be independent because his principal profession is his employment with VistaCare, pursuant to which he receives "$375,798 in salary alone." *Id.* Hence, Plaintiffs assert that Slager is not independent from Defendants Johnson, Matricaria and Klisares, because they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO. *Id.* "Because of his status as an inside director, and the concomitant substantial compensation he receives, defendant Slager could not consider a demand adverse to the Director Defendants serving on the Compensation Committee." *Id.* (citing the following in support of their argument: *Rales*, 634 A.2d at 937; *Steiner v. Meyerson*, No. 13139, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995); *In re The Student Loan Corp. Derivative Litig.*, No. 17799, 2002 WL 75470, at *3 (Del. Ch. Jan. 8, 2002)).

Second, Plaintiffs assert that Defendants Slager, Klisares and Faeder lack independence due to their "entangling relationships." Resp. (doc. 32) at 6. Plaintiffs note that Slager, Klisares and Faeder are "long-time business associates, all involved in the start-up and/or development of Karrington Health, Inc. ("Karrington"), which in 1998, was acquired by Sunrise Assisted Living, Inc." *Id.* at 11. Slager was the founder, Chairman and CEO of Karrington, and Klisares was COO and President of Karrington. *Id.* In addition, Plaintiffs note that Slager is the Executive Vice President and a director of Sunrise, and that Klisares is also a director of Sunrise. *Id.* "As a result, these entangled relationships create strong incentives for these defendants to avoid su-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2460610 (D.Ariz.)
**(Cite as: 2007 WL 2460610 (D.Ariz.))**

ing each other, thereby showing demand would have been futile." *Id.*

## V. Analysis-Demand Futility

### A. Alleged Insider Trades by Slager and Fine

In order to satisfactorily show that Slager and Fine face a "substantial likelihood" of liability for insider trading, Plaintiffs must plead facts that support the conclusion "that each sale by each individual defendant was entered into and completed on the basis of, and because of adverse material non-public information ." *Guttman,* 823 A.2d at 505 (citing *Stepak v. Ross,* 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985)). Plaintiffs, in their response, assert that under "the standard set forth in" *Zimmerman v. Braddock,* No. 18473-NC, 2005 WL 2266566, at *8 (Del. Ch. Sept. 8, 2005), they have adequately alleged that Slager and Fine had knowledge of material information that formed the basis of their trades, subjecting them to a "substantial likelihood of liability." The Court, however, finds this statement misplaced, as the "standard" utilized in *Zimmerman* is the same as that defined in *Guttman,* holding that "[t]o proceed on an insider selling claim, a plaintiff must show 'that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information.' " *Zimmerman,* No. 18473-NC, 2005 WL 2266566, at *8 (quoting *Guttman,* 523 A.2d at 505).

*8 The court in *Zimmerman* noted that the plaintiffs in that matter had adequately pled facts that created a reasonable inference that the specific defendants had "knowledge-directly and by imputation-of [the companies'] problems." *Id.* In contrast with the case at bar, the plaintiffs in *Zimmerman* pled particular facts that indicated that concerns about the companies at issue in the case had been expressed to the defendants and that the defendants had access to "Pricing Reports, Demographic Analyses, Network Operations Center Reports, and Promotion Reconciliation Reports," all of which detailed enough in-

formation to reveal the difficulties one of the companies faced. *Id.* Here, Plaintiffs plead no such facts.

In the case at bar, Plaintiffs claim that "[a]s a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, [Slager and Fine] knew the adverse non-public information regarding the improper accounting." Complt. (doc. 1) at ¶ 67(a). Such conclusory statements do not satisfy the strict requirements of Rule 23.1. Plaintiffs fail to indicate how or in what form the "non-public information regarding the improper accounting" was disclosed to Slager and Fine through any of these listed mechanisms. Absent from the Complaint are well-pled, particularized facts detailing the specific information that would have come to their attention in their roles at Vista-Care, and an indication as to why they would have perceived any accounting irregularities. In the absence of specific facts that support a rational inference that Slager or Fine had some basis to believe that VistaCare's financial statements were materially misleading in a manner that inflated the company's stock price, the mere fact that two of the directors sold large portions of their stock does not support the conclusion that they face a real threat of liability. Consequently, the Court concludes that Plaintiffs have failed to plead particular facts that show that Slager and Fine face a "substantial likelihood" of liability for insider trading.

### B. The Audit Committee

The Court also does not find that Plaintiffs have successfully pled particular facts that establish their *Caremark* claim. To establish that VistaCare's Audit Committee members are "interested" directors, Plaintiffs must plead facts that show that each member, who was a director, faces a "substantial likelihood" of liability. "The 'mere threat' of personal liability in the derivative action does not render a director interested; however, a 'substantial

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2460610 (D.Ariz.)
(Cite as: 2007 WL 2460610 (D.Ariz.))

Page 8

likelihood' of personal liability prevents a director from impartially considering a demand." *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del. Ch.1995).

Here, the parties do not dispute that the directors are exempt from liability for violations of their duty of care. *See* Mot. (doc. 20) at 7; Resp. (doc. 32) at 17. Additionally, the parties agree that to show a " 'substantial likelihood' of personal liability," Plaintiffs must plead specific facts that implicate breaches of the directors' duties of loyalty and good faith. *Id.; see also Emerald Partners v. Berlin,* 726 A.2d 1215, 1227 (Del.1999). The Court finds that Plaintiffs have failed to plead such facts.

*9 Here, Plaintiffs basically assert that the Audit Committee, which includes Director Defendants McBride, Klisares and Matricaria, "allowed the false press releases and financial statements and even recommended to the Board to include the false financial statements in VistaCare's Form 10-K filed with the SEC for the Fiscal Year 2003 ." Resp. (doc. 32) at 9-10. They allege that such Director Defendants were "required to take an active role in the review and dissemination of all of [VistaCare's] financial statements and communications concerning [VistaCare's] results, operations and prospects." *Id.* at 10. "By failing to properly carry out their duties as guardians of VistaCare's financial results, [the three Director Defendants] breached their fiduciary duties[.]" *Id.* Such conclusory claims, however, are not sufficient to survive a motion to dismiss.

In *Guttman,* the court considered *Caremark* claims brought by shareholders against directors of a specific corporation. 823 A.2d at 499, 505-07. The plaintiffs in *Guttman* asserted demand futility because, among other things, the defendant directors "failed to oversee the process by which [the corporation] prepared its financial statements so as to ensure that the resulting statements had integrity and met legal standards." *Id.* at 505. Thus, the plaintiffs argued that the defendant directors faced liability for breaches of their fiduciary duties and, therefore, lacked the ability to act impartially on a demand.

*Id.* at 499. The court, however, concluded that the plaintiffs failed to sufficiently plead particular facts to establish their claims. *Id.* at 506-08.

n this case, the plaintiffs have not come close to pleading a *Caremark* claim. Their conclusory complaint is empty of the kind of fact pleading that is critical to a *Caremark* claim, such as contentions that the company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation.

*Id.* at 506-07. The circumstances described in *Guttman* are on par with those currently before this Court.

Here, Plaintiffs do not plead particular facts (1) that indicate how Director Defendants McBride, Klisares and Matricaria were involved or failed "to take an active role" in the review and dissemination of the alleged false statements; (2) that designate a specific false statement that was reviewed and used by the Audit Committee; or (3) that indicate how and when these Defendant Directors learned that any alleged statement was false. The fact that Judge Martone concluded that "similar facts" sufficiently demonstrated the falsity of the contested financial statements in order to survive a motion to dismiss is irrelevant to the analysis of whether the particular Director Defendants in this matter are "interested" for purposes of a demand futility analysis. The mere fact that the documents may have been false is not dispositive on the issue of whether McBride, Klisares and Matricaria face a "substantial likelihood" of liability for breaches of their duties of loyalty or good faith. The Court finds no factual indication of bad faith on the part of Defendants McBride, Klisares and Matricaria. Consequently, the Court concludes that Plaintiffs have failed to plead particular facts that show that such Director Defendants face a "substantial likelihood" of liability.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2460610 (D.Ariz.)
**(Cite as: 2007 WL 2460610 (D.Ariz.))**

**\*10** In light of the fact that the Court finds no Director Defendant to be facing a "substantial likelihood" of liability, the issue of their control over a majority of the VistaCare board is irrelevant and need not be analyzed. Due to Plaintiffs' failure to show that demand on the VistaCare board was futile, Defendants' motion to dismiss shall be granted. Consequently, Defendants' arguments regarding Plaintiffs' alleged failure to state a claim in their Complaint also need not be analyzed by the Court.

Therefore,

IT IS ORDERED that Defendants' motion to dismiss Plaintiffs' consolidated derivative complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (doc. 20) is GRANTED.

IT IS FURTHER ORDERED that Individual Defendants' motion to dismiss for lack of jurisdiction (doc. 17) is DENIED as moot.

D.Ariz.,2007.
In re VistaCare, Inc., Derivative Litigation
Not Reported in F.Supp.2d, 2007 WL 2460610 (D.Ariz.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 6

Westlaw.

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333
**(Cite as: 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333)**

Page 1

☞
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Morton LEVINE, Plaintiff,
v.
Roger B. SMITH, F. James McDonald, Howard H.
Kehrl, F. Alan Smity, Robert J. Atwood, Lloyd E.
Reuss, Robert C. Stempel, Thomas A. Murphy
Anne L. Armstrong, Catherine B. Cleary, James H.
Evans, Walter A. Fallon, Charles T. Fisher, III,
Marvin L. Goldberger, John J. Horan Edmund T.
Pratt, Jr., James D. Robinson, III, Leon H. Sullivan,
Dennis Weatherstone, Thomas H. Wyman, H. Ross
Perot, Morton H. Meyerson, J. Thomas Walter, Jr.,
and William K. Gayden, Defendants,
and
General Motors Corporation, Nominal Defendant.
**Civil Action No. 8833.**

Submitted April 10, 1989.
Decided: Nov. 27, 1989.
Revised: May 21, 1990.

**\*\*337** John M. Bader, of Law Offices of John M.
Bader, Wilmington, Delaware; Curtis V. Trinko,
and Kevin J. Yourman, of Law Offices of Curtis V.
Trinko, New York City, of Counsel, James F.
Koehler, and John F. Hill, Esquires, of Gallagher,
Sharp, Fulton & Norman, Cleveland, Ohio, of
Counsel, for plaintiff.

William O. LaMotte, III and Thomas Reed Hunt,
Jr., of Morris, Nichols, Arsht & Tunnell, Wilming-
ton, Stephen C. Neal, Robert J. Kopecky, and Helen
E. Witt, of Kirkland & Ellis, Chicago, Illinois, Mi-
chael J. Basford, and Louis H. Lindeman, Jr., of
General Motors Corporation, Detroit, Michigan, of
Counsel, for defendant General Motors Corpora-
tion.

E. Norman Veasey, and Thomas A. Beck, of
Richards, Layton & Finger, Wilmington, Dennis J.
Block, Irwin H. Warren, Stephen A. Radin, and
Timothy E. Hoeffner, of Weil, Gotshal & Manges,
New York City, for General Motors Corporation
Director Defendants, Anne L. Armstrong, Catherine
B. Cleary, James H. Evans, Walter A. Fallon,
Charles T. Fisher, III, Marvin L. Goldberger, John
J. Horan, Howard H. Kehrl, Thomas A. Murphy,
Edmund T. Pratt, Jr., James D. Robinson, III, John
G. Smale, Leon H. Sullivan, Dennis Weatherstone
and Thomas H. Wyman.

Grover C. Brown, and Barbara MacDonald, of
Morris, James, Hitchens & Williams, Wilmington,
Roy L. Reardon, and Joseph F. Tringali, of
Simpson, Thatcher & Bartlett, New York City, for
General Motors Corporation Director defendants,
Donald J. Atwood, F. James McDonald, Lloyd E.
Ruess, F. Alan Smith, Roger B. Smith, and Robert
C. Stempel.

Bruce M. Stargatt, and David C. McBride, of
Young, Conaway, Stargatt & Taylor, Wilmington,
Thomas D. Barr, Evan R. Chesler, and Christopher
M. Mason, of Cravath, Swaine & Moore, New York
City, of Counsel, Thomas W. Luce, III, and M.
David Bryant, Jr., of Hughes & Luce, Dallas,
Texas, of Counsel, for defendant H. Ross Perot.

**\*\*338** JACOBS, Vice Chancellor.

**\*1** The plaintiff, a shareholder of General Motors
Corporation ("GM"), brings this derivative action
against GM and its Board of Directors (collectively,
"GM defendants"), and H. Ross Perot ("Perot"), to
challenge GM's repurchase, on December 1, 1986,
of GM Class E stock and contingent notes owned
by Perot and others. The plaintiff formally deman-
ded, on December 11, 1986, that the GM Board res-
cind the repurchase. On January 5, 1987, the GM
Board unanimously rejected that demand. On Feb-
ruary 13, 1987, the plaintiff filed this derivative ac-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333
(Cite as: 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333)

tion, alleging that GM's directors, in approving the repurchase, breached their fiduciary duties of care and loyalty to the corporation and its shareholders.

On April 20, 1987, the GM defendants moved to dismiss the complaint, and also moved for a protective order staying discovery pending the outcome of their dismissal motion. On December 22, 1987, the Court granted the GM defendants' motion for a protective order and stayed all discovery. *Levine v. Smith*, Del.Ch., C.A. No. 8833, Jacobs, V.C. (December 22, 1987).

On January 26, 1988, after briefing had already gone forward, the plaintiff filed an amended complaint. In response, the GM defendants moved to dismiss the amended complaint under Chancery Court Rule 23.1, arguing that that complaint fails to allege particularized facts sufficient to create a reasonable doubt that the GM board wrongfully rejected the plaintiff's pre-suit demand. Defendant Perot also filed a separate motion to dismiss the amended complaint pursuant to Chancery Court Rules 9(b), 12(b)(6), and 23.1. Both motions were argued on February 1, 1988. This is the decision of the Court on those motions.

## I. *The Facts*

The pertinent facts are as alleged in the amended complaint. Because the facts are largely as described in the earlier opinions of this Court and the Delaware Supreme Court in *Grobow v. Perot*, Del.Ch., 526 A.2d 914 (1987), *aff'd*, Del.Supr., 539 A.2d 180 (1988), they are given brief treatment here, except where necessary to highlight the differences between the present amended complaint and the complaint adjudicated in *Grobow*.

During the fall of 1984, GM and Electronic Data Systems ("EDS") consummated an Agreement and Plan of Merger in which **339 EDS became a wholly owned subsidiary of GM. (Am.Compl. ¶¶ 12-13). In that transaction, defendant Perot (who was EDS's Chairman) and defendants Morton H.

Meyerson, Thomas Walter, Jr., and William K. Gayden (who were directors and officers of EDS) exchanged their EDS stock for newly-created GM Class E stock, plus certain contingent notes maturing in 1991. Perot remained EDS's Chairman and joined GM's Board of Directors (Am.Compl. ¶¶ 18-19), and the Class E Stock that he received in the merger made Perot GM's single largest shareholder.

Despite the merger, EDS retained substantial autonomy, which preserved EDS's profitability and competitive force. That autonomy also minimized GM's potential conflict that existed by virtue of its dual status as EDS's parent corporation and as its largest customer. (Am.Compl. ¶¶ 20-29).

*2 The GM-EDS merger was initially successful in many respects. EDS provided GM with a broad range of data processing and telecommunication systems. For its part, GM provided EDS with approximately 75 percent of its total revenues, and GM's suppliers accounted for a large portion of EDS's other customers. (Am.Compl. ¶ 30). However, a conflict soon developed between the two companies which ended their amicable relationship. The companies' managements disputed over the pricing of EDS's services to GM, over certain long term contracts between EDS and GM, and over executive compensation, auditing, and management style. (Am.Compl. ¶ 31). Perot became increasingly and openly critical of GM's operations, business, and management (Am.Compl. ¶¶ 32-34). In May of 1986, Perot wrote to Roger B. Smith, GM's Board Chairman, proposing several options for settling the differences between GM and himself. Among these was the suggestion that GM buy him out. (Am.Compl. ¶ 35). Perot persisted in his criticisms of GM, and over the ensuing months, those criticisms became more pointed and received wide media attention. (Am.Compl. ¶¶ 37-41).

After Perot began to voice his criticisms publicly, GM negotiated to sell EDS to American Telephone and Telegraph. After those negotiations broke down in November of 1986, Perot took serious steps to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333
**(Cite as: 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333)**

resell his interest to GM (Am.Compl. ¶¶ 42-43). By November 30, 1986, Perot and GM had reached agreement with GM on a buyout,[FN1] and the following day (December 1, 1986), GM's entire **340 Board, a majority of whom were independent (Am.Compl. ¶¶ 5-6), approved the buyout transaction. (Am.Compl. ¶ 47).

Under the terms of the repurchase agreement, GM would repurchase approximately 12 million shares of its Class E stock, plus all of the contingent notes, held by Perot and three of his associates, for $61.90 per share. That represented a total cost of $742.8 million to GM. (Am.Compl. ¶¶ 47-48). The December 1, 1986 repurchase agreement also provided that: (i) for three years, Perot would not start a business that would compete with EDS; (ii) for 18 months Perot would not recruit EDS executives; (iii) for five years Perot would not acquire any GM stock or engage in a proxy contest against GM (Am.Compl. ¶ 51); (iv) Perot would (and did) resign from the GM Board and as EDS's Chairman, and Perot's three associates would (and did) resign from their executive positions with EDS (Am.Compl. ¶¶ 51-52); and (v) Perot would not criticize GM publicly, and would pay GM up to $7.5 million if he were found to have violated that covenant. (Am.Compl. ¶ 51).

The complaint alleges that the buyout agreement, and Perot's concomitant resignation from his positions at EDS and GM, occurred shortly before an anticipated major confrontation between Perot and the other GM directors over end-of-the-year senior management bonuses. (Am.Compl. ¶ 58). Shortly after the repurchase was consummated, Perot offered to hold in escrow, until December 15, 1986, the moneys he had received in exchange for his GM securities. That offer was made to give GM's directors time to "review the matter and the events that led to [the] decision." GM's directors, however, decided not to rescind the buyout agreement. (Am.Compl. ¶¶ 47, 57).

*3 On December 11, 1986, plaintiff submitted a written demand to the GM Board that it rescind the repurchase agreement.[FN2] By letter **341 dated December 15, 1986, GM responded that the plaintiff's demand would be considered at the next regularly scheduled Board meeting on January 5, 1987. On December 16, 1986, plaintiff requested permission to make a formal presentation to the Board. By letter dated January 9, 1987, GM replied that its Board had considered the plaintiff's demand on January 5, 1987, and had unanimously rejected it, on the basis that neither litigation nor rescission of the repurchase would serve the corporation's best interests. In his amended complaint, the plaintiff alleges that the Board's determination to reject his demand was wrongful.

## II. The Contentions

The defendants first argue that both the decision in *Grobow v. Perot,* Del.Ch., 526 A.2d 914 (1987), *aff'd,* Del.Supr., 539 A.2d 180 (1988), and the doctrine of res judicata, operate to preclude the plaintiff from contending that the Board wrongfully refused his demand. Alternatively, the defendants argue that in all events this action must be dismissed under Rule 23.1, because the amended complaint does not allege sufficiently particularized facts creating a reasonable doubt as to whether the Board's rejection of the demand **342 was wrongful. Specifically, the defendants argue that no reasonable doubt is created as to whether the GM Board was disinterested, or whether its rejection of the demand was adequately informed.

Defendant Perot advances three arguments in support of his separate motion to dismiss under Rule 12(b)(6). First, Perot contends that because he was no longer a director when GM's Board rejected plaintiff's demand, he owed no fiduciary duty, and therefore could not have breached any duty, owed by the Board to GM's stockholders. Second, he argues that the complaint fails to state a claim for breach of a duty owed in any other capacity. Third, Perot argues that the complaint fails to state a valid claim for aiding and abetting, because it alleges no valid underlying breach of fiduciary duty by GM's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333
**(Cite as: 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333)**

directors.

The plaintiff responds that the *Grobow* decisions do not operate either as res judicata or as collateral estoppel. He further contends that the amended complaint is sufficient under Rule 23.1, because (among other reasons) it need not allege particularized facts-but only "legally sufficient reasons"-to make the requisite showing that the GM Board wrongfully rejected his demand. Plaintiff insists that that showing is made because the complaint alleges that (a) the Board's decisions to enter into the December 1, 1986 buyout transaction, and to reject plaintiff's demand to rescind that transaction, were uninformed; (b) the Board failed to conduct an adequate investigation before rejecting plaintiff's demand; and (c) the directors acted in their own self interest to preserve their positions and remuneration.

As for the claims against Perot, the plaintiff responds that their adequacy must be evaluated under the Rule 12(b)(6) "notice pleading" standard, which (plaintiff contends) is easily satisfied here. Finally, plaintiff argues that, should his amended complaint be dismissed, he should be granted leave to amend under Chancery Court Rule 15(a).

**\*4** Having considered the parties' contentions, I conclude that the amended complaint must be dismissed for failure to satisfy the requirements of Rule 23.1. That makes it unnecessary to address the defendants' res judicata argument or Perot's separate motion to dismiss under Rule 12(b)(6).

### III. *The Motion to Dismiss Under Rule 23.1*

A. *The Applicable Standard.*

Chancery Court Rule 23.1 mandates that in a derivative action:

**\*\*343** The complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort ...

The purpose of that Rule is to require shareholders to seek redress of their grievances through the corporation's board of directors, or, alternatively, to justify their entitlement to act on the corporation's behalf independently of the board. The Rule is consistent with, and is designed to effectuate, the fundamental principle that the board of directors normally controls the corporation's actions and policies. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 811-12 (1984). Whether or not a corporation should bring a lawsuit is a question normally addressed to the directors' business judgment, for which reason shareholders normally lack the legal managerial power to bring a suit to enforce a corporate claim. *Id.*

The derivative action device is an exception to that rule and may be invoked only in those cases where the board is legally disabled from acting on the corporation's behalf due to circumstances that would deprive its decision of the business judgment rule's protections. The Rule 23.1 demand requirement, and the implimenting form of judicial scrutiny required by *Aronson v. Lewis* and *Grobow v. Perot, supra,* are procedures to which this Court must adhere in determining whether the board is so disabled.

Under Delaware law, the question of whether a derivative action may go forward normally arises in one of two distinct procedural settings.[FN3] The first is where the plaintiff shareholder files a derivative action without first having made a demand upon the board of directors to rectify the matters complained of, and claims that a **\*\*344** demand would have been futile. In this so-called "demand futility" procedural posture, the derivative action will be allowed to go forward where the Court is satisfied that the particularized facts in the complaint create a reasonable doubt either that the directors were disinterested and independent, or that the transaction under challenge was the product of a valid business judgment. *Aronson,* 473 A.2d at 814; *Grobow,* 539 A.2d at 188-89.

The second procedural setting (of which this case is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333
(Cite as: 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333)

an example) is the so-called "demand refused" case, wherein the plaintiff makes a demand upon the board of directors, which the board rejects, after which the plaintiff files a derivative action. In those circumstances the plaintiff will be permitted to proceed with his derivative suit if the Court is satisfied that the board's rejection of the demand was wrongful. That determination, as in the "demand futility" situation, is based upon the allegations of the complaint itself. *Levine v. Smith,* Del.Ch., C.A. No. 8833, Jacobs, V.C. (December 22, 1987).

*5 In this case the plaintiff has raised a threshold question, namely, what standard the Court should apply in assessing whether the complaint satisfactorily establishes, for Rule 23.1 purposes, that the demand was wrongfully rejected. The plaintiff advances several arguments toward his proposition that the *Aronson-Grobow* standard should not apply in "demand refused" cases.

First, the plaintiff suggests that the Court should adopt the "notice pleading" standard employed on motions to dismiss pursuant to Rule 12(b)(6), *i.e.,* whether the plaintiff would be entitled to relief under any reasonably conceivable set of facts based upon the allegations made. *Harman v. Masoneilan Int'l, Inc.,* Del.Supr., 442 A.2d 487, 502 (1982). This argument, however, flows from a misconception of this Court's earlier December 22, 1987 ruling in this case, and of the nature of a dismissal motion under Rule 23.1. In its December 22, 1987 Opinion, the Court observed that a determination of whether a demand was wrongfully rejected is, procedurally speaking, more akin to a Rule 12(b)(6) motion to dismiss than to a Rule 56 motion for summary judgment. *Levine,* slip op. at 11-12. In making that observation, the Court did not intend to suggest, nor did it hold, that the standard to be employed in a "demand refused" case is identical to that applied on a Rule 12(b)(6) dismissal motion.

Nor does the plaintiff advance any reasoned basis for his argument that the standard in a "demand refused" case should be different from that employed in a "demand futility" situation. In **345 both

cases the judicial inquiry is the same, *viz,* to determine whether the Board is legally disabled from making a decision that would be protected under the business judgment rule. The inquiry being the same, logic suggests that the standard should be also. Moreover, the plaintiff's argument ignores the critical difference between a motion to dismiss brought under Rule 23.1 and a motion to dismiss under Rule 12(b)(6). Unlike its Rule 12(b)(6) counterpart, a motion to dismiss under Rule 23.1 is not intended to test the legal sufficiency of the plaintiff's substantive claim. Rather, its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf. As earlier stated, that latter determination hinges upon whether there is a reasonable doubt that the challenged board action is protected by the business judgment rule. Such reasonable doubt must be based upon particularized facts alleged in the complaint. To supplant that requirement with the more lenient Rule 12(b)(6) "notice pleading" standard would contravene the policy underlying Rule 23.1 and the clear mandate of *Aronson.*

Alternatively, the plaintiff argues, in reliance upon certain language in *Allison v. General Motors Corp.,* 604 F.Supp., 1106, 1121 (D.Del.1985), that the complaint need allege only legally sufficient "reasons" (as distinguished from particularized "facts") to create a reasonable doubt concerning the directors' decision to reject a demand. Plaintiff relies upon *Allison* for his argument that a pleading standard less stringent than that called for by *Aronson* and *Grobow* should be applied in "demand refused" cases. But that argument rests upon a misreading of *Allison.* The *Aronson, Grobow,* and *Allison* decisions all applied, in specific factual settings, the Rule 23.1 mandate that the plaintiff "allege with particularity ... the reasons for his failure to obtain the action." Nothing in the *Allison* opinion, when fairly read, indicates that the District Court, by alluding to "legally sufficient reasons," intended any substantive departure from the particularized pleading requirement of Rule 23.1 and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333
**(Cite as: 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333)**

*Aronson.*

*6 Finally, the plaintiff argues that to satisfy Rule 23.1, the complaint need satisfy only the pleading requirements of Chancery Court Rule 9, which provides that only certain specified matters need be alleged with particularity.[FN4] Rule 9, however, governs complaints **346 generally, while Rule 23.1 specifically governs complaints in derivative actions. Because this is a derivative action, it must satisfy the pleading requirements independently imposed by Rule 23.1.

The Court concludes that the applicable standard for determining whether or not a demand has been wrongfully refused is that of "demand futility" under *Aronson* and *Grobow.* But it must be noted that while the standard is the same, the focus of the Court's inquiry varies according to the context. In a "demand futility" case, the inquiry focuses upon whether the business judgment rule protects the directors' initial decision to approve the challenged transaction. In a "demand refused" case such as this, the focus is upon whether the business judgment rule protects the board's later decision to reject a shareholder demand.[FN5]

*B. The Propriety of the Directors' Refusal of the Demand*

The appropriate review standard having been determined, the inquiry becomes whether the complaint alleges particularized facts that create a reasonable doubt as to whether (i) the GM Board was disinterested and independent when it rejected the demand, or (ii) its decision to reject the demand was the product of an informed business judgment. Because, as discussed below, that question must be answered in the negative, the plaintiff has not met his burden of justifying his entitlement to proceed derivatively on the corporation's behalf.

**347 1). *The Director's Disinterestedness and Independence*

The plaintiff first argues that the amended complaint adequately alleges that the GM directors were motivated by self interest both when they approved the Perot buyout and when they rejected plaintiff's demand that the buyout be rescinded. It is claimed that the directors' sole purpose in approving the buyout was to silence Perot and to remove him as a threat to their domination and control of GM. For that claim to satisfy Rule 23.1, it must be supported by particularized pleaded facts creating a reasonable doubt that the GM directors were tainted by financial self interest or were motivated by entrenchment considerations. *Grobow v. Perot,* 539 A.2d at 188. No such facts are found in the amended complaint.

The complaint does not allege that the GM directors were financially interested in the buyout transaction, or that they were not independent. [FN6] *See Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 626-627 (1986); *Aronson,* 473 A.2d at 815. Accordingly, any reasonable doubt concerning the directors' disinterest and independence can flow only from the claim that the directors were seeking to entrench their control of GM. The particularized factual allegations, however, do not support that claim. While Perot was very critical of the Board and was GM's single largest shareholder, he and his fellow Class E shareholders were in no position to threaten the GM Board's incumbency. Moreover, the complaint does not charge Perot and his associates with having commenced, threatened, or contemplated a tender offer, proxy contest, or other action to gain control of GM or to remove the incumbent Board. Therefore, no reasonable doubt that the GM Board rejected the demand to defend itself from a threat to their incumbency, arises.

*7 Similarly, the allegations that the Board acted solely in its own interest and to silence Perot do not create a reasonable doubt that the Board was disinterested. Those allegations are conclusory, and there are no particularized factual claims that the Board members stood to benefit personally from the buyout transaction.[FN7]

**348 2). *Whether the Board's Decision to Reject*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333
**(Cite as: 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333)**

*The Demand Was Informed*

Plaintiff next contends that the business judgment rule does not protect the GM's Board's decision to reject plaintiff's demand, because that decision was not adequately informed. Plaintiff says that the amended complaint creates a reasonable doubt in that regard, because it alleges that (1) the Board denied plaintiff's counsel an opportunity to make an oral presentation at the Board meeting, to explain why the buyout transaction was harmful to the corporation, and (2) the Board "did nothing" (including conducting no investigation) in response to his demand.[FN8] The Court finds those contentions also to be insufficient.

To begin with, as a matter of logic it cannot be true that a board's decision to reject a shareholder demand becomes uninformed because the shareholder's counsel was refused permission to present his case orally to the directors. That conclusion does not flow from the premise. The Board may not have needed further information at that time, because they possessed the information essential to an informed decision. Nor does the argument have a **349 sufficient foundation in law. A board of directors is not legally obligated to permit a demanding shareholder to make an oral presentation at a meeting. Corporate directors normally have only limited available time to deliberate, and a determination of what matters will (and will not) be considered must necessarily fall within the board's discretion. *See* Manning, *The Business Judgment Rule and the Director's Duty of Attention,* 39 Bus.Law 1477, 1485 (1984). A ruling that, as a practical matter, would require GM's Board to hear the plaintiff's oral presentation, would place directors in the untenable position of having to entertain presentations by any shareholder who threatens to file a derivative action. It would also be an unwarranted intrusion upon the board's authority to govern the corporation's affairs conferred by 8 *Del.C.* § 141.

Lastly, the plaintiff urges that the complaint independently establishes that the GM board was uninformed when it approved the buyout transaction. In his brief, plaintiff argues that his bare allegation that the GM Board was uninformed, must implicitly be taken to mean that the Board (i) conducted no investigation, (ii) interviewed none of the participants in the negotiations leading to the buyout, (iii) reviewed no relevant documentation, (iv) failed to assess the economic impact of the buyout transaction upon GM's recapitalization plans, (v) failed to consider Perot's admissions concerning the illegality of the transaction, and (vi) failed to consider Perot's offer to return the repurchase consideration.

*8 That is a lot of water for one conclusory allegation to carry uphill. A motion to dismiss under Rule 23.1 must be overcome with particularized facts. It will not do for a plaintiff to allege, in conclusory fashion, that the board "did nothing" and then argue that that conclusion establishes an array of subsidiary factual inferences that themselves are not supported by particularized facts alleged in the complaint. To accept that approach would virtually eviscerate the pleading requirements of *Aronson* and *Grobow.* The plaintiff's claim that the board was uninformed when it approved the buyout must therefore fail, because it is unsupported by particularized facts in the amended complaint.[FN9]

**350 In addition, GM's letter reply to the plaintiff's demand (which plaintiff incorporates in his complaint by reference) is inconsistent with, and thus diminishes the force of, plaintiff's allegation that the Board 'did nothing.' That letter states that the Board *reviewed* the demand and determined that it was in the corporation's best interests to reject it. [FN10] Finally, the alleged statements attributed to observers that the buyout was not the best decision for GM, suggest that others might have exercised their own business judgment differently, but do not create a reasonable doubt as to whether the GM Board, in making its decision, was sufficiently informed.

In summary, the amended complaint does not allege, in a legally sufficient manner, that the Board's rejection of the plaintiff's demand was wrongful. Therefore, this derivative action must be dismissed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333
**(Cite as: 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333)**

as to all defendants. *Zapata,* 430 A.2d at 784; *Aronson,* 473 A.2d at 813.

#### IV. *The Application for Leave to Amend*

Finally, the plaintiff requests leave to file a second amended complaint pursuant to Chancery Court Rule 15(a), which provides that "leave [to amend] shall be freely given when justice so requires." I conclude that in this case, justice does not so require.

This action is derivative. Legally it is brought on behalf of GM, the nominal defendant. At present ten other such derivative suits, **351 all arising out of the same buyout transaction, are pending. In this particular case, the plaintiff has already been permitted to file an amended complaint, after the defendants had previously submitted an opening brief in support of their motion to dismiss the initial complaint. The defendants have thus twice been put to the task of having to brief the sufficiency of the derivative allegations of the complaint in this action alone.

It will not serve justice to continue multiplying the number of derivative complaints filed as a result of a single transaction. If there is a valid derivative claim to be raised on GM's behalf, it is reasonable to assume that at least one of the several pending complaints will serve as the appropriate vehicle. There is no cognizable prejudice to the corporation in denying this particular plaintiff permission to add yet another complaint to the many already on file. For that reason, and given the procedural history of this action, to permit the filing of yet another amended complaint exceeds, my view, the requirements of reasonableness and justice.

*9 Accordingly, the motion to dismiss the amended complaint under Rule 23.1 is granted, and the motion for leave to file a second amended complaint under Rule 15(a) is denied. IT IS SO ORDERED.

> FN1. The original complaint alleged that a Special Review Committee of three GM directors, chaired by GM Audit Committee Chairman defendant James H. Evans, had approved the buy-back proposal.

> FN2. The full text of the plaintiff's December 11, 1987 demand letter is as follows:

> We are writing to you on behalf of our client, Morton Levine, a common shareholder of General Motors Corp. ...

> On behalf of our client, we hereby demand that GM take prompt action to rescind the buy-back of GM series "E" stock from H. Ross Perot, Morton H. Meyerson, J. Thomas Walter, Jr., and William K. Gaylord.

> The monetary value given to Mr. Perot by the Company is grossly in excess of the present market value of his series "E" stock and notes. Our client regards these payments to Mr. Perot as a waste of corporate assets and a deprivation of corporate opportunity. Moreover, the failure of the Company to offer a similar acquisition package to other GM shareholders was discriminatory, unjust and constitutes a breach of the Board's fiduciary duties to all of the Company's shareholders.

> Additionally, the prohibition on Mr. Perot's future ability to criticize GM and its management is nothing more than an attempt by the present Board of Directors to squelch constructive criticism of its business practices and philosophy. Not only is this a disservice to the Company and its shareholders, but it also reeks of improper personal motivations on the part of Mr. Smith and his cohorts, and is contrary to the principles of free speech and expression so precious to our society's and GM's future progress and growth.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333
(Cite as: 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333)

Accordingly, Mr. Levine request that the Board of Directors of GM rescind the contract with Mr. Perot and his associates immediately. Mr. Perot has foreseen the aforesaid injustices and has granted the Company time, until December 15, to reconsider the buy-back agreement, and, in fact, publicly appears to welcome such a rescission. Mr. Levine, on behalf of all of the Company's shareholders, as well as the Company itself, demands that the Board rescind the aforesaid contract. By rescinding the contract, there will be no damage or prejudice suffered by the Company, hundreds of millions of dollars in excessive "payoff" money will be returned to the Company's treasury, and the Company will not lose the comments, suggestions and insights of America's most successful entrepreneur.

We will be happy to meet with you to discuss these matters in greater detail. Moreover, we are certain that you will give significant consideration to the views expressed herein. However, please be advised that if you decide not to rescind the buy-back contract, we will have no alternative other than to seek the resolution of these issues in the appropriate forum. Therefore, unless you rescind the contract on or before December 15, we will be forced to take further action.

FN3. For this purpose I place to one side the "demand excused" situation involved in *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779 (1981), where a derivative action goes forward, and the corporation then forms an independent committee of its board of directors, which then conducts an investigation and determines that it would be in the corporation's best interests to terminate the derivative action. In those circumstances *Zapata* prescribes a two-step inquiry to determine whether the action should proceed. However, that inquiry is not, strictly speaking, conducted pursuant to Rule 23.1. *See Kaplan v. Wyatt,* Del.Ch., 484 A.2d 501, 506-07 (1984) *aff'd* 499 A.2d 1184 (1985); *Lewis v. Fuqua,* Del.Ch., 502 A.2d 962, 966 (1985); *appeal refused,* Del.Supr., 504 A.2d 571 (1986). Indeed, the "demand excused" scenario presupposes that a majority of the directors are disabled from making a protectible business judgment concerning whether or not to bring the litigation. *See, Levine v. Smith,* Del.Ch., C.A. No. 8833, Jacobs, V.C. (December 22, 1987).

FN4. Rule 9 requires particularized pleading to allege fraud, mistake, or special damage, as well as to deny the performance or occurrence of conditions precedent, or the legal existence of a party to sue or be sued in a representative capacity.

FN5. For the above reasons, the Court also rejects the defendants' invitation to impose, in demand refused cases, a requirement stricter than the *Aronson-Grobow* "reasonable doubt" standard. Defendants argue that the Court should require that the pleaded facts be sufficient to rebut the presumption of the business judgment rule. That argument stems from an erroneous reading of *Spiegel v. Buntrock,* Del.Ch., C.A. No. 8936, Allen, C. (November 17, 1988), where the Court applied the *Aronson-Grobow* standard, not a more stringent standard. Defendants' argument also overlooks the significance of the Supreme Court's holding in *Grobow,* that this Court had erred in interpreting "reasonable doubt" to require that the factual allegations be sufficient to support a "judicial finding." That Court held that such a requirement would impose a more rigorous

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333
(Cite as: 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333)

pleading standard than was warranted by *Aronson*, 539 A.2d at 186. By parity of reasoning, to adopt the defendants' position would come close to requiring the plaintiff to prove his entire case at the pleading stage, which goes far beyond the limited burden envisioned on a Rule 23.1 motion. *See Siegman v. Tri-Star Pictures, Inc.*, Del.Ch., C.A. No. 9477, Jacobs, V.C., slip op. at 32-33 (May 5, 1989).

FN6. To the contrary, the complaint concedes that a majority of the GM directors who approved the buyout transaction, and who rejected plaintiff's demand, were outside directors (Am.Compl. ¶¶ 5-6), which is inconsistent with the allegation that the directors were interested or not independ- ent.

FN7. In a similar vein, the complaint alleges that industry analysts and others had concluded that the GM Board "paid off Perot to get him off the board and off their backs." Those attributed conclusions do not establish that the Board members were improperly motivated in the sense that they stood to benefit personally from the buy- out.

FN8. The core of these contentions is set forth in Paragraphs 100 and 101 of the amended complaint, which state:

100. In compounding their failure to make properly informed business decisions, GM's Board of Directors, upon receiving plaintiff's demand for action on December 11, 1987, did nothing. The GM Board of Directors disregarded the duties and did not undertake an investigation, which would have uncovered the above detailed discrepancies and falsehoods underlying their original decision regarding the Perot buy-out. The GM Board merely met at their regularly

scheduled January meeting and denied plaintiff's request for action.

101. As previously asserted, the Board of Directors has colluded in the self-motivated buy-out of Mr. Perot. The board's refusal to permit plaintiff's counsel to make a presentation at the board meeting further indicated that the board would not actually consider rescinding the buy-out. Once again the board's intolerance to criticism has injured the Company. The board's actions show that the board was predisposed to refuse plaintiff's demand for action, without giving plaintiff's demand the slightest actual consideration. Indeed, on December 2, 1986, *The Wall Street Journal* quoted James H. Evans, Chairman of GM's Audit Committee, as stating: "The directors have 'no intention of rescinding the agreement.' " Therefore, in addition to all of the previously detailed breaches of their duties, GM's Board of Directors did not consider plaintiff's demand with the due care and reasonable investigation required by their corporate office.

FN9. To the extent that the amended complaint alleges other facts, those facts are not sufficiently particularized to create a reasonable doubt as to whether the GM Board was informed when it approved the buyout transaction or decided to reject the plaintiff's demand. At most those facts establish that the Board was not aware of all of the details of the Perot-Smith dispute-a dispute that plaintiff concedes was public knowledge. Specifically, the complaint alleges that when the Board approved the buyout, at least some of the Board members were not aware of the agreements made by Perot and GM to preserve EDS's autonomy. The complaint suggests that if

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333
**(Cite as: 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333)**

the Board members had known of these agreements, they would not have authorized the buyout, because they would have conceded the correctness of Perot's positions on the autonomy issue. But that allegation is inconsistent with, and is contradicted by, other allegations that there were strong disagreements in late 1986 as to how EDS should be managed, which caused the Board to conclude that it was in GM's best interest to buy out Perot and his associates. *See* Am.Compl. ¶¶ 67-90. Taken as a whole, these allegations do not create a reasonable doubt that the Board's decisions to approve the buyout and to reject the demand, were sufficiently in- formed.

FN10. GM's January 9, 1987 reply letter states as follows:

Please be advised that on January 5, 1987, following review of the matters set forth in your December 11, 1986 letter, the Board of Directors of General Motors Corporation unanimously determined that an attempt to rescind, or litigation, or other action concerning the transaction involving the purchase of General Motors Class E stock and related contingent notes from H. Ross Perot, Morton Meyerson, William Gayden and Thomas Walter is not in the best interests of the Corporation. Accordingly, the board refused your demands.

Del.Ch.,1989.

Levine v. Smith

Not Reported in A.2d, 1989 WL 150784 (Del.Ch.), 16 Del. J. Corp. L. 333

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.