# TAB 7

Westlaw.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
NORFOLK COUNTY RETIREMENT SYSTEM,
Plaintiff,
v.
JOS. A. BANK CLOTHIERS, INC., Defendant.
**Civil Action No. 3443-VCP.**

Submitted: Oct. 27, 2008.
Decided: Feb. 12, 2009.

**Background:** Shareholder brought action against
corporation seeking certain books and records relat-
ing to federal securities class action. Both parties
moved for summary judgment.

**Holdings:** The Court of Chancery, Parsons, Vice
Chancellor, held that
(1) company produced all of documents necessary
for shareholder to explore possible derivative suit,
and
(2) shareholder failed to demonstrate a credible
basis for suspecting wrongdoing sufficient to war-
rant granting access to additional corporate records.

Corporation's motion granted.

West Headnotes

**[1] Corporations 101 ⚎181(2)**

101 Corporations
    101IX Members and Stockholders
        101IX(A) Rights and Liabilities as to Cor-
poration
            101k181 Inspection of Corporate Books
and Records
                101k181(2) k. Books and Records
Subject to Inspection. Most Cited Cases

Company produced all of the documents under stat-
ute allowing shareholders to inspect corporate
books and records that were necessary for share-
holder to explore possible derivative suit by
provided a copy of special litigation committee re-
port investigating alleged wrongdoing, the minutes
of committee meetings, and the minutes of the com-
pany's board approving the creation of the commit-
tee; shareholder proffered no evidence to demon-
strate reasonable grounds for suspicion about the
committee's independence, good faith, due care, or
the reasonableness of its processes or conclusions.
8 West's Del.C. § 220.

**[2] Corporations 101 ⚎181(2)**

101 Corporations
    101IX Members and Stockholders
        101IX(A) Rights and Liabilities as to Cor-
poration
            101k181 Inspection of Corporate Books
and Records
                101k181(2) k. Books and Records
Subject to Inspection. Most Cited Cases
Shareholder failed to demonstrate a credible basis
for suspecting wrongdoing sufficient to warrant
granting access to additional corporate records and
documents pursuant to statute beyond those that
had already been made available; although federal
court denied motion to dismiss securities class ac-
tion against company, the court did not consider the
special litigation committee report investigating al-
leged wrongdoing, and thus, the court decision
alone was not a sufficient to grant access to addi-
tional records. 8 West's Del.C. § 220.
Seth D. Rigrodsky, Esquire, Brian D. Long, Es-
quire, Rigrodsky & Long, P.A., Wilmington,
Delaware; Robert M. Kornreich, Esquire, Carl L.
Stine, Esquire, Wolf Popper LLP, New York, New
York, Attorneys for Plaintiff.

Joel Friedlander, Esquire, Sean Brennecke, Esquire,
Bouchard Margules & Friedlander, P.A., Wilming-
ton, Delaware; James A. Dunbar, Esquire, Kristen

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

Page 2

H. Strain, Esquire, Venable LLP, Towson, Maryland, Attorneys for Defendant.

## MEMORANDUM OPINION

PARSONS, Vice Chancellor.

*1 This action concerns a demand, pursuant to 8 *Del. C.* § 220, for certain books and records of a well-known haberdasher, Jos. A. Bank Clothiers, Inc. In 2007, a federal securities class action was filed in a district court in Maryland alleging various misrepresentations related to the financial affairs of Jos. A. Bank Clothiers, Inc. from late-2005 to mid-2006. A derivative action also was filed in the same court alleging breaches of fiduciary duty. Although the plaintiff in the Maryland derivative action did not request any books and records before filing or in the course of prosecuting that suit, he sought to avoid the requirement of making a demand on the board by arguing demand futility. The federal court rejected that argument and dismissed the derivative action. The Maryland derivative plaintiff then made a demand on the board. In response, the board set up a special litigation committee ("SLC") to investigate the alleged wrongdoing. After an investigation, the SLC determined there was no wrongdoing and that the derivative action and the securities class action were without merit. In the meantime, however, the securities class action had survived a motion to dismiss and a motion for judgment on the pleadings.

Plaintiff in this action under Section 220 had no involvement in the federal litigation and seeks to inspect books and records of the Company regarding the same underlying conduct at issue in the securities class action and the derivative action in Maryland. The Company has provided Plaintiff with the SLC's Report, the exhibits thereto, the minutes of the meeting of the Board of Directors approving the formation of the SLC, and the minutes of the meetings of the SLC, but objects to producing anything more. The Company and Plaintiff have filed cross

motions for summary judgment. For the reasons stated in this opinion, I conclude that Plaintiff has not demonstrated that it has a right under 8 *Del. C.* § 220 to inspect any additional documents. I, therefore, grant Defendant's motion and deny Plaintiff's motion for summary judgment.

## I. BACKGROUND

### A. The Parties

Plaintiff, Norfolk County Retirement System ("Norfolk"), is a beneficial holder of stock in Defendant, Jos. A. Bank Clothiers, Inc. ("Jos. A. Bank" or the "Company").[FN1] Jos. A. Bank is a Delaware corporation whose principal place of business is located in Maryland.[FN2]

> FN1. Norfolk's Verified Complaint ("Complaint") ¶ 3.

> FN2. *Id.* ¶ 2.

### B. Facts

#### 1. The alleged wrongdoing

Through this Section 220 action, Norfolk seeks to investigate alleged wrongdoing in connection with Jos. A. Bank's financial affairs from December 2005 through June 2006. The Company made a series of statements over that time period regarding its financial condition supposedly without disclosing the existence of excessive levels of inventory of the Company's Fall/Winter 2005 clothing lines .[FN3] These inventory levels allegedly led the Company to steeply discount inventory, which increased sales but eroded profit margins .[FN4]

> FN3. *Id.* ¶ 15.

> FN4. *Id.* ¶ 17.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
**(Cite as: 2009 WL 353746 (Del.Ch.))**

*2 On June 7, 2006, the Company reported a drop in year-over-year first quarter earnings.[FN5] In the first quarter of 2006, the Company's net income was $5.9 million compared with $6.7 million for the first quarter of fiscal 2005.[FN6] By the end of the day on June 8, 2006, the Company's stock price fell 29%.[FN7] During the relevant period preceding June 7, 2006, Jos. A. Bank's Chief Executive Officer, Robert N. Wildrick, sold 74% of his common stock for an alleged profit of $36 million.[FN8]

FN5. *Id.* ¶ 20.

FN6. *Id.*

FN7. *Id.* ¶ 25.

FN8. *Id.* ¶ 24.

### 2. The Securities Class Action

In response to the stock price drop, stockholders filed securities class action complaints in the United States District Court for the District of Maryland (the "Securities Class Action") alleging violations of Section 10(b) of the Securities and Exchange Act of 1934 [FN9] and Rule 10b-5 promulgated thereunder.[FN10] Those actions were consolidated into *Lefkoe v. Jos. A. Bank Clothiers, Inc.,* C.A. No. WMN-06-1892 (D.Md.).[FN11] The Securities Class Action alleges, among other things, that senior management attempted to conceal excessive inventory by conducting liquidation sales and issued false and misleading statements regarding the Company's financial affairs.[FN12] Specifically, that Action alleges that a series of statements attributable to the Company were false because they omitted the Company's knowledge of excessive inventory levels throughout the final two quarters of 2005 and into the first quarter of 2006.[FN13]

FN9. 15 U.S.C. § 78j(b).

FN10. 17 C.F.R. § 240.10b-5 (2007).

FN11. The *Lefkoe* court issued two de-

cisions related to the adequacy of the plaintiff's pleadings. The first decision (" *Lefkoe I* ") was issued September 10, 2007 and is attached as Exhibit C to Plaintiff's Opposition to Defendant's Motion for Summary Judgment. The second decision (" *Lefkoe II* ") was issued May 1, 2008 and is attached as Exhibit 2 to the Transmittal Affidavit of Brian D. Long, Esq., in Support of Plaintiff's Motion for Summary Judgment.

FN12. Report of the Special Litigation Committee of Jos. A. Bank Clothiers, Inc. ("SLC Report") at 2, Ex. 2 at 1-4; Compl. ¶¶ 14-22. The SLC Report is attached as Exhibit A to the Affidavit of Sean M. Brennecke, filed on September 10, 2008 ("Brennecke Aff."). The facts recited in this opinion from the SLC Report are not subject to genuine dispute. I cite to the Report primarily for convenience in that it assembles in one place a number of relevant background facts and documents. The opinion does not rely on the SLC Report as establishing any disputed issue regarding the merits of the dispute over the underlying conduct of the Company's officers and directors.

FN13. SLC Report at 2.

### 3. The Maryland Derivative Action

On August 11, 2006, Glenn Hutton (the "Maryland Derivative Plaintiff") filed a stockholder derivative action (the "Maryland Derivative Action") in the United States District Court for the District of Maryland alleging that the Company's Board of Directors breached their fiduciary duties to the Company in connection with the same conduct at issue in the Securities Class Action.[FN14] Hutton did not make a demand on the Board, claiming that demand would be futile because the directors lacked independence.[FN15] On September 13, 2007,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
**(Cite as: 2009 WL 353746 (Del.Ch.))**

Chief Judge Benson Everett Legg dismissed the Maryland Derivative Action, because Hutton did not make any "particularized allegations creating a reasonable doubt that a majority of the directors would be disinterested or independent in considering a shareholder demand." [FN16] Hutton did not appeal.

> FN14. *Id.* at 8, Ex. 4. A second derivative action in the Maryland District Court was filed and the cases were consolidated. *Id.*

> FN15. *Id.* at 9.

> FN16. *In re Jos. A. Bank Clothiers, Inc. Deriv. Litig.,* No. L-06-2095, slip op. at 9-10 (D.Md. Sept. 13, 2007). The court's decision dismissing the Maryland Derivative Action appears in Exhibit 6 to the SLC Report.

Following the dismissal, Hutton sent a letter to the Company's Board, demanding that it establish a special litigation committee "to take action to fully investigate and remedy, *inter alia,* potential breaches of fiduciary duty by certain current and/or former officers and directors of the Company." [FN17] Hutton's demand concerned the same buildup of inventory levels and price markdowns in the first quarter of 2006 that motivated the Securities Class Action and the Maryland Derivative Action.

> FN17. *See* SLC Report at 10, Ex. 7.

#### 4. The Investigation by the SLC

Responding to the demand, on September 25, 2007, the Company's Board appointed the SLC to investigate Hutton's claims.[FN18] The SLC consisted of three nonexecutive directors that Judge Legg previously held were capable of impartially investigating and pursuing a derivative demand: William E. Herron, Sidney H. Ritman, and Andrew A. Giordano. [FN19]

> FN18. *See id.* at 6, 10, Ex. 8.

> FN19. *See id.* at 6, 11-12.

*3 The SLC retained the law firm of Kramon & Graham, P.A. to represent it. [FN20] Over a span of sixteen weeks, the SLC held eleven meetings to review the investigation's progress.[FN21] In the course of its work, the SLC interviewed over forty current and former Company employees, including corporate management, store managers, and others having knowledge of inventory and sales issues. [FN22] In addition, the SLC also reviewed approximately 5,000 emails, a number of the Company's filings with the SEC, store expansion schedules and progress reports, audit letters, management letters, spreadsheets, financial projections, marketing event calendars, and organizational charts.[FN23] The SLC also reviewed the results of an investigation performed in March 2006 by the law firm of Wilmer-Hale and the accounting firm of Ernst & Young on behalf of the Company's audit committee, which had received an anonymous tip that the inventory had been misstated. [FN24]

> FN20. *See id.* at 12.

> FN21. *See id.* at 7.

> FN22. *See id.* at 18, Ex. 17.

> FN23. *See id.* at 17-18.

> FN24. *See id.* at 15-16, 39-40.

On February 7, 2008, the SLC issued a report, and then advised Hutton that it had rejected his demand. [FN25] The SLC concluded that: the Company's inventory was not impaired or excessive; sales and promotions used by the Company were not out of the ordinary; and management did not make material misstatements or withhold information concerning the level of inventory. [FN26] In the opinion of the SLC, senior management "acted honestly and appropriately in preparing and releasing [the Company's] financial disclosures." [FN27] The SLC also concluded the Maryland Derivative Action and the Securities Class Action were without merit.[FN28]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

FN25. *See* Brennecke Aff. Ex. C.

FN26. *See* SLC Report at 3-4.

FN27. *See id.* at 54.

FN28. *See id.* at 54-55.

### 5. The Section 220 Demand

Nearly eighteen months after the June 2006 earnings announcement and share price decline and over two months after the dismissal of the Maryland Derivative Action, Norfolk sent a demand letter on November 27, 2007 to Jos. A. Bank ("the "Demand Letter"), seeking to inspect and copy certain books and records.[FN29] The books and records Norfolk seeks largely relate to the circumstances surrounding the allegedly false and misleading statements at issue in the Securities Class Action, which also formed the basis for the Maryland Derivative Action. Specifically, Norfolk seeks all Board Materials [FN30] relating to eleven categories of documents specified in paragraphs A-K of the Demand Letter. Paraphrasing somewhat, those categories concern:

FN29. *See* Compl. Ex. A.

FN30. Norfolk defines "Board Materials" as "all documents concerning, related to, provided at, considered at, discussed at, or prepared or disseminated in connection with any meeting of the Company's Board of Directors or any regular or specially created committee thereof, including all presentations, board packages, recordings, agendas, summaries, memoranda, transcripts, notes, minutes of meetings, drafts of minutes of meetings, exhibits distributed at meetings, summaries of meetings, or resolutions." *See id.* at 2 n. 1.

. The Company's financial data reporting procedures and controls;

. The Company's inventory management procedures and controls;

. The Company's procedures and controls for tracking, auditing and reporting its inventory levels;

, E. Inventory levels and pricing strategies at the Company for the period June 1, 2005 through June 15, 2006;

. The Company's compliance (or noncompliance) with Generally Accepted Accounting Principles;

. The Company's auditing procedures and con- trols;

. The Company's quarterly and annual financial statements for fiscal years 2005 to the present;

4 I. The "events, circumstances, and transactions underlying the announcements made by the Company in its Form 10-Q filed with the United States Securities and Exchange Commission ("SEC") on or around June 7, 2006 (the "June 2006 Form 10-Q"), through which it reported its financial results for the first fiscal quarter of 2006";

. Any "internal investigation by the Company or its accountants or advisors concerning the subject matter of the preceding categories of documents"; and

. Any "investigation undertaken by the SEC, or any other state or federal government or regulatory agency concerning any of the above subject matter."

The Demand Letter also stated that Norfolk seeks access to these categories of books and records for the following purposes:

A. To investigate potential wrongdoing, mismanagement, and breaches of fiduciary duties by the members of the Company's Board of Directors or others in connection with the events, circum-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
**(Cite as: 2009 WL 353746 (Del.Ch.))**

stances, and transactions underlying the Company's June 2006 Form 10-Q, including, among other things, the events surrounding the Company's announcements that Jos. A. Bank's gross profits had declined (by 16% as compared with the prior year period) as a result of increased customer demand for fall merchandise, resulting in less demand for year-round core merchandise;

B. To assess the ability of the Company's Board of Directors to impartially consider a demand for action (including a request for permission to file a derivative lawsuit on the Company's behalf) related to the items described in this demand; and

C. To take appropriate action in the event the members of the Company's Board of Directors did not properly discharge their fiduciary duties.

Since receiving the Demand Letter, the Company has provided Norfolk with a copy of the SLC Report, the exhibits thereto, the minutes of the meetings of the SLC, and the minutes of the Company's Board approving the creation and functioning of the SLC.[FN31]

> FN31. *See* Brennecke Aff. Ex. D.

### C. Procedural History

Norfolk filed its Complaint on January 3, 2008, seeking to compel inspection of certain Jos. A. Bank books and records pursuant to 8 *Del. C.* § 220 . Jos. A. Bank promptly answered, and then amended its answer on February 13, 2008. On September 10, 2008, the parties cross moved for summary judgment. Having carefully considered the parties' subsequent briefing and oral arguments, this is the Court's opinion on the pending motions for summary judgment.

### D. Parties' Contentions

Norfolk primarily relies upon the denial of a motion to dismiss for failure to state a claim and a motion

for judgment on the pleadings in the Securities Class Action to demonstrate a proper purpose for its books and records demand. Because the plaintiff there survived motions under Court of Chancery Rule 12 to dismiss in the face of the heightened pleading standards for federal securities class actions, Norfolk contends that a Section 220 complaint premised on the same facts underlying the Securities Class Action necessarily provides a credible basis to infer wrongdoing occurred at the Company. Norfolk further argues that the dismissal of the Maryland Derivative Action for failure to show demand futility is irrelevant to Norfolk's demand for books and records.

**\*5** In support of its motion for summary judgment, the Company makes two primary arguments. First, the Company asserts it has mooted Norfolk's Section 220 demand by producing the SLC Report, the exhibits thereto, the minutes of the SLC, and the minutes of the Board relating to the creation and functioning of the SLC.[FN32] The "operative question," according to the Company, is whether Norfolk already possesses the documents that are necessary and sufficient to address its purpose.[FN33] Second, the Company contends Norfolk has no right to any inspection of documents because Norfolk has no factual basis to challenge the independence of the Jos. A. Bank Board in any future action.

> FN32. DOB at 12-17. Defendant's opening brief in support of its motion for summary judgment is cited to as "DOB," and its reply as "DRB." Plaintiff's opening and reply briefs for its cross motion for summary judgment likewise are styled "POB" and "PRB," respectively. Defendant's and Plaintiff's respective answering briefs to their adversary's motion are referred to as "DAB" and "PAB."

> FN33. DOB at 13-14.

### II. ANALYSIS

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
**(Cite as: 2009 WL 353746 (Del.Ch.))**

Without conceding the propriety of Norfolk's purpose for inspecting books and records of the Company pursuant to § 220, the Company has produced certain documents to Norfolk pursuant to its Demand Letter. The Company maintains, however, that it has produced all the documents that would be necessary and sufficient to satisfy Norfolk's purpose. Because Norfolk disputes that contention, I must examine the purposes for Norfolk's demand and the scope of the documents necessary and sufficient to address any proper purpose.

### A. Standard

A stockholder of a Delaware corporation has a statutory right to inspect the books and records of the corporation under 8 *Del. C.* § 220. The stockholder must satisfy form and manner requirements for requesting books and records, and have a proper purpose for the inspection.[FN34] The statute defines "proper purpose" as any purpose "reasonably related to such person's interest as a stockholder."[FN35] Where, as here, the demand is for inspection of books and records rather than for a stock list, the stockholder bears the burden of proving a proper purpose.[FN36]

> FN34. *Highland Select Equity Fund, L.P. v. Motient Corp.,* 906 A.2d 156, 164 (Del.Ch.2006). There is no serious dispute that Norfolk is a stockholder and that it complied with the technical requirements of Section 220.

> FN35. 8 *Del. C.* § 220(b).

> FN36. 8 *Del. C.* § 220(c); *BBC Acq. Corp. v. Durr-Fillauer Med., Inc.,* 623 A.2d 85, 88 (Del.1992).

Additionally, "[p]roper purpose has been construed to mean that a shareholder's *primary purpose* must be proper, irrespective of whether any secondary purpose is proper."[FN37] Also, the primary purpose must not be adverse to the corporation's best interest.[FN38] One purpose Delaware courts have recognized as proper under certain circumstances is investigating wrongdoing by a corporation's management or board for the ultimate purpose of evaluating a board of directors' ability to evaluate a stockholder demand in good faith, independently, and with care.[FN39]

> FN37. *Grimes v. DSC Commc'ns Corp.,* 724 A.2d 561, 565 (Del.Ch.1998) (citations omitted).

> FN38. *Id.*

> FN39. *Seinfeld v. Verizon Commc'ns, Inc.,* 909 A.2d 117, 118 (Del.2006).

In general, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[FN40] Because this matter is before me on cross motions for summary judgment, it is also subject to Rule 56(h). Under Rule 56(h), where, as here, the parties have cross moved for summary judgment and have not presented argument that there is an issue of fact material to the disposition of either motion, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motion."[FN41]

> FN40. Ct. Ch. R. 56(c).

> FN41. Ct. Ch. R. 56(h). Rule 56(h) applies here with one possible exception. As explained *infra* Part II.B.2, there is a potential dispute concerning whether Norfolk has stated any purpose other than evaluating a potential derivative suit. To the extent there could be a dispute as to that, I draw all inferences in favor of Norfolk.

*6 In a case like this one, summary judgment may be granted for a corporate defendant if the stockholder seeks inspection to investigate potential corporate wrongdoing and yet fails to present "some

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

Page 8

evidence to suggest a credible basis from which a court can infer that mismanagement, waste or wrongdoing may have occurred." [FN42] The "credible basis" standard has been described as "the 'lowest possible burden of proof' in Delaware jurisprudence." [FN43] Under Delaware law, a stockholder making a Section 220 demand does not have to prove mismanagement actually occurred, but must make a "credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing." [FN44]

> FN42. *Seinfeld*, 909 A.2d at 118 (internal quotations omitted).

> FN43. *Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 917 n. 19 (Del.Ch.2007) (citation omitted).

> FN44. *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del.1997).

The scope of the documents available to a stockholder under § 220, however, is limited. Even if a plaintiff demonstrates a proper purpose, that plaintiff is not entitled to inspect all the documents that he or she believes are relevant or even likely to lead to information relevant to that purpose. Delaware courts repeatedly have held that "[t]he scope of inspection should be circumscribed with precision and limited to those documents that are necessary, essential and sufficient to the stockholder's purpose." [FN45]

> FN45. *See Marathon Partners, L.P. v. M & F Worldwide Corp.*, 2004 WL 1728604, at *4 (Del.Ch. July 30, 2004).

The issues presented by this case, therefore, are: (1) to what extent has Norfolk demonstrated a proper purpose for its request for inspection; and (2) if Norfolk has articulated a proper purpose, has the Company produced the documents "necessary, essential and sufficient" for that purpose?

**B. Does Norfolk have a Proper Purpose?**

Norfolk's Demand Letter sets forth three purposes for its request for books and records: (1) to investigate potential wrongdoing in connection with a disclosure in a Form 10-Q in June 2006 announcing a decline in both net income and earnings per share, which resulted in a substantial drop in the market price of Jos. A. Bank stock; (2) to assess the ability of the Company's Board of Directors to consider a demand for action, including permission for leave to file a derivative action, based on the same disclosure-related conduct; and (3) to take appropriate action if the requested documents indicate the board did not properly discharge their fiduciary duties.

The Company acknowledges Norfolk's purpose of exploring a possible derivative action,[FN46] but denies that Norfolk has any other purpose. Norfolk emphasizes that it has other purposes, as well. Before tackling the question of additional purposes, I focus first on whether Norfolk's purpose of investigating the possibility of bringing a derivative action based on the alleged misrepresentations of the Company's inventory situation in June 2006 warrants granting it access to additional documents.

> FN46. All three stated purposes are consistent with this purpose. In addition, Norfolk's first two stated purposes strongly suggest that its *primary* purpose is to evaluate whether or not it should file a derivative suit.

**1. Investigating a possible derivative action**

The Delaware courts have recognized that investigating the possibility of pursuing a derivative action based on perceived wrongdoing by a corporation's officers or directors represents a proper purpose for a Section 220 demand. [FN47] If the filing of such a future derivative action would be barred by claim or issue preclusion, however, a § 220 demand may be denied as a matter of law .[FN48] Applying this line of reasoning, the Company argues that even if Norfolk's purpose is to file a derivative action, the determination of the Maryland court regarding de-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

mand futility and the action of the SLC would preclude Norfolk from maintaining a future derivative suit. Further, the Company contends that it already has provided all of the documents that would be necessary and essential under the applicable precedents to address Norfolk's purpose of exploring a possible derivative action. In particular, the Company has provided Norfolk with a copy of the SLC Report, the exhibits thereto, the minutes of the meetings of the SLC, and the minutes of the Company's Board approving the creation and functioning of the SLC.[FN49] Thus, I turn next to whether the Company has produced all the documents necessary and essential to enable Norfolk to investigate the desirability of filing a derivative action.

> FN47. See, e.g., Seinfeld, 909 A.2d at 121; Saito v. McKesson, HBOC, Inc., 806 A.2d 113, 115 (Del.2002); Sec. First Corp., 687 A.2d at 567-68.

> FN48. See West Coast Mgmt. & Capital, LLC, 914 A.2d 636, 638 (Del.Ch.2006); Polygon Global Opportunities Master Fund v. West Corp., 2006 WL 2947486, at *5 (Del.Ch. Oct.12, 2006).

> FN49. See Brennecke Aff. Ex. D.

*7 Norfolk contends that the actions of the plaintiff in the Maryland Derivative Action should not preclude Norfolk from seeking a wide range of documents beyond those it has received. In attempting to avoid the potentially preclusive effects of the action taken by the plaintiff in the Maryland Derivative Action, Norfolk stresses that initially the Maryland Derivative Plaintiff did not make a demand on the board, but instead chose to make a case for demand futility.[FN50] But the Maryland Derivative Action was dismissed for failure to plead demand futility adequately. The Maryland Derivative Plaintiff then made a demand on the Jos. A. Bank Board,[FN51] which resulted in the formation of the SLC.[FN52] It was only after a court refused to excuse demand, a demand was made, and the SLC was formed, that Norfolk sought books and records.

> FN50. The demand requirement has been extensively discussed by this court elsewhere. Accordingly, I merely relate those elements pertinent to the actions of those persons relevant to this litigation. To show demand futility, the Delaware Supreme Court articulated a two-part test in Aronson v. Lewis. 473 A.2d 805, 814 (Del.1985). The court must decide whether, given the particularized facts alleged, a "reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Id. Thus, the plaintiff has two options to make out a demand futility argument. First, the plaintiff may argue that a majority of the board is either interested or lacks independence from those who are interested. Levine v. Smith, 591 A.2d 194, 205-06 (Del.1991). Second, the plaintiff may allege particularized facts that demonstrate that the challenged transaction simply cannot be a valid exercise of valid business judgment. Id. Demand futility under the second Aronson prong arises only in an extreme case of directorial failure. The situation must be one of the "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability exists." Aronson, 473 A.2d at 815. The second Aronson prong applies, for example, in situations where the particularized facts are such that it is "difficult to conceive" that a director could have satisfied his or her fiduciary duties. See Ryan v. Gifford, 918 A.2d 341, 355 (Del.Ch.2007). In short, the first prong typically has been easier for plaintiffs to fulfill than the second.

> FN51. If a plaintiff makes a demand on the board and the board refuses the demand,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

the plaintiff must then demonstrate that the demand was wrongfully refused to proceed with suit. *See Zapata Corp. v. Maldonado,* 430 A.2d 779, 784 (Del.1981). Demonstrating wrongful refusal is more daunting than demonstrating demand futility. The Delaware Supreme Court has explained that once a plaintiff has made a demand on the board the plaintiff effectively has conceded the board had the requisite independence and disinterest to objectively evaluate the demand. *See Levine,* 591 A.2d at 211-13. Therefore, a plaintiff seeking to show wrongful refusal must argue the board failed the second prong of the *Aronson* test, that the board's decision was not the product of valid business judgment. *Id.*

FN52. Even when demand would be futile, the corporation still may control derivative litigation by setting up a special litigation committee. The Delaware Supreme Court in *Zapata* fashioned a procedure whereby a special litigation committee can evaluate whether or not to pursue remedial action. 430 A.2d at 788-89. If the special litigation committee decides not to pursue any action, the court then applies a two-part test. First, the court looks at the independence and good faith of the investigation performed by the special committee and at the reasonableness of the committee's conclusion. *Id.* If the corporation fails to demonstrate the existence of those conditions, the plaintiff regains control. If the corporation succeeds in making that showing, the court then uses its own independent judgment to determine whether the suit should be dismissed. *Id.; see also In re Oracle Corp. Deriv. Litig.,* 824 A.2d 917, 948 (Del.Ch.2003).

The Company argues that the determination in the Maryland Derivative Action that demand is not excused would be binding upon subsequent plaintiffs

based on collateral estoppel or issue preclusion. The Company further maintains that because the Maryland Derivative Plaintiff ultimately made a demand on the board and the demand was refused by the SLC, Norfolk is only entitled to those documents that a plaintiff would need to attempt to prove wrongful refusal of a demand.[FN53]

> FN53. If in a future derivative action Norfolk was held not to be bound by the court's decision in the Maryland Derivative Action that demand would not be futile, the significance of the SLC's action to such a derivative action presumably would shift accordingly. That is, if Norfolk was able to demonstrate demand futility at some point in the future, then the SLC theoretically would become a *Zapata* committee and the burden would shift to the Company to show the committee was composed and acted appropriately. *See supra* note 52.

The Delaware Court of Chancery addressed an analogous situation in *Grimes v. DSC Communications Corp.*[FN54] There, a corporation had refused a presuit demand to rescind a compensation package awarded to the company's CEO. Following refusal of the demand, the stockholder filed a derivative suit, which was then dismissed.[FN55] The same stockholder then made a second demand. In response to the second demand, the board formed a special committee to investigate the stockholder's allegations. The committee then recommended rejection of the second demand.[FN56]

> FN54. 724 A.2d 561 (Del.Ch.1998).

> FN55. *Id.* at 563-64.

> FN56. *Id.*

After the second rejection, the stockholder made a demand for books and records pursuant to § 220. His stated purpose for the demand was to "determine the independence of the Special Committee and whether the Special Committee and the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

Board have complied with Delaware law in their analysis and rejection of the Demand." [FN57] The board responded by producing some documents, but refused to provide the special committee's report or any documents accompanying it.[FN58]

FN57. *Id.* at 565.

FN58. *Id.*

The court in *Grimes* held that the plaintiff was entitled to receive copies of the special committee report, minutes of the meetings of the special committee, and minutes of any meeting of the board of directors relating to the creation or the recommendations of the special committee.[FN59] The court noted that those documents ordinarily "should suffice for the purposes of establishing or raising reasonable grounds for suspicions about a special committee's independence, good faith and due care." [FN60] In addition, those were the documents necessary to the plaintiff's proper purpose. Thus, the court held that it would require a "further showing of need before requiring" the company to produce additional documents, such as interview summaries prepared by corporate counsel for use by the special committee.[FN61]

FN59. *Id.* at 567.

FN60. *Id.*

FN61. *Id.*

**\*8** In this case, Jos. A. Bank has produced the same types of documents. Nevertheless, Norfolk conclusorily asserts that "[i]ssue preclusion plainly does not apply" here as to questions of demand futility and the directors' independence and disinterestedness, and that it is entitled to inspect additional documents.[FN62]

FN62. PRB at 2.

Norfolk relies on a footnote in *West Coast Management & Capital, LLC v. Carrier Access* that suggests when a subsequent plaintiff "makes substan-tially different allegations of demand futility based on additional information, issue preclusion, from both a logic and fairness standpoint, would not apply." [FN63] In *West Coast,* the court observed:

FN63. 914 A.2d 636, 643 n. 22 (Del.Ch.2006).

reventing subsequent individual plaintiffs from bringing potentially meritorious suits based on additional information gained in a section 220 demand would undercut the purpose of the statute and the policy concern articulated by the Delaware Supreme Court that plaintiffs should employ section 220 before filing suit. While a prior suit by another plaintiff with similar allegations of demand futility may bar a second plaintiff from filing the same suit, if the second plaintiff makes substantially different allegations of demand futility based on additional information, issue preclusion, from both a logic and fairness standpoint, would not apply. [FN64]

FN64. *Id.*

*West Coast* recognized the trend in federal case law extending collateral estoppel to different plaintiffs in a second derivative suit concerning the same common nucleus of facts.[FN65] As noted in *In re Career Education Corp. Derivative Litigation,* those cases justified the extension of collateral estoppel based on the unique position in a derivative suit of the corporation, which is the true party in interest.[FN66] To some extent, therefore, the applicability of collateral estoppel depends upon the adequacy of representation in the prior proceeding. If a subsequent plaintiff makes credible allegations that the interests of the corporation were not suitably represented in the prior proceeding, collateral estoppel may not apply. [FN67]

FN65. *Id.* (listing cases).

FN66. 2007 WL 2875203, at \*10 (Del.Ch. Sept.28, 2007).

FN67. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

Page 12

Here, Norfolk contends the Maryland Derivative Plaintiff did not adequately represent the interests of the corporation in the prior lawsuit, principally because the plaintiff there did not seek books and records before filing suit and then failed to demonstrate demand futility.[FN68] Although the prior plaintiff's failure to make a books and records request before filing a derivative lawsuit does not comport with the approach suggested by Delaware courts, that alone does not indicate that he was an inadequate representative.

> FN68. Norfolk also questions the wisdom of the Maryland Derivative Plaintiff's decision, after that action was dismissed, to make a demand on the Jos. A. Bank Board. That decision had the effect of conceding the independence and disinterestedness of the board in considering a demand. Norfolk's criticism of the decision, therefore, is not surprising. Nevertheless, a strategic calculation by one plaintiff's attorney that puts a different plaintiff's attorney at a disadvantage in a later lawsuit does not necessarily mean that the original plaintiff's calculation was harmful to the corporation or a mark of inadequate representation.

[1] This case is currently before me on cross motions for summary judgment. In that context, Norfolk has not demonstrated a reasonable basis for believing that Jos. A. Bank was not adequately represented by the prior derivative plaintiff or the SLC. As in *Grimes*, Norfolk has received documents that "should suffice for the purposes of establishing or raising reasonable grounds for suspicions about a special committee's independence, good faith and due care." [FN69] Under the low burden imposed by Delaware courts in § 220 actions, such a showing could entitle Norfolk to inspect additional documents beyond what the Company voluntarily provided. Yet, Norfolk has made no meaningful attempt to question the adequacy of the SLC's process or the reasonableness of its investigation and conclusions.[FN70]

> FN69. 724 A.2d at 567.

> FN70. In fact, Norfolk's designated representative admitted on deposition that he was only made aware of the SLC Report the day before his deposition, and that he was not aware of any facts that led him to believe that the board was not capable of conducting an "independent, thorough, good faith investigation of the allegations relating to its earnings announcement in the first quarter of 2006." *See* Brennecke Aff. Ex. E at 31-34.

*9 Likewise, Norfolk's reliance on the opinions in the *Kaufman* case [FN71] is unavailing, because the principles upon which those opinions rest tend to support the Company's position. In *Kaufman I*, the court denied a special litigation committee's motion to stay a books and records action under § 220. The stated purpose of the § 220 demand was the investigation of corporate wrongdoing.[FN72] The year before the plaintiff filed the § 220 action, the company's board already had settled a shareholder derivative suit and related federal class action litigation filed in New York. The settlements included releases from civil liability for certain individuals employed at the company who later were indicted. [FN73] The indictments led to the filing of several more derivative actions in federal court in the Eastern District of New York.[FN74]

> FN71. *Kaufman v. Computer Assocs. Int'l (Kaufman I)*, 2005 WL 3470589, at *1-2 (Del.Ch. Dec.13, 2005); *Kaufman v. CA, Inc. (Kaufman II)*, 905 A.2d 749 (Del.Ch.2006).

> FN72. *Kaufman I*, 2005 WL 3470589, at *1-2.

> FN73. *Id.*

> FN74. *Id.*

The § 220 plaintiff in *Kaufman* was not a party to the first or second rounds of derivative litigation in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

Page 13

New York. Shortly after filing the § 220 action in Delaware, however, she moved under Fed.R.Civ.P. Rule 60(b) in the first round of derivative litigation to vacate the releases given by the company as part of the settlements. In response to these developments, the board formed a special litigation committee.[FN75]

FN75. *Id.* at *2.

*Kaufman I* dealt with the issue of whether the Section 220 action in Delaware should be stayed at the request of a special litigation committee pending resolution of the second round of derivative actions in New York. In *Kaufman I* the court began its analysis by noting that a special litigation committee formed in accordance with *Zapata Corp. v. Maldonado* has broad powers to control litigation nominally filed on behalf of a corporation.[FN76] The court also remarked that "[f]undamentally, the right to proceed under Section 220 to inspect books and records exists independently of any claim the stockholder might ultimately choose to bring."[FN77] Still, the court recognized that there could be "circumstances in which a Section 220 action can be understood to interfere with the workings of a special litigation committee of a corporation's board of directors."[FN78] Based on the specific facts in that case, however, the court determined that the request for documents constituted a minimal burden on the company and, thus, denied the stay.[FN79]

FN76. *Id.* at *3 (citing *Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del.1981)).

FN77. *Id.*

FN78. *Id.* at *4.

FN79. *Id.* The court in *Kaufman I* held that the stockholder was entitled to the discrete set of books and records sought, even though a derivative action covering the same allegedly wrongful conduct was ongoing, and the documents received as part of the § 220 demand were unlikely to lead

to the "assertion of new or different claims." *Id.*

*Kaufman II* involved a different procedural posture. The issues revolved around the scope of documents that should be made available to the plaintiff. In *Kaufman II,* the plaintiff sought books and records under § 220 for the purpose of evaluating a possible derivative suit.[FN80] The court held that relief under § 220 is limited to those books and records that are "necessary and essential to the satisfaction of the stated purpose."[FN81] When a § 220 plaintiff's purpose is to evaluate a potential derivative lawsuit, "the books and records that satisfy the action are those that are required to prepare a well-pleaded complaint."[FN82]

FN80. *Kaufman II,* 905 A.2d at 749.

FN81. *Id.* at 753.

FN82. *Id.*

*10 Pursuant to *Kaufman I,* the plaintiff had received "a wide range of basic documents" that should have provided "her with a substantial basis to investigate misconduct" at the company.[FN83] She had received "lightly redacted notes of all board meetings from the entire period in which any misconduct could have occurred, internal documents laying out the [company's] legal strategy, [Wachtell Lipton's] talking points to present to the government, and even summaries of interviews conducted with central figures in the fraud." Nevertheless, the plaintiff sought additional documents.[FN84]

FN83. *Id.* at 754.

FN84. *Id.* at 754-55.

The court denied the plaintiff's request, because she failed to explain "why the remaining documents are either necessary or essential to her proper investigative purpose."[FN85] As the court explained, the plaintiff had conflated the "usefulness or responsiveness of further discovery" with the "proper

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

standard of necessity under Section 220." [FN86] That is, the plaintiff had confused potentially discoverable material with those materials that are necessary and essential under § 220. Consistent with the limited production authorized under § 220, a "plaintiff is not entitled to receive or examine copies of documents not directly related to the Special Committee's conclusions and recommendations unless he can articulate a reasonable need to inquire further after a review of those basic documents." [FN87]

    FN85. *Id.*

    FN86. *Id.* at 755.

    FN87. *Id.* at 754.

The same principle applies to this case. Norfolk received a number of documents that should suffice for the purpose of evaluating a derivative suit. Like the situation in *Kaufman II*, Norfolk must now articulate a reasonable need for whatever additional documents it seeks. Norfolk could have studied the documents provided by the Company to show how these documents are insufficient or how other documents are necessary.[FN88] Yet, Norfolk failed to do so. In particular, Norfolk has not proffered any evidence to demonstrate reasonable grounds for suspicion about the SLC's independence, good faith, or due care, or the reasonableness of its processes or conclusions. Thus, I conclude the Company has produced all of the documents required under § 220, the relevant case law, and the circumstances of this case as to Norfolk's purpose of exploring a possible derivative suit.

    FN88. Norfolk argues that it cannot demonstrate that the SLC Report was inadequate, because to do so, it would need additional documents or discovery. I disagree, especially in light of the low burden of proof required for a Section 220 claim. Norfolk could have compared, for example, the complaint in the Securities Class Action to the SLC Report and at-

tempted to demonstrate that the SLC did not adequately address issues raised by the complaint in that action. Once it was provided with the SLC Report and the exhibits thereto, Norfolk also could have identified weaknesses in the SLC's investigation or its Report that might provide a credible basis to distrust the way in which the SLC proceeded or the conclusions the SLC reached.

## 2. Does Norfolk have any other proper purposes?

Norfolk contends it seeks not only to determine whether to file a derivative action, but also whether to take other "appropriate action" based on the suspected wrongdoing. The Company denies that Norfolk, in fact, has any purpose beyond investigating the possibility of bringing a derivative action. Therefore, I next examine that issue.

I begin by examining the three purposes stated in Norfolk's Demand Letter. The first purpose Norfolk articulates for its demand is to evaluate potential "wrongdoing, mismanagement, and breaches of fiduciary duties" regarding certain financial disclosures in June 2006, which could lead to the filing of a derivative suit. The second stated purpose patently concerns the possibility of filing a derivative suit. The third purpose, however, is somewhat broader, and conceivably could encompass other purposes beyond filing a derivative suit at some point in the future. The third purpose reads: "To take appropriate action in the event the members of the Company's Board of Directors did not properly discharge their fiduciary duties."

*11 Because Norfolk's assertion of an additional purpose is quite vague, one might question whether it is Norfolk's true purpose. This court is not required to accept without question a plaintiff's stated purpose as being its true purpose.[FN89] The court may consider a plaintiff's actual purpose, and discount any secondary or ulterior purposes.[FN90] Fur-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

thermore, to warrant relief from this court, a demand for books and records must be sufficiently specific to permit the court (and the corporation) to evaluate its propriety.[FN91] As this court has long held, "unless a demand in itself unspecific as to purpose can in some way successfully be given an expanded reading viewed in the light of surrounding circumstances ... a vague demand without more must a fortiori be deemed insufficient." [FN92]

> FN89. *See Thomas & Betts Corp. v. Leviton Mfg. Co.,* 681 A.2d 1026, 1033 (Del.1996); *Marathon Partners, L.P. v. M & F Worldwide Corp.,* 2004 WL 1728604, at *3 (Del.Ch. July 30, 2004).

> FN90. *See Marathon Partners,* 2004 WL 1728604, at *3 (citing *CM & M Group, Inc. v. Carroll,* 453 A.2d 788, 792 (Del.1982)).

> FN91. *See Northwest Indus., Inc. v. B.F. Goodrich Co.,* 260 A.2d 428, 429 (Del.1969).

> FN92. *Weisman v. W. Pac. Indus., Inc.,* 344 A.2d 267, 269 (Del.Ch.1975) (internal citations omitted).

To show the importance of its additional purpose of evaluating whether to take appropriate action in connection with a perceived breach of fiduciary duties, Norfolk relies on the Delaware Supreme Court's decision in *Saito v. McKesson, HBOC, Inc.*[FN93] In *Saito,* the Court addressed when and to what extent the unavailability of a derivative action would prevent a stockholder from seeking inspection of books and records.[FN94] In that case, the specific issue was whether a stockholder could seek books and records that predated his or her stock ownership. The question arose because to have standing for a derivative suit, a stockholder must have owned stock at the time of the alleged wrongful conduct.[FN95] The defendant in *Saito* sought to limit the books and records to which the plaintiff would have access to documents that were created

at or after the date the plaintiff became a stockholder. The Supreme Court disagreed for reasons related to the facts in that case.

> FN93. 806 A.2d 113 (Del.2002).

> FN94. *Id.* at 117.

> FN95. *See* 8 *Del. C.* § 327.

In its analysis, the Court noted that a stockholder might use information in other ways than to file a derivative suit. The stockholder might "seek an audience with the board [of directors] to discuss proposed reform, or failing in that, they may prepare a stockholder resolution for the next annual meeting, or mount a proxy fight to elect new directors." [FN96] Norfolk contends the Court's comments mean that its ability to pursue a derivative action is not dispositive. Likewise, Norfolk argues the "right to undertake an investigation under Section 220 is independent of any future derivative action plaintiff may or may not choose to file." [FN97] In any event, *Saito* recognizes that there may be proper purposes for a § 220 demand besides filing a derivative suit, and that, therefore, when a stockholder articulates such an alternate purpose, a bar to a derivative action will not necessarily preclude a books and records action.

> FN96. *Saito,* 806 A.2d at 117. The stockholder in *Saito* was investigating potential wrongdoing that might have been reflected in documents that were generated before he became a stockholder, but nevertheless were necessary and essential to the stockholder's purpose. *Id.*

> FN97. PAB at 7.

Norfolk plainly states in its papers: "Plaintiff filed this action in order to investigate potential corporate mismanagement and to determine whether there is a basis to file a derivative action." [FN98] Norfolk has not stated anywhere that it intends to engage in a proxy contest, or communicate directly with the board, or take some specific action other than eval-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
**(Cite as: 2009 WL 353746 (Del.Ch.))**

uating the actions of the board for a potential deriv-
ative suit.

  FN98. POB at 4-5.

**\*12** Nevertheless, I cannot say at this point from
the record presented on the Company's motion for
summary judgment that, as a matter of undisputed
fact, Norfolk's only purpose is to explore the pos-
sibility of a derivative suit. Thus, giving Norfolk
the benefit of all reasonable inferences, I assume
for purposes of the Company's motion that Norfolk
also has an additional purpose of determining
whether to take any other action based on the sus-
pected wrongdoing.

### C. Assuming Norfolk has a Purpose to Explore Other Action Beyond a Derivative Suit, has it Demonstrated a Right to any Additional Documents?

Norfolk contends it has shown a credible basis for
suspecting possible wrongdoing as to the Com-
pany's disclosures in June 2006 through two denials
of motions challenging the adequacy of the plead-
ings in the Securities Class Action. In some circum-
stances that might have been correct. The question
presented in the briefing and argument here,
however, is whether those preliminary decisions in
the Securities Class Action standing alone are suffi-
cient to demonstrate a credible basis for suspecting
wrongdoing in the face of the later SLC Report and
the absence of any reasonable basis to suspect the
disinterestedness, independence, or business judg-
ment of the SLC or the Board. Norfolk answers that
question in the affirmative, and urges this Court to
ignore the SLC Report and the fact that the plaintiff
in the Maryland Derivative Action, after being dis-
missed for failing to prove demand futility, made a
demand upon the Company's Board thereby waiv-
ing any opportunity to challenge the disinterested-
ness or independence of the Board.

According to Norfolk, it "seeks only 'Board Mater-
ials' related to the allegations in the federal class

action that the federal court sustained." [FN99] Nor-
folk relies upon two decisions by Judge Legg in the
Securities Class Action to bolster its claim that
these allegations provide a credible basis for
wrongdoing.[FN100] Norfolk contends the allega-
tions in the Securities Class Action deserve sub-
stantial weight, because the complaint there with-
stood a motion to dismiss based on the heightened
pleading standard of the Private Securities Litiga-
tion Reform Act ("PSLRA").[FN101]

  FN99. PRB at 10.

  FN100. PRB at 6 n. 5 ("Plaintiff bases its
  action on the *Lefkoe* court's *two* decisions
  upholding the federal plaintiffs' complaint,
  as well as the findings of that court.").

  FN101. *See* 15 U.S.C. § 78u-4(b)(2).

Specifically, § 21D(b)(2) of the PSLRA requires a
plaintiff to "state with particularity facts giving rise
to a strong inference that the defendant acted with
the required state of mind." [FN102] The United
States Supreme Court has held that to "qualify as
'strong' ... an inference of scienter must be more
than merely plausible or reasonable-it must be co-
gent and at least as compelling as any opposing in-
ference of nonfraudulent intent." [FN103] Norfolk
suggests that if the allegations in the Securities
Class Action lead to a strong inference of scienter,
then a Section 220 complaint based on those same
allegations clearly would satisfy the lower burden
of showing a credible inference of wrongdoing. [FN104]

  FN102. *Id.*

  FN103. *Tellabs, Inc. v. Makor Issues &*
  *Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499,
  2504-05, 168 L.Ed.2d 179 (2007).

  FN104. I note that civil liability for federal
  securities fraud does not necessarily imply
  that one would be liable on a derivative
  claim brought on state law fiduciary duty
  grounds. This observation holds true for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
**(Cite as: 2009 WL 353746 (Del.Ch.))**

reasons beyond procedural objections, such as standing or laches. For example, one might be civilly liable for federal securities fraud, and yet not be liable for breach of the duty of loyalty for the same conduct, because the required state of mind arguably is different. In *Tellabs,* the Supreme Court noted that "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally *or recklessly.* " *Tellabs,* 127 S.Ct. at 2507 n. 3 (emphasis added). On the other hand, Delaware courts have held that recklessness by itself only amounts to gross negligence, which is not sufficient to demonstrate the state of mind necessary for finding a breach of the duty of loyalty. *See In re Lear Corp. S'holder Litig.,* 2008 WL 4053221, at *9 n. 45 (Del.Ch. Sept.2, 2008) ("Indeed, the definition [of gross negligence in the corporate breach of fiduciary duty context] is so strict that it imports the concept of recklessness into the gross negligence standard, thus conflating two standards that are distinct when used in the criminal law concept.") (collecting cases and secondary materials).

The Company counters that Judge Legg did not make any findings of fact related to the wrongdoing, but rather merely assessed the sufficiency of the allegations. This objection is not persuasive, because a stockholder seeking books and records simply has the burden of coming forward with specific and credible allegations sufficient to warrant a suspicion of waste and mismanagement. The stockholder is not required actually to prove by a preponderance of the evidence that waste or mismanagement occurred.[FN105]

> FN105. *Thomas & Betts Corp. v. Leviton Mfg. Co.,* 681 A.2d 1026, 1031 (Del.1996).

*13 The Company also contends that the Court

should assess the existence of the requisite credible basis in the context of all the facts in the record on summary judgment. That would include, for example, the SLC Report and the extensive exhibits to it. Norfolk objects to that approach on the ground that it has not been permitted to take discovery as to the SLC Report or to obtain production of such things as the notes of the numerous interviews conducted by the SLC during its investigation.[FN106]

> FN106. The type of discovery Norfolk sought and was denied equated to production of the very documents it seeks in this action. The courts repeatedly have denied such discovery requests. *See U.S. Die Casting & Dev. Co. v. Sec. First Corp.,* 1995 WL 301414, at *3 (Del.Ch. Apr.28, 1995) ("To grant U.S. Die its complete requested discovery would obviate the need for the § 220 action because U.S. Die would obtain through discovery all of the documents requested before a determination of the scope of its rights under § 220 "); *see also Maitland v. Int'l Registries, LLC,* 2008 WL 2440521, at *1-3 (Del.Ch. June 6, 2008). Instead, Norfolk could have worked with publicly available documents and the documents made available by the Company to attempt by documents, logic, or otherwise to meet the relatively low credible basis standard.

[2] I hold that the Court cannot ignore the circumstances in which this case has arisen for purposes of evaluating Norfolk's § 220 demand and must consider all the relevant evidence. The alleged wrongdoing, various misrepresentations relating to the Company's inventory situation, occurred in 2006 and resulted in a sharp drop in the stock price. The first case in the Federal Securities Action was filed in July 2006; the first case in the Maryland Derivative Action was filed in August 2006; the Derivative Action was dismissed in September 2007; and the plaintiff in that action made his demand on the Jos. A. Bank Board later that same month. Only after

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
**(Cite as: 2009 WL 353746 (Del.Ch.))**

that, on November 27, 2007, more than fifteen months after the initial lawsuits were filed, did Norfolk make its demand for books and records under 8 *Del. C.* § 220. The SLC issued its report on February 7, 2008, and the Company later voluntarily provided Norfolk with that report and related documents.

The SLC consisted of three nonexecutive directors that Judge Legg previously held were capable of impartially investigating and pursuing a derivative demand. The SLC retained its own counsel, met extensively, interviewed over forty current and former Company employees, and reviewed a large number of relevant documents of varied types, including the results of a former investigation performed in March 2006 by the law firm of WilmerHale and the accounting firm of Ernst & Young on behalf of the Company's audit committee. [FN107] For the reasons stated in its Report, the SLC concluded the Maryland Derivative Action and the Securities Class Action were without merit. According to the SLC, senior management "acted honestly and appropriately in preparing and releasing [their] financial disclosures" in 2006. Thus, the SLC Report and related documents support a contrary inference to that which Norfolk seeks to draw from the decisions in the Securities Class Action.

> FN107. The previous investigation occurred after the Audit Committee of the Board received an anonymous tip. *See* SLC Report at 15.

This Court obviously is not bound by the conclusions of the SLC. Rather, the SLC Report and exhibits and the other documents that have been made available to Norfolk constitute a portion of the evidence from which the Court must determine whether Norfolk has shown a credible basis for suspecting wrongdoing by the Company's management and directors. The decisions of the *Lefkoe* court are part of that evidence, as well.

In that regard, there is an important congruence among the allegations underlying the Securities

Class Action, the SLC investigation, and this lawsuit. The plaintiff in the Maryland Derivative Action relied on the same allegations of wrongdoing in its complaint as were asserted in the Securities Class Action. Moreover, when the same plaintiff made his demand of the Company's Board and the SLC undertook to investigate his allegations, he again relied on those same allegations. And, finally, in this action under Section 220, Norfolk bases its claims of suspected wrongdoing on the very same allegations that were made in the Securities Class Action and later investigated by the SLC.

**\*14** *Lefkoe I* was issued September 10, 2007 and denied a motion to dismiss the Securities Class Action. In *Lefkoe II*, issued May 1, 2008, the court denied a motion for judgment on the pleadings under Fed.R.Civ.P. 12(c). One of the issues presented in *Lefkoe II* was the extent to which the court could consider exhibits to the defendants' answer in deciding the Rule 12(c) motion. Defendants argued that the court could consider, among other things, the SLC Report when evaluating the competing inferences as to scienter without converting the 12(c) motion into one for summary judgment.[FN108] The court declined to examine the SLC Report at the pleading stage, however, because the SLC Report was not incorporated by reference into the plaintiff's complaint and was not a public document.[FN109] The circumstances here are quite different.

> FN108. *Id.* at 12-13.

> FN109. *Id.*

This action is before me on cross motions for summary judgment. In litigating the pending motions, Norfolk made no attempt, other than a few comments by its counsel at oral argument, to challenge the reliability or reasonableness of the SLC's investigation or the conclusions reflected in its Report. Instead, Norfolk relied on the *Lefkoe* court's decisions in the Securities Class Action to show a credible basis for wrongdoing. As Norfolk points out, the "credible basis" standard is a relatively low

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
(Cite as: 2009 WL 353746 (Del.Ch.))

one. Nevertheless, the party seeking inspection un-
der § 220 bears the burden of meeting that standard.
[FN110]

> FN110. Delaware courts have held that
> even with a credible showing of wrongdo-
> ing, a plaintiff still may not be entitled to
> books and records where the circumstances
> indicate that the request is burdensome or
> opportunistic. *See, e.g.,* Trial Tr., *Parfi
> Holding, AB v. Mirror Image Internet,
> Inc.,* No. 18457, at 6-9 (Del. Ch. Mar. 23,
> 2001) (denying demand for books and re-
> cords where a court in a different jurisdic-
> tion already granted a stay of discovery,
> and the same plaintiff came before the
> court to compel a corporate defendant to
> produce documents according to a Section
> 220 action).

In the absence of contrary evidence, such as the
SLC Report, the decisions in the Securities Class
Action might have been sufficient to carry Nor-
folk's burden. Having waited as long as it did while
the Company responded to actions of other share-
holders, however, Norfolk cannot ignore the other
facts of record here. Norfolk was at least on inquiry
notice in 2006 that the Maryland Derivative Action
proceeded in the absence of a Section 220 action.
Yet, Norfolk did not seek books and records from
the Company until after the Maryland Derivative
Action had already been dismissed, a demand
made, and an SLC formed.

A books and records request is the favored method
of obtaining information that is reasonably related
to a stockholder's interest before filing a lawsuit,
and the law looks favorably on requests conforming
to the requirements of 8 *Del. C.* § 220. Indeed,
Delaware courts have repeatedly encouraged the
use of the "tools at hand," including § 220, before
filing derivative suits. [FN111] There is, however, a
countervailing concern that at some point a books
and records request has diminishing returns for
wealth creation and at some point begins to harm
the company. "A stockholder may not use § 220 as

a means to invade the corporate board room and in-
spection rights may be limited where production of
certain documents would be adverse to the interests
of the corporation." [FN112] The Delaware Supreme
Court has reaffirmed that the courts must look at
the interests of the corporation when assessing the
documents that should be made available:

> FN111. *See Seinfeld v. Verizon Commc'ns,
> Inc.,* 909 A.2d 117, 120 (Del.2006).

> FN112. *Radwick PTY., Ltd. v. Medical,
> Inc.,* 1984 WL 8264, at *3 (Del.Ch. Nov.7,
> 1984); *see also Eastlund v. Fusion Sys.
> Corp.,* 1990 WL 126660, at *3 (Del.Ch.
> Sept.6, 1990).

**\*15** Investigations of meritorious allegations of
possible mismanagement, waste or wrongdoing,
benefit the corporation, but investigations that are
indiscriminate fishing expeditions do not. At
some point, the costs of generating more informa-
tion fall short of the benefits of having more in-
formation. At that point, compelling production
of information would be wealth-reducing, and so
shareholders would not want it produced. Ac-
cordingly, this Court has held that an inspection
to investigate possible wrongdoing where there is
no credible basis, is a license for fishing expedi-
tions and thus adverse to the interests of the cor-
poration.[FN113]

> FN113. *Seinfeld,* 909 A.2d at 118.

The difficulty Norfolk faces stems from its dilatory
demand for books and records. Norfolk's arguments
might have had more force if Norfolk had pursued
its demand for books and records promptly. Be-
cause it did not, Norfolk had to make at least a
threshold showing that it had a reasonable prospect
of overcoming the additional and contrary evidence
presented by the SLC related documents. Norfolk
failed to meet that burden. In particular, I find that
because the decisions in the Securities Class Action
on which Norfolk relies dealt with motions under
Fed.R.Civ.P. 12 and did not consider the SLC Re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)
**(Cite as: 2009 WL 353746 (Del.Ch.))**

port or the exhibits to that report, those decisions are not dispositive on the issue of a proper purpose. To the contrary, based on all the facts available to me and to Norfolk on the summary judgment record in this § 220 action, I find that the *Lefkoe* decisions alone are not sufficient to demonstrate a credible basis for suspecting wrongdoing sufficient to warrant granting Norfolk access to additional records and documents of the Company beyond those that already have been made available to Norfolk.

### III. CONCLUSION

For the foregoing reasons, Norfolk's motion for summary judgment is denied, and the Company's motion for summary judgment is granted. Norfolk's Complaint is, therefore, dismissed with prejudice.

**IT IS SO ORDERED.**

Del.Ch.,2009.
Norfolk County Retirement System v. Jos. A. Bank Clothiers, Inc.
Not Reported in A.2d, 2009 WL 353746 (Del.Ch.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 8

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 756043 (N.D.Ill.)
(Cite as: 2006 WL 756043 (N.D.Ill.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
Sylvia PIVEN, Plaintiff,
v.
Patrick G. RYAN, et al., Defendants,
AON CORPORATION, Nominal Defendant.
**No. 05 CV 4619.**

March 23, 2006.

Richard Marc Goldwasser, Young, Finkel & Sil-
bert, Ltd., Chicago, IL, Kenneth J. Vianale, Vianale
& Vianale LLP, Boca Raton, FL, Ronen Sarraf,
Joseph Gentile, Sarraf Gentile LLP, New York,
NY, for Plaintiff.

Courtney Ann Rosen, David F. Graham, James
Wallace Ducayet Sidley Austin LLP, Christina M.
Tchen, Lanelle Kay Meidan, Skadden Arps Slate
Meagher & Flom, LLP, Chicago, IL, for Defend-
ants.

MEMORANDUM AND ORDER

MANNING, J.

*1 Until recently, Aon Corporation and other insur-
ance carriers and reinsurers enjoyed a lucrative
source of additional income-contingent commis-
sions obtained from underwriters. However, rather
than obtaining the commissions from underwriters
offering its clients the best deals, Aon allegedly ob-
tained them from companies offering it the biggest
commissions. After becoming the target of an in-
vestigation by New York attorney general Elliot
Spitzer, Aon admitted accepting contingent com-
missions, agreed to stop, and set up a $190-million
fund for affected policyholders. Aon has agreed to
pay millions more to settle related claims.

After Aon's scheme came to light, shareholder
Sylvia Piven filed this derivative action against
members of Aon's board of directors, contending
that they, among other things, breached their fidu-
ciary duties. The defendants have moved to dismiss
under Federal Rule of Civil Procedure 12(b)(6) be-
cause Piven filed suit before giving them adequate
time to respond to her pre-suit demand letter. Al-
ternatively, the defendants move to stay the pro-
ceedings under *Colorado River* pending the out-
come of a similar case in Illinois state court. For the
reasons that follow, the defendants' motion to dis-
miss is GRANTED.

Background

The following facts are taken from Piven's com-
plaint, and are deemed to be true. *Makor Issues &
Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 592 (7th
Cir.2006). Aon's contingent commission scheme
first came under scrutiny in 1999 as a result of a
suit filed in state court, *Daniel v. Aon Corp.,* No. 99
CH 11893, Circuit Court of Cook County, Illinois.
In it, a class of insureds alleged that AON "received
improper contingent commissions at the expense of
and to the detriment of its clients." Although Aon
did not disclose the existence of the lawsuit in its
filings with the Securities and Exchange Commis-
sion until 2005, it nevertheless attracted the atten-
tion of attorney general Spitzer, who began invest-
igating contingent commissions within the insur-
ance industry. In October 2004, the *Wall Street
Journal* reported that Aon was one of the subjects
of Spitzer's investigation. Within days the value of
its stock sunk 30%, followed by Aon's announce-
ment on October 22, 2004, that it would no longer
accept contingent commissions from underwriters.

The following month, Piven, on behalf of a trust
that owns Aon stock, wrote to Aon making a pre-
suit demand that the board "take the appropriate
steps to provide for equitable and therapeutic relief,
as well as retroactive damages, to remedy the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 756043 (N.D.Ill.)
(Cite as: 2006 WL 756043 (N.D.Ill.))

breach of fiduciary duty, mismanagement and cor-
porate waste described below." The Board con-
sidered Piven's demand at its January 2005 meet-
ing, and advised her in writing that "outside law
firms have been engaged to investigate, *inter alia,*
the issues in your letter."

A short time later, Aon got hit with two lawsuits.
The first was a derivative suit filed in February
2005 in state court, *Sherman v. Ryan,* 05 CH 03430,
Circuit Court of Cook County, Illinois. It asserts
claims similar to the ones raised in Piven's demand
letter. The second suit was filed in March 2005 by
Spitzer, joined by other state attorneys general in-
cluding Illinois'. Aon settled the Spitzer suit the day
after it was filed. In addition to creating a
$190-million fund for affected policyholders, the
settlement required Aon to implement reforms, in-
cluding a prohibition on contingent commissions
and similar schemes. CEO Patrick Ryan also issued
the following apology: "Aon ... entered into contin-
gent commission agreements and other arrange-
ments that created conflicts of interest. I deeply re-
gret that we took advantage of those conflicts ...
Such conduct was improper and I apologize for it."

*2 Following the filing of those two suits, in May
2005 the board responded again to Piven's demand
letter. This time, the board stated that it would de-
vote its resources to defending itself in the *Sherman*
suit rather than "conduct additional inquiry into the
allegations raised in your letter." However, the
board added that it would "monitor the progress of
the *Sherman* litigation and will consider your letter
at a later point in time, as circumstances warrant."
Unsatisfied with the board's response, on July 14,
2005, Piven sent a second demand letter, this time
to examine the corporate books and records. The re-
quest was denied.

Piven then filed this suit. In it, she alleges breach of
fiduciary duty, abuse of control, gross negligence
and mismanagement, waste of corporate assets,
breach of contract, unjust enrichment, and violation
of a Delaware statute that allows shareholders to re-
view corporate books. The defendants responded

with a motion to dismiss. They advance two main
reasons for either dismissing or staying Piven's suit.
First, they contend that the suit should be dismissed
because it is premature. Specifically, they argue
that Piven may not yet sue because the Aon board
has not failed to respond to her demand letter. Al-
ternatively, the defendants argue that the case
should be stayed because the *Sherman* case is
pending in Illinois state court, was filed before this
case, and raises almost identical issues. Because of
the parallels between the cases, the defendants con-
tend that the court should stay Piven's suit under the
abstention doctrine set forth in *Colorado River Wa-
ter Conservation Dist. v. United States,* 424 U.S.
800, 818, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

Standard of Review

In ruling on a motion to dismiss under Rule
12(b)(6), the court must assume the truth of the
facts alleged, and must construe the allegations in
the light most favorable to non-moving party.
*Barnes v. Briley,* 420 F.3d 673, 677 (7th Cir.2005).
Dismissal is proper only if the plaintiff would be
unable to prove any facts that would entitle her to
relief. *Id.* The parties have applied Delaware law,
so the court will too.

Analysis

Piven's suit is a derivative action, which permits a
shareholder to enforce a corporate cause of action.
*See Kamen v. Kemper Fin. Srvs., Inc.,* 500 U.S. 90,
96, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). It al-
lows individual shareholders like Piven to protect
the interests of the corporation from the
"misfeasance and malfeasance" of the corporate
directors. *Id.*

However, before filing a derivative action, the
shareholder must make a written pre-suit demand
on the corporation's board. *Brehm v. Eisner,* 746
A.2d 244, 255 (Del.2000). The purpose of the de-
mand requirement is to allow the corporation time
to remedy the shareholder's complaints. *Id.* Once

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 756043 (N.D.Ill.)
(Cite as: 2006 WL 756043 (N.D.Ill.))

demand is made, the board must investigate the alleged wrongdoing and then decide upon an appropriate course of action. *Levine v. Smith,* 591 A.2d 194, 212 (Del.1991).

To ensure compliance, Fed.R.Civ.P. 23.1 requires that the shareholder "allege ... with particularity" the demand made and the board's failure to act. Fed.R.Civ.P. 23.1; *In re Abbott Labs. Derivative Shareholders Litig.,* 325 F.3d 795, 803-04 (7th Cir.2003). The shareholder must also have afforded the board sufficient time to investigate the allegations and decide whether to bring suit or reject the demand. *Allison v. General Motors Corp.,* 604 F.Supp. 1106, 1117 (D.Del.1985). Premature filing "frustrates the policy of Rule 23.1," and should result in dismissal of the suit without prejudice. *Recchion v. Kirby,* 637 F.Supp. at 1309, 1319 (W.D.Pa.1986).

*3 Courts determine what constitutes an adequate amount of time to respond on a case-by-case basis by examining the complexity of the issues presented as well as the surrounding circumstances. *Allison,* 604 F.Supp. at 1117; *Mozes v. Welch,* 638 F.Supp. 215, 220 (D.Conn.1986). However, the board may not simply "brush off" the demand letter by responding that the allegations are under investigation. *Allison,* 604 F.Supp. at 1117. The board must have either actually investigated, or reasonably decided to delay an investigation. *Id.*

Whatever the board's decision, it is protected under the business judgment rule. *Levine,* 591 A.2d at 212 . Under the business judgment rule, board members and directors are presumed to act on an informed basis in good faith, and in the honest belief that the action taken was in the best interests of the company. *In re Abbott Labs.,* 325 F.3d at 808. However, if a shareholder can establish that the board refused demand in the absence of due care, adequate information, or good faith, then the board's decision will not be afforded the protection of the business judgment rule. *Levine,* 591 A.2d at 212.

With all that in mind, the court concludes that Piven sued prematurely. The court disagrees with Piven's contention that she was entitled to sue because the Aon board "dropped" its investigation. It is true that after promising an investigation, the board changed course and decided against investigating Piven's claims pending resolution of the *Sherman* case in state court. But it did not, as Piven now claims, state that it would *never* investigate her allegations. To the contrary, the board stated that it *"will* consider your letter at a later point in time, as circumstances warrant." (emphasis added).

Piven counters that Aon was obligated to investigate her claims immediately regardless of *Sherman,* but that contention is simply not true. A board's decision to delay responding to a demand in order to focus on related litigation is reasonable. For instance, in *Mozes v. Welch,* a shareholder made a demand three days after the corporation was indicted for overcharging the government. *Mozes,* 638 F.Supp. at 217. The corporation decided to respond to the demand two months after the conclusion of the criminal proceedings, which the court concluded was not a "brush-off" and was reasonable. *Id.* at 221. Likewise, in *MacCoumber v. Austin,* which presented circumstances eerily similar to those of the instant case, this court concluded that a board's decision to respond to a demand letter only after a parallel state court case was resolved was reasonable. *MacCounber v. Austin,* No. 03 CV 9405, 2004 WL 1745751, at ----5-6 (N.D.Ill.2004). In both cases, the courts dismissed the shareholders' derivative actions as premature. *MacCounber,* 2004 WL 1745751, at ----5-6; *Mozes,* 638 F.Supp. at 222.

Piven attempts to distinguish *Mozes* and *MacCoumber* on two bases. First, she points out that in those cases, demand was made only after the related lawsuits had been filed. In contrast, Piven's demand preceded the filing of *Sherman.* But she never explains why that should make a difference, and offers no authority attaching any significance to the distinction. Nor does the court perceive any signi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 756043 (N.D.Ill.)
(Cite as: 2006 WL 756043 (N.D.Ill.))

Page 4

ficance: Aon must devote resources to litigating *Sherman* regardless of whether it was filed before or after Piven's demand.

*4 Second, Piven contends that unlike the boards in *Mozes* and *MacCoumber*, the Aon board has plenty of time to address her demand letter because *Sherman* is essentially dormant: the state court granted the defendants' motion to dismiss and no amended complaint was filed within the 28 days the court allowed. Though Piven asserts that the complaint in *Sherman* was never amended and that the case is consequently inactive, she has provided the court with nothing to support those assertions. Furthermore, the Cook County circuit court's electronic docket belies Piven's assertions: while it is difficult to tell from the docket exactly what activity has occurred, the court takes judicial notice of a flurry of entries since the September 2005 order granting the motion to dismiss, including activity as late as February 2006.

In sum, the court concludes that the board's decision to postpone its investigation is reasonable given that it is currently litigating related issues in state court. If the shareholder in *Sherman* prevails, investigation in this case will be unnecessary. If, however, the shareholder in *Sherman* is unable to press its claims, then Aon will be required to definitively respond to Piven's demand, but that time has not yet arrived. Until then, it would be unreasonable to require the board to expend Aon's resources unnecessarily.

Given the court's decision to grant the motion to dismiss without prejudice, it need not address the defendants' arguments that the case should be stayed under *Colorado River.*

### Conclusion

Accordingly, the court concludes that the board's decision to postpone its investigation until the state court proceedings in *Sherman* are resolved is not an unreasonable or untimely delay, and therefore the

defendants' motion [29-1] is GRANTED. Piven's complaint is dismissed without prejudice as being premature; she is granted leave to refile an amended complaint within two months after a decision in the state court litigation.

N.D.Ill.,2006.
Piven v. Ryan
Not Reported in F.Supp.2d, 2006 WL 756043 (N.D.Ill.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 9

Westlaw.

Not Reported in A.2d, 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223
(Cite as: 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223)

Page 1

**H**
  UNPUBLISHED OPINION. CHECK COURT
  RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
READING CO.
v.
TRAILER TRAIN CO.
No. 7422

March 15, 1984

The plaintiff, Reading Company, stockholder of Trailer Train sued Trailer Train seeking a declaration that Trailer Train's proposed agreement with creditors of its wholly owned subsidiary, American Railbox Car Company, constituted a waste of corporate assets. Due to decreased box car use and other market factors, Railbox was indebted to Trailer Train in the amount of $43 million. Under the proposed agreement Trailer Train would contribute up to $42 million over four years. The loans were to be repaid by Railbox from operating revenues. The plan was based on a study which predicted an upswing in box car utilization by 1987. The plaintiff contended that the additional loan would never be repaid and attacked the plan on the following grounds: 1) the board was not provided with sufficient information; 2) the board ignored or disregarded known facts; 3) the board acted out of self-interest and a conflict of interest; and 4) the plan would waste Trailer Train's assets. The court of chancery, per Vice-Chancellor Longobardi held that: 1) the board of directors enjoyed a presumption of sound business judgment; 2) the board had met their burden of informing themselves of all material information reasonably available to them; and 3) the plaintiff had not met its burden of proving a reasonable probability of success on the merits.

**[1] Corporations 101 ☞393**

101 Corporations
  101XI Corporate Powers and Liabilities
    101XI(A) Extent and Exercise of Powers in General
      101k393 k. Judicial Supervision. Most Cited Cases
A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose.

**[2] Corporations 101 ☞393**

101 Corporations
  101XI Corporate Powers and Liabilities
    101XI(A) Extent and Exercise of Powers in General
      101k393 k. Judicial Supervision. Most Cited Cases
To invoke the protection of the sound business judgment rule, directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them.

**[3] Corporations 101 ☞187**

101 Corporations
  101IX Members and Stockholders
    101IX(A) Rights and Liabilities as to Corporation
      101k187 k. Dealings Between Members of Same Corporation. Most Cited Cases
The standard of intrinsic fairness will be applied only when the fiduciary duty is accompanied by self-dealing.

**[4] Injunction 212 ☞151**

212 Injunction
  212IV Preliminary and Interlocutory Injunctions
    212IV(A) Grounds and Proceedings to Procure
      212IV(A)4 Proceedings
        212k151 k. Scope of Inquiry and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223
**(Cite as: 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223)**

Questions Considered. Most Cited Cases

In seeking a preliminary injunction, the plaintiff has the burden of proving a reasonable probability of success on the merits and that it will suffer irreparable injury if the court fails to issue the requested relief.

**\*\*224** Richard R. Wier, Jr., Esquire, and Walter P. McEvilly, Jr., Esquire, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Delaware, for plaintiff.

Allen M. Terrell, Jr., Esquire, Richard G. Elliott, Jr., Esquire, and Thomas A. Beck, Esquire, of Richards, Layton & Finger, Wilmington, Delaware, for defendant.

LONGOBARDI, *Vice-Chancellor*

**\*1** The Plaintiff, Reading Company ('Reading'), sued Trailer Train Company ('Trailer Train'), seeking a declaration that Trailer Train's proposed agreement with creditors of its wholly owned subsidiary, American Rail Box Car Company (Railbox'), constitutes a waste of corporate assets. Reading contends the debt restructuring agreement which obligates Trailer Train to an additional loan of up to $54,000,000 will never be repaid.

A motion for preliminary injunction was heard and this is the Court's decision on that motion.

Trailer Train was incorporated in 1955 by several operating railroads in order to provide a fleet of standardized railroad flat cars for lease to railroads. Over the years, 40 railroads have become stockholders of Trailer Train. Reading became a stockholder in 1961. By requiring a purchase of 500 shares of stock, each of the stockholders is given a seat on Trailer Train's Board of Directors. In 1971, Reading entered into reorganization under the bankruptcy laws and in 1976 conveyed its rail properties to the Consolidated Rail Corp. ('Conrail'). Thereafter, it discontinued all railroad operations but it retained its stock in Trailer Train.

**\*\*225** Under the pooling concept, participating railroads were required to sign Trailer Train's Form A Car Contract. The stockholder was then entitled at a special rate to use the cars from the pool on its own lines and to interchange those cars with other railroads including non-shareholder railroads. Those shareholder and non-shareholder railroads with Trailer Train cars in their possession pay a car hire fee set by Trailer Train.

In 1974, Railbox was formed as a wholly owned subsidiary of Trailer Train. Its purpose was to provide a pool of standardized box cars. Like Trailer Train, Railbox is and has been dominated by the operating railroads. Its 23 member Board of Directors includes 20 Directors which serve on Trailer Train's Board. Of the 20 Directors, only 1 represents a non-operating railroad company. In effect, Trailer Train's management is almost identical to Railbox's management and Trailer Train provides Railbox with all its general and administrative services.

The passage of time has not been kind to Railbox's fortunes. Box car utilization has diminished over the ensuing years and the decline has been marked by at least the following circumstances:

(a) Severe seasonal imbalance in loadings and, therefore, in box car fleet productivity;

(b) A long-term downward trend in plain (unequipped) box car loadings;

(c) A rapid shift of grain loadings from plain box cars to large covered hopper cars, many of them furnished by shippers;

(d) A very rapid shift of rail merchandise traffic from the box cars largely used prior to the rise of truck competition to piggyback or rail-truck intermodal movement (cars for the latter being largely supplied by Trailer Train);

(e) Increasing specialization of the residual market for box car loadings, a market now substantially limited to a few commodity groups which require box cars fitted with loading-restraining and/or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223
**(Cite as: 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223)**

shock-cushioning devices necessary to avoid physical damage to the lading, as well as cars of greater length (50 feet or longer) and increased loading capacity reflecting both additional length and interior height (high cube cars).

**\*2** To further burden Railbox, the operating railroads have seen fit to buy their own box cars and to frequently use them to the exclusion of Railbox's cars. Lastly, motor carrier competition has diverted business from box car utilization and, if railroads are used in a piggyback mode, it is the intermodal rail car, the flat cars, and its special application forms, which have become more popular.

**\*\*226** As Trailer Train prospers, Railbox has drifted into debt. In late 1981, Trailer Train loaned Railbox $30,000,000. In the Spring of 1982, it loaned an additional $13,000,000. Of the $43,000,000 now due, only $13,000,000 is secured. Worried about their fiduciary responsibilities, Trailer Train's management decided to get independent advice and retained the firm of Paul, Weiss, Rifkind, Wharton & Garrison ('Paul Weiss'). That firm advised an independent study should be conducted and a decision was reached to retain Temple, Barker & Sloan, Inc. ('Temple Barker'). The study, completed in September, 1982, was pessimistic and confirmed that box car utilization rates would remain lower until at least 1987. It also revealed that another $30,000,000-$40,000,000 was not going to solve the problem. In September, 1982, Trailer Train's president called a special meeting of the Board of Directors at which the pessimistic Temple Barker report was presented. At the meeting, the Board called upon Mr. Newlon of the Paul Weiss firm to advise them of their fiduciary duties and responsibilities in connection with additional loans to Railbox. In this regard, it must admitted that at this very early stage, Trailer Train's Board was conscientiously pursuing their duties, albeit on a tightrope.

The Board also commissioned another study from Booz Allen & Hamilton, Inc. ('Booz Allen'). That study, completed in October, 1982, appeared to be more pessimistic than the Temple Barker report although both predicted an upswing in box car utilization at about 1987. That report was presented to the Board on October 27, 1982.

The Trailer Train Board met again on December 2, 1982, and Newlon again advised them of their duty as Directors. Following the advice and a review of the Booz Allen report, the Board resolved to make no further loans to Railbox.

With new management in place and with a view towards resolving in problems facing Trailer Train and Railbox, Trailer Train contacted First Boston Corporation ('First Boston)'. Affidavit of F.M.R. Smith, paragraph 2. Because Railbox was Trailer Train's wholly owned subsidiary and the managements were interlocking, First Boston frequently advised both Trailer Train and Railbox. It was Railbox, however, which formally retained First Boston. Railbox also retained Robert Hallock of Kirkland & Ellis. By the Spring of 1983, First Boston made a proposal for restructuring the Railbox debts. This proposal became known as Plan A. In essence, the plan required Trailer Train and the railroads to lease Railbox's box cars with certain additional obligations fixed on Trailer Train. The Railroads and the creditors of Railbox refused to participate in the plan and, therefore, it expired. Later, in the Summer of 1983, a new Plan evolved which came to be known **\*\*227** as Plan B or the 'Workout.' The Workout was presented to Trailer Train's Board in September, 1983. As presented, the Plan proposed that Trailer Train would contribute up to $42,000,000 over 4 years. The commitment amounted to a total infusion of $78,000,000 over a span of 6 years. The loans were to be repaid by Railbox from operating revenues. The economic projections supporting such a proposition were based primarily on the Temple Barker & Booz Allen reports together with management's update calculations and its projections. First Boston concurred that there was a reasonable probability of success. The critical aspect of the proposal and one of the most heatedly contested by the Plaintiff is management's projec-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223
(Cite as: 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223)

tion of an extraordinary percentage increase in box car utilization rates sometime around 1987. It is noteworthy, however, that the conclusions were not entirely speculative because the Temple Barker and Booz Allen reports were supportive of that conclusion.

*3 Between the September and November, 1983, Board meetings, continued negotiations with the creditors resulted in the Workout being modified so that Trailer Train would commit $54,000,000 over 4 years (1984-1987) with no yearly contribution in excess of $13,500,000. Thirty million of the outstanding $43,000,000 debt would be considered a contribution to capital and other creditors and equity lessors would contribute $24,000,000 again the total of $78,000,000.

On December 1, 1983, Trailer Train's Board, with 5 dissenting votes, approved a resolution authorizing management to execute the Workout agreement. The Plaintiff contends that the Board's decision was not based on a sufficient amount of information on the Workout. On the other hand, the affidavit by F.M.R. Smith, paragraphs 10, 11 and 12, indicates a fully comprehensive evaluation of the Workout and its attendant problems. Not the least of the discussions are those references to possible scenarios if the Workout was not approved. These included the institution of law suits against Trailer Train, its Board and stockholders by Railbox's creditors, the piercing of the corporate veil which would ordinarily insulate Trailer Train, the probability of Railbox's bankruptcy and the attendant credit problems Trailer Train would encounter as a result of that bankruptcy. Further, Trailer Train's negotiations for $800,000,000 in loans for new equipment would be affected so that Trailer Train would inevitably pay more for the loans than would otherwise be available. Finally, the restructuring of Railbox's debts would provide Trailer Train with substantial tax benefits calculated at $10,000,000-$12,000,000.

The Plaintiff attacks the decision of the Board on the following bases:

**228 1. The Board was provided insufficient information on the Workout.

Plaintiff contends that the box car utilization rates were 'unrealistic and inconsistent with' the Booz Allen report. In addition, it points to several areas of additional information which might have been helpful. Furthermore, Plaintiff alleges that there were no explanations for the utilizations projected by management. All of these allegations amount to a contention that the Board failed to make an informed judgment. Plaintiff also alleges that the Board received no independent legal and financial advice.

2. The Board ignored or disregarded known facts or facts it should have known.

Plaintiff attacks the projections and conclusions of the Workout. Principally, Plaintiff contends the projections were based on a fleet of 25,000 box cars when it should have known that 10,000 cars had been returned to investors. Plaintiff also contends that the Board should have known that the projections fly in the face of known trends in the industry.

3. The Board acted out of self-interest and a conflict of interest.

Plaintiff contends that the Board became an unwitting tool of the railroad industry generally and, rather than being concerned about the viability of Trailer Train, the Board was more concerned with the reputation of the railroad industry.

*4 4. The Workout will waste Trailer Train's assets for it won't work.

Based on Paul H. Reistrup's affidavit, filed after the Board's decision, Plaintiff points to an expert's opinion that the Workout will not succeed.

Based on the foregoing, Plaintiff contends that any evaluation of its burden of proof in these proceedings should consider that the business judgment rule is not applicable. Alternatively, Plaintiff contends that the burden of proof on the merits will

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in A.2d, 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223
(Cite as: 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223)

shift to the Defendant because the 'intrinsic fair-ness' burden will be imposed. Under these conditions, it contends that it has shown a probability of success on the merits and if the injunction is not granted, it will suffer irreparable harm.

[1][2] As a first step, it is important, then, to determine from the complaint, the motion and supporting affidavits what the Plaintiff seeks to prove and what relief it ultimately will request. In this case, the basic premise of the complaint is that Trailer Train's decision to participate in the Workout by providing, *inter alia*, $54,000,000 over 4 years to its subsidiary, Railbox, constitutes a waste of corporate assets. **229 Trailer Train counters by contending that since Railbox is a wholly owned subsidiary of Trailer Train, the loan is only one of numerous incidents of control and management that has occurred since Railbox's creation and the decision by the Board cannot be assailed by the Court because of the business judgment rule. Under that rule, 'A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment.' *Sinclair Oil Corporation v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971). The protection of the rule is afforded directors, who in the exercise of their business judgment on the transaction in question, were disinterested. 'To invoke the rule's protection, directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties.' *Aronson v. Lewis*, Del.Supr., -- A.2d -- (1984), No. 203, 1983, at 13, Moore, J. (Mar. 1, 1984). The standard for director liability is 'predicated upon concepts of gross negligence.' *Id.* at 14. In this regard, Reading contends that the business judgment rule is not applicable because the Board ignored or disregarded facts it should have known. In short, the argument suggests the Board's decision was not

an informed one because the presentation of information to the Directors was not complete and was too abbreviated, that it contained information that was faulty, that the utilization projections were not explained and industry trends in utilization were ignored. A mere perusal of the record on these issues, however, indicates just the opposite. There is no question that Reading and their experts disagree with the basis for and the judgment of the Board. But that is not the question that must be resolved. The business judgment rule allows for the possibility that other people might disagree with a board's decision. Indeed, it is acknowledged that a board's decision, otherwise properly based, could be wrong and still withstand attack. And this is as it should be. In the context of our corporate business world, courts should be loathe to interfere with the internal management of corporations or to interfere with their business decisions unless statutory or case law indicates they have overstepped their bounds. But corporations should not be bounced back and forth, with every decision scrutinized, merely because somebody else has a different opinion. The stockholders have made their choice and they are entitled to that Board's unfettered lawful exercise of its management prerogatives. With regard **230 to all of Plaintiff's arguments on this issue, the Court considers them expressions of opinion which are different from those expressed and exercised by the Board. The Court believes that the record makes it abundantly clear that this Board was conscientious in the exercise of its responsibilities. Look, for instance, at their repeated requests for legal advice. Look, for instance, at their demand for an additional study after reading the Temple Barker report. In addition, these are people admittedly knowledgeable about the railroad industry. Almost to the man, they are representative of operating railroads. They know the trends in the business. They knew about the increased usage of motor freight carriers and the effects of deregulation. And they certainly knew that the reports and projections which were utilized during the December, 1983, Board meeting were based on a fleet of 15,000 box cars rather than 25,000 box cars. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223
**(Cite as: 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223)**

projections for 1987 were based on contingencies about which ordinary and reasonable people might differ but that can be said for almost every projection of future events.

*5 These issues are clouded by a veil of insinuation that suggests that the Board did what it did because it was a tool of the railroad industry and, as a consequence of its decision, it was serving railroad interests rather than Trailer Train's interest. The argument loses force because Trailer Train is the railroad industry, or at least an important cog in it, and what affects the industry affects Trailer Train. Being responsive to one's business environment appears to be a necessity for survival. Secondly, this appears to be a backhand approach to assailing the decision of the Court of Appeals for the Third Circuit in the *Matter of Reading Co.*, 711 F.2d 509 (3d Cir. 1983). In that case, the matter of goals, purpose and design for this corporation and how it operates and utiltzes its profits has been decided adversely to the plaintiff and it is now a matter of *res judicata*. Reading did not successfully attack Trailer Train's motives in its operation in that court and it cannot be allowed to relitigate that issue in this Court.

The present record is replete with evidence which shows Trailer Train's vital interests in the restructuring of Railbox's debt. The following list demonstrates that Trailer Train and its stockholders had very much to gain by proceeding with the Workout:

1. Railbox's creditors have threatened to sue Trailer Train, its Board and stockholders unless the Workout is approved.

2. Trailer Train's ability to finance a new fleet of intermodal cars costing $800,000,000 would be jeopardized and, in the face of any litigation, would cost at least 1/2 of 1% more.

**231 3. Without the Workout, there is a strong probability the creditors would force Railbox into bankruptcy and, according to First Boston and Kirkland & Ellis, that would seriously impair Trailer Train.

4. Trailer Train had an optimistic forecast of box car utilization as well as a pessimistic one.

5. Trailer Train was advised by First Boston that there was a reasonable probability the Workout would succeed.

6. Trailer Train would gain valuable tax advantages by proceeding with the Workout.

7. Trailer Train would get a release from Railbox's creditors.

Under all of these circumstances, it is difficult to see how Reading would succeed on the merits of its complaint.

Reading has pleaded alternatively, however, that the business judgment standard is not applicable in the present situation. It contends that the intrinsic fairness test would be applicable and, under that standard, the burden of proof would shift to the Defendant at the time of trial on the merits. Reading's position is that Trailer Train's Board and Railbox's Board were practically the same and, since the Directors stood on both sides of this parent-subsidiary transaction, Trailer Train has to prove the terms of the transaction were intrinisically fair to Trailer Train and its stockholders.

At first blush, one can read excerpts from any number of cases which say practically the same thing. The very words, 'on both sides of the transaction' and 'parent-subsidiary dealings' conjure up 'intrinsic fairness.' But it is not every transaction between parent and subsidiary with Directors on both sides that would allow judicial review utilizing the intrinsic fairness standard. The applicability of the standard 'depends upon the presence of fair advantage usurped or at least secured through control . . ..' Folk, *The Delaware Corporation Law* 78 (1972). If it were otherwise, the everday business occurrences between a parent and its subsidiary would be subject to the intrinsic fairness scrutiny. Indeed, Professor Folk has captured the essence of the problem in the following quotation:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in A.2d, 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223
(Cite as: 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223)

*6 In the application of the intrinsic fairness rule, the mere fact that interlocking directors are involved in an intercorporate transaction does not of itself cause the higher burden of proof called for under such rule to shift to the party sought to be charged with accountability. In other words, self-dealing on the part of a dominant fiduciary must first be established in order for the intrinsic fairness rule to be successfully invoked.

**232 *Id.* at 80.

Usually, the complaining parties attempting to invoke the intrinsic fairness rule in a parent-subsidiary transaction are the minority stockholders in the subsidiary. In this case, we have the unique situation of stockholders holding a minority interest in Trailer Train complaining about Trailer Train's commitment of $54,000,000 to its subsidiary. Admittedly, then, it is Trailer Train's use of these assets which forms the basis of this minority stockholders' complaint. And the only construction which can fairly characterize the complaint, then, is that this loan of $54,000,000 is unfair to Plaintiff because it jeopardizes its investment and Trailer Train's viability. But the burden of Trailer Train's decision does not unfairly or improportionately fall on Reading. The risk falls on each and every stockholder in Trailer Train in a proportion equal to their holdings in the company. Where then, under these circumstances, is the use of domination and control utilized to the disadvantage of only Reading?

This principle was more succinctly posed in *Getty Oil Company v. Skelly Oil Company*, Del.Supr., 267 A.2d 883 (1970), when Chief Justice Wolcott decided: 'A basic ground for judicial interference with business judgment on the complaint of minority interests is an advantage obtained by the dominant group to the disadvantage of the corporation or its minority owners.' *Id.* at 887.

As a matter of interest, the transaction in the case *sub judice* poses a transaction more akin to those dictated by third parties than by an agreement in isolation between Trailer Train and Railbox. From the facts presented, it is clear that the creditors involved in this case have dictated the terms of the Workout to the near exclusion of Trailer Train or Railbox. *Cf., Getty Oil Corporation v. Skelly Oil Company, supra,* at 887; *Meyerson v. El Paso Natural Gas Co.,* Del.Ch., 246 A.2d 789 (1967). Under these circumstances, our courts have invariably determined the business judgment rule to be applicable.

[3] The gist of all the preceding is that the standard of 'intrinsic fairness' will be applied only 'when the fiduciary duty is accompanied by self-dealing . . . .' *Sinclair Oil Corporation v. Levien, supra,* at 721. And, in the context of this case, it could only be applied if there were allegations of usurpation of advantage at the expense of minority interests. I find that wanting in these pleadings.

In all fairness, the only remaining element of Reading's argument that could be interpreted to fit under the prerequisites of 'self-dealing' or 'advantage usurped at minority interests costs' is Reading's allegations concerning Trailer Train being an alter ego for **233 the railroad industry. Under this premise, the argument goes, Trailer Train adopted the Workout because it was in the railroad industry's best interests and, since Reading is not an operating railroad, all of it was at Reading's expense. To ascribe these motives is tenuous, at best, but it belies other important facts that the Court listed previously. There was a firm basis for deciding that the Workout was in Trailer Train's best interests. If it benefited anybody else, so be it. But that is no legal reason to strike the terms of the transaction. Furthermore, Reading knew since the day it first bought stock in Trailer Train that Trailer Train was designed to serve the needs of the railroad industry. Indeed, without paying dividends, it has plowed back its profits in an ever expanding fleet of modern specialized rail cars designed to promote and expedite railroad interests. Reading participated in those programs as a stockholder to its distinct advantage. When it sold its railroad holdings, it voluntarily held its stock in Trailer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in A.2d, 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223
(Cite as: 1984 WL 8212 (Del.Ch.), 9 Del. J. Corp. L. 223)

Train and now seeks to attack that which it sub-
scribed to, fostered and enjoyed. To allow it to suc-
cessfully attack those motives now would be incon-
ceivable.

[4]*7 In seeking a preliminary injunction, Reading
has the burden of proving a reasonable probability
of success on the merits and that it will suffer irre-
parable injury if the Court fails to issue the reques-
ted relief. In addition, the Court must balance the
equities in this situation, weighing the conveni-
ences and the injuries that will befall the parties if
relief is granted or denied. *New Castle County, Etc.
v. Board of Educ.*, Del.Ch., 451 A.2d 1156 (1982).
Injunctive relief constitutes the 'strong arm of
equity jurisdiction, and should never be utilized un-
less a clear case of imminent, irreparable injury is
presented . . ..' *Petty v. Penntech Papers, Inc.*,
Del.Ch., 347 A.2d 140, 141 (1975).

Based on all the foregoing, it is apparent that
Plaintiff has failed to carry its burden in proving a
reasonable probability of success on the merits. On
this basis alone, the Court denies the application for
injunctive relief. There is another aspect of the
case, however, that requires comment. Even if the
Court had gotten as far as having to balance the
equities in this situation, the Court would have
denied the motion for preliminary injunction. Con-
sidering all of the disasterous results which would
attend Trailer Train's abstinence from the Workout
as against the possible jeopardy of Reading's relat-
ively minor investment, the Court would have ruled
the same way.

IT IS SO ORDERED.

Del.Ch. 1984
Reading Co v. Trailer Train Co
Not Reported in A.2d, 1984 WL 8212 (Del.Ch.), 9
Del. J. Corp. L. 223

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 10

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 766788 (D.Del.)
(Cite as: 2008 WL 766788 (D.Del.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Vernette WALKER, Plaintiff,
v.
THE NEWS JOURNAL and Ann Hines, Defendants.
No. C.A. 06-138-MPT.

March 24, 2008.

Vernette Walker, Pro Se, New Castle, DE.

Jennifer C. Jauffret, Esquire, Kelly A. Green, Esquire, and Lori A. Brewington, Esquire, Richards, Layton & Finger, P.A., Wilmington, DE.

### MEMORANDUM OPINION

THYNGE, United States Magistrate Judge.

### I. Introduction

*1 This is an employment discrimination case involving several claims. Plaintiff, Vernette Walker ("Walker") alleges that she was wrongfully terminated from her employment with defendant, The News Journal, on August 30, 2004. Walker alleges that her termination was a discriminatory action based on her age and disability in violation of the Age Discrimination in Employment Act ("ADEA") and the Americans with Disabilities Act of 1990 ("ADA") respectively. Walker also alleges discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII").

Defendant, Ann Hines ("Hines"), a manager at The News Journal, moved to dismiss all of the above claims against her pursuant to Fed.R.Civ.P. 12(b)(6) because she maintains that there is no individual liability under the ADEA, ADA, or Title VII. The News Journal moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) because it argues that Walker failed to exhaust the required administrative remedies before bringing this action. The News Journal also moved for summary judgment pursuant to Fed.R.Civ.P. 56(c) on the basis that Walker cannot establish *prima facie* discrimination under the ADA and further that there is no evidence to support Walker's ADEA claim. This opinion addresses all three motions herein.

### II. Facts

The following facts are undisputed. Walker was an employee of the News Journal from December 1987 through August 2004. On April 27, 2004, Walker was involved in a car accident, from which she sustained injuries to her neck and back. Although Walker was "sore" from her injuries, she was released from the hospital on the same day as the accident.[FN1] The next morning Walker informed her supervisor, Shelly Rumph ("Rumph"), that she would be absent from work until she felt better. Although Walker did not provide an anticipated return to work date, she promised to update her employer on the status of her recovery.

FN1. D.I. 63 at 5.

Before the accident, the parties agree that Walker was a competent employee who had a good working relationship with her superiors.[FN2] After the accident, however, the relationship began to disintegrate. On April 30, 2004, three days after Walker's car accident, Hines sent Walker notification of her benefits' entitlement under The News Journal's Income Protection Plan (the "Plan") and its Family Medical Leave Act ("FMLA") policy. The Plan stated in part, "At its discretion, the Company may require written information from your personal physician or through an examination by a company-selected physician, before payments under this plan are authorized."[FN3] Although Walker provided

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 766788 (D.Del.)
**(Cite as: 2008 WL 766788 (D.Del.))**

Page 2

periodic updates from her doctor, The News Journal alleges the updates failed to provide sufficient detail. Accordingly, The News Journal scheduled a medical exam for August 23, 2004, with a company-selected physician to determine the extent of her recovery and when she might return to work. [FN4] At the conclusion of the that examination, the company-selected physician informed Walker that she could return to work that day without restriction. Walker did not return to work and on August 30, 2004, The News Journal terminated her employment.

> FN2. D.I. 63 at 4.

> FN3. D.I. 63 at 6.

> FN4. D.I. 63 at 9-10.

*2 Walker commenced administrative action against The News Journal when she filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Delaware Department of Labor ("DDOL") on October 7, 2004. On June 30, 2005, the DDOL dismissed Walker's claims. The EEOC adopted the findings of the DDOL and on December 5, 2005, the EEOC dismissed Walker's claims. On March 1, 2006, Walker filed the present action against Hines and The News Journal alleging discrimination for the reasons set forth above.

## III. Legal Standard

### Motion to Dismiss

A motion to dismiss is governed by Fed.R.Civ.P. 12(b)(6).[FN5] Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted.[FN6] The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case.[FN7] To that end, a Rule 12(b)(6) motion should be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief." [FN8] The court assumes that all factual allegations in plaintiff's amended complaint are true and draws all reasonable factual inferences in the light most favorable to her.[FN9] However, the court should reject unsupported allegations, "bald assertions," or "legal conclusions." [FN10]

> FN5. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409-10 (3d Cir.1991) (citing *Lunderstadt v. Colafella*, 885 F.2d 66, 70 (3d Cir.1989) ("The threshold to withstand a motion to dismiss under [Rule] 12(b)(1) is thus lower than that required to withstand a Rule 12(b)(6) motion.")).

> FN6. Fed.R.Civ.P. 12(b)(6).

> FN7. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993).

> FN8. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

> FN9. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir .1997).

> FN10. *Id.* (citations omitted).

### Summary Judgment

Granting summary judgment pursuant to Fed.R.Civ.P. 56(c) is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [FN11] A Rule 56(c) movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case." [FN12] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." [FN13] The nonmovant must be given the benefit of all justifiable inferences and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 766788 (D.Del.)
(Cite as: 2008 WL 766788 (D.Del.))

the court must resolve any disputed issue of fact in favor of the nonmovant.[FN14] The mere existence of some evidence in support of the nonmoving party, however, is insufficient to deny a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmoving party on that issue.[FN15] If the nonmoving party fails to make a sufficient showing on an essential element of its case, the moving party is entitled to judgment as a matter of law.[FN16]

FN11. Fed.R.Civ.P. 56(c).

FN12. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

FN13. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

FN14. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

FN15. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN16. *See Celotex Corp.,* 477 U.S. at 325.

## IV. Analysis

*Hines' Motion to Dismiss*

Following Third Circuit precedent, this court applies arguments regarding individual liability to all three statutes interchangeably. While there is no express grant of individual liability under any of the statutes, employers may be liable under all three. Thus, an individual must be considered an employer under one of the statutes to be potentially liable.

**\*3** The definition of "employer" is nearly identical in each statute. In Title VII, an "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees

... and any agent of such a person." [FN17] Similarly, the ADEA defines an "employer" as "a person engaged in an industry affecting commerce who has twenty or more employees ... and any agent of such a person." [FN18] Language identical to Title VM's definition of an employer was included in the earliest proposals of the ADA and was not altered by the Senate or House.[FN19] In fact, the EEOC's regulations state that the term "employer" as used in the ADA "shall have the meaning[ ] ... set forth in ... the Civil Rights Act of 1964." [FN20]

FN17. 42 U.S.C. § 2000e(b).

FN18. 29 U.S.C. § 630(b); see also *Sheridan v. E.I. Du Pont de Nemours and Co.* citing *EEOC v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1279-80 (7th Cir.1995) ("[T]he ADEA's definition is ... essentially identical to Title VM's.... [T]herefore, the ADEA is interchangeable with Title VII.").

FN19. See S. 933, 101st Cong., 1st Sess. § 201 (1989); H.R. 2273, 101st Cong., 1st Sess. § 201 (1989) (defining an "employer" as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person." This definition is identical to the final version of the Act, although a different standard was in effect for two years following the ADA's effective date).

FN20. 29 C.F.R. § 1601.2(1996).

Although at first blush, the phrase "any agent of such a person" that is included in the definition of employer under all three statutes may appear to include Hines, the Third Circuit has explicitly rejected individual liability under Title VII, the ADA, and the ADEA.[FN21] Accordingly, these claims against Hines must be dismissed.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 766788 (D.Del.)
(Cite as: 2008 WL 766788 (D.Del.))

FN21. *Kachmar v. Sungard Data Systems, Inc.* 109 F.3d 173, 184 (3d Cir.1997) ("Congress did not intend to hold individual employees liable under Title VII."); *Emerson v. Thiel College,* 296 F.3d 184 (3d Cir.2002) (holding individual liability was not appropriate under Title III of the ADA and explaining that that finding was consistent with other circuits which determined that individual liability was not appropriate under Titles I and II of the ADA); *Koslow v. Pennsylvania,* 302 F.3d 161, 178 (3d Cir.2002) ("[T]here appears to be no individual liability for damages under Title I of the ADA"); *Hill v. Borough of Kutztown,* 455 F.3d 225, 246 (3d Cir.2006) ("[T]he ADEA does not provide for individual liability.")

*News Journal's Motion to Dismiss*

The News Journal moves to dismiss the ADEA and Title VII claims against it on the basis that plaintiff failed to exhaust the required administrative remedies before bringing those claims. The ADEA provides, in pertinent part, that "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission."[FN22] The Third Circuit has interpreted that provision as requiring a plaintiff to exhaust certain administrative remedies before bringing an action under the ADEA. Plaintiff, however, did not file an age discrimination claim with the EEOC.[FN23] Therefore, her ADEA claims must be dismissed for failure to exhaust administrative remedies.

FN22. 29 U.S.C. § 626(d).

FN23. D.I. 15 at Exhibit B.

Similarly, Title VII requires that a "charge under [that] section shall be filed within one hundred eighty days after the alleged unlawful employment

practice occurred ..."[FN24] Once the EEOC makes a final determination about the Title VII claim, the EEOC "shall so notify the person aggrieved within ninety days after the giving of such notice [that] a civil action may be brought against the respondent ..."[FN25] The Third Circuit has interpreted those provisions to mean that a Title VII claim cannot be raised for the first time in a civil action.[FN26] As that court has said, "it is a basic tenet of administrative law that a plaintiff must exhaust all administrative remedies before bringing a claim for judicial relief."[FN27] Moreover, questions about whether administrative remedies have been exhausted "are best resolved under Rule 12(b)(6) covering motions to dismiss for failure to state a claim."[FN28] Here, plaintiff failed to raise any Title VII claims with the EEOC or Delaware Department of Labor ("DDOL"). Thus, those claims must be dismissed.

FN24. 42 U.S.C.A. § 2000e-5.

FN25. *Id.*

FN26. *Hornsby v. United States Postal Serv.,* 787 F.2d 87 (3d Cir .1986).

FN27. *Robinson v. Dalton,* 107 F.3d 1018, 1020 (3d Cir.1997).

FN28. *Id.* at 1022.

*News Journal's Motion for Summary Judgment*

*4 News Journal moved for summary judgment on plaintiff's ADEA and ADA claims. In light of the previous findings herein, the motion for summary judgment on the ADEA claim is moot; therefore, this opinion will only address the motion for summary judgment on the ADA claim.

News Journal contends that summary judgment is appropriate because plaintiff cannot establish a *prima facie* case of disability discrimination under the ADA. To establish a *prima facie* case, plaintiff must establish that she: (1) has a disability within the meaning of the ADA; (2) is otherwise qualified

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 766788 (D.Del.)
(Cite as: 2008 WL 766788 (D.Del.))

to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) was subject to some adverse action as a result of her disability.[FN29] If plaintiff fails to establish any of the elements listed above, summary judgment is appropriate.

> FN29. *Buskirk v. Apollo Metals*, 307 F.3d 160, 166 (3d Cir.2002).

Regarding the first element, Walker does not appear to have a disability within the meaning of the ADA. A "disabled" individual under the ADA is one whose physical or mental impairment *substantially limits* one or more *major life activities*. The Supreme Court has held that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." [FN30] The Third Circuit has explained that "major life activities" are those "activities that the average person in the general population can perform with little or no difficulty." [FN31]

> FN30. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

> FN31. *Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 361 (3d Cir.2000).

By plaintiff's own admission, she is not substantially limited in any major life activity. In fact, plaintiff testified at her deposition that she know her job would be eliminated, and she would have returned to work immediately. [FN32] However, even if this court accepts there is a genuine issue of material fact there, plaintiff cannot satisfy the second element of a *prima facie* case of disability discrimination.

> FN32. D.I. 63 at 19.

Regarding the second element, plaintiff is not a "qualified individual" under the ADA. A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position." [FN33] Walker is es-

topped from asserting that she could perform the essential functions of her job because Walker previously represented that she was totally and permanently disabled from April 27, 2004 to December 18, 2006.[FN34] Walker claimed that she was not "able to physically get out and work" due to her injuries. [FN35] Moreover, Walker's treating physicians consistently maintained Walker was unable to work in any occupation. Perhaps most importantly, the Social Security Administration ("SSA") accepted those representations as true when awarding Walker SSDI benefits.[FN36] Consequently, Walker is now estopped from claiming that she was, in fact, qualified to perform the essential functions of her job.

> FN33. 42 U.S.C. § 12112(8).

> FN34. D.I. 63 at 22.

> FN35. *Id.*

> FN36. *Id.*

Judicial estoppel is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with the one that she has previously asserted in the same or in a previous proceeding. [FN37] "Absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." [FN38] The potential for inconsistency arises where a plaintiff, as in here, applies for and receives SSDI benefits under the theory that she is totally disabled and thereafter alleges that she could have worked but for some discriminatory act.[FN39] Accordingly, plaintiff is estopped from claiming she is a qualified individual under the ADA. Since plaintiff cannot satisfy the second element of a *prima facie* case of disability discrimination under the ADA, it is unnecessary to address the final element. Accordingly, News Journal's motion for summary judgment is granted.

> FN37. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 766788 (D.Del.)
**(Cite as: 2008 WL 766788 (D.Del.))**

Cir.1996).

FN38. 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* Juris.2d § 4477 (1981).

FN39. *Lorde v. City of Philadelphia,* 2000 U.S. Dist. LEXIS 17196, at *4,2000 WL 176367 (E.D.Pa. Nov. 30, 2000).

**V. Conclusion**

**\*5** For the reasons contained herein, Ann Hines' motion to dismiss is GRANTED, News Journal's Motion to Dismiss is GRANTED, and News Journal's Motion for Summary Judgment is GRANTED in part and found as moot in part.

*ORDER*

At Wilmington this 24th day of March, 2008,

A memorandum opinion having been issued on the same date in the above captioned matter

IT IS ORDERED, ADJUDGED AND DECREED that:

1. Consistent with the memorandum opinion, defendant Ann Hines motion to dismiss (D.I.12) is GRANTED; defendant News Journal's motion to dismiss (D.I.14) is GRANTED; and defendant News Journal's motion for summary judgment (D.I.62) is GRANTED.

D.Del.,2008.
Walker v. The News Journal
Not Reported in F.Supp.2d, 2008 WL 766788 (D.Del.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.