# Exhibit A



# ORRICK

January 29, 2009

Michael D. Torpey
(415) 773-5932
mtorpey@orrick.com

*FEDERAL EXPRESS*

Laurence D. Paskowitz, Esq.
Paskowitz & Associates
60 East 42nd Street, 46th Floor
New York, NY 10165

Re:   Intel Corporation/Annette Villari's Shareholder Demand

Dear Mr. Paskowitz:

I write as a follow up to my September 25, 2008 and November 3, 2008 letters. As you know, your client, Ms. Annette Villari, made a demand on Intel Corporation's ("Intel" or the "Company") Board of Directors to "investigate certain claims, initiate appropriate legal action, and take necessary and appropriate remedial measures to ensure that the Corporation is protected from further harm" in connection with what you have characterized as Intel's "anticompetitive business practices."

In response to Ms. Villari's demand, the Board authorized the Audit Committee to conduct a review of the situation and evaluate the demand as articulated in your June 12, 2008 letter to Intel. Intel's General Counsel, D. Bruce Sewell, informed you of that decision in a letter dated August 22, 2008. The Audit Committee retained my firm to assist with its review of the demand. I sent you letters on September 25, 2008 and November 3, 2008 requesting any facts or information you have in support of Ms. Villari's demand. We did not receive any response to those requests. The Audit Committee considered Ms. Villari's demand and, after deliberation, recommended that the full Board defer any determination regarding the demand. In considering the Audit Committee's recommendation, the Board considered the following factors, among others:

- That the issues raised in the underlying matters (including those which you mention in your demand letter), which the Company has denied and is vigorously contesting, are legally and factually complex and the Company would benefit from the judicial resolution of those questions;

- The factual records in the underlying matters are not yet fully developed, and the Company would benefit from a more fully developed factual record;

- The issues raised in the demand are legally and factually intertwined with those of the underlying matters and any action by the Company at this time could unnecessarily expose the Company to liability, including potential liability in the underlying matters;



**ORRICK**

Laurence D. Paskowitz, Esq.
January 29, 2009
Page 2

- Any further action on Ms. Villari's demand at this time could have an adverse effect on the Company's business; and

- Any action against the Company's directors and officers would require the Company to indemnify such directors and officers for the substantial costs and expenses (including attorney's fees) they would incur in defending the actions which the Company does not believe is appropriate at this time.

Having considered these factors, the Board deliberated and concluded that it is not currently in the best interest of the Company to make any determination regarding the merits of Ms. Villari's demand and that it will continue to monitor the underlying matters.

Please do not hesitate to contact me at (415) 773-5932 if you would like to discuss this matter further.

Very truly yours,

Michael D. Torpey / by λmw

Michael D. Torpey

# Exhibit B

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS (190264)
MARC M. UMEDA (197847)
KEVIN A. SEELY (199982)
MARK A. GOLOVACH (220760)
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRISTINE DEL GAIZO, Derivatively on behalf of INTEL CORPORATION, | Case No. |
| Plaintiff, | SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT |
| vs. | |
| PAUL S. OTELLINI, ANDY D. BRYANT, ANAND CHANDRASEKHER, ERIC B. KIM, SEAN M. MALONEY, D. BRUCE SEWELL, STACY J. SMITH, CRAIG R. BARRETT, CHARLENE BARSHEFSKY, CAROL A. BARTZ, SUSAN L. DECKER, REED E. HUNDT, JAMES D. PLUMMER, DAVID S. POTTRUCK, JANE E. SHAW, JOHN L. THORNTON, DAVID B. YOFFIE, D. JAMES GUZY and DOES 1-25, inclusive | |
| Defendants, | |
| -and- | |
| INTEL CORPORATION, a Delaware corporation, | |
| Nominal Defendant. | |
| | JURY TRIAL DEMANDED |

SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by her attorneys, derivatively on behalf of Intel Corporation ("Intel" or the "Company"), submits this Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.   This is a shareholder derivative action brought by a shareholder of Intel on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, waste of corporate assets and unjust enrichment that occurred between January 2000 and the present (the "Relevant Period") and that have caused substantial monetary losses to Intel and other damages, such as to its reputation and goodwill.

2.   Intel engages in making, marketing and selling integrated circuits for computing and communications worldwide. Intel controls more than 80 percent as measured by volume, or 90 percent as measure by revenue, of the x86 microprocessor market. The x86 microprocessors are the critical microprocessors that are used to run the Microsoft Windows operating system.

3.   Defendants have used the Company's dominant position in the x86 microprocessor market to stifle competition. Defendants have used such monopolistic practices as threatening, coercing and bribing customers, distributors and retailers to refrain from dealing with Intel's only real competitor, Advanced Micro Devices, Inc. ("AMD").

4.   In 2005, recognizing the unlawful actions that defendants caused Intel to engage in, the Japanese Fair Trade Commission ("JFTC") recommended that Intel be sanctioned. Since then, anti-trust regulators and agencies across the globe, including the Korean Fair Trade Commission ("KFTC"), the European Commission and the New York State Attorney General have initiated actions and investigations into Intel's business practices. Most recently, on June 6, 2008, the United States Federal Trade Commission (the "FTC") announced that it served a formal subpoena on Intel after informally investigating the Company since 2006.

5.   Intel is also facing a plethora of civil suits brought by private parties concerning the Company's monopolistic practices. For example, on June 27, 2005, AMD filed a lawsuit against Intel and a consumer class action against the Company soon followed.

6.   Intel's Board of Directors (the "Board") has been aware that the defendants were causing Intel to engage in illegal practices since at least 2005. Instead of seeking to enforce Intel's

- 1 -

1  rights and seek to recover for the millions of dollars expended thus far for fines and litigation, the

2  Board has chosen to do nothing but allow the Company to publicly deny the allegations.

3        7.      Moreover, the wrongdoing reaches the highest levels within Intel. For instance,

4  Intel's Chairman and former Chief Executive Officer ("CEO"), defendant Craig R. Barrett

5  ("Barrett"), visited a customer in 2003 and threatened that there would be "severe consequences"

6  unless that customer withdrew its public support of AMD. Further, in the consumer class action

7  against the Company, it was revealed that e-mails from defendants Barrett and Paul S. Otellini

8  ("Otellini"), Intel's current CEO, were deleted – a failure to follow Intel's document retention policy.

9        8.      These charges and investigations have already cost Intel millions of dollars in

10  litigation defense costs alone. Moreover, the KFTC fined Intel over $25 million after finding the

11  Company abused its position of dominance. Further, actions, inadvertent or otherwise, that continue

12  to obscure the truth, such as defendants Barrett's and Otellini's e-mail destruction, only add to the

13  litigation expenses and the damage done to Intel's reputation.

14                        **JURISDICTION AND VENUE**

15        9.      This Court has jurisdiction over all causes of action asserted herein pursuant to the

16  California Constitution, Article VI, §10, because this case is a cause not given by statute to other

17  trial courts, as this derivative action is brought pursuant to §800 of the California Corporations Code

18  to remedy defendants' violations of law.

19        10.     This Court has jurisdiction over each defendant named herein because each defendant

20  is either a corporation that conducts business in and maintains operations in this County, or is an

21  individual who has sufficient minimum contacts with California so as to render the exercise of

22  jurisdiction by the California courts permissible under traditional notions of fair play and substantial

23  justice.

24        11.     Venue is proper in this Court because one or more of defendants either resides in or

25  maintains executive offices in this County, a substantial portion of the transactions and wrongs

26  complained of herein, including defendants' primary participation in the wrongful acts detailed

27  herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Intel occurred

28

1   in this County, and defendants have received substantial compensation in this County by doing

2   business here and engaging in numerous activities that had an effect in this County.

3 **THE PARTIES**

4       12.   Plaintiff Christine Del Gaizo was a beneficial shareholder of Intel common stock at

5   the time of the conduct of which plaintiff complains.

6       13.   Nominal defendant Intel is a Delaware corporation with its principal executive offices

7   located at 2200 Mission College Boulevard, Santa Clara, California 95054-1549. Intel engages in

8   making, marketing, and selling integrated circuits for computing and communications industries

9   worldwide.

10       14.   Defendant Otellini is Intel's CEO and has been since May 2005. Otellini is also

11   Intel's President and has been since 2002. Otellini is an Intel director and has been since 2002.

12   Otellini was Intel's Chief Operating Officer from 2002 to 2005. Because of Otellini's positions and

13   his access to internal corporate documents, conversations and connections with other corporate

14   officers and employees, attendance at management and Board meetings and committees thereof, as

15   well as reports and other information provided to him in connection therewith, defendant Otellini

16   knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic

17   practices. During the Relevant Period, Intel paid Otellini the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $770,000 | - | $595,100 | $6,034,700 | $3,964,200 | - | $178,000 |
| 2006 | $700,000 | - | $352,000 | $6,699,000 | $1,772,700 | $46,000 | $236,700 |
| 2005 | $608,300 | - | - | $7,600,800 | $2,683,400 | $1,171,000 | $158,500 |
| 2004 | $450,000 | $1,000 | - | $6,521,400 | $1,358,700 | - | $106,400 |

| Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2003 | $350,000 | $867,600 | 900,000 | $8,219,400 | $77,200 |
| 2002 | $350,000 | $612,600 | 664,000 | - | $73,000 |
| 2001 | $300,000 | $561,000 | 357,586 | - | $125,400 |
| 2000 | $300,000 | $1,293,500 | 120,000 | - | $177,500 |

- 3 -

SHAREHOLDER DERIVATIVE COMPLAINT

15.   Defendant Andy D. Bryant ("Bryant") is Intel's Executive Vice President, Finance and Enterprise Services and Chief Administrative Officer and has been since October 2007. Bryant was Intel's Executive Vice President, Chief Financial Officer ("CFO") and Enterprise Services Officer from 2001 to October 2007; Senior Vice President, Chief Financial and Enterprise Services Officer from 1999 to 2001; Senior Vice President and CFO in 1999; and Vice President and CFO from 1994 to 1999. Because of Bryant's positions and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof, as well as reports and other information provided to him in connection therewith, defendant Bryant knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices. During the Relevant Period, Intel paid Bryant the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $455,000 | - | $357,700 | $3,124,500 | $1,673,400 | - | $114,000 |
| 2006 | $356,000 | - | $117,300 | $4,888,000 | $1,178,500 | $49,000 | $148,200 |
| 2005 | $330,000 | - | - | $4,963,700 | $1,765,000 | $1,235,000 | $100,300 |
| 2004 | $305,000 | $1,000 | - | $4,938,500 | $912,500 | - | $84,600 |

| Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2003 | $290,000 | $746,700 | 200,000 | $1,599,600 | $66,000 |
| 2002 | $280,000 | $532,300 | 1,332,852 | - | $59,900 |
| 2001 | $260,000 | $468,000 | 253,704 | - | $121,800 |
| 2000 | $260,000 | $1,309,400 | 90,000 | - | $166,100 |

16.   Defendant Anand Chandrasekher ("Chandrasekher") is Intel's Senior Vice President and General Manager, Ultra Mobility Group and has been since July 2006. Chandrasekher was Intel's Senior Vice President and General Manager, Sales and Marketing group from November 2005 to July 2006; Vice President and Director, Sales and Marketing Group from January 2005 to November 2005; Vice President and General Manager, Mobile Platforms Group from 2001 to January 2005; Vice President and General Manager, Intel Architecture marketing Group from 2000

- 4 -

1  to 2001; and Vice President and General manager, Workstation Platforms Group from 1997 to 2000.
2  Because of Chandrasekher positions and his access to internal corporate documents, conversations
3  and connections with other corporate officers and employees, attendance at management meetings,
4  as well as reports and other information provided to him in connection therewith, defendant
5  Chandrasekher knew, consciously disregarded or was reckless in not knowing that Intel engages in
6  monopolistic practices.

7      17.    Defendant Eric B. Kim ("Kim") is Intel's Senior Vice President and General Manager,
8  Digital Home Group and has been since July 2006.  Previously, Kim was Intel's General Manager,
9  Sales and Marketing Group and was Chief Marketing Officer.  Kim joined Intel in November 2004.
10 Because of Kim's positions and her access to internal corporate documents, conversations and
11 connections with other corporate officers and employees, attendance at management meetings, as
12 well as reports and other information provided to her in connection therewith, defendant Kim knew,
13 consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

14     18.    Defendant Sean M. Maloney ("Maloney") is Intel's Executive Vice President and
15 General Manager, Sales and Marketing Group and Chief Sales and Marketing Officer and has been
16 since 2006.  Maloney was Intel's Executive Vice President, General Manager of Mobility Group
17 from 2005 to 2006 and Executive Vice President, General Manager of Intel Communications Group
18 from 2001 to 2005.  Maloney joined Intel in 1982.  Because of Maloney's positions and his access to
19 internal corporate documents, conversations and connections with other corporate officers and
20 employees, attendance at management meetings, as well as reports and other information provided to
21 him in connection therewith, defendant Maloney knew, consciously disregarded or was reckless in
22 not knowing that Intel engages in monopolistic practices.  Intel paid Maloney the following
23 compensation:

24
25
26
27
28

- 5 -
SHAREHOLDER DERIVATIVE COMPLAINT

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $390,000 | - | $429,000 | $3,207,200 | $1,493,900 | - | $98,300 |
| 2006 | $290,000 | - | $87,100 | $4,678,400 | $1,019,000 | $7,000 | $127,200 |
| 2005 | $270,000 | - | - | $4,823,400 | $1,530,700 | $210,000 | $79,600 |
| 2004 | $250,000 | $1,000 | - | $5,029,000 | $715,000 | - | $63,600 |

| Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2003 | $225,000 | $538,500 | 200,000 | $1,599,600 | $44,100 |
| 2002 | $225,000 | $325,100 | 1,333,707 | - | $46,500 |

19.     Defendant D. Bruce Sewell ("Sewell") is Intel's Senior Vice President and General Counsel and has been since 2005. Sewell was Intel's Vice President, General Counsel in 2005 and Vice President of Legal and Government Affairs, Deputy General Counsel from 2001 to 2004. Sewell joined Intel in 1995. Because of Sewell's positions and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith, defendant Sewell knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

20.     Defendant Stacy J. Smith ("Smith") is Intel's Vice President, CFO and has been since October 2007. Smith was Intel's Vice President, Assistant CFO from March 2006 to October 2007; Vice President, Finance and Enterprise Services and Chief Information Officer from May 2004 to 2006; and Vice President, Sales and Marketing Group and General Manager of Intel Europe, Middle East and Africa from 2002 to 2004. Smith joined Intel in 1988. Because of Smith's positions and her access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to her in connection therewith, defendant Smith knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices. Intel paid Smith the following compensation:

SHAREHOLDER DERIVATIVE COMPLAINT

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2007 | $305,000 | $135,600 | $548,500 | $953,000 | - | $261,700 |
| 2006 | $235,000 | $22,300 | $485,100 | $430,200 | $11,000 | $57,000 |
| 2005 | $202,000 | - | $450,500 | $580,100 | $371,000 | $37,000 |

21.    Defendant Barrett is Intel's Chairman of the Board and has been since May 2005. Barrett is also an Intel director and has been since 1992. Barrett was Intel's CEO from 1998 to May 2005; President from 1997 to 2002; Chief Operating Officer from 1993 to 1997; and an Executive Vice President from 1990 to 1997. Because of Barrett's positions and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith, defendant Barrett knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices. Intel paid Barrett the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $358,300 | - | $409,900 | $3,969,700 | $1,394,100 | $88,000 | $102,100 |
| 2006 | $463,000 | - | $47,700 | $6,410,200 | $1,110,400 | $36,000 | $222,200 |
| 2005 | $610,000 | - | - | $6,308,100 | $2,727,800 | $1,898,000 | $196,500 |
| 2004 | $610,000 | $1,000 | - | $8,004,200 | $1,842,700 | - | $170,700 |

| Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2003 | $610,000 | $1,512,100 | 1,350,000 | $12,499,300 | $134,800 |
| 2002 | $610,000 | $1,070,400 | 684,000 | - | $134,900 |
| 2001 | $575,000 | $1,075,300 | 484,696 | - | $264,800 |
| 2000 | $575,000 | $2,784,700 | 200,000 | - | $397,700 |

22.    Defendant Charlene Barshefsky ("Barshefsky") is an Intel director and has been since January 2004. Barshefsky was a member of the Corporate Governance and Nominating Committee in 2007. Because of Barshefsky's positions and her access to internal corporate documents,

- 7 -

1  conversations and connections with other corporate officers and employees, attendance at Board
2  meetings and committees thereof, as well as reports and other information provided to her in
3  connection therewith, defendant Barshefsky knew, consciously disregarded or was reckless in not
4  knowing that Intel engages in monopolistic practices.

5       23.    Defendant Carol A. Bartz ("Bartz") is an Intel director and has been since January
6  2008. Because of Bartz's position and her access to internal corporate documents, conversations and
7  connections with other corporate officers and employees, attendance at Board meetings and
8  committees thereof, as well as reports and other information provided to her in connection therewith,
9  defendant Bartz knew, consciously disregarded or was reckless in not knowing that Intel engages in
10  monopolistic practices.

11       24.    Defendant Susan L. Decker ("Decker") is an Intel director and has been since
12  November 2006. Decker is a member of the Corporate Governance and Nominating Committee and
13  has been since at least April 2008. Because of Decker's position and her access to internal corporate
14  documents, conversations and connections with other corporate officers and employees, attendance
15  at Board meetings and committees thereof, as well as reports and other information provided to her
16  in connection therewith, defendant Decker knew, consciously disregarded or was reckless in not
17  knowing that Intel engages in monopolistic practices.

18       25.    Defendant Reed E. Hundt ("Hundt") is an Intel director and has been since April
19  2001. Hundt is a member of the Corporate Governance and Nominating Committee and has been
20  since 2002. Because of Hundt's position and his access to internal corporate documents,
21  conversations and connections with other corporate officers and employees, attendance at Board
22  meetings and committees thereof, as well as reports and other information provided to him in
23  connection therewith, defendant Hundt knew, consciously disregarded or was reckless in not
24  knowing that Intel engages in monopolistic practices.

25       26.    Defendant James D. Plummer ("Plummer") is an Intel director and has been since
26  July 2005. Because of Plummer's position and his access to internal corporate documents,
27  conversations and connections with other corporate officers and employees, attendance at Board
28  meetings and committees thereof, as well as reports and other information provided to him in

- 8 -

1 connection therewith, defendant Plummer knew, consciously disregarded or was reckless in not

2 knowing that Intel engages in monopolistic practices.

3   27. Defendant David S. Pottruck ("Pottruck") is an Intel director and has been since

4 December 1998. Because of Pottruck's position and his access to internal corporate documents,

5 conversations and connections with other corporate officers and employees, attendance Board

6 meetings and committees thereof, as well as reports and other information provided to him in

7 connection therewith, defendant Pottruck knew, consciously disregarded or was reckless in not

8 knowing that Intel engages in monopolistic practices.

9   28. Defendant Jane E. Shaw ("Shaw") is an Intel director and has been since January

10 1993. Shaw was a member of the Corporate Governance and Nominating Committee from 2000 to

11 2006. Because of Shaw's positions and her access to internal corporate documents, conversations

12 and connections with other corporate officers and employees, attendance at Board meetings and

13 committees thereof, as well as reports and other information provided to her in connection therewith,

14 defendant Shaw knew, consciously disregarded or was reckless in not knowing that Intel engages in

15 monopolistic practices.

16   29. Defendant John L. Thornton ("Thornton") is an Intel director and has been since July

17 2003. Thornton is a member of the Corporate Governance and Nominating Committee and has been

18 since at least April 2007. Because of Thornton's position and his access to internal corporate

19 documents, conversations and connections with other corporate officers and employees, attendance

20 at Board meetings and committees thereof, as well as reports and other information provided to him

21 in connection therewith, defendant Thornton knew, consciously disregarded or was reckless in not

22 knowing that Intel engages in monopolistic practices.

23   30. Defendant David B. Yoffie ("Yoffie") is an Intel director and has been since 1989.

24 Yoffie is Lead Independent Director and has been since at least April 2000 and Chairman of the

25 Corporate Governance and Nominating Committee and has been since 2007. Yoffie was Co-

26 Chairman of the Corporate Governance and Nominating Committee from May 2004 to 2007 and

27 Chairman of the Corporate Governance and Nominating Committee from 2000 to May 2004.

28 Because of Yoffie's positions and his access to internal corporate documents, conversations and

- 9 -

SHAREHOLDER DERIVATIVE COMPLAINT

1   connections with other corporate officers and employees, attendance at Board meetings and
2   committees thereof, as well as reports and other information provided to him in connection
3   therewith, defendant Yoffie knew, consciously disregarded or was reckless in not knowing that Intel
4   engages in monopolistic practices.

5       31.   Defendant D. James Guzy ("Guzy") was an Intel director from 1969 to May 2008.
6   Guzy was a member of the Corporate Governance and Nominating Committee from 2000 to 2004
7   and Co-Chairman of the Corporate Governance and Nominating Committee from May 2004 to 2006.
8   Because of Guzy's positions and his access to internal corporate documents, conversations and
9   connections with other corporate officers and employees, attendance at Board meetings and
10  committees thereof, as well as reports and other information provided to him in connection
11  therewith, defendant Guzy knew, consciously disregarded or was reckless in not knowing that Intel
12  engages in monopolistic practices.

13      32.   The true names and capacities of defendants sued herein under California Code of
14  Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who
15  therefore sues these defendants by such fictitious names. Plaintiff will seek to amend this complaint
16  and include these Doe defendants' true names and capacities when they are ascertained. Each of the
17  fictitiously-named defendants is responsible in some manner for the conduct alleged herein and for
18  the injuries suffered by the Company as a result of defendants' wrongful and illegal conduct.

19      33.   The defendants identified in ¶¶14, 21-31 are referred to herein as the "Director
20  Defendants." The defendants identified in ¶¶14-21 are referred to herein as the "Officer
21  Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein
22  as the "Individual Defendants."

23                **DUTIES OF THE INDIVIDUAL DEFENDANTS**

24      34.   By reason of their positions as officers, directors and/or fiduciaries of Intel and
25  because of their ability to control the business and corporate affairs of Intel, the Individual
26  Defendants owed Intel and its shareholders fiduciary obligations of trust, loyalty, good faith and due
27  care, and were and are required to use their utmost ability to control and manage Intel in a fair, just,
28  honest and equitable manner. The Individual Defendants were and are required to act in furtherance

                                    - 10 -
                    SHAREHOLDER DERIVATIVE COMPLAINT

1  of the best interests of Intel and its shareholders so as to benefit all shareholders equally and not in

2  furtherance of their personal interest or benefit.

3      35.    Each director and officer of the Company owes to Intel and its shareholders the

4  fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

5  Company and in the use and preservation of its property and assets, and the highest obligations of

6  fair dealing.

7      36.    The Individual Defendants, because of their positions of control and authority as

8  directors and/or officers of Intel, were able to and did, directly and/or indirectly, exercise control

9  over the wrongful acts complained of herein.

10      37.    At all times relevant hereto, each of the Individual Defendants was the agent of each

11  of the other Individual Defendants and of Intel, and was at all times acting within the course and

12  scope of such agency.

13      38.    To discharge their duties, the officers and directors of Intel were required to exercise

14  reasonable and prudent supervision over the management, policies, practices and controls of the

15  financial affairs of the Company.  By virtue of such duties, the officers and directors of Intel were

16  required to, among other things:

17      (a)    ensure that the Company acts only within the scope of the law in pursuing

18  business arrangements;

19      (b)    conduct the affairs of the Company in an efficient, business-like manner so as

20  to make it possible to provide the highest quality performance of its business, to avoid wasting the

21  Company's assets, and to maximize the value of the Company's stock;

22      (c)    remain informed as to how Intel conducted its operations, and, upon receipt of

23  notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in

24  connection therewith, and take steps to correct such conditions or practices and make such

25  disclosures as necessary to comply with securities laws; and

26      (d)    ensure that the Company was operated in a diligent, honest and prudent

27  manner in compliance with all applicable laws, rules and regulations.

28

- 11 -
SHAREHOLDER DERIVATIVE COMPLAINT

39.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Intel, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Intel's Board during the Relevant Period.

40.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in illegal conduct, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was engaging in illegal conduct; and (ii) enhance the Individual Defendants' executive and directorial positions at Intel and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

SHAREHOLDER DERIVATIVE COMPLAINT

1       43.     The Individual Defendants engaged in a conspiracy, common enterprise and/or

2  common course of conduct during the Relevant Period. During this time, the Individual Defendants

3  caused the Company to conceal the true fact that Intel was engaging in illegal conduct.

4       44.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise,

5  and/or common course of conduct was, among other things, to disguise the Individual Defendants'

6  breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse

7  information concerning the Company's operations.

8       45.     The Individual Defendants accomplished their conspiracy, common enterprise and/or

9  common course of conduct by causing the Company to engage in monopolistic practices. Because

10  the actions described herein occurred under the authority of the Board, each of the Individual

11  Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise

12  and/or common course of conduct complained of herein.

13       46.     Each of the Individual Defendants aided and abetted and rendered substantial

14  assistance in the wrongs complained of herein. In taking such actions to substantially assist the

15  commission of the wrongdoing complained of herein, each Individual Defendant acted with

16  knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

17  wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

18                               **BACKGROUND**

19       47.     Intel's primary business is creating microprocessors, the "chip" inside a computer

20  which controls the computational functions of a computer. The chip is defined by its instruction set -

21  the machine language instructions that a computer follows.

22       48.     When the original personal computer ("PC") was created in the early 1980s, a variety

23  of microprocessors were available, each with its own instruction set. The chips were created by a

24  variety of companies, including Motorola, Intel and AMD.

25       49.     International Business Machines Corp. ("IBM"), at that time the dominant maker of

26  PCs on the market, decided to define a single instruction set for all chips. IBM choose the Intel chip,

27  which utilized the x86 instruction set ("x86"). The x86 version of Microsoft Windows is the most

28

1 commonly used operating system today. A variety of applications and programs have been created

2 that use only the x86 instruction set.

3    50.    IBM, however, realized that having only a single source for the x86 microprocessor

4 would be detrimental for business. Therefore, IBM demanded that Intel license its instruction set to

5 another entity, AMD. AMD agreed to abandon its own microprocessor chip and manufacture x86

6 chips. In 1982, Intel and AMD executed the AMD-Intel Technology Exchange Agreement (the

7 "Exchange Agreement"), which ensured that Intel would share with AMD key information about its

8 x86 chips.

9    51.    Despite the existence of the Exchange Agreement, Intel engaged in a plan to

10 minimize AMD as a competitor. Defendants caused Intel to provide unusable or incomplete

11 information to AMD, thus hindering AMD's ability to manufacture competitive chip sets.

12    52.    In 1987, AMD petitioned to compel arbitration for Intel's breach of the Exchange

13 Agreement. In 1992, an arbitrator awarded AMD more than $10 million plus prejudgment interest

14 and a permanent, non-exclusive and royalty-free license to any Intel intellectual property embodied

15 in AMD's own microprocessor, including the x86 instruction set. In deciding for AMD, the

16 arbitrator stated, "In fact, it is no fantasy that Intel wanted to blunt AMD's effectiveness in the

17 microprocessor marketplace, to effectively remove AMD as a competitor." The arbitrator further

18 stated that Intel's conduct was "inexcusable and unworthy," the Company engaged in "corporate

19 extortion" and employed "all of its economic force and power on a smaller competitor to have its

20 way." Two years later, the California Supreme Court upheld the award.

21    **DEFNDANTS CAUSE INTEL TO ENGAGE IN ANTI-COMPETITIVE**
   **MONOPOLISTIC PRACTICES**
22
23    53.    Intel dominates the microprocessor market. According to some reports, Intel has
   achieved more than a 90% market share as measured by revenue. Intel's closest competitor, AMD,
24
   has a market share of approximately 9%, as measured by revenue.
25
26    54.    The defendants have engaged in a global operation to illegally prevent AMD from
   gaining access to a significant market anywhere in the world. As time has gone by, the evidence of
27
   defendants' illegal actions has become overwhelming.
28

1   55.   Below is a non-exhaustive list of the defendants' illegal actions.

2   **A.   Defendants' Monopolistic Practices Aimed at OEMs**

3   56.   The majority of microprocessors are sold to original equipment manufacturers

4   ("OEMs"). OEMs include such universally recognized brands as Hewlett-Packard ("HP"), Dell, Inc.

5   ("Dell"), IBM, Hitachi Ltd. ("Hitachi"), Fujitsu Ltd. ("Fujitsu"), Toshiba Corp. ("Toshiba"), Acer,

6   Inc. ("Acer"), which now owns Gateway, Inc. ("Gateway"), NEC Electronics Corporation ("NEC")

7   and Sony Corp. ("Sony"). Dell and HP are the two dominant OEMs.

8   57.   Defendants' monopolistic practices are targeted at these OEMs to ensure that the

9   OEMs have exclusive or near-exclusive arrangements with Intel. Defendants' primary approach is to

10   use a variety of "loyalty" awards to ensure exclusivity. Intel's anti-competitive exclusionary rebates

11   are the Company's chief method of ensuring exclusivity, but the "loyalty" awards can also include

12   discounts, promotional support and subsidies. The awards are based on OEMs achieving quarterly

13   targets that are unilaterally set by the defendants. If the OEM achieves the target, it is entitled to a

14   rebate of all the quarter's purchases of microprocessors, usually around 8-10% of the price paid.

15   Intel provides the rebate in cash at the quarter's close. Since OEMs operate on thin operating

16   margins, qualifying for a rebate can be the difference between reporting a profit or loss in a quarter.

17   Defendants are able to develop these customer-by-customer targets due to the number of industry

18   publications that accurately forecast and track anticipated sales and because OEMs' market shares

19   remain relatively stable.

20   58.   These rebates are significantly different than standard "volume discounts" that are

21   usually offered by sellers. Volume discounts are nondiscriminatory and reflect cost efficiencies that

22   accrue when dealing in larger quantities. Intel's system is based on its percentage of an OEM's

23   purchases of microprocessors.

24   59.   There are a number of variations on the rebate scheme. For instance, defendants have

25   tied Intel's rebates for one European OEM to a specific microprocessor that AMD competes

26   favorably against.

27   60.   On the rare occasions where Intel's loyalty rewards are not enough, defendants freely

28   use threats and intimidation to achieve the desired results.

- 15 -

1. **Discounts, Promotional Supports and Rebate Agreements**

61.     Intel pays millions of dollars to OEMs in order to ensure exclusive or near-exclusive arrangements with Intel. Intel's dominance, however, was threatened, at least in Asia, in the later part of 2002 when AMD captured approximately 22% of the microprocessor market. This jump in market share was due to AMD's introduction of its Athlon microprocessor.

62.     One of Intel's largest OEM targets was Sony. AMD supplied approximately 22% of Sony's microprocessor needs. In 2003, however, Intel entered into an agreement with Sony whereby it paid Sony million of dollars in the form of discounts and promotion support. By the end of 2003, AMD only supplied Sony with 8% of its microprocessors and by 2004 AMD was cut off from Sony completely.

63.     NEC is another Japanese OEM that formerly purchased a substantial amount of its microprocessors from AMD. In May 2002, however, Intel agreed to pay NEC more than 300 million yen in exchange for capping the amount of purchases from AMD. The caps assured that Intel received at least 90% of NEC's Japanese business and a quota of NEC's AMD purchases worldwide. NEC's purchases from Intel fell from 40% of its needs worldwide to approximately 15%.

64.     Intel also reached an exclusive agreement with Toshiba, which is another OEM that conducts business with the Company. In exchange for $25 to $30 million per quarter, Toshiba agreed not to use AMD microprocessors. Intel entered into a similar agreement with Hitachi. According to the JFTC, in 2002, AMD's shipments to Hitachi fell from 50,000 microprocessors per quarter to 0 microprocessors per quarter. In 2003, Intel agreed to provide Fujitsu an undisclosed financial incentive in order to limit its dealings with AMD. As a result, Fujitsu limited AMD to a single notebook product.

65.     The defendants' actions, though, are not limited to markets overseas. In August 2000, AMD and IBM engaged in negotiations over a proposed commercial PC business relationship. As a deal was nearly finalized, Intel approached IBM with an incentive-based program that would make Intel the "preferred supplier" for IBM's commercial products. IBM accepted the offer and withdrew

- 16 -

SHAREHOLDER DERIVATIVE COMPLAINT

1  from negotiations with AMD. According to one IBM executive, Intel paid IBM millions of dollars
2  in market development funds.

3      66.    IBM and AMD did partner in April 2003 on a 64-bit server chip called Opteron.
4  IBM, however, consigned the Opteron computer market to a single target market segment.
5  According to an industry report, Intel paid IBM to stop further Opteron development.

6      67.    Further, when IBM created its "ThinkCentre" line of commercial desktops it entered
7  into an exclusive arrangement with Intel. When AMD asked IBM to include its chips in the
8  ThinkCenter line, AMD was rebuffed. IBM executives told AMD that using AMD products would
9  cost them important subsidies that Intel provides.

10      68.    In 2001, Gateway began to exclusively use Intel chips. In making the decision,
11  Gateway's former CEO, Ted Waitt, explained to an AMD executive that Intel offered Gateway large
12  sums of money not to deal with AMD. Further, according to reports, Intel bought Dell's exclusivity
13  with payments and discriminatory pricings and services.

14      **2.**    **Threats and Retaliation**

15      69.    Prior to late 2000, Compaq Computer Corporation ("Compaq") did significant
16  business with AMD. Because of this significant amount of business between Compaq and AMD,
17  Intel withheld delivery of server chips that Compaq needed. Compaq's CEO, Michael Capellas,
18  stated that he "had a gun" to his head and was forced to stop buying AMD processors.

19      70.    In 2002, AMD attempted to make in-roads with HP's commercial desktop product
20  line. HP demanded a $25 million quarterly fund to compensate it for Intel's expected retaliation.
21  AMD and HP instead reached an agreement that AMD would provide HP's first million
22  microprocessors for free. On the eve of the products' launch, however, HP told Intel of its plans.
23  Intel informed HP that AMD's entry into HP's commercial line would be a "Richter 10" event. Intel
24  pressured HP into withdrawing the AMD offering from its premier "Evo" brand and withholding the
25  AMD-powered computer from HP's network of independent value added resellers. Intel even
26  pressured HP's senior management to consider firing the HP executive who reached the agreement
27  with AMD. Of the million microprocessors AMD offered to HP *for free*, HP took only 160,000.

28

SHAREHOLDER DERIVATIVE COMPLAINT

71.    In 2002, defendants threatened to discontinue providing NEC with the technological roadmap of future products if NEC did not convert its entire line of Value Star L computer to Intel microprocessors. Without that roadmap, NEC would be at a disadvantage to its competitors. NEC submitted to Intel's request and did not use AMD's products on its Value Star L series in 2002 and 2003.

72.    NEC was acutely aware that the defendants did not make empty threats. According to the consolidated complaint in *In re Intel Corp. Microprocessor Antitrust Litigation*, Case No. 1:05-Md-01717 (D. Del.) when NEC's European subsidiary, NEC-CI, used AMD's products in its commercial desktop segments the defendants said they would "destroy" NEC-CI. The defendants told NEC-CI's retailers that NEC-CI's use of AMD microprocessors could impair its ability to supply them with products. When NEC-CI refused to cave to the defendants' pressure, the defendants imposed a discriminatory price increase.

73.    In 2003, AMD was poised to launch a major new product, its Athlon64. Acer committed to support AMD's new product by making a senior executive available for a videotaped endorsement and to introduce two new computers to coincide with AMD promotional events. Learning of Acer's commitment, defendant Barrett, at that time Intel's CEO, visited Acer's Chairman, CEO and President in Taiwan to express his concern about these events. Defendant Barrett stated that Acer would suffer "severe consequences" if it publicly supported AMD's Athlon64. Defendant Barrett's visit coincided with an unexplained delay by Intel in providing $15-$20 million in market development funds owed to Acer. Acer subsequently withdrew its public support of the Athlon64 launch, banned the use of the senior executive's video and delayed the announcement of the new computers. Acer's President stated that the only thing unique about defendant Barrett's visit is that he went to Taiwan himself, since the threats were "usually done by lower ranking managers."

74.    In 2004, Gateway merged with eMachines. AMD saw this as an opportunity to reopen its relationship with Gateway. Gateway, however, refused to use AMD in its direct internet sales, commercial offerings and server line, creating only one AMD-powered desktop at the request of Circuit City. According to reports, Gateway's executives stated that the defendants' threats beat them into "guacamole."

-18-

75.     In the fourth quarter of 2004, HP's product with AMD microprocessors sold so well, that they capture nearly 60% of HP's U.S. retail sales for the quarter.  As a result, Intel withheld HP's fourth quarter rebate check and refused to waive HP's failure to achieve its targeted rebate goal.  HP was forced to make up the difference in succeeding quarters when it promised Intel at least 90% of HP's mainstream retail business.

**B.     Defendants' Monopolistic Practices Aimed at Distributors**

76.     Defendants use many of the same tactics used on OEMs' on distributors to restrict them from carrying non-Intel processors.  Defendants offer marketing bonuses, increased rebates, credit programs for new customers, payment of freight charges and special inventory assistance if a distributor agrees to deal with Intel exclusively.  Defendants have gone so far as to bribe distributors to not do business with AMD.  According to reports, when a high-ranking Tech Data executive turned down $1 million to stop doing business with AMD, a defendant asked, "How much would it take?"

77.     Defendants' monopolistic practices concerning distributors are legion.  Defendants have caused Intel to enter into an exclusive arrangement with Synnex Corp., one of the largest distributors to OEMs in the United States.  In December 2004, Ingram Micro, Intel's biggest distributor in China, cut off talks to distribute AMD chips.  A high ranking Ingram Micro official stated that Intel's loyalty rebates were too lucrative to pass up.

78.     Companies that resist the defendants' monopolistic practices are often dealt with harshly by Intel.  When ASI, one of the largest computer hardware and software distributors in the United States, accepted master distributor status in January 2005, the defendants began reducing the market development funds Intel provided ASI.  When Supercom, another distributor, began providing AMD's products in Canada, Intel pressured Supercom's customers to switch to another distributor.

**C.     Defendants' Monopolistic Practices Aimed at Retailers**

79.     Approximately one fifth of desktop and notebook computers are purchased at retail stores.  In the United States, Best Buy and Circuit City are the two largest retailers.

- 19 -

80.    Major retailers demand market development funds ("MDF") in exchange for shelf space, usually consisting of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars - *e.g.*, space in a Sunday circular, an in-store display or an internet training opportunity with the chain's sales staff. The MDF required to secure shelf space can run as high as $25 per box depending on the computer price point and how urgently the competing chipmakers want the shelf space.

81.    The defendants use Intel's significant market advantage to suppress competition. For example, until recently Office Depot declined to stock AMD-powered notebooks regardless of the amount of MDF AMD offered, citing its "premier" status with Intel that would be put at risk. When Intel learned that Fry's was very successfully marketing Fujitsu's Athlon XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

82.    The defendants use these same methods around the world. Europe's largest computer retailer, Media Markt, which accounts for 35% of Germany's retail sales, will only stock Intel products. This is because the defendants cause Intel to provide Media Markt between $15-$20 million of MDF annually. Intel subsidies also foreclose AMD from Aldi, a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market.

83.    In the United Kingdom, the defendants have caused Intel to provide substantially all of the business of Dixon Services Group ("DSG"), operator of three major chains (including Dixon and PC World) that collectively account for two thirds of the U.K. PC market. In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10%. Like Media Markt, DSG reports that Intel penalizes it with reduced MDF because of the business it does with AMD. Toys 'R' Us in the U.K. is also exclusive to Intel. Time, another U.K. retailer took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models. In France, Intel has brought pressure on the largest retailers (including Conforama, Boulanger) causing them to cease dealing with AMD or to drastically reduce their AMD business.

84.     The defendants have also caused Intel to institute a rebate program similar to what it employed with OEMs, resulting in similar exclusivity. Under this program, Intel only provides full MDF payments to retailers if AMD platforms do not account for more than 20% of the revenues of the retailer. If AMD's share of revenues exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% *across all products*.

## DEFENDANTS' MISCONDUCT RESULTED IN SIGNIFICANT LITIGATION AND FINES AGAINST INTEL

85.     Defendants' unlawful conduct has already caused and will continue to cause substantial harm to Intel and its shareholders. The Company has already paid over $10 million in damages to AMD stemming from its alleged breach of the Intel/AMD Exchange Agreement and faces potential liability from several ongoing regulatory investigations, scores of private lawsuits in the United States and Japan, and a private lawsuit brought by AMD in the United States District Court for the District of Delaware, which is scheduled for trial in 2009. Further, on June 6, 2008, the KFTC fined Intel over $25 million for "abuse of dominance."

86.     On March 8, 2005, the JFTC issued a recommendation (the "Recommendation") to Japan-based Intel Kabushiki Kaisha ("IJKK"), stating, in part, the following:

The Fact-Findings in the Recommendation

IJKK, since May 2002, has made the five major Japanese OEMs[1] refrain from adopting competitors' CPUs[2] for all or most of the PCs manufactured and sold by them or all of the PCs that belong to specific groups of PCs referred to as 'series', by making commitments to provide the five OEMs with rebates and/or certain funds referred to as 'MDF' (Market Development Fund) in order to maximize their MSS (MSS is the ratio of the CPUs manufactured and sold by Intel ('Intel's CPUs') in the volume of CPUs to be incorporated into the PCs which are manufactured and sold by an OEM), respectively, on condition that

(a)     the Japanese OEMs make MSS at 100% and refrain from adopting competitors' CPUs.

---

[1]  Japanese manufacturers of PCs with head offices located in Japan.

[2]  x86 series central processing units.

(b)    the Japanese OEMs make MSS at 90%, and put the ratio of competitors' CPUs in the volume of CPUs to be incorporated into the PCs manufactured and sold by them down to 10%; or

(c)    the Japanese OEMs refrain from adopting competitors' CPUs to be incorporated into PCs in more than one series with comparatively large amounts of production volume to others.

Based on the facts mentioned above, the ratio of the sales volume by AMD Japan and Transmeta USA among Total Domestic CPU Sales Volume decreased from approximately 24% in 2002 to approximately 11 % in 2003.

By means of such conducts, IJKK has substantially restrained the competition in the market of CPUs sold to the Japanese OEMs, by acting to exclude its competitors' business activities related to the sales of CPUs to the five OEMs.

Summary of Measures Recommended

(1)    IJKK, when selling Intel's CPUs to the Japanese OEMs, shall terminate such conducts which have been engaged by IJKK since May 2002 as with respect to the CPUs incorporated into the PCs manufactured and sold by the Japanese OEMs, by making commitments to provide the Japanese OEMs with the rebates and/or funds on condition that, as mentioned above, the Japanese OEMs refrain from adopting competitors' CPUs to be incorporated into all or most of the PCs which are manufactured and sold by them.

(2)    IJKK shall notify the following matters to all the Japanese OEMs with which IJKK deals, and shall also make them known to its employees thoroughly.

    a)    Measures taken by IJKK based on (1) above

    b)    IJKK, when providing the Japanese OEMs with such rebates and/or funds, has no intention to set condition which lead to exclude competitors' CPUs out of the PCs which are manufactured and sold by the Japanese OEMs

    c)    IJKK has already terminated the conduct to make a Japanese OEM not adopt competitors' CPUs in more than one groups of PCs, each of which has comparatively large amount of production volume to others, thereby making all the PCs in those groups of PCs at that OEM incorporate Intel's CPUs, by making a commitment to provide it with the rebates and/or funds on condition that the Japanese OEM change to Intel's CPUs competitors' CPUs previously incorporated into the PCs in those groups of PCs, and that it keep using Intel's CPUs in all the PCs in those groups of PCs.

(3)    IJKK, from now on, shall not exclude the business activities of the competitors for the sales of CPUs by employing following conducts:

    a)    The conduct to restrict the ratio in the volume of competitors' CPUs to be incorporated into the PCs manufactured and sold by a Japanese OEM at 10 percent or less, by making a commitment to provide the Japanese OEM with the rebates and/or funds on condition that it make MSS at 90% or more and maintain MSS at such level

    b)    The conduct to, without justification, make a Japanese OEM not adopt competitors' CPUs to be incorporated into PCs in more than one groups of PCs, each

SHAREHOLDER DERIVATIVE COMPLAINT

of which has comparatively large amount of production volume to others, thereby making all the PCs in those groups of PCs at that OEM incorporate Intel's CPUs, by making a commitment to provide the Japanese OEM with the rebates and/or funds on condition that it change to Intel's CPUs competitors' CPUs previously incorporated into the PCs in those groups of PCs, and that it keep using Intel's CPUs in all the PCs in those groups of PCs.

(4)      IJKK shall take measures to operate (i) Antimonopoly training for officers of sales department and their staffs [sic] engaged in promoting and selling CPUs, and (ii) periodical audits by legal section, thereby ensuring the conduct mentioned above in (3) shall not be caused hereafter.

87.      In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to, among other companies, Sony, NEC, Toshiba, Fujitsu and Hitachi. The Japanese authorities demanded that Intel remove all exclusivity arrangements in its contracts.

88.      On July 12, 2005, European antitrust investigators from the European Commission and officials from at least four European countries raided Intel's European offices.

89.      On February 10, 2006, the KFTC conducted surprise raids of Intel's offices in Korea. It was then that the world learned for the first time that the KFTC had begun an investigation into Intel's practices back in June 2005. Korean officials removed documents and hard drives as part of their evidence collection. Intel's spokesman Chuck Mulloy was quoted as saying all Intel's business practices were "both fair and lawful."

90.      On July 27, 2007, the European Commission issued a press release entitled "Competition: Commission Confirms Sending of Statement of Objections to Intel." The press release stated, in relevant part:

> The European Commission can confirm that it has sent a Statement of Objections (SO) to Intel on 26[th] July 2007. The SO outlines the Commission's preliminary view that Intel has infringed the EC Treaty rules on abuse of a dominant position (Article 82) with the aim of excluding its main rival, AMD, from the x86 Computer Processing Unites (CPU) market.
>
> In the SO, the Commission outlines its preliminary conclusion that Intel has engaged in three types of abuse of a dominant market position. First, Intel has provided substantial rebates to various Original Equipment Manufacturers (OEMs) conditional on them obtaining all or the great majority of their CPU requirements from Intel. Secondly, in a number of instances, Intel made payments in order to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based CPU. Thirdly, in the context of bids against AMD-based products for strategic customers in the server segment of the market, Intel has offered CPU s on average below cost.

These three types of conduct are aimed at excluding AMD, Intel's main rival, from the market. Each of them is provisionally considered to constitute an abuse of a dominant position in its own right. However, the Commission also considers at this stage of its analysis that the three types of conduct reinforce each other and are part of a single overall anti-competitive strategy.

91.    In response to the European Commission's press release, Sewell denied the allegations and stated that Intel did not break any European laws.

92.    In September 2007, after a two year probe, South Korea officially charged Intel with violating that country's antitrust laws. In response, the Company's spokesman, Chuck Mulloy, stated he hoped to assure South Korea that "the microprocessor market is functioning normally and that this is an extremely competitive market and that our conduct has been pro-competition and beneficial to consumers."

93.    In addition, on January 11, 2008, *The Wall Street Journal* reported that New York State Attorney General Andrew Cuomo served on Intel "a wide ranging subpoena ... to determine whether the Company coerced" customers to refrain from buying AMD chips.

94.    *The Wall Street Journal,* article further stated that, "[t]hree other government bodies have sided against Intel after studying the situation. The European Commission issued a 'statement of objections' against the company in July, a preliminary ruling that can lead to fines or other penalties .... In September, authorities in Korea accused Intel of violating the country's antitrust laws. Japan's Fair Trade Commission regulator issued a cease-and-desist order against Intel in March 2005 over tactics that included using rebates and marketing funds to induce Japanese computer makers to buy microprocessors from Intel."

95.    On February 12, 2008, *Bloomberg.com* reported that the European Union regulators, in furtherance of their antitrust probe, raided Intel's offices in Munich and computer retailers in the United Kingdom and Germany. Specifically, the officials inspected the offices of Media Markt, DSG International Plc in the United Kingdom and France's PPR SA. The raids targeted "Intel's possible links with computer retailers." The regulators stated that "it has reason to believe that the companies may have violated EU rules on restrictive business practices, abuse of a dominant market position, or both." Commenting on the investigation, a PPR SA representative stated that the company and its companies are concerned about this probe because "it markets products by Intel."

- 24 -

SHAREHOLDER DERIVATIVE COMPLAINT

96.   On February 13, 2008, commenting on the European regulators' raids of Intel's German offices, *The Wall Street Journal* reported that "[i]t is 'unusual' for the commission to raid companies halfway into its antitrust investigation, one Brussels-based lawyer said. It could mean that the companies have not been straight with the information they have supplied to the commission, or that some new infringement has come to light, he said."

97.   Further, recent reports have stated that defendants have failed to ensure that Intel act in good faith and adhere to court orders in the litigation it is involved in due to the monopolistic practices. In March 2007, Intel was forced to admit that it had lost over 21 months of potentially relevant correspondence as a result of "e-mail retention lapses." This included e-mails from some of Intel's highest ranking employees, including defendants Barrett and Otellini, Intel's Chairman and CEO, respectively.

98.   On May 30, 3008, Intel disclosed for the first time that it failed to hand over the contents of more than 900 computer folders from backup files in its lawsuit with AMD. Intel's disclosure happened only hours after the Company negotiated a case management order implying compliance with document production cutoff dates. As a result, on June 5, 2008, U.S. District Court Judge for the District of Delaware Joseph J. Farnan ordered Intel to turn over notes from interviews its lawyers conducted with employees in order to identify problems with the Company's evidence-preservation system.

99.   On June 6, 2008, the Company revealed that the KFTC fined Intel more than $25 million. Also, on that date the Company announced that the FTC issued Intel a subpoena concerning the Company's business practices related to competitiveness in the microprocessor market. Intel stated that the FTC began its informal investigation in 2006.

### DAMAGES TO INTEL CAUSED BY THE INDIVIDUAL DEFENDANTS

100.   As a result of the Individual Defendants' improprieties, Intel engaged in illegal monopolistic activities. As a direct and proximate result of the Individual Defendants' actions, Intel has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

1       (a)    costs incurred from fines levied against Intel by various governments for

2  breaking their anti-trust laws;

3       (b)    costs incurred in defending Intel and its executives in the consumer class

4  action lawsuit, the AMD lawsuit, and any regulatory or governmental lawsuit filed in connection

5  with the Company's illegal activity; and

6       (c)    compensation and benefits paid to the Individual Defendants who have

7  breached their duties to Intel.

8      101.    Moreover, these actions have irreparably damaged Intel's corporate image and

9  goodwill. For at least the foreseeable future, Intel will suffer from what is known as the "liar's

10  discount," a term applied to the stocks of companies who have been implicated in illegal behavior

11  and have misled the investing public, such that Intel's ability to raise equity capital or debt on

12  favorable terms in the future is now impaired.

13          **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

14      102.    Plaintiff brings this action derivatively in the right and for the benefit of Intel to

15  redress injuries suffered, and to be suffered, by Intel as a direct result of breaches of fiduciary duty,

16  waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the

17  Individual Defendants. Intel is named as a nominal defendant solely in a derivative capacity. This is

18  not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

19      103.    Plaintiff will adequately and fairly represent the interests of Intel in enforcing and

20  prosecuting its rights.

21      104.    Plaintiff is and was an owner of the stock of Intel during times relevant to the

22  Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the

23  Company.

24      105.    The current Board of Intel consists of the following eleven individuals: defendants

25  Barrett, Otellini, Barshefsky, Bartz, Decker, Hundt, Plummer, Pottruck, Shaw, Thornton and Yoffie.

26      106.    Defendants Barrett, Otellini, Barshefsky, Hundt, Pottruck, Shaw, Thornton, Plummer

27  and Yoffie have all been directors since at least 2005. During that time numerous red flags should

28  have alerted these directors that Intel is engaging or did engage in illegal monopolistic business

1   practices. These red flags include: (i) the filing in 2005 of AMD's anti-trust complaint against Intel;
2   (ii) the investigation by the KFTC into Intel's business practices, which began in 2005; and (iii) the
3   findings against the Company by the JFTC. In 2006, defendant Decker joined the Board. Red flags
4   that should have alerted the directors to the monopolistic business practices occurring or that did
5   occur at Intel continued. These red flags included (i) the raids that occurred in 2006 on Intel's
6   offices in Korea; (ii) the raids that occurred on Intel's offices in Europe also in 2006; (iii) the filing
7   of a consumer class action complaint against Intel in 2006; and (iv) the findings against Intel by the
8   European Commission in 2007. In 2008, defendant Bartz joined the Board. Evidence of Intel's
9   illegal monopolistic practices has continued even since then, including: (i) the findings against the
10  Company by the KFTC and the subsequent $25 million fine; (ii) the subpoena and investigations
11  into Intel's business practices by the FTC; and (iii) the New York Attorney General's investigation
12  into Intel's business practices. All the events listed were high profile matters that received extensive
13  news coverage in reputable and widely read publications such as *The Wall Street Journal*. Despite
14  this overwhelming amount of evidence, the Board has allowed Intel's spokesman on multiple
15  occasions to assert that Intel did not violate any laws and the microprocessor market is working
16  efficiently and fairly. The Board has not engaged in a sufficient investigation to discover all persons
17  responsible for the illegal monopolistic business practices, and has not brought an action or sought to
18  recover for the harm done to the Company, in violation of their fiduciary duties. Instead, the Board
19  has perilously allowed the harm done to go unpunished and risk being forever time-barred from
20  bringing any action. This conscious disregard for their fiduciary duties cannot be an action done in
21  good faith and in the best interests of the Company and its shareholders. Thus, the entire Board has
22  breached its fiduciary duties, therefore there is a reasonable doubt that the Board faces a substantial
23  likelihood of liability, making a demand upon it futile.
24      107.   Further, the Board has overseen Intel's contentious litigation thus far, and has made
25  no effort to ensure that the Company acts in good faith in the litigation. In fact, in March 2007, it
26  was disclosed that certain evidence has been lost or destroyed in those matters, including 21 months
27  of potentially relevant correspondence, including e-mails by directors Barrett and Otellini, due to
28  their failure to comply with the Company's document retention policy. A year later, Intel disclosed

- 27 -
SHAREHOLDER DERIVATIVE COMPLAINT

1   that it failed to produce to AMD the contents of over 900 computer folders from backup files as

2   required only hours after Intel negotiated a case management order implying compliance with

3   production cutoff dates. This conscious disregard for their fiduciary duties cannot be an action done

4   in good faith and in the best interests of the Company and its shareholders. The entire Board has

5   thus breached its fiduciary duties and therefore there is a reasonable doubt that it faces a substantial

6   likelihood of liability. Thus, demand up the entire Board is futile.

7          108.   According to Intel's Board Guidelines for Significant Corporate Governance Issues,

8   the entire Board is tasked with "[o]verseeing the conduct of the company's business to evaluate

9   whether the business is being properly managed" and "[o]verseeing the processes for maintaining the

10  integrity of the company with regards to its financial statements and other public disclosures, and

11  compliance with law and ethics." Further, Intel's code of conduct states that "Intel follows the letter

12  and spirit of the law," and prohibits putting "inappropriate conditions on purchases or sales."

13  Defendants Barrett, Otellini, Hundt, Pottruck, Shaw, Thornton and Yoffie were all on the Board

14  when the principal monopolistic business practices were occurring. Thus, by knowingly or

15  recklessly causing or allowing the Company to engage in illegal activity, Barrett, Otellini, Hundt,

16  Pottruck, Shaw, Thornton and Yoffie breached their fiduciary duties and therefore, there is a

17  reasonable doubt that they face a substantial likelihood of liability. Thus any demand upon Barrett,

18  Otellini, Hundt, Pottruck, Shaw, Thornton and Yoffie is futile.

19         109.   Defendants Decker, Hundt, Thornton, Yoffie, Barshefsky and Shaw were members of

20  the Company's Corporate Governance and Nominating Committee. According to the Corporate

21  Governance and Nominating Committee's charter, defendants Decker, Hundt, Thornton, Yoffie,

22  Barshefsky and Shaw are charged with "review[ing] and report[ing] to the Board on a periodic basis

23  with regards to matters of corporate governance (which is defined for this purpose as the

24  relationships of the Board, the stockholders and management in determining the direction and

25  performance of the company)." Thus, defendants Decker, Hundt, Thornton, Yoffie, Barshefsky and

26  Shaw had an even higher duty to investigate and ensure that the Company was not engaged in illegal

27  activities. Defendants Decker, Hundt, Thornton, Yoffie, Barshefsky and Shaw consciously or

28  recklessly failed to do their duties as set forth in the Corporate Governance and Nominating

- 28 -

SHAREHOLDER DERIVATIVE COMPLAINT

1  Committee's charter.  Thus, there is a reasonable doubt that defendants Decker, Hundt, Thornton,

2  Yoffie, Barshefsky and Shaw face a substantial likelihood of liability.  Therefore, demand upon

3  Decker, Hundt, Thornton, Yoffie, Barshefsky and Shaw is futile.

4       110.   The principal professional occupation of defendants Barrett and Otellini is their

5  employment with Intel, pursuant to which they received and continue to receive substantial monetary

6  compensation and other benefits.  Specifically, Intel paid Barrett and Otellini the following

7  compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|-----------|-------------|--------|-------|-------------------------|---------------|-----------------------------------------|--------------------------------------------------------------------------|------------------------|
| Otellini  | 2007 | $770,000 | - | $595,100 | $6,034,700 | $3,964,200 | - | $178,000 |
|           | 2006 | $700,000 | - | $352,000 | $6,699,000 | $1,772,700 | $46,000 | $236,700 |
|           | 2005 | $608,300 | - | - | $7,600,800 | $2,683,400 | $1,171,000 | $158,500 |
|           | 2004 | $450,000 | $1,000 | - | $6,521,400 | $1,358,700 | | $106,400 |

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|-----------|-------------|--------|-------|-----------------------------------------|-------------------------------|------------------------|
| Otellini  | 2003 | $350,000 | $867,600 | 900,000 | $8,219,400 | $77,200 |
|           | 2002 | $350,000 | $612,600 | 664,000 | - | $73,000 |
|           | 2001 | $300,000 | $561,000 | 357,586 | - | $125,400 |
|           | 2000 | $300,000 | $1,293,500 | 120,000 | - | $177,500 |

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|-----------|-------------|--------|-------|-------------------------|---------------|-----------------------------------------|--------------------------------------------------------------------------|------------------------|
| Barrett   | 2007 | $358,300 | - | $409,900 | $3,969,700 | $1,394,100 | $88,000 | $102,100 |
|           | 2006 | $463,000 | - | $47,700 | $6,410,200 | $1,110,400 | $36,000 | $222,200 |
|           | 2005 | $610,000 | - | - | $6,308,100 | $2,727,800 | $1,898,000 | $196,500 |
|           | 2004 | $610,000 | $1,000 | - | $8,904,200 | $1,842,700 | | $170,700 |

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|-----------|-------------|--------|-------|-----------------------------------------|-------------------------------|------------------------|
| Barrett   | 2003 | $610,000 | $1,512,100 | 1,350,000 | $12,499,300 | $134,800 |
|           | 2002 | $610,000 | $1,070,400 | 584,000 | - | $134,900 |
|           | 2001 | $575,000 | $1,075,300 | 484,696 | - | $264,800 |
|           | 2000 | $575,000 | $2,784,700 | 200,000 | - | $397,700 |

SHAREHOLDER DERIVATIVE COMPLAINT

1  The Compensation Committee has the authority to review and approve Barrett and Otellini's base
2  salary, bonus and equity compensation. Accordingly, Otellini and Barrett lack independence from
3  defendants Hundt, Pottruck, Thornton and Yoffie who are not disinterested and/or independent and
4  who exert influence over Barrett and Otellini's compensation by virtue of their positions as members
5  of the Compensation Committee. This lack of independence renders defendant Barrett and Otellini
6  incapable of impartially considering a demand to commence and vigorously prosecute this action.
7  Further, there is a reasonable doubt that defendant Barrett faces a substantial likelihood of liability
8  due to personally flying to Taiwan to threaten Acer not to support AMD's product launch. There is
9  also reasonable doubt that defendants Barrett and Otellini face a substantial likelihood of liability for
10 failing to comply with the Company's document retention policies concerning their e-mails and thus
11 failing to ensure that the Company participated in good faith in the antitrust litigation. This
12 destruction of e-mail correspondence also prevents their production in any investigation by any
13 government or regulatory agency into Intel's business practices, increasing the likelihood that Intel
14 will face stiff penalties as a result of these investigations. Accordingly, demand is futile as to
15 defendants Otellini and Barrett because of their lack of independence and their personal interest in
16 the litigation.

17       111.   Each of the key officers and directors knew of and/or directly benefited from the
18 wrongdoing complained of herein.

19       112.   The Director Defendants of Intel, as more fully detailed herein, participated in,
20 approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to
21 conceal or disguise those wrongs from Intel's stockholders; or recklessly and/or negligently
22 disregarded the wrongs complained of herein and are therefore not disinterested parties.

23       113.   The acts complained of constitute violations of fiduciary duties owed by Intel's
24 officers and directors and these acts are incapable of ratification.

25       114.   Each of the Director Defendants of Intel authorized and/or permitted the false
26 statements disseminated directly to the public or made directly to securities analysts and which were
27 made available and distributed to shareholders, authorized and/or permitted the issuance of various

28

- 30 -
SHAREHOLDER DERIVATIVE COMPLAINT

1  improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could
2  not fairly and fully prosecute such a suit even if such suit was instituted by them.

3      115.   Moreover, despite the Individual Defendants having knowledge of the claims and
4  causes of action raised by plaintiff, the current Board has failed and refused to seek recovery for
5  Intel for any of the wrongdoing alleged by plaintiff herein.

6      116.   A true and correct copy of the complaint was delivered to Intel prior to being filed
7  with this Court.

8                    **FIRST CAUSE OF ACTION**
9        **Against All Individual Defendants for Breach of Fiduciary Duty**

10     117.   Plaintiff incorporates by reference and realleges each and every allegation as set forth
11  above as if fully set forth herein.

12     118.   The Individual Defendants owed and owe Intel fiduciary obligations.  By reason of
13  their fiduciary relationships, the Individual Defendants owed and owe Intel the highest obligation of
14  good faith, fair dealing, loyalty and due care.

15     119.   Each of the Individual Defendants had actual or constructive knowledge that the
16  Company was engaged in illegal monopolistic business practices.  At a minimum, to discharge their
17  duties, each Individual Defendant should have exercised reasonable and prudent supervision over the
18  management, policies, practices, controls and financial affairs of Intel, including:

19          (a)   remaining informed as to how Intel was operating and, upon receiving notice
20  or information of an imprudent, questionable, or unlawful decision, condition, or practice, make
21  reasonable inquiry and, if necessary, make all reasonable remedial efforts necessary to correct the
22  illegal actions and harm done to the Company, including initiating a legal action against those
23  responsible;

24          (b)   ensuring that the affairs of Intel were and are conducted in a lawful manner
25  and in compliance with government rules and regulations; and

26          (c)   ensuring that the Company acted in good faith in litigation and investigations
27  concerning Intel's business practices.

28

120.   Failure to perform these actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests

121.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Intel has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

122.   Plaintiff, on behalf of Intel, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against All Individual Defendants for Waste of Corporate Assets

123.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by causing Intel to pay OEMs, distributors and retailers hundreds of millions of dollars in furtherance of their illegal plan.

125.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

126.   Plaintiff, on behalf of Intel, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against All Individual Defendants for Unjust Enrichment

127.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Intel by receiving salaries, bonuses and raises, based on sales and revenues achieved only through using illegal business practices.

129.   Plaintiff, as a shareholder and representative of Intel, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

SHAREHOLDER DERIVATIVE COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.      Directing Intel to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Intel and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

            1       a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

            2.      a provision to permit the shareholders of Intel to nominate at least three candidates for election to the Board;

            3.      a proposal to ensure the accuracy of the qualifications of Intel's directors, executives and other employees; and

            4.      appropriately test and then strengthen the internal corporate governance and control functions;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Intel has an effective remedy;

D.      Awarding to Intel restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

- 33 -

F.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 26, 2008

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
KEVIN A. SEELY
MARK A. GOLOVACH

_____
MARC M. UMEDA

610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

349025_14.DOC

- 34 -
SHAREHOLDER DERIVATIVE COMPLAINT

# Exhibit C

# EXHIBIT A

# PASKOWITZ & ASSOCIATES

### 60 EAST 42ND STREET, 46TH FLOOR
### NEW YORK, NEW YORK 10165

TEL. (212) 685-0969 · (800) 705-9529
FAX (212) 685-2308
E-MAIL: CLASSATTORNEY@AOL.COM

June 12, 2008

Via Overnight Mail

To the Board of Directors of Intel Corp.
c/o Craig R. Barrett, Chairman
2200 Mission College Blvd.
Santa Clara, CA 95054-1549

Re: *Shareholder Demand on the Intel Board of Directors to Investigate Claims, Initiate*
*Appropriate Legal Action, and Take Necessary and Appropriate Remedial Measures*

Dear Members of the Intel Board of Directors:

   We represent Ms. Annette Villari, a long time Intel shareholder. On behalf of our client, this letter constitutes a demand for the Intel Board of Directors to investigate certain claims, initiate appropriate legal action, and take necessary and appropriate remedial measures to ensure that the corporation is protected from further harm.

   As you are aware, a controversy has arisen regarding Intel's potentially anticompetitive business practices. Major media sources, including the New York Times, Forbes, the Associated Press, Business Week and the Minneapolis Star Tribune, recently reported that the Federal Trade Commission ("FTC") opened a formal antitrust investigation of Intel in response to accusations that Intel's pricing is calculated to maintain a functional monopoly on the microprocessor market.

   *In a sign that Intel Corp.'s legal woes are going from bad to worse, federal antitrust regulators*
   *have launched a major investigation into the company's business practices to determine*
   *whether they may have hurt consumers and competitor Advanced Micro Devices Inc.*
   -Bob Cox, "Intel Targeted in Antitrust Investigation" Minneapolis Star Tribune. June 6, 2008.

   The FTC investigation is only the latest development in Intel's global legal battle, and marks an increased interest of American regulators into the controversy surrounding Intel's potentially illegal business practices. As early as 2005, Intel reached a settlement with Japan's Fair Trade Commission ("JFTC"), which had

Craig R. Barrett, Chairman
Intel Board of Directors
June 12, 2008—Page Two

> [R]uled against Intel, saying the chip maker used its position to influence several Japanese PC manufacturers to limit or eliminate AMD chips used in their systems. Intel, in response, accepted the JFTC's recommendations, which called for it to cease practices such as offering favorable prices to companies that agree to limit their use of AMD chips. But the company said it disagreed with the JFTC's findings of facts and with the application of the law in its recommendations."
> -John G. Spooner, "AMD Files Suit Against Intel" eWeek.com. June 28, 2005. (available at http://www.eweek.com/c/a/Desktops-and-Notebooks/AMD-Files-Suit-Against-Intel/).

Likewise, the European Union and the State of New York are currently conducting similar investigations of Intel's allegedly anti-competitive practices. The most recent regulatory decision finding Intel's practices illegal was announced June 5, 2008, when the Korean Fair Trade Commission ordered Intel to pay more than $25 million for violating its fair trade laws.

> The Korean commission found that Intel had violated antitrust law when it offered $37 million in rebates to the personal computer makers, Samsung Electronics and the Trigem Company, from 2002 to 2005 in return for a pledge not to buy microprocessors from A.M.D. Intel responded by saying it was disappointed with the decision and would probably appeal.
> - Stephen Labaton, "In Turnabout, Antitrust Unit Looks At Intel" New York Times. June 7, 2008.

In addition to Intel's issues with regulatory bodies, private lawsuits against the company are another obvious source of concern. As you are of course aware, Intel currently controls about 80% to 90% of the microchip processor market share. Advanced Micro Devices ("AMD") controls the remainder of the market. AMD has accused Intel of systematically giving its customers significant discounts, at times reducing prices below Intel's manufacturing costs, in exchange for commitments to not do business with competitors, namely, Intel's only competitor, AMD.

AMD filed a broad antitrust lawsuit in the U.S. District Court for the District of Delaware against Intel in 2005, claiming that Intel violated the Sherman Antitrust Act, the Clayton Act and the California Business and Professional Code by illegally maintaining its monopoly by influencing the product plans of computer makers to limit consumers' ability to choose between different types of products. AMD's lawsuit identifies 38 companies, including Hewlett-Packard Co., that Intel allegedly pressured to not use AMD chips, or to limit their use of AMD chips. In addition to AMD's domestic suit, AMD also has pending antitrust litigation against Intel in the Tokyo High Court.

In its suit in Delaware, AMD is currently challenging Intel's implementation of its document-retention policy, which Intel drew up as soon as it learned of AMD's lawsuit. According to Intel's sworn testimony, there were a number of mistakes occurred in the actual implementation of its policy.

Craig R. Barrett, Chairman
Intel Board of Directors
June 12, 2008—Page Three

*In addition, individuals [at Intel] often failed to retain sent e-mails as well as received e-mails, and the backup tapes in Europe were mistakenly erased after 12 months despite an order to retain them for the duration of litigation. AMD was understandably unhappy about this, stating, "Through what appears to be a combination of gross communication failures, an ill-conceived plan of document retention and lackluster oversight by outside counsel, Intel has apparently allowed evidence to be destroyed.*

-Joel Hruska, "AMD Forces Intel to Turn Over More Documents." ars technica. May 16, 2008. (available at http://arstechnica.com/news.ars/post/20080516-amd-forces-intel-to-turn-over-more-documents.html).

According to Intel's SEC filings, at least 83 class actions have been filed that repeat AMD's antitrust allegations and allege various consumer injuries. Most of these suits are currently consolidated in U.S. District Court in the District of Delaware and the Superior Court of California in Santa Clara County.

It is incumbent upon the Board to thoroughly investigate all of these allegations, and bring legal action to protect the Company and its shareholders, including actions for breach of fiduciary duty, unjust enrichment and other available causes of action. The potential defendants include not only executives but Board members who have not conscientiously worked to ensure that Intel conducted its business solely through lawful means. The Board should also investigate and evaluate any ongoing activities that may violate the antitrust laws, as such conduct could expose Intel to greater scrutiny and harm than it already faces from past activities including, but not limited to, governmental enforcement actions, competitor lawsuits, and treble damage penalties.

We ask finally that the Board review its own actions and those of its members concerning the manner in which they did or did not appropriately discharge their fiduciary duties with respect to the underlying claims

Please advise me within 60 days regarding what action you intend to take in response to this Demand.

Yours truly,

Laurence D. Paskowitz

**Exhibit D**



# ORRICK

September 25, 2009

Michael D. Torpey
(415) 773-5932
mtorpey@orrick.com

*VIA FEDERAL EXPRESS*

Laurence D. Paskowitz, Esq.
Paskowitz & Associates
60 East 42nd Street, 46th Floor
New York, NY 20165

Re:     Intel Corporation - Ms. Villari's Shareholder Demand

Dear Mr. Paskowitz:

I write to provide you with an update regarding Ms. Villari's demand on the Board of Directors of Intel Corporation ("Intel" or the "Company").

As you know, the Audit Committee has been authorized to review the issues raised by Ms. Villari's demand, including her request that the Board secure tolling agreements from certain individuals. Following its review, the Audit Committee will report to the full Board of Directors which will decide how it wishes to proceed.

We appreciate your willingness to meet with us last month. We felt the meeting was helpful and productive. We have provided the materials you prepared to the Audit Committee members for their consideration. The Audit Committee will be reporting to the Board of Directors at a regularly scheduled Board meeting in the coming quarter. We will keep you apprised.

Should you have any questions in the meantime, or if you would like to discuss this matter further, please do not hesitate to contact me at (415) 773-5932 or Amy Ross at (415) 773-5723.

Very truly yours,

Michael D. Torpey / by jmmz

Michael D. Torpey

OHS West:260728918.1

# Exhibit E



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
THE ORRICK BUILDING
405 HOWARD STREET
SAN FRANCISCO, CALIFORNIA 94105-2669

*tel* +1-415-773-5700
*fax* +1-415-773-5759

WWW.ORRICK.COM

November 3, 2008

Michael D. Torpey
(415) 773-5932
mtorpey@orrick.com

*VIA U.S. MAIL*

Laurence D. Paskowitz, Esq.
Paskowitz & Associates
50 East 42nd Street, 46th Floor
New York, NY 10165

Re:   Intel Corporation/Annette Villari's Shareholder Demand

Dear Mr. Paskowitz:

I write as a follow up to my September 25, 2008 letter.  As you are aware, on June 12, 2008 you sent a letter to Intel Corporation ("Intel" or "the Company") on behalf of Ms. Annette Villari.  Ms. Villari has made a demand that Intel's Board of Directors "investigate certain claims, initiate appropriate legal action, and take necessary and appropriate remedial measures to ensure that the corporation is protected from further harm" in connection with what you have characterized as Intel's "anticompetitive business practices."

As you know, the Audit Committee retained our firm to assist it with the evaluation of Ms. Villari's demand.  We hereby reiterate our request that you provide us with all facts, information and documents you have, or are aware of, to support Ms. Villari's allegations that Intel has engaged in "anticompetitive practices" so that the Audit Committee may consider such information in the course of its evaluation.

Please forward all such documents or information to me at the above address at your earliest possible convenience.

Very truly yours,

Michael D. Torpey

# Exhibit F

# EXHIBIT B

# PASKOWITZ & ASSOCIATES

60 East 42nd Street—46th Floor

New York, New York 10165

TEL: (212) 685-0969

FAX: (212) 685-2306

lpaskowitz@pasklaw.com

June 8, 2009

**Via Overnight Mail**
Michael D. Torpey, Esq.
ORRICK, HERRINGTON & SUTCLIFFE, LLP
405 Howard Street
San Francisco, CA 94105

Re:   Supplemental Shareholder Demand on the Intel Corporation Board of
Directors to Investigate Claims, Initiate Appropriate Legal Action, and
Take Necessary and Appropriate Remedial Measures

Dear Mr. Torpey:

As you know we represent Intel shareholder Annette Villari. On behalf of our client, this letter constitutes a Supplemental Demand upon the Intel Board of Directors based on material developments in the matter to expeditiously investigate claims, initiate appropriate legal action, and take necessary and appropriate remedial measures to ensure that Intel Corporation ("Intel" or the "Company") is protected from further harm.

On May 13, 2009, it was announced that Intel had been fined $1.45 billion by the European Competition Commission — the largest fine ever assessed for a case involving monopoly abuse. The EC called for changes in the way Intel sells the microprocessors at the heart of most of the world's PCs. It was held that Intel broke EU rules by using rebates it offered to large computer manufacturers -- its customers – in ways that could penalize them if they bought too many chips from its smaller rival.

Previously the Japan Fair Trade Commission, in a warning to Intel's Japan unit, said the chipmaker attempted to stifle competition in Japan by offering rebates to Japanese PC makers if they agreed to limit their use of others' processors. The Korea Fair Trade Commission previously ruled that Intel paid rebates to South Korean computer firms to undercut arch rival Advanced Micro Devices, Inc. ("AMD"), and ordered Intel pay a substantial fine for violating fair trade rules. Intel is now subject to renewed investigatory

Michael D. Torpey, Esq.                                      June 8, 2009
Page 2

interest by the Federal Trade Commission. Further, a private antitrust action by AMD is
scheduled to proceed to trial next year.

In your letter of January 29, 2009, you indicated that the Intel Board through its Audit
Committee had deferred any action on Ms. Villari's demand citing certain enumerated
reasons. We believe that further deferral is unwarranted in light of the EC's ruling. Ms.
Villari previously demanded that the Board thoroughly investigate all referenced allegations,
and bring legal action to protect the Company and its shareholders, including damages
actions for breach of fiduciary duty, unjust enrichment and other available causes of action.
The potential defendants include not only executives but also Board members who have not
conscientiously worked to ensure that Intel conducted and/or conducts its business solely
through lawful means. Now that the EC has rendered its decision, there is no justification for
delaying investigation of possible wrongdoing.

Ms. Villari also previously demanded that the Board investigate and evaluate any
ongoing activities that may cause the Company to violate the antitrust laws, as such conduct
could expose Intel to greater scrutiny and harm than it already faces from past activities
including, but not limited to, governmental enforcement actions, competitor lawsuits, and
treble damage penalties. We request that the Audit Committee investigation and analysis go
forward at once so that it can determine what corporate governance changes are required, and
can effect such changes on an expedited basis so that the Company might avoid any further
violations of the antitrust laws. In light of the EC decision, this has certainly become an
immediate priority.

I believe that it would be worthwhile for us to meet in the very near future. I look
forward to hearing from you in that regard. I also respectfully request that the Audit
Committee make its best efforts to provide us with a report within 30 days regarding what
action it intends to take in response to this Supplemental Demand.

Yours truly,

Laurence D. Paskowitz

# Exhibit G

# PASKOWITZ & ASSOCIATES

60 East 42nd Street—46th Floor

New York, New York 10165

TEL: (212) 685-0969

FAX: (212) 685-2306

lpaskowitz@pasklaw.com


July 29, 2009

By Overnight Mail
Michael Torpey, Esq.
Orrick, Herrington & Sutcliffe, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669


Re:     Intel Corporation/Annette Villari's Shareholder Demand

Dear Mr. Torpey:

Thank you for your letter of July 22, 2009. While we understand the Audit Committee's desire to proceed in a cautious and deliberative manner, we are quite concerned that any further delay in performing a full investigation of the matters detailed in our previous correspondence will jeopardize Intel's ability to protect its interests, and obtain any meaningful relief.

As you know, Ms. Villari sent her initial letter on June 12, 2008, almost 14 months ago. During that time, her counsel has delayed taking action at the request of the Audit Committee and the Board. We are aware, however, that in previous litigation involving some of the same matters raised by Ms. Villari, present and former directors of Intel named as defendants urged the Court to adopt a very narrow view of the applicable statute of limitations. *See e.g. In re Intel Corporation Derivative Litigation*, No. 08-CV-93 (JJF)(D. Del), Memorandum of Law in support of motion to dismiss or stay dated September 5, 2008, pp. 21-23.

While we do not agree that the relevant limitations periods have already passed, any further substantial delay in action by Intel could allow many key defendants to advance arguments as to a limitations bar. We therefore must request that the Audit Committee immediately obtain tolling agreements from all Board members and all senior members of management during the relevant period so that all potential claims may be preserved. We make this request without prejudice to any argument Ms. Villari may have that the relevant limitations periods have been tolled or waived by the letters she has sent, and the responses she has received.

Michael Torpey, Esq.
July 29, 2009—Page Two


     There are a number of other issues we wish to raise which may be more appropriately and productively addressed by telephone conference call.  I will contact you shortly to arrange for a convenient time to have such a conference call, which would include myself, and Roy L. Jacobs, Esq., who is working with me on this matter.  I look forward to speaking with you soon.

                                        Sincerely yours,

                                        Laurence D. Paskowitz

# Exhibit H

# EXHIBIT C

# PASKOWITZ & ASSOCIATES

60 East 42nd Street--46th Floor

New York, New York 10165

TEL: (212) 685-0969

FAX: (212) 685-2306

lpaskowitz@pasklaw.com

October 14, 2009

By Overnight Mail
Michael Torpey, Esq.
Orrick, Herrington & Sutcliffe, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669

Re:   Intel Corporation/Annette Villari's Shareholder Demand; Joinder in Demand by
Shareholder Charles A. Gilman

Dear Mike:

Thank you for your letter of September 25, 2009. We are disappointed in this response as we expected the Board to act with alacrity on our request for tolling agreements, especially in light of the directors' prior invocation of limitations defenses. I must reiterate that we feel these delays may be prejudicial.

Please also inform the Board and the Committee that another client of my firm, Mr. Charles A. Gilman, joins in Ms. Villari's demand. Documentation of Mr. Gilman's long-time and current shareholder status will be sent to you shortly. For the sake of efficiency, Mr. Gilman adopts and incorporates by reference herein all previous demands and other communications made by us on behalf of Ms. Villari, both written and oral.

Sincerely yours,

Laurence D. Paskowitz

CERTIFIED: 12/7/09
AS A TRUE COPY:
ATTEST:
PETER T. DALLEO, CLERK
BY Debra K Smith
Deputy Clerk

# Exhibit I



# ORRICK

November 30, 2009

Michael D. Torpey
(415) 773-5932
mtorpey@orrick.com

**FEDERAL EXPRESS**

Laurence D. Paskowitz, Esq.
Paskowitz & Associates
60 East 42nd Street, 46th Floor
New York, NY 10165

Re:   Intel Corporation - Annette Villari and Charles Gilman's Shareholder Demand

Dear Mr. Paskowitz:

I write as a follow up to my September 25, 2009 letter. As you know, on June 8, 2009, your client, Ms. Annette Villari, made a Supplemental demand on Intel Corporation's ("Intel" or the "Company") Board of Directors to "investigate certain claims, initiate appropriate legal action, and take necessary and appropriate remedial measures to ensure that the Corporation is protected from further harm" in connection with what you have previously characterized as Intel's "anticompetitive business practices." Further, on July 29, 2009, you requested that the Board seek tolling agreements from all individuals who were Board members or members of senior management during the period it issue in the various underlying antitrust related litigations that are the basis for your client's demand.

In mid-October 2009, you also notified us that another client of your firm, Mr. Charles Gilman, "adopt[ed] and incorporate[ed] by reference" all of Ms. Villari's previous demands. Since that time, we understand that you have filed a derivative lawsuit against Intel's Board members in the United States District Court for the District of Delaware on Mr. Gilman's behalf alleging that his purported demand was somehow wrongfully rejected despite the fact that the Board had not taken any action to reject his demand.

As we explained when we met with you on August 27, 2009, the Board asked that the Audit Committee review and consider Ms. Villari's demand, including the request to secure tolling agreements from certain individuals. We appreciate the time you took to meet with us regarding these issues generally and your client's concerns specifically. We also appreciate the materials and analysis that you prepared for the Audit Committee's consideration. The Audit Committee received and considered the materials you prepared and, in addition, we relayed the various concerns you expressed to us during our meeting.

The Audit Committee reported to the Board at its recent Board meeting held on November 11, 2009. At that time, the Board was told about Mr. Gilman's "adoption" and "incorporation" of Ms.

OHS West:260782914.1



ORRICK

Laurence D. Paskowitz, Esq.
November 30, 2009
Page 2

Villari's demand. After due consideration, at the recommendation of the Audit Committee, the Board has decided to defer any determination regarding Ms. Villari's and Mr. Gilman's demand. In considering the Audit Committee's recommendation, the Board considered the following factors, among others:

- That the issues raised in the underlying matters (including, among others, those which you mention in your demand letters), are legally and factually complex and the Company would benefit from additional administrative and judicial proceedings in connection with those questions;

- The factual records in the underlying matters are not yet fully developed, and the Company expects further factual development in additional proceedings and believes it will benefit from a more fully developed factual record;

- The issues raised in the demand are legally and factually intertwined with those of ongoing underlying matters and any action by the Company at this time could unnecessarily expose the Company to liability, including potential liability in the underlying matters;

- Any further action on Ms. Villari's and Mr. Gilman's demand at this time could have an adverse effect on the Company's business; and

- Any action against the Company's directors and officers would require the Company to indemnify them for the substantial costs and expenses (including attorneys' fees) they would incur in defending the actions which the Company does not believe is appropriate at this time.

Further, in considering your request to secure tolling agreements, the Board noted that there is a shareholder derivative action entitled *Del Gaizo v. Otellini, et al.*, Case No. 1-08-CV-116137, pending in Santa Clara Superior Court (filed on June 27, 2008). This litigation names many of the same individuals from whom you asked the Board secure tolling agreements, and asserts similar conduct to the conduct you have alleged in the complaint filed by Mr. Gilman. Moreover, that case names "Doe" defendants. In light of the existence of the pending litigation, the Board does not feel it is necessary to secure tolling agreements at this time.

The Board will continue to monitor the underlying antitrust matters.

Please do not hesitate to contact me at (415) 773-5932 or Amy Ross at (415) 773-5723 if you would like to discuss this matter further.



**ORRICK**

Laurence D. Paskowitz, Esq.
November 30, 2009
Page 3

Very truly yours,

Michael D. Torpey

# Exhibit J



## BERMAN DeVALERIO

November 12, 2009

*Via Overnight Mail*

To the Board of Directors of Intel Corp.
c/o Craig R. Barrett, Chairman
2200 Mission College Blvd.
Santa Clara, CA 95054-1549

      Re:    *Shareholder Demand on the Intel Board of Directors to Investigate*
               *Claims, Initiate Appropriate Legal Action, and Take Necessary and*
               *Appropriate Remedial Measures*

Dear Members of the Intel Board of Directors:

      We represent the Louisiana Municipal Police Employee's Retirement System, a defined-benefit pension fund for police officers of the State of Louisiana, and a large institutional shareholder of Intel Corporation ("Intel"). On behalf of our client, please be on notice that this letter constitutes a formal demand for the Intel Board of Directors to investigate the claims discussed herein, initiate appropriate legal action, and take necessary and appropriate remedial measures to ensure that the corporation is protected from further harm.

      As you are aware, there has been another significant legal development in the ongoing controversy regarding Intel's potentially anticompetitive business practices. Just today Intel announced that it has entered into a $1.25 billion settlement with rival Advanced Micro Devices, Inc. ("AMD") that will end the company's legal battles with AMD over Intel's sales tactics. AMD filed suit against Intel in June 2005 in the United States District Court for the District of Delaware alleging that Intel and its Japanese subsidiary engaged in various actions in violation of the Sherman Act and the California Business and Professions Code, including, among other things, providing discounts and rebates to Intel manufacturer and distributor customers conditioned on exclusive, or near exclusive, dealings that allegedly unfairly interfered with AMD's ability to sell its microprocessors, interfering with certain AMD product launches, and interfering with AMD's participation in certain industry standards-setting groups. The settlement means that Intel and AMD will not be going to trial, as scheduled, in March 2010. As part of the settlement, AMD has agreed to withdraw its regulatory complaints worldwide. However, the settlement does not impact the antitrust actions and fines imposed by the European and Asian regulators.

One Liberty Square  •  Boston, MA  ■  02109  #  Tel: 617-542-8300  ■  Fax: 617-542-1194  «  www.bermandevalerio.com

BOSTON                SAN FRANCISCO            PALM BEACH GARDENS

## Ǝꓓ
### BERMAN DeVALERIO

Page 2
To the Board of Directors of Intel Corp.
c/o Craig R. Barrett, Chairman
November 12, 2009

Recently, on November 4, 2009, New York State Attorney General Andrew Cuomo filed a federal antitrust lawsuit against Intel charging that Intel violated state and federal anti-monopoly laws by engaging in a worldwide, systematic campaign of illegal conduct in order to maintain its monopoly power and prices in the market for microprocessors. The suit seeks to bar further anticompetitive acts by Intel, restore lost competition, recover monetary damages suffered by New York governmental entities and consumers, and collect penalties. The factual allegations in their entirety can be found in the November 4, 2009 Complaint in *State of New York v. Intel Corp.*, C.A. No. 1:09-cv-00827.

In a press release concerning the lawsuit, Attorney General Cuomo stated, "[r]ather than compete fairly, Intel used bribery and coercion to maintain a stranglehold on the market. Intel's actions not only unfairly restricted potential competitors, but also hurt average consumers who were robbed of better products and lower prices. These illegal tactics must stop and competition must be restored to this vital marketplace." Please see *Attorney General Cuomo Files Antitrust Lawsuit Against Intel Corporation, The World's Largest Maker of Microprocessors*, Nov. 4, 2009 (available at http://www.oag.state.ny.us/media_center/2009/nov4a_09.html).

In addition to the AMD settlement and the New York Attorney General's action, Intel was dealt a severe blow on May 13, 2009, when the European Commission ("EC") imposed a staggering *$1.45 billion* fine for violation of EC Treaty antitrust rules on the abuse of dominant market position. This fine is the largest ever levied by the EC. The EC found Intel guilty of engaging in illegal anticompetitive practices to exclude competitors from the market for computer chips called x86 central processing units ("CPU's"). The complete factual allegations and conclusions leading to the EC action and fine are contained in the May 13, 2009 EC decision, Case Comp/C-3/37.990/Intel. The relevant press release, dated May 13, 2009, is available at http://europa.eu/rapid/pressReleasesAction.do?reference=IP/09/745.

Furthermore, and significantly, as detailed in Intel's November 2, 2009 10-Q filing with the Securities Exchange Commission ("SEC"), Intel is currently party to a number of legal proceedings and regulatory actions challenging its competitive practices, contending generally that it improperly conditions price rebates and other discounts on its microprocessors on exclusive, or near exclusive, dealings by some of Intel's customers to exclude competition.

In June 2008, the U.S. Federal Trade Commission announced a formal investigation into the sales practices of Intel. That investigation is ongoing. Intel has also faced regulatory action by the Korean Fair Trade Commission ("KFTC"), which announced in June 2008 that it was ordering Intel to pay more than $25 million for violation of its fair trade laws.



## BERMAN DeVALERIO

Page 3
To the Board of Directors of Intel Corp.
c/o Craig R. Barrett, Chairman
November 12, 2009


In addition to Intel's issues with international regulatory authorities, numerous private lawsuits against the company are currently being prosecuted. According to Intel's latest SEC filing, at least 82 separate class actions have been filed that repeat AMD's antitrust allegations and allege various consumer injuries. These actions have been filed in the U.S. District Courts for the Northern District of California, Southern District of California, District of Idaho, District of Nebraska, District of New Mexico, District of Maine, and District of Delaware, as well as in various California, Kansas, and Tennessee state courts. All of the federal class actions and the Kansas and Tennessee state court class actions have been consolidated by the Multidistrict Litigation Panel to the District of Delaware and are being coordinated for pre-trial purposes with the AMD litigation. All California class actions have been consolidated to the Superior Court of California in Santa Clara County. The Court in the California action has stayed that proceeding until after the Delaware Federal Court rules on a similar motion in the coordinated actions.

It is incumbent upon the Board to thoroughly investigate all of these allegations, and bring legal action to protect the Company and its shareholders, including actions for breach of fiduciary duty, unjust enrichment, and other available causes of action. The potential defendants include not only executives but Board members who have not conscientiously worked to ensure that Intel conduct its business solely through lawful means. The Board should also investigate and evaluate any ongoing activities that may violate the antitrust laws, as such conduct could expose Intel to greater scrutiny and harm than it already faces from past activities including, but not limited to, governmental enforcement actions, competitor lawsuits, and treble damage penalties.

We ask that the Board review its own actions and those of its members concerning the manner in which they did or did not appropriately discharge their fiduciary duties with respect to the underlying claims

Please advise me within 60 days regarding what action you intend to take in response to this Demand.

Yours truly,

Jeffrey C. Block

# Exhibit K



# ORRICK

ORRICK, HERRINGTON & ...
THE ORRICK BUILDING
405 HOWARD STREET
SAN FRANCISCO, CALIFORN... .

tel +1-415-773-5700
fax +1-415-773-5759

WWW.ORRICK.COM

December 1, 2009

Michael D. Torpey
(415) 773-5932
mtorpey@orrick.com

*VIA FEDERAL EXPRESS*

Jeffrey C. Block, Esq.
Berman DeValerio
One Liberty Square
Boston, MA 02109

Re:   Intel Corporation/Louisiana Municipal Police Employee's Retirement System Shareholder Demand

Dear Mr. Block:

I write in response to the November 12, 2009 letter you sent to the Board of Directors of Intel Corporation ("Intel" or "the Company") on behalf of Louisiana Municipal Police Employee's Retirement System ("Louisiana Municipal"). As you know, Louisiana Municipal has made a demand that Intel's Board of Directors "investigate claims," "initiate appropriate legal action" and take necessary and appropriate remedial measures to ensure that the corporation is protected from further harm" in connection with what you have characterized as Intel's "anticompetitive business practices."

We have been retained by the Board to assist it with the evaluation of Shareholder demands. We will make the Board aware of your demand and expect that it will take up the matter in the near future. I will be in touch once the Board has decided how it wishes to proceed in responding to your demand.

Please contact me at the number above or my colleague, Amy Ross, at (415) 773-5723 if you wish to speak further.

Very truly yours,

Michael D. Torpey

OHS West:260784817.1

**Exhibit L**



**BERMAN DeVALERIO**

December 7, 2009

<u>Via E-Mail and First Class Mail</u>
Michael D. Torpey, Esq.
Orrick, Herrington & Sutcliff, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669

Mtorpey@orrick.com

Re:   <u>**Louisiana Municipal Police Retirement System/Demand Letter**</u>

Dear Mr. Torpey:

Thank you for the letter of December 1, 2009 informing us that you and your firm have been retained by the Intel Board to assist with the evaluation of the demands. As you say in your letter, you expect the Board to "take this up in the near future."

We have recently communicated with counsel for derivative plaintiff Charles A. Gilman who, as you know, has brought an action in the District of Delaware. It is our understanding that Gilman and another shareholder represented by the same counsel made a demand on the Intel Board roughly 18 months ago. It is also our understanding that you recently wrote these counsel and informed them of the Board's continuing position that the demand to take action is premature for a variety of reasons.

Please let me know by the end of the week if the Board intends to treat the demand by my client, the Louisiana Municipal Police Retirement System, any differently than the demand already made by Mr. Gilman.

I look forward to your response.

Very truly yours,

Jeffrey C. Block

cc:   Randall Roche, Esq.
      Laurence D. Paskowitz, Esq.
      Roy L. Jacobs, Esq.

Intel/c/torpey_12_7_09

# Exhibit M



**ORRICK**

December 14, 2009

Michael D. Torpey
(415) 773-5932
mtorpey@orrick.com

*VIA FEDERAL EXPRESS AND EMAIL (PDF)*

Jeffrey C. Block, Esq.
Berman DeValerio
One Liberty Square
Boston, MA 02109

Re:    Intel Corporation/Louisiana Municipal Police Employee's Retirement System Shareholder
       Demand

Dear Jeff:

I received your letter dated December 7, 2009 regarding Louisiana Municipal Police Retirement
System's ("Louisiana Municipal") Demand on the Board of Intel Corporation ("Intel") to investigate
certain claims.  At this time I cannot tell you how the Intel Board will respond to Louisiana
Municipal's demand.  The Board had not yet considered your client's demand, but intends to do so
at its next regularly scheduled Board meeting which is scheduled for January 2010.

I will be in touch as soon as the Board has considered your client's demand.  In the meantime, I am
happy to discuss the matter.  Call me at (415) 773-5932 or my colleague, Amy Ross at (415) 773-
5723.

Very truly yours,

Michael D. Torpey

OHS West:260794188.1