# Exhibit N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
LOUISIANA MUNICIPAL POLICE                      :
EMPLOYEES' RETIREMENT SYSTEM,                   :
                                                :
              Plaintiffs,                       :
                                                :
         --against--                            :       C.A. No.
                                                :
PAUL S. OTELLINI, CRAIG R. BARRETT, D. JAMES    :
GUZY, SR., DAVID S. POTTRUCK, JANE E. SHAW,     :
DAVID B. YOFFIE, CHARLENE BARSHEFSKY,           :
JAMES D. PLUMMER, SUSAN L. DECKER,              :
CAROL BARTZ, JOHN J. DONAHOE, and               :       JURY TRIAL DEMANDED
FRANK D. YEARY,                                 :
                                                :
              Defendants,                       :
                                                :
         --and--                                :
                                                :
INTEL CORP.,                                    :
                                                :
              Nominal Defendant.                :
-----------------------------------------------------x
```

## SHAREHOLDERS' DEMAND-MADE DERIVATIVE COMPLAINT

Plaintiff, through its undersigned attorneys, alleges as follows on information and belief, except as to those matters that are personal to Plaintiff, which are alleged on personal knowledge:

### NATURE OF THE ACTION

1.   This derivative action is brought by Plaintiff, an institutional shareholder of nominal defendant Intel Corp. ("Intel" or the "Company"). Plaintiff, along with other Intel shareholders, have made demands upon the Intel Board of Directors (the "Board") to take actions to redress the decade long anti-competitive actions undertaken by Intel, its senior management

1

and members of the Board.   The Board has repeatedly failed to take any action with respect to the demands made upon it.  Plaintiff Gilman's demand on the Board was made more than 18 months ago and, to date, the Board has refused to take any action in response to the Gilman demand, tacitly conceding that it is refusing demand.  Plaintiff Louisiana Municipal Police Employees' Retirement System ('MPERS') has made a similar demand on the Board and the MPERS demand has been met with a similar response.  In the face of facts demonstrating a decade long antitrust scheme approved and implemented by Intel's most senior executives, including CEO Paul S. Otellini ('Otellini'), the Intel Board responded to those demand letters by: (a) refusing to appoint an independent committee of directors empowered to review the charges and take remedial action; (b) refusing outright *to perform any investigation at all*; (c) asking the Audit Committee of the Board to "respond" to the demand, with full knowledge that in previous litigation involving many of these same matters a majority of the Audit Committee members (without any investigation) informed this Court that they had concluded that the underlying claims exhibited an "utter lack of merit,"[1] (e) attempting to run out the statute of limitations so that no claims could ever be personally asserted against them; and (f) refusing to enter into tolling agreements in the hope that the limitations period will indeed expire, whereas fiduciaries acting in good faith would enter into such agreements so that meritorious claims could be preserved.

2.      As a result, the Board members have not acted independently with regard to demands made by Plaintiff and other shareholders, but rather have responded as would guilty parties seeking to evade responsibility.  Therefore, Plaintiff has made all possible efforts to

---

[1] Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Consolidated Complaint or, in the Alternative, to Stay this Action, dated September 5, 2008, pp. 21-23, filed in *In re Intel Corp. Derivative Lit.*, C.A. No. 08 CV 93 (JJF) (D. Del.).

2

obtain action prior to initiating this suit, as required under Fed. R. Civ. P. 23.1, and Delaware law.

3.     The antagonism of the Board to shareholder demand letters is readily explained by growing evidence that the antitrust scheme, which spanned three continents and has led to over $2.7 billion in fines and settlements, was personally directed by CEO Otellini and by Intel's former Board Chairman, Craig R. Barrett ("Barrett").   Indeed, numerous instances of direct involvement by Otellini and Barrett in unlawful activities are detailed in an action recently filed in this Court by the New York State Attorney General.[2]

4.     The Board, directly and through its Audit Committee, are charged with monitoring, investigating, and remediating any unlawful acts committed by Intel or its executives.  The Audit Committee charter describes its general function as follows:"The purpose of the Audit Committee is to represent and assist the Board of Directors in its general oversight of the company's accounting and financial reporting processes, audits of the financial statements, internal control and audit functions, *and compliance with legal and regulatory requirements and ethical standards adopted by the company.*"

5.     The Audit Committee also must"review[] matters related to the corporate compliance activities of the company, including the review of reports from the company's Ethics and Compliance Oversight Committee [ECOC] and other related groups."

6.     Intel's corporate Code of Conduct stresses compliance with antitrust laws, and notes that:"Violating antitrust laws is a serious matter and could place both the company and the individual at risk of substantial criminal penalties."

---

[2] The factual allegations contained in the November 4, 2009 Complaint in *State of New York v. Intel Corp.*, C.A. No. 1:09-cv-00827 (unassigned) ("New York State Action"), are incorporated by reference herein.

7.     The ECOC, on a quarterly basis, "invites various organizations within Intel to assess and report on ethics and compliance in their respective businesses. Each organization completes an ethics and compliance self-assessment that covers four major areas: *legal and regulatory risks and supporting compliance programs;* ethics and Code of Conduct activities and tone; internal control environment and activities; and business continuity planning and preparedness. *Legal and regulatory risk areas are also reviewed against the Federal Sentencing Guidelines. The ECOC reviews the self-assessment reports, and provides feedback and recommendations that are tracked to closure.*[3] (emphasis added).

8.     Through its receipt and review of ECOC reports, the Audit Committee would have known not only of the allegations against Intel by various private parties and regulatory authorities in several nations, but also that the allegations had a strong basis in fact, and threatened Intel with large fines and large private damages awards, which might even imperil the Company's existence.  Nonetheless, neither the Audit Committee nor the Board called a halt to the unlawful actions of Intel's senior executives, and its members made common cause with the wrongdoers in seeking to stymie any investigatory or remedial efforts.  The actions of the Board members went far beyond conscious inaction, but included affirmative statements to this Court that the underlying claims were utterly without merit.  Their misconduct has been further aggravated by attempts in the previous "demand futile" shareholder action by plaintiff Martin Smilow ("*Smilow* Action") to spuriously invoke the statute of limitations so as to evade answering to the charges, and to "run out" the statute by foot-dragging and inaction in reaction to subsequent shareholder demands.

---

[3] Intel 2008 Corporate Responsibility Report, p. 24.

4

9.    This action is necessary to protect Intel and its shareholders from the actions of its senior executives, and a Board of Directors that aided and abetted them in a cover-up of their misconduct. Allegations and factual evidence of inexcusable wrongdoing have mounted in private and governmental actions in Japan, South Korea, the United States and the European Union.

10.    Intel has suffered serious repercussions as a result of this corporate malfeasance. For example, on May 13, 2009, the European Commission ("EC") levied a record *$1.45 billion* fine on the Company.[4] The EC ruling was the culmination of many years of investigation involving a review of, among other things, interviews, testimony and documents, some voluntarily produced, and others obtained by raids on Intel corporate headquarters. In imposing the largest fine in its history, the EC stated: "Intel has not convincingly argued or forwarded any convincing evidence showing negligence on its part *and the Commission has found Intel to have engaged in a strategy of exclusion*". EC Dec., p. 591, ¶ 1791.

11.    Specifically, the EC determined that Intel's executives had "engaged in two specific forms of illegal practice. First, Intel gave wholly or partially hidden rebates to computer manufacturers on condition that they bought all, or almost all, their x86 CPUs from Intel. Intel also made direct payments to a major retailer on condition it stock only computers with Intel x86 CPUs. Such rebates and payments effectively prevented customers - and ultimately consumers - from choosing alternative products. Second, Intel made direct payments to computer manufacturers to halt or delay the launch of specific products containing competitors' x86 CPUs and to limit the sales channels available to those products. The Commission found that those practices constituted abuses of Intel's dominant position on the x86 CPU market that harmed

---

[4]  The factual allegations and conclusions contained in the May 13, 2009 EC decision, Case Comp/C-3 /37.990/Intel, are incorporated herein by reference.

consumers throughout the EEA. By undermining its competitors' ability to compete on the merits of their products, Intel's actions undermined competition and innovation.[5]

12.     The EC action came in the wake of similar allegations and governmental enforcement actions in Japan and South Korea. Intel's senior executives were able to continue their scheme and cover-up and avoid direct evidence from being made know to the public in connection with those cases by settling the charges (as in the case of Japan), or by quickly agreeing to the payment of a relatively small fine (as in the case of South Korea). In the course of the EC investigation, Intel's senior managers and Board members (hereinafter sometimes referred to as "Intel's Compliance Fiduciaries") would have become privy to the knowledge that "the jig was up." They would have known that regulatory authorities that were determined to hold Intel to account had come into possession of direct and compelling evidence of wrongdoing. (Indeed, the EC Decision contains numerous examples of direct involvement in unlawful activities by Intel "senior executives," whose exact identities have been redacted from the decision at the insistence of Intel.). Instead of taking immediate remedial action that would have avoided or reduced the $1.45 billion fine, Intel's Board decided to stonewall the investigation, once again deriding compelling allegations as unfounded.

13.     In addition to the massive EC fine, Intel agreed on November 12, 2009, to pay another *$1.25 billion* to settle *In re Intel Corp. Microprocessor Antitrust Lit.,* MDL No. 05-1717-JJF (D. Del), a private antitrust lawsuit brought by Advanced Micro Devices, Inc. ("AMD")–one of Intel's competitors–in connection with the anticompetitive conduct addressed in the EC

---

[5]  EC press release dated May 13, 2009, available at
http://europa.eu/rapid/pressReleasesAction.do?reference=IP/09/745

proceeding that Intel's officers and directors allowed to flourish during the relevant time period ('AMD Action').[6]

14.    Going forward, the countenance of Intel's fiduciaries in the decade long anti-trust scheme may next result in harm to the Company from recently-filed actions by the United States Federal Trade Commission ('FTC'), New York State's Attorney General, and by dint of consumer class actions pending in this District and other state courts.  In particular, the non-monetary remedies sought by the FTC pose a substantial threat to Intel's ability to build market share in the burgeoning graphics processor unit ('GPU') market.

15.    It is the plain intention of Intel's Board members and senior managers that any damages, settlements or fines will be paid by Intel's innocent shareholders, and that the individual wrongdoers will completely escape responsibility. This action is brought so as not to allow that to happen:  Plaintiff is pursuing these claims so that individual responsibility cannot be evaded, and to ensure that necessary remedial measures are taken to prevent a recurrence of this type of activity.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs and the dispute is between citizens of different states.  This action is not brought collusively to confer jurisdiction on this Court.

17.    This action also falls under this Court's ancillary jurisdiction, as many of the claims asserted herein are substantially related to claims asserted under the federal antitrust laws in this Court by the State of New York, and by AMD in the AMD Action.

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391 because, in

---

[6] The factual allegations and conclusions contained in the ADM Action are incorporated herein by reference.

7

part, Intel is incorporated in Delaware, and because acts and offenses pertinent to the causes of action stated herein were committed in the State of Delaware.

## THE PARTIES

### Plaintiff

19.    MPERS is an institutional shareholder of Intel that currently holds approximately 110,000 shares of Intel common stock and has continuously held Intel shares since at least May 2004.  MPERS will fairly and adequately represent the interest of Intel in this litigation.  MPERS is a citizen of Louisiana.

### Defendants

20.    Nominal Defendant Intel is a Delaware corporation with its principal executive offices at Santa Clara, California.  It conducts business both directly and through wholly-owned and dominated subsidiaries worldwide.  Intel and its subsidiaries design, produce, and sell a variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries worldwide.

21.    Defendant Otellini is presently Intel's President and Chief Executive Officer, and a member of its Board of Directors.  Otellini has been President and CEO since 2005; was President and Chief Operating Officer from 2002 to 2005; and a director since 2002.  Otellini is a citizen of California.

22.    Defendant Barrett was an Intel director from 1974 until his retirement from the Board in May 2009.  Barrett was Intel's CEO from 1998-2005, and Chairman of the Board from 2005 through May 2009.  Barrett is a citizen of Arizona.

23.    Defendant D. James Guzy, Sr. ('Guzy') was a director of Intel from 1969 through May 2008.  Guzy served as a member of Intel's Audit Committee from at least 2001 through his

8

retirement in May 2008. Guzy is a citizen of Nevada.

24.     Defendant David S. Pottruck ("Pottruck") is presently an Intel director, and has been a director since 1998. Pottruck served as a member of Intel's Audit Committee from in or about May 2006 through in or about May 2008. Pottruck is a citizen of California.

25.     Defendant Jane E. Shaw ("Shaw") has served as a Board member since 1993, and as Board Chairman since May 2009. Shaw served as a member of Intel's Audit Committee from in or about May 2002 through at least 2009. Shaw is a citizen of California.

26.     Defendant David B. Yoffie ("Yoffie") is presently an Intel director, and has been a director since 1989. Yoffie is a citizen of Massachusetts.

27.     Defendant Charlene Barshefsky ("Barshefsky") is presently an Intel director, and has been a director since 2004. Barshefsky is a citizen of the District of Columbia.

28.     Defendant James D. Plummer ("Plummer") is presently an Intel director, and has been a director since 2005. Plummer served as a member of Intel's Audit Committee from in or about May 2004 through at least 2009. Plummer is a citizen of California.

29.     Defendant Susan L. Decker ("Decker") is presently an Intel director, and has been a director since 2006. Decker served as a member of Intel's Audit Committee from in or about May 2009 through at least 2009. Decker is a citizen of California.

30.     Defendant Carol Bartz ("Bartz") was an Intel director from January 2008 through March 2009. Bartz served as a member of Intel's Audit Committee from in or about January 2008 through in or about March 2009. Bartz is a citizen of California.

31.     Defendant John J. Donahoe ("Donahoe") is presently an Intel director, and has been a director since March 2009. Donahoe serves as a member of Intel's Audit Committee. Donahoe is a citizen of California.

9

32.     Defendant Frank D. Yeary ("Yeary") is presently an Intel director, and has been a director since March 2009.  Yeary serves as a member of Intel's Audit Committee.  Yeary is a citizen of California.

33.     The claims asserted herein against the present and former Intel officers and directors named above are divided into three types:

a.   *Active Misconduct Claims.*  These claims are brought against those persons who were officers and/or directors during the period in which it has been alleged Intel's executives engaged in active violations of the European, Japanese, South Korean and United States antitrust laws, and the Board of Directors failed in bad faith to rein in, ameliorate or countermand such misconduct, or to ensure cooperation with regulatory authorities.  Such claims, which pertain to the period 2001 through 2007, are brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, and Decker.

b.   *EC Regulatory Claims.*  These claims are brought against those persons who were officers and/or directors during the period from which the EC began investigating Intel's conduct in Europe through the imposition of the record fine in May 2009.  During this period, the relevant defendants failed to ensure that full and complete cooperation was provided to regulatory authorities; failed to hold accountable any person who engaged in unlawful misconduct; failed to take necessary remedial actions; and failed to work to with the EC on remedies or resolutions of the charges that would have reduced or even eliminated the EC fine.  Such claims are brought against defendants Otellini,

10

Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, Decker and Bartz.

c.  *Claims Related to Failure to Take Remedial Measures.*  These claims are brought against those persons who are presently Intel directors and who are consciously and in bad faith refusing to thoroughly investigate and address executive wrongdoing; attempting to stymie and defeat legitimate claims against directors and officers through efforts to cause such claims to lapse by dint of the statute of limitations; and failing in bad faith to enact necessary therapeutic and remedial measures.

## FACTUAL ALLEGATIONS

### INTEL'S ANTICOMPETITIVE SCHEME

**A.   THE MARKET**

**1.   x86 Microprocessor Technology**

34.    A microprocessor is a computer central processing unit ("CPU")—the "brains" of the computer—which is manufactured on a single, tiny wafer, or "chip." Such chips consist of materials called semiconductors, because of physical properties that allow the rapid, controlled flow or "conducting" of electrons through miniature pathways called circuits.  The manufacture of microprocessors is a highly specialized and costly process that takes place in factories called "fabs." The planning and construction of a single fab costs billions of dollars. Manufacture involves, among other highly complicated operations, the etching, using lasers, of circuitry into the chip on the model of a specially designed microarchitecture. This microarchitecture, however, serves only to implement what from the computer user's perspective is a more significant attribute of the microprocessor, *i.e.*, its "instruction set." The

11

instruction set provides the basic building blocks–the architecture–of the language that directs

the computer's operations, and that supports each of the software programs written to run on that

computer.

35.     The CPUs at issue here are known as "x86" CPUs, in reference to the specific

instruction set that the CPU recognizes. The x86 instruction set derives its name from the model

numbers of Intel processors initially introduced in the late 1970's. It is now ubiquitous in desktop

and notebook computers, and widespread in servers and workstations. The initial prominence of

the x86 instruction set was largely due to the fact that it was chosen by IBM in the early 1980s,

together with Microsoft's PC operating system, as one of the standard components of what

became known as IBM-compatible PCs. Generally speaking, a specific version of software

(including operating systems and/or applications) can only be run on machines that recognize a

specific instruction set.

36.     It was not IBM's intention, however, that Intel be the sole source of x86

microprocessors for its products. IBM arranged that AMD–which at that time produced

microprocessors with a competing architecture–would also be able to manufacture x86

microprocessors as a second source of supply. Intel, however, proved reluctant to share the

intellectual property that underlay the x86 instruction set, until it was compelled to do by an

arbitration award and a subsequent 1995 settlement with AMD. The settlement set the stage for

AMD to morph from a low-margin "clone" manufacturer–an imitator–into a true competitor. The

settlement secured AMD a shared interest in the x86 instruction set, but AMD was now required

to develop its own microarchitecture in order to implement that instruction set in its own

microprocessor products. When AMD attempted to do so, in the late 1990s, its efforts were met

with remarkable success. Intel's anticompetitive reaction to that success is what gives rise to this

action.

### 2.    The x86 Microprocessor Market

37.    Microprocessors are not sold directly for final use to businesses or consumers but as components–generally the most expensive and most important components–of desktop, mobile, and server computers. Those computers, in turn, are manufactured by"OEMs." The OEMs are, therefore, Intel's largest and most important customers. During the relevant period, the top 10 OEMs accounted for a large and increasing share of microprocessor sales worldwide - approximately 70%.

38.    It is not merely their size, but their strategic importance as"gatekeepers"to the lucrative commercial segment of the computer market that makes the top OEMs–most prominently Dell, HP, and IBM1–Intel's most important customers. For example, the highest margins are earned on server microprocessor products, and those are sold almost entirely through a handful of major OEMs. There are other avenues of distribution, but they are shrinking, as a result of OEM consolidation and other factors. Distribution through channels other than the OEMs serves principally to reach smaller, less profitable customers.

39.    Moreover, the production volumes and the brand awareness, as well as market credibility and experience that a microprocessor firm needs, depend on close cooperation with OEMs. Without detailed feedback and market intelligence from major OEMs, a microprocessor firm cannot adequately plan or test its products, for it is the OEMs that have the depth of customer and market knowledge required. Nor will any microprocessor firm be able to develop a strong and credible brand without the continuing support and cooperation of major OEMs.

### 3.    Intel's Monopoly Power

40.    Intel is a durable and extraordinarily powerful monopoly. For over a decade, it

has had extremely high market shares, measured at approximately 80-90% by revenue and 75% by unit volume. All major computer manufacturers depend on Intel in a variety of ways and are reliant on it for microprocessors, because AMD is, and in the foreseeable future will remain, unable to fulfill more than a small share of their requirements.

41.    Intel's monopoly power is protected by the extremely high barriers to entry into the x86 microprocessor market. First, design and manufacture of microprocessors requires access to intellectual property that only Intel and AMD have, so that substantial licensing issues would arise for any potential entrant. Second, manufacturing facilities for microprocessors fabs cost billions of dollars to design and construct (not to mention a great deal of time and regulatory approval). Third, this is an industry characterized by economies of scale, so that smaller manufacturers are at a cost disadvantage and often have difficulty achieving profits.

42.    Intel is extremely profitable; in contrast, the margins of its primary customers, the "top tier" OEMs, tend to be thin—often in low single digits. This enables Intel to directly affect OEMs' bottom-line quarterly profits, by favoring certain OEMs with lower prices and other subsidies, while punishing others.

43.    Intel's profits on its microprocessors reflect its monopoly power, as the OEMs that are compelled to do business with it know. A May 2002 internal HP document, comparing Intel's profitability with the narrow profit margins of OEMs, noted that "Intel has margins of a monopoly."

44.    Michael Dell, founder and CEO of Dell, Intel's largest customer, pointed out in a February 2004 internal email that not even Microsoft could exercise the pricing power that Intel has displayed: "[Intel] profits in the 2nd half of 2001 were $1.397B on revenues of $13.528B. In the 2nd half of 2003 they were $4.885B on revenues of $16.574B. In other words their sales

14

went up 22.5% and their profits went up 350%!  Or said another way their revenues went up

$3.046B and their profits went up $3.488B!!  Not even Microsoft can do that.  In other words

these guys have massive operating leverage."

     45.    OEMs also depend on Intel in such vital matters as allocation of products,

marketing support, and access to technical information.  An internal 2002 HP document

presentation slide noted that "[r]egardless of [s]cenario, Intel's [m]onopoly [will] [l]ikely [be]

[s]ustained" because of Intel's:

Relationships

    -  PC manufacturers, distributors, ISVs [Independent Software Vendors], BIOS [Basic

Input/Output System] suppliers, etc.

       -  Exerts substantial influence over PC manufacturers and their channels of distribution

          through the 'Intel Inside' brand program and other marketing programs

☐ Technology

    - Design capabilities for microprocessors, memory, chip sets, etc.

☐ Resources

    - Manufacturing, R&D, Marketing

* * *

☐ Control of industry standards

    - Intel has been able to control x86 microprocessor and PC system standards; can dictate

    type of products market requires of Intel's competitors

     46.    Intel has also created alliances with major OEMs that give it substantial leverage

over those OEMs.  Because OEMs rely on Intel's active participation in those alliances in the

form of funding, marketing, and intellectual property, OEMs cannot easily disregard Intel's

wishes.

47.     At the highest levels, Intel routinely takes steps to make its displeasure felt when
it feels threatened by OEM actions–even when those actions appear to be routine commercial
behavior. Intel's customers are constantly reminded where their primary loyalty should lie. For
example, in March 2006, Otellini received a courtesy "heads-up" from an HP executive that HP
was sponsoring an advertisement featuring HP's relationship with AMD and the theme of
customer choice. Otellini reacted: "So,..why did you feel compelled to do this? It is certainly
insulting to us and I do not see how it helps you....If we are your key partner, this is nothing but a
slap at us..I really don't want to get in a pissing contest over this..But running an ad touting 10
years with amd [sic] and 'choice' is not the behavior of someone who wants to bring our two
companies together."

48.     Similarly, in November, 2004, Otellini directly expressed his displeasure at
increases in IBM's AMD Opteron server sales to a senior IBM executive and reminded him of
IBM's reliance on Intel: "I just saw the [sales] tracker data for Q3...IBM opteron shipments in 2P
[dual-processor servers] doubled from 3.5Ku [thousand units] to 7. 5Ku..IBM was the fastest
growing opteron system seller!!..It is a bit disheartening to see IBM outgrow both Sun and HP in
Opteron shipments given our current engagement."

### 4.     The Threat From AMD's New Products

49.     In the late 1990s, Intel and AMD each began developing a new generation of
microprocessor products. Both were intended to increase processing speed by enabling
computers to address larger chunks of data at one time–in technical terms, to make the transition
from 32-bit to 64-bit computing.

50.     Intel (working together with HP) planned a new, more advanced microprocessor

16

product named Itanium, directed primarily at powerful, high-end servers or computers. Itanium would not be "backwards compatible" with the thousands of software applications and operating systems that Intel's corporate customers currently used. In other words, if a corporate customer wanted to use Intel's Itanium product, it would require it to make large new investments in software and programming, as well as computer hardware. For these and other reasons, Itanium was not well received by either the OEMs or their customers.

51.    At the same time, AMD was bringing its new products—including the Athlon microprocessor for PCs and the Opteron server microprocessor—to market. Those products represented AMD's first attempt at competing directly with Intel in the high-end segments of the market and had cost billions of dollars to develop. Opteron garnered virtually unanimous industry acclaim; AMD had succeeded with an innovative product design yielding performance advantages that effectively "leapfrogged" Intel. According to one publication, for example, tests performed by HP in 2004 for data-intensive applications showed that Opteron's performance was "anywhere from 40% all the way up to several hundred percent" over Intel's latest competitive product.

52.    Moreover, Opteron was much more energy-efficient than Intel's competing chip. This was a major consideration for the administrators of corporate data centers, where the amounts of electricity used and heat generated were critical factors. AMD engineers had also succeeded in developing a "Direct Connect Architecture" that enabled more efficient processing of information—a microprocessor's basic task. By connecting processors more directly with each other and with processor memory, AMD design architects accomplished the equivalent of providing six lanes, instead of two, for busy highway commuters, thereby achieving a higher performance data flow throughout the chip. The value of this architectural breakthrough would

17

increase as chips were designed to have multiple centers or "cores" for data processing.

### 5.   AMD Begins To Gain OEM And Customer Approval

53.    However, AMD's other task—using these products to enter the lucrative business segment of the market—was not one it could accomplish alone; that road led through the major OEMs. The business segment of the market included not only medium and small business customers, but also large enterprise customers—the Fortune 500 companies—that purchase expensive server computers. AMD was, as noted, helped by the fact that Intel's attempt to capture the high-end computing market with its Itanium product met with little enthusiasm from corporate purchasers. Those customers now had an AMD alternative that would allow them to achieve higher performance with AMD products, but continue to use their legacy 32-bit software, and make the transition to 64-bit computing on a schedule of their own choosing.

54.    By late 2004, Fortune Magazine was reporting on some initial success in AMD's enterprise strategy: "By employing its own chip-design innovations and exploiting strategic missteps by Intel, AMD has built alliances with the likes of Microsoft, Hewlett-Packard, Sun, Fujitsu, and IBM. Those tech powers mostly ignored AMD before, but now they see the chipmaker as a means to build market share by helping customers lower the cost of their IT operations. Almost overnight, AMD has become a major supplier of chips to the high-priced and high-margin world of servers, the big machines that power the internet and corporate networks." For Intel, AMD's opportunity was a competitive threat. Genuine competition with respect to server computers, which were generally sold to enterprise and government customers, would erode Intel's monopoly profits. And if large enterprise customers began to purchase AMD server products, they would consider purchases of AMD desktops and notebooks as well.

55.    What made the situation critical beginning in 2002-03, as shown in internal Intel

18

documents, was that Intel had recognized that it would be years before it would be able to design and develop its own x86 products to be genuinely competitive with those AMD was already marketing. In the industry parlance, Intel had a "big competitive hole" in its product development "roadmap."

## B.   INTEL'S EXERTION OF MONOPOLY POWER

### 1.   Intel Seeks To Limit AMD's Advances

56.   Faced with AMD's advances, Intel took steps to ensure that consumers would have limited opportunity to buy AMD's products. It accomplished that by bribing or coercing OEMs either not to offer, or to severely limit, AMD CPUs. That took place in the context of regular quarterly "negotiations" between OEMs and Intel–in which each OEM was in the position of one among several competitors, and Intel was, with respect to each of them, in the position of its essential and irreplaceable supplier. Because Intel disposed of the monopoly power and resources described above–advance knowledge of technical developments, ability to control supply, and above all, the ability to grant or withhold "rebate" payments and marketing money– Intel was in a position in which it could virtually dictate the terms of its deals.

57.   Intel's customers understood Intel's power and its strategy. As an internal HP document concluded in November, 2003: "[I]n this market, Intel dictates the rules of the game... and most of their actions can be understood in the context of keeping their distribution outlets (their customers) in line."

58.   Intel's acts and objectives were, therefore, radically different from legitimate marketing of its own products. Instead, Intel eliminated opportunities for AMD to gain sales, even when Intel's own sales would not directly benefit consumers. For example, Intel paid HP, as part of a 2002 agreement between the companies, to delay the launch of AMD-based

19

commercial desktop PCs for a six-month period in Europe and for a period of at least two months in Latin America. And Intel repeatedly pressured OEMs to guarantee it specified market shares of their sales, to ensure that the OEMs' marketing decisions would be controlled by Intel, rather than responsive to consumer demand.

59.    Thus, Intel entered into an agreement with HP that "capped" AMD's share of the commercial desktop segment at 5% of HP's worldwide sales. The "cap" provision was suppressed and kept secret, but numerous drafts, subsequent emails, and testimony confirm that it was central to the agreement and was observed by HP and enforced by Intel. In another 2006 agreement with HP, Intel effectively ensured that its share of HP's over-all sales would increase and AMD's would decrease. In all cases, however, Intel attempted to erase the most obvious traces of its anticompetitive scheme, by eliminating crucial but flagrantly objectionable provisions (such as the 5% cap) from written agreements (while nevertheless subsequently enforcing them), or altering language so that agreements about market shares were camouflaged as agreements regarding volume targets. The email request of the Intel executive who negotiated a 2006 deal with HP is typical: "Could you also take the mss [market segment share] references off and just leave everything at volume targets. Our counsel is very picky on that stuff.".

60.    Intel sought and frequently reached such agreements despite its awareness of "antitrust risk." In the context of Intel's negotiations with NEC, a Japanese OEM, an Intel executive in December of 2002 asked for new documentation because "[t]he original email minutes from [the] May meeting shows [sic] MSS target, and we can't use it…where it exposes us to anti-trust risk."

61.    The basic quid pro quo that Intel sought was invariably clear:  exclusion of competition was rewarded with valuable inducements, which were withheld if the OEMs

cooperation was not forthcoming.  This conditionality was Intel's basic *modus operandi*, as illustrated by the following exchange in May of 2002 between two Intel executives reacting, during negotiations with Sony, to the news that Intel was "getting hammered in the value segment" by AMD in the marketplace.  The first executive inquired: "Can [another Intel representative] discreetly hint to Sony that the Corp Marketing dollars are at risk if Intel's MSS with Sony in the value segment does not improve?"  The second responded: "We should not be shy about our unhappiness with our current MSS.  Intimating that the program is in jeopardy if they don't get their act together and work with us on this is clearly ok."

63.     A favorite Intel code word for the degree of exclusivity Intel desired from the OEMs was "alignment."  If they were not "aligned," OEMs could not expect favorable treatment from Intel with respect to rebates, technological development, pricing concessions, priority in obtaining supplies of scarce parts, or marketing funds.  As one Intel executive reported to another in April, 2002 regarding negotiations with Sony: "I also told him that Intel..would really have to make sure Sony and Intel are well 'Aligned' before we commit to doing this kind of comarketing program .If we can get [Sony] to agree on better alignment (MSS recovery in US NB [United States notebook computers], No more surprises), then, we can move forward with co-marketing discussion.  If not, we may have to think about alternatives."

63.     Similarly, a top HP executive reported back from a conversation with Otellini, then Intel's COO, concerning Intel's reaction to the news that HP was considering launching an AMD-based PC directed at commercial customers: "I talked to Paul Otellini last night [who asked whether] we have a transactional relationship or a partnership?  If we go with AMD on the commercial desktop, Intel equates this to a transactional relationship, and therefore we are foregoing the benefits of price pull-forwards [pricing concessions] to level the direct/indirect

21

playing field."

64.     Intel forced OEMs to choose between having a "strategic" or a "transactional"

relationship with Intel.  In Intel's parlance, a "strategic" relationship was one with a high degree of

exclusivity or "alignment." An OEM that opened itself to a relationship with another

microprocessor supplier–AMD–was regarded as desiring only a "transactional" relationship with

Intel, and Intel made clear in such cases that this would not be in the OEM's own best interest.

Thus, in April 2002, one Intel executive wrote to his counterpart at HP during HP's merger with

Compaq, reacting to a telephone conference between the CEOs of Intel and HP in which HP

indicated that it might develop products based on AMD's new microprocessor product, code-

named "Hammer": "[Intel's] Craig [Barrett] came away believing Compaq was leading HPAQ to a

transactional vs. a strategic relationship with Intel.  Not interested in partner of choice

relationship. [Intel was] [v]ery disappointed in the response on Hammer and why this is in

Compaq's best strategic interest."

65.     Intel often cloaked its exclusionary transactions with OEMs in the language of

pricing, using terms such as "CAP" ("Customer Authorized Price") or "ECAP" ("Exception to Customer

Authorized Price").  In fact, although Intel often exerted considerable effort to retroactively justify

its payments to OEMs in such terms, those "rebates" bore no genuine relationship to pricing based

on volume-related cost savings or genuine efforts to meet specific competitive offers.  The

purpose and effect of those payments–of which Intel executives were always mindful–was to

induce OEMs to exclude competition.  When it became too difficult to accomplish that using

"ECAPs"–purported discounts that were to be calculated on a product by product basis–Intel found

other methods, such as lump-sum payments, to reach its goal of "strategic alignment."

66.     For example, Intel for years paid Dell lump-sum rebates known initially at Intel

and Dell as "MOAP," an acronym for "Mother of all Programs," and later renamed "MCP," short for "Meet Competition Program." In an October 2003 internal Intel email regarding Intel's negotiations with Toshiba, Intel executives considered abandoning the burdensome "ECAP" method of "justifying" rebate payments and adopting a "dell like moap [mother of all programs]" method of payment, which facilitated increasing the size of the payments necessary to purchase Toshiba's cooperation (referred to as "the incremental cost of getting them competitive"): "With [Toshiba] I think we are at the end of the rope wrt [with respect to] product by product ecaps—too painful across the product line; I think we have to take them to a dell like moap program—the incremental cost of getting them competitive could be buried into the overall moap program...and then we can use the moap program to drive strategic alignment."

67.     In short, Intel first determined what payment or other benefit was necessary to enlist an OEM's cooperation in excluding AMD, and then sought to camouflage it with an apparently procompetitive "structure." As Dell's lead negotiator with Intel put it in a December 7, 2004 email to his Intel counterpart, explaining that Michael Dell wanted an additional $400 million rebate payment from Intel: "This is really easy...MSD [Michael Dell] wants $400M [million] more. I've been trying to figure out the structure." Intel's objective throughout was not to eliminate AMD entirely, but to crush an unprecedented threat to its monopoly power. As internal Intel emails show, Intel understood that not all market segments were vital to the maintenance of its monopoly power. "[L]ow cost/low value" output by AMD did not threaten the sources of Intel's monopoly profits, which included its—until 2002-03—unchallenged position in the high value, high-priced corporate segment.

68.     As a 1998 email exchange among Intel's top executives show Intel's strategic priority was "to avoid losing any SMB [small business] or corp skus [stock-keeping units]." At

23

that time, Intel was concerned about AMD's success in the retail market because it was "strengthening their position for movement to high end skus and entry into the business segment."

69.    Intel knew that if it could exclude AMD from the most lucrative segments of the microprocessor business, AMD could never become a genuine threat. For AMD to make sales was not sufficient; if it were to challenge Intel's monopoly power, it would have to make substantial high-value sales to major corporate customers. Only by raising the average selling price of its products could AMD challenge Intel's leadership. Intel, therefore, argued to OEMs that Intel would "continue to pigeon hole AMD to the bottom 10% of segment." Ottellini believed that AMD units which were sold on "the backstreets of beijing [sic] are wonderful ...[T]here is really no question that in the long run, I would like to see amd [sic] output spread round the world as a low cost/low value, unbranded brand". Accordingly, in the following years, Intel focused on barring AMD's access to this vital high ground–the corporate market and its gatekeepers, the major OEMs.

### 2.    OEMS's Reasons For Collaborating With Intel

70.    During the relevant period, OEMs understood that they would benefit from increased competition in the microprocessor market. If a competitor such as AMD could establish itself as a genuine alternative to Intel, they (and consumers) would enjoy more choices, lower prices, and better products. Nevertheless, they frequently decided, when faced with the array of incentives and threats that Intel brought to bear, to collaborate with Intel in restricting their purchases from AMD.

71.    There were several reasons for this. The most basic was that the payments for exclusivity Intel provided could make the difference between profit or loss for an OEM or a segment of its business. In 2002-2004, for example, HP's business desktop unit depended

24

significantly on Intel rebate payments for its financial success. In September 2004, HP executives considered whether to continue to adhere to a deal they had struck with Intel in 2002 to limit HP's marketing of AMD-based commercial desktop PCs by, among other things, agreeing to sell AMD-based PCs directly only, rather than through distributors. A senior HP executive vetoed the plan, on the ground that Intel would detect any cheating and that Intel's rebate payments were essential for the HP division involved to "make it financially."

72.     Dell's profitability also came to depend on Intel rebate payments. This was dramatically illustrated by internal Intel emails in April, 2004, arising from Dell's need to finalize its earnings forecast for the coming quarter. Essentially, Dell asked Intel for an additional $100 million; without it, as an Intel executive reported, Dell would "readjust their margin guidance downward." In other words, Dell would advise investors that it expected lower earnings.

73.     As Dell and HP both learned, once an OEM accepted Intel rebate payments as a substitute for marketing AMD-based products, it became very difficult to break the habit. Dell on several occasions assessed whether purchasing from AMD would be likely to improve its profitability. Dell's estimates of Intel's likely reaction, however, loaded the scales against AMD, because Dell assumed—with good reason—that those reactions could well be severe and disproportionate. In a February 27, 2003 internal Dell document, for example, it was assumed that "aggressive" purchases by Dell from AMD could result in "[r]etaliatory [rebate] reductions [by Intel that] could be severe and prolonged with impact to all LOBs [lines of business]." Another Dell document from March 2003 concluded that "[a]nticipated Intel response wipes out all potential opinc [operating income] upside from going with AMD."

74.     Moreover, Intel did not hesitate to threaten severe punishment for OEMs that marketed AMD in ways of which Intel disapproved. Even large and powerful firms, such as

IBM, took those threats very seriously. In 2003, for example, one IBM executive expressed doubts about the advisability of a proposed deal with AMD that would involve IBM marketing assistance, because Intel retaliation could severely damage IBM's multi-billion dollar business in low-end, industry standard servers, its "x-series" line: "It became clear to me that if we did all that on the marketing side [for AMD], Intel would kill our x-Series business." Later, in 2005, a senior IBM executive faced a similar issue: Key IBM customers wanted IBM to expand its line of AMD products, but a negative Intel reaction would put IBM in a "very difficult spot." The executive wrote: "I understand the point about the accounts wanting a full AMD portfolio. The question is, can we afford to accept the wrath of Intel.?It is a very hard question to deal with."

75.     Intel repeatedly used such threats to drastically raise the risks and costs of any OEM engagement with AMD. The choices the OEMs faced were skewed by Intel's willingness to use its monopoly power to retaliate against them, and their ability to use AMD products to lower their own costs and to satisfy consumer demand was held in check by their fear that Intel would strike back if they went too far. In a May 2006 "Strategy Update" document, HP carefully analyzed its relationship with Intel and concluded that the best strategy was to "[m]aintain judicious use of competitive bid situations to lower HP costs..but not so aggressively as to risk the strategic Itanium relationship," a joint venture with Intel on which HP's future high-end server business depended.

76.     The exclusionary agreements which the OEMs entered into with Intel were sometimes for terms of a year or less. But given the stable, long-term nature of Intel's monopoly power, this did not mean that opportunities for AMD were only temporarily deferred, or that OEMs could effectively reserve freedom of action for themselves at a later date. Nor did it mean that, when new supply opportunities arose at a particular OEM, such "design competitions" could

26

be decided by the OEMs on the merits, without taking account of Intel's monopoly power and its willingness to use it as a weapon. Rather, although each quarter might have appeared to bring new opportunities for AMD, Intel continually refreshed the range of threats and rewards with which it confronted the OEMs, so that their incentives remained largely constant.

77.    Given these realities, OEMs' frequent choices to collaborate with Intel to restrict opportunities for AMD and consumers were to be expected. Their circumstances were essentially those that economic theorists have described as the "prisoner's dilemma." If *all* of the OEMs had been willing to deal with AMD without Intel-imposed restrictions, the resulting strengthened competition would have benefited them all, as well as consumers, by lowering their microprocessor costs. Nevertheless, there were strong–often overwhelming–incentives for any *individual* OEM to accept the pay-offs–and avoid the punishments–which Intel dealt out. On the one hand, each individual OEM's collaboration with Intel resulted in less competition and higher prices for themselves and for consumers. On the other, Intel used the monopoly profits thus preserved to favor complicit OEMs, and punish recalcitrant ones. By complying with Intel's anticompetitive wishes, an OEM could gain substantial rewards, while its competitors, and consumers, suffered most of the consequences.

78.    Now, however, the scheme has come unraveled and been exposed, which is the inevitable fate of such extensive wrongdoing. The defendant directors should never have provided senior management with a free hand to resort to unlawful means to squash a worrisome competitor. The **$1.45 billion** EC fine and **$1.25 billion** AMD settlement may be just the beginning of the ruinous consequences Intel will suffer because senior executives were reckless and foolhardy, and the Board that was charged with putting halt to their malfeasance consciously decided to turn a blind eye.

27

## THE EC INVESTIGATION AND THE RECORD $1.45 BILLION FINE

79.    In response to complaints received about potential antitrust violations, on July 12, 2005, antitrust investigators from the European Commission and officials from at least four European countries raided Intel's European offices.

80.    On July 27, 2007, the European Commission issued a press release entitled "Competition: Commission Confirms Sending of Statement of Objections to Intel." The press release stated, in relevant part:

> The European Commission can confirm that it has sent a Statement of Objections (SO) to Intel on 26th July 2007. The SO outlines the Commission's preliminary view that Intel has infringed the EC Treaty rules on abuse of a dominant position (Article 82) with the aim of excluding its main rival, AMD, from the x86 Computer Processing Unites (CPU) market.

> In the SO, the Commission outlines its preliminary conclusion that Intel has engaged in three types of abuse of a dominant market position. First, Intel has provided substantial rebates to various Original Equipment Manufacturers (OEMs) conditional on them obtaining all or the great majority of their CPU requirements from Intel. Secondly, in a number of instances, Intel made payments in order to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based CPU. Thirdly, in the context of bids against AMD-based products for strategic customers in the server segment of the market, Intel has offered CPUs on average below cost.

> These three types of conduct are aimed at excluding AMD, Intel's main rival, from the market. Each of them is provisionally considered to constitute an abuse of a dominant position in its own right. However, the Commission also considers at this stage of its analysis that the three types of conduct reinforce each other and are part of a single overall anti-competitive strategy.

81.    On February 12, 2008, *Bloomberg.com* reported that the European Union regulators, in furtherance of their antitrust probe, raided Intel's offices in Munich and computer retailers in the United Kingdom and Germany. Specifically, the officials inspected the offices of Media Market, DSG International Pic in the United Kingdom and France's PPR SA. The raids targeted "Intel's possible links with computer retailers." The regulator stated that "it has reason to

28

believe that the companies may have violated EU rules on restrictive business practices, abuse of a dominant market position, or both."

82.     On December 19, 2008, the Commission sent Intel a letter drawing Intel's attention to a number of specific items of evidence relating to the Commission's existing objections which the Commission indicated it might use in a potential final decision. The Commission set a deadline of January 19, 2009 for Intel to provide comments on those items. That deadline was extended to January 23, 2009.

83.     Intel failed to reply to the Commission's letter of December 19, 2008 by the extended deadline of January 23, 2009, a fact confirmed by Intel's counsel on January 27, 2009, after the Commission had asked Intel about the matter.  Intel did not provide reasons for its failure to reply by the extended deadline.

84.     On February 2, 2009, the Commission informed Intel by letter that the Commission had decided not to grant any further extension of the deadlines to reply to the 17 July 2008 SSO or to the Commission letter of December 19, 2008, as such an extension would not be justified given that Intel had had ample opportunity to submit such replies within the deadlines and had chosen not to do so.

85.     On February 5, 2009 Intel belatedly made a submission to the Commission in its defense.  Although the Commission was not bound to consider that submission due to Intel's lack of cooperation, it nonetheless did so.  (EC Dec. pp.34-35, ¶¶ 96-97).

86.     On May 13, 2009, the EC announced it was fining Intel €1.06 billion, the equivalent of $1.45 billion.  Competition Commissioner Neelie Kroes said in connection with the announcement:"Intel has harmed millions of European consumers *by deliberately acting to keep competitors out of the market for computer chips for many years.* Such a serious and sustained

29

violation of the EU's antitrust rules cannot be tolerated." (emphasis added).

      87.    The May 13, 2009 press release detailed the EC findings as follows:

> The European Commission has imposed a fine of €1 060 000 000 on Intel Corporation for violating EC Treaty antitrust rules on the abuse of a dominant market position (Article 82) by engaging in illegal anticompetitive practices to exclude competitors from the market for computer chips called x86 central processing units (CPUs). The Commission has also ordered Intel to cease the illegal practices immediately to the extent that they are still ongoing. Throughout the period October 2002-December 2007, Intel had a dominant position in the worldwide x86 CPU market (at least 70% market share). The Commission found that Intel engaged in two specific forms of illegal practice. First, Intel gave wholly or partially hidden rebates to computer manufacturers on condition that they bought all, or almost all, their x86 CPUs from Intel. Intel also made direct payments to a major retailer on condition it stock only computers with Intel x86 CPUs. Such rebates and payments effectively prevented customers - and ultimately consumers - from choosing alternative products. Second, Intel made direct payments to computer manufacturers to halt or delay the launch of specific products containing competitors' x86 CPUs and to limit the sales channels available to these products. The Commission found that these practices constituted abuses of Intel's dominant position on the x86 CPU market that harmed consumers throughout the EEA. By undermining its competitors' ability to compete on the merits of their products, Intel's actions undermined competition and innovation. The Commission will actively monitor Intel's compliance with this decision. The world market for x86 CPUs is currently worth approximately €22 billion (US$ 30 billion) per year, with Europe accounting for approximately 30% of that.

     ***

> The computer manufacturers concerned by Intel's conduct in the Commission's decision are: Acer, Dell, HP, Lenovo and NEC. The retailer concerned is Media Saturn Holding, owner of the MediaMarket chain

> Conditional rebates and payments

> Intel awarded major computer manufacturers rebates on condition that they purchased all or almost all of their supplies, at least in certain defined segments, from Intel:

> - Intel gave rebates to computer manufacturer A from December 2002 to December 2005 conditional on this manufacturer purchasing exclusively Intel CPUs

30

- Intel gave rebates to computer manufacturer B from November 2002 to May 2005 conditional on this manufacturer purchasing no less than 95% of its CPU needs for its business desktop computers from Intel (the remaining 5% that computer manufacturer B could purchase from rival chip maker AMD was then subject to further restrictive conditions set out below)
- Intel gave rebates to computer manufacturer C from October 2002 to November 2005 conditional on this manufacturer purchasing no less than 80% of its CPU needs for its desktop and notebook computers from Intel
- Intel gave rebates to computer manufacturer D in 2007 conditional on this manufacturer purchasing its CPU needs for its notebook computers exclusively from Intel.

Furthermore, Intel made payments to major retailer Media Saturn Holding from October 2002 to December 2007 on condition that it exclusively sold Intel-based PCs in all countries in which Media Saturn Holding is active.

Certain rebates can lead to lower prices for consumers. However, where a company is in a dominant position on a market, rebates that are conditional on buying less of a rival's products, or not buying them at all, are abusive according to settled case-law of the Community Courts unless the dominant company can put forward specific reasons to justify their application in the individual case.

In its decision, the Commission does not object to rebates in themselves but to the conditions Intel attached to those rebates. Because computer manufacturers are dependent on Intel for a majority of their x86 CPU supplies, only a limited part of a computer manufacturer's x86 CPU requirements is open to competition at any given time.

Intel structured its pricing policy to ensure that a computer manufacturer which opted to buy AMD CPUs for that part of its needs that was open to competition would consequently lose the rebate (or a large part of it) that Intel provided for the much greater part of its needs for which the computer manufacturer had no choice but to buy from Intel. The computer manufacturer would therefore have to pay Intel a higher price for each of the units supplied for which the computer manufacturer had no alternative but to buy from Intel. In other words, should a computer manufacturer fail to purchase virtually all its x86 CPU requirements from Intel, it would forego the possibility of obtaining a significant rebate on any of its very high volumes of Intel purchases.

Moreover, in order to be able to compete with the Intel rebates, for the part of the computer manufacturers' supplies that was up for grabs, a competitor that was just as efficient as Intel would have had to offer a price for its CPUs lower than its costs of producing those CPUs, even if the average price of its CPUs was lower than that of Intel.

31

For example, rival chip manufacturer AMD offered one million free CPUs to one particular computer manufacturer. If the computer manufacturer had accepted all of these, it would have lost Intel's rebate on its many millions of remaining CPU purchases, and would have been worse off overall simply for having accepted this highly competitive offer. In the end, the computer manufacturer took only 160,000 CPUs for free.

As a result of Intel's rebates, the ability of rival manufacturers to compete and innovate was impaired, and this led to reduced choice for consumers.

Rebates such as those applied by Intel are recognised in many jurisdictions around the world as anti-competitive and unlawful because the effect in practice is to deny consumers a choice of products.

Payments to prevent sales of specific rival products

Intel also interfered directly in the relations between computer manufacturers and AMD. Intel awarded computer manufacturers payments - unrelated to any particular purchases from Intel - on condition that these computer manufacturers postponed or cancelled the launch of specific AMD-based products and/or put restrictions on the distribution of specific AMD-based products. The Commission found that these payments had the potential effect of preventing products for which there was a consumer demand from coming to the market. The Commission found the following specific cases:

- For the 5% of computer manufacturer B's business that was not subject to the conditional rebate outlined above, Intel made further payments to computer manufacturer B provided that this manufacturer:

- sold AMD-based business desktops only to small and medium enterprises
- sold AMD-based business desktops only via direct distribution channels (as opposed to through distributors) and
- postponed the launch of its first AMD-based business desktop in Europe by 6 months.

- Intel made payments to computer manufacturer E provided that this manufacturer postponed the launch of an AMD-based notebook from September 2003 to January 2004.
- Before the conditional rebate to computer manufacturer D outlined above, Intel made payments to this manufacturer provided that it postponed the launch of AMD-based notebooks from September 2006 to the end of 2006.

The Commission obtained proof of the existence of many of the conditions found to be illegal in the antitrust decision even though they were not made explicit in Intel's contracts. Such proof is based on a broad range of contemporaneous evidence such as e-mails obtained inter alia from

unannounced on-site inspections, in responses to formal requests for information and in a number of formal statements made to the Commission by the other companies concerned. In addition, there is evidence that Intel had sought to conceal the conditions associated with its payments.

x86 CPUs are the main hardware component of a computer. The decision contains a broad range of contemporaneous evidence that shows that AMD, essentially Intel's only competitor in the market, was generally perceived, by computer manufacturers and by Intel itself, to have improved its product range, to be a viable competitor, and to be a growing competitive threat. The decision finds that Intel's practices did not constitute competition on the merits of the respective Intel and AMD products, but rather were part of a strategy designed to exploit Intel's existing entrenched position in the market.

88.      Publication of the text of the EC's decision was thereafter delayed for many months to accommodate Intel's request for redaction of incriminating evidence relating to the identities of individual Intel senior executives and others. Indeed, once the EC decision was released to the public in September 2009, it was replete with references to senior executive involvement. For example: (a) three Intel executives, including a senior executive, confirmed to Hewlett-Packard that business agreements contained secret, unwritten elements;[7] and (b) in an e-mail circulated by an Intel senior executive concerning Dell's announcement that it would not use AMD chips, Dell was referred to as "the best friend money can buy."[8]

89.      Although Intel executives disingenuously claimed that it was unaware that the activities uncovered by the EC were unlawful, the EC stated:

>   The legal underpinning of the Commission's case is based on a consistent pattern of Court jurisprudence, including Case 85/76 *Hoffmann-La Roche v Commission*, Case T-203/01 *Michelin v Commission*, Case C-95/04 *British Airways v Commission*, Joined Cases T-24/93 and others, *Compagnie Maritime Belge v Commission*, and Case T-228/97, *Irish Sugar*.

90.      Intel's senior management would have been aware of this type of misconduct due to its direct participation and otherwise, as would the Board through ECOC Reports and through

---

[7]  EC Dec. p. 54, ¶ 169. *See also id.*, ¶ 170.
[8]  EC Dec. p. 71, ¶ 240.

their access to the non-public evidentiary record, and other systems employed at Intel to detect

potential violations of law.  Nonetheless, and in bad faith, they permitted such activities so as to

further short-term and short-sighted financial goals.

## ACTION BY THE NEW YORK STATE ATTORNEY GENERAL

91.     On November 4, 2009, an action against Intel was filed in this District by the

Attorney General for the State of New York (the "NYAG Action"), alleging antitrust violations

similar to those alleged by AMD,[9] and seeking treble damages for the State of New York and

certain "assignor OEMs" who have authorized New York to pursue claims.

92.     The NYAG Action was brought after a lengthy investigation.  The NYAG

Complaint asserts vast factual support for a wide-ranging scheme to violate the antitrust laws,

involving Intel's relationships with Dell, Hewlett-Packard, IBM and others.

93.     Among other things, the NYAG alleges: "Intel, as it had done before when faced

with a threat by AMD, decided to bribe and threaten Dell to induce it to remain exclusive", and

that:

> In September 2003, Intel's then Chairman and CEO Craig Barrett met with
> Michael Dell to address the basic relationship between the companies. He
> reported back to his Intel colleagues that he and Michael Dell "shook hands on
> the deal. MD [Michael Dell] agreed to quarterly mtgs…to make sure we are
> aligned in our strategic issues and coordinated in spending the monies.  He
> had no issue with the win/win nature of the agreement. *I clearly committed
> our long range support regardless of competition.* Nice work you guys!"

(Emphasis in original).[10]

94.     Later, in 2006, when Dell tried to throw off the restraints imposed by Intel and

carry AMD-based products:

---

[9]  The factual allegations contained in *In re Intel Corp. Microprocessor Antitrust Lit.*, MDL No.
05-1717-JJF (D. Del) (the "AMD Litigation") are incorporated herein by reference.
[10]  NYAG Cplt., ¶¶ 99-100.

34

The reaction of Craig Barrett, Intel's Board Chairman, was unequivocal: Dell should immediately be deprived of the payments it had long enjoyed in return for its willingness not to offer AMD products, and should start paying 'list prices." Barrett told Ottelini: "[T]hey have just signaled they are only interested in being a transaction based customer. I think you should reply in kind. Not a time for weakness on our part. Stop writing checks immediately and put them back on list prices asap." (Emphasis added).

***

The direction Otellini gave his subordinates the next day was consistent with Barrett's advice. Intel should make clear to Dell that if Dell offered any AMD products all of the 'mcp' payments Dell received from Intel would be at risk–just as Dell had always feared: "[W]e should be [pre]pared to remove all mcp and related programs. Post haste. then we ought to enter negotiations."[*]

95.     Otellini was, according the NYAG, similarly personally involved with enforcing

exclusive arrangements with Hewlett-Packard:

[A] top HP executive reported back from a conversation with Intel's then-COO Paul Otellini concerning Intel's reaction to the news that HP was considering launching an AMD-based PC directed at commercial customers: 'I talked to Paul Otellini last night [who asked whether] we have a transactional relationship or a partnership? If we go with AMD on the commercial desktop, Intel equates this to a transactional relationship, and therefore we are foregoing the benefits of price pull-forwards [pricing concessions] to level the direct/indirect playing field."

96.     The NYAG Complaint reflects information that has been available to Intel senior

management and the Board for many years. Nonetheless, they all turned a blind eye to that

information, in bad faith disregard of their fiduciary obligations.

## ACTION BY THE FTC

97.     On December 16, 2009, the FTC filed a complaint against Intel alleging that Intel

violated Section 5 of the Sherman Act by "engag[ing] in a number of unfair methods of

competition and unfair practices to block or slow the adoption of competitive products and

---

[11] NYAG Cplt. ¶¶ 142-43. *See also* ¶¶ 132-39, as to Otellini's direct involvement with the Dell agreements, and ¶¶ 216, 237-38, as to Otellini's personal involvement with IBM.

maintain its monopoly to the detriment of consumers. . . . us[ing] its market presence and

reputation to limit acceptance of [competitors'] products, and us[ing] deceptive practices to leave

the impression that [competitors'] products did not perform as well as they actually did"(FTC

Action"). The FTC Action came on the heels of a multi-year investigation by the FTC and

extensive negotiations between Intel and the FTC, which included an unprecedented four

Commission meetings.[12] The FTC Action is scheduled to be heard before an Administrative

Law Judge on September 15, 2010.

98.     Among other things, the FTC Action alleges:

First, Intel entered anticompetitive arrangements with the largest computer
manufacturers that were designed to limit or foreclose [the] use of competitors'
relevant products. On the one hand, Intel threatened to and did increase price,
terminate product and technology collaborations, shut off supply, and reduce
marketing support to OEMs that purchased too many products from Intel's
competitors. On the other hand, some OEMs that purchased 100 percent or nearly
100 percent of their requirements from Intel were favored with guarantees of
supply during shortages, indemnification from intellectual property litigation, or
extra monies to be used in bidding situations against OEMs offering a non-Intel
product.

Second, Intel offered market share or volume discounts selectively to OEMs to
foreclose competition in the relevant CPU markets. In most cases, it did not make
economic sense for any OEM to reject Intel's exclusionary pricing offers. Intel's
offer had the practical effect of foreclosing rivals from all or substantially all of
the purchase by an OEM.

Third, Intel used its position in the complementary markets to help ward off
competitive threats in the relevant CPU markets. For example, Intel redesigned
its compiler and library software on or about 2003 to reduce the performance of
competing CPUs. Many of Intel's design changes to its software had no legitimate
technical benefit and were made only to reduce the performance of competing
CPUs relative to Intel's CPUs.

Fourth, Intel paid or otherwise induced suppliers of complimentary software and
hardware to eliminate or limit their support of non-Intel CPU products.

---

[12] The factual allegations contained in the FTC Action, *In the Matter of Intel Corporation*, FTC
Docket No. 9341 (2009) are incorporated herein by reference.

Fifth, Intel engaged in deceptive acts and practices the misled consumers and the public. For example, Intel failed to disclose material information about the effect of its redesigned compiler on the performance of non-Intel CPUs. Intel expressly or by implication falsely misrepresented that industry benchmarks reflected the performance of its CPUs relative to its competitors' products. Intel also pressured independent software vendors ("ISVs") to label their products as compatible with Intel and not to similarly label with competitors' products' names or logos, even though these competitor microprocessor products were compatible.

99.    According to an FTC press release announcing the FTC Action, "Intel's anticompetitive tactics were designed to put the breaks on superior competitive products that threatened its monopoly in the CPU microchip market. Over the last decade, this strategy has succeeded in maintaining the Intel monopoly at the expense of consumers, who have been denied access to potentially superior non-Intel CPU chips and lower prices." The FTC's press release further quoted Richard A. Feinstein, the Director of the FTC's Bureau of Competition as saying that: "Intel has engaged in a deliberate campaign to hamstring threats to its monopoly. . . . It's been running roughshod over the principles of fair play and the laws of protecting competition on the merits. The Commission's action today seeks to remedy the damages that Intel has done to competition, innovation, and, ultimately, the American consumer."

100.    The FTC Action poses a serious threat to Intel's short-term profitability and may ultimately prove to have grave consequences for its long-term viability. According to the press release announcing the FTC Action:

> To remedy the anticompetitive damage alleged in the complaint, the FTC is seeking an order which includes provisions that would prevent Intel from using threats, bundled prices, or other offers to encourage exclusive deals, hamper competition, or unfairly manipulate the prices of its CPU or GPU chips. The FTC also may seek an order prohibiting Intel from unreasonably excluding or inhibiting the sale of competitive CPUs or GPUs, and prohibiting Intel from making or distributing products that impair the performance – or apparent performance–of non-Intel CPUs or GPUs.

A December 17, 2009 *Bloomberg News* article entitled *FTC Action May Drop Bombshell on*

37

*How Intel Operates* reported that the FTC's preferred non-monetary remedies of "keep[ing] Intel from signing exclusive deals with computer makers and require the company to share more of its technology with rivals" may have a greater impact on Intel's business model than fines imposed in other regulatory proceedings. Indeed, the *Bloomberg* article noted that the FTC has focused on the GPU market, which makes the action "further-reaching than cases brought by regulators in the European Union, South Korea and Japan." Significantly, the article further quoted analysts such as Bill Gorman, at PNC Institutional Investments, who predicted that such remedies could severely impede Intel's ability to build market share in the increasingly important GPU market.

101.     The FTC Action reflects information reflects information that has been available to Intel's senior management and the Board for many years. Indeed, as FTC Chairman Leibowitz and Commissioner Rosch made clear in a statement concerning the FTC Action, Intel's senior management and Board have had "unprecedented" levels of communications concerning the subject matter of the FTC Action prior to the filing of a complaint. Nonetheless, they all turned a blind eye to that information, in bad faith disregard of their fiduciary duties.

## THE DEMAND REQUIREMENT HAS BEEN SATISFIED

### THE BOARD HAS SHOWN HOSTILITY TOWARD PRIOR SHAREHOLDER DEMAND LETTERS

102.     Well prior to any action by other shareholders, Intel had been engaged in litigation over alleged antitrust violations similar to some of those referenced above with competitor AMD. AMD filed its complaint against Intel and a foreign subsidiary of Intel on June 27, 2005. Prior to settling for $1.25 billion, that action was scheduled for trial in the spring of 2010 and, by Intel's reckoning, has involved the production and review of hundreds of millions

38

of documents, and the examination of thousands of commercial transactions.[13]  In addition, on

July 27, 2007, the European Commission (the "EC") served upon Intel a Statement of Objections

containing its "preliminary conclusion that Intel has engaged in three types of abuse of a dominant

market position." Intel, at that point, began preparing its formal defense to those assertions.

   103..  The Board and its Audit Committee are presumed to have fulfilled their duty to be

well-informed concerning those serious matters, including:  gaining a fair understanding of the

allegations made; evaluating the force of the evidence supporting the contentions; and assessing

the risks to Intel of both the treble damages private action, and EC regulatory proceedings.

Delaware law requires that corporations such as Intel have systems in place to provide that type

of quantitative and qualitative information to the Board so that it may exercise oversight and

control over important litigation and regulatory threats.[14]  There is no reason to believe those

systems failed during the relevant period.

   104.  On February 12, 2008, Intel shareholder Smilow commenced the *Smilow* Action,

a shareholder's derivative action, in the District of Delaware, alleging demand futility and seeking

to hold present and former Board members liable for some of the same violations referenced in

the demand letter.  The legal basis for Smilow's claim was primarily an alleged breach by the

Intel directors of their duty of corporate oversight.  On August 7, 2008, Smilow amended his

complaint, essentially continuing the same allegations.  Smilow's amended complaint asserted

---

[13] *See* Intel's Motion, Pursuant to Rules 16 and 56, For a Pretrial Conference to Seek the Court's Determination of Key Issues of Law that Will Govern Completion of Preparation and Trial, dated May 8, 2009, p. 4, filed in *In re Intel Corp. Microprocessor Antitrust Lit.*, MDL No. 05-1717-JJF (D. Del).

[14] *See e.g., In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 131 (Del. Ch. 2009) ("Directors should, *indeed must under Delaware law*, ensure that reasonable information and reporting systems exist that would put them on notice of fraudulent or criminal conduct within the company. Such oversight programs allow directors to intervene and prevent frauds or other wrongdoing that could expose the company to risk of loss as a result of such conduct.") (emphasis supplied).

that Intel had suffered millions of dollars in damages, and likely would be additionally damaged as a result of pending proceedings against it.

105.    On September 25, 2008, and November 3, 2008, the Audit Committee requested that the demand shareholders Villari an Gilman, both non-insiders, by asking them to provide facts or information in support of the demand.  This request was without merit since:  The Board knew that an outsider shareholder could supply no facts that would not *already be known* to the Intel Board by dint of the AMD Litigation, the proceedings initiated by the European Commission, the Request for Judicial Notice submitted in the *Smilow* Action, and other proceedings brought by regulators in South Korea and Japan.  On September 5, 2008, the *Smilow* defendants moved to dismiss the amended complaint.  The movants included three of the five members of the Intel Audit Committee:  Jane E. Shaw, Susan Decker, and David S. Pottruck.  Among other things, those defendants argued that numerous events and public allegations–beginning in 1987 and continuing through spring 2004–served to bar the *Smilow* Action under Delaware's three-year statute of limitations for actions sounding in breach of fiduciary duty.[15]  The defendants, while asserting that the allegations exhibited an "utter lack of merit," nonetheless maintained that demand on the Board would not be futile.[16]

106.    At the same time, efforts by other shareholders to obtain action from the Intel Board of Directors to redress harm done to Intel were proving to be fruitless.  In particular, on June 12, 2008, Intel shareholder Annette Villari ("Villari"), by and through counsel, made a

---

[15] *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Consolidated Complaint or, in the Alternative, to Stay this Action, dated September 5, 2008, pp. 21-23, filed in *In re Intel Corp. Derivative Lit.*,C.A. No. 08 CV 93 (JJF) (D. Del.).

[16] *Id.* at 2.  The *Smilow* Action was ultimately dismissed for failure to make pre-suit demand.  *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165 (D. Del. 2009).

demand upon the Board.[17] The letter outlined the long history of accusations of antitrust

violations by Intel executives and demanded that the Board:

> thoroughly investigate all of these allegations, and bring legal action to protect the
> Company and its shareholders, including actions for breach of fiduciary duty,
> unjust enrichment and other available causes of action. The potential defendants
> include not only executives but Board members who have not conscientiously
> worked to ensure that Intel conducted its business solely through lawful means.
> The Board should also investigate and evaluate any ongoing activities that may
> violate the antritrust laws, as such conduct could expose Intel to greater scrutiny
> and harm than it already faces from past activities including, but not limited to,
> governmental enforcement actions, competitor lawsuits, and treble damage
> penalties.
>
> We ask finally that the Board review its own actions and those of its members
> concerning the manner in which they did or did not appropriately discharge their
> fiduciary duties with respect to the underlying claims.

107.    Long time Intel shareholder Charles A. Gilman ('Gilman'), joined in that demand

later, incorporating and adopting all demand-related communications made previously by Ms.

Villari.

108.    Such efforts by Ms. Villari and Mr. Gilman have been met with an obstinate

refusal by the Intel Board, which has: (a) refused to appoint an independent committee of

directors empowered to review the charges and take remedial action; (b) refused outright *to*

*perform any investigation at all*; (c) asked the Audit Committee of the Board to 'respond' to the

demand, with full knowledge that in previous litigation involving many of these same matters a

majority of the Audit Committee members (without any investigation) informed this Court that

they had already concluded that the underlying claims exhibited an 'utter lack of merit'; (e) have

attempted to run out the statute of limitations so that no claims could ever be personally asserted

against them or anyone else; and (f) refused to enter into tolling agreements in the hope that the

---

[17] This letter is attached as Exhibit A to the action captioned *Gilman v. Otellini, et al.* 1:09-cv-
00867 (D. Del.).

limitations period would indeed run out, whereas fiduciaries acting in good faith would enter into such agreements so that meritorious claims could be preserved.

109.    On January 29, 2009, the Audit Committee wrote a letter to counsel for Ms. Villari and Mr. Gilman setting forth five reasons supporting its recommendation to the Intel Board that it "defer any determination regarding the demand." Those five reasons may be summarized as follows: (1) the demand is premature as the matters raised are the subject of contentious litigation, and Intel could "benefit" from a judicial resolution of those questions; (2) despite years of litigation, the "factual records" in the underlying matters were not fully developed, and the Company could benefit from a fuller factual record; (3) any action taken by Intel against any alleged wrongdoers could expose Intel to liability; (4) action taken on the demand could have an unspecified adverse effect on Intel's business; and (5) action by Intel against any alleged wrongdoers could trigger large indemnity obligations.

110.    Those excuses to do nothing demonstrate the Board's lack of independence and its failure to redress the decade's long anti-trust scheme perpetrated by Intel and the Board's failure to hold management accountable for its illegal conduct. Arguments like those could be made in every case of corporate wrongdoing in which a shareholder has made a demand, as justification for looking the other way, and taking no remedial action. Indeed, it is the Board's view (but not the view of the Delaware courts) that the more serious the wrongdoing, the less of a duty the Board has to investigate it, to remediate it, and to call the wrongdoers to account.

111.    The excuses provided to prior shareholders by the Board for failing even to investigate the demand are specious for the following reasons:

1.    Prematurity.

The Board's *prematurity* argument was made contemporaneously with court arguments by

42

a majority of directors (including a majority of the members of the Committee) in the *Smilow* Action that any corporate action is already time-barred and *too late*. Those two arguments are in conflict. As the Intel Board has taken the position that the limitations periods are actively running on all or some of the underlying claims, it is estopped from arguing prematurity, especially as to the EU matter, where a $1.45 million fine has already been imposed.

2.    Need for a Clearer Factual Record

The Board claimed that the "factual records" in the underlying matters were not fully developed, and the Company could benefit from a fuller factual record. That argument is a variation on the first argument as to prematurity. The factual record in the EC matter is closed. The factual record in the AMD Litigation was closed, or nearly closed, at the time. In any event, lack of judicial resolution or lack of a full factual record are matters that could be raised by any company in serious legal trouble as a reason not to investigate a demand. It is clear that an abundant factual record exists, and has existed, for quite some time.

3.    Action By the Company Could Expose Intel to Liability

That argument is absurd, as the derivative liability of any individual defendant to re-pay Intel, flows from corporate fines, damages, or penalties incurred in litigation *prosecuted by others*. Thus, preserving the claims asserted herein and prosecuting them as "claims over" cannot *increase* Intel's liability. Rather, recoveries from the individual defendants (and/or their insurers) can only *decrease* Intel's liability. There is nothing novel or extraordinary about pursuing claims against contingently liable parties: It is done all the time in federal and state court so that the defendant/claimant's exposure can be limited, not expanded. In addition, there is no possible

43

excuse for the Intel Board to ignore or defer demands that were made for corporate governance reforms to prevent a recurrence of these types of schemes. This type of therapeutic corporate action certainly cannot enhance Intel's exposure to liability. Moreover, to the extent the Board believes the Company can never bring action to protect its interests directly (or cannot do so in a timely manner), its best course would be to step aside and allow the corporate claims to be pursued derivatively. A decision that valuable claims should never be pursued by anyone due to the seriousness of the underlying allegations would not be a reasonable decision, and would tend to bring the demand process into disrepute. As it appears to be the Board's ultimate conclusion (unreasonable as it may be) that the nature of pending litigation precludes any Board-level investigation, review, or remedial action, the Board should concede (as is the case) that demand has been denied due to Board's interest, bias, or incapacity to act in Intel's best interests.

4.   Action on the Demand Could Have an Adverse Effect on Business

That purported reason not to act is specious as well. Any demand investigation or corporate action will involve some degree of corporate expense and disruption, but if that were enough to justify a refusal to act on a demand, then no demand would ever be addressed by any Board.

5.   Indemnification Expenses

Any action undertaken by a corporation against an officer or director may trigger indemnification expense. The fact that litigation against fiduciaries that violate the law may be costly is plainly an inadequate cause to refuse to investigate a demand. That boilerplate objection can be invoked in response to any demand for shareholder action, and is certainly no reason in this case to turn a blind eye to individual wrongdoing.

112.   Although counsel for Ms. Villari and Mr. Gilman were apparently not in

44

agreement with the excuses provided in the January 29, 2009 letter, action was deferred to await

judicial or administrative resolution of one or more of the serious matters pending against Intel.

113.   On May 13, 2009, the EC announced that it was imposing a staggering €1.06

billion penalty on Intel (approximately $1.45 billion), the largest fine ever imposed by that body.

114.   On June 8, 2009, counsel for Mr. Gilman and Ms. Villari wrote to the Intel Board,

expressing the view that further deferral of action on the demand was unwarranted in light of the

EC decision. Counsel asked that the Committee take prompt action to protect the corporation,

including determining individual liability and initiating appropriate lawsuits, and evaluating the

effectiveness of Intel's corporate governance systems, so as to determine the types of corporate

governance improvements sorely needed by Intel.

115.   On July 29, 2009, counsel for Mr. Gilman and Ms. Villari submitted a letter to the

Board expressing concern over the previous invocation of a statute of limitations defense in the

*Smilow* Action, and urging immediate action to protect the Company's rights against lapse due to

passage of time. Counsel for Mr. Gilman and Ms. Villari further requested that the Committee

obtain "tolling agreements from all Board members and all senior members of

management during the relevant period so that all major claims may be preserved."

116.   The request for tolling agreements has been ignored, as Board members attempt

to escape personal liability by "running down the clock."

117.   On August 27, 2009, counsel for Mr. Gilman and Ms. Villari met with counsel for

the Board to again urge action, including adopting 14 different types of remedial measures that

must be employed now to protect Intel from further harm. Subsequent to that meeting, the Board

has taken no action, and none is ever expected, as the Board members are hostile, biased, and

have demonstrated a lack independence.

## THE BOARD DEMONSTRATES ITS HOSTILITY
## TO PLAINTIFF'S DEMAND LETTERS

118.    On November 12, 2009, subsequent to the announcement of the NY State Action

and the $1.25 billion AMD settlement, Plaintiff made its initial demand on the Board through

counsel, outlining the litany of allegations and adverse findings against Intel for violations of

U.S. and international antitrust laws.  The facts described in Plaintiff's demand letter were

substantially the same as the facts underlying demands made by shareholders Mr. Gilman and

Ms. Villlari and allegations made in the *Smilow* Action.  Plaintiff further demanded that Intel's

Board:

> thoroughly investigate all of these allegations, and bring legal action to protect the
> Company and its shareholders, including actions for breach of fiduciary duty,
> unjust enrichment, and other available causes of action. The potential defendants
> include not only executives but Board members who have not conscientiously
> worked to ensure that Intel conduct its business solely through lawful means.
> The Board should also investigate and evaluate any ongoing activities that may
> violate the antitrust laws, as such conduct could expose Intel to greater scrutiny
> and harm than it already faces from past activities including, but not limited to,
> governmental enforcement actions, competitor lawsuits, and treble damage
> penalties.

> We ask that the Board review its own actions and those of its members
> concerning the manner in which they did or did not appropriately discharge their
> fiduciary duties with respect to the underlying claims.

119.    On December 1, 2009, counsel for the Board wrote to Plaintiff claiming that the

Board would be made aware of Plaintiff's demand and would "take up the matter in the near

future."

120.    In response, On Monday, December 7, 2009, Plaintiff's counsel wrote to counsel

for the Board, stating that they had been in communication with counsel for Mr. Gilman and Ms.

Villari and had been made aware of the Board's continuing position that their demand to take

action, as described herein, was premature for various reasons.  Accordingly, Plaintiff's counsel

demanded assurances by Friday, December 11, 2009, that Plaintiffs demand would not be met with the same hostility afforded the demands of shareholders Gilman and Villari. Counsel for the Board responded simply by stating that the Board would consider the demand at its next meeting in January, 2010.

## INDEPENDENDENCE OF THE INTEL AUDIT COMMITTEE

121.   After Ms. Villari's and Mr. Gilman's demand was made the matter was referred to the Audit Committee (the "Committee") for review, although the Committee was never granted power to bring claims, or act independently of the entire Board (including CEO Otellini).

122.   The Board knew that the Committee was not independent, and would render no independent recommendations.

123.   Under Delaware law, a Board or Board committee that appears *ab initio* to be independent may lose that presumption if, following a demand, it fails to act in a disinterested manner.

124.   On September 5, 2008, less than four months after Ms. Villari made her demand, the Intel director defendants (including Audit Committee Chairman Shaw and two other present Audit Committee members) stated in the motion to dismiss brief in the *Smilow* Action that the allegations exhibited an "*utter lack of merit*," that the allegations created only the "*illusion of a lengthy pattern of wrongdoing*," and that they could not be sued due to the expiration of the applicable statute of limitations. Plaintiffs demands concern some of the same matters raised in the *Smilow* Action.

125.   The assertions in the *Smilow* Action by a majority of the members of the Audit Committee that the claims of antitrust violations were meritless and illusory were (as evidenced by the Committee's later letter of January 29, 2009) made without due investigation, and at a time

47

when the pertinent facts were "not yet fully developed."

126.    By its very words and actions, the Audit Committee demonstrated, after receipt of a shareholder demand, that it is was not disinterested concerning that demand, and had indeed pre-judged its merits without due investigation, or the benefit of a fully developed factual record. Given the Board's tacit admission that Plaintiff's demand will be treated similarly to prior demands, there is no reason to believe that the Audit Committee will address its demand with any greater independence.  Indeed, it is abundantly evident that the "outside" directors were taking direction from senior management as to how they should view the propriety of their actions. This "one for all, and all for one" approach is inconsistent with disinterest and independence of mind.

## FIRST CAUSE OF ACTION

### (Breach of the Fiduciary Duty of Loyalty as to Active Misconduct Claims)

127.    Plaintiff incorporates by reference all previous allegations.

128.    This Cause of Action relates only to the Active Misconduct Claims and is brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, and Decker.

129.    During the period from in or about 2001 through 2007,  Intel's executives allegedly engaged in active violations of the European, Japanese, South Korean and United States antitrust laws, and the Board of Directors failed in bad faith to rein in, ameliorate or countermand such misconduct, or to ensure cooperation with regulatory authorities.

130.    As a result of the foregoing conscious disregard of the defendants' fiduciary duties, Intel has suffered substantial fines and settlement payments, and may be forced to pay more in fines, settlements and verdicts, including possible treble damages.

48

131.    Defendants are liable for any damages incurred by Intel as a result of their wrongful misconduct.

## SECOND CAUSE OF ACTION

### (Breach of the Fiduciary Duty of Loyalty as to EC Regulatory Claims)

132.    Plaintiff incorporates by reference all previous allegations.

133.    These claims are brought against those persons who were officers and/or directors during the period from which the EC began investigating Intel's conduct in Europe through the imposition of the record fine in May 2009. During this period, the relevant defendants failed to ensure that full and complete cooperation was provided to regulatory authorities; failed to hold accountable any person who engaged in unlawful misconduct; failed to take necessary remedial actions; and failed to work to with the EC on remedies or resolutions of the charges which would have reduced or even eliminated the EC fine. Such claims are brought against defendants Otellini, Barrett, Guzy, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, Decker and Bartz.

134.    Defendants are liable for any damages incurred by Intel as a result of their wrongful misconduct.

## THIRD CAUSE OF ACTION

### (Breach of the Fiduciary Duty of Loyalty as to Failure to Take Remedial Measures)

135.    Plaintiff incorporates by reference all previous allegations

136.    These claims are brought against those persons who are presently Intel directors and who are consciously and in bad faith refusing to thoroughly investigate and address executive wrongdoing; attempting to stymie and defeat legitimate claims against directors and officers through efforts to cause such claims to lapse by dint of the statute of limitations; and failing in bad faith to enact necessary therapeutic and remedial measures.

49

137.   Defendants herein have failed to enact crucial remedial measures including: (a) devoting greater resources to targeted compliance activities; (b) affording enhanced independence to compliance personnel; (c) implementing antitrust audit risk and training programs that proceed from an "acquiescence standpoint"; (d) conducting a full antitrust compliance program audit to ensure efficacy; (e) reviewing, implementing or strengthening domestic and international "whistle-blower" protections; (f) increasing reliance on outside compliance experts; (g) creating or expanding the role of governmental liaison officers; (h) creating an ombudsman charged with receiving and evaluating OEM or retailer complaints of coercive practices; (i) reviewing and strengthening compliance with procedures relating to employee certifications that their actions have complied with applicable laws; (j) enhancing and applying sanctions for non-compliance with corporate ethics and legal compliance rules; (k) reviewing and enforcing proper contracting procedures; (l) reviewing and strengthening internal reporting channels; (m) conducting an independent review of the function and efficacy of the ECOC; and (n) reviewing, revising and strengthening "crisis management" procedures.

138.   Defendants' actions and refusals to act as detailed herein are in bad faith. They have caused and will cause damages to Intel.

139.   Defendants are liable for any damages incurred by Intel, and which will be incurred by Intel, as a result of their wrongful misconduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Requiring the Defendants named in the Third Cause of Action herein to enact and

implement the remedial, corporate governance and audit procedures as set forth in that Cause of

Action;

C.      Awarding to plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.      Granting such other and further relief as the Court deems just and proper.


Dated: December 23, 2009

                                                        **BIGGS AND BATTAGLIA**

**OF COUNSEL**                                          By: _____

**BERMAN DEVALERIO**                                    Robert D. Goldberg (ID #631)
Jeffrey C. Block                                        Biggs and Battaglia
Bryan A. Wood                                           921 North Orange Street
One Liberty Square                                      Wilmington, DE  19899
Boston, MA  02109                                       (302) 655-9677
Tel:  (617) 542-8300                                    *Attorneys for Plaintiff*
Fax: (617) 542-1194


51

## VERIFICATION

R. Randall Roche, under pain and penalty of perjury under the laws of the United States

avers that as plaintiff herein he verifies that he has reviewed the foregoing Shareholder's

Demand-Made Derivative Complaint, and that the allegations are true and correct to the best of

his information, knowledge and belief.

Dated: December 22, 2009

R. Randall Roche
General Counsel
Louisiana Municipal Police
Employees' Retirement System

# Exhibit O

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------x
CHARLES A. GILMAN,                          :
                                            :
                    Plaintiff,              :
                                            :
         v.                                 :
                                            :
PAUL S. OTELLINI, et al.,                   :
                                            :
                    Defendants,             :     C.A. No. 09-cv-867-(JJF)
                                            :
         --and--                            :
                                            :
INTEL CORP.,                                :
                                            :
                    Nominal Defendant.      :
─────────────────────────────              :
                                            :
LOUISIANA MUNICIPAL POLICE                  :
EMPLOYEES' RETIREMENT SYSTEM,               :
                                            :
                    Plaintiff,              :
                                            :
         --against--                        :
                                            :
PAUL S. OTELLINI, et al.,                   :     C.A. No. 09-cv-993-(JJF)
                                            :
                    Defendants,             :
                                            :
         --and--                            :
                                            :
INTEL CORP.,                                :
                                            :
                    Nominal Defendant.      :
--------------------------------------------------x

**STIPULATION AND [PROPOSED] ORDER CONSOLIDATING CASES FOR ALL PURPOSES AND PERMITTING FILING OF CONSOLIDATED COMPLAINT**

This Stipulation is entered into by and among plaintiffs Charles A. Gilman and the

Louisiana Municipal Police Employees' Retirement System ("MPERS") (collectively,

"Plaintiffs"), and defendants Paul S. Otellini, Craig R. Barrett, D. James Guzy, Sr., David S. Pottruck, Jane E. Shaw, David B. Yoffie, Charlene Barshefsky, James D. Plummer, Susan L. Decker, Carol Bartz, John J. Donahoe and Frank D. Yeary (collectively "Defendants"), and nominal defendant Intel Corporation ("Intel"), by and through their respective attorneys of record.

WHEREAS, Charles A. Gilman, purporting to act derivatively on behalf of nominal defendant Intel, filed a complaint on or about November 13, 2009; and

WHEREAS, MPERS, purporting to act derivatively on behalf of nominal defendant Intel, filed a complaint on or about December 23, 2009; and

WHEREAS, counsel for the parties have conferred, and the parties are in agreement that that the *Gilman* action should be consolidated with the *MPERS* action for all purposes; and

WHEREAS, the parties seek to agree upon a briefing schedule for the filing of a consolidated complaint and motion(s) to dismiss; it is, therefore,

STIPULATED AND AGREED, by and between the undersigned counsel for Plaintiffs and counsel for Intel and all Defendants (the "Stipulating Defendants"), that:

1.  The following actions are related cases within the meaning of Local Civil Rule 3.1(b):

    - *Gilman v. Otellini, et al.*, No. 09-cv-867 (JJF); and

    - *Louisiana Municipal Police Employees' Retirement System v. Otellini, et al.*, No. 09-cv-993 (JJF).

2.  Pursuant to Federal Rule of Civil Procedure 42(a), the above-captioned actions are hereby consolidated for all purposes into one action.

3.  These actions shall be referred to herein as the "Consolidated Actions." The Master Docket and Master File for the Consolidated Actions shall be Civil Action No. 09-cv-867 (JJF).

2

4.   Every pleading in this Consolidated Action shall bear the following caption

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re Intel Corp. Derivative Litig. | ) C.A. No. 09-cv-867 (JJF) |

All orders, pleadings, motions and other documents shall, when filed and docketed in the Master file, be deemed filed and docketed in each individual case to the extent applicable.

5.   The Court hereby appoints Mr. Gilman and MPERS as lead plaintiffs in this Consolidated Action.  The Court hereby appoints Paskowitz & Associates and Berman DeValerio to be Co-Lead Counsel.

6.   The Plaintiffs shall file a Consolidated Complaint on or before February 12, 2010.

7.   The briefing of any motions to dismiss the Consolidated Complaint is bifurcated, with a threshold motion to dismiss pursuant to Rule 23.1 to be made first.  Remaining motions to dismiss pursuant to Rule 12(b)(6) would then be made and heard only if issues remain following the Court's rulings on the threshold Rule 23.1 motion.

8.   The Stipulating Defendants shall answer, make a motion to dismiss under Rule 23.1, or otherwise respond to the Consolidated Complaint on or before March 12, 2010.

9.   In the event that the Stipulating Defendants move to dismiss the Consolidated Complaint, Plaintiffs shall file their opposition papers on or before April 9, 2010.  The Stipulating defendants shall file their reply papers on or before April 30, 2010.

10. This stipulation is without prejudice to any other rights that any party may have.

BIGGS & BATTAGLIA

By:   /s/ Robert D. Goldberg
      Robert D. Goldberg (ID #631)
      921 North Orange Street
      Wilmington, Delaware 19899
      (302) 655-9677
      goldberg@battlaw.com

Attorneys for Plaintiff Charles Gilman and
Louisiana Municipal Police Employees'
Retirement System


Laurence D. Paskowitz
PASKOWITZ & ASSOCIATES
60 East 42nd Street—Suite 4600
New York, NY 10165
212-685-0969

Co-Lead Counsel for Plaintiffs

BERMAN DEVALERIO
Jeffrey C. Block
Bryan A. Wood
Scott A. Mays
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax:(617) 542-1194

Co-Lead Counsel for Plaintiffs


POTTER ANDERSON & CORROON LLP

By:   /s/ Stephen C. Norman
      Donald J. Wolfe, Jr. (#285)
      Stephen C. Norman (ID #2686)
      Hercules Plaza, 6th Floor
      1313 North Market Street
      P.O. Box 951
      Wilmington, Delaware 19899-0951
      (302) 984-6000
      snorman@potteranderson.com

Attorneys for Nominal Defendant Intel
corporation and Defendants Paul S. Otellini,
Craig R. Barrett, David S. Pottruck, Jane E.
Shaw, David B. Yoffie, Charlene Barshefsky,
James D. Plummer, Susan L. Decker, Carol
Bartz, John J. Donahoe, and Frank D. Yeary


CONNOLLY BOVE LODGE & HUTZ LLP

By:   /s/ Collins J. Seitz, Jr.
      Collins J. Seitz, Jr. (ID #2237)
      The Nemours Building
      1007 North Orange Street
      P.O. Box 2207
      Wilmington, Delaware 19899-2207
      (302) 658-9141
      cseitz@cblh.com

Attorneys for Defendant D. James Guzy, Sr.


Dated: January 14, 2010


IT IS SO ORDERED THIS _15_ DAY OF JANUARY, 2010:

U.S.D.J.

4