IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | **:** | |
| In re Intel Corp. Derivative Litig. | **:** | C.A. No. 09-cv-867 (JJF) |
| | **:** | |

**MEMORANDUM OF THE PLAINTIFFS,
CHARLES GILMAN AND THE LOUISIANA MUNICIPAL
POLICE EMPLOYEES' RETIREMENT SYSTEM,
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SHAREHOLDERS' DEMAND MADE CONSOLIDATED DERIVATIVE COMPLAINT**

Dated:  April 9, 2010

**BIGGS & BATTAGLIA**
Robert D. Goldberg (ID #631)
921 North Orange Street
Wilmington, Delaware 19899
(302) 655-9677
goldberg@batlaw.com

**Attorneys for Plaintiff Charles Gilman
and Louisiana Municipal Police
Employees' Retirement System**

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
60 East 42nd Street—Suite 4600
New York, NY 10165
212-685-0969

**BERMAN DEVALERIO**
Jeffrey C. Block
Bryan A. Wood
Scott A. Mays
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

**Co-Lead Counsel for Plaintiff Charles
Gilman and Louisiana Municipal Police
Employees' Retirement System**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF FACTS ................................................................................. 4

    I.    THE UNDERLYING FACTS EVIDENCE A HISTORY
        OF VERY SERIOUS WRONGDOING ................................................. 4

    II.   THE INTEL BOARD'S CONDUCT *EX POST* DEMONSTRATES
        A COMPLETE LACK OF INDEPENDENCE ........................................ 6

        A.    Intel's Baseless Refusal to Make Any Investigation ..................... 6

        B.    The Intel Board's Improper Designation of the
              Conflicted Audit Committee to Address
              Plaintiffs' Demand ...................................................................... 7

        C.    Having Repeatedly Taken a Public Stance That
              Regulators and Private Litigants Are Wrong
              and That Intel, Its Senior Management, and the
              Board Have Committed No Wrongdoing
              Whatsoever, the Board Cannot Be Deemed
              Independent .................................................................................. 7

ARGUMENT ..................................................................................................... 9

    I.    DEFENDANTS' FAILURE TO RESPOND TO PLAINTIFFS'
        DEMANDS IS TANTAMOUNT TO A REJECTION ........................... 11

    II.   THE DEFENDANTS' DECISION TO EFFECTIVELY REJECT
        PLAINTIFFS' DEMANDS IS NOT ENTITLED TO THE
        PROTECTION OF THE BUSINESS JUDGMENT RULE .................... 18

        A.    The Complaint Adequately Pleads That the Board Was
              Not Independent or Disinterested, Did Not Act In
              Good Faith, and Did Not Exercise Due Care ............................... 19

              1.    *The Board Is Not Independent-Minded*
                    *or Disinterested* ................................................................. 19

a.     Under *Biondi,* the Board Has Disqualified Itself from Passing on the Demands ....................................................19

b.     The Board Has Not Responded to the Demands in a Disinterested Manner ........................................................22

c.     The Board Did Not Act In Good Faith ......................................24

d.     The Board Did Not Exercise Due Care......................................29

III.    DEFENDANTS KNOW THAT IF THIS CASE IS DISMISSED, THEY MAY ESCAPE LIABILITY FOR THEIR WRONGDOING BY RUNNING OUT THE STATUTE OF LIMITATIONS ...................................30

IV.    PLAINTIFFS' COMPLAINT PROPERLY ALLEGES DEFENDANTS' FAILURE TO TAKE REQUIRED REMEDIAL MEASURES ........................................................................33

V.    ANY ARGUMENT THAT THE INTEL BOARD NEEDED MORE TIME IN LATE 2009 TO CONSIDER HOW TO RESPOND TO MPERS'S DEMAND IS ABSURD, AS THE BOARD HAD ALREADY DECIDED IN EARLY 2009 WHAT ITS RESPONSE WOULD BE TO SUCH SHAREHOLDER DEMANDS .......................................35

VI.    MPERS HAS HELD INTEL SHARES AT ALL RELEVANT TIMES...................................................................................35

VII.   GILMAN MADE A DEMAND ON THE BOARD................................................38

CONCLUSION..................................................................................................................39

TABLE OF AUTHORITIES

Cases

*7547 Partners v. Beck,*
  682 A.2d 160 (Del. 1996) ........................................................................................... 37

*Albert v. Alex. Brown Mgmt. Servs.,*
  C.A. No. 762-N,
  2005 Del. Ch. LEXIS 100,
  (Del. Ch. June 29, 2005) ............................................................................................. 38

*Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp.,*
  283 F.2d 93 (3d Cir. 1960) ........................................................................................ 35

*ATR-Kim Eng Fin. Corp. v. Araneta,*
  C.A. No. 489-N
  2006 Del. Ch. LEXIS 215,
  (Del. Ch. Dec. 21, 2006) ............................................................................................ 34

*Behradrezaee v. Dashtara,*
  910 A.2d 349 (D.C. 2006) .......................................................................................... 22

*Biondi v. Scrushy,*
  820 A.2d 1148 (Del. Ch. 2003) ............................................................................. passim

*Brandin v. Deason,*
  941 A.2d 1020 (Del. Ch. 2007) ................................................................................. 18

*Brehm v. Eisner,*
  746 A.2d 244 (Del. 2000) ..................................................................................... 10, 21

*Burns v. Friedli,*
  241 F. Supp. 2d 519 (D. Md. 2003) .......................................................................... 12

*Cf. O'Connor v. Freyman,*
  C.A. No. 85-0566,
  1985 U.S. Dist. LEXIS 19289,
  (D.D.C. May 31, 1985) .............................................................................................. 39

*City of Pittsburgh v. West Penn Power Co.,*
  147 F.3d 256 (3d Cir. 1998) ...................................................................................... 36

*Cohen v. Beneficial Loan Corp.,*
  337 U.S. 541 (1949) ..................................................................................................... 9

*Debiec v. Cabot Corp.*,
   352 F.3d 117 (3d Cir. 2003)...............................................................30

*Desimone v. Barrows*,
   924 A.2d 908 (Del. Ch. 2007)...........................................................37

*Donald M. Durkin Contracting, Inc. v. City of Newark*,
   C.A. No. 04-163,
   2006 WL 2724882,
   (D. Del. Sept. 22, 2006) ...................................................................29

*Furman v. Walton*,
   No. 06-3532,
   2007 WL 1455904,
   (N.D. Cal. May 16, 2007) ..................................................14, 27, 28

*Grafman v. Century Broad. Corp.*,
   743 F. Supp. 544 (N.D. Ill. 1990) ....................................................13

*Grimes v. Donald*,
   673 A.2d 1207 (Del. 1996) .........................................................passim

*Grossman v. Johnson*,
   674 F.2d 115 (1st Cir. 1982).............................................................13

*Grunstein v. Silva*,
   C.A. No. 3932,
   2009 WL 4698541,
   (Del. Ch. Dec. 8, 2009) ....................................................................29

*In re: Affiliated Computer Servs., Inc. S'holders Litig.*,
   No. 2821-VCL,
   2009 WL 296078,
   (Del. Ch. Feb. 6, 2009) ....................................................................13

*In re Bank of N.Y. Derivative Litig.*,
   99 Civ. 9977 (DC),
   2000 U.S. Dist. LEXIS 16502,
   (S.D.N.Y. Nov. 13, 2000) .................................................................21

*In re Bed Bath & Beyond Inc.*,
   No. 06-5107,
   2007 U.S. Dist.,
   LEXIS 85213,
   (D.N.J. Nov. 19, 2007).....................................................................32

iv

*In re Career Educ. Corp. Derivative Litig.*,
   No. 1398,
   2007 Del. Ch. LEXIS 184,
   (Del Ch. Sept. 28, 2007) .................................................................... 32

*In re Citigroup Inc. S'holder Derivative Litig.*,
   964 A.2d 106 (Del. Ch. 2009) ............................................................ 34

*In re Intel Corp. Derivative Litig.*,
   621 F. Supp. 2d 165 (D. Del. 2009) .................................................... 32

*In re Intel Corp. Microprocessor Antitrust Lit.*,
   MDL No. 05-1717-JJF (D. Del) ............................................................ 5

*In re Loral Space & Communs. Consol. Litig.*,
   C.A. No. 2808,
   2008 Del. Ch. LEXIS 136,
   (Del. Ch. Sept. 19, 2008) .................................................................... 34

*In re Morgan Stanley & Co.*,
   08-Civ.-7587,
   2009 U.S. Dist. LEXIS 65166,
   (S.D.N.Y. July 22, 2009) .................................................................... 11

*In re Sonus Networks, Inc. S.holders Derivative Litig.*,
   499 F.3d 47 (1st Cir. 2007) ................................................................ 32

*In re Take-Two Interactive Software, Inc. Derivative Litig.*,
   06 Civ. 5279,
   2007 U.S. Dist. LEXIS 46874,
   (S.D.N.Y. June 29, 2007) .................................................................... 11

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
   919 A.2d 563 (Del. Ch. 2007) ....................................................... 30, 31

*In re UA Theatre Co.*,
   315 F.3d 217 (3d Cir. 2003) ................................................................ 38

*Kamen v. Kemper Fin. Servs., Inc.*,
   500 U.S. 90 (1991) .......................................................................... 9, 10

*Kaplan v. Peat, Marwick, Mitchell & Co.*,
   540 A.2d 726 (Del. 1987) ........................................................... passim

*Leung v. Schuler,*
   C.A. No. 17089,
   2000 Del. Ch. LEXIS 41,
   (Del. Ch. Feb. 29, 2000) ......................................................................... 38

*Levine v. Smith,*
   591 A.2d 194 (Del. 1991) .................................................................. 10, 18

*Lewis v. Sporck,*
   646 F. Supp. 574 (N.D. Cal. 1986) ................................................ 13, 14, 15

*Mills v. Esmark, Inc.,*
   91 F.R.D. 70 (N.D. Ill. 1981) .......................................................... 11, 13

*Parfi Holding AB v. Mirror Image Internet, Inc.,*
   954 A.2d 911 (Del. Ch. 2008) .................................................................. 37

*Pfeiffer v. Toll,*
   No. 4140-VCL,
   2010 Del. Ch. LEXIS 51,
   (Del. Ch. Mar. 31, 2010) ..................................................................... 3, 23

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,*
   506 A.2d 173 (1986) .................................................................................. 18

*Scattered Corp. v. Chicago Stock Exch., Inc.,*
   701 A.2d 70 (Del. 1997) .................................................................... 21, 22

*Seaford Assocs. Ltd. P'ship v. Subway Real Estate Corp.,*
   No. 2248,
   2003 Del. Ch. LEXIS 57,
   (Del. Ch. May 29, 2003) ......................................................................... 35

*Seaford Funding Ltd. P'ship v. M&M Assocs. II, L.P.,*
   C.A. No. 1598-5,
   1995 Del. Ch. LEXIS 51,
   (Del. Ch. Apr. 26, 1995) ......................................................................... 12

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
   No. 08-008,
   2010 U.S. LEXIS 2929,
   (U.S. Mar. 31, 2010) ................................................................................ 12

*Stepak v. Addison,*
   20 F.3d 398 (11th Cir. 1994) ................................................................... 18

*Warden v. McLelland,*
   288 F.3d 105 (3d Cir. 2002)...................................................................................... 11

*Wilson v. Garcia,*
   471 U.S. 261 (1985)............................................................................................. 30

*Zapata Corp. v. Maldonado,*
   430 A.2d 779 (Del. 1981) .................................................................................... 30


Statutes

15 U.S.C. § 4............................................................................................................ 6


Rules

Del. Ct. C.P.R. 23.1 ............................................................................................... 10

Fed. R. Civ. P. Rule 8(d)(2) ................................................................................... 29

Fed. R. Civ. P. 23.1 ............................................................................................ 1, 10

Fed. R.. Civ. P. 23.1(b)(3)....................................................................................... 12

Plaintiffs Charles Gilman ("Gilman") and the Louisiana Municipal Police Employees'

Retirement System ("MPERS") respectfully submit this Memorandum in Opposition to

Defendants' Motion to Dismiss the Shareholders' Demand Made Consolidated Derivative

Complaint filed February 12, 2010 ("Complaint" or "Cplt.") pursuant to Rule 23.1 of the Federal

Rules of Civil Procedure.  For the reasons set forth below, Defendants' Motion should be denied

and Plaintiffs should be permitted to proceed with this action.

## PRELIMINARY STATEMENT

Defendants herein are certain current and former directors of Intel Corporation ("Intel").

This consolidated shareholders' "demand made" derivative action arose out of a series of

antitrust violations committed by Intel's senior management, which Intel's Board of Directors

("Board") has allowed to continue for and extended period of time.  That antitrust conduct has,

thus far, cost the Company at least $2 billion.  Plaintiffs seek both money damages for Intel, and

an order requiring the enactment of urgently needed corporate therapeutic reforms.  (*See* Cplt. at

¶ 2.)

Before filing suit, Plaintiffs made a demand seeking the relief requested in the Complaint,

as required by Fed. R. Civ. P. 23.1, but were met with hostility, temporizing, vehement

disclaimers of liability by the very persons being asked to judge their own fault, *i.e.*, the Board,

and excuses not to take action that are designed to run out the statute of limitations.  (*Id.* at ¶¶8-

10, 116-51.)

Defendants claim that they have merely deferred a decision on Plaintiffs' demand for

action, and that this case must be dismissed so that all parties can await the Board's supposedly

unbiased and independent determinations, which are to be rendered at some unspecified point in

the distant future.  In the meantime, the remedial measures requested will not be taken, no

monetary recoveries will be sought, and the corporate officers will continue to act with the assurance that whatever calamities they instigate will be met by the Board with a "head in the sand" approach.

Defendants motion to dismiss can only succeed if their actions are protected by the business judgment rule. The business judgment rule has no application here, however, because Plaintiffs have pled facts demonstrating a reasonable doubt that the Defendants are independent, unbiased, and acting in good faith. Indeed, the conduct of the Board, which appeared to be independent at the time Plaintiffs made their demands, has dispelled all notions of its independence.

As the Delaware Supreme Court made clear in *Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996), it is a bedrock principle of Delaware law that to preserve the presumption of independence and enjoy the protections of the business judgment rule, a Board *must act* independently and in disinterested and unbiased manner *subsequent to* receiving a demand. As the court in *Grimes* reasoned:

> Simply because the composition of the board provides no basis *ex ante* for the stockholder to claim with particularity and consistently with Rule 11 that it is reasonable to doubt that a majority of the board is either interested or not independent, it does not necessarily follow *ex post* that the board in fact **acted** independently, disinterestedly or with due care in response to the demand. A board or a committee of the board may **appear** to be independent, but may not always **act** independently. If a demand is made and rejected, the board rejecting the demand is entitled to the presumption of the business judgment rule unless the stockholder can allege facts with particularity creating a reasonable doubt that the board is entitled to the benefit of the presumption. If there is reason to doubt that the board acted independently or with due care in responding to the demand, the stockholder may have the basis *ex post* to claim wrongful refusal. The stockholder then has the right to bring the underlying action with the same standing which the stockholder would have had, *ex ante,* if demand had been excused as futile.

*Id.* (emphasis in original).

Here, the Board did not behave in a disinterested fashion *ex post* and is entitled to no business judgment rule protection.  In previous shareholder "demand futile" derivative litigation filed in this Court that addressed much the same subject matter, the Intel directors (including a majority of the current Audit Committee) claimed that the underlying allegations against them exhibited "an utter lack of merit" and "created only the illusion of a lengthy pattern of wrongdoing," indicating that they had investigated the underlying claims and found them wholly wanting.[1]  That statement was made on behalf of the entire Board *subsequent* to its having received a shareholder demand, and *before* they responded to that demand.  Under Delaware law, pre-judging the merits of the claims in that way, and public proclamations of innocence *post hoc,* preclude any finding that the Board is disinterested enough to be deemed independent.  *See Biondi v. Scrushy*, 820 A.2d 1148 (Del. Ch. 2003).

From their reaction to the demands made by Plaintiffs, it appears that Defendants are paralyzed by the possibility of pending or threatened litigation against Intel resulting from the senior executives' actions, and thus will never take any action to rein them in, or hold them legally accountable (at least not within any applicable statute of limitations).  Indeed, Defendants admit as much in their motion papers (*see* Defs.' Mem. at 2) claiming they are unable to address the pre-suit demands due to the pendency of other litigation against Intel.  That admission alone is sufficient to find reasonable doubt as to the Board's independence.  *See Pfeiffer v. Toll*, No. 4140-VCL, 2010 Del. Ch. LEXIS 51, at *21-22 (Del. Ch. Mar. 31, 2010) (holding that Board could not consider demand impartially where class action was pending against company and assertion of claims against officers and directors would undercut their efforts with respect to

---

[1]      (*See* Cplt. at ¶¶ 9, 13, 19, 123, 149 (referencing Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Consolidated Complaint or, in the Alternative, to Stay this Action, dated September 5, 2008, at 21-23, filed in *In re Intel Corp. Derivative Lit., C.A.* No. 08 CV 93 (JJF) (D. Del.), a case in which shareholder Martin Smilow filed a demand-futility derivative action against these same Defendants) (hereinafter, "*Smilow* Action").)

other litigation).  The proper resolution is not for the claims herein to be buried in the sand, but rather for the Board to step aside and allow Plaintiffs to litigate the case so they can seek the much-needed remedial action before the Company is even more substantially damaged by out-of-control executives.[2]

## STATEMENT OF FACTS

### I.   THE UNDERLYING FACTS EVIDENCE A HISTORY OF VERY SERIOUS WRONGDOING

At the heart of the underlying wrongdoing herein is a long history of directorial indifference to (or acquiescence in) anticompetitive conduct charged against Intel and brought to the Board's attention by government agencies and private parties.  The actions brought against Intel relate to its alleged efforts to illegally dominate the supply market for computer central processing units ("CPUs") and to prevent one of its major competitors, Advanced Micro Devices, Inc. ("AMD"), from successfully competing with Intel in the CPU market.   (*See* Cplt. at ¶¶ 15-5, 36.)

After a multi-year investigation of Intel's long-running conduct, on May 13, 2009, the European Commission ("EC") levied a record $*1.45 billion* fine on the Company ("EC Action"). (Cplt. ¶ 2.)  The EC ruling was the culmination of many years of investigation involving witness interviews, testimony and documents, some of which was voluntarily produced, while other evidence was obtained during raids on Intel's corporate offices.  (*Id.*)  In imposing the largest fine in its history, the EC stated that "Intel has not convincingly argued or forwarded any

---

[2]   Defendants' arguments present an odd paradox:  They seem to be asserting that as the wrongdoing committed by the senior executives gets more and more serious, the Board has less and less of an obligation to take action to rein in unlawful activities, due to the feared "consequences" of doing the right thing.  That cannot be the law of Delaware, or any other jurisdiction, as it is blatantly against public policy, and turns every Board of a recidivist company into a group of *de facto* accomplices.  That type of argument is disingenuous and must be rejected.

convincing evidence showing negligence on its part **and the EC has found Intel to have engaged in a strategy of exclusion ...."** (*Id.* at ¶ 3 (emphasis added).)[3]

After years of bitter litigation, Intel agreed on November 12, 2009, to pay another **$1.25 billion** to settle *In re Intel Corp. Microprocessor Antitrust Lit.,* MDL No. 05-1717-JJF (D. Del), a private antitrust lawsuit brought in 2005 by Intel's main competitor, AMD.  (*Id.* at ¶ 5).  The AMD Action concerned much of the same anticompetitive conduct that was addressed in the EC proceeding.  Significantly, the AMD settlement also required Intel to alter its cross-licensing agreements with AMD to allow AMD the freedom to produce large quantities of competing CPUs in factories not owned by AMD or an AMD affiliate – an action it was previously prohibited from taking under existing licensing arrangements.  (*Id.* at ¶¶ 5, 97.)

As if this were not enough, two domestic regulatory agencies filed actions against Intel as a result of its anticompetitive activities.  Namely, on November 4, 2009, the Attorney General of the State of New York filed an action against Intel in this District alleging violations of the Sherman Antitrust Act and New York State antitrust law ("NYAG Action").  (*Id.* at ¶ 6.)  In addition, on December 16, 2009, the United States Federal Trade Commission ("FTC") filed an administrative action alleging that Intel's antitrust scheme violated Section 5 of the Federal

---

[3]     Specifically, the EC determined that Intel's executives had:

> engaged in two specific forms of illegal practice.  First, Intel gave wholly or partially hidden rebates to computer manufacturers on condition that they bought all, or almost all, of their x86 CPUs from Intel.  Intel also made direct payments to a major retailer on condition it stock only computers with Intel x86 CPUs.  Such rebates and payments effectively prevented customers – and ultimately consumers – from choosing alternative products.  Second, Intel made direct payments to computer manufacturers to halt or delay the launch of specific products containing competitors' x86 CPUs and to limit the sales channels available to those products.  The EC found that those practices constituted abuses of Intel's dominant position on the x86 CPU market that harmed consumers throughout the European Economic Area.  By undermining its competitors' ability to compete on the merits of their products, Intel's actions undermined competition and innovation. (*Id.*)

Trade Commission Act, 15 U.S.C. § 4, which prohibits unfair methods of competition and deceptive acts and practices in commerce ("FTC Action"). (*Id.*) The FTC Action potentially poses a more serious threat than any proceeding to date. Rather than monetary damages, the FTC Action seeks to fundamentally restrict the methods by which Intel conducts its business. (*Id.* at ¶ 7.) Indeed, including sub-parts, the FTC's requested relief includes forty-three (43) separate requirements and/or prohibitions to which Intel must conform when conducting future business transactions – including broad requirements to license the Company's intellectual property to direct competitors "upon such terms and conditions as the Commission may order." (*Id.*) As a result, if successful, the FTC Action greatly inhibits Intel's immediate profitability and may even endanger the Company's long-term survival. (*See Id.* at ¶¶ 6, 100-15.) Those mounting legal problems highlight the need for active intervention by the Board, something which is sorely lacking, as seen by their conduct described herein.

## II.  THE INTEL BOARD'S CONDUCT *EX POST* DEMONSTRATES A COMPLETE LACK OF INDEPENDENCE

Plaintiffs' duly filed pre-suit demands requested that the Board hold responsible those whose actions or inactions resulted in this debacle, and asked the Board further to enact corporate governance changes to insure that such misconduct never recurs.[4] (Cplt. ¶ 8, 120-33.)

### A.   Intel's Baseless Refusal to Make Any Investigation

In a letter dated January 29, 2009, counsel for Intel's Audit Committee stated that Intel could not address the demand because it could expose Intel to liability in the underlying matters – the exact impediment that disabled the Board in *Toll*. (Cplt. ¶ 125.) Further, the response

---

[4]   The initial demand was filed on June 12, 2008 and is set forth as Exhibit C to Defendants' Compendium of Exhibits ("Compendium"). (*See* Cplt. ¶ 121.) That demand was supplemented on June 8, 2009, to address the EC decision with respect to Intel. (*See* Defendants' Compendium, Exh. F.) Gilman joined the prior demand by a written demand dated October 14, 2009. (*See* Cplt. at ¶122.) MPERS's demand, dated November 12, 2009, is set forth as Exhibit J to Defendants' Compendium.

claimed that "the factual records in the underlying matters are not yet fully developed, and the Company would benefit from a more fully developed factual record."[5]   The Audit Committee's contention was wholly false on its face.  As will be established below, Intel completed its factual investigation of those litigations years ago, and Intel has had *no problem* since claiming that each proceeding lacks merit – statements the Company presumably would not publicly disseminate without a proper factual basis.  Moreover, it is absurd to suggest that Intel approved the $1.25 billion AMD settlement in ignorance of the underlying facts.  Finally, as detailed in the Complaint, mechanisms have long existed at Intel to evaluate legal issues, and report on them at least quarterly to the Audit Committee, which reports to the Board.  (*See Id.* at ¶¶ 10-12.)

### B.   The Intel Board's Improper Designation of the Conflicted Audit Committee to Address Plaintiffs' Demand

Certainly the Board knew that, in the previous *Smilow* Action involving much of the same subject matter as this case, a majority of the Audit Committee members informed this Court that the underlying claims exhibited an "utter lack of merit" and "created only the illusion of a lengthy pattern of wrongdoing."  Given that the Audit Committee had already taken an adverse position that the underlying claims alleged in *Smilow* were baseless, there was no way that it could fairly address the demands in the instant action.

### C.   Having Repeatedly Taken a Public Stance That Regulators and Private Litigants Are Wrong and That Intel, Its Senior Management, and the Board Have Committed No Wrongdoing Whatsoever, the Board Cannot Be Deemed Independent

Where there is ample evidence that a Board has prejudged the matter, it can no longer be deemed independent.  Here the Board has consistently and repeatedly stated that no director or manager has done anything wrong, and that regulators on three continents and private litigants are pursuing meritless claims.  *Cf. Biondi,* 820 A.2d at 1157 (noting that statements evidencing

---

[5]      That letter is annexed to Defendants' Compendium as Exhibit A.

doubt in validity of plaintiff's allegations before special litigation committee's investigation was completed "undercut the SLC's credibility" and resulted in SLC being deemed not independent).

Thus, Intel's representatives time and again have held firm to the position that they and the Company have done nothing wrong.  In response to the EC's record $1.45 billion fine against Intel, Defendant Otellini issued a May 13, 2009, press release stating that:

> Intel takes strong exception to this decision.  We believe the decision is wrong and ignores the reality of a highly competitive microprocessor marketplace – characterized by constant innovation, improved product performance and lower prices. There has been absolutely zero harm to consumers. Intel will appeal.  We do not believe our practices violated European law.  The natural result of a competitive market with only two major suppliers is that when one company wins sales, the other does not.

(Cplt. at ¶ 139(a).)  Similarly, in a November 12, 2009, *New York Times* article reporting the settlement of the AMD Action, Defendant Otellini discounted the merits of AMD's allegations, stating that "[w]e have never wavered in our position that Intel did nothing outside the law ... [i]t made sense to step back and find a way to settle this [litigation]."  (*Id.* at ¶ 139(b).)

In response to the NYAG Action, a statement on the Company's website affirmatively states that the claims in the NYAG Action are groundless: "[t]he NYAG's Complaint is grounded more in rhetoric and politics than fact and law[.] Rather than setting forth a clear statement of facts upon which its claim is based, the NYAG's allegations are deliberately inflammatory, apparently made for the political purpose of providing sound bites for media attention."[6]  (*Id.* at ¶ 139(c).)  In response to the FTC Action, the Company issued a press release

---

[6]     Intel's **118-page** answer to the NYAG Action ("NYAG Answer"), filed on January 12, 2010, illustrates Intel's view of the relevant facts. At the very outset, Intel unequivocally stakes out the position that the NYAG Action has no fundamental basis in fact.  (*Id.* at ¶ 143.)  The NYAG Answer further provides, in even greater detail, a virtually identical evaluation of the relevant facts as that found in Intel's answer to the FTC action. Notably, however, in conjunction with mirroring the factual analysis of that pleading, the NYAG Answer takes Intel's analysis one step further.  In particular, the NYAG Answer concludes from the facts that AMD – and not Intel – is to blame for its own competitive disadvantage in the relevant markets.  In sum, Intel's conclusion from the facts is that "AMD consistently lagged Intel in

on December 16, 2009, calling the lawsuit "misguided" and quoting Intel Senior Vice President and General Counsel Doug Melamed as saying that "[t]he FTC's rush to file this case will cost taxpayers tens of millions of dollars to litigate issues that the FTC has not fully investigated." (*Id.* at ¶ 139(d).)  In Intel's 2008 Corporate Responsibility Report, the Company stated that "Intel is engaged in a series of private litigations and regulatory investigations prompted by complaints from its primary competitor.  Our position on these matters is simple:  We believe that the worldwide microprocessor market is functioning normally and is highly competitive, and that our conduct has always been lawful, pro-competitive, and beneficial to consumers."[7]  (*Id.* at ¶ 139(e).)

Based on those public comments, it is clear that the Board has prejudged this matter. Therefore, it is neither independent nor entitled to no protection under the business judgment rule.  Plaintiffs should thus be allowed to proceed with this action.

## ARGUMENT

The purpose of a shareholder derivative action is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'"  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95(1991) (quoting *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 548 (1949)).  Because the

---

addressing the stability, quality, manageability, security, and performance concerns of corporate customers and … **these critical failures, and AMD's failure to build a competitive mobile microprocessor,** *not alleged Intel misconduct,* **account for AMD's lack of success in the corporate segment."**  (*Id.* at ¶ 144 (emphasis added).)

[7]     Intel's 21-page Answer to the FTC Complaint, filed on December 31, 2009 ("FTC Answer") leaves no doubt that its conclusions with respect to all alleged antitrust violations came as the result of a comprehensive and exhaustive analysis of the alleged facts.  Indeed, before ever responding to any of the specific numbered paragraphs of the FTC Complaint, the FTC Answer contains a detailed *8-page* introduction assailing the FTC's allegations and its use of the FTC Act to address alleged antitrust violations.  (*Id.* at ¶ 140.)  Also, the FTC Answer staunchly defends Intel's practice of bullying original equipment manufacturers, Intel's main customers, into limiting their dealings with AMD by withholding technical assistance or collaboration.  (*Id.* at 141.)  Finally, The FTC Answer similarly defends in minute detail its anticompetitive conduct with respect GPUs.  (*Id.* at ¶ 142.)

derivative claim belongs to the company, there is an initial presumption that a company, through its officers and directors controls the decision to prosecute such a claim. *See Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1987) ("[T]he decisions of a corporation, including the decision to initiate litigation – should be made by the board of directors or the majority of shareholders.") (citation omitted). Accordingly, Rule 23.1 of the Federal Rules of Civil Procedure and its Delaware Chancery counterpart requires "that shareholders seeking to assert a claim on behalf of the corporation must first exhaust intracorporate remedies by making a demand on the directors to obtain the action desired."[8] *Id.* at 730; *see also* Fed R. Civ. P. 23.1; Del. Ct. C.P.R. 23.1.

There are several types of so-called "demand" cases in derivative litigation. First, "demand refused" cases exist where, as here, a shareholder is justified in bringing an action on behalf of the company after he makes demand on the corporation's board of directors to take corrective action and the board refuses to take such action. *See Levine v. Smith*, 591 A.2d 194, 210 (Del. 1991) (making distinction between demand refused and demand excused cases), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000). Second, "demand excused" cases entail shareholder filing suit on behalf of the company without first making any demand because demand would be futile. *Id.* Finally, where a board or board committee assigned to review the merits of proposed derivative claims has shown by its actions that it has pre-judged those claims or otherwise failed to act in good faith, a Court need not await their decision whether to prosecute derivative claims, because the directors are disqualified from acting and no decision they ultimately make would be entitled to any deference. *See Biondi*, 820 A.2d at 1166 (holding that where Chairman of Special Litigation Committee stated publicly at

---

[8]     Because Rule 23.1 of the Federal Rules of Civil Procedure "speaks only to the adequacy of the shareholder representative's pleadings," the law of the state of incorporation provides the substantive law relating to demand requirements. *See Kamen*, 500 U.S. at 97.

time when Committee had barely commenced its work that claims were meritless, no decision ever reached by directors would be entitled to business judgment deference and derivative action could proceed without awaiting the directors' ultimate response, because "[e]ven if the SLC later issues a report in favor of dismissal that reads well and that appears to be factually supported, there will always linger a reasonable doubt that its investigation was designed to paper a decision that had already been made").

As shown herein, in light of Defendants' unreasonable actions in response to Plaintiffs' demands, those demands have effectively been refused, and such refusal must be deemed wrongful. Alternatively, under *Biondi*, even if the Court finds that the demand has not yet been refused, this action may proceed, as any decisions the Board may make cannot be entitled to deference due to its demonstrated bias and hostility toward the underlying claims. Finally, should the Court determine that the Board is entitled to additional time to reach a final decision, due to statute of limitations concerns and for other reasons, this action should be stayed for a set period of time, rather than dismissed outright.[9]

## I.   DEFENDANTS' FAILURE TO RESPOND TO PLAINTIFFS' DEMANDS IS TANTAMOUNT TO A REJECTION

In a shareholder derivative action, "[t]he purpose of the demand requirement of Rule 23.1 is to allow a corporation to activate intracorporate remedies to address shareholder complaints prior to resorting to judicial intervention." *Mills v. Esmark, Inc.*, 91 F.R.D. 70, 72 (N.D. Ill. 1981). The authority of the board of directors to take action, however, is "tempered by

---

[9]    *See e.g., In re Morgan Stanley & Co.,* 08-Civ. 7587, 2009 U.S. Dist. LEXIS 65166, at *6 (S.D.N.Y. July 22, 2009) (staying derivative proceedings pending directors' issuance of their report); *In re Take-Two Interactive Software, Inc. Derivative Litig.,* 06 Civ. 5279, 2007 U.S. Dist. LEXIS 46874, at *6-7 (S.D.N.Y. June 29, 2007) (granting directors three-month extension, which gave SLC total of seven months to complete investigation) (collecting cases)*; see also Warden v. McLelland,* 288 F.3d 105, 111 (3d Cir. 2002) (holding that where derivative plaintiff risked losing his claims if he waited, final results of demand action should not have been dismissed on "demand" grounds, as plaintiff was required to act with alacrity).

fundamental fiduciary obligations owed by the directors to the corporation and its shareholders."

*Kaplan*, 540 A.2d at 729.   Balancing those competing interests, Rule 23.1 requires a plaintiff to

state with particularity:   (1) his efforts to obtain the desired action from the board of directors;

and (2) "the reasons for not obtaining the action or not making the effort."   Fed. R. Civ. P.

23.1(b)(3).[10]

As shown below, the Board's decision to take no action on Plaintiffs' demands is, in

effect, a rejection of those demands.   Moreover, Plaintiffs have met the *Grimes* standard

sufficiently to bar Defendants from shielding their conduct under the protection of the business

judgment rule.   *See Grimes*, 673 A.2d at 1219 ("If there is reason to doubt that the board acted

independently or with due care in responding to the demand, the stockholder may have the basis

*ex post* to claim wrongful refusal. The stockholder then has the right to bring the underlying

action with the same standing which the stockholder would have had, *ex ante,* if demand had

been excused as futile") (emphasis in original); *see also Burns v. Friedli,* 241 F. Supp. 2d 519,

525 (D. Md. 2003) (permitting derivative case to proceed post-demand where "it appears that the

complaint alleges with particularity facts pertaining to the Osiris board's bias, lack of

independence, control by [individual directors], and aversion to conducting a reasonable

investigation of the allegations contained in the plaintiffs' demand"); *Seaford Funding Ltd.*

*P'ship v. M&M Assocs. II, L.P.*, C.A. No. 1598-5 1995 Del. Ch. LEXIS 51, at *15-16 (Del. Ch.

---

[10]      There is nothing in Fed. R. Civ. P. 23.1 that requires a plaintiff to plead with particularity a
wrongful refusal or that the directors acted in bad faith or with bias.   To the extent that Delaware
decisions have read such a particularity requirement into their version of Rule 23.1, that heightened
standard does not apply in the federal courts under the rule set forth in *In re Tower Air, Inc.,* 416 F.3d
229, 236 (3d Cir. 2005) (holding that Delaware chancery rules requiring particularity in pleading cases
involving fiduciary breaches set standard that is higher than federal rules standard and, therefore, it does
not apply in federal court).   In this regard, *Tower Air* foreshadowed the recent Supreme Court ruling
establishing that federal courts shall follow the federal rules and not similar, but more restrictive, state
rules.   *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, No. 08-008, 2010 U.S. LEXIS 2929
(U.S. Mar. 31, 2010).   In any event, Plaintiffs set forth their claims with great particularity as to all such
issues and the instant Complaint meets both Delaware and federal standards.

Apr. 26, 1995) (deeming demand refused under circumstances where general partner refused to take action set forth in demand).

Under Delaware law, once a plaintiff has made a good faith and proper demand upon a board of directors, "the corporation must function under a reciprocal duty to make an earnest effort to consider the shareholder's demand and to decide upon a response within a reasonable time" and not delay the suit by engaging in "idle ceremony." *Mills*, 91 F.R.D. at 73 (applying Delaware law) (noting that suit may proceed where board of directors fails to respond to demand within reasonable time). A board may not consider a demand in perpetuity, but rather must respond within a reasonable period of time, particularly when the board has gathered all of the relevant factual information to evaluate the underlying allegations. *See Lewis v. Sporck*, 646 F. Supp. 574, 578 (N.D. Cal. 1986) (finding that derivative plaintiff was justified in bringing suit without waiting for action from board of Delaware corporation where board delayed taking action on shareholder demand even though facts underlying demand had been public knowledge for several years); *Grafman v. Century Broad. Corp.*, 743 F. Supp. 544, 548 (N.D. Ill. 1990) (applying Delaware law) (stating that "[i]t is the duty of the courts to insure that the corporation's investigation is not a mere artifice for delay"); *Grossman v. Johnson*, 674 F.2d 115, 122 (1st Cir. 1982) (noting that where board engages in "dawdling or the taking of excessive time to reply to a demand, a district court could allow suit to go forward without awaiting a response") (citing *Mills*); *see also In re: Affiliated Computer Servs., Inc. S'holders Litig.*, No. 2821-VCL, 2009 WL 296078, at *10 n.43 (Del. Ch. Feb. 6, 2009) ("[I]f, as the plaintiffs suggest, the outside directors would have simply ignored the demand without due consideration, the plaintiffs might then have had a claim for wrongful demand refusal.").

13

Here, Defendants are undoubtedly taking an excessive time to reply to Plaintiffs' repeated demands.  As described more fully below, it is clear that Defendants' position in antitrust litigation concerning the same underlying facts *and a fortiori in the prior shareholder's derivative suit* – that those allegations have absolutely no merit – had been staked out long before demand was made here, and then reiterated afterwards.[11]  Moreover, the fact that Intel agreed to settle the AMD antitrust action for $1.25 billion and to make significant changes in how it conducts business, indicates that the Board is fully informed with regard to the facts underlying the antitrust claims.  Accordingly, the Court should find that demand has been wrongfully refused and allow this suit to move forward.

Under Delaware law, a board's decision to defer final action on a shareholder's demand until resolution of pending litigation can be construed as rejection.  "[A] corporation may not stand neutral in the face of a shareholder's demand; it must affirmatively object to or support the continuation of the litigation."  *Furman v. Walton*, No. 06-3532, 2007 WL 1455904, at *2 n.1 (N.D. Cal. May 16, 2007) (noting that where "defendants [] did not support [plaintiff's] demand, their deferral is effectively an objection or rejection") (citing *Kaplan*, 540 A.2d at 731).  This is especially true when, as here, the defendants possess the relevant information with which to make a decision.  *See Lewis*, 646 F. Supp. at 578.  In this case, Defendants gathered more than enough information about Plaintiffs' demands to enable them to make an informed decision,

---

[11]     Defendants' personal opinions expressed in the prior S*milow* action as to the lack of merit of the claims asserted were expressed *subsequent to* Defendants having received the first shareholder demand. That blatantly and publicly expressed bias satisfies the *Grimes* rule that judges the directors' behavior "*ex ante*." Here, *ex ante,* the directors (who now claim to be insufficiently informed regarding the matter) rushed to judgment concerning the merits of the claims, disqualifying them from claiming good faith or the requisite independence of mind.

obtaining information both from Intel's internal reporting system and from at least three separate lawsuits or regulatory actions that share the same underlying facts.[12]  (*See* Cplt. ¶ 138.)

Indeed, there can be no doubt that Defendants here were well informed regarding the underlying facts supporting Plaintiffs' demands.  Defendants gained that knowledge from their review of the evidence supporting regulatory proceedings and private actions commenced as early as mid-2005, all of which contained the same core allegations as Plaintiffs' demands.  (*Id.* at ¶ 138.)  Despite their plainly sufficient knowledge base, the Board has been temporizing and trying to run out the statute of limitations.  Such bad faith delay justifies Plaintiffs in acting when they did.  Case law supports that position.  For example, in *Lewis*, the plaintiff shareholder brought suit after making demand on behalf of National Semiconductor Corporation ("NSC") against NSC's individual board members for violations of the RICO Act, trade secret theft and testing fraud.[13]  *Lewis*, 646 F. Supp. at 576.  After the NSC board informed the plaintiff that no investigation into the demand had commenced and that any investigation would take ninety (90) days, the plaintiff filed his complaint.  *Id.* at 576-77.  The defendants moved to dismiss the trade secret claims pursuant to Rule 23.1 as premature.  *Id.*  In reaching its conclusion that the plaintiff was justified in filing his complaint without waiting for board action, the court cited both the fact that NSC's involvement in trade secret violations was public knowledge for years and also that those violations were the subject of a government investigation and a subsequent $3 million settlement with a competitor.  *Id.* at 578.

---

[12]    Significantly, Intel's Ethics and Compliance Oversight Committee ("ECOC"), which was charged with reviewing claims of legal violations, gathered information and reported it on at least a quarterly basis to the Audit Committee which, in turn, reports to the Board.  (*See* Cplt. ¶¶ 10-12 (detailing internal reporting system).)

[13]    Although the issues in Lewis concerned plaintiff's demand on the trade secret claims, the court also found that, because the NSC board had three years to respond to the plaintiff's testing fraud demand and never did so, the demand had effectively been rejected.  *Id.*

In this case, Gilman made his initial demand on the Board by joining in a demand made on June 12, 2008, by another Intel shareholder, Annette Villari. (Cplt. ¶¶ 121-22.) On January 29, 2009, the Board's Audit Committee set forth the five reasons supporting its recommendation that the Board "defer any determination regarding the demand."[14] Thereafter, on May 13, 2009, the EC announced the imposition of a penalty on Intel of $1.45 billion, (*id.* at ¶ 129), and after meeting with counsel for Gilman in August 2009, the Board still refused to take any action on the demand.

On November 12, 2009, subsequent to the announcement of the NYAG Action and on the very same day as the announcement of the $1.25 billion AMD settlement, Plaintiff MPERS made its demand on the Board. (*Id.* at ¶ 134.) Counsel for the Board wrote to MPERS on December 1, 2009, claiming that the Board was aware of the demand and would "take up the matter in the near future." (*Id.* at ¶ 135.) MPERS's counsel wrote back to counsel for the Board on December 7, 2009, informing counsel that they were aware of the Board's position regarding Gilman's demand and asking for assurances by December 11, 2009, that MPERS's demand would be treated differently. (*Id.* at ¶ 136.) Counsel for the Board brushed off MPERS's demand by simply stating that the matter would be considered at the Board's next regularly scheduled meeting in January, 2010. (*Id.*) To date, the Board has failed to take any action on the MPERS demand. Nor has the Board provided MPERS with any reason to believe that its demand will be treated any differently than Gilman's demand.

---

[14] Those five reasons are encapsulated as follows: (1) the demand is premature because the matters raised are the subject of contentious litigation, and Intel could "benefit" from a judicial resolution of those questions; (2) despite years of litigation, the "factual records" in the underlying matters were not fully developed, and the Company could benefit from a fuller factual record; (3) any action taken by Intel against any alleged wrongdoers could expose Intel to liability; (4) action taken on the demand could have an unspecified adverse effect on Intel's business; and (5) action by Intel against any alleged wrongdoers could trigger large indemnity obligations. (*Id.* at ¶ 125.)

Just as the board in *Lewis*, the Board here had knowledge of all the facts underlying Plaintiffs' demands. The allegations forming the basis for Plaintiffs' demands are closely related to: (1) the AMD Litigation filed in June 2005; and (2) the EC Action commenced in July 2007. Moreover, the core allegations against Intel have been public knowledge since at least July 2007, when the EC issued a press release confirming its "Statement of Objections" against Intel. (*Id.* at ¶82.) Therefore, there can be no doubt that the Board was well informed about the antitrust allegations in this matter prior to the initial demand.

In addition, the Board had clearly completed its investigations into those allegations, as shown by Intel's public stances taken in response to the various actions, overwhelmingly trumpeting the Board's belief that Intel committed absolutely no wrongdoing. (*Id.* at ¶¶ 139-45.) Intel's statement from its 2008 Corporate Responsibility Report encapsulates the Board's position with regard to all such antitrust allegations:

> Intel is engaged in a series of private litigations and regulatory investigations prompted by complaints from its primary competitor. Our position on these matters is simple: We believe that the worldwide microprocessor market is functioning normally and is highly competitive, and that our conduct has always been lawful, pro-competitive, and beneficial to consumers.

(*Id.* at ¶ 139.) As Intel's own public statements reveal, the Board was completely disingenuous when it deferred decision on Plaintiffs' demands in this matter. The Board's stance was fixed long ago: All antitrust allegations are completely without merit. As a result, the Board knew from the moment it received Plaintiffs' demands in this case that those demands (and any subsequent demands) would ultimately be rejected (or forever "deferred") in keeping with the Board's position in every similar litigation.

The Board's *de facto* rejection of the demands in this case – stating that it is somehow prudent to postpone a decision – while vigorously defending the Company in the related

litigations and at the same time publicly touting its innocence of any misconduct is obviously a

disingenuous and bad faith delay tactic. The Board is not entitled to sit on a demand for an

unreasonable period of time when it has already made its decision regarding the merits of the

asserted claims. Like the plaintiff in *Lewis*, Plaintiffs here were justified in filing a Complaint

because their demands have been effectively rejected.[15]

## II.   THE DEFENDANTS' DECISION TO EFFECTIVELY REJECT PLAINTIFFS'DEMANDS IS NOT ENTITLED TO THE PROTECTION OF THE BUSINESS JUDGMENT RULE

Delaware directors owe fundamental fiduciary duties of care and loyalty to the company

and its shareholders. *See Kaplan*, 540 A.2d at 729. It follows that, although the business affairs

of a corporation are to be managed under the direction of a board of directors, that managerial

power is not unlimited. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173,

179 (1986) ("In discharging [its managerial] function the directors owe fiduciary duties of care

and loyalty to the corporation and its shareholders."). To survive a motion to dismiss pursuant to

Rule 23.1, a plaintiff must sufficiently allege "'facts that create a reasonable doubt that' the

board's [demand] refusal was in fact made on an informed basis, in good faith, and with the

corporation's best interests in mind." *Stepak v. Addison*, 20 F.3d 398, 403-04 (11th Cir. 1994)

(applying Delaware law) (finding that board did not exercise due care in rejecting shareholder

demand because of reliance on "conflicted" counsel) (citing *Levine*, 591 A.2d at 211).

Once demand is made and refused, the inquiry is whether the board was: (1)

independent, (2) disinterested, and (3) acted with due care and in good faith. *See Grimes*, 673

---

[15]    *See also Brandin v. Deason,* 941 A.2d 1020, 1024 n.16 (Del. Ch. 2007) ("The fact that Delaware law requires a stockholder to make an election between arguing wrongful demand refusal or demand futility in order to maintain a derivative suit seems to suggest, at least from a standpoint of equity and fairness, that a corporation's board should have to make a decision early in the litigation, instead of waiting until months of discovery are complete to raise demand-related issues. In the past, the Delaware Supreme Court has held that equivocal actions by directors can amount to a concession of interestedness or non-independence.").

A.2d at 1219 (holding that question in demand refused cases is whether board "in fact acted independently, disinterestedly, or with due care in response to the demand") (emphasis in original); *see also Biondi*, 820 A.2d at 1164 (finding that in evaluating demand refused cases court must query whether board members:  "(1) were independent; (2) acted in good faith; and (3) had a reasonable basis for their conclusions").

Here, Defendants' motion to dismiss should be denied under that standard, because the Complaint raises a reasonable doubt as to whether Defendants ***either***:  (i) were independent; (ii) acted in good faith; ***or*** (iii) exercised due care.

A. **The Complaint Adequately Pleads That the Board Was Not Independent or Disinterested, Did Not Act In Good Faith, and Did Not Exercise Due Care**

1. *The Board Is Not Independent-Minded or Disinterested*

(a) Under *Biondi*, the Board Has Disqualified Itself from Passing on the Demands

The case at bar presents circumstances quite similar to those presented to the Delaware Chancery Court in *Biondi*.  There, a shareholder of the scandal-plagued HealthSouth Corporation brought a derivative suit against, among others, former corporate CEO Richard Scrushy. Although the shareholder asserted demand futility, a "Special Litigation Committee" of directors ("SLC") moved to take control of the litigation so that it could "conclude its investigation and to decide what course of action is in HealthSouth's best interests."  *Biondi*, 820 A.2d at 1150. Days after the SLC was formed, the Company's CEO issued a statement that:  "Richard M. Scrushy had absolutely no knowledge about any change in Medicare reimbursement rules until August 6, 2002, *and none of us had any knowledge* whatsoever that a possible rule change would have a material, financial impact on our company until August 15, 2002."  *Id.* at 1157 (emphasis added).  The Court noted that:

> This statement was rather unusual, coming from the CEO of a company that had just chosen to form the SLC to investigate, among other things, the very question of whether Scrushy and other HealthSouth insiders had traded improperly while recognizing the adverse effect the Group Rate Policy would have on the company.

*Id.* Next, before the SLC had advanced beyond the early stages of its work, the SLC's Chairman, a newly-appointed director, issued a statement opining that a report issued by a law firm hired *by HealthSouth* had cleared defendant Scrushy of wrongdoing and had put the matter "to rest." *Id.* at 1158. The Chairman later tried to disclaim this statement as merely being "attributed to him…" *Id.* at 1158 n.15.

In those circumstances, the Chancery Court held that – no matter what decision the directors eventually reached – "the undisputed facts make it clear that this court will never be able to defer to a decision by the HealthSouth SLC to terminate these actions." *Id.* at 1150. The Court reasoned that:

> How can the court and the company's stockholders reasonably repose confidence in an  SLC whose Chairman has publicly and prematurely issued statements exculpating one of the key company insiders whose conduct is supposed to be impartially investigated by the SLC? The answer is that they cannot. Even if the SLC later issues a report in favor of  dismissal that reads well and that appears to be factually supported, there will always linger a reasonable doubt that its investigation was designed to paper a decision that had already been made.

*Id.* at 1166.

Here, the glaring lacking of independence is even stronger than that present in *Biondi*. There, the acts of one director tainted everyone else on his Committee.  In the present case, the corporation via its CEO, who is also a member of the Board, and others have not only issued repeated denials of wrongdoing, but the *all* of the directors themselves, after a demand had been received, attempted to convince this Court in previous briefing that the underlying claims had an "utter lack of merit" and that the claims reflected only the "illusion of a lengthy pattern of wrongdoing." (Cplt. ¶ 149.) It is plain that, as in *Biondi,* the directors have issued statements

prematurely exculpating themselves, *to wit*, the decision as to whether the claims subject to the demands have merit had "already been made." *Biondi*, 820 A.2d 1166.

Thus, under *Biondi*, whether the demands have been deferred (as Defendants would have it) or *de facto* refused (as is truly the case) is not truly relevant because either way the Board's decision can *never* be given business judgment deference. *Id.*; *see also In re Bank of N.Y. Derivative Litig.*, 99 Civ. 9977 (DC), 2000 U.S. Dist. LEXIS 16502, at *10 (S.D.N.Y. Nov. 13, 2000) ("The members of the SLC have joined in the instant motion, *in which they and the other defendants have strenuously denied any wrongdoing*; it is difficult to imagine that the SLC will reach any conclusion other than that the complaint lacks merit and therefore should be withdrawn.") (emphasis added).

As noted, the issue of directorial independence is a proper subject for inquiry post-demand.  Despite Defendants' contention to the contrary, "[i]t is not correct that a demand concedes independence 'conclusively' and *in futuro* for all purposes relevant to the demand." *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 74-75 (Del. 1997), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  "Failure of an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation.  Such failure could constitute wrongful refusal." *Scattered Corp.*, 701 A.2d at 75.  This is completely consistent with the *Levine* and *Spiegel* cases cited by Defendants.  (*See* Defs.' Mem. at 27); *see also Scattered Corp.*, 701 A.2d at 75 ("[A] board that appears independent *ex ante* may not necessarily act independently *ex post* in rejecting [or deferring] a demand.");[16] *accord*

---

[16]     *See also Scattered Corp.*, 701 A.2d at 74 ("Simply because the composition of the board provides no basis *ex ante* for the stockholder to claim with particularity and consistently with Rule 11 that it is reasonable to doubt that a majority of the board is either interested or not independent, it does not

*Behradrezaee v. Dashtara,* 910 A.2d 349, 360 (D.C. 2006) (stating that, where demand refusal is asserted, "[i]t is eminently logical and reasonable to permit *ex post* challenges to the board's independence").

Thus, Defendants' contention that the law precludes Plaintiffs from arguing that the Board is not appropriately independent once a demand on the Board has been made is blatantly incorrect.  Like the defendants in *Scattered Corp.*, Defendants "state (or overstate) the standard in terms that appear to be more sweeping" than the applicable case law indicates.  *Scattered Corp.*, 701 A.2d at 74.  The allegations in this case are more than sufficient to constitute wrongful refusal, and lack of the requisite independence.

(b)    The Board Has Not Responded to the Demands
       in a Disinterested Manner

By their own actions, Defendants concede that they are not capable of acting in a disinterested manner when considering Plaintiffs' dmands.  In a letter to Gilman's counsel dated January 29, 2009 (seven months after the initial demand), the Board's Audit Committee outlined the reasons supporting its recommendation that the Board "defer any determination regarding the demand."  (Cplt. ¶ 125.)  Among the reasons proffered by the Audit Committee was that by taking action against wrongdoers as requested in the demand, Intel could be exposed to liability in ongoing antitrust litigation – a position that Defendants reiterated in their motion to dismiss. (*See* Defs.' Mem. at 20-21 n.17 (stating that Board's compliance with Plaintiffs' demands might result in either:  (1) the Company admitting liability in the ongoing antitrust actions; or (2) the Company being estopped from asserting inconsistent positions in those cases).)

If the Defendants' contention – that they cannot bring the action contemplated in Plaintiffs' demands without admitting liability on behalf of Intel in other pending litigation – is

---

necessarily follow *ex post* that the board in fact **acted** independently, disinterestedly or with due care.") (emphasis in original).

correct, then the Board is effectively disabled from making an independent, disinterested decision regarding those demands. *See Pfeiffer*, 2010 Del. Ch. LEXIS at *20 ("In light of the [pending] federal securities action, it is not possible for the defendants in this case, who comprised a majority of the Board when the suit was filed, to consider a demand impartially."). By conceding that they are in this position, Defendants effectively admit that they are paralyzed and can take no action to further investigate the underlying matters, protect the corporation from monetary harm, or enact urgently-needed remedial measures. Defendants have shown that they did not, indeed cannot, consider Plaintiffs' demands in a disinterested manner. Thus, their prejudicial response to Plaintiffs' demands does not qualify for protection under the business judgment rule.

As a reasonable alternative to "fiddling while Rome burns," the Board can and should stand aside and allow Plaintiffs to prosecute this action, just as the company in *Kaplan* did, thereby dispelling any concern about admissions of liability and alleviating the ongoing harm to Intel that is detailed in Plaintiffs' Complaint. *See Kaplan*, 540 A.2d at 730. In *Kaplan*, the plaintiff shareholders filed a derivative action on behalf of Chase Manhattan Corporation ("Chase") against the company's auditors, Peat, Marwick, Mitchell & Co. ("Peat Marwick") for negligence and breach of contract. *Id.* at 727. Peat Marwick moved to dismiss for failure to make demand pursuant to Chancery Court Rule 23.1, or, in the alternative, for summary judgment because Chase made a business judgment not to bring suit against the auditor. *Id.* Plaintiffs argued that Peat Marwick lacked standing to raise Rule 23.1 defenses and, in any event, demand was excused because Chase's board had taken a neutral position regarding the derivative action. *Id.* In ruling for Plaintiffs on appeal, the Supreme Court of Delaware held that "[b]ecause of the inherent nature of the derivative action, a corporation's failure to object to a

suit brought on its behalf must be viewed as an approval for the shareholders' **capacity** to sue derivatively." *Id.* at 731 (emphasis added).  The Court further stated that given the facts in the case, the board's neutral position was enough to excuse demand.  *Id.*

For all of the foregoing reasons, the Board here was not disinterested and, therefore, its decision regarding Plaintiffs' demands is not entitled to the protection of the business judgment rule.  Because the Complaint raises a reasonable doubt about whether the Defendants were disinterested, the Motion to Dismiss should be denied.  *See Grimes*, 673 A.2d at 1219.

(c)      <u>The Board Did Not Act In Good Faith</u>

The Complaint also pleads specific facts that demonstrate that Defendants' *de facto* rejections of Plaintiffs' demands were made in bad faith.  Accordingly, the business judgment rule does not protect Defendants' decision to indefinitely "defer."

As detailed in the Complaint, the antitrust violations forming the basis of Plaintiffs' demands in this matter are almost identical to those alleged in ongoing antitrust litigation that Intel is currently defending and/or has resolved, including the AMD Litigation and the EC Action.  (Cplt. ¶ 138.)  Defendants' position in those matters and in public statements has been consistent, *to wit*, that Intel, its management, and the Board have not engaged in any wrongful behavior.  (*Id.* at ¶ 139.)  That consistent stance points to only one conclusion regarding Defendants' efforts to continually defer a decision on Plaintiffs' demands:  that those deferrals were nothing more than bad faith efforts to stall or prevent this litigation because Defendants, as all of their actions and statements dictate, were always going to reject Plaintiffs' demands.  Evidencing that fact, Defendants' January 29, 2009 response, which deemed Plaintiffs' demands premature because the relevant facts were "not yet fully developed," was completely without merit.  At that time, Intel was only months away from a $1.25 billion settlement of the AMD

24

action (which had reached the summary judgment stage after extensive discovery) and an agreement to a host of changes to its sales, marketing, and technical practices – all of which boiled down to an agreement to discontinue anticompetitive behavior against AMD. Since the AMD settlement, the Board continues to claim insufficient knowledge. It strains credulity to suggest that the Board would ever agree to pay **$1.25 billion** and simultaneously agree to change major components of its business practices in order to settle a lawsuit without fully understanding **all** of the facts underlying the allegations, as well as all of the pros and cons of entering into such a settlement. To do so would be extremely reckless. For the Board to suggest otherwise is specious.

Intel's public stance in other cases also demonstrates Defendants' bad faith in claiming that more evaluation is needed before a response to Plaintiffs' demands can be made. As discussed, in the *Smilow* Action, a demand futile case, Defendants filed a Motion to Dismiss after demand was made claiming that the allegations exhibited an "utter lack of merit." (Cplt. at ¶ 119.) Similarly, after it was fined a record $1.45 billion by the EC in May 2009, Defendant Otellini issued a statement asserting that:

> Intel takes strong exception to this decision. We believe the decision is wrong and ignores the reality of a highly competitive microprocessor marketplace – characterized by constant innovation, improved product performance and lower prices. There has been absolutely zero harm to consumers. Intel will appeal. We do not believe our practices violated European law.

(Cplt. ¶ 139.) Likewise, after settling the AMD Litigation, Defendant Otellini once again went on record with the Defendants' familiar song of innocence when he was quoted in a November 12, 2009, *New York Times* article as saying that "[w]e have never wavered in our position that Intel did nothing outside the law … [i]t made sense to step back and find a way to settle this [litigation]." (*Id.*)

25

In the FTC Answer, Defendants again made the argument that Intel's anticompetitive conduct was somehow lawful, stating that: "The [FTC] Complaint seeks – by using words such as 'threats' and 'exclusionary' – to transform precompetitive, above-cost price reductions aimed at winning additional sales into something sinister.   But the Supreme Court has repeatedly declared such above-cost discounting to be entirely lawful."   (*Id.*) at ¶ 140.   The 118-page NYAG Answer was similar, asserting that:

> [t]he Complaint is based on a fundamental inconsistency – it accuses Intel of overcharging customers, but the mechanism through which it claims that Intel overcharged customers is *discounting*. It takes the irrational position that price competition from the larger player in the market is anticompetitive and leads to higher, not lower prices. The Complaint also takes a highly selective approach to citation of evidence to support its theories … the Complaint regularly quotes material taken out of context and presents it in a misleading fashion. The Complaint ignores a massive amount of additional evidence, provided to the NYAG during its investigation that refutes its claims.[17]

(*Id.* at ¶ 143) (emphasis in original).)

Defendants' position with regard to Plaintiffs' demands is that they require more time to investigate the underlying facts, yet Defendants were miraculously able to marshal enough facts, and a clear understanding of those facts, to enable them:  (1) to settle the AMD Action for $1.25 billion while making changes to business practices; and (2) to respond to the EC Action, the FTC Action, the NYAG Action, and the *Smilow* Action by consistently stating that those actions were and/or are wholly without merit.  The stance taken toward Plaintiffs' demands as compared with those other actions is so blatantly inconsistent that it is difficult to discern how Defendants can even make such an argument to this Court.

---

[17]    Moreover, the Complaint in this matter is laden with many detailed and specific allegations similar to those above that demonstrate Defendants' consistent position with regard to all antitrust allegations, each of which shows that they "deferred" a decision on Plaintiffs' demands in bad faith.  (*See* Cplt. ¶¶ 96, 98, 105, 110, 119, 139-45.)

Independent of the Defendants' position on the underlying antitrust claims, Defendants' claims that they need more time to evaluate Plaintiffs' demands were in bad faith for the additional reason that by the time MPERS made its demand, the AMD action had already been resolved and the EC fine had been imposed.  The AMD Action involved the production and review of hundreds of millions of documents, testimony from hundreds of witnesses, and the examination of thousands of commercial transactions.  (*Id.* at ¶ 116.)  Further, the EC's Statement of Objections setting forth the Commission's preliminary conclusions caused Defendants to begin preparing a formal response, which ultimately was submitted in February 2009.  (*Id.* at ¶¶ 87, 116.)  Moreover, the ECOC was required to report on all of those matters to the Audit Committee on at least a quarterly basis.  Despite possessing that mountain of information regarding the underlying facts contained in Plaintiffs' demands, Defendants' continued insistence that they need additional time to develop the "factual record" rings hollow. (*Id.* at ¶ 125.)

Defendants rely on *Furman v. Walton*, No. 06-3532, 2007 WL 1455904 (N.D. Cal. May 16, 2007), for the proposition that, where there is pending litigation raising similar issues as the demand, a board's decision to defer regarding that shareholder's demand is reasonable and thus protected by the business judgment rule.  (*See* Defs.' Mem. at 19-20.)  *Furman*, however, is entirely distinguishable.  In *Furman*, the plaintiff made a demand on the board of directors of Wal-Mart Stores, Inc.  *See Furman*, 2007 WL 1455904, at *2.  The court found the board's decision to defer making a final decision until after the completion of pending litigation was, in essence, a rejection of the demand and was protected by the business judgment rule.  *Id.* at *2. The *Furman* court, however, was able to distill the plaintiff's 34-page complaint down to three (3) paragraphs that addressed the issue of demand rejection.  *Id.* at *3.  Discussing those three

paragraphs the court noted that the allegations were conclusory and that the complaint in general was "wholly absent of any particular factual allegations buttressing these conclusions." *Id.* at *4. In marked contrast to the complaint in *Furman*, the Complaint in this matter is replete with numerous detailed factual allegations regarding Defendants' conduct and why that conduct is not entitled to the protection of the business judgment rule. By way of comparison, the Complaint in this matter addresses and refutes each of Defendants' reasons for not acting in great detail; sets forth Defendants' history of pre-judging this matter (as was also the case in *Biondi*); and explains why this action cannot be dismissed, lest the claims be lost due to lapse of the statute of limitations. Plaintiffs also detailed fourteen (14) basic remedial measures that Defendants must take, but have not agreed to take, that in no way "harm" the corporation. Thus, needed detail missing in *Furman* is present here.[18]

In sum, as detailed in the Complaint, Defendants' deferral of Plaintiffs' demands after having already decided that the allegations at the heart of those demands were "without merit" and that neither Intel or the Board nor the Company's senior management had done anything wrong (*see* Cplt. ¶ 139), was simply a bad faith attempt to delay or prevent this litigation. Therefore, Defendants' decision was not in the best interests of the Company and is not entitled to the protection of the business judgment rule.

---

[18]    Finally, the court in *Furman* was satisfied that the Wal-Mart board's business judgment was reasonable because the defendants there submitted a brief to the court promising that "for one year following the Wal-mart Board's final determination concerning plaintiff's demand, they will not assert any statute of limitations defense." *Id.* at *5. Thus, the potential expiration of the company's claims against the defendants was no longer a consideration. *Id.* In contrast, the statute of limitations is a serious concern for Plaintiffs here and yet Defendants have refused to provide Plaintiffs or this Court with any such assurances or to enter into tolling agreements to preserve Plaintiffs' claims.

(d)       The Board Did Not Exercise Due Care

The Complaint unequivocally demonstrates that that Defendants did not act reasonably or with due care when they deferred – and thereby effectively rejected – Plaintiffs' demands.  *See Grimes*, 673 A.2d at 1219.   Thus, Defendants cannot claim the protection of the business judgment rule.

Rather than act with due care in considering Plaintiffs' demands, Defendants have attempted to avoid their obligations.  For example, the "action" taken in response to Plaintiffs' demands has been to:

a.       refuse to appoint a truly independent committee of directors to review the allegations and take decisive action;

b.       refuse to perform any meaningful investigation of the allegations against Intel officers and directors contained in the demands;[19]

c.       refer the matter to the Board's Audit committee for a response, even though that same committee had already concluded in previous litigation that the underlying claims lacked merit;

---

[19]       In footnote 18 of their Brief, Defendants argue that Plaintiffs make contradictory arguments in the Complaint.  As a threshold matter, Plaintiffs are entitled to plead, *in the alternative*, that it would be grossly inappropriate, to say the least, if Defendants did not investigate the underlying antitrust violations in the face of potentially debilitating litigation.  *See* Fed. R. Civ. P. Rule 8(d)(2) ("A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); *Donald M. Durkin Contracting, Inc. v. City of Newark*, C.A. No. 04-163, 2006 WL 2724882, at * 6 (D. Del. Sept. 22, 2006) (noting that, under federal rule, parties may "set forth inconsistent, alternative and hypothetical pleadings"); *Grunstein v. Silva*, C.A. No. 3932, 2009 WL 4698541, at *9 (Del. Ch. Dec. 8, 2009) (noting that Delaware Court of Chancery Rule 8(e)(2) gives plaintiffs ability to plead in alternative and that "party may also state as many separate claims or defenses as the party has regardless of consistency").  Regardless, Plaintiffs' statements are, in fact, completely consistent.  The Complaint alleges two wholly different points:   (1) that Defendants have failed to investigate the merits of the action demanded by Plaintiffs:   for them to bring a lawsuit against Intel's *officers and/or directors* with claims for breach of fiduciary duties and other relevant causes of action that will protect the legal interests of Intel; and (2) that Defendants' refusal to investigate the merits of the demand and deferral of a decision is unreasonable in light of their investigation into the allegations of the underlying antitrust violations raised in the prior litigation.  Thus, there is no inconsistency between those arguments.

d.  selfishly act in their own best interests by trying to run out the statute of limitations in order to avoid personal claims against individual members of the Board;

e.  refuse, in bad faith, to enter into tolling agreements that would preserve the Company's claims; and

f.  claim, again in bad faith, that the Board would review Plaintiffs' allegations at the next meeting, even though Defendants had already decided the claims were meritless.

(*See* Cplt. ¶¶ 9-10, 119, 123, 131-32, 136, 148.)

Defendants cite *Zapata Corp. v. Maldonado*, 430 A.2d 779, 785 (Del. 1981), for the proposition that if the Board had decided not to bring the claims demanded, its decision would unqualifiedly be protected by the business judgment rule.  (*See* Defs. Mem. at 19 n.14 (quoting *Zapata* as saying that "[i]f the board determines that a suit would be detrimental to the company, the board's determination prevails").)  Defendants, however, unabashedly fail to inform the Court of the qualifying factor in this proposition – that "a board has the power to choose not to pursue litigation when demand is made upon it, ***so long as the decision is not wrongful***," which Defendants' decision here decidedly was.  *Zapata*, 430 A.2d at 785 (emphasis added). Moreover, under *Grimes*, no Board determination is conclusive where, as here, independence, good faith, and disinterestedness are reasonably in doubt.  *See Grimes*, 673 A.2d at 1219.

## III.  DEFENDANTS KNOW THAT IF THIS CASE IS DISMISSED, THEY MAY ESCAPE LIABILITY FOR THEIR WRONGDOING BY RUNNING OUT THE STATUTE OF LIMITATIONS

In Delaware, a breach of fiduciary duty claim is governed by a three-year statute of limitations, subject to extension through the application of a variety of tolling doctrines.[20]  *See In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584-85 (Del. Ch. 2007).  During the past few years, private litigants and government regulators have uncovered facts that Defendants

---

[20]  In a diversity case, federal courts apply state statutes of limitation and state tolling doctrines. *See Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985); *Debiec v. Cabot Corp.,* 352 F.3d 117, 128 (3d Cir. 2003).

here may seize upon to argue that Plaintiffs were put on "inquiry notice," requiring them to file suit or lose any chance of holding the various corporate wrongdoers accountable for injuring Intel. Plaintiffs have a real concern that Defendants' temporizing is merely a tactical effort to seek shelter behind the statute of limitations.[21] Plaintiffs' fears in this regard are heightened and legitimized by two facts: (1) in the previous *Smilow* action, these same Defendants aggressively asserted that the limitations periods had lapsed years earlier, relying upon expansive readings of Delaware precedents;[22] and (2) Defendants have steadfastly refused to enter into tolling agreements to protect the *corporation's* claims. (*See* Cplt. ¶¶ 9(f), 119.)

Defendants seek to undercut Plaintiffs' concerns about limitations issues by highlighting the existence of a derivative case brought on behalf of Intel in mid-2008 in California state court by plaintiff Christine Del Gaizo ("*Del Gaizo*"). *Del Gaizo* was filed shortly after *Smilow,* and asserts almost identical claims. According to the docket in *Del Gaizo,* the case was stayed on September 2, 2008. There has been absolutely no substantive docket activity in the succeeding nineteen (19) months.[23]

---

[21]   For example, after a two-year investigation that included a raid of Intel's offices to obtain evidence, the EC on July 27, 2007 issued a "Statement of Objections" containing its preliminary findings as to the details of a pervasive scheme by Intel executives to violate the EC antitrust laws. (*See* Cplt. ¶¶ 81-82.) Delaware courts have held that the release of factual findings by government investigators can commence the limitations period. *See Tyson,* 919 A.2d at 588. If the same type of ruling were rendered here, the absolute cut-off date for claims would be July 27, 2010, only a few months hence. Thus, Defendants' insistence that this action be dismissed while they contemplate taking action at some distant point in the future amounts to nothing more than a ploy through which they will one day announce that they cannot possibly take action against themselves on these "time-barred" claims.

[22]   It is significant that, during the *Smilow* briefing, the individual defendants not only argued on their own behalf that the corporation's claims were time-barred, but also directed the *corporation* to join in the argument that *its* claims were time-barred. That hardly bespeaks independence of mind concerning Intel's interests, and further undermines the individual defendants' claims that they can be considered independent "post hoc" as required by *Grimes.* To the contrary, *Grimes* requires at the very least that directors not *undermine* the company's claims while a demand is pending.

[23]   *See* Declaration of Bryan A. Wood in Opposition to Defendants' Motion to Dismiss the Consolidated Complaint ("Wood Decl."), Exh. A (attaching docket).

Like the plaintiff in the *Smilow* case, the plaintiff in *Del Gaizo* alleges standing to bring her claims based on a theory of demand futility.   In *Smilow,* however, this Court held that demand futility is not a viable theory.   *See In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 175-79 (D. Del. 2009).   Thus, Defendants may obtain the dismissal of *Del Gaizo* at their whim, as a growing body of precedent indicates that this Court's decision as to the viability of a "demand futility" action has a preclusive effect on subsequent proceedings.   *See e.g.*, *In re Sonus Networks, Inc. S.holders Derivative Litig.,* 499 F.3d 47, 56-64 (1st Cir. 2007) (holding that dismissal of earlier derivative suit in Massachusetts state court for failure to plead either demand on company's board of directors or futility of such demand was preclusive of second suit brought on behalf of company and premised on the same theory of demand futility); *accord In re Career Educ. Corp. Derivative Litig.*, No. 1398, 2007 Del. Ch. LEXIS 184 (Del Ch. Sept. 28, 2007) (holding that shareholder plaintiff collaterally estopped from re-litigating issue of board's independence based on final judgment in prior shareholder derivative suit); *In re Bed Bath & Beyond Inc.,* No. 06-5107, 2007 U.S. Dist. LEXIS 85213 (D.N.J. Nov. 19, 2007).

Thus, Defendants' assertion that *Del Gaizo* presently tolls the claims against them, and will continue to do so, is highly cynical as the moribund *Del Gaizo* action will remain pending only for so long as Defendants desire.   Defendants' suggestion that the *Del Gaizo* case may suddenly spring to life, and that we will one day see the filing of an amended complaint or other action, constitutes unsupported speculation.   The most likely scenario is that, if Defendants were to succeed in obtaining dismissal of the instant case, they would then seek dismissal of *Del Gaizo* on the ground of preclusion, thus forever time-barring any claims against themselves.

In sum, this Court should disregard the existence of *Del Gaizo,* as the continued pendency of that dormant case is within Defendants' control and, indeed, highly speculative.   It

is crystal clear that Defendants will invoke any tenuous theory to evade liability, and run out the statute of limitations – conduct that should not be countenanced from these supposedly "independent" directors.

## IV. PLAINTIFFS' COMPLAINT PROPERLY ALLEGES DEFENDANTS' FAILURE TO TAKE REQUIRED REMEDIAL MEASURES

Plaintiffs' Fourth Cause of Action faults Defendants for refusing to enact basic remedial measures designed to detect and address wrongdoing, and seeks an Order requiring them, after trial, to take certain specified actions.  Defendants launch a number of attacks on this cause of action, none of which are well-taken.

First, Defendants claim that no demand was ever made to take these remedial measures.  They are demonstrably in error.  As recounted in the Complaint, after the initial demand was made upon the Board, counsel for the Audit Committee wrote more than once requesting further information regarding the contours of the relief requested.  (*See* Cplt. ¶ 124.)  On June 8, 2009, a letter was sent to counsel for the Audit Committee demanding that the Board effectuate corporate governance changes.  (*Id.* at ¶ 130; King Dec., Exh. F.)  Soon thereafter, in order to satisfy the Board's request for greater details as to exactly what action was being demanded, a meeting was held with counsel for the Audit Committee in New York, at which the Committee was presented with voluminous written materials and an oral presentation explaining precisely what type of remedial action was being demanded.  (*See* Cplt. ¶ 133.)  No fewer than fourteen (14) different types of remedial measures were discussed.  (*Id.*)  Given that history, it is astonishing that Defendants would now argue that, prior to this lawsuit, no demand for this type of action was ever made.[24]

---

[24]     To the extent Defendants are now arguing that they did not understand that a "demand" for remedial action is the equivalent of threatening a lawsuit if such remedial action is never taken, such an

Second, although this motion, by agreement, is not designed to test the sufficiency of any underlying cause of action, it is plain that the Fourth Cause of Action does not simply fault Defendants for failing to accede to a demand as Defendants claim (*see* Defs.' Mem. at 18 n.13) but rather seeks relief for Defendants' failure to adhere to their duty to have effective systems in place to monitor corporate conduct, to detect wrongdoing, and to remedy any wrongdoing that has been uncovered.  *See e.g., In re Citigroup Inc. S'holder Derivative Litig.,* 964 A.2d 106, 131 (Del. Ch. 2009) ("Directors should, *indeed must under Delaware law,* ensure that reasonable information and reporting systems exist that would put them on notice of fraudulent or criminal conduct within the company. Such oversight programs allow directors to intervene and prevent frauds or other wrongdoing that could expose the company to risk of loss as a result of such conduct.") (emphasis added); *ATR-Kim Eng Fin. Corp. v. Araneta*, C.A. No. 489-N, 2006 Del. Ch. LEXIS 215, at *76 (Del. Ch. Dec. 21, 2006) (holding that directors could be held liable for breach of duty of loyalty where they "did nothing to make themselves aware of...blatant misconduct or to stop it").

The remedies Plaintiffs suggest for Defendants' defalcations are not exclusive, but are subject to revision based on the evidence.  Under Delaware law, where directors' actions are found to be deficient, courts have "broad remedial power" to fashion any appropriate remedy.  *In re Loral Space & Communs. Consol. Litig.*, C.A. No. 2808, 2008 Del. Ch. LEXIS 136, at *120 (Del. Ch. Sep. 19, 2008).[25]

In sum, Plaintiffs' Fourth Cause of Action is sufficiently pled in all respects, and cannot be dismissed on this motion.

---

argument must be rejected, as these sophisticated parties surely understood that a demand under Delaware law is a precursor to legal action.

[25]     The *Loral* court emphasized that any proper future-looking remedial measures may be ordered by the Court, and that where (as is the case with the Fourth Cause of Action) relief is sought that does not involve damages, the Court may dispense with "a director-by-director liability assessment."  *Id.*

**V.  ANY ARGUMENT THAT THE INTEL BOARD NEEDED MORE TIME IN LATE 2009 TO CONSIDER HOW TO RESPOND TO MPERS'S DEMAND IS ABSURD, AS THE BOARD HAD ALREADY DECIDED IN EARLY 2009 WHAT ITS RESPONSE WOULD BE TO SUCH SHAREHOLDER DEMANDS**

Defendants assert that MPERS filed its Complaint without providing the Board with sufficient time to formulate its response.  (*See* Defs.' Mem. at 11.)  But, as the Complaint makes clear, the Board had already fully articulated its stance as to the facts underlying Plaintiffs' demands on January 29, 2009, almost ten (10) months prior to MPERS's demand letter.  (*See* Cplt. ¶¶ 125, 134.)  Shortly after MPERS sent its demand letter, the *Gilman* complaint was filed, detailing the unswerving position the Board had taken throughout 2009 – a position it continues to take to this day.  (*See* Cplt. ¶ 136.)  Defendants do not, and cannot, argue that had MPERS waited longer to file its action, Defendants ever would have responded differently than it did on January 29, 2009.  Thus, no good purpose would have been served by MPERS waiting more than the six weeks it did to file its Complaint.  *See Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp.*, 283 F.2d 93, 96 (3d Cir. 1960) (holding that where defendant has already made up its mind about matter, "then performance of procedural requirements could well be excused since the law does not require a party to do a useless act"); *Seaford Assocs. Ltd. P'ship v. Subway Real Estate Corp.*, C.A. No. 2248, 2003 Del. Ch. LEXIS 57, at *7 n.10 (Del. Ch. May 29, 2003) ("The law does not require the doing of a vain and useless act.") (citation omitted).  Indeed, rather than being improper, considering that *Gilman* was on file for only forty (40) days before MPERS filed suit, MPERS's filing when it did has produced the benefit of allowing the two actions to proceed in tandem, thereby preserving scarce judicial resources.

**VI.  MPERS HAS HELD INTEL SHARES AT ALL RELEVANT TIMES**

Plaintiff MPERS has held Intel shares continuously since ***at least*** May 2004.  (*See* Cplt. ¶ 21.)  Defendants nevertheless argue that MPERS was not a shareholder at the time of the

wrongdoing complained of, as required by 8 Del. Code § 327, which embodies what has become known as the "contemporaneous ownership rule."  (*See* Defs.' Mem. at 11 n.8.)

Defendants, however, are factually incorrect.  The Complaint alleges four discrete types of fiduciary violations committed by Intel's directors, occurring at various time periods:

(a) The *Active Misconduct Claims* assert that certain enumerated directors failed to rein in ongoing antitrust violations *once they learned of them* through quarterly reports generated by Intel's Ethic and Compliance Committee ("ECOC").  (*See* Cplt. ¶¶ 11, 12, 36a.)  The ECOC would have uncovered the facts reported to the Board as a result of reviewing the allegations of actions brought by private parties and regulatory authorities in several nations, and (pursuant to its charter) investigating the bases for those allegations.[26]  (*Id.* at ¶ 12.)  Thus, it is alleged the directors would have known of serious misconduct by dint of the assertions made by AMD, Japan and South Korea.  (*Id.* ¶¶ 12, 124.)  The action by AMD, as well as the findings made by Japan and South Korea, all were *subsequent to* 2004.[27]  Accordingly, there is simply no allegation by MPERS in connection with the *Active Misconduct Claims* that the Intel directors were aware of antitrust misconduct, or engaged in any wrongdoing with regard to such misconduct, prior to MPERS's purchase of Intel stock.

(b) The *EC Regulatory Claims* are brought against those persons who were officers and/or directors during the period *from which the EC began investigating Intel's conduct in Europe* through the imposition of the record fine in May 2009.  *During that period, the relevant defendants failed to ensure* that full and complete cooperation was provided to regulatory authorities; failed to hold accountable any person who engaged in unlawful misconduct; failed to take necessary remedial actions; and failed to work with the EC on remedies or resolutions of the charges that would have reduced or even eliminated the EC fine.  (Cplt. ¶ 36(b).)  The EC investigation of Intel's European activities was not commenced until *August, 2006*.[28]

---

[26]     Those allegations differentiate this case from *In re Intel Corp.*, 621 F. Supp. 2d at 174, where plaintiff's cursory pleading did not contain "allegations as to how often and by whom the Board was advised regarding the 'red flags'" raised by these private lawsuits and regulatory charges.

[27]     The initial AMD Complaint, consolidated in *In re Intel Corp. Microprocessor Antitrust Litig.,* 05-1717-JJF, was filed in this Court on June 27, 2005.  The findings by the Japan Fair Trade Commission were released on March 8, 2005.  *See* Wood Decl., Exh. B ("Intel Abuses its Power, Japan Says," Los Angeles Times, March 9, 2005).  South Korea, which disclosed preliminary charges on Sept. 12, 2007, did not announce its final ruling until June 5, 2008.  *See* " Intel Fined in South Korea for Antitrust Rules Breach," Bloomberg.com, June 5, 2005, *available at* http://www.bloomberg.com/apps/news?pid=conewsstory&refer=conews&tkr=INTC:US&sid=a2mpgvYb aE1M.  This Court may take judicial notice of events occurring in relevant regulatory proceedings.  *See City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 259 (3d Cir. 1998).

[28]     *See* Wood Decl., Exh. C ("EU takes over German antitrust inquiry into Intel," CNET New.com, Sept. 11, 2006).

(c) The *AMD Settlement Claims* are brought against those persons who were officers and/or directors during the period in which AMD asserted claims alleging that Intel unlawfully restricted AMD's ability to compete, resulting in a settlement payment to AMD of $1.25 billion in November 2009. (*Id.* ¶ 36(c).)  AMD's complaint was filed in this District on June 27, 2005, *one year after* MPERS's purchase.  Thus, Plaintiff obviously does not allege that the Board failed to react to any claims and conduct detailed in the AMD action prior to the date that action was filed. (*Id.* ¶161 (limiting claims to action or inaction by the enumerated Intel directors "[d]uring that period" AMD action was pending).)

(d) The *Claims Related to Failure to Take Remedial Measures* are brought against those persons who are presently Intel directors and who are alleged to be consciously and in bad faith refusing to thoroughly investigate and address executive wrongdoing; attempting to stymie and defeat legitimate claims against directors and officers through efforts to cause such claims to lapse by dint of the statute of limitations; and failing in bad faith to enact necessary therapeutic and remedial measures. (*Id.* ¶ 36(d).)  Those claims involve ongoing misconduct, but cannot have arisen earlier than the directors' knowledge of the underlying misconduct which, as noted above, is traceable to private and regulatory proceedings begun after 2004.

Under Delaware law, a plaintiff who complains of a wrongful "transaction" must have been a plaintiff prior to the "transaction" he asserts was improper, *i.e.*, the shareholder must assert "stock ownership at the time of challenged conduct . . . ." *Desimone v. Barrows,* 924 A.2d 908, 927 (Del. Ch. 2007).  Thus, "the timing of the allegedly wrongful transaction must be determined by identifying the w*rongful acts which [Plaintiff] want[s] remedied* and which are susceptible of being remedied in a legal tribunal." *7547 Partners v. Beck,* 682 A.2d 160, 162 (Del. 1996) (citation omitted and emphasis added); *accord Parfi Holding AB v. Mirror Image Internet, Inc.,* 954 A.2d 911, 935 (Del. Ch. 2008) (stating that contemporaneous ownership test … requires stockholders to have owned stock at  time of the wrong complained of").

Here, MPERS is not an antitrust plaintiff complaining of Sherman Act or Clayton Act violations committed by unknown corporate officers, but rather a derivative plaintiff, complaining of four discrete types of breach of fiduciary duty by Intel's directors, all occurring after the defendant directors would have learned of antitrust allegations made in actions

commenced in 2005 and later. Thus, the fiduciary breaches (and the wrongs sought to be remedied here) did not occur when someone at Intel other than a director acted wrongfully under the Sherman or Clayton Acts or EC rules, but rather when the *directors themselves* acted wrongfully under Delaware law. *See e.g., Leung v. Schuler*, C.A. No. 17089, 2000 Del. Ch. LEXIS 41, at *26-28 (Del. Ch. Feb. 29, 2000) (stating that even where some underlying acts may have occurred before plaintiff purchased his stock, relevant date for purposes of Section 327 was when directors took inappropriate action); *see also In re UA Theatre Co.*, 315 F.3d 217, 233 (3d Cir. 2003) (noting that occurrence of breach is measured by when director fails in his duty); *Albert v. Alex. Brown Mgmt. Servs.*, C.A. No. 762-N, 2005 Del. Ch. LEXIS 100, at *43-44 (Del. Ch. June 29, 2005) (holding that fiduciary breach occurred when defendants failed to act in face of known risks).[29]

In sum, as the relevant date for purposes of the contemporaneous ownership rule is when Defendants' wrongs occurred, MPERS has complete standing to assert the claims contained in the Complaint, as all directorial breaches of fiduciary duty are alleged to have occurred after May 2004.

## VII.  GILMAN MADE A DEMAND ON THE BOARD

Defendants' peculiar assertion that Gilman never made a demand is another example of how Defendants will raise any quibble to evade responsibility for their actions. It is crystal clear that Gilman, through counsel, on October 14, 2009, submitted a demand to the Board. (*See* Cplt. ¶ 122; King Dec., Exh. H.) Defendants' gripe seems to be that Gilman, in order to avoid

---

[29]     Defendants' reliance upon *Brambles USA, Inc. v. Blocker*, 731 F. Supp. 643 (D. Del. 1990), is misplaced. There, the plaintiff acquired stock following a merger between two companies, and then sued derivatively claiming certain aspects of the merger were unfair. *Id.* at 652. Accordingly, all of the alleged fiduciary wrongdoing in that case occurred *before* the plaintiff had acquired any shares. *Id.* Here, by contrast, the foreign and domestic actions would have alerted the Board to the extensive legal violations occurring at Intel – the foundational facts that gave rise to Defendants' breach of their fiduciary duties – occurred *after* Plaintiff MPERS's purchase of Intel shares.

redundancy and waste, adopted and incorporated by reference all prior communications made in connection with the demand earlier made by shareholder Villari.   But Defendants were not confused in any way by the nature of Gilman's letter.   Indeed, counsel for the Audit Committee responded that "the Board has decided to defer any determination regarding . . . *Gilman's demand*."   (King Dec., Exh. I, at 2 (emphasis added).)   Accordingly, as Defendants' own statements demonstrate, joining in an existing demand is a perfectly appropriate way for Gilman to have proceeded. *Cf. O'Connor v. Freyman*, C.A. No. 85-0566, 1985 U.S. Dist. LEXIS 19289, at *5-6 (D.D.C. May 31, 1985) (holding that second plaintiff, in order to have standing to sue, was required to "join in the prior demand").   Thus, Gilman has done all that is required under the law to have made a proper demand on the Board.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety**.**   Alternatively, this action should be stayed for such period of time as the Court deems appropriate to allow Defendants to definitively respond to Plaintiffs' demands and accord Plaintiffs time to act on that response, if necessary.   Moreover, should the Court find any deficiency in the pleadings, Plaintiffs hereby request an opportunity to re-plead.

Dated:  April 9, 2010

**BIGGS & BATTAGLIA**

/s/ Robert D. Goldberg
Robert D. Goldberg (ID #631)
921 North Orange Street
Wilmington, Delaware 19899
(302) 655-9677
goldberg@batlaw.com

**Attorneys for Plaintiff Charles Gilman
and Louisiana Municipal Police
Employees' Retirement System**

- AND -

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
60 East 42nd Street, Suite 4600
New York, NY 10165
212-685-0969

**BERMAN DEVALERIO**
Jeffrey C. Block *(pro hac vice adm. pending)*
Bryan A. Wood *(pro hac vice adm. pending)*
Scott A. Mays *(pro hac vice adm. pending)*
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

**Co-Lead Counsel for Plaintiff Charles
Gilman and Louisiana Municipal Police
Employees' Retirement System**