**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

-------------------------------------------------------x

IN RE INTEL CORP. DERIVATIVE
LITIGATION

-------------------------------------------------------x

C.A. No. 1:09-cv-867-JJF

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL
OF SETTLEMENT AND FOR AN ORDER APPROVING NOTICE AND SETTING A
<u>HEARING FOR FINAL APPROVAL OF THE SETTLEMENT</u>**

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
Roy L. Jacobs
Angelica Kontoroff
60 East 42nd St., Suite 4600
New York, NY  10165
(212) 685-0969 (tel.)
(212) 685-2306 (fax)


and

**BERMAN DEVALERIO**
Jeffrey C. Block
Bryan A. Wood
Scott A. Mays
One Liberty Square
Boston, MA 02109
(617) 542-8300 (tel.)


*Co-Lead Counsel for
Delaware Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii-iii

I.      INTRODUCTION .................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND............................................2

        Pre-Suit Shareholder Demands ...........................................................................2

        Intel Board's Responses......................................................................................2

        Litigation Ensues ...............................................................................................3

        Defendants' Move To Dismiss the
        Delaware Complaint ...........................................................................................5

III.    THE SETTLEMENT ............................................................................................5

IV.     THE COURT SHOULD APPROVE THE
        PROPOSED SETTLEMENT ...............................................................................10

        A.      Approval Standard ..................................................................................12

        B.      The Proposed Settlement Is The Result
                Of Arm's Length Negotiations ................................................................14

        C.      The Settlement Effectively Balances The Risks
                Of Litigation With The Benefits To The
                Nominal Defendant..................................................................................14

        D.      The Recommendation Of Counsel Favors
                Approval Of The Settlement....................................................................16

V.      NOTICE................................................................................................................17

VI.     PROPOSED SCHEDULE OF EVENTS.............................................................18

VII.    CONCLUSION ....................................................................................................18

## TABLE OF AUTHORITIES

## CASES

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee,*
616 f.2D 305 (7th Cir.  1980) ...............................................................................13, 16

*Bacas v. Way,*
2008 U.S. Dist. LEXIS 23025 (S.D. Tex. Mar. 20, 2008) ...........................................12

*Bell Atl. Corp. v. Bolger,*
2 F.3d 1304 (3d Cir. 1993)...........................................................................................11

*Cannon v. Texas Gulf Sulphur Co.,*
55 F.R.D. 308 (S.D.N.Y. 1972) ...................................................................................16

*Carlough v. Amchem Prods., Inc.,*
158 F.R.D. 314 (E.D. Pa. 1993).....................................................................................13

*Cohn v. Nelson,*
375 F.Supp.2d 844 (E.D. Mo. 2005).............................................................................11

*Cotton v. Hinton,*
559 F.2d 1326 (5th Cir. 1977) ......................................................................................14

*Eichenholtz v. Brennan,*
52 F.3d 478 (3d Cir.1995)..............................................................................................10

*Felzen v. Andreas,*
134 F.3d 873 (7th Cir. 1998) ........................................................................................13

*Fisher Bros. v. Cambridge-Lee Indus., Inc.,* 630 F. Supp. 482 (E.D. Pa. 1985) ..........16

*In re Corel Corp. Sec. Litig.,*
293 F. Supp. 2d 484 (E.D. Pa. 2003) ...........................................................................14

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
55 F.3d 768 (3d Cir. 1995)............................................................................................11

*In re Schering-Plough Corp. S'holders Derivative Litig.,*
2008 U.S. Dist. LEXIS 2569 (D.N.J. Jan. 14, 2008) ...................................................12

*Jones v. Commerce Bancorp, Inc.,*
2007 WL 2085357 (D.N.J. July 16, 2007).....................................................................13

*Maher v. Zapata Corp.,*
714 F.2d 436 (5th Cir. 1983) ...............................................................................11

*Mills v. Electric Auto-Lite Co.,*
396 U.S. 375 (1970)...............................................................................................11

*Officers for Justice v. Civil Serv. Comm'n of City and County of S.F.,*
688 F.2d 615 (9th Cir. 1982) ...............................................................................14

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
390 U.S. 414 (1968)...............................................................................................14

*Schimmel v. Goldman,*
57 F.R.D. 481 (S.D.N.Y. 1973) ...........................................................................11

*Shlensky v. Dorsey,*
574 F.2d 131 (3d Cir. 1978).............................................................................11, 13

*Torrisi v. Tuscon Elec. Power Co.,*
8 F.3d 1370 (9th Cir 1993) ...................................................................................18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
396 F.3d 96 (2d Cir. 2005).................................................................................13, 14

*Walsh v. Great Atl. & Pac. Tea Co.,*
726 F.2d 956 (3d Cir. 1983)..................................................................................12

*Zimmerman v. Bell,* 800 F.2d 386, 392 (4th Cir. 1986) ...…………………………………11

## **OTHER AUTHORITIES**

Manual for Complex Litigation, Third § 30.42 (1995)..................................................13

## **RULES**

Fed. R. Civ. P. 23.1 ...................................................................................................15, 17

## INTRODUCTION

Plaintiffs Louisiana Municipal Police Employees' Retirement System ("MPERS"), and Charles A. Gilman ("Gilman") (collectively, "Plaintiffs") are pleased to inform the Court that after extensive, arm's-length negotiations, the parties to these consolidated shareholder derivative actions (the "Derivative Actions") have entered into a Stipulation of Settlement dated as of May 25, 2110, the "Stipulation", attached as Exhibit A to the accompanying Motion) which fully, finally, and forever resolves, discharges, and settles the "Settled Claims"[1] while providing substantial benefits to Intel Corp., the Nominal Defendant (the "Settlement"). As a result of the pendency, prosecution, and settlement of the Derivative Actions, Plaintiffs' efforts obtained the institution of very material corporate therapeutic changes to Intel's antitrust compliance policies and procedures, and were a substantial factor in the adoption by Intel of very significant additional corporate changes.

As shown herein, the Settlement constitutes an appropriate resolution of a case of great complexity and is well within the range of possible approval, thereby satisfying the test courts typically employ in reviewing a settlement for preliminary approval. Accordingly, Plaintiffs respectfully request the Court to enter the proposed Scheduling Order, submitted herewith as an exhibit to the Stipulation, which will: (i) preliminarily approve the Settlement set forth in the Stipulation; (ii) direct the dissemination of the Notice of Pendency of Derivative Action, Proposed Settlement of Derivative Action, Settlement Hearing and Right to Appear (the "Notice"); and (iii) schedule a hearing to entertain any objections by current Intel shareholders and to consider final approval of the Settlement (the "Settlement Hearing").

---

[1]      All capitalized terms not defined herein shall have the same definitions as set forth in the Stipulation. The Stipulation, upon approval by this Court, shall resolve claims in the instant actions, as well as effect a resolution of similar claims asserted by other Intel shareholders (the "Related Plaintiffs"), who are presently engaged in litigation with Intel and/or its present and former officers and directors in the Superior Court of the State of California, *Paris v. Otellini, et al.,* Case No. 110CV166850 (the "Paris Action"), or in the Delaware Court of Chancery, *Rosenfeld Family Foundation, et ano. v. Intel Corporation,* Civil Action No. 5070-VCS (the "Rosenfeld Action") (collectively, "the Related Actions"). Counsel in those Related Actions are signatories to the Stipulation.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### Pre-Suit Shareholder Demands

On June 12, 2008, Annette Villari, a stockholder of Intel Corporation ("Intel" or the "Company"), acting through her counsel, sent a letter to Intel's Board of Directors (the "Board") demanding that the Board investigate alleged anticompetitive business practices that are or were the subject of various proceedings, initiate appropriate legal action against any Intel Board members or employees responsible for such alleged practices, and take necessary and appropriate remedial measures to ensure that Intel is protected from further harm (the "Villari Demand").  On June 8, 2009, counsel for Ms. Villari renewed the Villari Demand, and set forth certain additional facts related thereto.  On August 27, 2009, counsel for Ms. Villari met with counsel for the Board to discuss additional matters relating to the Villari Demand.  On October 14, 2009, counsel for Ms. Villari informed Intel's Board that Charles A. Gilman, another Intel stockholder, was joining the Villari Demand (the "Gilman Demand").  On November 12, 2009, the Louisiana Municipal Police Employees' Retirement System ("MPERS"), an Intel stockholder, acting through its counsel, sent a letter to Intel's Board demanding that the Board investigate alleged anticompetitive business practices that are or were the subject of various proceedings, initiate appropriate legal action against any Intel Board members or employees responsible for such alleged practices, and take necessary and appropriate remedial measures to ensure that Intel is protected from further harm (the "MPERS Demand").

### Intel Board's Responses

On January 29, 2009, counsel for the Board sent a letter to Ms. Villari's counsel advising that the Board had deliberated and, for reasons set forth in the letter, concluded that it currently was in the best interest of Intel to defer taking action on the Villari Demand.  Thereafter, On November 30, 2009, counsel for the Board sent a letter to counsel for Ms. Villari and Mr. Gilman advising him that

the Board had deliberated and, for reasons set forth in the letter, concluded that it currently was in the best interest of Intel to defer taking action on the renewed Villari Demand and the Gilman Demand.

**Litigation Ensues**

On November 13, 2009, Mr. Gilman commenced a shareholder derivative action in this Court (the "Gilman Action") on behalf of Intel against defendants Craig R. Barrett, Carol Bartz, Charlene Barshefsky, Susan L. Decker, John J. Donahoe, D. James Guzy, Sr., Paul S. Otellini, David S. Pottruck, James D. Plummer, Jane E. Shaw, David B. Yoffie, and Frank D. Yeary (collectively, the "Individual Defendants") and nominal defendant Intel (together with the Individual Defendants, the "Defendants").

On December 23, 2009, MPERS commenced a shareholder derivative action in this Court on behalf of Intel against the Individual Defendants and nominal defendant Intel (the "MPERS Action"). On January 15, 2010, this Court entered an order consolidating the Gilman Action and the MPERS Action into the Delaware Action, appointing Mr. Gilman and MPERS as lead plaintiffs (the "Delaware Plaintiffs"), and appointing Paskowitz & Associates and Berman DeValerio to be Co-Lead Counsel (together "Delaware Plaintiffs' Counsel").

On February 12, 2010, the Delaware Plaintiffs filed a Shareholders' Demand-Made Consolidated Derivative Complaint (the "Delaware Complaint"), alleging *inter alia* that Intel has, for a number of years, engaged in conduct which violates U.S. and foreign competition laws, resulting in civil suits and regulatory investigations and proceedings against Intel (together the "Antitrust Proceedings") including, without limitation:

a.      A suit commenced by Advanced Micro Devices, Inc. and AMD International Sales & Services, Ltd. in the United States District Court for the District of Delaware, entitled *Advanced Micro Devices, Inc. v. Intel Corp.*, Civil Action No. 05-441 (JJF) (the "AMD Action");

b.      A series of putative class action suits brought under state competition laws, consolidated in the United States District Court for the District of Delaware under the caption *In re Intel Corporation Microprocessor Antitrust Litigation*, MDL No. 05-1717 (JJF);

c.      A proceeding by the Japan Fair Trade Commission against Intel Kabushiki Kaisha, Intel's Japanese subsidiary, which resulted in a consent decree ordering Intel Kabushiki Kaisha to cease and desist certain actions;

d.      An investigation and proceeding brought by the European Commission, in which the European Commission issued a decision and imposed a fine against Intel in May 2009;

e.      A proceeding brought by the Korea Fair Trade Commission, in which the Korea Fair Trade Commission entered a ruling against Intel in June 2008;

f.      An action commenced by the New York Attorney General in the United States District Court for the District of Delaware, entitled *State of New York v. Intel Corp.*, Civil Action No. 09-827 (JJF); and

g.      An administrative proceeding commenced by the U.S. Federal Trade Commission against Intel on or about December 16, 2009, Docket No. 9341.

The Delaware Complaint further asserted that Intel's alleged anticompetitive conduct resulted in damage to Intel, and that the Individual Defendants breached their fiduciary duties to Intel by failing to, among other things, rein in, ameliorate, or countermand such conduct, and failing to institute certain remedial measures.  The Delaware Complaint sought recovery for and on behalf

4

of Intel of the damages it allegedly suffered as a result of the alleged breaches of fiduciary duty by the Individual Defendants.

### Defendants Move To Dismiss the Delaware Complaint

On March 12, 2010 Defendants moved to dismiss the Delaware Complaint arguing *inter alia* that the Intel Board's refusal to take action on Plaintiffs' pre-suit demands were protected by the Business Judgment Rule and accordingly, the Delaware Complaint should be dismissed. On April 9, 2010, Plaintiffs served their Opposition to the Motion to Dismiss arguing that the Intel Board did not act in a disinterested manner in assessing Plaintiffs' pre-suit demand and, therefore, the Board was not entitled to any of the protections of the Business Judgment Rule. On May 10, 2010 Defendants served their Reply Memorandum in support of the Motion to Dismiss. Only thereafter did the parties finalize the agreement to settle this matter on the terms and conditions set forth in the Stipulation.

## II.   THE SETTLEMENT

The Settling Parties, through their respective, highly experienced counsel, have engaged in ongoing, good-faith and protracted arm's-length negotiations to resolve the Derivative Actions. Their diligence and extensive discussions culminated in the Stipulation entered into on May 25, 2010. The Stipulation, which fully sets forth the terms of the Settlement, provides that Intel will adopt very significant changes to its corporate governance and antitrust compliance policies to insure that the Company does not again find itself embroiled in a rash of governmental and private lawsuits alleging violation of the various antitrust laws and facing huge fines and liability for damages by aggrieved competitors and consumers. The governance changes as set forth in paragraph 2-3 of the Stipulation provide as follows:

2.      Intel has always been and continues to be committed to the enhancement, implementation, and enforcement of its antitrust compliance programs, procedures, employee training and data management systems. Enhancements to these programs, procedures, training and systems that have been made, or were planned and are in the process of being implemented, since the

Antitrust Proceedings and the Villari Demand include:

        a.      Formation of a Compliance Committee to review Intel's policies, programs and procedures with regard to significant pending and threatened litigation, monitor the Company's programs to implement legal obligations arising from judgments, settlement agreements and other similar documents that bear upon the Company's effective conduct of its business in a legal and ethical manner, consistent with the Committee's charter;

        b.      Appointment of a General Counsel with an extensive background in all aspects of antitrust practice;

        c.      Creation of an attorney position within the Legal Compliance Group (group was formally created in May 2008 and reports to General Counsel) to focus solely on global antitrust compliance, and addition of attorney and non-attorney resources across most Intel geographic areas to support antitrust compliance efforts;

        d.      Addition of attorneys to the various geographic areas in Intel's Sales & Marketing Group (SMG) to provide counseling, and address compliance issues regarding, antitrust and competition laws;

        e.      Addition/dedication of non-attorney personnel in Finance, SMG, the Microprocessor Marketing and Business Planning group (MMBP), and Information Technology (IT) to support antitrust compliance activities;

        f.      Creation of a process to audit accounts to assess compliance with Intel's antitrust policy, the results of which shall be reported to the Global Director of Legal Compliance ("GDLC") and the Compliance Committee;

        g.      Creation of a process to monitor individuals' compliance with Intel's antitrust policy, the results of which shall be reported to the GDLC and the Compliance Committee;

        h.      Intel will continue to refine and enhance its pricing procedures to ensure that it has reliable pricing tools to enable it to set its microprocessor prices at levels that exceed the appropriate measure of costs used to determine when prices constitute anticompetitive conduct or unfair competition;

        i.      Elimination of retroactive rebates, absent approval by the head of SMG Legal;

        j.      Addition of new controls on requests for Marketing Development Funds (MDF) and Non-Recurring Engineering Funds (NRE) with respect to Intel's principal product lines for all customers worldwide;

        k.      Movement to a smaller number of standard deal types;

        l.      Addition of a requirement that, absent approval by the head of SMG Legal, all new sales and pricing agreements must: (i) be in writing, (ii) include standard integration and non-

exclusivity clauses, and (iii) be kept in a centralized repository;

m.      Implementation of the Intel Deal Management System (IDMS), an internal deal approval tool to include deal terms, cost guard band data, agreement/document repository, and rebate forecasting and payment information.  IDMS will assist with implementing and monitoring compliance with changes to sales process and policies described above.  (IDMS was rolled out in pilot form in 2009; complete implementation for all direct customers is scheduled in 2010 with further implementation for indirect customers in 2010 and 2011.)

n.      Roll out of required basic antitrust training in 2009 – approximately 7,500 employees completed training in 2009;

o.      Roll out of advanced antitrust communications training course in 2009 – approximately 1,500 employees completed advanced antitrust communications training in 2009;

p.      Launch of Antitrust Awareness 2010 as a required course for over 8,000 employees, covering both SMG and the product groups;

q.      Requirement that in 2009, all employees in SMG dealing with customers certify their review of, and agreement to comply with, Intel's refreshed antitrust policy;

r.      Roll out of training on new sales processes and sales policies in the fall of 2009 to approximately 1600 employees (primarily in SMG) involved in negotiating pricing and sales agreements.

Intel represents that it has expended millions of dollars to date in costs and resources to implement the foregoing enhancements set forth in this paragraph 2, and agrees to commit the monetary and personnel resources necessary and appropriate to implement and enforce the Company's future antitrust compliance programs, procedures, training and systems.

3.      Since the initiation of the Delaware Action and the Rosenfeld Action, Intel has implemented, or agreed to implement, the following additional enhancements to Intel's corporate governance and antitrust compliance policies and procedures:

a.      Intel will maintain a Legal Compliance Group, which will be headed by the GDLC, and which together will be given increased roles and responsibilities for antitrust compliance based upon recommendations made to and approved by the newly-formed Compliance Committee of the Board.

(i)      The GDLC will have the authority, experience, skill, training, budget, and staff to carry out his or her responsibilities.  The GDLC shall report to Intel's General Counsel.

(ii)      The Compliance Committee will review and concur in the appointment, replacement, reassignment, or dismissal of the GDLC.

(iii)      The GDLC shall receive and review reports and recommendations concerning antitrust compliance matters from other personnel supporting compliance functions within the Legal

Compliance Group, SMG, Finance, MMBP, and IT.

(iv)   Intel will review and strengthen the GDLC's role in the design, implementation and enforcement of a compliance and ethics program directed to antitrust and competition issues, as is deemed appropriate and necessary under the circumstances.

(v)   The GDLC shall meet with the Compliance Committee in executive session at least twice annually, or more frequently if the Compliance Committee determines after consultation with the GDLC that additional meetings are necessary, to discuss antitrust compliance matters and to report on any material changes to Intel's antitrust compliance policies, procedures, and programs.

(vi)   The GDLC shall, on at least an annual basis, provide a written report to the Compliance Committee outlining the GDLC's activities regarding antitrust and competition issues, and any other items that the Committee may request.

(vii)   In reviewing any conduct that raises potential issues regarding antitrust compliance, the GDLC or his or her delegated staff will be given full cooperation by Company personnel, including access to Company records as reasonably necessary to further any investigation into alleged antitrust misconduct, and Company personnel shall promptly respond to inquiries from the GDLC.

(viii)   If the GDLC determines that such assistance is necessary or desirable, the GDLC may retain and utilize personnel, outside advisors, or independent consultants who are experienced and knowledgeable in the subject matter being investigated.

(ix)   The GDLC shall have input into the design, implementation and enforcement of a compliance and ethics program directed to antitrust and competition issues. Any disagreement concerning the GDLC's recommendations may be reviewed and resolved by the Compliance Committee.

(x)   If a credible and material report of an antitrust or competition issue is received by the Intel employee whistleblower hotline, the GDLC shall promptly be informed of this report except for good cause.

b.   The Compliance Committee shall consist of independent directors (as defined in the applicable rules for NASDAQ-traded issuers), will review the effectiveness of the Company's antitrust compliance policies and procedures at least annually, including the effectiveness of any new policies and procedures established as part of this Settlement, and will review and approve a risk assessment at least annually with regard to the Company's risk of antitrust or foreign competition law violations. The Compliance Committee shall review and approve recommended changes to Intel's antitrust compliance policies as it deems appropriate, and such approved changes shall be reported to the Board.

(i)   Intel shall keep records of its antitrust compliance program as the Compliance Committee deems appropriate to gauge the overall effectiveness of such program.

(ii)     Intel will implement an "audit" program sufficient to review and consider the effectiveness of the Company's antitrust compliance policies and procedures with respect to senior executives who are significantly involved in OEM contracting activities.  The results of this audit program shall be provided to the Compliance Committee and the GDLC, and may be provided to Intel's external auditors as necessary to satisfy any financial statement audit procedures.

(iii)     The Compliance Committee will monitor Intel's implementation of the terms of this Settlement Agreement.

(iv)     The Compliance Committee will monitor the Company's compliance with the terms of the Company's Settlement Agreement with Advanced Micro Devices, Inc., dated November 11, 2009, including contracting procedures specified therein.

(v)     The Compliance Committee will review and, as it deems necessary based on the recommendations of the GDLC, approve strengthening the employee training and certification programs related to antitrust compliance.

(vi)     The Compliance Committee is authorized to retain and consult with subject matter experts as it deems appropriate in order to carry out its review and monitoring function.

(vii)     The Compliance Committee members shall be given such training and education as they may request regarding antitrust compliance.

c.     Intel agrees that its antitrust compliance policies, procedures and programs will be intended to conform in material respects to the relevant provisions of the U.S. Federal Sentencing Guidelines, and that in implementing such policies, procedures, and programs the Company will not knowingly cause the involved personnel to violate any applicable professional standards.

d.     Intel agrees that its Code of Conduct will be further revised to address antitrust compliance in a more particularized fashion, as part of the Antitrust & Competition Law Worldwide Policy and Standards element of the Code of Conduct.

(i)     Any personnel found to have violated Intel's antitrust policies will, subject to local laws, be disciplined, up to and including termination of employment.

(ii)     Any personnel found liable by a court of law in a final, non-appealable judgment for violating United States federal or state antitrust laws will, subject to local laws, be disciplined, up to and including termination of employment, and any non-independent director so found to have violated federal or state antitrust laws shall also be subject to removal from the Board.

(iii)     Intel will give strong weight to any officer's or employee's failure to comply with Intel's antitrust policies in making employment and compensation decisions, and in evaluating performance of all officers and employees of the Company.

(iv)     Consistent with the terms of its Code of Conduct, Intel agrees that any personnel found to have retaliated against or threatened retaliation against anyone for: (a) having

raised an antitrust or competitive concern; or (b) having objected to a course of action on behalf of the Company on the grounds that such course of action raises antitrust concerns; shall be disciplined as contemplated by the Code of Conduct.

        e.     Intel will continue to enhance its existing antitrust training and education programs for Intel officers and employees, based on the recommendations made to and approved by the Compliance Committee.  Such training and education may include topics related to compliance with the terms of recently-resolved antitrust proceedings, or such future settled antitrust actions or proceedings, as the Compliance Committee deems appropriate.

The Settlement was negotiated at arms-length between the parties, and provides for very significant benefits to Intel.  Continued litigation of the Derivative Actions is not appropriate when measured against the immediate benefits of the Settlement.  As discussed below, the Settlement is in the best interests of Intel.  Accordingly, the Settlement is fair, reasonable, and adequate, and the Scheduling Order should be entered by the Court.  Defendants do not contest these assertions.

The Settlement also provides Delaware Plaintiffs' Counsel and counsel in the Paris Action, collectively, with an agreed-to award (subject to Court approval) of attorneys' fees and reimbursement of expenses of up to $1.8 million and in the Rosenfeld Action with an agreed-to award (subject to Court approval) of attorneys' fees and reimbursement of expenses of up to $800,000 to be paid by or on behalf of Intel.  No negotiations regarding fees were conducted until all material terms of the settlement had already been agreed upon.

## III.    <u>THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT</u>

Settlement of complex litigation is in the public interest and encouraged by the courts.  *See Eichenholtz v. Brennan,* 52 F.3d 478, 486 (3d Cir.1995) ("In general, the settlement of complex litigation before trial is favored by the federal courts."); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (Public policy favors the resolution of litigation "particularly in class actions and other complex cases where substantial judicial resources

can be conserved by avoiding formal litigation.").[2]   The courts strongly favor settlement of derivative actions because the cases are "'notoriously difficult and unpredictable.'" *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) quoting *Schimmel v. Goldman,* 57 F.R.D. 481, 487 (S.D.N.Y. 1973); *Cohn v. Nelson*, 375 F.Supp.2d 844, 852 (E.D. Mo. 2005) (There exists a "policy in favor of settlement of shareholder derivative actions.").

Courts have long recognized the benefits of settling complex litigation, such as the present case.  For example, in *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986), the court explained the benefits of settling derivative actions:

> Settlement here is favored for the reasons that settlements generally are favored: disputes are resolved; the resources of litigants and courts are saved; and, in the case of a derivative action, management can return its attention and energy from the courtroom to the corporation itself.

Settlement in the present matter offers the resolution of a complex derivative case and avoids excess expenditures of time and expense, continuing litigation risk, and distraction to the Individual Defendants while at the same time conferring a significant benefit on the Nominal Defendant.  As the Supreme Court has stated, "an increasing number of lower courts have acknowledged that a corporation may receive a 'substantial benefit' from a derivative suit...regardless of whether the benefit is pecuniary in nature." *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 395 (1970).  *Accord, Bacas v. Way,* No. 07-cv-456, 2008 U.S. Dist. LEXIS 23025, at \*6-7 (S.D. Tex. Mar. 20, 2008); *In re Schering-Plough Corp. S'holders Derivative Litig.*, No 01-1412, 2008 U.S. Dist. LEXIS 2569, at

---

[2]       Courts typically utilize the standards applicable to the approval of class action settlement when considering the propriety of the settlement of a shareholder derivative action. *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) ("In evaluating a district court's determination that a settlement agreement is fair and reasonable, we consider factors applied initially to class action settlement agreements, and subsequently to derivative actions ….") (internal citation omitted); *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978) ("it is clear that the same [class action settlement fairness] factors are relevant in a shareholders' derivative suit.").

*6 (D.N.J. Jan. 14, 2008)(approving settlement based on corporate governance changes, and noting: "the fundamental aim of the litigation was to correct the Board's failure of oversight, and the resulting damage to Schering, by implementing specific changes to the Schering's corporate governance mechanisms. The monetary losses and the regulatory troubles with the FDA are the fruit of the same tree, stemming directly from a breakdown in Schering's managerial structure. Thus, the most important motivation for maintaining this action was to prevent future losses of this ilk by changing how the corporation's directors oversee the running of the corporation.").

Considering the strong public policy favoring settlement as well as the additional standards and factors below, this Court should preliminarily approve the Settlement as fair, reasonable, and adequate.

## A.   Approval Standard

Pursuant to Fed. R. Civ. P. 23.1(c), a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval." A court approving such a settlement must find that the settlement is fair, adequate and reasonable in light of the settled claims. *See Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 965 (3d Cir. 1983); *Bell Atl. Corp.*, 2 F.3d at 1311. District courts engage in a well-settled two-step process to make a preliminary and then final review of a proposed settlement in shareholder litigation. The procedure is summarized as follows:

> The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval." This hearing is not a fairness hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing. Manual for Complex Litigation § 1.46, at 53-55 (West 1977). If the district court finds a settlement proposal "within the range of possible approval," it then proceeds to the second step in the review process, the fairness hearing. Class members are notified of the proposed settlement and of the fairness hearing at which they and all interested parties have an opportunity to be heard. The goal of the fairness hearing is to adduce all information necessary to enable the judge intelligently to rule on whether the proposed settlement is "fair, reasonable, and adequate." Manual for Complex Litigation at 57. On the basis of all information

available to him, the trial judge must decide whether or not to approve the proposed settlement.[3]

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980) (footnote omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also*, *Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 320 (E.D. Pa. 1993).

At this stage in the proceedings, the Court's inquiry is simply whether the Settlement is "within the range of possible approval" to then provide notice to current Intel shareholders and conducting a final approval hearing in the future. *Armstrong*, 616 F.2d at 314. "A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel ….'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) *quoting Manual for Complex Litigation, Third* § 30.42 (1995). Additionally, preliminary approval "is granted unless a proposed settlement is obviously deficient." *Jones v. Commerce Bancorp, Inc.*, No. 05-5600 (RBK), 2007 WL 2085357, at *2 (D.N.J. July 16, 2007).

The proposed Settlement meets the standards for preliminary approval. The proposed Settlement in this case is presumptively fair, adequate, and reasonable because it was negotiated in good faith, at arm's length among experienced counsel, after meaningful confirmatory discovery. It will substantially strengthen Intel's antitrust compliance regime, and will reduce Intel's future exposure to the types of lawsuits, fines and governmental actions that has been interposed in the last several years. It has been vetted and approved by plaintiffs' experts in the areas of corporate

---

[3]      While this process is generally used in the class action settlement context, the same process may be used to evaluate the settlement of a shareholder derivative action because the relevant factors are substantially similar. *See, e.g.*, *Shlensky*, 574 F.2d at 147 (using class action settlement factors to evaluate the proposed settlement in a derivative action, but with less rigor.)

governance, and antitrust law.  Moreover, settlement at this stage in the case will also limit the expense of risky, unnecessary, and prolonged litigation and is in the interests of all Settling Parties. These reasons offer more than enough support for preliminary approval of the Settlement.

### B.    The Proposed Settlement Is The Result Of Arm's Length Negotiations

The proposed Settlement before the Court is the product of arm's-length negotiations by counsel with significant experience in complex shareholder derivative litigation.  The terms of the Settlement are the result of in-depth negotiations over several months by experienced counsel on both sides who were aware at all times of the relative strengths and weaknesses of their respective cases through their own investigation into the allegations in the litigation.  *See Wal-Mart Stores*, 396 F.3d at 116 (recognizing presumptive approval of settlement negotiated at arm's length by experienced counsel); *In re Corel Corp. Sec. Litig.*, 293 F. Supp. 2d 484, 491 (E.D. Pa. 2003) (initial presumption of fairness attaches to proposed settlement that has been negotiated at arm's length by counsel).  As a result, there is no reason to doubt the fairness of the proposed Settlement.

### C.    The Settlement Effectively Balances The Risks Of Litigation With The Benefits To The Nominal Defendant

"[T]he very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Comm'n of City and County of S.F.*, 688 F.2d 615, 624 (9th Cir. 1982) (citations omitted); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968) ("Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.")  Further, "[t]he trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained ....'"  *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (citation omitted).

After due consideration of the risks of continuing litigation against the benefits provided to Intel from the Settlement, the Settling Parties decided that Settlement is in the best interest of Intel. In this matter, Plaintiffs face not only the risks of establishing liability and damages, but all the Parties and their counsel face the risks and uncertainties of protracted litigation which will certainly result in additional expense, delay and time.  For example, the Court is currently considering Defendants' Rule 23.1 Motion to Dismiss, which has been fully briefed by both sides.  The outcome of this motion remains uncertain.

The Individual Defendants have vigorously denied, and continue to deny:  (i) any liability or wrongdoing with respect to any and all claims alleged in the Delaware Action and the Related Actions; (ii) that they engaged in any wrongdoing whatsoever; (iii) that they committed any violation of law; (iv) that they breached any fiduciary duties; (v) that they acted improperly in any way; and (vi) that any of the enhancements to Intel's corporate governance and antitrust compliance policies and procedures that are set forth in this Settlement were legally required, or that to the extent such policies and procedures were not in place in the past, it constituted a breach of fiduciary duty or other wrongdoing.  Rather, the Individual Defendants believe:  (a) that they fulfilled their fiduciary duties to the Company; (b) that they engaged in proper oversight of Intel's antitrust compliance activities; and (c) that Intel had in place, at all relevant times, adequate and appropriate corporate governance and antitrust compliance policies and procedures.  Without conceding any infirmities in their defenses to the claims asserted in the Delaware Action and the Related Actions, the Individual Defendants nevertheless consider it desirable that the Delaware Action and the Related Actions be dismissed, on the terms and conditions herein, because the Settlement will eliminate the substantial burden, expense, inconvenience and distraction of litigation and will dispel any uncertainty that may exist as a result of the Delaware Action and the Related Actions.

In light of the risks of continuing litigation and the benefits of the Settlement discussed above, the very substantial enhancements to Intel's Corporate Governance and Antitrust Compliance Policies and Procedures, the benefits of this Settlement overwhelmingly support approval.

### D.        The Recommendation Of Counsel Favors Approval Of The Settlement

In determining the fairness of a proposed settlement, significant weight should be attributed to the views of experienced counsel that the proposed settlement is in the best interest of the parties. It is well settled that "great weight" should be given to the views of lawyers involved in the litigation. *Cannon v. Texas Gulf Sulphur Co.*, 55 F.R.D. 308, 316 (S.D.N.Y. 1972) (showing deference to opinion of lawyers involved in litigation who supported settlement); *see also Fisher Bros. v. Cambridge-Lee Indus., Inc.*, 630 F. Supp. 482, 488 (E.D. Pa. 1985) (view of attorneys conducting litigation "is entitled to significant weight" when considering settlement.); *Armstrong*, 616 F.2d at 325 (significant weight given to the opinions of experienced counsel for the settling parties).

Counsel for Delaware Plaintiffs have significant experience in both shareholder litigation and other complex class action litigation, and have litigated and settled scores of other complex shareholder matters. Delaware Plaintiffs' Counsel has made a thorough investigation of the facts and circumstances relating this derivative action, and the specific claims asserted. Delaware Plaintiffs' Counsel have: (i) independently investigated the claims and allegations in this matter; (ii) reviewed all publicly available documents relating to, or in connection with, the facts and allegations in this matter; (iii) retained an investigator and consulted with experts; (iv) have had extensive discussions with counsel for Defendants concerning the matters at bar; (v) reviewed over 17,000 pages of documents; and (vi) taken the deposition of a Senior Competition Compliance attorney at Intel. Although the confirmatory discovery undertaken by Plaintiffs provided support for their claims, there was no "smoking gun" found that would eliminate the risk of establishing liability at trial, or

16

which could ease the burden of establishing that pre-suit demand was wrongfully refused. Given the uncertainty and substantial additional expense of pursuing Defendants on all claims through trial, Delaware Plaintiffs' Counsel submit that the Settlement is in fact fair, reasonable, adequate, and in the best interests of Intel and its shareholders. Based upon their years of experience and the information gathered through independent investigation, Delaware Plaintiffs' Counsel fully support the Settlement. Notably, Defendants' counsel do not dispute that the Settlement is in Intel's best interest and that of all Settling Parties, and do not oppose this motion. Therefore, the recommendations of highly experienced counsel in support of preliminary approval of the Settlement is powerful evidence that the Court should enter the Scheduling Order.

## IV.  **NOTICE**

The Stipulation provides that the Notice will be distributed by first-class mail to all shareholders of Intel common stock as of the date set forth in the Scheduling Order. The Stipulation also provides that Intel shall use reasonable efforts to give notice to all beneficial owners of common stock of Intel as of the date set forth in the Scheduling Order: (a) by providing additional copies of the Notice to any record holder requesting the Notice for purposes of distribution to such beneficial owners; and (b) by posting a copy of the Notice on Intel's corporate website. The Notice provides more than adequate information relating to (i) the terms of the Settlement; (ii) the date of the final approval hearing; and (iii) the protocol for Intel shareholders to follow to voice their objections, if any, to the proposed Settlement.

Here, Intel shareholders of record will be provided notice by first class mail as of the date set forth in the Scheduling Order. Brokerage firms, banks and/or other persons or entities who held shares of the common stock of Intel for the benefit of others are directed promptly to send this Notice to all of their respective beneficial owners. This form and manner of the proposed Notice

easily satisfies the requirements of Fed. R. Civ. P. 23.1.  *See e.g., In re Ikon Office Solutions, Inc.,* 194 F.R.D. 166, 189 (E.D. Pa. 2000).

## V.    <u>PROPOSED SCHEDULE OF EVENTS</u>

Delaware Plaintiffs' Counsel proposes the following schedule for the distribution of the Notice and the Settlement Hearing.  This schedule is similar to those used an approved by courts in derivative action settlements and provides due process to current Intel shareholders with respect to their rights concerning the Settlement.  *See Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir 1993) (holding that timing of notice was adequate where notice was mailed thirty-one days before the deadline for written objections and forty-five days before the hearing).

| | |
|---|---|
| Notice to be mailed by First Class Mail to all record holders of common stock of Intel as of May __, 2010: | 10 business days after the Court enters the Scheduling Order |
| Last Day for shareholders to object to settlement: | Ten (10) business days before Settlement Hearing |
| Date by which to respond to any objections to the Settlement: | Five (5) calendar days before Settlement Hearing |
| Date by which to file final papers in support of Settlement: | Five (5) calendar days before Settlement Hearing |
| Settlement Hearing | The Parties respectfully suggest a hearing the week of July 19, 2010. |

## VI.    <u>CONCLUSION</u>

The substantial benefits provided to Intel by the proposed Settlement fully justify the entry of the Scheduling Order.  Accordingly, Plaintiffs respectfully request that this Court: (i) preliminarily approve the proposed Settlement; (ii) approve the form and manner of the proposed Notice and direct the mailing of the Notice as set forth in the proposed Scheduling Order; and (iii) schedule the Settlement Hearing.

Dated: May 25, 2010

**BIGGS & BATTAGLIA**


  /s/ Robert D. Goldberg
Robert D. Goldberg (ID #631)
921 North Orange Street
Wilmington, Delaware 19899
(302) 655-9677
goldberg@battlaw.com

Attorneys for Delaware Plaintiffs

OF COUNSEL:

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
Roy L. Jacobs
Angelica Kontoroff
60 East 42nd St., Suite 4600
New York, NY  10165
(212) 685-0969

**BERMAN DEVALERIO**
Jeffrey C. Block
Bryan A. Wood
Scott A. Mays
One Liberty Square
Boston, MA 02109
(617) 542-8300

Co-Lead Counsel for Delaware Plaintiffs