# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ) | |
| IN RE INTEL CORP. DERIVATIVE ) | C.A. No. 1:09-cv-867-JJF |
| LITIGATION ) | |
| ) | |
| ) | |

## [REDACTED] SHAREHOLDER CHRISTINE DEL GAIZO'S OBJECTIONS TO THE PROPOSED SETTLEMENT OF DERIVATIVE ACTION

**CONFIDENTIAL – SUBMITTED PER MOTION TO FILE UNDER SEAL
SUBJECT TO A CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT**

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
MARC M. UMEDA
KEVIN A. SEELY
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Shareholder Objector
Christine Del Gaizo

Date: July 6, 2010

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................ 1

II. THE PUBLICLY AVAILABLE INFORMATION DOES NOT SUPPORT
    APPROVAL ..................................................................................................... 3

    A.    The Wrongful Conduct Directly Involved Defendants Otellini and Barrett .......... 3

    B.    Japan and Korea Investigate and Find Intel Antitrust Violations .......................... 4

    C.    Extensive Investigation Results in Fine of $1.45 Billion ....................................... 4

    D.    The NYAG Implicates Otellini and Barrett ......................................................... 5

    E.    The FTC Files Suit Alleging "Deliberate Campaign" ........................................... 6

    F.    Extensive Discovery Results in Agreement to Pay AMD $1.25 Billion................. 6

    G.    The MDL Action Still Pending ............................................................................ 7

III. THE DERIVATIVE CLAIMS AND THE PROPOSED SETTLEMENT ......................... 8

    A.    Del Gaizo Inspection Demand Initiated – the Statute of Limitations Tolled .......... 8

    B.    Del Gaizo Inspection Demand Continues – Demand Made ................................... 9

    C.    Del Gaizo Presentation – Liability Determination Deferred.................................. 9

    D.    The Delaware Plaintiffs – "Growing Body of Evidence" Including Otellini
    and Barrett ..................................................................................................... 10

    E.    Delaware Motion to Dismiss – "Defer Decision" Defended and Statute of
    Limitations Tolled .......................................................................................... 11

    F.    Overview of the Objection ................................................................................ 11

    G.    The Del Gaizo Objection................................................................................... 12

IV. THE PROPOSED SETTLEMENT SHOULD NOT BE APPROVED ............................ 13

    A.    Standards for Approval of Derivative Settlements .............................................. 13

        1.    Duty of the Court and Burden on the Parties ............................................ 13

        2.    Benefit to the Company and Extensive Discovery Factors........................ 14

           3.      Extra Scrutiny for Non-Monetary Settlements ............................................. 14

    B.    The Delaware Plaintiffs' Considerations Do Not Support Approval .................... 15

           1.      The "Risks of Litigation" Do Not Support Approval ................................ 16

           2.      The Strong "Merits" Do Not Support Approval ...................................... 17

           3.      Demand Futility Dismissal Does Not Support Approval .......................... 22

           4.      The "Possible Defenses" Do Not Support Approval ................................ 22

           5.      The "Risks of Not Settling" Do Not Support Approval ........................... 24

    C.    The Factual Record Does Not Support Approval ................................................. 25

           1.      The Publicly Available Documents Do Not Support Approval ................ 25

           2.      ███████████████████████████████████████ ............................... 25

           3.      ███████████████████████████████████████ ............................... 26

           4.      The Lack of Discovery Made Available Does Not  Support Approval ............................................................................................................ 26

    D.    Intel Will Not Be Harmed if the Settlement Is Not Approved ............................. 27

    E.    The Carriers and Individuals Are Able to Contribute to a Monetary Settlement .......................................................................................................... 28

V.    CONCLUSION ............................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arnold v. Soc'y for Sav. Bancorp, Inc.,*
    650 A.2d 1270 (Del. 1994).................................................................23

*Beiser v. PMC Sierra, Inc.,* C.A.
    No. 3893-VCL, 2009 WL 483321 (Del. Ch. Feb. 26, 2009) .............................8

*Bell Atlantic Corp. v. Bolger,*
    2 F.3d 1304 (3d Cir. 1993)........................................................13, 14, 15

*Gagliardi v. TriFoods Int'l, Inc.,*
    683 A.2d 1049 (Del. Ch. 1996) ...........................................................17

*Gantler v. Stephens,*
    965 A.2d 695 ...............................................................................23

*Homestore, Inc. v. Tafeen,*
    888 A.2d 204 (Del. 2005)..................................................................24

*In re Cendant Corp. Litig.,*
    264 F.3d 201 (3d Cir. 2001) ..............................................................13

*In re Citigroup Inc. S'holder Derivative Litig.,*
    964 A.2d 106 (Del. Ch. 2009) ............................................................17

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995).............................................................14, 26

*In re Pittsburgh & Lake Erie Railroad Co. Sec. and Antitrust Litig.,*
    543 F.2d 1058 (3d Cir. 1976) .............................................................14

*In re Walt Disney Co. Derivative Litig.,*
    906 A.2d 27 (Del. 2006)) .................................................................17

*In re Zoran Corp. Derivative Litig.,*
    No. C 06-05503-WHA, 2008 WL 4104517 (N.D. Cal. Sept. 2, 2008)...........................21

*In re Zoran Corp. Derivative Litigation,*
    No. C 06-05503 WHA, 2008 WL 941897 (N.D. Cal. Apr. 7, 2008) ..................20, 21, 28

*Louisiana Muni. Police Employees' Ret. Sys. v. Crawford,*
    918 A.2d 1172 (Del. Ch. 2007) ...........................................................23

*Off v. Ross,*
  Civil Action No. 3468-VCP, 2008 WL 5053448 (Del. Ch. Nov. 26, 2008)............... 13, 28

*Parfi Holding AB v. Mirror Image Internet, Inc.,*
  954 A.2d 911 (Del. Ch. 2008) ...................................................................................... 27

*Schwartz v. Novo Industri A/S,*
  119 F.R.D. 359 (S.D.N.Y. 1988) ................................................................................. 13

*West Coast Mgmt. & Capital, LLC v. Carrier Access Corp.,*
  914 A.2d 636 (Del. Ch. 2006) ....................................................................................... 8

## RULES AND STATUTES

California Corporations Code
  Section 1601 ..................................................................................................................... 8

Title 8 of the Delaware Code
  Section 102(b)(7)..................................................................................................... 15, 22
  Sections 145(a) and (b) ................................................................................................ 23

Intel shareholder Dr. Christine Del Gaizo ("Del Gaizo" or the "Objector"), by and through her undersigned counsel, consistent with instructions contained in the "Notice of Pendency of Derivative Action, Proposed Settlement of Derivative Action, Settlement Hearing and Right to Appear," hereby submits the following Objections to the Proposed Settlement of Derivative Action ("Objection"). This document is being submitted under seal, out of an abundance of caution, consistent with a confidentiality agreement entered into with defense counsel on or about June 15, 2010. The Objector's Proof of Ownership is discussed herein.[1] A Notice of Intent to Appear at the July 20, 2010 Settlement Hearing has been filed simultaneously herewith.

## I. INTRODUCTION

The individual defendants here, according to the allegations, wrongfully caused *billions* of dollars to be paid by Intel Corporation ("Intel" or the "Company"). That amount could grow even larger as other pending actions against Intel are resolved. Astonishingly, the proposed settlement of the derivative claims provides for *no monetary compensation* to Intel. In light of the disloyal and bad faith nature of the alleged conduct of the individual defendants and the incriminating record developed to this point, the proposed settlement terms are unfair and unreasonable and do not provide an adequate benefit to Intel.

The Delaware derivative complaint filed in this action appropriately contends that "[i]t is the plain intention of Intel's Corporate Fiduciaries that any damages, settlements, fines, and/or remedial measures *will be paid for by Intel's innocent shareholders, and that the individual wrongdoers will completely escape responsibility. Plaintiffs are pursuing these claims so as*

---

[1] The objector's proof of ownership is undisputed. *See* the Declaration of Kevin A. Seely in Support of Shareholder Christine Del Gaizo's Objections to the Proposed Settlement of Derivative Action ("Seely Decl.") at 5, Exs. 9, 10, 28, submitted herewith.

*not to allow that to happen*—and to ensure that necessary corrective actions are taken to prevent a recurrence of this type of activity." Delaware Complaint, ¶15, D.I. 35.[2]  However, the Delaware plaintiffs now propose a settlement with no monetary component.  If such a settlement is approved, Intel's "innocent shareholders," who have already shouldered billions of dollars in Intel payments, will be the ones left to cover any future payments by Intel due to the alleged misconduct of Intel's "individual wrongdoers."

It is important to note that the significant actions brought against Intel have been litigated or investigated for years with extensive factual records, and have resulted in billion-dollar resolutions.  Moreover, the pending actions against Intel brought by the Federal Trade Commission ("FTC") and New York State Attorney General ("NYAG") are equally significant and their development will also help determine the extent of the liability the individual defendants face and the total damages caused to the Company.  Here, the parties have agreed to settle an action brought to recover some of the damages Intel has suffered after fairly minimal litigation, with virtually no pre-settlement proposal discovery, and based on a relatively limited factual record.

To the extent the factual record has been developed, the facts strongly support a monetary payment to the Company.  Indeed, until this proposed non-monetary settlement was announced, even Intel had repeatedly acknowledged, only months earlier, that it would be more prudent to wait until the factual record is more fully developed.  Now, despite the fact that there have been no factual developments that support approval of this proposed settlement, the Company, and its soon-to-be-released alleged wrongdoers, are all-in.

---

[2]  "Delaware Complaint" refers to the Delaware plaintiffs' Shareholders' Demand-Made Consolidated Derivative Complaint filed in this action on February 12, 2010, D.I. 35.

For all of the reasons discussed herein, the proposed settlement is unreasonable, unfair, and wholly inadequate. None of the factors raised in the proposed settlement papers support a corporate governance only settlement. Based on what has been presented, this Court should not approve a release and settlement of these valuable claims on behalf of the Company without a monetary recovery. Therefore, it must not be approved.

## II. THE PUBLICLY AVAILABLE INFORMATION DOES NOT SUPPORT APPROVAL

### A. The Wrongful Conduct Directly Involved Defendants Otellini and Barrett

Dating back to the 1990s, Intel dominated the microprocessor market with a market share of approximately 80-90% as measured by revenue. Delaware Complaint, ¶43, D.I. 35. Intel achieved this domination by violating antitrust laws in jurisdictions worldwide in an effort to prevent its closest competitor, Advanced Micro Devices, Inc. ("AMD"), from gaining access to any significant market. *Id.*, ¶58. At the direction of defendants Paul S. Otellini ("Otellini"), Intel's President and Chief Executive Officer ("CEO"), and Craig Barrett ("Barrett"), Intel's former Chairman of the Board, former CEO, and former Chief Operating Officer, Intel engaged in multiple unlawful anticompetitive acts, including, among other things, withholding the delivery of server chips and threatening to withhold critical technology to original equipment manufacturers ("OEMs") in retaliation for doing business with AMD. *Id.*, ¶¶13, 58. Additionally, Intel paid illegal "loyalty" awards totaling hundreds of millions – in some cases, billions – of dollars to OEMs in exchange for "strategic alignment," or the OEMs promise to use Intel's products exclusively. *Id.*, ¶¶65, 95. Intel also used unlawful tactics in dealing with its distributors to prevent them from carrying non-Intel processors. For example, Intel offered marketing bonuses, increased rebates, credit programs, payment of freight charges, and special inventory assistance to distributors who agreed to deal exclusively with Intel. *Id.*, ¶¶48, 94. Intel

further illegally suppressed competition by withholding critical market development funds from retail stores which did business with AMD. *Id.*, ¶58.

### B.    Japan and Korea Investigate and Find Intel Antitrust Violations

The unlawful conduct alleged above resulted in numerous investigations and lawsuits against Intel.  In April 2004, the Japan Fair Trade Commission ("JFTC") began an eleven-month investigation based on its suspicion that Intel had pressured manufacturers to "spurn competitors' products." *See* Seely Decl., Ex. 1.  In March 2005, the JFTC found that "Intel *unlawfully offered discounts* to PC makers if they agreed to limit their business with rivals," and had "substantially restrained competition in the market of CPUs sold to the Japanese OEMs..." *See* Seely Decl., Ex. 2; Ex. 3 at 1.

In June 2005, the Korea Fair Trade Commission ("KFTC") began its investigation. Approximately three years later, in June 2008, the KFTC found that Intel violated South Korean antitrust laws. *See* Seely Decl., Ex. 4.  The KFTC concluded, among other things, that "local OEMs were *coerced* to use expensive Intel-based CPUs," and fined Intel $25 million. *Id.* at 5.

### C.    Extensive Investigation Results in Fine of $1.45 Billion

The European Commission ("EC") investigated Intel's anticompetitive conduct starting as far back as May 2004 and continued for at least five years. *See* Seely Decl., Ex. 5, Section II.1.(7).  The EC found that Intel had, among other things, provided substantial, conditional rebates to various OEMs; made payments influencing OEMs decisions to delay the launch of AMD products; and offered products below its cost in order to win certain bids. Delaware Complaint, ¶82, D.I. 35.  Each of these acts was conducted to keep AMD from advancing in the marketplace, and constitute an overarching anticompetitive business practice. *Id.*, ¶82.

While the EC did not wholly object to all instances of rebates, "where a company is in a dominant position on a market, rebates that are conditional on buying less of a rival's products, or not buying them at all, are abusive according to settled case-law of the Community Courts ...." *Id.*, ¶89. According to the EC report, Intel made sure that when structuring its pricing policy that computer manufacturers sourcing AMD would lose their Intel rebate and support as a consequence. This type of action forced the manufacturers to buy exclusively from Intel.

On May 13, 2009, in connection with its ruling, the EC announced that it was fining Intel *$1.45 billion*, the largest fine ever levied by the EC. *Id.*, ¶2. The EC ruling found that Intel "committed a single and continuous infringement" of antitrust law "from October 2002 until December 2007 by implementing a strategy aimed at foreclosing competitors from the market of x86 CPUs," and involved key OEMs such as Acer, Inc., Dell, Inc., ("Dell"), Hewlett-Packard, ("HP"), Lenovo Group Limited ("Lenovo") and NEC Electronics Corporation. *See* Seely Decl., Ex. 5, Section IX.3.4(1803).

### D. The NYAG Implicates Otellini and Barrett

In January 2008, the NYAG's office announced it was investigating Intel and served a "wide-ranging subpoena seeking documents and information" from Intel. *See* Seely Decl., Ex. 6. In November 2009, the NYAG filed a complaint against Intel in connection with the Company's anticompetitive practices and efforts to monopolize the microprocessor market.[3] The NYAG Complaint[4] details the steps Intel took to exclude AMD products form consumers, including by bribing or coercing OEMs not to offer, or to severely limit, AMD microprocessors. *See* Seely

---

[3] *State of New York v. Intel Corp.*, Case No. 1:09-cv-00827-JJF (D. Del. Nov. 4, 2009) ("NYAG Action").

[4] "NYAG Complaint" refers to the Complaint filed by the NYAG in this Court on November 4, 2009.

Decl., Ex. 25, ¶40. The NYAG Action also alleges that defendants Barrett and Otellini often negotiated Intel's agreements to provide "rebates" to OEMs and actively participated in and authorized the alleged wrongdoing. *See* Section IV.B.2, *infra*. The NYAG Action is still pending.

### E.     The FTC Files Suit Alleging "Deliberate Campaign"

Intel is also currently facing a suit from the FTC. On December 16, 2009, after a multi-year investigation and "extensive negotiations between Intel and the FTC, which included an unprecedented four Commission meetings," the FTC filed a complaint against Intel for violations of Section 5 of the Federal Trade Commission Act. Delaware Complaint, ¶107, D.I. 35. In its complaint, the FTC alleged that Intel "entered anticompetitive arrangements with the largest computer manufacturers that were designed to limit or foreclose [the] use of competitors' relevant products ... [and] threatened to and did increase price, terminate product and technology collaborations, shut off supply, and reduce marketing support to OEMs that purchased too many products from Intel's competitors." *Id.*, ¶108. The FTC's December 16, 2009 press release announcing the FTC's action quoted "Richard A. Feinstein, the Director of the FTC's Bureau of Competition as saying that: 'Intel has engaged in a deliberate campaign to hamstring threats to its monopoly ... [i]t's been running roughshod over the principles of fair play and the laws of protecting competition ....'" *Id.*, ¶109. On June 21, 2010, Intel and the FTC filed a motion to suspend trial proceedings while they worked on a potential settlement of the government's antitrust case against Intel. *See* Seely Decl., Ex. 7.

### F.     Extensive Discovery Results in Agreement to Pay AMD $1.25 Billion

Intel originally gained a prominent position in the x86 market when it was chosen by IBM in the early 1980s as one of the standard components of what became known as IBM-compatible PCs. Delaware Complaint, ¶38, D.I. 35. IBM later arranged that AMD would be

able to manufacture the x86 microprocessors as a second source of supply. Intel, however, refused to share the intellectual property necessary to create the x86 microprocessors until it was compelled to do so by an arbitration award and subsequent 1995 settlement with AMD. *Id.*, ¶39. When AMD ultimately implemented that instruction set in its own products in the late 1990s, its efforts were extremely successful. *Id.*

In June 2005, AMD filed suit against Intel in this Court due to Intel's anticompetitive actions. AMD asserted claims alleging that Intel unlawfully restricted AMD's ability to compete by leveraging its monopoly power in the x86 microprocessor market through the use of exclusionary, pricing, discount, and other practices ("AMD Action"). *See* Seely Decl., Ex. 8. Soon after, multiple consumer class actions arising out of the same allegations of Intel's anticompetitive conduct were filed across the country.

The parties in the AMD Action have exchanged over 200 million pages of documents, conducted 2,000 hours of depositions, and sent thousands of pages of expert reports to the Court. Delaware Complaint, ¶96, D.I. 35. The discovery conducted in the AMD Action includes documents and deposition testimony from vital third parties, including the major OEMs who purchased Intel and AMD products. In November 2009, Intel agreed to pay AMD *$1.25 billion* to settle the AMD Action. *Id.*, ¶97.

G.    **The MDL Action Still Pending**

Approximately eighty class actions alleging violations of antitrust laws and various other federal and state violations by Intel were consolidated into a multidistrict litigation proceeding currently pending in this Court ("MDL Action"). The First Amended Consolidated Complaint in the MDL Action, captioned *In re Intel Corp. Microprocessor Antitrust Litig.*, MDL Docket No. 1:05-md-01717-JJF, was filed in this Court on May 26, 2006. It alleges violations of the Sherman Act, various California state laws, and other state antitrust, consumer protection, and

unfair competition laws. While consolidated with the AMD Action, the MDL Action also undoubtedly has benefitted from the extensive discovery discussed above.

## III. THE DERIVATIVE CLAIMS AND THE PROPOSED SETTLEMENT

### A. Del Gaizo Inspection Demand Initiated – the Statute of Limitations Tolled

On March 18, 2008, Del Gaizo[5] made a demand to inspect Intel's books and records pursuant to California Corporations Code Section 1601 ("Section 1601") concerning potential antitrust violations.[6] *See* Seely Decl., Ex. 11. After an extensive letter-writing campaign between Del Gaizo's attorneys and counsel for Intel concerning the documents the Company was willing to produce, counsel for Intel rejected Del Gaizo's request that the Company enter into tolling agreements with certain persons believed to have breached their fiduciary duties to Intel. *See* Seely Decl., Exs. 12-13. Therefore, Del Gaizo filed a shareholder derivative complaint on June 27, 2008 (the "Del Gaizo Complaint"), in order to toll the statute of limitations and preserve

---

[5] Del Gaizo is a medical doctor with a family practice in New York. It is undisputed that Del Gaizo is a long-time and current Intel shareholder. *See* Seely Decl., Exs. 9, 29. Although irrelevant, it is also undisputed that Del Gaizo's son is an associate employed by Del Gaizo's counsel. Counsel for Intel is aware of this fact and has never objected or otherwise expressed concern over Del Gaizo's adequacy in a representative litigation, and there is no basis to do so. *See* Seely Decl., ¶6; Ex. 10.

[6] Intel is a Delaware corporation. Delaware courts have "consistently encouraged" plaintiffs to make an inspection demand before filing a derivative action. *See Beiser v. PMC Sierra, Inc.*, C.A. No. 3893-VCL, 2009 WL 483321, at *3 (Del. Ch. Feb. 26, 2009); *see also West Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 643 (Del. Ch. 2006) (noting that the Delaware Supreme Court has articulated a policy concern that "plaintiffs should employ section 220 before filing suit"). California Corporations Code section 1601(a) specifically grants shareholders the right to inspect the books, records, and minutes of proceedings "of any foreign corporation keeping ... records in this state or having its principal executive office in this state...." Therefore, California law permits Intel's shareholders to inspect the books and records of Intel, a foreign corporation which is headquartered in California.

the Company's valuable claims.[7]  The Company has acknowledged that the Del Gaizo Action tolls the statute of limitations. *See* Seely Decl., Exs. 14-16.

## B.     Del Gaizo Inspection Demand Continues – Demand Made

The parties to the Del Gaizo Action agreed to stay the action on or about August 27, 2008, and Del Gaizo continued to pursue her inspection demand. *See* Seely Decl., ¶3; *see also* Ex. 17.  Ultimately, Intel produced a limited number of heavily redacted documents to Del Gaizo's counsel. *See* Seely Decl., ¶4; Exs. 18-20.  As a result of the heavily redacted nature of the documents, Del Gaizo decided that Intel's Board may be in the best position to commence an investigation of the wrongdoing alleged.  Accordingly, on July 8, 2009, plaintiff Del Gaizo made a demand that the Board investigate those responsible for the alleged antitrust violations and commence litigation against the wrongdoers in order to recover some of the damages caused to the Company ("Del Gaizo Litigation Demand"). *See* Seely Decl., Ex. 21.

## C.     Del Gaizo Presentation – Liability Determination Deferred

After sending the demand, Del Gaizo's counsel engaged in discussions with the Audit Committee's counsel concerning its investigation and met with counsel for the Audit Committee on October 28, 2009. *See* Seely Decl., Ex. 22.  At that meeting, Del Gaizo's counsel made a substantial presentation to the Audit Committee's counsel detailing Del Gaizo's concerns on behalf of Intel.  The presentation was based on a thorough review of the relevant public documents available, including the May 13, 2009 non-confidential EC Decision.[8]

---

[7] Del Gaizo's derivative action is pending before the Honorable Joseph H. Huber in the Superior Court of California, County of Santa Clara, and is captioned *Del Gaizo v. Otellini*, Case No. 1-08-CV-116137 (Santa Clara Super. Ct. June 27, 2008) ("Del Gaizo Action"). *See* Seely Decl., ¶2.

[8] *See* letter to counsel enclosing a copy of the PowerPoint presentation that was discussed with the Audit Committee's counsel attached as Ex. 23 to the Seely Decl.  The "EC Decision" refers to the Commission Decision of the European Commission dated May 13, 2009.

On November 30, 2009, counsel for the Audit Committee informed Del Gaizo that, while the Audit Committee "appreciate[d] the presentation [Del Gaizo's counsel] prepared for [the] meeting ... [a]fter due consideration, at the recommendation of the Audit Committee, the Board ha[d] decided to defer any determination" regarding the Del Gaizo Litigation Demand. *See* Seely Decl., Ex. 14. According to the Audit Committee's counsel, in coming to this "deferral decision," the Board had determined that "the Company would benefit from additional administrative and judicial proceedings." *Id.* Further, the Board "believe[d] it will benefit from a more fully developed factual record." *Id.* The Board also informed Del Gaizo it was aware of Del Gaizo's contention that the Del Gaizo Action tolled the statute of limitations and that the Board would continue to monitor the underlying antitrust matters. *Id.* Del Gaizo did not oppose the decision by the Board to defer determination and continued to investigate her allegations.

### D. The Delaware Plaintiffs – "Growing Body of Evidence" Including Otellini and Barrett

On February 12, 2010, the Delaware Plaintiffs[9] filed the Delaware Complaint. The Delaware Complaint acknowledges that Intel has failed to argue or come forward with "any convincing evidence showing negligence on its part *and the EC has found Intel to have engaged in a strategy of exclusion* ...." *Id.*, ¶2 (citing EC Decision) (emphasis in original). The Delaware Complaint refers to "numerous examples of direct involvement in unlawful activities by Intel's 'senior executives ....'" *Id.*, ¶4. The Delaware Complaint rightly expresses great concern over both the costly $1.45 billion EC fine as well as Intel's agreement to pay AMD $1.25 billion to settle the AMD Action. *Id.*, ¶80. The Delaware Complaint also correctly warns

---

[9] According to the Stipulation of Settlement filed on May 25, 2010, D.I. 51 (the "Stipulation"), the lead "Delaware Plaintiffs" are Louisiana Municipal Police Employees' Retirement System and Charles A. Gilman. But for purposes of this document, the term is also used to reference the other plaintiffs included in the proposed settlement.

of the still pending NYAG Action as well as the FTC Action, and properly points out that "the FTC Action potentially poses *a more serious threat than any proceeding to date* ... the FTC Action greatly inhibits Intel's immediate profitability and may *even endanger the Company's long-term survival.*" *Id.*, ¶7. Finally, the Delaware Complaint admits that there is a "growing body of evidence that the antitrust scheme, which spanned three continents and has already led to more than *$2.7 billion* in fines and settlements, was personally directed by ... Otellini ... and Barrett." *Id.*, ¶13 (emphasis in original).

### E. Delaware Motion to Dismiss – "Defer Decision" Defended and Statute of Limitations Tolled

On March 12, 2010, defendants in this action (the "Delaware Action") filed a motion to dismiss ("MTD") the Delaware Complaint for failure to establish that demand was wrongfully refused. The MTD argued that there had been no rejection of the Delaware Plaintiffs' litigation demands, and that the Board properly exercised its business judgment to "defer decision" on the demands. MTD at 17-18, D.I. 40. The MTD also noted that should the Board decide to bring the claims, they would "relate back" to the earlier filed Del Gaizo Action for statute of limitations purposes. *Id.* at 4 ("Thus, the Audit Committee, in consultation with counsel, concluded that any breach of fiduciary duty claim filed by Intel would, for statute of limitations purposes, 'relate back' to June 27, 2008 – the date on which the Del Gaizo Action was filed.") *Id.* at 29. The MTD has not been decided.

### F. Overview of the Objection

On May 25, 2010, the Delaware Plaintiffs filed their motion for preliminary approval of the proposed settlement and the Stipulation, setting forth the terms of the proposed settlement. *See* Stipulation, D.I. 51. The Stipulation provides for enhancements to Intel's corporate governance and antitrust compliance policies and procedures, but it proposes no money

payments to Intel despite the Delaware Plaintiffs' strong allegations of direct involvement in the wrongdoing by defendants Otellini, Barrett, and other Intel insiders. Instead, the proposed settlement grants broad releases to every possible wrongdoer in exchange for corporate governance enhancements only. *Id.* at 17-21. Significantly, according to the Stipulation, the corporate governance measures that were not already implemented went into effect on June 30, 2010. *Id.* at 17. Thus, all corporate governance and compliance policy enhancements have already been implemented.

### G. The Del Gaizo Objection

The Delaware Plaintiffs' own complaint acknowledges the weight and substance of the "growing body of evidence that the antitrust scheme, which spanned three continents and has already led to more than *$2.7 billion* in fines and settlements, was personally directed by Otellini and Barrett." Delaware Complaint, ¶13, D.I. 35. The Company has repeatedly defended its decision to defer a determination as to liability to allow the various matters to develop. Yet, despite their respective positions, the growing body of overwhelming evidence, and the billions of dollars of fines and settlements, among other things, the parties now do an about-face with regard to their respective positions, and claim that the proposed corporate governance only settlement is fair, reasonable, adequate, and in the best interests of Intel. It is not. Del Gaizo objects.

On or about May 21, 2010, Del Gaizo's counsel was informed that the Board had changed course and decided to settle the Delaware Action for no monetary recovery to Intel and release all of the claims alleged on Intel's behalf in the Delaware Action and the Del Gaizo Action, among others. *See* Seely Decl., ¶5. On May 28, 2010, Del Gaizo served on the Board a second demand to inspect Intel's books and records pursuant to Section 1601. Seely Decl., Ex. 30. The purpose of the second inspection demand was to obtain documents concerning the Board's

apparent decision "to settle the very claims that [Del Gaizo] was told were being preserved by deferring litigation against the culpable parties while other proceedings developed." *Id.* at 1.



For the reasons stated herein, Del Gaizo now objects to the proposed settlement of the Delaware Action.

## IV. THE PROPOSED SETTLEMENT SHOULD NOT BE APPROVED

### A. Standards for Approval of Derivative Settlements

#### 1. Duty of the Court and Burden on the Parties

Federal Rule of Civil Procedure 23.1 requires court approval of settlement of a derivative action. Similar to a class settlement, before approving a proposed derivative settlement, the court must determine that it is "'fair, reasonable, and adequate.'"[10] Moreover, the parties to the derivative suit bear the burden of demonstrating the reasonableness of the terms of the settlement. *See Schwartz v. Novo Industri A/S*, 119 F.R.D. 359, 362 (S.D.N.Y. 1988). None of the factors outlined in the Stipulation help the parties meet their high burden under the

---

[10] *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001) ("the District Court acts as a fiduciary guarding the rights of absent class members and must determine that the proffered settlement is 'fair, reasonable, and adequate") (citation omitted); *see also Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) ("[i]n evaluating a district court's determination that a settlement agreement is fair and reasonable, we consider factors applied initially to class action settlement agreements, and subsequently to derivative actions"); *see also, Off v. Ross*, Civil Action No. 3468-VCP, 2008 WL 5053448, at *6 (Del. Ch. Nov. 26, 2008) ("[T]he Court has a duty to protect the interests of absent class members who will be barred from future litigation of claims released by a proposed settlement.").

circumstances in this case. For the reasons stated herein, the Court should not approve the proposed settlement.

### 2. Benefit to the Company and Extensive Discovery Factors

The "principal factor" to be considered "is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest...." *Bell*, 2 F.3d at 1311. Here, the corporate governance benefits have already been conferred on the Company. Stipulation, ¶4, D.I. 51. Thus, there is no real harm to the Company to not approve the proposed settlement until the Del Gaizo Action is resolved.

Further, courts often consider whether there has been sufficient discovery to enable the parties to make an informed judgment about the merits of the case. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 789 (3d Cir. 1995). This is because when parties are "[w]ithout the benefit of extensive discovery, both sides may underestimate the strength of the plaintiffs' claims." *Id.* When the confirmatory discovery conducted in support of this proposed settlement (consisting of about 17,000 pages of twenty depositions of Intel employees) is compared to the extensive discovery conducted in the AMD Action and the EC investigation, this Court should be very suspicious of whether the Company is getting all of the benefits it deserves, including monetary benefits.

### 3. Extra Scrutiny for Non-Monetary Settlements

Although it is certainly true that a proposed derivative settlement need not result in any monetary recovery by the corporation in order to be approved, courts should generally scrutinize non-monetary settlements to ensure that the benefit to the corporation is real and not illusory.[11]

---

[11] *See Bell*, 2 F.3d at 1311-12 ("[t]he difficulty in valuing therapeutic relief poses significant risks. Parties may capitalize on the valuation problem and exchange cosmetic 'reforms' for plaintiffs' fees, concealing a collusive settlement.") (citation omitted); *see also In re Pittsburgh & Lake Erie Railroad Co. Sec. and Antitrust Litig.*, 543 F.2d 1058 (3d Cir. 1976) (disapproving

Faced with a similar proposed derivative settlement providing only corporate governance enhancements despite strong allegations of misconduct by company insiders, the Honorable Charles R. Breyer, U.S. District Court Judge for the Northern District of California questioned,

> [H]ow a company could lose $100 or $200 million, allegedly, and the settlement come in and say, Oh, by the way, we represent the company – we are a derivative action. We're going to try to get them compensation for their loss. And then you go on to say, by the way, in this settlement, we're not going to give you any money.

*See* Seely Decl., Ex. 24 at 3.

The proposed settlement should only be approved if the proposed relief is fair and reasonable to Intel and its shareholders and the Company will derive a sufficient benefit from the settlement in relation to the gravity of damages alleged. *See Bell*, 2 F.3d at 1311. It does not, and therefore, the proposed settlement should not be approved.

**B.**     **The Delaware Plaintiffs' Considerations Do Not Support Approval**

As reasons for offering the corporate-governance-only, no-money-to-Intel proposed settlement, the Stipulation states that the Delaware Plaintiffs have "independently considered and evaluated the benefits provided by this Settlement to Intel and Intel's shareholders, and have also considered:

(i)     **[Risks of Litigation]** [T]he attendant risks of continued litigation and the uncertainty of the outcome of the Delaware Action;

(ii)     **[Merits]** [T]he probability of success on the merits and the allegations contained in the Delaware Action;

(iii)     **[Demand Futility Denied]** [T]he fact that a previous shareholder derivative suit on behalf of Intel ... was dismissed ... in an opinion dated June 4, 2009;

---

settlement because benefit conferred on plaintiff's counsel and minority shareholders, without any benefit conferred on corporation).

    (iv)   **[Possible Defenses]** [T]he possible defenses that the Defendants may assert and other impediments to a better outcome of the Delaware Action, including:

        (a)   **[MTD]** [T]he motion to dismiss filed by the Defendants that is currently pending;

        (b)   **[Violations of Law]** [T]he unlikelihood of proving that Intel violated U.S. or foreign competition law;

        (c)   **[Breach of Duty Standards]** [T]he difficult standard that must be met to prove a breach of the duty of oversight under Delaware law;

        (d)   **[Indemnity]** [T]he fact that Intel's Certificate of Incorporation includes an exculpatory provision permitted by Delaware General Corporation Law §102(b)(7) and

        (e)   **[Insurance]** [T]he fact that Intel's directors and officers liability insurance excludes coverage for any loss for which Intel is obligated to indemnify the insureds; and

    (v)   **[Risks of Not Settling]** [T]he desirability of permitting this Settlement to be consummated according to its terms, and avoiding the substantial expense and risks of continued litigation."

Stipulation at 6-7, D.I. 51. However, as shown below, none of these assertions provides a good reason to consummate the proposed settlement.

### 1.    The "Risks of Litigation" Do Not Support Approval

The risks of continued litigation are minimal or nonexistent. Even if the Delaware Plaintiffs were to lose the pending MTD, the claims on behalf of the Company are preserved by the Del Gaizo Action. The Company would be allowed to continue to defer its decision, as it has repeatedly argued is the appropriate course of action (until this recently announced proposed settlement). Once the Board makes its final determination regarding the pending Del Gaizo Litigation Demand, Del Gaizo can then file an amended demand-made complaint, as would be her right, if the Board improperly rejects the demand.

### 2. The Strong "Merits" Do Not Support Approval

The Delaware Plaintiffs' own complaint contains strong allegations of bad faith and disloyal conduct by Intel defendants. It alleges that numerous Intel insiders, including Barrett and Otellini, engaged in active misconduct from 2001 through the present that amounted to deliberate violations of European, Japanese, South Korean, and United States antitrust laws, and failed to ameliorate such misconduct or ensure cooperation with regulatory or governmental authorities. Delaware Complaint, ¶¶154, 161, 164-65, D.I. 35.

Actions taken by company fiduciaries with the intent to violate positive law amount to a bad faith breach of the duty of loyalty. *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106 (Del. Ch. 2009) ("The Delaware Supreme Court has stated that bad faith conduct may be found where a director 'intentionally acts with a purpose other than that of advancing the best interests of the corporation, ... acts with the intent to violate applicable positive law, or ... intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.") (citing *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) ("By 'bad faith' is meant a transaction that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is *known to constitute* a violation of applicable positive law.").

For instance, the NYAG Complaint, which is quoted from and incorporated by reference into the Delaware Complaint, specifically alleges that Otellini and Barrett actively participated in Intel's anticompetitive conduct. The NYAG Complaint alleges that Barrett and Otellini offered various Intel manufacturers financial support in exchange for an exclusive agreement with Intel. *See* Seely Decl., Ex. 25, ¶136. Otellini and Barrett often met with top executives at OEMs and personally negotiated agreements for the OEMs to use Intel products. For example, in August 2006, Otellini met with a top HP executive and formulated the basic term of the deal between the

companies. *Id.*, ¶196. Intel promised hefty cash payments and other benefits to HP in exchange for market share gain (by decreasing the proportion of AMD products HP purchased). *Id.* As another example, a top HP executive reported back from a conversation with Otellini concerning Intel's reaction to news that HP was considering an AMD product, stating: "I talked to Paul Otellini last night [who asked whether] we have a transactional relationship or a partnership? If we go with AMD on the commercial desktop, Intel equates this to a transactional relationship, and therefore we are foregoing the benefits of price pull-forwards [pricing concessions] to level the direct/indirect playing field." *Id.*, ¶47. Intel sought "strategic" relationships with OEMs, meaning Intel exclusivity, as opposed to "transactional" relationships. *Id.*, ¶48. The NYAG Complaint further alleges that in a 2005 e-mail to Michael Dell, Otellini stated that "[a]dditionally, we are transferring over $1B per year to Dell for meet comp efforts. This was judged by your team to be more than sufficient to compensate for the [AMD] competitive issues." *Id.*, ¶136. Otellini suggested to a top Lenovo executive that Lenovo could benefit from a similar relationship that Intel had with Dell, stating in a "read and delete" e-mail that "[A]ny meet comp program we may have had with Dell will get nullified as they introduce competition – this opens vistas of opportunity for LeNovo/Intel that I have only hinted at in the past. This represents an inflection point for LeNovo." *Id.*, ¶148. When Dell deviated from Otellini's plan and incorporated AMD products into its line, Otellini allegedly retaliated against the manufacturer, stopping order support. *Id.*, ¶¶143-44. Otellini similarly threatened HP when it was considering using an AMD product by threatening to redirect a development effort that would significantly hinder HP's "IPF migration." *Id.*, ¶164.

The NYAG Complaint also alleges direct involvement by Barrett. *Id.*, ¶100. For instance, Barrett arranged with Dell to financially support the manufacturer in exchange for

exclusivity with Intel. *Id.* In September 2003, Barrett personally met with Michael Dell to address the relationship between the companies. *Id.* Barrett reported back to Intel executives that he and Michael Dell "shook hands on the deal. MD [Dell] agreed to quarterly mtgs ... to make sure we are aligned in our strategic issues and coordinated in spending monies. He had no issue with the win/win nature of the agreement. I clearly committed our long range support regardless of competition." *Id.*; *see also* Delaware Complaint, ¶102, D.I. 35. In January 2005, Intel began "actively encouraged below-cost transactions in order to maintain its monopoly and keep AMD out of the market. Seely Decl., Ex. 25, ¶123. In February 2006, in an e-mail reacting to a news report that Dell "made no plans to begin using" AMD chips, Otellini commented that Dell was "[t]he best friend money can buy." *Id.*, ¶139.

When Dell realized it was becoming less cost effective to stay with Intel despite receiving hundreds of millions of dollars per quarter for their "loyalty," a Dell executive described what would happen if Dell switched to AMD: "PSO/CRB [Otellini and Barrett] are prepared for jihad if Dell joins the AMD exodus. We [will] get ZERO MCP for at least one quarter while Intel 'investigates the details' – there's no legal/moral/threatening means for us to apply to avoid this." *Id.*, ¶105. Eventually, when Dell made the decision to introduce the AMD line, Barrett responded by directing Otellini to immediately stop payment and charge Dell the list price. *Id.*, ¶142. ("[T]hey have just signaled they are only interested in being a transaction based customer. I think you should reply in kind. Not a time for weakness on our part. *Stop writing checks immediately and put them back on list prices asap.*"). *Id.* (emphasis in original).

These actions had the effect of unfairly excluding AMD from the market place, as observed by a top IBM executive writing to AMD's CEO sating: "I can envision a scenario of Intel having made preferential deals with HPQ and Dell and us getting 'punished' for trying to

work with AMD. We believe in you and we are a big company but we are not immune from single supplier pressure." ¶216.

The Delaware Complaint also incorporates by reference the complaint in the AMD Action, which details similar to the NYAG Complaint the measures Intel took to prevent AMD from obtaining market segment. *See* Delaware Complaint, ¶¶93-99, D.I. 35. For instance, Intel allegedly forced major customers into exclusivity deals with Intel. *Id.*, ¶94. The Company conditioned rebates on OEMs' agreement to not purchase AMD products, and threatened retaliation against them if they subsequently chose to use AMD. *Id.* Intel further allegedly "established and enforced quotas among key retailers effectively requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers, thereby artificially limiting consumer choice." *Id.*

*In re Zoran Corp. Derivative Litigation*, No. C 06-05503 WHA, 2008 WL 941897 (N.D. Cal. Apr. 7, 2008), is particularly instructive. In *Zoran*, the court ruled that the "main vice" of the proposed shareholder derivative settlement was the fact that it did not include any monetary recovery to the corporation. *Id.*, at *11. Plaintiffs' expert damage report calculated maximum damages at almost $16 million. *Id.*, at *5. The court compared this amount against the proposed settlement, coming to the "key conclusion" that the economic benefits of the proposed settlement were nowhere close to the $1.65 million value counsel claimed was conferred on the company by the proposed settlement. *Id.*, at *6. The court found that the complaint contained "strong allegations" of wrongdoing and, therefore, a settlement that contained only corporate governance reforms was inadequate. *Id.*, at *10. Further, the court noted that the company had already committed to following many of the corporate governance reforms regardless of the settlement. *Id.*, at *5. Therefore, the proposed settlement conferred "so little value on the corporation that it

could only be approved upon by [sic] showing that the suit is virtually worthless." *Id.*, at *1. Because the settling plaintiff had not shown difficult proof problems on the issue of liability, especially given the strong allegations of wrongdoing, (*id.*, at *10) the court denied the plaintiff's motion for preliminary approval of the settlement.[12] *Zoran*, 2008 WL 941897, at *1.

Here, the proposed settlement is similar to that in *Zoran*, as it does not provide any monetary recovery to the corporation despite the strong allegations of wrongdoing and the **over $2.7 billion in damages** alleged in the complaint. Like the complaint in *Zoran*, the Delaware Plaintiffs' complaint does not present difficult proof problems on the issues of liability, as discussed above. Therefore, this Court should follow the reasoning in *Zoran* and decline to approve a settlement where "the only cash involved … would go to counsel." *Id.*, at *5. The proposed corporate governance only settlement is also inadequate because, as in *Zoran*, it appears the Company has already committed and in fact implemented the reforms. *See* Section IV.D., *infra*. In *Zoran*, the court denied preliminary approval; certainly here, the Court should deny final approval.

Thus, in light of the strong likelihood of success on the merits, a corporate governance only settlement is inadequate. Following a conclusion of several actions still pending against Intel, it is unlikely that the Board would, in good faith, decline to pursue claims against the individual defendants for the billions of dollars of harm they caused Intel. In any event, if the Board did decline to pursue the derivative claims, the allegations of wrongdoing against the individual defendants are so compelling that there is a strong likelihood that a derivative action,

---

[12] A settlement which provided for a payment of $3,395,000 in cash to the company, among other things, was eventually approved. *In re Zoran Corp. Derivative Litig.*, No. C 06-05503-WHA, 2008 WL 4104517, at *1 (N.D. Cal. Sept. 2, 2008). The cash payment to the Company was funded by the Company's insurance carrier and payment by two individual defendants. *Id.*

following litigation and discovery concerning the allegations, would result in a significant monetary recovery to Intel.

### 3. Demand Futility Dismissal Does Not Support Approval

The fact that the *In re Intel Corporation Derivative Litig.* (the "Smilow Action") action was dismissed for failure to plead demand was futile has no bearing on the strength of the claims in the Delaware Action and the defenses available to defendants. *See* Seely Decl., Ex. 26. The Smilow Action alleged that demand on the Board was excused because of several "red flags" that should have put the Board on alert as to Intel's anticompetitive conduct. However, many of the "red flags" were based on regulatory actions or other lawsuits that were still pending and had not reached finality. In fact, none of the $2.7 billion in fines and settlements accrued against Intel to date had taken place at the time the Smilow Action's amended complaint was filed. More importantly, the Delaware Action is a "demand-made" action, thus obviating the need to plead demand on the Board would have been futile.

### 4. The "Possible Defenses" Do Not Support Approval

The Delaware Plaintiffs' concerns regarding the pending motion to dismiss, proving violations of antitrust laws, and proving breach of duty violations, are all repetitive of the "Risks of Litigation" and the "Merits" arguments, which have already been addressed. For the reasons already stated, these repetitive "defenses" offer no support for the proposed settlement.

The Delaware Plaintiffs' claims are not exculpable or indemnifiable under Section 102(b)(7) of Title 8 of the Delaware Code ("Section 102(b)(7)"). Section 102(b)(7) permits a corporation to adopt a charter provision that eliminates or limits the personal liability of directors for monetary damages for breach of the duty of care. While Barrett and Otellini were directors of Intel for much of the wrongdoing alleged, their breach of duty of care is not exculpable under Section 102(b)(7) while they were acting in their capacities as officers of Intel. *See Arnold v.*

*Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994). This is because "actions taken solely in ... capacity as an officer are outside the purview of Section 102(b)(7)." *Id.; see also Gantler v. Stephens*, 965 A.2d 695, 708-09 n.37. *Arnold* held that a plaintiff's complaint was sufficient to withstand a motion to dismiss asserting the protections of the exculpatory clause when it "highlight[ed] ... specific actions [the defendants] undertook as [] officer[s]." 650 A.2d at 1288. Here, the Delaware Complaint highlights numerous specific actions which defendants Barrett and Otellini undertook in their capacity as officers. *See* Section IV.B.2, *supra*. Section 102(b)(7) thus does not exculpate Barrett and Otellini for breaches of their fiduciary duty of care committed in their capacities as officers of Intel.

Further, even if defendants Barrett and Otellini were acting in their capacity as directors only, much of their conduct would still not be exculpated under Section 102(b)(7) because their actions implicate a breach of the duty of loyalty, which is not exculpable or indemnifiable under Delaware law. *See* Section 102(b)(7); *Louisiana Muni. Police Employees' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1180 n.8 (Del. Ch. 2007) (corporation may only indemnify its own directors to the extent that a director acts in good faith and in the best interests of the corporation and, therefore, may not eliminate or limit the liability of a director who acts in violation of their duty of loyalty). The allegations in the Delaware Complaint, if true, show deliberate violations of antitrust laws, which implicate breach of duty of loyalty and bad faith. *See* Section IV.B.2, *supra*. Moreover, the Delaware Complaint adequately alleges that Barrett, Otellini, and other Intel defendants participated in, authorized, and were fully aware of the anticompetitive conduct at Intel, in breach of their fiduciary duties. *Id*.

The Delaware Plaintiffs' claims are not indemnifiable under Sections 145(a) and (b) of Title 8 of the Delaware Code ("Section 145"). Section 145 gives corporations the power to

indemnify their current and former corporate officials from expenses incurred in legal proceedings "'*by reason of the fact* that the person is or was a director, officer, employee or agent of the corporation.'" *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005) (citing Section 145) (emphasis in original). The right to indemnification under Section 145 does not apply here because the allegations in the Delaware Complaint, which are assumed to be true at the pleadings stage and receive all reasonable inferences in their favor, allege that certain of the individual defendants intentionally violated positive law in breach of their fiduciary duty of loyalty. *See* Section IV.B.2, *supra*.



As discussed above, Delaware law prohibits Intel from indemnifying officers and directors for conduct that amounts to a breach of the duty of loyalty.

### 5. The "Risks of Not Settling" Do Not Support Approval

Much like the "Risks of Litigation," the risks associated with not approving the proposed settlement are virtually nonexistent. The Company has already received and implemented its main benefit under the settlement, the corporate governance. There is no real risk to the Company if the proposed settlement is rejected, at least until the Del Gaizo Action is resolved.

**C.     The Factual Record Does Not Support Approval**

The Stipulation states that the "Delaware Plaintiffs' Counsel have conducted a thorough

investigation of the claims and allegations asserted in the Delaware Action, including:

> (i)     review of publicly-available documents concerning Intel and the Antitrust
> Proceedings,
>
> (ii)    review of over 17,000 pages of documents produced by Intel, including
> transcripts of the depositions of twenty Intel officers, directors, or
> employees that were taken in the AMD Action,
>
> (iii)   the deposition of Evangelina Almirantearena, Senior Counsel, Competition
> Compliance for Intel, and
>
> (iv)    consultation with experts in the areas of corporate governance, antitrust
> law, and compliance.[14] "

Stipulation at 5-6, D.I. 51.  However, once again, these reasons do no support a settlement of the

Delaware Action on the terms proposed in the Stipulation.

**1.     The Publicly Available Documents Do Not Support Approval**

For all of the reasons already discussed at length herein, the publicly available documents

overwhelmingly support denial of the proposed settlement.  Even the Delaware Plaintiffs admit

there is a growing body of evidence, and defendants concur, at least at times, that the best course

of action is to therefore, defer a determination as to liability issues.

**2.     ██████████████████████████████████████████**

Counsel for Del Gaizo were given access to deposition transcripts and exhibits for twenty

Intel representatives, consisting of approximately 17,000 pages.[15] ████████████████████

---

[14] Based on the overwhelming evidence and the pending significant liability risks still faced by
Intel, it is doubtful that any of the Delaware Plaintiffs' consultants advised that Intel should not
be paid any money in this multi-billion dollar case in the context of the proposed settlement.

[15] The documents were made available for review under restrictive and very inefficient
conditions.  The documents were only made available at Intel's counsel's offices during regular
business hours.  No copying of the transcripts was allowed, despite the presence of a

to thoroughly review the depositions of ███████████ and were able to perform a cursory review of the rest of the depositions. The depositions showed



*See* Seely Decl., ¶7.

3. ████████████████████████████

As mentioned above, the Stipulation states that Delaware Plaintiffs deposed Evangelina Almirantearena, one of the Competition Compliance counsel for Intel.

*See* Seely Decl., ¶7.

### 4. The Lack of Discovery Made Available Does Not Support Approval

The discovery made available to the Delaware Plaintiffs is insufficient in a case of this magnitude, to determine that a corporate governance only settlement is appropriate. The United States Court of Appeals for the Third Circuit has recognized the issues that may arise when a settlement is based on too little discovery, noting that when parties are "[w]ithout the benefit of extensive discovery, both sides may underestimate the strength of the plaintiffs' claims." *Gen. Motors Corp.*, 55 F.3d at 789.

---

confidentiality agreement permitting necessary and reasonable copying. Also, the documents were made available in hard copy format only, rather than an electronic, searchable format. *See* Seely Decl., ¶¶5-6.

While 17,000 pages of deposition transcripts is generally a substantial amount of material, the Stipulation does not put the documents reviewed into the proper perspective of this enormous case. As this Court is aware, the 17,000 pages are far from a fair sampling of the evidence that has been compiled in the AMD Action. For example, the "Stipulation and Case Management Order No. 13" from the AMD Action makes it apparent that over eighty third-party witnesses were deposed (and these were just the deponents who would apparently be unavailable to testify in person at trial). *See* Seely Decl., Ex. 27. The Delaware Plaintiffs (and Del Gaizo) had no access to these critical depositions.[16]

The third-party deponents are significant for obvious reasons, including their unique knowledge of specific allegations relating to the defendants. Such third-party evidence was no doubt a significant factor in Intel's decision to pay AMD $1.25 billion to settle that litigation and such evidence was obviously critical in the EC's decision to fine Intel $1.45 billion. Del Gaizo is not suggesting that all of these relevant documents must have been reviewed in order for the parties to adequately evaluate the Delaware Plaintiffs' claims, but only that the universe of available documents, when coupled with the lack of monetary recovery to Intel, suggests that the parties have underestimated the strength of the claims.

### D.    Intel Will Not Be Harmed if the Settlement Is Not Approved

Objector Del Gaizo, the Delaware Plaintiffs, and counsel for Intel share the same role of ensuring that Intel's interests are protected. *See Parfi Holding AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 942 (Del. Ch. 2008) ("A 'derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom, and integrity.'") (citation omitted).

---

[16] Del Gaizo's counsel did request access to critical third-party depositions (and other relevant information) but their requests were rejected. *See* Seely Decl., Ex. 29; Exs. 31-32.

Intel, the real party in interest, will suffer no harm if approval of the settlement is delayed or denied until the Del Gaizo Action is resolved. According to the Stipulation, the corporate governance reforms contemplated by the proposed settlement *went into effect on June 30, 2010*, if they had not already been implemented. *See* Stipulation at 17, D.I. 51. Therefore, the sole benefit to Intel is not dependent upon approval of the proposed settlement. *See Off*, 2008 WL 5053448, at *3-*9 (court rejected proposed derivative and class settlement because much of the purported benefit would have occurred regardless of the settlement); *Zoran*, 2008 WL 941897, at *10 (characterizing corporate governance only settlement as "troubling" when company had already committed to follow many of the reforms before settlement discussions and declining to approve settlement).

Additionally, as defendants have acknowledged, the Del Gaizo Action is tolling the statute of limitations regarding the claims alleged in the Delaware Action.[17] The Company will only benefit if the proposed settlement is not rushed for approval so that adequate exploration of the significant derivative claims alleged can be completed. *See Off*, 2008 WL 5053448, at *5 (Court granted objector's request to postpone resolution of the settlement in order for him to conduct discovery, "[i]n part because Plaintiff had not taken any confirmatory discovery *and because no immediate monetary benefit accrued to the class....*") (emphasis added).

### E. The Carriers and Individuals Are Able to Contribute to a Monetary Settlement

Finally, there are sources from which Intel could recover money, if this proposed settlement is denied. █████████████████████████████████████████████████████

█████████████████████████████████████████████████████ *See* Seely Decl., ¶6. Moreover, Del Gaizo's own analysis

---

[17] *See*, for example, MTD at 4, D.I. 40; Seely Decl., ¶¶15-16.

shows that certain of the primary wrongdoers, such as defendants Barrett, Otellini, and Sean M. Maloney (a defendant in the Del Gaizo Action), and others have the ability (and should in fairness be required) to reimburse Intel for at least some of the billions of dollars in damages they helped cause.[18]

## V.   CONCLUSION

For the foregoing reasons, the proposed settlement should not be approved. The Delaware Plaintiffs and the defendants have entered into a proposed settlement that is not reasonable, fair, or adequate. No harm would come to the Company if the proposed settlement were denied or if this Delaware Action were stayed, pending the final resolution of the Del Gaizo Action. Such a ruling would preserve the status quo in this case and give the California derivative action an opportunity to pursue the critical discovery and the additional monetary (and any other) benefits to which, even the Delaware Plaintiffs once, but no longer believe, the Company is entitled.

DATED: July 3, 2010                    Respectfully submitted,

                                       ROBBINS UMEDA LLP
                                       BRIAN J. ROBBINS
                                       MARC M. UMEDA
                                       KEVIN A. SEELY


                                       _____
                                       KEVIN A. SEELY

---

[18] Defendant Barrett's compensation received from Intel, since approximately 2000, including the value of his current Intel holdings and all other compensation, is approximately $309,501,770.55; defendant Otellini's compensation received from Intel, since approximately 2000, including the value of his current Intel holdings and all other compensation, is approximately $162,120,168.63; and California defendant Maloney's compensation received from Intel, since approximately 2002, including the value of his current Intel holdings and all other compensation, is approximately $34,365,914.07. *See* Seely Decl., ¶10.

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Objector Christine Del Gaizo

499317