# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE INTEL CORP. DERIVATIVE LITIGATION | ) ) ) ) ) ) | C.A. No. 1:09-cv-867-JJF |

### [REDACTED] DECLARATION OF KEVIN A. SEELY IN SUPPORT OF SHAREHOLDER CHRISTINE DEL GAIZO'S OBJECTIONS TO THE PROPOSED SETTLEMENT OF DERIVATIVE ACTION

### CONFIDENTIAL – SUBMITTED PER MOTION TO FILE UNDER SEAL SUBJECT TO A CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT


ROBBINS UMEDA LLP
BRIAN J. ROBBINS
MARC M. UMEDA
KEVIN A. SEELY
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Objector Christine
Del Gaizo

Date: July 6, 2010

I, Kevin A. Seely, declare as follows:

1.      I am an attorney at Robbins Umeda LLP. We are counsel for Intel shareholder Christine Del Gaizo ("Del Gaizo"). This document is being filed consistent with the instructions contained in the "Notice of Pendency of Derivative Action, Proposed Settlement of Derivative Action, Settlement Hearing and Right to Appear." I submit this declaration in support of Shareholder Christine Del Gaizo's Objections to the Proposed Settlement of Derivative Action ("Objection").

2.      Counsel for Intel is aware of the fact that Del Gaizo is a long-time and current Intel shareholder and counsel for Del Gaizo has provided proof of ownership to Intel. *See* Exhibit 10 attached hereto. Although it is not relevant, it is also undisputed that Del Gaizo's son is an associate employed by Del Gaizo's counsel. For example, on or about May 24, 2010, opposing counsel acknowledged this relationship and has never objected or otherwise expressed concern about said relationship.

3.      On June 6, 2008, shareholder Christine Del Gaizo filed a Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets and Unjust Enrichment, *Del Gaizo v. Otellini, et al.*, Case No. 1:08-cv-116137 in the Superior Court of California, County of Santa Clara ("Del Gaizo Action").

4.      Defendants initially sought to stay the Del Gaizo Action in favor of *Intel x86 Microprocessor Cases*, No. 1:05-CV-045077 (Santa Clara Super. Ct. July 14, 2005). Del Gaizo agreed to stay the action on August 27, 2008, because it was consistent with her good-faith intentions with regard to this matter. *See, e.g.*, Exhibit 17 attached hereto. The California court stayed the Del Gaizo Action on or about September 2, 2008.

5.      Counsel for Del Gaizo were permitted (after flying from our offices in San Diego, California to Intel's counsel's office in Palo Alto, California) to review a ███████████ policy.

We were not allowed to make copies of the policy. *See, e.g.,* <u>Exhibit 29</u> regarding the restrictive nature of the review permitted. According to our office's review, █████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

6.     My office was also given access to deposition transcripts and exhibits for twenty Intel representatives, consisting of approximately 17,000 pages. Again, *see* <u>Exhibit 29</u> regarding the restrictive nature of the review permitted. Nevertheless, our travel team was able to thoroughly review the depositions of ████████████████████████████████████████████ and were able to perform a cursory review of the rest of the depositions. According to our travel team and their contemporaneous notes, █████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

7.     Delaware Plaintiffs apparently conducted one confirmatory discovery deposition of

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

8.  My firm's own analysis shows that certain of the primary wrongdoers, such as defendants Barrett, Otellini, and Sean M. Maloney ("Maloney") and others, have the ability to contribute to any judgment or monetary component of a settlement. Through researching Intel's public filings with the U.S. Securities and Exchange Commission, our office staff determined defendants Barrett and Otellini and California defendant Maloney's compensation received from Intel throughout their tenure. For example, defendant Barrett's compensation received from Intel, since approximately 2000, including the value of his current Intel holdings and all other compensation, is approximately $309,501,770.55; defendant Otellini's compensation received from Intel, since approximately 2000, including the value of his current Intel holdings and all other compensation, is approximately $162,120,168.63; and California defendant Maloney's compensation received from Intel, since approximately 2002, including the value of his current Intel holdings and all other compensation, is approximately $34,365,914.07.

9.  Although the letter is not attached hereto, it is relevant to note that on or about January 13, 2009, I received a letter from Jonathan C. Dickey regarding the second production of discovery of additional relevant documents regarding the inspection demand.

10.  To the best of my knowledge, information, and belief, the following exhibits attached hereto are true and correct copies of what they purport to be:

EXHIBIT 1 - Audrey McAvoy, *Japan's Fair Trade Commission Raids Intel Offices*, Information Week, (Apr. 8, 2004);

EXHIBIT 2 - Newman and Bodoni, *Intel, Computer Retailers Raided in EU Investigation*, Bloomberg, (Feb. 12, 2008);

EXHIBIT 3 -   Japan Fair Trade Commission Ruling (Mar. 8, 2005);

EXHIBIT 4 -   Korea Fair Trade Commission Ruling, Corrective Measures Against Intel's Abuse of Market Dominance (undated);

EXHIBIT 5 - *Excerpts* from European Commission Decision of Relating to a Proceeding Under Article 82 of the EC Treaty and Article 54 of the EEA Agreement (May 13, 2009);

EXHIBIT 6 - *Attorney General Cuomo Launches Antitrust Investigation of Intel – Subpoena Seeks Information on Potentially Monopolistic Practices*, New York State Attorney General (Jan. 10, 2008);

EXHIBIT 7 -   Edwin Chan, *Intel and FTC Talk Settlement of Market Abuse Suit*, Reuters (June 21, 2010);

EXHIBIT 8 - *Excerpts* from the First Amended Consolidated Complaint, In re Intel Microprocessor Antitrust Litigation, MDL Docket No. 05-1717-JJF (D. Del. May 26, 2006);

EXHIBIT 9 - Letter to Jonathan C. Dickey from Marc M. Umeda regarding proof of ownership, dated April 14, 2008;

EXHIBIT 10 - Letter to Kevin A. Seely from Jonathan C. Dickey regarding confirmation of proof of ownership, dated June 15, 2010;

EXHIBIT 11 - Inspection demand letter to Intel Corporation's Board of Directors from Marc M. Umeda, dated March 18, 2008;

EXHIBIT 12 - Response and request letter to Jonathan C. Dickey from Marc M. Umeda regarding request for tolling agreement, dated June 17, 2008;

EXHIBIT 13 - Response letter to Marc M. Umeda from Jonathan C. Dickey regarding denial of tolling agreement, dated June 23, 2008;

EXHIBIT 14 - Deferral of demand letter to Kevin A. Seely from Michael D. Torpey, dated November 30, 2009;

EXHIBIT 15 - █████████████████████████████████████

EXHIBIT 16 - █████████████████████████████████████

EXHIBIT 17 - Response letter to Jonathan C. Dickey from Kevin A. Seely providing history regarding inspection demand, dated July 8, 2008;

EXHIBIT 18 - Letter to Kevin A. Seely from Jonathan C. Dickey first production of discovery regarding inspection demand, dated September 3, 2008;

EXHIBIT 19 - Letter to Jonathan C. Dickey from Kevin A. Seely regarding requests for additional discovery, dated October 28, 2008;

EXHIBIT 20 - Letter to Kevin A. Seely from Jonathan C. Dickey regarding denial of request, dated November 14, 2008 (enclosure omitted);

EXHIBIT 21 - Litigation demand letter to Intel Corporation's Board of Directors from Marc M. Umeda, dated July 8, 2009;

EXHIBIT 22 - Response letter to Jonathan Dickey from Marc M. Umeda regarding good history of the case, dated August 6, 2009;

EXHIBIT 23 - Letter to Michael Torpey and Amy M. Ross from Kevin A. Seely attaching Robbins Umeda LLP PowerPoint Presentation, *Informal Discussion re July 8, 2009 Shareholder Demand Letter to Intel Corporation* (Oct. 28, 2009), dated November 4, 2009;

EXHIBIT 24 - Transcript of Proceedings, *In re Brocade Communications Systems, Inc. Derivative Litigation*, Case No. C05-02233-CRB (N.D. Cal. Aug. 18, 2006);

EXHIBIT 25 - *Excerpts* from Complaint, *State of New York v. Intel Corporation*, Case No. 1:09-cv-00827-JJF (D. Del. Nov. 4, 2009);

EXHIBIT 26 - Opinion, *In re Intel Corporation Derivative Litigation*, C.A. No. 08-93-JJF (D. Del. June 4, 2009);

EXHIBIT 27 - Stipulation and Case Management Order No. 13, In re Intel Corporation Microprocess Antitrust Litigation, MDL No. 05-1717-JJF (D. Del. Oct. 23, 2009);

EXHIBIT 28 - Excerpts from letter to Jonathan C. Dickey from Kevin A. Seely regarding confirmation of ownership (June 14, 2010);

EXHIBIT 29 - E-mail chain between Kevin A. Seely and Jonathan C. Dickey regarding proposed settlement discovery disputes (June 26, 2010);

EXHIBIT 30 - Second inspection demand letter to Intel Corporation's Board of Directors from Kevin A. Seely, dated May 28, 2010;

EXHIBIT 31 - Letter to Jonathan C. Dickey from Kevin A. Seely regarding demand to inspected documents concerning reasons for proposed settlement, dated June 29, 2010; and

EXHIBIT 32 - E-mail chain between Kevin A. Seely and Jonathan C. Dickey regarding proposed settlement discovery disputes (June 29, 2010).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 3rd day of July, 2010, at San Diego, California.

_____
KEVIN A. SEELY

# EXHIBIT 1





BUSINESS INNOVATION POWERED BY TECHNOLOGY

# Japan's Fair Trade Commission Raids Intel Offices

It suspects the chipmaker pressured PC makers to avoid using competitors' products.

By Audrey McAvoy, Associated Press Writer, InformationWeek
April 8, 2004
URL: http://www.informationweek.com/story/showArticle.jhtml?articleID=18900652

TOKYO (AP) -- Japan's Fair Trade Commission raided offices of Intel Corp. on Thursday on suspicion the world's semiconductor leader pressured personal computer manufacturers to spurn competitors' products, a commission official said.

Fair trade authorities suspect that Intel improperly urged clients not to include central processing units-- the key chips that do computers' thinking--manufactured by Advanced Micro Devices and other companies, said Masaru Matsuo, a manager at the Fair Trade Commission.

The raid covered three Intel locations across Japan, including the company's Tokyo headquarters, and comes exactly six weeks after the commission raided offices of Microsoft Corp. in a probe of alleged anti-competitive practices by the world's most powerful software company.

Intel said it was cooperating with the probe.

"We did get visits from the Japanese FTC, and, as is our normal practice, we attempt to the best of our ability to cooperate with authorities as they conduct investigations of this nature," said Chuck Mulloy, a spokesman based at Intel headquarters in Santa, Clara, Calif.

The fair trade agency spokesman, Matsuo, declined to specify what exactly investigators were after, and Mulloy said he did not have enough information to comment further.

"We're not clear on exactly what they were looking for, but we're attempting to both understand that and also understand the nature of the complaint," Mulloy said.

Intel microprocessors power about 80 percent of personal computers worldwide, and the company pays PC makers to include "Intel Inside" branding on their machines.

The U.S. Federal Trade Commission closed a three-year investigation into Intel's business practices in September 2000 without taking any action. A year later, European competition officials confirmed they were investigating allegations that Intel abused its position as the world's leading chipmaker. The

investigation was prompted in part by a complaint by rival AMD.

Some 85 percent of all PCs shipped in Japan were embedded with Intel chips in the last quarter of 2003, according to IDC, a high-technology market analysis company. AMD followed with 12 percent.

On Feb. 26, the Japanese fair trade agency raided Microsoft offices in Tokyo over a clause in the company's contracts with hardware companies that essentially barred Japanese companies that license Windows operating systems from any legal action against Microsoft over patent violations, commission and Microsoft officials have said.

Microsoft has denied any wrongdoing. But shortly after the commission's raid, the company said it had decided to delete the clause in future contracts--and had already told the manufacturers.

Tokyo has lately grown somewhat wary of Microsoft's might, joining South Korea and China in endorsing the use of open-source software such as Linux not only in government but also in the private sector.

It was not immediately clear if similar objections are harbored about Intel.



Copyright © 2009 United Business Media LLC, All rights reserved.

EXHIBIT 2

BN          Intel, Computer Retailers Raided in EU Investigation (Update6)
            Feb 12 2008  13:02:39


(Adds closing share price in eighth paragraph.)

By Matthew Newman and Stephanie Bodoni
     Feb. 12 (Bloomberg) -- European Union antitrust regulators
ramped up their investigation of Intel Corp. by raiding the
world's biggest computer-chip maker's offices in Munich and
computer retailers in the U.K., France and Germany.
     EU officials inspected offices of German retail chain Media
Markt, DSG International Plc in the U.K. and France's PPR SA,
the companies said. Intel is cooperating with the investigation,
company spokesman Chuck Mulloy said.
     ``We believe the microprocessor market is functioning as
one would expect a normally functioning competitive market to
behave,'' Mulloy said today in a phone interview. ``Our business
practices are lawful and we hope to convince the commission that
we have violated no laws.''
     The raids follow charges by the European Commission in July
that Intel unlawfully wrested sales away from ``its main rival''
in the more than $30 billion microprocessor market. Advanced
Micro Devices Inc., Intel's largest competitor, told regulators
that Intel offers rebates to stifle competition. Intel will
respond to the claims at a hearing next month.
     ``Either something may have happened since the last
statement of objections was made by the commission or it could
be a completely different matter,'' said Mike Pullen, head of
European competition and regulatory affairs at law firm DLA
Piper in London, who isn't involved in the case. ``The details
are still confidential.''


                         AMD's Complaint


     The commission, the EU's antitrust authority in Brussels,
began a probe in 2005 by conducting surprise visits at Intel's
European offices. The probe was prompted by a complaint from
Sunnyvale, California-based Advanced Micro.
     Intel, based in Santa Clara, California, has said
competition hurt both its own and Advanced Micro's earnings, a
sign that the processor market is competitive.
     Intel rose 22 cents to $20.90 in Nasdaq Stock Market
trading at 4 p.m. The stock has fallen 21.6 percent this year.
     ``These things are always more noise than substance until
one of them proves to be material,'' said Doug Freedman, an
analyst at American Technology Research in San Francisco. He has
a ``buy'' rating on Intel's shares and doesn't own them.
     The commission's first investigation focused on Intel's
relationship with PC makers. Today's raids targeted Intel's
possible links with computer retailers.


                       Commission Statement


     The commission said in a statement in Brussels that ``it

**Bloomberg** - Your definitive source
If you need help on the BLOOMBERG press the HELP key twice
Copyright (c) 2009, Bloomberg, L. P.

BN        Intel, Computer Retailers Raided in EU Investigation (Update6)
          Feb 12 2008  13:02:39

has reason to believe'' that the companies may have violated EU
rules on restrictive business practices, abuse of a dominant
market position, or both. The commission didn't identify the
companies.

    DSG, which owns the Currys chain, said its offices in Hemel
Hempstead in the U.K. were inspected as part of ``the ongoing
investigation between Intel and AMD.''

    PPR, owner of retailers Conforama, Surcouf and Fnac, said
the company was visited by EU officials as part of the probe.

    ``PPR and its companies are only concerned by this probe
because it markets products by Intel, among others,'' PPR's
Paris-based spokeswoman Charlotte Judet said by telephone. The
commission's visits took place at the company's purchasing
center outside Paris.

    Commission officials also visited the headquarters of Metro
AG's Media Markt in Ingolstadt to conduct interviews, Sven
Jacobsen, a spokesman for the company said today. The commission
said in 2006 that it was taking over a complaint filed with
German regulators by Advanced Micro.

    Under EU rules, companies can be fined up to 10 percent of
annual sales for antitrust violations.

                  `Important Expansion'

    ``This is an important expansion and escalation of the
commission's investigation into Intel's illegal business
practices and the resulting harm to consumers,'' Michael
Silverman, an Austin, Texas-based spokesman for Advanced Micro,
said today in a phone interview.

    Japan's Fair Trade Commission in March 2005 ruled Intel
unlawfully offered discounts to PC makers if they agreed to
limit their business with rivals. The company disputed the
allegations and said it would remove clauses restricting
Japanese PC makers from using other companies' chips.

--With reporting by Ian King in San Francisco, Simon Thiel in
London and Philipp Grontzki in Vienna. Editors: Anthony Aarons,
Lars Klemming

To contact the reporters on this story:
Matthew Newman in Brussels at +322-237-4329 or
Mnewman6@bloomberg.net;
Stephanie Bodoni in Luxembourg at +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-5270 or
sbodoni@bloomberg.net.

To contact the editors responsible for this story:
Anthony Aarons at +44-20-7673-2227 or aaarons@bloomberg.net;
Cesca Antonelli at +1-202-654-4305 or fantonelli@bloomberg.net.

# EXHIBIT 3

The JFTC rendered a recommendation to Intel K.K.

The Japan Fair Trade Commission (JFTC), March 8, 2005, rendered a recommendation to a Japan-based company, Intel Kabushiki Kaisha (IJKK), a wholly-owned subsidiary of Intel International (a wholly-owned subsidiary of Intel Corporation, Santa Clara, CA, USA). The recommendation requires IJKK to cease and desist its conducts which violate Section 3 of the Antimonopoly Act (Private Monopolization). The JFTC has been investigating since last April.

The Facts-Findings in the Recommendation

IJKK, since May 2002, has made the five major Japanese OEMs[1] refrain from adopting competitors' CPUs[2] for all or most of the PCs manufactured and sold by them or all of the PCs that belong to specific groups of PCs referred to as 'series', by making commitments to provide the five OEMs with rebates and/or certain funds referred as 'MDF' (Market Development Fund) in order to maximize their MSS[3], respectively, on condition that

(a) the Japanese OEMs make MSS at 100% and refrain from adopting competitors' CPUs.
(b) the Japanese OEMs make MSS at 90%, and put the ratio of competitors' CPUs in the volume of CPUs to be incorporated into the PCs manufactured and sold by them down to 10%; or
(c) the Japanese OEMs refrain from adopting competitors' CPUs to be incorporated into PCs in more than one series with comparatively large amount of production volume to others.

Based on the facts mentioned above, the ratio of the sales volume by AMD Japan and Transmeta USA among Total Domestic CPU Sales Volume decreased from approximately 24% in 2002 to approximately 11% in 2003.

By means of such conducts, IJKK has substantially restrained the competition in the market of CPUs sold to the Japanese OEMs, by acting to exclude its competitors' business activities related to the sales of CPUs to the five OEMs.

Summary of Measures Recommended

(2)   IJKK shall notify the following matters to all the Japanese OEMs with which IJKK deals, and shall also make them known to its employees thoroughly.
   a)   Measures taken by IJKK based on (1) above
   b)   IJKK, when providing the Japanese OEMs with such rebates and/or funds, has no intention to set condition which lead to exclude competitors' CPUs out of the PCs which are manufactured and sold by the Japanese OEMs
   c)   IJKK has already terminated the conduct to make a Japanese OEM not adopt competitors' CPUs in more than one groups of PCs, each of which has comparatively large amount of production volume to others, thereby making all the PCs in those groups of PCs at that OEM incorporate Intel's CPUs, by making a commitment to provide it with the rebates and/or funds on condition that the Japanese OEM change to Intel's CPUs competitors' CPUs previously incorporated into the PCs in those groups of PCs, and that it keep using Intel's CPUs in all the PCs in those groups of PCs.

(3)   IJKK, from now on, shall not exclude the business activities of the competitors for the sales of CPUs by employing following conducts:
   a)   The conduct to restrict the ratio in the volume of competitors' CPUs to be incorporated into the PCs manufactured and sold by a Japanese OEM at 10 percent or less, by making a commitment to provide the Japanese OEM with the rebates and/or funds on condition that it make MSS at 90% or more and maintain MSS at such level
   b)   The conduct to, without justification, make a Japanese OEM not adopt competitors' CPUs to be incorporated into PCs in more than one groups of PCs, each of which has comparatively large amount of production volume to others, thereby making all the PCs in those groups of PCs at that OEM incorporate Intel's CPUs, by making a commitment to provide the Japanese OEM with the rebates and/or funds on condition that it change to Intel's CPUs competitors' CPUs previously incorporated into the PCs in those groups of PCs, and that it keep using Intel's CPUs in all the PCs in those groups of PCs.

(4)   IJKK shall take measures to operate (i)Antimonopoly training for officers of sales department and their staffs engaged in promoting and selling CPUs, and (ii)periodical audits by legal section, thereby ensuring the conduct mentioned above in (3) shall not be caused hereafter.

<u>Due Date of Acceptance or Rejection of the Recommendation</u>

March 18, 2005
(If the recommendation is accepted, the JFTC will issue a decision, a legally binding order with the same corrective measures as those in the recommendation. Otherwise, the JFTC will initiate a hearing procedure.)


      Contact point:   Third Investigation Division, Investigation Bureau
                       03-3581-3345

EXHIBIT 4

# Corrective measures against Intel's abuse of market dominance

> *The multinational CPU manufacturer Intel ordered to correct its business practice of providing various rebates to local pc makers conditional upon them not purchasing CPUs from its competitor AMD*

☐ On 4 June 2008, the Korea Fair Trade Commission (Chairman: Baek Yong Ho) held a full-member committee and decided to impose a corrective order and a surcharge on Intel Corporation, Intel Semiconductor Limited and Intel Korea (hereinafter "Intel") for abusing their dominant market position.

☐ Illegal Acts

○ It was found that Intel tried to exclude its competitor AMD(Advanced Micro Devices) in the relevant market by providing various rebates to local Original Equipment Manufacturers(OEMs) including Samsung Electronics and Sambo Computer contingent upon them not purchasing CPUs from AMD.

 * relevant market : x86 CPUs market (directly sold to local OEMs)

☐ Corrective Measures

○ Corrective Oder

 – To cease providing various rebates to local OEMs in exchange for not purchasing CPUs from its competing

enterprise or maintaining its Market Segment Share(MMS: its CPU share of an OEM's total CPU requirements) over a certain level

○  Surcharge : some 26 billion won(to be determined after confirmation of the affected turnover)

< **Major Findings** >

Intel leveraged its dominant market position in the CPU market to exclude its competitor AMD by providing various rebates to Samsung Electronics and Sambo Computer, No. 1 and No. 2 players of the local PC market respectively, conditional on them not buying CPUs from AMD.

**Samsung Electronics**

○  In May 2002, Intel reached an agreement with Samsung Electronics to provide rebates in exchange for ceasing the purchase of AMD-based CPUs.

○  Accordingly, Samsung Electronics actually dropped buying AMD-based CPUs from the Q4 of 2002, and since then on to Q2 of 2005, it received rebates contingent upon it purchasing Intel-based CPUs only.

### Intel MSS in Samsung Electronics

| 01 4/4 | 02 1/4 | 02 2/4 | 02 3/4 | 02 4/4 | 03 1/4 | 03 2/4 ~ 05 2/4 |
|--------|--------|--------|--------|--------|--------|------------------|
| 100%   | 96.9%  | 87.2%  | 81.8%  | 99.7%  | 99.6%  | 100%             |

※ As of Q1 of 2002 when it saw its MSS decreasing, Intel began the rebate provision conditional on exclusive dealing.

| Sambo Computer |
| --- |

○ Intel offered rebates to Sambo Computer, the then No. 2 OEM in the local PC market, conditional on it buying Intel-based CPUs instead of AMD-based ones for TV home shopping channel market sales.

- As AMD-based CPU product line sales began to pick up at a home shopping channel from 2003, Intel started to offer rebates to Sambo Computer with a big influence on the channel.

○ Between Q3 of 2004 and Q2 of 2005, Intel provided rebates to Sambo Computer conditional on Sambo maintaining its MSS at 70% in the local PC market.

○ In September 2004, Intel leveraged its dominant market position and rebates to make Sambo Computer obstruct AMD's release of its 64-bit desktop CPUs to the local market.

< Applied Statues >

○ The case concerns an undertaking's act of providing various rebates to its business partners "conditional upon them not doing business with its competitor" and this act is in violation of Article 3-2 (5) of the Monopoly Regulation and Fair Trade Act.

※ Article 3-2 of the MRFTA (prohibition of abuse of market dominance)
 ① A dominant market enterprise shall not undertake an act described as in the following subparagraph.
  5. An act of dealing to unreasonably exclude competitors or substantially undermining consumer interests

< Judgement on anti-competitiveness>

○ As Intel's rebate provision was conditional upon buyers not using products from its competitor, it limited local OEMs' freedom to choose a business partner, thereby restraining competition in the relevant market.

- Economic analysis on the case showed that with Intel's rebate practice intact, AMD would not be able to viably compete against Intel, even if it supplies its CPUs to OEMs for free.

○ In fact, a look at the market shares of Intel and AMD tells that Intel's act significantly restrained competition by preventing its competitor from increasing its market share (MS). (Appendix 2)

- AMD's MS of the relevant market during the most of the time period of between 2000 and 2006 did not surpass 10%, with its high just 17%.

- When AMD's MS went up, Intel offered new rebates to OEMs, dragging AMD's MS again.

- In the CPU sales agency market where PC consumers' preferences are directly reflected, AMD's MS between 2000 and 2005 was continuously on the rise, reaching around 30% at the end of 2005. (Appendix 2)


< Significance >

○ In June 2005, the KFTC launched investigation into the case and it took 3 years of thorough investigation, data collection and debates with renowned economists and legal scholars from home and abroad before the KFTC finally made a decision.

\* Examinar side : Professor Janus Ordover of NYU, Professor Lee In-ho of Seoul National University, Professor Kim Jong-min of Kookmin University

Intel side : Professor Carl Shapiro, UC Berkeley, Law Professor Herbert Hovenkamp of Iowa University, Professor jeon Seong-hun of Sogang University etc.

○ Intel's act undermined interests of local PC consumers in two respects.

- First, local OEMs were coerced to use expensive Intel-based CPUs, making consumers buy PCs for higher price.

- Second, PC consumers' opportunities for choice and product diversity have been greatly reduced as the product choice right has been limited for PC consumers who favor AMD-based CPUs.

○ The corrective measures against Intel's act are expected to produce the following effect.

- First, competition in the local CPU market will be promoted, cutting PC CPU prices at a faster pace and accelerating technological innovation through the race to develop new CPU-related products.

- Second, local PC consumers will have an easier access to PCs embedded with non-Intel CPUs, leading to greater opportunities to choose a product they want.

○ In addition, this case is meaningful in that it marks the second since the 2006 Microsoft case in which a multinational IT giant operating in the local market was accused of exclusion of competitors and damages of local OEMs and consumers have been actively redressed.

<Appendix 1>

# <u>Overview of Intel's illegal act</u>

Intel
(Intel Corporation, Intel Semiconductor Ltd., Intel Korea



rebate provision

- conditions -
① to cease purchasing competitor's CPUs
② Intel's MMS of the total(or home shopping): 100% (Samsung), 70% (Sambo)

local OEMs
(Samsung Electronics, Sambo Computer)

 

| to cease CPU purchase from competitor, to use Intel CPUs only | to replace competitor's CPUs with its at home shopping channel |



exclusion of competitor



restrained competition in CPU might leads to price raises and limited right of consumers

# EXHIBIT 5



EUROPEAN COMMISSION

Brussels,13.5.2009
D(2009) 3726final

COMMISSION DECISION

of

relating to a proceeding under Article 82 of the EC Treaty and Article 54 of the
EEA Agreement

(COMP/C-3 /37.990 - Intel)

(Only the English text is/are authentic)

(Text with EEA relevance)

company in 1972. Since 1979, its common stock has been listed on the New York Stock Exchange under the symbol "AMD".[6]

(4)     At the end of 2007, AMD had approximately 16 420 employees. In 2007, AMD had net revenues of USD 6 013 million and made a net loss of USD 3 379 million. In 2006, AMD had net revenues of USD 5 649 million and made a net loss of USD 166 million.[7]

## II.     PROCEDURE

### 1.     Commission procedure

(5)     On 18 October 2000, AMD submitted a formal complaint to the Commission under Article 3 of Council Regulation (EC) No 17/62, First Regulation implementing Articles 81 and 82 of the Treaty.[8]

(6)     On 26 November 2003, AMD submitted a supplementary complaint under Article 3 of Regulation (EC) No 1/2003[9] providing new facts and making new allegations.

(7)     In May 2004, the Commission launched a round of investigations focusing on allegations contained in the supplementary complaint. Within the framework of that investigation, in July 2005, the Commission, assisted by several National Competition Authorities, carried out on-the-spot inspections under Article 20(4) of Regulation (EC) No 1/2003 at four Intel locations in [...] ([...][10] [...]), [...], as well as the locations of several Intel customers [...].

(8)     On 26 July 2007, the Commission notified a Statement of Objections to Intel in Case No. COMP/C-3/37.990 ("the 26 July 2007 SO"). The Commission took the preliminary view that Intel held a dominant position and had abused its dominant position by engaging in exclusionary marketing arrangements and other practices with certain customers.

---

[6]     AMD's form 10-K report for the fiscal year ended 29 December 2007, http://www.sec.gov/Archives/edgar/data/2488/000119312508038588/d10k.htm, downloaded and printed on 14 January 2009.

[7]     idem.

[8]     OJ 13, 21.2.1962, p. 204. p.

[9]     OJ L 1, 4.1.2003, p.. 1.

[10]     [...].

(1799)    Intel's argument that Intel was misled by OEMs with respect to the proportion of their x86 CPU purchases they were willing to switch to AMD, that is to say their contestable share, cannot be accepted as a mitigating factor either. Firstly, as set out above, the as efficient competitor analysis is not a requirement for finding an abuse according to the case-law. Knowledge about the contestable share is therefore not relevant to the finding of abuse according to the case-law and hence to the imposition of fines. Secondly, Intel raised that argument in its Reply to the 26 July 2007 SO only in respect of HP.[2109] Therefore, it cannot be accepted as a mitigating circumstance with respect to the overall amount of the fine. Thirdly, Intel knew that in their negotiations, HP overstated its contestable share. As described in section VII.4.2.3.3.f), Intel actively encouraged HP to provide it with overestimated contestable share figures, and even increased the HP representations itself.

(1800)    With respect to Intel's argument that it had no grounds to believe that AMD was foreclosed, this argument would not be sufficient to show that the infringement has been committed as a result of negligence. Furthermore, as this Decision demonstrates, Intel pursued an overall exclusionary strategy vis-à-vis AMD. Therefore, it is irrelevant if Intel was unaware of the exact extent to which it succeeded in foreclosing AMD.

(1801)    In the light of the above analysis concerning mitigating circumstances, there is no justification for reducing the amount of the fine to be imposed on Intel.

### 3.4    Conclusion

(1802)    According to the Guidelines, the final amount of the fine shall not, in any event, exceed 10% of the total turnover in the preceding business year of the undertaking participating in the infringement.[2110] Intel has submitted that its annual turnover in the business year ending 29 December 2008 was EUR 25 555 million (USD 37 586 million).[2111]

(1803)    The final amount of the fine to be imposed on Intel should therefore be EUR 1 060 000 000,

HAS ADOPTED THIS DECISION:

*Article 1*

---

[2109]    Intel Reply to the 26 July 2007 SO, paragraphs 309-315.

[2110]    Paragraph 32 of the Guidelines.

[2111]    Intel's submission of 3 April 2009, answer to question 3.