# EXHIBIT 19

# ROBBINS UMEDA & FINK, LLP

## ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
JEFFREY P. FINK
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

610 WEST ASH STREET, SUITE 1800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

MARK A. GOLOVACH
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
DAVID L. MARTIN
ERIN P. FRASER

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

October 28, 2008

**VIA E-MAIL**
jdickey@gibsondunn.com

Jonathan C. Dickey
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166

  **Re:**  *Shareholder Inspection Demand of Intel Corporation*

Dear Mr. Dickey:

  Thank you for your letter of October 17, 2008. We appreciate and accept your offer to provide a privilege log with regard to the materials redacted on privilege grounds. We do think that a privilege log might be helpful and we look forward to receiving it at your earliest convenience.

  With regard to the other redactions, we understand that you redacted everything in the meeting minutes that you did not think was relevant to the issues of the Board's oversight or decision making process with regard to antitrust compliance policies and procedures, or antitrust investigations or legal proceedings. However, the point of our October 8 letter was to appeal to your sense of fairness. In their current redacted form, the Board meeting minutes are insufficient for our client to determine whether the Board was fulfilling its fiduciary duties to Intel. We hope that you will agree that our client, a shareholder of Intel, is entitled to something more than the significantly redacted Board meeting minutes that you produced to her.

  Thus, we respectfully request that your client reconsider its position in this regard. We request that Intel provide unredacted copies of the Board's meeting minutes, except where covered by an applicable privilege. Our client, a longtime shareholder of Intel, is entitled to these documents under California and Delaware law. Cal. Corp. Code §1601. *See also Amalgamated Bank v. UICI*, No. 884-N, 2005 WL 1377432, at *4 (Del. Ch. June 2, 2005) (finding that plaintiff was entitled to unredacted minutes, not limited by the transactions it was investigating, in order to evaluate whether

directors satisfied their fiduciary duties).  The confidentiality agreement that we entered into after extensive negotiations would extend to this unredacted production.  *See Disney v. Walt Disney Co.*, 857 A.2d 444 (Del. Ch. 2004).  If your client continues to refuse to produce anything other than the substantially redacted documents that have been produced thus far, what was the point of the confidentiality agreement?

Finally, in the alternative to producing the unredacted Board meeting minutes, is your client willing to produce any other documents relating to the Board's oversight and decision making processes regarding antitrust compliance policies, procedures, investigations or legal proceedings? Some examples of such documents might include any of the following:

(a)     documents regarding agreements between Intel and its customers designed to ensure exclusive or near-exclusive arrangements with Intel to supply products or services;

(b)     documents regarding the conditioning of rebates, allowances, discounts, subsidies and/or market development funding on Intel's customers' agreements to limit purchases from Intel's competitors, including but not limited to AMD;

(c)     documents regarding retroactive, first-dollar rebates for Intel's customers;

(d)     documents regarding the establishment and/or enforcement by Intel of quotas for its customers concerning Intel's products or services;

(e)     documents regarding any plan, policy or procedure by Intel designed to penalize, punish or retaliate against any Intel customer that conducts business with Intel's competitors, including but not limited to AMD; or

(f)     documents regarding any plan, policy or procedure by Intel designed to penalize, punish or retaliate against any Intel customer that refuses to limit their business with Intel's competitors, including but not limited to AMD, to products or services that Intel approves.

Thank you for your attention to this important matter. We look forward to hearing from you.

Very truly yours,

KEVIN A. SEELY

KAS/cll

cc:    Marc Umeda
        Mark Golovach

**EXHIBIT 20**

# GIBSON, DUNN & CRUTCHER LLP

## LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

200 Park Avenue  New York, New York 10166-0193
(212) 351-4000
www.gibsondunn.com

mking@gibsondunn.com

November 14, 2008

Direct Dial
(212) 351-3905
Fax No.
(212) 351-5243

Client No.
T 42376-00859

BY E-MAIL AND U.S. MAIL

Kevin A. Seely, Esq.
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, California 92101

Re:  *Intel/Del Gaizo*

Dear Mr. Seely:

I write in response to your October 28 letter to Jon Dickey.

As you requested, I am enclosing a privilege log reflecting the material that was withheld from Intel's production on the basis of the attorney-client privilege or work product doctrine. The log should be self-explanatory, but please let me know if you have any questions.

Regarding your request for additional documents, the other redactions from the board minutes concern topics that are simply unrelated to the issues that were the subject of your inspection demand, and Intel is not disposed to produce the minutes in unredacted form. Similarly, the other documents you have identified are outside the scope of the documents that are subject to inspection demands, and are not connected to any conceivable proper purpose that Ms. Del Gaizo might have.

Nevertheless, we are considering your request that we produce additional documents beyond the board materials. If we agree to produce any additional materials, we will let you know within a few weeks.

Very truly yours,

Marshall R. King

100555069_1.DOC

LOS ANGELES  NEW YORK  WASHINGTON, D.C.  SAN FRANCISCO  PALO ALTO  LONDON
PARIS  MUNICH  BRUSSELS  DUBAI  SINGAPORE  ORANGE COUNTY  CENTURY CITY  DALLAS  DENVER

**EXHIBIT 21**

# ROBBINS UMEDA LLP

### ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

610 WEST ASH STREET, SUITE 1800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
MARK A. GOLOVACH
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

July 8, 2009

**VIA U.S. MAIL**

The Board of Directors
Intel Corporation
c/o Jonathan C. Dickey
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166

      **Re:**    *Shareholder Demand of Intel Corporation*

Dear Intel Corporation Board of Directors:

## I.    INTRODUCTION

As you know, our client, Dr. Christine Del Gaizo, is a concerned shareholder of Intel Corporation ("Intel" or the "Company"). It has long appeared that certain of the Company's current and former officers and/or directors may have breached their fiduciary duties by causing the Company to use its dominant position in the x86 microprocessor market to stifle competition via such monopolistic practices as threatening, coercing, and bribing customers, distributors, and retailers to refrain from dealing with Intel's only real competitor, Advanced Micro Devices, Inc. ("AMD").

As you will recall, on March 18, 2008, our client demanded the right to inspect and make copies of certain books and records of the Company to determine whether certain officers and directors of Intel participated in the illegal scheme to exclude competitors such as AMD. The Company's decision-makers were slow in responding to our client's statutory right as a shareholder of Intel.

Despite the delay, our client made every reasonable effort to avoid filing a lawsuit. On May 8, 2008, our client asked Intel to enter into tolling agreements with its officers and directors in order to ensure that the Company's claims based on certain individuals' illegal monopolistic actions would not be time barred. The tolling agreement offer was rejected.[1] After a derivative lawsuit was filed and the statute of limitations was thereby tolled, our client cooperated to voluntarily stay the case.[2]

Our client simultaneously continued to pursue her right to inspect Company books and records. After an extensive letter-writing campaign that included negotiating a confidentiality agreement between Intel and our client, on September 3, 2008, Intel agreed to provide our client with certain heavily redacted documents. After another lengthy letter-writing campaign, on January 13, 2009, Intel produced some additional greatly redacted documents.

Intel's production of heavily redacted documents has not adequately responded to our clients' inspection demands. Due to the severe amount of important information that has been redacted from the documents produced to our client, the documents are of only limited use and our client is unable to take the necessary steps to investigate, address, and remedy the harm inflicted upon Intel as a result of the misconduct described herein. Thus, at this time, and under the circumstances of this case, we believe that Intel's Board of Directors (the "Board") is in the best position to commence an investigation of the matters detailed herein and, if appropriate, seek to recover from those who proximately caused the significant damage to the Company. Nothing herein shall be considered a waiver of our client's rights to seek further information responsive to her books and records requests or to take any other appropriate course of action.

## II.   LITIGATION DEMAND

The investigations, legal fees, and fines incurred as a result of illegal anticompetitive practices have cost Intel over a billion dollars. On June 6, 2008, the Korea Fair Trade Commission ("KFTC") fined Intel over $25 million after finding the Company abused its position of dominance. Most recently, on May 13, 2009, the European Commission levied an unprecedented $1.45 billion fine – the largest fine ever levied in a European Union antitrust case – after finding Intel abused its dominant position in the marketplace. It has been revealed that Craig R. Barrett, the Company's former Chief Executive Officer ("CEO") and Chairman, and Paul S. Otellini, Intel's current President and CEO, may have been directly involved in certain anticompetitive practices and that their e-mails – along with many of Intel's highest ranking employees – were deleted in violation of the Company's document retention policy.

---

[1] Despite this legitimate statute of limitation concern, on June 23, 2008, Intel refused our client's requests to enter into tolling agreements with the suspected wrongdoers.

[2] On June 27, 2008, our client filed a shareholder derivative action on behalf of the Company in the Superior Court of California, County of Santa Clara styled *Del Gaizo v. Otellini, et. al.*, Case No. 1-08-CV-116137. The complaint alleges violations of state law, including breaches of fiduciary duties, waste of corporate assets, and unjust enrichment against members of Intel's senior management. On August 29, 2008, our client's derivative action was temporarily stayed.

Our client formally demands that the Board immediately take appropriate action to commence an independent investigation of these matters, including, but not limited to, determining who was responsible for the conduct that led to violations of European Commission Treaty antitrust rules and the imposition of a $1.45 billion fine on the Company. Further, our client demands that, if appropriate, the Company immediately seek recovery, by litigation if necessary, for all damages proximately caused by those individuals' breaches of the fiduciary duties of loyalty, good faith, and due care, as set forth herein. In addition to causing a crisis of confidence, Intel has been named in over eighty separate antitrust class action lawsuits from different states that were consolidated by the United States Judicial Panel on Multidistrict Litigation in the U.S. District Court for the District of Delaware styled *In re Intel Corp. Microprocessor Antitrust Litigation*, MDL Docket No. 1:05-md-01717-JJF. Our client also demands that the Board implement corporate governance reforms to prevent the recurrence of the acts complained of herein.

## III.   STATEMENT OF FACTS

During the period from October 2002 through December 2007, Intel dominated the microprocessor market. According to the European Commission, during this period, Intel achieved at least a 70% market share as measured by revenue. Intel's closest competitor, AMD, had a market share of less than 9%, as measured by revenue.

The Company engaged in a sophisticated global operation to illegally prevent AMD from gaining access to a significant market anywhere in the world. To this end, the Company withheld the delivery of server chips and threatened to withhold critical technology to original equipment manufacturers ("OEMs") as punishment for doing business with AMD. Further, Intel used a variety of "loyalty" awards – resulting in payments totaling millions of dollars – to ensure OEMs exclusively used Intel's products.

Intel also used many of the same tactics on the Company's distributors to restrict them from carrying non-Intel processors. For example, the Company offered marketing bonuses, increased rebates, credit programs for new customers, payment of freight charges, and special inventory assistance if a distributor would agree to deal with Intel exclusively.

Finally, Intel suppressed competition in retail stores. They withheld critical market development funds – such as space in a Sunday circular, in-store displays, or internet training opportunities with the retail chain's sales staff – if the retail store did business with AMD.

### A.   Multiple Investigations

This unlawful conduct has already caused and will continue to cause substantial harm to Intel and its shareholders. On March 8, 2005, the Japan Fair Trade Commission issued a recommendation that Intel be sanctioned for misconduct with respect to, among other OEMs, Sony Corp., NEC Electronics Corporation, Toshiba Corp., Fujitsu Ltd., and Hitachi Ltd. The Japanese authorities demanded that Intel remove all exclusivity arrangements in its contracts with those OEMs. In March 2007, Intel was forced to admit that it had lost over twenty-one months of potentially pertinent correspondence as a result of "e-mail retention lapses." This included e-mails from some of Intel's highest ranking employees, including Intel's Chairman and

CEO. In September 2007, after a two-year probe, the KFTC officially charged Intel with violating that country's antitrust laws, and, on June 6, 2008, the KFTC fined Intel over $25 million for "abuse of dominance." Further, on January 11, 2008, *The Wall Street Journal* reported that New York State Attorney General Andrew Cuomo served on Intel "a wide ranging subpoena ... to determine whether the Company coerced" customers to refrain from buying AMD chips. On May 30, 2008, Intel disclosed for the first time that it failed to hand over the contents of more than 900 computer folders from backup files in a lawsuit with AMD. The foregoing has caused Intel to expend significant sums of money – in fines, investigation, and legal costs – and has damaged the Company's reputation and corporate goodwill significantly. However, these events were just the beginning of Intel's problems with antitrust regulators.

### B.     The European Commission

On July 27, 2007, the European Commission issued a press release entitled "Competition: Commission Confirms Sending of Statement of Objections to Intel." The press release stated, in relevant part:

> The European Commission can confirm that it has sent a Statement of Objections (SO) to Intel on 26th July 2007. The SO outlines the Commission's preliminary view that Intel has infringed the EC Treaty rules on abuse of a dominant position (Article 82) with the aim of excluding its main rival, AMD, from the x86 Computer Processing Units (CPU) market.

> In the SO, the Commission outlines its preliminary conclusion that Intel has engaged in three types of abuse of a dominant market position. First, Intel has provided substantial rebates to various Original Equipment Manufacturers (OEMs) conditional on them obtaining all or the great majority of their CPU requirements from Intel. Secondly, in a number of instances, Intel made payments in order to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based CPU. Thirdly, in the context of bids against AMD-based products for strategic customers in the server segment of the market, Intel has offered CPUs on average below cost.

> These three types of conduct are aimed at excluding AMD, Intel's main rival, from the market. Each of them is provisionally considered to constitute an abuse of a dominant position in its own right. However, the Commission also considers at this stage of its analysis that the three types of conduct reinforce each other and are part of a single overall anti-competitive strategy.

### C.     The $1.45 Billion Fine

On May 13, 2009, the European Commission announced that it had imposed a $1.45 billion fine on the Company for violating antitrust laws by engaging in practices that harmed competition. The press release stated, in relevant part:

> The European Commission has imposed a fine of [$1.45 billion] on Intel Corporation for violating EC Treaty antitrust rules on the abuse of a dominant

market position (Article 82) by engaging in illegal anticompetitive practices to exclude competitors from the market for computer chips called x86 central processing units (CPUs). The Commission has also ordered Intel to cease the illegal practices immediately to the extent that they are still ongoing. Throughout the period October 2002-December 2007, Intel had a dominant position in the worldwide x86 CPU market (at least 70% market share). The Commission found that Intel engaged in two specific forms of illegal practice. First, Intel gave wholly or partially hidden rebates to computer manufacturers on condition that they bought all, or almost all, their x86 CPUs from Intel. Intel also made direct payments to a major retailer on condition it stock only computers with Intel x86 CPUs. Such rebates and payments effectively prevented customers - and ultimately consumers - from choosing alternative products. Second, Intel made direct payments to computer manufacturers to halt or delay the launch of specific products containing competitors' x86 CPUs and to limit the sales channels available to these products. *The Commission found that these practices constituted abuses of Intel's dominant position on the x86 CPU market that harmed consumers throughout the EEA. By undermining its competitors' ability to compete on the merits of their products, Intel's actions undermined competition and innovation.* The Commission will actively monitor Intel's compliance with this decision. The world market for x86 CPUs is currently worth approximately €22 billion (US$ 30 billion) per year, with Europe accounting for approximately 30% of that.

Competition Commissioner Neelie Kroes said: "*Intel has harmed millions of European consumers by deliberately acting to keep competitors out of the market for computer chips for many years*. Such a serious and sustained violation of the EU's antitrust rules cannot be tolerated."

*       *       *

Certain rebates can lead to lower prices for consumers. However, where a company is in a dominant position on a market, *rebates that are conditional on buying less of a rival's products, or not buying them at all, are abusive according to settled case-law* of the Community Courts unless the dominant company can put forward specific reasons to justify their application in the individual case.

In its decision, *the Commission does not object to rebates in themselves but to the conditions Intel attached to those rebates.* Because computer manufacturers are dependent on Intel for a majority of their x86 CPU supplies, only a limited part of a computer manufacturer's x86 CPU requirements is open to competition at any given time.

Intel structured its pricing policy to ensure that a computer manufacturer which opted to buy AMD CPUs for that part of its needs that was open to competition would consequently lose the rebate (or a large part of it) that Intel provided for the

much greater part of its needs for which the computer manufacturer had no choice but to buy from Intel. ***The computer manufacturer would therefore have to pay Intel a higher price for each of the units supplied for which the computer manufacturer had no alternative but to buy from Intel.*** In other words, should a computer manufacturer fail to purchase virtually all its x86 CPU requirements from Intel, it would forego the possibility of obtaining a significant rebate on any of its very high volumes of Intel purchases.

*     *     *

As a result of Intel's rebates, the ability of rival manufacturers to compete and innovate was impaired, and this led to reduced choice for consumers.

***Rebates such as those applied by Intel are recognised in many jurisdictions around the world as anti-competitive and unlawful because the effect in practice is to deny consumers a choice of products.***

*     *     *

Intel also interfered directly in the relations between computer manufacturers and AMD. Intel awarded computer manufacturers payments - unrelated to any particular purchases from Intel - on condition that these computer manufacturers postponed or cancelled the launch of specific AMD-based products and/or put restrictions on the distribution of specific AMD-based products. The Commission found that these payments had the potential effect of preventing products for which there was a consumer demand from coming to the market.

*     *     *

***The Commission obtained proof of the existence of many of the conditions found to be illegal in the antitrust decision even though they were not made explicit in Intel's contracts.*** Such proof is based on a broad range of contemporaneous evidence such as e-mails obtained *inter alia* from unannounced on-site inspections, in responses to formal requests for information and in a number of formal statements made to the Commission by the other companies concerned. ***In addition, there is evidence that Intel had sought to conceal the conditions associated with its payments.***

(Emphasis added.)

In summarizing the European Commission's findings, Competition Commissioner Neelie Kroes said, "Intel has harmed millions of European consumers by deliberately acting to keep competitors out of the market for computer chips for many years. Such a serious and sustained violation of the EU's antitrust rules cannot be tolerated."

According to the European Commission, a detailed 542-page decision discussing the Company's wrongdoing will be published as soon as relevant business secrets are redacted from the document. The decision will provide further information concerning the nature of Intel's anticompetitive conduct and may provide further detail regarding the identity of some of those responsible for this behavior.

### D.    Conclusion

By reason of their positions at Intel and because of their ability to control the business and corporate affairs of the Company, Intel's current and former management owe and owed the Company and its shareholders the fiduciary obligations of duty of care, loyalty, and good faith. These individuals were required to use their utmost ability to control and manage Intel in a fair, just, and equitable manner and ensure the Company complied with the antitrust rules and regulations in the jurisdictions in which Intel sold products.

Similarly, the Company's management was required to remain informed as to how the Company conducted its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, before the conduct subjected the Company to significant damage. Despite these duties, from at least October 2002 through at least October 2007, certain of Intel's current and former officers and directors caused or allowed the Company to violate antitrust rules around the globe and failed to take corrective action to prevent the reoccurrence of such violations. This wrongful conduct has caused innumerable damage to the Company, including the filing of antitrust class actions and a $1.45 billion fine by the European Commission.

## IV.    DEMANDS

Our client demands that the Board take steps to investigate, address, and remedy the harm inflicted upon Intel as a result of the patent misconduct described herein. In particular, our client demands that the Board commence an investigation of the Company's current and former officers and directors' roles in the violation(s) of anticompetitive laws in the countries where Intel does business. Our client also demands that the Board make disclosures upon completion of its investigation to clarify the Board's findings and corroborate the Board's conclusions. Our client further demands that the Company commence legal proceedings against any individual who it finds breached their fiduciary duties and/or violated or caused the Company to violate antitrust laws or any other state or federal law. The legal proceeding(s) brought by the Board against any such individual(s) should seek to recover damages from, and compensation, benefits, and bonuses paid to, any Intel officer and/or director determined to be involved in the wrongdoing.

Further, to help ensure the foregoing problems do not occur again, our client demands that the Board implement sound corporate governance policies related to the Company's internal controls regulating anticompetitive activities. This should include a review of the following: (1) the Company's use of discounts, promotional supports, and rebate agreements paid to OEMs, distributors, and/or retailers; (2) the Company's use of exclusivity agreements with its distributors; and (3) the Company's manipulation of demand market development funds aimed at various retailers. Finally, our client demands that the Company hire an independent outside

corporate governance expert to review the Company's corporate governance and internal controls in these three areas.

We would appreciate a written statement of your intentions. If we are not advised within 21 days of the date of this demand that appropriate action is being taken, then we will take such further action on behalf of the Company as our client considers appropriate.

Our client, an Intel shareholder, thanks you and the rest of the Board for your prompt attention to this urgent matter. It is incumbent upon the Board to do the right thing and hold accountable all those responsible for the harm done to the Company. Should you have any requests, questions, or concerns, please do not hesitate to contact us.

Very truly yours,

MARC M. UMEDA

MMU/sem

cc:  Kevin A. Seely, Esq.
     Daniel R. Forde, Esq.

# EXHIBIT 22

# ROBBINS UMEDA LLP

ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

600 B STREET, SUITE 1900
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

August 6, 2009

<u>VIA ELECTRONIC MAIL AND U.S. MAIL</u>
JDickey@gibsondunn.com

Jonathan Dickey
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

    Re:   *Shareholder Demand of Intel Corporation*

Dear Mr. Dickey:

We are in receipt of your letter dated July 27, 2009. Many of the general legal points in your letter are well taken. However, given the unique facts of this case, and your and our mutual concern for the best interests of Intel Corporation ("Intel" or the "Company"), we think that your request that we dismiss this stayed shareholder derivative lawsuit, brought for the benefit of Intel, is premature and unnecessary.

As you know, our client has repeatedly and consistently sought only the truth and what is best for the Company. At every stage, our client has shown patience, caution, and a cooperative spirit. When her inspection demand was rejected again and again, our client patiently pursued her statutory rights to inspect Intel's books and records. When delays associated with the inspection demand – which were not caused by our client – threatened the Company's right to bring litigation against those responsible for illegal anticompetitive practices at Intel, our client cautiously sought to have Intel enter into tolling agreements with the suspected wrongdoers to ensure the claims would not become time-barred. When our client's request was denied, after appropriate analysis and consideration of the circumstances of this case, our client filed the derivative lawsuit properly asserting the futility of any demand. After the derivative lawsuit was filed and the statute of limitations was thereby tolled, our client cooperated to voluntarily stay the case.

Of course, our client continued to pursue her right to inspect Company books and records. After extensive delays, Intel finally agreed to provide our client with certain heavily redacted documents. For the reasons stated on page 2 of our client's letter of July 8, 2009, our client made a demand on Intel's Board of Directors to, among other things, determine who was responsible for the conduct that led to violations of European Commission Treaty antitrust rules and the imposition of a $1.45 billion fine on the Company.

As you have noted, the Audit Committee is now considering our client's demand. The Audit Committee's investigation must be allowed to play out before the derivative lawsuit is dismissed. The Audit Committee must be given sufficient time to undertake a proper inquiry of the matters identified in our client's demand and to consider the appropriate course of action in the Company's best interest. Our client is cautiously hopeful that the wrongdoers will be held accountable without delay. We stand willing to assist the Audit Committee in its review of our client's demand if that will help aid the process.

If the Audit Committee's investigation uncovers evidence of wrongdoing, as we expect it will, the Company should bring litigation against those individuals responsible for causing the Company to engage in anticompetitive conduct resulting in an unprecedented $1.45 billion fine. However, if this stayed derivative lawsuit is prematurely and needlessly dismissed, statute of limitations concerns could make further litigation by or on behalf of the Company much more difficult. No one, other than the potential wrongdoers, should want that.

This case is currently stayed. There is no harm, prejudice or waste to the Company or the Court by not dismissing the case. The lawsuit was properly filed under the unique circumstances of this case and was appropriately stayed at your request. For the same reasons that this case was originally stayed, it should remain stayed for the time being. There is no need to litigate at this critical juncture, when the Company is investigating serious matters which have caused great harm to the Company.

Thus, we think it is inappropriate to dismiss this stayed action under these circumstances. The facts of this case are unique and distinguishable from the facts of the cases you cited. For instance, none of the cases you cited in your letter appear to involve derivative lawsuits that, if dismissed, would detrimentally impact a company's right to recover against wrongdoers due to statute of limitations concerns. Further, it appears that none of the cases you cite involve lawsuits that were already subject to a voluntary stay agreed to by the parties.

Even if you disagree with our initial legal analysis of the cases you cite in your letter, you must agree that the equities of this case weigh in favor of not dismissing this stayed case at this time. The right of shareholders to bring and maintain derivative actions on behalf of corporations has long been grounded upon equitable principles and the interests of justice. *See Taormina v. Taormina Corp.*, 78 A.2d 473, 475 (Del. Ch. 1951) ("[W]henever a corporation possesses a cause of action which it either refuses to assert or, by reason of circumstances, is unable to assert, equity will permit a stockholder to sue in his own name for the benefit of the corporation solely for the purpose of preventing injustice when it is apparent that the corporation's rights would not be protected otherwise."); *Sohland v. Baker*, 141 A. 277, 282 (Del. 1927) ("The right of a stockholder to file a bill to litigate corporate rights is, therefore, solely for

the purpose of preventing injustice, where it is apparent that material corporate rights would not otherwise be protected."). Here, the order of events that have transpired, the statute of limitations concerns, the voluntary stay, and the strong equitable factors all weigh in favor of waiting for the Audit Committee to complete its investigation before discussing a dismissal of this stayed case.

Although we appreciate some of the general legal propositions asserted in your July 27, 2009 letter, surely you must agree, as a legal representative of Intel, that there is no harm to the Company in postponing the issues you raised until after the Audit Committee completes its investigation of our client's demand. We trust that Mr. Torpey, the Audit Committee's counsel, would also agree. Once the Audit Committee completes its investigation, our client will take whatever steps are appropriate and in the best interests of the Company.

Thank you for your anticipated cooperation and understanding in this regard. If you have any questions, comments, or concerns with regard to the contents of this letter or any other matter, please do not hesitate to contact us again.

Very truly yours,

MARC M. UMEDA

MMU/sem

cc:     Kevin A. Seely, Esq.
        Daniel R. Forde, Esq.

419503

EXHIBIT 23

**FILED SEPARATELY UNDER SEAL**

# EXHIBIT 24

060818brocadeCV.txt

Pages 1 - 16
              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
        BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

IN RE: BROCADE COMMUNICATIONS )
SYSTEMS, INC.            )   Case No. 05-2233 (CRB)
  Derivative Litigation      )
_____)

                    San Francisco, California
                    Friday, August 18, 2006

            TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:      FARUQI & FARUQI LLP
                     320 East 39th Street
                     New York, New York 10016
                  BY: ADAM R. GONNELLI

                     FEDERMAN & SHERWOOD
                     120 North Robinson
                     Suite 2720
                     Oklahoma City, Oklahoma 73102
                  BY: WILLIAM B. FEDERMAN

                     MARY ALEXANDER & ASSOCIATES, P.C.
                     44 Montgomery Street
                     Suite 1303
                     San Francisco, California 94104
                  BY: MARY E. ALEXANDER

For Plaintiff        PATTON, ROBERTS McWILLIAMS & CAPSHAW
Arkansas Retirement    Century Plaza - Suite 400
Services, et al.:      2900 St. Michael Drive
                     Texarkana, Texas 75503
                  BY: SEAN F. ROMMEL

For Defendant        HELLER, EHRMAN, LLP
Blears:              275 Middlefield Road
                     Menlo Park, California 94025
                  BY: NORMAN J. BLEARS


            CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

APPEARANCES (cont.):

                      Page 1

060818brocadeCV.txt

For Defendant          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
Reyes:                 300 South Grand Avenue Suite 3400
                       Los Angeles, California 90071
                       BY: RONDA McKAIG

For Defendants:        WILSON, SONSINI, GOODRICH & ROSATI
                       650 Page Mill Road
                       Palo Alto, California 94304
                       BY: NICKI LOCKER
                       STEVEN GUGGENHEIM

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

3

1   Friday, August 18, 2006
2                                   (10:10 a.m.)
3        DEPUTY CLERK:  05-2233, In Re: Brocade
4   Communications.  Appearances, Counsel?
5        MS. ALEXANDER:  Mary Alexander for the plaintiff.
6        MR. GONNELLI:  Adam Gonnelli for the plaintiffs.
7        MR. FEDERMAN:  William B. Federman for the plaintiffs,
8   your Honor.
9        MS. LOCKER:  Nicki Locker from Wilson, Sonsini on
10  behalf of Brocade and a number of the officers and directors.
11  Would you like me to list them?
12       THE COURT:  Yes.
13       MS. LOCKER:  All of the officers and directors other
14  than Mr. Canova and Mr. Reyes.
15       MS. McKAIG:  Ronda McKaig, Skadden, Arps, on behalf of
16  nonsettling defendant Greg Reyes.
17       MR. BLEARS:  Norm Blears from Heller, Ehrman on behalf
18  of defendant Tony Canova.
19       MR. ROMMEL:  Good morning, your Honor.  My name is
                              Page 2

060818brocadeCV.txt

20  Sean Rommel. I represent Arkansas Retirement Services and
21  Employee Retirement Services. We filed an objection yesterday
22  to the proposed settlement, and I represent the plaintiff in
23  the consolidated class action litigation securities case.
24      MR. GUGGENHEIM:  Steven Guggenheim, appearing with
25  Miss Locker.

        CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
                    4
1       THE COURT:  Okay.  Well, this is the derivative action
2   on behalf of Brocade, and I have the Brocade derivative action,
3   I have the Brocade securities action, I have the Brocade SEC
4   action, and I have the Brocade criminal indictment.  And I must
5   say that I -- in reading the proposed preliminary settlement,
6   I'm -- I have a number of questions, and I don't need to
7   explore them all this morning, but this is what I basically
8   don't understand about the settlement at its core, which is:
9       This is a case of back-dating options, and the
10  argument is that by back-dating the effective date of an
11  option, when an option was in the money, that the -- certain --
12  there were certain violations of accounting rules, reporting
13  regulations and so forth, as evidenced by the allegations that
14  are found in the SEC complaint, the plaintiff's securities
15  action, and, of course, the criminal indictment.
16      And looking at your complaint itself, you allege that
17  Brocade, by this scheme, lost, I think, several hundred
18  millions of dollars.  Is that correct?
19      MR. GONNELLI:  In market cap, your Honor, yes.
20      THE COURT:  Whatever that sum of money is, it's a vast
21  sum of money.  And then we get to the proposed settlement on
22  behalf of Brocade to return to Brocade this enormous sum of
23  money that was taken, and your proposal, as I understand it, is
24  to give no money to Brocade; is that correct?
25      MR. GONNELLI:  That's correct, your Honor.

        CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
                    5
1       THE COURT:  So at the very outset, I'm trying to
2   figure out how a company could lose $100 or $200 million,
3   allegedly, and the settlement come in and say, Oh, by the way,
4   we represent the company -- we're a derivative action.  We
5   represent the company.  We're going to try to get for them
6   compensation for their loss.  And then you go on to say, but by
7   the way, in this settlement, we're not going to give you any
8   money.  We don't have any money to give you.  And that's not
9   part of it.
10      What we have is some new corporate governance
11  requirements saying that.  Of course, there's nothing in the
12  proposed settlement that establishes the value of those
13  corporate governance requirements, that I could find, other
                    Page 3

060818brocadeCV.txt

14    than a lawyer saying, I think this is a good deal, so, I mean,
15    based upon the record in front of me, where there's no money
16    involved going to the corporation, where there's some corporate
17    governance requirements which I have no idea the value of
18    those, I have no idea of whether or not those corporate
19    governance requirements are mandated by the SEC or
20    Sarbanes-Oxley or by have been put into effect voluntarily by
21    Brocade, I don't know. I don't know anything about it. And
22    how can I approve a settlement of that type when the allegation
23    is that hundreds of millions of dollars were lost? I don't
24    understand it.
25         So, I'm not asking you to comment on it, because this

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
6

1    is just totally inadequate. So I think what I will do: I'm
2    not going to approve it -- I may approve it, but you have to
3    make a showing that this is in the best interests of the
4    corporation.
5         And you didn't even serve -- as I understand it, you
6    haven't even served outside accountants, KPMG, or whatever the
7    accountants were -- they weren't even served in the lawsuit.
8    They aren't here today, are they?
9         MS. LOCKER: That's correct.
10        THE COURT: And so -- and they were accused of all
11   sorts of things. And they're going to be released, aren't
12   they, by your proposal?
13        MR. GONNELLI: In the derivative case, yes, sir.
14        THE COURT: That's all I'm talking about, the
15   derivative case. So I don't even -- you know, I'm trying to
16   figure out, I have, whatever it is, a 65-page complaint,
17   a 95 -- I don't know how many pages it is -- of item after item
18   after item of malfeasance on the part of all of these
19   defendants involving millions of dollars, and then it's sort of
20   a Roseannadanna situation; you know: Well, all right... never
21   mind. We'll just put some new requirements in.
22        Now, maybe you're right. You certainly haven't given
23   me anything to suggest you're right. And, you know, also -- I
24   mean, you asked for a half a million dollars in fees. Okay,
25   that may be appropriate. May not. You haven't put in a

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
7

1    lodestar. I don't know how many hours you've spent on it. No
2    idea at all.
3         But it's not the fees that are bothering me. It's the
4    fact that there are millions of dollars of purported losses by
5    a company for which there's no compensation or recompense.
6         If you want to say something, I'll let you, but you
7    really have to think about whether you want to say something
Page 4

060818brocadeCV.txt
8    about this settlement at this point.
9        Go ahead.
10        MR. GONNELLI: Well, your Honor, let's just take one
11   thing off the table.
12        THE COURT: Sorry?
13        MR. GONNELLI: Let's take one thing off the table.
14   Obviously, this is preliminary approval.
15        THE COURT: Well, I don't know what that means.
16   Preliminary approval. It means it's the first time I've seen
17   it, and I'm telling you that I -- that it's -- it raises a
18   number of questions.
19        MR. GONNELLI: Sure. It's a different standard, but
20   of course the Court is perfectly able to reject a settlement at
21   preliminary approval.
22        THE COURT: Would you like me to reject it?
23        MR. GONNELLI: The question is whether we allow notice
24   to go out now.
25        THE COURT: No. No. In light of what I've said?

              CONNIE KUHL, RMR, CRR
       Official Reporter - U.S. District Court (415) 431-2020
                            8
1    Maybe you haven't heard me. You haven't presented to me any
2    evidence at all that this is -- any evidence, other than the
3    lawyers in the motion saying, we think this is a good deal.
4    You haven't presented me single declaration, have you? Maybe I
5    missed it somewhere. A declaration of an expert in corporate
6    governance saying, These are very good -- is it in there? I
7    didn't see it.
8        MR. GONNELLI: No, your Honor. There's no
9    declaration.
10        THE COURT: No, there's nothing. There's nothing.
11   So --
12        MS. LOCKER: Your Honor, may I speak for one moment,
13   please?
14        THE COURT: You can speak, go ahead.
15        MS. LOCKER: Nicki Locker from Wilson, Sonsini. I've
16   heard your comments. It's not -- they have not escaped me.
17   I'd like to propose, though, a slightly different way to look
18   at this settlement, if I may:
19        As the Court may recall, as the outset of this
20   litigation, the company and the defendants filed a motion to
21   dismiss for lack of standing, and the Court granted that
22   motion. And in so doing, the Court stated that given the
23   composition of the board, that the Court did not think that the
24   plaintiffs would ultimately be able to successfully allege that
25   demand was excused, so they wanted to make a demand on the

              CONNIE KUHL, RMR, CRR
       Official Reporter - U.S. District Court (415) 431-2020
                            9
1    board.
                       Page 5

060818brocadeCV.txt

2       THE COURT: Right, it went on whether or not demand
3  was excused.
4       MS. LOCKER: That's right.
5       THE COURT: And I said, it's not futile. I know you
6  argued it's futile. It's not futile; make a demand. So you
7  made a demand. And what happened? They said --
8       MS. LOCKER: Your Honor, so that is the alternative
9  way of looking at this, which is the demand was made. And that
10  this settlement agreement reflects -- essentially is the
11  functional equivalent of the board's response to that demand,
12  which is entitled to the benefit of the business judgment
13  presumption.
14       THE COURT: Sure. They look, and they have their
15  carrier out there. And their carrier says, Oh, look, we can
16  take care of this problem for the company. We'll just have the
17  carrier pay a half million dollars to the lawyers and then
18  we'll put in -- we'll have an outside director, an independent
19  this, or so forth and so on. That's what they say. I don't
20  know, by the way, whether all those directors are
21  conflict-free. I don't know what type of advice they're being
22  given. I don't know -- and I'm not suggesting that they are
23  getting advice -- that it presents a problem.
24       I don't know. There's nothing there. There's no
25  "here" there. I mean, there's nothing in these papers that

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
10

1  tell me why this is a good deal. Nothing. Zero. Zippo. So
2  what am I supposed to do? Say, Oh, well, the lawyers say it's
3  a good deal, I'll just sign off of it?
4       MR. GONNELLI: Given the fact the Court indicated
5  we're going to lose on demand futility, here's then what we're
6  faced with as we go forward: We're faced with a new board.
7  Obviously it's the current board that counts, not the board at
8  the time of filing. That new board has at least three new
9  directors on it who are outside directors and presumptively
10  independent. In fact, there's only one insider left on the
11  board, Mr. Klayko. So looking that the board, and giving that
12  board the deference of the business judgment rule, which is
13  nearly impossible to overcome under Delaware law under the
14  Grimes case and the Scattered case. When you have an
15  independent board, the idea that plaintiffs are then going to
16  come in and succeed on some of these claims, I think, you know,
17  in litigating these claims on behalf of the company when the
18  board says we don't want to litigate them, it's going to be
19  nearly impossible to do. And that analysis, of course,
20  informed where we went with this case. Clearly, had we
21  succeeded in our argument that demand was excused and we should
22  go ahead, it would be an entirely different case. No question
23  about that.
24       Second, when you look at this new independent board,
Page 6