060818brocadeCV.txt
25    its composition, we also have to look at the fact that this

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
11

1    board -- the new board -- has been the beneficiary of an
2    investigation that went on for over a year. They spent
3    something like $7 million. There were, I think -- and Miss
4    Locker can correct me if I'm wrong -- over 40 board meetings
5    addressed to these issues. So you've got a board that is
6    extremely well-informed. Hasn't been driving with its eyes
7    closed. A board that's spent a lot of money, had a lot of
8    advice. They then make a decision, which since demand is not
9    futile, then gets the deference of the business judgment rule
10   under Delaware law. I mean, that's where we are.
11          So -- and we can talk about the settlement. We'll be
12   happy to talk to your Honor about why we think this is a good
13   deal, and we'd also be happy to supplement the record, if your
14   Honor wishes us to do that. But, you know, I have to tell you,
15   this case changed fundamentally when the Court indicated that
16   demand was not going to be excused.
17          THE COURT: I think what you have to do is, one, you
18   have to submit declarations based upon the value: Why this is
19   a good settlement. And file a memorandum of law as to any of
20   the points that you're now making. That's fine, I'll take a
21   look at it. I'm not saying I'm not going to consider it.
22          I'm just saying I'm certainly not, based upon what's
23   being presented to me today, going to approve this settlement,
24   for the reasons that I've stated.
25          MR. GONNELLI: Okay, your Honor.

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
12

1          THE COURT: You want to supplement the record, that's
2    fine.
3          MS. LOCKER: We'll do that, your Honor.
4          MR. GONNELLI: We'll supplement the record; confer
5    with our colleagues.
6          THE COURT: I think you should also address -- there's
7    an objection to the releases, and I think you ought to address
8    that as well.
9          MR. GONNELLI: Well, let me -- if the Court has a
10   moment, I'll just talk about that for a second. There have
11   been a lot of -- there's been a lot of press coverage
12   obviously, as the Court knows, on Brocade and on these issues.
13   A lot of the press coverage, especially with regard to the
14   derivative case, has just been inaccurate. Mr. Federman and I,
15   and I'm sure the defendants, have fielded a lot of calls from
16   investors, plaintiffs' lawyers, journalists, asking about the
17   case, and in none of those instances, at least that I took, had
18   they actually read the stipulation of settlement. They were
Page 7

060818brocadeCV.txt

19    under the impression that all sorts of things were going to be
20    released that are not being released.
21        Example: Mr. Reyes is not being released. And he's
22    obviously the lightning rod in this whole situation. He's not
23    a part of this settlement.
24        Second, the class claims are obviously not being
25    released. This is not a class action. We're not here -- we're

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

13

1    standing in the shoes of the corporation. We're not here
2    representing the shareholders as a separate entity. We're not
3    releasing the class claims.
4        Third, there's an express carve-out of the Roth case
5    which is the 16(b) claims, the short-swing claims. There's a
6    lot of questions about that that we expressly carved out. We
7    thought the release was clear before that. But we went the
8    extra mile and said, Okay, we'll put it in the settlement.
9        When it comes time to send a notice out, should the
10    Court grant us preliminary approval, we may have to do a few
11    things just to be on the safe side to make sure there isn't
12    further confusion out in the market. If you recall, the letter
13    I sent to your Honor last week with the amended stipulation of
14    settlement, and we discussed some of the changes that have been
15    made, some of that language we may want to incorporate in the
16    notice. I have to tell you, we thought about making all sorts
17    of calls, maybe even issuing a press release to clarify the
18    record, but we thought that just might create more confusion in
19    the marketplace, and certainly not what we wanted to do.
20        So those objections --
21        THE COURT: But I'm trying to square your complaint,
22    your derivative action complaint, with this settlement. And
23    that's the hard part I'm having. When you allege in 65 pages
24    point after point after point of wrongdoing, and then you say,
25    Oh, well, never mind, I'm trying to figure out what that all

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

14

1    means in the context of this settlement.
2        Now, if your argument is that as a result of having to
3    seek the board's demand -- on the board, and that makes all the
4    difference in the world, fine, then I want to look at that
5    argument. I want to understand that argument. But you have to
6    make that argument. You have to make the argument why this is
7    an appropriate settlement. You haven't made that argument.
8        And I don't know about the press, I don't care about
9    the press. I don't care about -- I know that there are all
10    these different actions. When I start putting together all
11    these different actions, you know, you're right, there's a lot
12    that's being said. But there's not a lot that's being said in

Page 8

060818brocadeCV.txt

13  your proposal in terms of the merits of why it ought to be
14  accepted. And I'm sorry, when you settle a derivative action,
15  you actually have an obligation to explain why it's in the
16  interests of the company to resolve it this particular way.
17  You have that obligation, as I understand it. Especially in a
18  case in which the only thing that's being done is some new
19  governance requirements.
20      So I'm not saying they're not meaningful, but you
21  better say, Look, this is what we got out of this.
22      And, by the way, in the context of this particular
23  litigation, this is a good settlement. You know, that's okay.
24  But you have to present it to the Court. Otherwise, we have no
25  role in it. Maybe we shouldn't have a role in it, you know,

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
15

1   judges always sort of butt in. And, you know, that's another
2   argument. But while I have a role in it, I'm just not going to
3   sign off on it, and I think you have to do something.
4       That's why I don't particularly feel that you have to
5   make your argument today, because it's not even in the papers.
6   So put it in the papers and then we'll have another go at it.
7   Okay. So when do you want to come back?
8       MS. LOCKER: As soon as possible, your Honor.
9       MR. GONNELLI: Tomorrow? No.
10      THE COURT: As soon as possible. I mean, seriously,
11  do you want to come back next Friday? Let's see, Friday.
12      MR. GONNELLI: I know I have a deposition next Friday,
13  your Honor.
14      THE COURT: Do you want to come back next Thursday?
15  It's called calling your bluff. Wednesday. Tuesday. You pick
16  the day.
17      MR. GONNELLI: I'm happy to stay, your Honor.
18      THE COURT: No, no, we're not staying today. I want
19  something in writing.
20      MR. GONNELLI: Okay. Why don't we select a date by
21  which we'll submit a new written submission?
22      THE COURT: It's your show. Go ahead. Just give me a
23  day.
24      MR. GONNELLI: Your Honor, we'd like Monday the 28th
25  for the written submissions.

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
16

1       MS. LOCKER: For the written? No, for the hearing.
2       MR. GONNELLI: All right. I can do that as well.
3       MS. LOCKER: Okay.
4       MR. GONNELLI: Monday the 28th for the hearing. How
5   long would the Court like to review the written submissions?
6       THE COURT: I think I need at least two days. If you
Page 9

060818brocadeCV.txt

```
7   can get them to me by --
8          MR. GONNELLI:  The 28th is a Monday.
9          THE COURT:  Why don't you get them to me not later
10  than -- well, today is -- not later than the end of the 23rd,
11  okay?
12         MR. GONNELLI:  Okay.
13         THE COURT:  Anything you want me to look at.  Okay?
14  Like declarations, like a memorandum of law.  Those
15  old-fashioned things.  And also, you have to please give me a
16  lodestar, give me the number of hours worked, billings and so
17  forth.
18         MR. GONNELLI:  Very well, your Honor.
19         MR. ROMMEL:  May I ask what time the hearing would be
20  on the 28th?
21         THE COURT:  10:00.
22         MR. ROMMEL:  Thank you, your Honor.
23         MR. GONNELLI:  Very good, your Honor.
24      (Adjourned)
25                       oOo
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

CERTIFICATE OF REPORTER

I, CONNIE KUHL, Official Reporter for the United
States Court, Northern District of California, hereby certify
that the foregoing proceedings in Case No. C 05-2233 (CRB),
IN RE: BROCADE COMMUNICATIONS SYSTEMS, INC., were reported by
me, a certified shorthand reporter, and were thereafter
transcribed under my direction into typewriting; that the
foregoing is a true record of said proceedings as bound by me
at the time of filing.

The validity of the reporter's certification of said
transcript may be void upon disassembly and/or removal from
the court file.

Connie Kuhl, RMR, CRR
Friday, August 25, 2006

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STATE OF NEW YORK, BY ATTORNEY GENERAL ANDREW M. CUOMO, | Case No. _____ |
| Plaintiff, | |
| v. | **Trial By Jury Demanded** |
| INTEL CORPORATION, a Delaware corporation, | |
| Defendant. | |

## COMPLAINT

ANDREW M. CUOMO
Attorney General of the State of New York
ERIC CORNGOLD
Executive Deputy Attorney General
 For Economic Justice
MICHAEL BERLIN
Deputy Attorney General
 For Economic Justice
RICHARD L. SCHWARTZ
JEREMY R. KASHA
JAMES YOON
SAAMI ZAIN
Assistant Attorneys General

120 Broadway, 26th Floor
New York, New York 10271-0332
Tel: (212) 416-8262/Fax: (212) 416-6015

*Attorneys for Plaintiff State of New York*

during negotiations with Sony, to the news that Intel was "getting hammered in the value segment" by AMD in the marketplace. The first executive inquired: "Can [another Intel representative] discreetly hint to Sony that the Corp Marketing dollars are at risk if Intel's MSS with Sony in the value segment does not improve?" The second responded: "We should not be shy about our unhappiness with our current MSS. Intimating that the program is in jeopardy if they don't get their act together and work with us on this is clearly ok."

46.    A favorite Intel code word for the degree of exclusivity Intel desired from the OEMs was "alignment." If they were not "aligned," OEMs could not expect favorable treatment from Intel with respect to rebates, technological development, pricing concessions, priority in obtaining supplies of scarce parts, or marketing funds. As one Intel executive reported to another in April, 2002 regarding negotiations with Sony: "I also told him that Intel ... would really have to make sure Sony and Intel are well 'Aligned' before we commit to doing this kind of comarketing program.... If we can get [Sony] to agree on better alignment (MSS recovery in US NB [United States notebook computers], No more surprises), then, we can move forward with co-marketing discussion. If not, we may have to think about alternatives."

47.    Similarly, a top HP executive reported back from a conversation with Intel's then-COO Paul Otellini concerning Intel's reaction to the news that HP was considering launching an AMD-based PC directed at commercial customers: "I talked to Paul Otellini last night [who asked whether] we have a transactional relationship or a partnership? If we go with AMD on the commercial desktop, Intel equates this to a transactional relationship, and therefore we are foregoing the benefits of price pull-forwards [pricing concessions] to level the direct/indirect playing field."

understood from Intel that, "[i]f there was a change in our Intel only [status], then our discount program would have to be revisited."

97.     Under these circumstances, Dell decided not to launch AMD-based products at that time. A Dell executive who was responsible for the "analytics" and "cost assumptions" of the Boomerang study testified to the Attorney General that concern about Intel's reaction was a substantial part of that decision.

### 6.   The "MAID" Episode And The "New Partnership Arrangement" Between Intel And Dell

98.     In the fall of 2003, Intel learned that Dell had been involved in discussions with Microsoft, AMD, and IBM regarding a proposal named "MAID" – an acronym formed from the first initials of the four companies involved. The MAID proposal contemplated agreements between Microsoft, IBM, Dell and AMD which would have greatly strengthened AMD's position as a competitive alternative to Intel. Under the proposal, Dell and IBM would have become major AMD customers, with each of the four companies providing necessary aspects of the program. An internal Dell email later stated that, under MAID, Dell would have shifted "approx[imately] 25% of [Dell's] total volume" of CPUs to AMD, from Intel.

99.     The MAID proposal came into play in the rebate negotiations between Intel and Dell. Intel, as it had done before when faced with a threat by AMD, decided to bribe and threaten Dell to induce it to remain exclusive.

100.    In September 2003, Intel's then Chairman and CEO Craig Barrett met with Michael Dell to address the basic relationship between the companies. He reported back to his Intel colleagues that he and Michael Dell "shook hands on the deal. MD [Michael Dell] agreed to quarterly mtgs ... to make sure we are aligned in our strategic issues and coordinated in

33

spending the monies. He had no issue with the win/win nature of the agreement. *I clearly committed our long range support regardless of competition* ... Nice work you guys!" (Emphasis added).

101.    An internal Dell email reported that under the new arrangement, Intel was making a $40 million lump sum payment in order to maintain Dell's status as a an Intel-only CPU buyer. Specifically, one Dell executive wrote that "[a]s part of our latest negotiation with Intel they have agreed to provide an additional $40m of MCP in Q3." The message added that those funds are not to be used, but, rather, stated they are to be kept in reserve at "a high level for EOQ [end of quarter earnings] support." Another Dell executive responded, asking: *"I assume this is predicated on our AMD decision?"* The reply confirmed that *"[i]t is and this is exactly the right way to handle these."* (Emphasis added).

102.    The MAID proposal never came to fruition, at least in part because of Dell's new "arrangement" with Intel.

### 7.    Intel Pays Dell Not To Launch AMD-Based Servers

103.    HP's decision to launch servers based on AMD's Opteron processor, as discussed below, in early 2004 provoked strong reactions at Intel. HP's announcement was made on February 24, 2004, but internal Dell and Intel documents show that Intel was already reacting to advance word of the announcement. Both also anticipated that IBM would announce AMD-based server products, and that Dell would be "bracketed" by HP and IBM. A Dell executive wrote on January 19, 2004: "This is very scary. HP (and IBM) can bracket our server business by using AMD to beat us on price, and their Itanium/RISC/enterprise stuff to beat us on performance. We chase their AMD boxes with our Intel boxes and drain our profit pool."

34

Another Dell executive agreed, writing that Intel had "better be down here sucking up with a bag-o-money."

104.   An internal Intel review recognized that this development could cost Intel dearly in terms of revenue, noting that, as a result of the introduction of AMD competition in the server market by HP as well, $250 million in Intel revenue was at risk in 2004.

105.   Dell understood that Intel's reaction would likely be severe if "Dell joins the AMD exodus." Specifically, the Dell executive who served as Intel's informal liaison to Dell management wrote the following analysis:

> If we play this right, we walk away with a 3-year contract that drives structural Dell advantage in cost, supply, and influence....
> *PSO/CRB [Paul Ottelini, Intel's CEO, and Craig Barrett, Intel's Chairman] are prepared for jihad if Dell joins the AMD exodus. We [will] get ZERO MCP for at least one quarter while Intel 'investigates the details' – there's no legal/moral/threatening means for us to apply and avoid this.* We'll also have to bite and scratch to even hold 50% [of MCP] including a commitment to NOT ship [AMD-based products] in [the] Corporate [sector].
>
> If we go [with AMD CPUs] in [the] Opti[plex product line], [Intel] cut[s] [MCP] to <20% and use[s] the added MCP to compete against us. [Intel has] gamed this out and can clearly withstand a 2-3 year industry price war to ensure that they lose no market share if Dell ships AMD. (Emphasis added).

106.   Top Dell and Intel executives met and Intel again agreed on substantial increases in rebate levels; Dell would now receive a "base" rebate of 11% of its processor purchases from Intel, up from 7%, for not switching to AMD. In addition, they also agreed on another 3% in "incremental" or "variable" rebates, for a total of up to 14%. Dell's lead negotiator estimated that the "new MCP" would be worth $400 million to Dell over the twelve month period from April 1, 2004 to March 31, 2005. Indeed, around that time, Intel's payments to Dell started to

wrote, in February 2005: "it should [not] be surprising that ... a lot of $$$ ... is what it takes to overcome a slower processor with a higher cost."

123.    As Dell found itself losing more and more of these bids – even with bid bucket subsidies – in January 2005, Intel gave Dell "a verbal OK to remove any discounting restrictions" on bids against Opteron servers. In other words, Intel was now actively encouraging below-cost transactions in order to keep AMD out of the key enterprise market. In accordance with Intel's instruction, Dell sent new guidelines to Dell's "Centers of Competence" or "COCs" (*i.e.*, regional offices), dispensing with the limits, but also instructing the COCs that they "MUST ... [w]ork proactively with Intel to respond to and win those deals." (Emphasis in original).

124.    As Intel recognized in internal emails, the removal of discounting restrictions meant that "effectively, the processor could be at $0 ... could even be negative."

125.    Dell's detailed quarterly bid bucket reports to Intel show that many transactions were indeed below cost, sometimes listing "negative margin" as the "justification for support." Some reports explicitly indicate that the bid bucket "relief per processor" exceeded 100% of the nominal cost (before rebates). For example, one bid bucket report that Dell sent to Intel contains the following information about a below cost transaction involving 352 server systems, in competition against an IBM Opteron-based system:

41

134.     Intel's Dell account representative responded: "[T]he 10,000 lb gorilla is what he didn't say, he wants to renegotiate their MCP deal ... starting in their Fq3 [Dell's 3rd fiscal quarter] – that's their idea of a 'win-win sell-up deal.' They want to maintain their historical meet-comp consumption. I don't, unless they change – even then I'm cautious. I've told [Dell's lead negotiator] and the rest at Dell that we don't want another opportunistic hollow commitment ... I'm told they want to evolve into a much more collaborative relationship – we'll see."

135.     In the following months, Otellini also had increasingly emotional and frank exchanges with Michael Dell himself.  On November 4, 2005 Otellini reported internally in a "Confidential – DO NOT FORWARD" email about "one of the most emotional calls I have ever, ever had with [Michael Dell]."  In this email, Otellini wrote:

- [Michael Dell] opened by saying "I am tired of losing business" ... he repeated it 3-4 times. I said nothing and waited.

- He has been traveling around the USA. He feels they are losing all the high margin business to AMD-based sku's ...

- He is 'tired of being behind for 4 years (when I protested that it was 2, he said, no the last 2 years, this year, and next year).

- As a result, "Dell is no longer seen as a thought leader"

136.     On November 10, 2005, Michael Dell followed up with an email to Otellini: "We have lost the performance leadership and it's seriously impacting our business in several areas." Otellini's reply: "There is nothing new here. Our product roadmap is what it is. It is improving rapidly daily. It will deliver increasingly leadership products ... *Additionally, we are transferring over $1B per year to Dell* for meet comp efforts. This was judged by your team to be more than sufficient to compensate for the competitive issues." (Emphasis added).

44

137.     Michael Dell, however, continued to press home to Intel its performance deficit and its effects on Dell. On November 24, 2005 he capped an email exchange with Otellini by writing: "None of the current benchmarks and reviews say that Intel based systems are better than AMD. We are losing the hearts, minds and wallets of our best customers."

138.     Meanwhile, Intel increased its payment to Dell to an unprecedented level. According to figures provided by Dell, Intel's payments ($471 million) amounted to 78% of Dell's reported net income ($606 million) for the period August to October of 2005.

139.     On February 16, 2006, Intel took note of a service report in which Dell's CEO Kevin Rollins had said that Dell had "made no plans to begin using" AMD chips. "Finally something positive" commented one Intel executive. *Otellini commented: "The best friend money can buy."* (Emphasis added).

### 12.     Dell Finally Launches AMD-Based Products

140.     By April 2006, Dell's relationship with Intel reached a breaking point. As Michael Dell wrote: "Intel – we overestimated both their ability to execute and our true competitive position with them and we underestimated AMD. And we relied too much on rebates from Intel ..."

141.     Dell was finally ready to act, despite the pressure and incentives from Intel. In an April 29 email to other top Dell executives, Michael Dell wrote: "We have been looking at the situation for a long time, and have decided to introduce a broad range of AMD based systems into our product line to provide the choice our customers are asking for."

45

142.    The reaction of Craig Barrett, Intel's Board Chairman, was unequivocal: Dell should immediately be deprived of the payments it had long enjoyed in return for its willingness not to offer AMD products, and should start paying "list prices."   Barrett told Otellini: "[T]hey have just signaled they are only interested in being a transaction based customer. I think you should reply in kind. Not a time for weakness on our part. *Stop writing checks immediately and put them back on list prices asap.*" (Emphasis added).

143.    The direction Otellini gave his subordinates the next day was consistent with Barrett's advice. Intel should make clear to Dell that if Dell offered any AMD products all of the "mcp" payments Dell received from Intel would be at risk – just as Dell had always feared: "*[W]e should be [pre]pared to remove all mcp and related programs. Post haste... then we ought to enter negotiations ...*" (Emphasis added).

144.    But at Dell, Intel's anticompetitive strategy of paying Dell not to deal with AMD had at long last become too destructive for the company and its client base, which was increasingly demanding AMD products.  As one Dell executive wrote on May 12, 2006 to Dell's CEO Kevin Rollins: "We are getting slammed with missing our numbers and not announcing anything with AMD. Conversely, Intel is not giving us enough money to make Q2 EPS [2nd quarter earnings per share] and our current plan of record for Q2 is to beg them for more money to make our targets... My vote is [to] announce AMD now if they do not cooperate this week."

145.    As Intel had done with other OEMs who were determined to introduce AMD products, it attempted to severely limit the range of the AMD products that would be offered.  In May, Intel sought a deal with Dell in which Dell would make an AMD announcement – but limited to multi-processor servers and "remain all intel (sic) for all other lines through this year,"

46

as Otellini informed Intel's Board of Directors. Under that deal, Intel was to make further payments to Dell in return for continued exclusivity outside the multi-processor server segment. Dell's Rollins wrote in a June 1, 2006 email that he was trying to get $250 million still from Intel, "but they [Intel] are asking for a commitment to exclusivity for the rest of the year to get the money."

146.   Despite this agreement, by September of 2006, Dell realized that it could no longer limit its introduction of AMD to this segment if it wanted to retain its market share, accordingly, in September, it announced further AMD products.

147.   Intel's retaliation was massive. For February, March and April of 2006, Intel had paid Dell approximately $800 million in rebates; in the three month period from November 2006 through January 2007 – after it had first offered an AMD-based product – Dell received less than $200 million in rebates.

148.   In Intel's view, the end of the exclusive relationship it had had with Dell opened opportunities elsewhere, specifically with another OEM, Lenovo. In a "read and destroy" email to a top Lenovo executive ("I am asking you as a matter of trust to read and delete it") Intel's Otellini suggested that Lenovo could benefit from the same kind of relationship: "Any meet comp program we may have had with Dell will get nullified as they introduce competition – this opens vistas of opportunity for LeNovo/Intel that I have only hinted at in the past. This represents an inflection point for LeNovo."[3]

---

[3] Notwithstanding the fact that Dell finally launched AMD-based products in 2006, and continues to sell them today, there is evidence that Intel continues to apply pressure to Dell to minimize AMD's ability to compete effectively.

1  microprocessor products] usage."

2  164.   A direct threat was delivered by Intel's then COO Paul Otellini, as recorded in an

3  internal HP email: "If [HP] do[es] Hammer [an AMD microprocessor] . . . he [Otellini] will

4  redirect development effort from IPF to 64-bit extensions [an alternative Intel technology],

5  significantly hindering our IPF migration."

6  

7  165.   For HP executives, avoiding the consequences to the Itanium project threatened

8  by Intel was a top priority.  Any prospect of dealings with AMD would have to be subordinated

9  to HP's overriding interest in preserving Intel's cooperation on Itanium.  A senior HP executive

10  made the point in an internal April 2002 email: "HP and Intel have worked very closely on IPF.

11  We can not mess that up as it is the engine for our future systems business.... [I]t will be very

12  important that we consider any potential AMD change with our eyes wide open."

13  

14  **4.     HP Agrees To Cap Its Sales Of AMD Products**

15  166.   Confronted with Intel's threats to the Itanium project, and eager to obtain rebate

16  payments from Intel, HP believed it had no choice but to bend to Intel's demands.  Accordingly,

17  it negotiated a deal with Intel which drastically limited its marketing of AMD-based business

18  desktop PCs and added a tremendous "rebate" payment to its bottom line.

19  

20  167.   First, HP agreed to limit its global sales of AMD-based business desktop PCs to

21  no more than 5% of its total business desktop sales.  Second, to meet Intel's concern about

22  enhancing AMD's reputation among enterprise customers, it agreed to limit its marketing of

23  AMD-based products to the small and medium sized business segment.  Third, HP agreed not to

24  use its distributor network to fulfill orders for AMD-based products, but to sell only as many

25  AMD-based products as it could ship directly – something HP was ill-prepared to do at that time.

26  

27  52

28

### 7.    HP's 2006 Company-Wide Agreement with Intel

194.    Prior to 2006, the agreements which HP and Intel reached to limit HP's sales and promotion of AMD-based products were generally limited to specific segments of HP's business. In 2006, however, the two companies reached a new, more comprehensive understanding, at AMD's expense. In a "Memorandum of Understanding" dated September 29, 2006, HP agreed to increase Intel's share of its business company-wide in exchange for rebate payments and other valuable benefits to its business.

195.    Since 2002, HP had persisted in maintaining a limited relationship with AMD, which brought it repeated criticism from Intel. In a March, 2006 email, a senior Intel executive complained that HP was "celebrating a 10 yr anniversary with our direct competitor" and characterized such conduct as a "poke in the eye" directed at Intel. A senior HP executive emailed back: "This is not a poke in the eye! It really reflects the market situation over the past few years. You and I both know you have been at a price/performance disadvantage. In many cases you have been trying to close the gap using $ in the field ...." In the Spring of 2006, however, HP and Intel began discussion of a new agreement.

196.    In August, 2006, Intel's Otellini told senior Intel executives in an email that "we need to have a much deeper relationship with HP... We will have the choice in the next week to sign up to an 07 deal with hp or not ... I believe it is in our interest to make this happen regardless of the near term issues." On August 25, 2006 Otellini met with a top HP executive. A "Deal Status" Summary circulated between the companies in early September outlined what would become the basic structure of the deal: Intel promised hefty cash payments and other benefits to HP in exchange for market share gains. In other words, it was understood that HP

would decrease the proportion of x86 microprocessor product it purchased from AMD to Intel's

benefit.

197.    Intel did what it could to sanitize written versions of the deal terms, by asking that

references to "mss" or "market segment share" be replaced by "volume targets." A September

10, 2006 email from the principal Intel negotiator of the deal to his HP counterpart made this

explicit: "Could you take the mss references off and just leave everything at volume targets. Our

counsel is very picky on that stuff and I don't want to infer that we have had conversations about

anything other than volume targets or relative volume targets … thx."

198.    HP obliged. Nevertheless, the substance of the agreement was clear. The "Deal

Status" memo contemplated that Intel would pay $925 million to HP during HP's 2007 fiscal

year. In exchange, HP promised specific Intel market share gains. In its desktop and mobile

product lines, HP was willing to provide a 5% Intel market share gain; in some segments of its

server business, HP agreed to a 2% Intel increase. In return, HP received, in addition to the

rebate payments, other valuable concessions, including favorable changes in supply chain

conditions and an Intel promise of "profound change" in Intel's "white box strategy." This

referred to the terms on which Intel sold and promoted its products to non-brand name computer

manufacturers which competed with HP.

199.    On September 14, 2006, Intel and HP entered into a "Letter of Intent" which cast

HP's obligation to shift its purchases to Intel in terms of "unit volumes," but also provided that

those volumes would adjust proportionately in accordance with HP's actual growth: "In FY'07

[HP's fiscal year 2007] HP agrees to direct additional CPU unit volumes to Intel beyond our

current vector … In the event that HP TAM [total available market] growth is higher or lower

*get jeopardized with continued momentum on the AMD front and I believe they are taking notice of this reality.* [A top IBM server executive] confirmed it and absolutely expressed concern here." (Emphasis added).

216.    As a result, IBM declined requests by AMD for support on Opteron promotional activities at an important industry event and in advertising. When AMD's CEO complained, a top IBM executive responded:

> From our side, the biggest thing we are worried about is retaliation. I believe as strongly as anyone in what AMD has in Opteron and the opportunity that it presents for a breakthrough in the industry. On the other hand, we have a strong fear that Dell is merely using this to extract better terms from Intel and we will end up in a very deep hole . . . I can envision a scenario of Intel having made preferential deals with HPQ and Dell and us getting 'punished' for trying to work with AMD. *We believe in you and we are a big company but we are not immune from single supplier pressure.* (Emphasis added).

217.    A later (September 2004) internal Intel email confirms both the existence of an agreement between Intel and IBM restricting IBM's Opteron marketing and its effectiveness. The occasion for the email was IBM's launch in September 2004 of an upgrade to the e325, labeled the e326. Responding to CEO Paul Otellini's inquiry as to whether the e326 launch was "inconsistent with our agreement" an Intel executive responsible for IBM responded:

> Probably looks like I'm splitting hairs, but IBM never committed to stop selling the e325 ... They did commit their mainstream servers and blades for both DP [dual processor servers] and MP [multi-processor servers]. They have been true to their word in positioning to their field, to their business partners and to customers that they are strategically lined up with Intel on x86 servers and as expected the [small] volumes [of Opteron-based products sold] have supported their commitment ... most of the volume comes from a couple of big clusters that were won over a year ago.

67

Dated: November 3, 2009
    New York, New York

                                  Respectfully submitted,
                                  ANDREW M. CUOMO
                                  Attorney General of the State of New York

                                  By: *Michael Berlin*
                                  ERIC CORNGOLD
                                  Executive Deputy Attorney General
                                    For Economic Justice
                                  MICHAEL BERLIN
                                  Deputy Attorney General
                                    For Economic Justice
                                  RICHARD L. SCHWARTZ
                                  JEREMY R. KASHA
                                  JAMES YOON
                                  SAAMI ZAIN
                                  Assistant Attorneys General

                                  120 Broadway, 26th Floor
                                  New York, New York 10271-0332
                                  Tel: (212) 416-8262
                                  Fax: (212) 416-6015
                                  Richard.Schwartz@oag.state.ny.us
                                  Jeremy.Kasha@oag.state.ny.us

                                  *Attorneys for Plaintiff State of New York*

83

# EXHIBIT 26

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: INTEL CORPORATION DERIVATIVE LITIGATION | : : : : | Civil Action No. 08-93-JJF |

Joseph H. Weiss, Esquire; David C. Katz, Esquire; Moshe Balsam, Esquire and Ilya Nuzov, Esquire of WEISS & LURIE, New York, New York.
Jules, Brody, Esquire of STULL, STULL & BRODY, New York, New York.
Seth D. Rigrodsky, Esquire and Brian D. Long, Esquire of RIGRODSKY & LONG, Wilmington, Delaware.

Attorneys for Plaintiff.

Jonathan C. Dickey, Esquire and Marshall R. King, Esquire of GIBSON, DUNN & CRUTCHER LLP, New York, New York.
Donald J. Wolfe, Jr., Esquire and Stephen C. Norman, Esquire of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.

Attorneys for Defendants.

<u>OPINION</u>

June 4, 2009
Wilmington, Delaware

Farnan, District Judge

    Presently before the Court is Defendant's Motion To Dismiss
The Amended Consolidated Complaint Or, In The Alternative, Stay
This Action. (D.I. 21.)  For the reasons discussed, the Court
will grant Defendant's Motion to the extent it seeks dismissal
with prejudice of Plaintiff's Amended Complaint (D.I. 15) for
failure to adequately plead demand futility pursuant to Rule
23.1 of the Federal Rules of Civil Procedure.

**BACKGROUND**

**I.   Procedural Background**

    Plaintiff Martin Smilow brought this derivative lawsuit
against former and current members of the Board of Directors
(the "Board") of Intel Corporation ("Intel"), alleging that they
failed to prevent the company from committing anti-competitive
practices to monopolize the microprocessor market.  (See D.I.
15.)  On September 5, 2008, Defendants filed the instant Motion
To Dismiss based on (1) failure to adequately plead demand
futility, (2) failure to state a claim, (3) the statute of
limitations, or (4) failure to plead contemporaneous ownership.
In the alternative, Defendants requested that the Court stay
this action pending the outcome of parallel antitrust litigation
between Advanced Micro Devices, Inc. ("AMD") and Intel.  (See
generally D.I. 21; D.I. 22.)

1

## II.  Factual Background

This action stems from Intel's alleged unfair domination of
the x86 microprocessor market through anti-competitive and
monopolistic practices.  Plaintiff points to a number of ongoing
investigations pertaining to Intel's trade practices as evidence
of Intel's anti-competitive behavior:

- In 2001, the European Commission ("EC") began
  looking into claims by Advanced Micro Devices,
  Inc. ("AMD") that Intel used unfair trade
  practices.  In July 2007, the EC issued a press
  release stating it had reached a "preliminary
  view that Intel has infringed the EC treaty rules
  on abuse of a dominant position . . . ."  (D.I.
  15 ¶ 71.)  Roughly one year later, the <u>Wall
  Street Journal</u> reported that European Union
  antitrust regulators had made new charges against
  Intel, including that Intel paid a computer
  manufacturer to delay the launch of certain AMD-
  based machines and awarded rebates conditioned
  upon the manufacturers' use of only Intel chips.
  (<u>Id.</u> ¶ 81.)

- In April 2004, Japan's Fair Trade Commission
  ("JFTC") began investigating the sales and
  marketing activities of a Japanese subsidiary of
  Intel.  In March, 2005, the JFTC issued a report
  concluding, among other things, that since May
  2002 the Intel subsidiary "has made the five
  major Japanese OEMs refrain from adopting
  competitors' CPUs for all or most of the PCs
  manufactured and sold by them . . . ."  (<u>Id.</u> ¶
  69.)

- In June 2005, the South Korean Fair Trade
  Commission ("SKFTC") inquired into the marketing
  and rebate programs of Intel's Korean subsidiary.
  In June 2008, the <u>Wall Street Journal</u> reported
  that the SKFTC fined Intel $25.4 million based on
  its conclusion that Intel had violated South
  Korean antitrust laws.  (<u>Id.</u> ¶ 79.)

- In January 2008, <u>Business</u> <u>Week</u> reported that the New York State Attorney General sought information from Intel and AMD regarding whether Intel "stifled competition and hurt consumers by illegally coercing computer makers to use its chips." (<u>Id.</u> ¶ 74.) The article further reported that the Federal Trade Commission had begun an investigation into alleged anti-competitive behavior by Intel. (<u>Id.</u>)

According to Plaintiff, these investigations constitute "red flags signaling persistent corporate malfeasance" that the Defendants have ignored in violation of their fiduciary duty of loyalty to Intel. (<u>Id.</u> ¶ 86(ii).) Plaintiff, an Intel shareholder, thus initiated this derivative lawsuit in February 2008 to recover for these alleged breaches of fiduciary duty.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23.1 requires a plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed. R. Civ. P. 23.1. Rule 23.1 only goes to the adequacy of a plaintiff's pleadings; however, "the substantive requirements of demand are a matter of state law." <u>Blasband v. Rales</u>, 971 F.2d 1034, 1047 (3d Cir. 1992).

Under Delaware law, "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." <u>Aronson v. Lewis</u>,

473 A.2d 805, 812 (Del. 1984) (overruled on other grounds). In the case of "claims involving a contested transaction i.e., where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties," courts must apply the Aronson test to determine whether demand was futile. Wood v. Baum, 953 A.2d 136, 140 (Del. 2008). Under this test, the trial court is confronted with two related but distinct questions: (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. Levine v. Smith, 591 A.2d 194, 205 (Del. 1990) (overruled on other grounds). These two inquiries are disjunctive, meaning that if either prong is met, demand is excused. In re J.P. Morgan Chase & Co. S'holder Litig., No. 531-N, 2005 Del. Ch. LEXIS 51, at *28 (Del. Ch. Apr. 29, 2005).

Under the first prong, "directorial interest exists whenever divided loyalties are present, or where the director stands to receive a personal financial benefit from the transaction not equally shared by the shareholders." Blasband, 971 F.2d at 1048. A director lacks independence when a director's decision is based on extraneous influences, rather than the merits of the transaction. Id. In order for a court

4

to find that demand is futile due to director interest or a lack of independence, a majority of the board of directors, or one-half of an evenly-numbered board, must be interested or lack independence. <u>Beam v. Stewart</u>, 845 A.2d 1040, 1046 n.8 (Del. 2004).

If the first prong is not satisfied, there is a presumption that the Board's actions were the product of a valid exercise of business judgment. <u>Id.</u> at 1049. Thus, to satisfy the second prong, a plaintiff must plead sufficient particularized facts to "raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." <u>In re J.P. Morgan Chase & Co.</u>, 2005 Del. Ch. LEXIS 51, at *39 (quoting <u>In re Walt Disney Co. Derivative Litig.</u>, 825 A.2d 275, 286 (Del. Ch. 2003)) (citations omitted).

However, "where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties," the trial court must apply the <u>Rales</u> test. <u>Wood</u>, 953 A.2d at 140. Under the <u>Rales</u> test, the court must consider whether the plaintiff has alleged "particularized facts establishing a reason to doubt that 'the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" <u>Id.</u> (citing <u>Rales v. Blasband</u>, 634 A.2d 927, 934 (Del. 1993)). A