plaintiff might do this, for instance, by showing that the directors would face a "substantial likelihood" of personal liability by complying with a shareholder's demand to pursue litigation. See Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993). However, "[w]here directors are contractually or otherwise exculpated from liability for certain conduct, 'then a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts.'" Wood, 953 A.2d at 141 (citing Guttman v. Huang, 823 A.2d 492, 501 (Del. Ch. 2003)). Furthermore, if "directors are exculpated from liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, i.e., that they had actual or constructive knowledge that their conduct was legally improper." Id.; see also Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006) (in discussing In re Caremark Int'l, 698 A.2d 959, 959 (Del. Ch. 1996), explaining that "imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations").

### THE PARTIES' CONTENTIONS

Defendants contend that under either the Aronson or Rales test, Plaintiff has failed to plead particularized facts establishing demand futility. Defendants raise six separate

6

points in support of this position. First, Defendants contend that there is no basis to conclude that Board members lack independence or objectivity such that their ability to consider a shareholder demand would be impaired. Defendants note, among other things, that none of the twelve directors are alleged to have been a party to any antitrust violations. With respect specifically to outside directors, Defendants contend that none of them are alleged to have received any benefits other than his or her director compensation and that the Complaint includes no facts suggesting that they were controlled by management or any other individual involved in the alleged antitrust violations. (See D.I. 22 at 9.) Second, to the extent the Complaint pleads a failure of the Directors' duty of oversight, Defendants contend that the pleading standard is extraordinarily high and that, although Plaintiff identifies alleged "red flags" in the form of ongoing antitrust investigations, the Complaint still fails to meet the pleading standard because it includes no facts regarding Intel's oversight mechanisms and/or any allegations that the Directors consciously and in bad faith ignored their oversight duties. (Id. at 13-14.) Third, Defendants note that under Intel's certificate of incorporation, Board members are immunized from personal liability except for intentional fraud, bad faith, or breach of the duty of loyalty. In these circumstances, Delaware law requires Plaintiff to plead facts

7

demonstrating that Defendants acted with scienter, and Defendants contend that Plaintiff has failed to do this. (Id. at 15.) Fourth, to the extent the Complaint alleges that demand is futile because the Intel Directors would be required to sue themselves, Defendants point to Delaware authority rejecting this theory of demand futility. (Id. at 16.) Fifth, with regard to Plaintiff's allegation that the "known principal wrongdoers" controlled the Board through payment of "high annual and monthly fees," Defendants maintain that Plaintiff has failed to even identify the "known principal wrongdoers" and that, under the law, allegations that the Directors' compensation compromises their independence are insufficiently particularized to establish demand futility. (Id. at 17-18.) Finally, though Plaintiff appears to plead a theory of liability based on a failure of oversight, to the extent the Complaint can be construed as alleging conscious inaction by Defendants, Defendants contend that Plaintiff has failed to plead particularized facts that negate the applicability of the business judgment rule, including any facts describing any decision by the Board and any facts alleging infirmity in the Board's decision making process. (Id. at 19.)

Plaintiff responds that his Complaint satisfies both the Rales and Aronson test. With respect to the Rales test, Plaintiff contends, first, that the news of repeated alleged

anti-competitive activities involving Intel's business constituted "red flags" that should have alerted the Board to illegal conduct, the continuation of which demonstrates an actionable lack of Board oversight. (See D.I. 26 at 12-14.) Second, Plaintiff contends that because these "red flags" took place over the course of years and are geographically widespread, they have a "magnitude and duration" that clearly demonstrates a lack of oversight. (Id. at 14-15.)

As to the Aronson test and the issue of whether the Directors are entitled to invoke the protections of the business judgment rule, Plaintiff maintains that given the duration and scope of the alleged "illegal monopoly scheme," it can be inferred under the totality of the circumstances that Defendants consciously determined not to take any responsive action and are thus not entitled to the protections of the business judgment rule. (Id. at 17-18.) Plaintiff further contends that the continuing investigations into Intel's alleged anti-competitive activity render the Board interested because these investigations pose a "substantial likelihood" of liability for Board members, in particular inside directors and those who sit on Board committees such as the Audit or Corporate Governance committees. (Id. at 19-21.)

In Reply, Defendants challenge Plaintiff's contention that the Board members face a "substantial likelihood" of personal

liability for Intel's alleged anti-competitive activity. In particular, Defendants maintain that the ongoing investigations into Intel's business practices pose not a "substantial likelihood" of activity, but a "mere threat" of liability, which, as a matter of law, is insufficient to establish demand futility. (See D.I. 32 at 5-6.) Indeed, the ongoing investigations, Defendants contend, are only allegations of wrongdoing and not firm findings of wrongdoing. (See id. at 6-7.) With respect to Plaintiff's position that membership on a Board committee, such as the Audit committee, tends to establish a "substantial likelihood" of liability, Defendants note, first, that Plaintiff failed to plead these allegations and, second, that Delaware law dictates that these considerations do not meaningfully contribute to establishing demand futility. (Id. at 14-15.)

<div align="center">

**DISCUSSION**[1]

</div>

**I.  Whether The Court Should Apply The _Aronson_ Or _Rales_ Test**

It is unclear to the Court whether Plaintiff is alleging a claim based on a simple failure to monitor, a conscious decision by the Board not to take action, or both. On the one hand, the

---

[1] Because the Court will dismiss the Complaint based on a failure to adequately plead demand futility, the Court will not consider whether the case is time barred or whether Plaintiff has failed to plead contemporaneous ownership. Likewise, the Court will not consider whether this case should be stayed pending completion of the ongoing anti-trust litigation between Intel and AMD.

Amended Complaint states that "[t]here was a sustained and systematic failure of the Board to exercise oversight," which suggests that Plaintiff's claim is based simply on a negligent dereliction of duty. (D.I. 15 ¶ 86(ii).) On the other hand, the Amended Complaint states that "[t]he directors' <u>decision</u> not to act was not made in good faith and was contrary to the best interests of the Company." (<u>Id.</u> ¶ 86(ii)(e) (emphasis added).) However, even if Plaintiff intends to assert the latter type of claim, the Court is unable to identify any Delaware authority holding that the <u>Aronson</u> standard should be applied to allegations of conscious inaction. On the contrary, Delaware courts have explained that "[w]here the complaint does not address an action taken by the board . . . or alleges that the board failed to act, the inquiry narrows. The Court cannot address the business judgment of an action not taken and, therefore, should concern itself with what is now known as the <u>Rales</u> test . . . ." <u>In re infoUSA, Inc. S'holders Litig.</u>, 953 A.2d 963, 986 (Del. Ch. 2007); <u>see also</u> <u>Postorivo v. AG Paintball Holdings, Inc.</u>, No. 2991-VCP, 2008 Del. Ch. LEXIS 29, at *16 (Del. Ch. Feb. 29, 2008).

The only authority cited by Plaintiff for the proposition that the <u>Aronson</u> test should be applied to an allegation of "conscious inaction" is the Seventh Circuit decision <u>In re Abbott Labs. Deriv. S'holders Litig.</u>, 325 F.3d 795, 806 (7th

Cir. 2003). However, the Third Circuit rejected application of the Aronson test to such claims in Fagin v. Gilmartin, 432 F.3d 276, 282 (3d Cir. 2005). In Fagin, the plaintiff argued that the "board's conduct constituted an active decision not to act rather than inaction," yet the district court nevertheless applied a test akin to the Rales test. See Fagin v. Gilmartin, No. 03-2631 (SRC), 2004 U.S. Dist. LEXIS 28916, at *16 (D.N.J. Aug. 20, 2004). On appeal, plaintiff argued that this was error, contending that Abbott stood for the proposition that (1) Rales only applies where the directors are "blamelessly unaware" of the conduct in question and (2) that "inaction is an affirmative decision not to act" when a corporate governance structure exists. Fagin, 432 F.3d at 282. The Third Circuit rejected this reading of Abbott and upheld the District Court's application of Rales, explaining that the Seventh Circuit's interpretation of Illinois law was not a faithful application of Delaware law. See id.; see also In re Fannie Mae Sec., 503 F. Supp. 2d 9, 18 n.6 (D.D.C. 2007) ("Plaintiffs assert that this Court should apply the standard used by the Seventh Circuit in [Abbott]. However, because the Seventh Circuit applied Illinois state law, that case is not applicable here where Delaware law controls."). Accordingly, following Fagin, the Court will apply the Rales test for demand futility to the instant Complaint. See also Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995)

("[P]laintiff does not challenge any specific board action that approved or ratified these alleged wrongdoings. Therefore, Plaintiff must satisfy the one step test announced in <u>Rales</u> to demonstrate that he was excused from making a demand.").

## II.  Whether Plaintiff Has Alleged Particularized Facts Satisfying The <u>Rales</u> Standard For Demand Futility

Plaintiff sets forth his reasons for failing to make a demand on the Board in paragraph 86 of his Amended Complaint. Briefly, these reasons include (1) that the Board failed to bring remedial action against "wrongdoers," including Chairman and CEO Craig R. Barrett, (2) that the Board failed to respond to "red flags," (3) that the Board was dominated by "principal wrongdoers," (4) that the Board members would have been required to sue themselves, and (5) that the Board members received "substantial benefits, and other emoluments" by virtue of being on the Board. (<u>See</u> D.I. 15 ¶ 86.)  Under <u>Rales</u>, these allegations must establish a reason to doubt that the Board could have properly exercised its independent and disinterested business judgment in responding to a demand.

### A.  Whether Defendants Face A Substantial Likelihood Of Liability For Ignoring Red Flags

Of Plaintiff's reasons for failing to make demand, the one that is alleged with most particularity pertains to the Board's alleged indifference to "red flags," specifically the ongoing investigations into Intel's alleged anti-competitive business

13

practices. (See, e.g., Part II of this Memorandum Opinion.)
Through this allegation, Plaintiff aims to establish that the
directors face a "substantial likelihood" of personal liability
by their alleged failure of oversight in the face of these "red
flags." Under Caremark and its progeny, liability for such a
failure to oversee requires a showing that the directors knew
they were not discharging their fiduciary obligations or that
they demonstrated a conscious disregard for their duties. See,
e.g., In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d
106, 122-23 (Del. Ch. 2009). The Delaware Court of Chancery has
explained that this theory of liability "is possibly the most
difficult theory in corporation law upon which a plaintiff might
hope to win a judgment." In re Caremark Int'l, 698 A.2d 959,
967 (Del. Ch. 1996).

Plaintiff has not alleged particularized facts sufficient
to show a "substantial likelihood" of liability under this high
standard. Indeed, what is most notable about Plaintiff's "red
flags" allegation, and the Complaint generally, is what is
lacking. Though Plaintiff identifies a number of so-called "red
flags," Plaintiff fails to identify what the Directors actually
knew about the "red flags" and how they responded to them. For
instance, there are no allegations regarding how often the Board
met, if at all, to discuss the alleged anti-competitive activity
and no allegations that the Board approved any such "red flag"

activity.  Similarly, there are no allegations as to how often and by whom the Board was advised regarding the "red flags." There is no allegation that any of the Directors is a party to any of the proceedings or investigations that Plaintiff alleges is a "red flag."  At most, the Complaint notes that nine of the Defendants signed Intel's 2005 and 2006 10-K's, which publicly reported the ongoing investigations, and that the Board has not "acted in any way."  (See D.I. 15 ¶¶ 86(i), 86(ii)(e).)  In the Court's view, this allegation is insufficient for the Court to draw the significant inference that the Directors had constructive knowledge that an alleged failure to respond to the "red flags" would be a breach of their fiduciary duties, which is required under Delaware law.  See Wood, 953 A.2d at 141 ("Where, as here, directors are exculpated from liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, i.e., that they had 'actual or constructive knowledge' that their conduct was legally improper.").

The only Director for whom the Complaint includes any particularized allegations is Director Craig R. Barrett. Specifically, the Complaint alleges that in September 2003 Barrett personally participated in wrongful anti-competitive activity when he told the Chairman and CEO of computer

manufacturer Acer that Acer would suffer "severe consequences"
if it publicly supported the launch of AMD's Athlon64 processor.
(D.I. 15 ¶ 50.) However, even if the Court were to conclude
that this allegation established a "substantial likelihood" of
personal liability for Barrett, Delaware law is clear that
demand will not be excused when a Complaint includes
particularized allegations for just one member of the Board.
See In re Citigroup, 964 A.2d at 121 n.36.

Simply put, when it comes to "red flags," Plaintiff's
approach is little more than to catalog the ongoing
investigations into Intel's alleged wrongdoing, and then assert
that the thickness of the catalog demonstrates that Intel's
conduct was so egregious and widespread that the Directors
certainly must now face at least a "substantial likelihood" of
personal liability for having ignored the "red flags." However,
setting aside Plaintiff's failure to allege facts suggesting
that Defendants knew they were not discharging their duties, the
Court is unable to conclude that the alleged "red flags" are so
compelling that the Defendants now face a "substantial
likelihood" of liability.

First, in the Amended Complaint, Plaintiff points to a 1992
$10 million arbitration award that resulted from litigation
pertaining to a Technology Exchange agreement with AMD, which
Intel allegedly breached as part of a campaign "to install

itself as the sole source for the new x86 instruction set processor." (D.I. 15 ¶¶ 26-27, 86(ii)(a).)[2] However, since this award was made roughly 16 years ago and before nine of the twelve current Directors joined the Board, it is difficult to see how this is a "red flag" that the Directors' allegedly disregarded at their peril. An additional domestic allegation made by Plaintiff involving AMD pertains to a January 2008 Business Week article suggesting that the New York State Attorney General sought information from Intel regarding anti-competitive activity and that the FTC is investigating Intel. (Id. ¶ 74.) However, these allegations are vague, not specifically connected to any of the Directors, concern events that ostensibly took place only a few weeks before the Complaint was filed, and allege little more than that the government has sought information from Intel. In the Court's view, these allegations contribute little, if anything, towards establishing that the Directors now face a "substantial likelihood" of liability for having ignored "red flags."

Second, Plaintiff points to the commencement of a 2001 EC investigation, which resulted in a corresponding 2007 report having a "preliminary conclusion" that Intel infringed the EC Treaty rules on abuse of a dominant market position. (Id. ¶¶

---

[2] Although this award is detailed in the Complaint, Plaintiff does not discuss it in his opposition to Plaintiff's Motion To Dismiss.

71, 86(ii)(b); D.I. 26 at 5.) However, the Court does not place great weight on a "preliminary" finding and therefore cannot conclude that the directors now face a "substantial likelihood" of liability for having allegedly ignored the EC investigation. Indeed, in attempting to fend off Defendants' statute of limitations defense, Plaintiff even appears to characterize this investigation as having been "dormant" in 2004. (See D.I. 26 at 28.)

Third, with regard to the Korean investigation, Defendants repeatedly note that in June 2008, roughly three years after the SKFTC requested documents from Intel's Korean subsidiary regarding certain marketing and rebate programs, the SKFTC fined Intel $25.4 million and ordered it to end illegal rebates. (D.I. 15 ¶ 79.) However, to the extent the SKFTC identified an Intel violation of Korean law, it did not do so until approximately six months after this lawsuit was initiated. On these facts, the Court cannot conclude that the directors were impaired in their ability to consider a demand because they faced a "substantial likelihood" of liability for ignoring a "red flag" that was not fully raised until after this litigation was initiated.[3]

---

[3] In his Amended Complaint and in his Answering Brief in opposition to the Motion To Dismiss, Plaintiff identifies additional "red flags" that were not available until after this lawsuit was filed. These "red flags" include a February 12, 2008 EC raid of Intel's Munich offices and a July 17, 2008 Wall Street

Finally, with regard to the Japanese investigation, Plaintiff notes that in June 2005 the JFTC issued a recommendation calling for Intel's Japanese subsidiary to cease and desist violations of Japanese antitrust law, institute antimonopoly training, and operate periodic audits. (<u>Id.</u> ¶ 27.) Though declining to admit wrongdoing, Intel agreed to the remedies proposed by the JFTC. (<u>See</u> D.I. 32 n. 7.) The Complaint includes no allegations that Intel has since violated Japanese antitrust law or the terms of the JFTC recommendation. Though one could reasonably conclude that the JFTC investigation constitutes a "red flag," the fact that Intel has abided by the JFTC investigation and has not since violated Japanese antitrust laws makes it difficult for the Court to conclude that the Directors now face a "substantial likelihood" of liability for ignoring the JFTC investigation, even against the backdrop of the European and Korean investigations.

In sum, in the Court's view, the alleged "red flags" identified by Plaintiff are not so severe that the Defendants now face a "substantial likelihood" of liability for allegedly ignoring them. At the very most, the Directors face a "mere

Journal article reporting new European Union charges against Intel. (<u>See</u> D.I. 15 ¶¶ 76-78, 81.) In addition, Plaintiff has advised the Court that in May 2009 the European Commission decided to fine Intel roughly $1.45 billion for violation of European Community antitrust rules. (D.I. 43.) The Court is similarly unable to fairly consider these post-filing incidents in the demand futility inquiry.

threat" of liability, which, as explained above, is insufficient to establish demand futility. See Aronson, 473 A.2d at 815 ("[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors . . . .").

None of the four cases relied upon by Plaintiff to argue that the directors face a "substantial likelihood" of liability are from Delaware courts.[4] Thus, as authority for the Court to rely upon in forming its decisions in this case, the cited cases are not persuasive. Furthermore, as explained below, after considering the cases cited by Plaintiff, the Court concludes that they are distinguishable from the instant case because they all include a much more compelling collection of "red flags."

First, in In re Abbott, the FDA conducted thirteen inspections of the company to determine whether it was in compliance with FDA regulations, sent four formal warning letters to the company (three of which were sent directly to the chairman of the board), implemented a "Voluntary Compliance Plan" to remedy compliance problems, filed a complaint for an

---

[4] The cases relied upon by Plaintiff include In re Abbott Labs. Derivative S'Holders Litig., 325 F.3d 795, 802-803 (7th Cir. 2003); In re Veeco Instruments, Inc. Sec. Litig., 434 F. Supp. 2d 267, 276-277 (S.D.N.Y. 2006); McCall v. Scott, 239 F.3d 808, 824 (6th Cir. 2001); and In re SFBC Int'l, Inc. Sec. & Derivative Litig., 495 F. Supp. 2d 477, 485 (D.N.J. 2007).

injunction, ordered the company to destroy non-compliant product inventory, and met at least 10 times with company representatives, including the chairman of the board. In re Abbott, 325 F.3d at 799-802. These events, which were widely reported and caused one analyst to question why the company continued to "drag[] [its] feet fixing the FDA problems," ultimately culminated in "the largest civil fine ever imposed by the FDA" and total losses to the company of approximately $250 million. Id. at 808-09. Although the Court has not reached any conclusions as to whether these types of facts would establish demand futility under Delaware law, in the Court's view, the alleged wrongdoing by Intel in this case does not rise to the Abbott level of wrongdoing. In addition, unlike In re Abbott, there is no indication that government agencies have specifically reached out to individual board members to apprise them of problems within the company. Accordingly, In re Abbott is not particularly useful in deciding the question of whether demand is futile in this case.

In In re Veeco, another case relied upon by Plaintiff, the plaintiff alleged specific facts regarding the role of the audit committee, including inter alia its duties to respond to whistleblowers and oversee regulatory compliance. In re Veeco, 434 F.Supp.2d at 276. The complaint detailed the company's failure to respond to two whistleblower reports and an internal

audit causing the company to conclude that it had violated
federal export control laws on at least nine occasions, events
that "jeopardize[d] the future viability" of the company given
its reliance on export privileges. Id. at 277-78. With regard
to accounting controls, the company allowed its accounting staff
to be reduced to only two people and, in light of several
resulting accounting improprieties, acknowledged in its 10-K a
deficiency "in the internal control over financial reporting."
Id. at 277. Despite meeting 27 times, the audit committee,
which included five director-defendants, took no action to
correct the problems. Id. Unlike In re Veeco, the Complaint at
issue here includes no allegations of any internal conclusion by
Intel that it had repeatedly violated antitrust laws and/or
allowed oversight mechanisms to lapse. Likewise, there are no
allegations identifying any committee charged with monitoring
anti-trust activities, the membership of that committee, and the
number of times it met to address potential antitrust
violations.

McCall v. Scott, 239 F.3d 808, 824 (6th Cir. 2001), is yet
another case where the litany of allegations directly
implicating the directors far exceeds the scope of what is
alleged in this case. Indeed, in McCall, the complaint
identified particular accounting irregularities and specific
facts illustrating how these were brought to the attention of

the board's audit committee. As just one of many examples, the complaint alleged that the board's audit committee was informed of a report that auditors had concealed from the government the erroneous attribution of a long-term loan to capital and that $3.7 million had been reserved in case the error was discovered. McCall, 239 F.3d at 820 n.12. In addition, the complaint alleged a series of improper acquisition practices, and noted that certain directors attended meetings of the company's acquisition development group and had lobbied the government to secure approval of the acquisitions. Id. at 820-21. The companies actions were also the subject of a federal qui tam action, an investigation by four federal agencies, and a series of articles in the New York Times. Id. at 822-24. An additional "significant factor" to the court in McCall was that a number of the defendants had prior experience as either directors or managers of the organizations acquired by the company and were hence familiar with the practices at issue. Id. at 819. Here, although the Complaint notes that Intel's alleged anti-competitive activity has been investigated and widely reported, the Complaint lacks similar particularized allegations regarding what the individual Directors knew about Intel's alleged monopolistic activities and how they may have known that failure to respond would constitute a breach of fiduciary duty. See also In re Citigroup, 964 A.2d at 129

(distinguishing McCall and explaining that "the plaintiffs in McCall alleged numerous specific instances of widespread, prevalent wrongdoing throughout the company and the mechanisms by which the wrongdoing came to the board's attention.").

Finally, Plaintiff relies upon In re SFBC Int'l, Inc. Sec. & Derivative Litig., 495 F. Supp. 2d 477, 485 (D.N.J. 2007). There, the company, which was in the business of conducting human drug trials, conducted tests in "an egregiously unethical manner." In particular, in order to secure contracts for large drug trials, the company compromised test data in such a way that human test participants – and ultimately the public – were placed at risk. In re SFBC, 495 F. Supp. 2d at 486. The complaint alleged "endemic mismanagement of the company," including abuse of human test participants, deliberate falsification of data, "a compensation structure for test subjects that discouraged the reporting of adverse effects," unsanitary conditions at test facilities, and "preying on groups particularly vulnerable to . . . financial inducements to participate in drug trials without protest regarding the conditions of treatment." Id. at 484-85. The complaint further detailed that the company received over 80 FDA citations and had their principal testing facility condemned by the building department. Id. at 485. In the Court's view, In re SFBC

presents facts that are not particularly useful in evaluating the case at bar.

In sum, with regard to Plaintiff's non-Delaware cases, the Court finds that they are not convincing authority upon which to find that the Intel Directors now face a "substantial likelihood" of liability for disregard of "red flags."

### B. Whether Plaintiff's Remaining Allegations Establish Reasonable Doubt That The Board Could Have Exercised Disinterested And Independent Judgment

Plaintiff's remaining allegations on demand futility are conclusory and insufficient under the law. The Complaint's allegations that the directors are "unwilling to bring remedial action against wrongdoers," (see D.I. 15 ¶¶ 86(i), 86(iv)-(v)), are stated in conclusory fashion with little if any detail as to who the wrongdoers are, what the wrongdoers' actions were, what action the Board should have taken, and/or how the Board allegedly reached a decision not to take action or consciously ignored wrongdoing. Though the Complaint notes Barrett's 2003 threat against Acer, for the reasons set forth above, these allegations alone are insufficient to establish demand futility.

Similar remarks may be made with regard to Plaintiff's allegations that "principal wrongdoers are in a position to, and do, dominate and control" the Board. Indeed, the Complaint fails to identify the "principal wrongdoers" and, other than a vague reference to the Directors' "high annual and monthly

fees," also fails to explain how they supposedly "dominate" the Board. (Id. ¶ 86(vi).) The Complaint reiterates that the Directors' "substantial benefits, and other emoluments" would likely prevent the Board from taking action, but puts no meat on this otherwise conclusory allegation. (See id. ¶ 86(viii).) This is insufficient to establish demand futility. See In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 360 (Del. Ch. 1998) ("[T]he Delaware Supreme Court has held that such allegations of payment of director's fees, without more, do not establish any financial interest.") (citations and internal quotations omitted).

To the extent the Complaint alleges that the "Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company," this rationale for demand futility has been repeatedly rejected by Delaware courts. See, e.g., In re Citigroup, 964 A.2d at 121 ("Demand is not excused solely because the directors would be deciding to sue themselves."); Kanter v. Barella, 489 F.3d 170, 180 (3d Cir. 2007) ("The bare allegation that a board is interested because its members would be reluctant to sue themselves has been considered and rejected."). Likewise, the Complaint fails to specify in any detail the "entangling alliances, interests, and dependencies" that would allegedly

prevent the directors from suing each other. (See D.I. 15 ¶ 86(vii).)

Notably, all of the these allegations could be made in any derivative lawsuit with the same level of specificity offered by Plaintiff in this case. Thus, these sorts of allegations cannot meaningfully contribute to establishing demand futility, even when viewed in conjunction with the Directors' alleged disregard for "red flags" as discussed above.

### CONCLUSION

For the reasons discussed the Court will grant Defendants' Motion To Dismiss The Amended Consolidated Complaint Or, In The Alternative, Stay This Action (D.I. 21) to the extent it seeks dismissal with prejudice for failure to adequately plead demand futility pursuant to Fed. R. Civ. P. 23.1.

An appropriate Order will be entered.

# EXHIBIT 27

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | )<br>)<br>)<br>)<br>)<br>) | MDL No 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC., a<br>Delaware corporation, and AMD<br>INTERNATIONAL SALES & SERVICES, LTD.,<br>a Delaware corporation,<br><br><div align="center">Plaintiffs,</div><br><div align="center">v.</div><br>INTEL CORPORATION, a Delaware corporation,<br>and INTEL KABUSHIKI KAISHA, a Japanese<br>corporation,<br><br><div align="center">Defendants.</div> | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-441-JJF |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated,<br><br><div align="center">Plaintiffs,</div><br><div align="center">v.</div><br>INTEL CORPORATION,<br><br><div align="center">Defendants.</div> | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

## STIPULATION AND CASE MANAGEMENT ORDER NO. 13

WHEREAS, as reflected in Case Management Order No. 12, Paragraph 3(a), there is a

dispute between AMD and Intel as to the propriety of calling by deposition adverse employee-

witnesses, current and former, that the adverse party is intending to bring to trial and is willing to

produce for live cross-examination during the proponent's case in chief;

WHEREAS, AMD and Intel continue to request the Court's early resolution of this dispute;

WHEREAS, as called for by Case Management Order No. 12, Paragraph 3(b)(i), AMD and Intel have met and conferred and have reached agreement that certain third party witnesses are "unavailable" within the meaning of F.R.E. 804(a) or otherwise may be called to testify by deposition <u>without regard</u> to the Court's resolution of the foregoing dispute.

NOW, THEREFORE, it is hereby stipulated by and between AMD and Intel, through their respective counsel of record and subject to the approval of the Court, as follows:

1.     It is agreed that the following third party witnesses are unavailable within the meaning of F.R.E. 804(a) and that either party may call such individuals to testify by deposition:

| Deponent | Date Taken |
| --- | --- |
| Abary, Mike | 6/3/09 |
| Abreu, Robbie | 11/3/2008; 11/4/2008 |
| Abuyounes, Simon | 4/21/09 |
| Allen, Daniel | 3/3/2009; 3/4/2009; 3/5/2009 |
| Anne, Seshu | 5/14/09 |
| Anshakov, Igor | 5/28/09 |
| Barney, Jeff | 6/3/09 |
| Barton, Thomas | 6/12/09 |
| Becker, Elliot | 8/21/08 |
| Benck, Jeff | 2/24/2009; 2/25/2009 |

| | |
|---|---|
| Beyers, Joe | 4/30/2009; 5/1/2009 |
| Bonfig, Jason | 6/8/09 |
| Booth, James | 6/1/09 |
| Bradley, Keith | 5/8/09 |
| Callaway, Jeri | 5/12/2009; 5/13/2009 |
| Cathey, Pat | 2/20/09 |
| Clark, Ted | 7/29/09 |
| Clarke, Jeffrey | 2/18/2009; 2/19/2009; 2/20/2009 |
| Cohen, Mark | 3/12/09 |
| Cook, Alex | 8/13/08 |
| Crane, Marie | 6/3/2009; 6/4/2009 |
| Cutler, Dave | 5/21/09 |
| Davy, Phillipe | 6/3/09 |
| Day, Chris | 6/4/09 |
| Dell, Michael | 2/11/2009; 3/2/2009 |
| Ellett, Edward | 5/23/08 |
| Epstein, Shannon | 6/9/09 |
| Ford, Todd | 6/1/09 |
| Goelkel, Christopher | 8/5/08 |
| Granberry, Kimberly | 6/12/09 |
| Greenwood, Bruce | 6/9/09 |
| Groudan, Jeff | 6/4/2009; 6/5/2009 |
| Hallman, Lynne | 11/2/07 |
| Hanson, Mark | 6/2/09 |

| | |
|---|---|
| Herman, Robert | 5/8/09 |
| Hollingshead, Kevin | 6/5/09 |
| Hortensius, Peter | 5/21/09 |
| Hsu, Alex | 11/4/2008; 11/5/2008 |
| Huang, Robert | 6/19/09 |
| Hummel, Tracy | 6/12/09 |
| Ichinaga, Stephen | 6/19/09 |
| Kamins, Ed | 3/27/09 |
| Kim, Daniel | 2/13/09 |
| Kim, Louis | 2/26/2009; 2/27/2009 |
| Klassen, Chris | 4/21/09 |
| Koester, Dean | 6/2/09 |
| Lee, Joe | 5/8/09 |
| Lefebvre, Keith | 6/22/2009; 6/23/2009 |
| Lemay, Victor | 6/9/09 |
| Leng, Tau (Current) | 3/6/09 |
| Levy, Elio | 8/28/08 |
| Liang, Christine | 2/27/09 |
| Lorenzo, Sheila | 6/17/09 |
| Lostroscio, John | 6/17/09 |
| Luecke, Alan | 1/13/2009; 1/14/2009 |
| Manca, Pete | 5/27/09 |
| May, Charles (Chuck) | 4/23/09 |
| McKinnon, Rick and Shelton, Kevin | 6/17/09 |
| Memo, Greg | 4/27/09 |