# EXHIBIT A

**THIRD RESTATED CERTIFICATE OF INCORPORATION**

**OF**

**INTEL CORPORATION**

INTEL CORPORATION, a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

FIRST: The name of the corporation is Intel Corporation.

SECOND: The original Certificate of Incorporation of the corporation was filed with the Secretary of State of Delaware on March 1, 1989, and the original name of the corporation was Intel Delaware Corporation. The first Restated Certificate of Incorporation of the corporation was filed with the Secretary of State of Delaware on May 11, 1993. The second Restated Certificate of Incorporation of the corporation was filed with the Secretary of State of Delaware on March 13, 2003.

THIRD: Pursuant to Section 245 of the General Corporation Law of the State of Delaware, the provisions of the Certificate of Incorporation as heretofore amended and supplemented are hereby restated and integrated into the single instrument which is hereinafter set forth, and which is entitled "Third Restated Certificate of Incorporation of Intel Corporation," without further amendment and without any discrepancy between the provisions of the Certificate of Incorporation as heretofore amended and supplemented and the provisions of such single instrument as hereinafter set forth.

FOURTH: The Board of Directors of the corporation has duly adopted this Third Restated Certificate of Incorporation pursuant to the provisions of Section 245 of the General Corporation Law of the State of Delaware in the form set forth as follows:

1. The name of the Corporation is Intel Corporation.

2. The address of its registered office in the State of Delaware is 1209 Orange Street, in the City of Wilmington, 19801, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

3. The nature of the business of the Corporation and the objects or purposes to be transacted, promoted or carried on by it are as follows: To engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

4. The total number of shares of all classes of stock that the Corporation is authorized to issue is ten billion fifty million (10,050,000,000) consisting of ten billion (10,000,000,000) shares of Common Stock with a par value of one-tenth of one cent ($.001) per share and fifty million (50,000,000) shares of Preferred Stock with a par value of one-tenth of one cent ($.001) per share. The Preferred Stock may be issued in one or more series, and the Board of Directors of the Corporation is expressly authorized (i) to fix the descriptions, powers, preferences, rights, qualifications, limitations, and restrictions with respect to any series of Preferred Stock and (ii) to specify the number of shares of any series of Preferred Stock.

5. The Board of Directors is expressly authorized to make, alter, or repeal the bylaws of the Corporation.

6. Elections of directors need not be by written ballot unless the bylaws of the Corporation shall so provide.

7. The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Third Restated Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

8. To the fullest extent permitted by Delaware statutory or decisional law, as amended or interpreted, no director of this Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. This Article 8 does not affect the availability of equitable remedies for breach of fiduciary duties. Any repeal or modification of the provisions of this Article 8 by the stockholders of the Corporation shall not adversely affect any right or protection of any director existing at the time of such repeal or modification.

9. Any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation and may not be effected by any consent in writing by the stockholders.

**IN WITNESS WHEREOF,** Intel Corporation has caused this certificate to be signed by its Senior Vice President and General Counsel and attested by its Corporate Secretary this 15th day of May, 2006.

By: ______________________
Bruce Sewell
Senior Vice President and General Counsel

Attest: ______________________
Cary Klafter
Corporate Secretary

# EXHIBIT B

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS (190264)
MARC M. UMEDA (197847)
KEVIN A. SEELY (199982)
MARK A. GOLOVACH (220760)
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRISTINE DEL GAIZO, Derivatively on behalf of INTEL CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>PAUL S. OTELLINI,<br>ANDY D. BRYANT,<br>ANAND CHANDRASEKHER,<br>ERIC B. KIM,<br>SEAN M. MALONEY,<br>D. BRUCE SEWELL,<br>STACY J. SMITH,<br>CRAIG R. BARRETT,<br>CHARLENE BARSHEFSKY,<br>CAROL A. BARTZ,<br>SUSAN L. DECKER,<br>REED E. HUNDT,<br>JAMES D. PLUMMER,<br>DAVID S. POTTRUCK,<br>JANE E. SHAW,<br>JOHN L. THORNTON,<br>DAVID B. YOFFIE,<br>D. JAMES GUZY<br>and DOES 1-25, inclusive<br><br>Defendants,<br><br>-and-<br><br>INTEL CORPORATION, a Delaware corporation,<br><br>Nominal Defendant. | Case No.<br><br>SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

Plaintiff, by her attorneys, derivatively on behalf of Intel Corporation ("Intel" or the "Company"), submits this Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought by a shareholder of Intel on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, waste of corporate assets and unjust enrichment that occurred between January 2000 and the present (the "Relevant Period") and that have caused substantial monetary losses to Intel and other damages, such as to its reputation and goodwill.

2. Intel engages in making, marketing and selling integrated circuits for computing and communications worldwide. Intel controls more than 80 percent as measured by volume, or 90 percent as measure by revenue, of the x86 microprocessor market. The x86 microprocessors are the critical microprocessors that are used to run the Microsoft Windows operating system.

3. Defendants have used the Company's dominant position in the x86 microprocessor market to stifle competition. Defendants have used such monopolistic practices as threatening, coercing and bribing customers, distributors and retailers to refrain from dealing with Intel's only real competitor, Advanced Micro Devices, Inc. ("AMD").

4. In 2005, recognizing the unlawful actions that defendants caused Intel to engage in, the Japanese Fair Trade Commission ("JFTC") recommended that Intel be sanctioned. Since then, anti-trust regulators and agencies across the globe, including the Korean Fair Trade Commission ("KFTC"), the European Commission and the New York State Attorney General have initiated actions and investigations into Intel's business practices. Most recently, on June 6, 2008, the United States Federal Trade Commission (the "FTC") announced that it served a formal subpoena on Intel after informally investigating the Company since 2006.

5. Intel is also facing a plethora of civil suits brought by private parties concerning the Company's monopolistic practices. For example, on June 27, 2005, AMD filed a lawsuit against Intel and a consumer class action against the Company soon followed.

6. Intel's Board of Directors (the "Board") has been aware that the defendants were causing Intel to engage in illegal practices since at least 2005. Instead of seeking to enforce Intel's

rights and seek to recover for the millions of dollars expended thus far for fines and litigation, the Board has chosen to do nothing but allow the Company to publicly deny the allegations.

7. Moreover, the wrongdoing reaches the highest levels within Intel. For instance, Intel's Chairman and former Chief Executive Officer ("CEO"), defendant Craig R. Barrett ("Barrett"), visited a customer in 2003 and threatened that there would be "severe consequences" unless that customer withdrew its public support of AMD. Further, in the consumer class action against the Company, it was revealed that e-mails from defendants Barrett and Paul S. Otellini ("Otellini"), Intel's current CEO, were deleted – a failure to follow Intel's document retention policy.

8. These charges and investigations have already cost Intel millions of dollars in litigation defense costs alone. Moreover, the KFTC fined Intel over $25 million after finding the Company abused its position of dominance. Further, actions, inadvertent or otherwise, that continue to obscure the truth, such as defendants Barrett's and Otellini's e-mail destruction, only add to the litigation expenses and the damage done to Intel's reputation.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, §10, because this case is a cause not given by statute to other trial courts, as this derivative action is brought pursuant to §800 of the California Corporations Code to remedy defendants' violations of law.

10. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this County, or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this Court because one or more of defendants either resides in or maintains executive offices in this County, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Intel occurred

in this County, and defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

**THE PARTIES**

12. Plaintiff Christine Del Gaizo was a beneficial shareholder of Intel common stock at the time of the conduct of which plaintiff complains.

13. Nominal defendant Intel is a Delaware corporation with its principal executive offices located at 2200 Mission College Boulevard, Santa Clara, California 95054-1549. Intel engages in making, marketing, and selling integrated circuits for computing and communications industries worldwide.

14. Defendant Otellini is Intel's CEO and has been since May 2005. Otellini is also Intel's President and has been since 2002. Otellini is an Intel director and has been since 2002. Otellini was Intel's Chief Operating Officer from 2002 to 2005. Because of Otellini's positions and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith, defendant Otellini knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices. During the Relevant Period, Intel paid Otellini the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $770,000 | - | $595,100 | $6,034,700 | $3,964,200 | - | $178,000 |
| 2006 | $700,000 | - | $352,000 | $6,699,000 | $1,772,700 | $46,000 | $236,700 |
| 2005 | $608,300 | - | - | $7,600,800 | $2,683,400 | $1,171,000 | $158,500 |
| 2004 | $450,000 | $1,000 | - | $6,521,400 | $1,358,700 | - | $106,400 |

| Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2003 | $350,000 | $867,600 | 900,000 | $8,219,400 | $77,200 |
| 2002 | $350,000 | $612,600 | 664,000 | - | $73,000 |
| 2001 | $300,000 | $561,000 | 357,586 | - | $125,400 |
| 2000 | $300,000 | $1,293,500 | 120,000 | - | $177,500 |

15. Defendant Andy D. Bryant ("Bryant") is Intel's Executive Vice President, Finance and Enterprise Services and Chief Administrative Officer and has been since October 2007. Bryant was Intel's Executive Vice President, Chief Financial Officer ("CFO") and Enterprise Services Officer from 2001 to October 2007; Senior Vice President, Chief Financial and Enterprise Services Officer from 1999 to 2001; Senior Vice President and CFO in 1999; and Vice President and CFO from 1994 to 1999. Because of Bryant's positions and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof, as well as reports and other information provided to him in connection therewith, defendant Bryant knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices. During the Relevant Period, Intel paid Bryant the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $455,000 | - | $357,700 | $3,124,500 | $1,673,400 | - | $114,000 |
| 2006 | $355,000 | - | $117,300 | $4,888,000 | $1,178,500 | $49,000 | $148,200 |
| 2005 | $330,000 | - | - | $4,963,700 | $1,765,000 | $1,235,000 | $100,300 |
| 2004 | $305,000 | $1,000 | - | $4,938,500 | $912,500 | - | $84,600 |

| Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2003 | $290,000 | $746,700 | 200,000 | $1,599,600 | $66,000 |
| 2002 | $280,000 | $532,300 | 1,332,852 | - | $59,900 |
| 2001 | $260,000 | $468,000 | 253,704 | - | $121,800 |
| 2000 | $260,000 | $1.309,400 | 90,000 | - | $166,100 |

16. Defendant Anand Chandrasekher ("Chandrasekher") is Intel's Senior Vice President and General Manager, Ultra Mobility Group and has been since July 2006. Chandrasekher was Intel's Senior Vice President and General Manager, Sales and Marketing group from November 2005 to July 2006; Vice President and Director, Sales and Marketing Group from January 2005 to November 2005; Vice President and General Manager, Mobile Platforms Group from 2001 to January 2005; Vice President and General Manager, Intel Architecture marketing Group from 2000

to 2001; and Vice President and General manager, Workstation Platforms Group from 1997 to 2000. Because of Chandrasekher positions and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith, defendant Chandrasekher knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

17. Defendant Eric B. Kim ("Kim") is Intel's Senior Vice President and General Manager, Digital Home Group and has been since July 2006. Previously, Kim was Intel's General Manager, Sales and Marketing Group and was Chief Marketing Officer. Kim joined Intel in November 2004. Because of Kim's positions and her access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to her in connection therewith, defendant Kim knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

18. Defendant Sean M. Maloney ("Maloney") is Intel's Executive Vice President and General Manager, Sales and Marketing Group and Chief Sales and Marketing Officer and has been since 2006. Maloney was Intel's Executive Vice President, General Manager of Mobility Group from 2005 to 2006 and Executive Vice President, General Manager of Intel Communications Group from 2001 to 2005. Maloney joined Intel in 1982. Because of Maloney's positions and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith, defendant Maloney knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices. Intel paid Maloney the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $390,000 | - | $429,000 | $3,207,200 | $1,493,900 | - | $98,300 |
| 2006 | $290,000 | - | $87,100 | $4,678,400 | $1,019,000 | $7,000 | $127,200 |
| 2005 | $270,000 | - | - | $4,823,400 | $1,530,700 | $210,000 | $79,600 |
| 2004 | $250,000 | $1,000 | - | $5,029,200 | $715,000 | - | $63,600 |

| Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2003 | $225,000 | $538,500 | 200,000 | $1,599,600 | $44,100 |
| 2002 | $225,000 | $325,100 | 1,333,707 | - | $46,500 |

19. Defendant D. Bruce Sewell ("Sewell") is Intel's Senior Vice President and General Counsel and has been since 2005. Sewell was Intel's Vice President, General Counsel in 2005 and Vice President of Legal and Government Affairs, Deputy General Counsel from 2001 to 2004. Sewell joined Intel in 1995. Because of Sewell's positions and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith, defendant Sewell knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

20. Defendant Stacy J. Smith ("Smith") is Intel's Vice President, CFO and has been since October 2007. Smith was Intel's Vice President, Assistant CFO from March 2006 to October 2007; Vice President, Finance and Enterprise Services and Chief Information Officer from May 2004 to 2006; and Vice President, Sales and Marketing Group and General Manager of Intel Europe, Middle East and Africa from 2002 to 2004. Smith joined Intel in 1988. Because of Smith's positions and her access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to her in connection therewith, defendant Smith knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices. Intel paid Smith the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2007 | $305,000 | $135,600 | $548,500 | $953,000 | - | $261,700 |
| 2006 | $235,000 | $22,300 | $485,100 | $430,200 | $11,000 | $57,000 |
| 2005 | $202,000 | - | $450,500 | $580,100 | $371,000 | $37,000 |

21. Defendant Barrett is Intel's Chairman of the Board and has been since May 2005. Barrett is also an Intel director and has been since 1992. Barrett was Intel's CEO from 1998 to May 2005; President from 1997 to 2002; Chief Operating Officer from 1993 to 1997; and an Executive Vice President from 1990 to 1997. Because of Barrett's positions and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith, defendant Barrett knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices. Intel paid Barrett the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2007 | $358,300 | - | $409,900 | $3,969,700 | $1,394,100 | $88,000 | $102,100 |
| 2006 | $463,000 | - | $47,700 | $6,410,200 | $1,110,400 | $36,000 | $222,200 |
| 2005 | $610,000 | - | - | $6,308,100 | $2,727,800 | $1,898,000 | $196,500 |
| 2004 | $610,000 | $1,000 | - | $8,004,200 | $1,842,700 | - | $170,700 |

| Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2003 | $610,000 | $1,512,100 | 1,350,000 | $12,499,300 | $134,800 |
| 2002 | $610,000 | $1,070,400 | 584,000 | - | $134,900 |
| 2001 | $575,000 | $1,075,300 | 484,696 | - | $264,800 |
| 2000 | $575,000 | $2,784,700 | 200,000 | - | $397,700 |

22. Defendant Charlene Barshefsky ("Barshefsky") is an Intel director and has been since January 2004. Barshefsky was a member of the Corporate Governance and Nominating Committee in 2007. Because of Barshefsky's positions and her access to internal corporate documents,

conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to her in connection therewith, defendant Barshefsky knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

23. Defendant Carol A. Bartz ("Bartz") is an Intel director and has been since January 2008. Because of Bartz's position and her access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to her in connection therewith, defendant Bartz knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

24. Defendant Susan L. Decker ("Decker") is an Intel director and has been since November 2006. Decker is a member of the Corporate Governance and Nominating Committee and has been since at least April 2008. Because of Decker's position and her access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to her in connection therewith, defendant Decker knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

25. Defendant Reed E. Hundt ("Hundt") is an Intel director and has been since April 2001. Hundt is a member of the Corporate Governance and Nominating Committee and has been since 2002. Because of Hundt's position and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith, defendant Hundt knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

26. Defendant James D. Plummer ("Plummer") is an Intel director and has been since July 2005. Because of Plummer's position and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in

connection therewith, defendant Plummer knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

27. Defendant David S. Pottruck ("Pottruck") is an Intel director and has been since December 1998. Because of Pottruck's position and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith, defendant Pottruck knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

28. Defendant Jane E. Shaw ("Shaw") is an Intel director and has been since January 1993. Shaw was a member of the Corporate Governance and Nominating Committee from 2000 to 2006. Because of Shaw's positions and her access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to her in connection therewith, defendant Shaw knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

29. Defendant John L. Thornton ("Thornton") is an Intel director and has been since July 2003. Thornton is a member of the Corporate Governance and Nominating Committee and has been since at least April 2007. Because of Thornton's position and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith, defendant Thornton knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

30. Defendant David B. Yoffie ("Yoffie") is an Intel director and has been since 1989. Yoffie is Lead Independent Director and has been since at least April 2000 and Chairman of the Corporate Governance and Nominating Committee and has been since 2007. Yoffie was Co-Chairman of the Corporate Governance and Nominating Committee from May 2004 to 2007 and Chairman of the Corporate Governance and Nominating Committee from 2000 to May 2004. Because of Yoffie's positions and his access to internal corporate documents, conversations and

connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith, defendant Yoffie knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

31. Defendant D. James Guzy ("Guzy") was an Intel director from 1969 to May 2008. Guzy was a member of the Corporate Governance and Nominating Committee from 2000 to 2004 and Co-Chairman of the Corporate Governance and Nominating Committee from May 2004 to 2006. Because of Guzy's positions and his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith, defendant Guzy knew, consciously disregarded or was reckless in not knowing that Intel engages in monopolistic practices.

32. The true names and capacities of defendants sued herein under California Code of Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who therefore sues these defendants by such fictitious names. Plaintiff will seek to amend this complaint and include these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously-named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the Company as a result of defendants' wrongful and illegal conduct.

33. The defendants identified in ¶¶14, 21-31 are referred to herein as the "Director Defendants." The defendants identified in ¶¶14-21 are referred to herein as the "Officer Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

34. By reason of their positions as officers, directors and/or fiduciaries of Intel and because of their ability to control the business and corporate affairs of Intel, the Individual Defendants owed Intel and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Intel in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance

of the best interests of Intel and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

35. Each director and officer of the Company owes to Intel and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

36. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Intel, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Intel, and was at all times acting within the course and scope of such agency.

38. To discharge their duties, the officers and directors of Intel were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Intel were required to, among other things:

(a) ensure that the Company acts only within the scope of the law in pursuing business arrangements;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Intel conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith. and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(d) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

39. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Intel, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Intel's Board during the Relevant Period.

40. The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in illegal conduct, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

41. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was engaging in illegal conduct; and (ii) enhance the Individual Defendants' executive and directorial positions at Intel and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

43. The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that Intel was engaging in illegal conduct.

44. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations.

45. The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to engage in monopolistic practices. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

46. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

47. Intel's primary business is creating microprocessors, the "chip" inside a computer which controls the computational functions of a computer. The chip is defined by its instruction set - the machine language instructions that a computer follows.

48. When the original personal computer ("PC") was created in the early 1980s, a variety of microprocessors were available, each with its own instruction set. The chips were created by a variety of companies, including Motorola, Intel and AMD.

49. International Business Machines Corp. ("IBM"), at that time the dominant maker of PCs on the market, decided to define a single instruction set for all chips. IBM choose the Intel chip, which utilized the x86 instruction set ("x86"). The x86 version of Microsoft Windows is the most

commonly used operating system today. A variety of applications and programs have been created that use only the x86 instruction set.

50. IBM, however, realized that having only a single source for the x86 microprocessor would be detrimental for business. Therefore, IBM demanded that Intel license its instruction set to another entity, AMD. AMD agreed to abandon its own microprocessor chip and manufacture x86 chips. In 1982, Intel and AMD executed the AMD-Intel Technology Exchange Agreement (the "Exchange Agreement"), which ensured that Intel would share with AMD key information about its x86 chips.

51. Despite the existence of the Exchange Agreement, Intel engaged in a plan to minimize AMD as a competitor. Defendants caused Intel to provide unusable or incomplete information to AMD, thus hindering AMD's ability to manufacture competitive chip sets.

52. In 1987, AMD petitioned to compel arbitration for Intel's breach of the Exchange Agreement. In 1992, an arbitrator awarded AMD more than $10 million plus prejudgment interest and a permanent, non-exclusive and royalty-free license to any Intel intellectual property embodied in AMD's own microprocessor, including the x86 instruction set. In deciding for AMD, the arbitrator stated, "In fact, it is no fantasy that Intel wanted to blunt AMD's effectiveness in the microprocessor marketplace, to effectively remove AMD as a competitor." The arbitrator further stated that Intel's conduct was "inexcusable and unworthy," the Company engaged in "corporate extortion" and employed "all of its economic force and power on a smaller competitor to have its way." Two years later, the California Supreme Court upheld the award.

**DEFNDANTS CAUSE INTEL TO ENGAGE IN ANTI-COMPETITIVE MONOPOLISTIC PRACTICES**

53. Intel dominates the microprocessor market. According to some reports, Intel has achieved more than a 90% market share as measured by revenue. Intel's closest competitor, AMD, has a market share of approximately 9%, as measured by revenue.

54. The defendants have engaged in a global operation to illegally prevent AMD from gaining access to a significant market anywhere in the world. As time has gone by, the evidence of defendants' illegal actions has become overwhelming.

55. Below is a non-exhaustive list of the defendants' illegal actions.

**A. Defendants' Monopolistic Practices Aimed at OEMs**

56. The majority of microprocessors are sold to original equipment manufacturers ("OEMs"). OEMs include such universally recognized brands as Hewlett-Packard ("HP"), Dell, Inc. ("Dell"), IBM, Hitachi Ltd. ("Hitachi"), Fujitsu Ltd. ("Fujitsu"), Toshiba Corp. ("Toshiba"), Acer, Inc. ("Acer"), which now owns Gateway, Inc. ("Gateway"), NEC Electronics Corporation ("NEC") and Sony Corp. ("Sony"). Dell and HP are the two dominant OEMs.

57. Defendants' monopolistic practices are targeted at these OEMs to ensure that the OEMs have exclusive or near-exclusive arrangements with Intel. Defendants' primary approach is to use a variety of "loyalty" awards to ensure exclusivity. Intel's anti-competitive exclusionary rebates are the Company's chief method of ensuring exclusivity, but the "loyalty" awards can also include discounts, promotional support and subsidies. The awards are based on OEMs achieving quarterly targets that are unilaterally set by the defendants. If the OEM achieves the target, it is entitled to a rebate of all the quarter's purchases of microprocessors, usually around 8-10% of the price paid. Intel provides the rebate in cash at the quarter's close. Since OEMs operate on thin operating margins, qualifying for a rebate can be the difference between reporting a profit or loss in a quarter. Defendants are able to develop these customer-by-customer targets due to the number of industry publications that accurately forecast and track anticipated sales and because OEMs' market shares remain relatively stable.

58. These rebates are significantly different than standard "volume discounts" that are usually offered by sellers. Volume discounts are nondiscriminatory and reflect cost efficiencies that accrue when dealing in larger quantities. Intel's system is based on its percentage of an OEM's purchases of microprocessors.

59. There are a number of variations on the rebate scheme. For instance, defendants have tied Intel's rebates for one European OEM to a specific microprocessor that AMD competes favorably against.

60. On the rare occasions where Intel's loyalty rewards are not enough, defendants freely use threats and intimidation to achieve the desired results.

1. **Discounts, Promotional Supports and Rebate Agreements**

61. Intel pays millions of dollars to OEMs in order to ensure exclusive or near-exclusive arrangements with Intel. Intel's dominance, however, was threatened, at least in Asia, in the later part of 2002 when AMD captured approximately 22% of the microprocessor market. This jump in market share was due to AMD's introduction of its Athlon microprocessor.

62. One of Intel's largest OEM targets was Sony. AMD supplied approximately 22% of Sony's microprocessor needs. In 2003, however, Intel entered into an agreement with Sony whereby it paid Sony million of dollars in the form of discounts and promotion support. By the end of 2003, AMD only supplied Sony with 8% of its microprocessors and by 2004 AMD was cut off from Sony completely.

63. NEC is another Japanese OEM that formerly purchased a substantial amount of its microprocessors from AMD. In May 2002, however, Intel agreed to pay NEC more than 300 million yen in exchange for capping the amount of purchases from AMD. The caps assured that Intel received at least 90% of NEC's Japanese business and a quota of NEC's AMD purchases worldwide. NEC's purchases from Intel fell from 40% of its needs worldwide to approximately 15%.

64. Intel also reached an exclusive agreement with Toshiba, which is another OEM that conducts business with the Company. In exchange for $25 to $30 million per quarter, Toshiba agreed not to use AMD microprocessors. Intel entered into a similar agreement with Hitachi. According to the JFTC, in 2002, AMD's shipments to Hitachi fell from 50,000 microprocessors per quarter to 0 microprocessors per quarter. In 2003, Intel agreed to provide Fujitsu an undisclosed financial incentive in order to limit its dealings with AMD. As a result, Fujitsu limited AMD to a single notebook product.

65. The defendants' actions, though, are not limited to markets overseas. In August 2000, AMD and IBM engaged in negotiations over a proposed commercial PC business relationship. As a deal was nearly finalized, Intel approached IBM with an incentive-based program that would make Intel the "preferred supplier" for IBM's commercial products. IBM accepted the offer and withdrew

from negotiations with AMD. According to one IBM executive, Intel paid IBM millions of dollars in market development funds.

66. IBM and AMD did partner in April 2003 on a 64-bit server chip called Opteron. IBM, however, consigned the Opteron computer market to a single target market segment. According to an industry report, Intel paid IBM to stop further Opteron development.

67. Further, when IBM created its "ThinkCentre" line of commercial desktops it entered into an exclusive arrangement with Intel. When AMD asked IBM to include its chips in the ThinkCenter line, AMD was rebuffed. IBM executives told AMD that using AMD products would cost them important subsidies that Intel provides.

68. In 2001, Gateway began to exclusively use Intel chips. In making the decision, Gateway's former CEO, Ted Waitt, explained to an AMD executive that Intel offered Gateway large sums of money not to deal with AMD. Further, according to reports, Intel bought Dell's exclusivity with payments and discriminatory pricings and services.

**2. Threats and Retaliation**

69. Prior to late 2000, Compaq Computer Corporation ("Compaq") did significant business with AMD. Because of this significant amount of business between Compaq and AMD, Intel withheld delivery of server chips that Compaq needed. Compaq's CEO, Michael Capellas, stated that he "had a gun" to his head and was forced to stop buying AMD processors.

70. In 2002, AMD attempted to make in-roads with HP's commercial desktop product line. HP demanded a $25 million quarterly fund to compensate it for Intel's expected retaliation. AMD and HP instead reached an agreement that AMD would provide HP's first million microprocessors for free. On the eve of the products' launch, however, HP told Intel of its plans. Intel informed HP that AMD's entry into HP's commercial line would be a "Richter 10" event. Intel pressured HP into withdrawing the AMD offering from its premier "Evo" brand and withholding the AMD-powered computer from HP's network of independent value added resellers. Intel even pressured HP's senior management to consider firing the HP executive who reached the agreement with AMD. Of the million microprocessors AMD offered to HP *for free*, HP took only 160,000.

71. In 2002, defendants threatened to discontinue providing NEC with the technological roadmap of future products if NEC did not convert its entire line of Value Star L computer to Intel microprocessors. Without that roadmap, NEC would be at a disadvantage to its competitors. NEC submitted to Intel's request and did not use AMD's products on its Value Star L series in 2002 and 2003.

72. NEC was acutely aware that the defendants did not make empty threats. According to the consolidated complaint in *In re Intel Corp. Microprocessor Antitrust Litigation*, Case No. 1:05-Md-01717 (D. Del.) when NEC's European subsidiary, NEC-CI, used AMD's products in its commercial desktop segments the defendants said they would "destroy" NEC-CI. The defendants told NEC-CI's retailers that NEC-CI's use of AMD microprocessors could impair its ability to supply them with products. When NEC-CI refused to cave to the defendants' pressure, the defendants imposed a discriminatory price increase.

73. In 2003, AMD was poised to launch a major new product, its Athlon64. Acer committed to support AMD's new product by making a senior executive available for a videotaped endorsement and to introduce two new computers to coincide with AMD promotional events. Learning of Acer's commitment, defendant Barrett, at that time Intel's CEO, visited Acer's Chairman, CEO and President in Taiwan to express his concern about these events. Defendant Barrett stated that Acer would suffer "severe consequences" if it publicly supported AMD's Athlon64. Defendant Barrett's visit coincided with an unexplained delay by Intel in providing $15-$20 million in market development funds owed to Acer. Acer subsequently withdrew its public support of the Athlon64 launch, banned the use of the senior executive's video and delayed the announcement of the new computers. Acer's President stated that the only thing unique about defendant Barrett's visit is that he went to Taiwan himself, since the threats were "usually done by lower ranking managers."

74. In 2004, Gateway merged with eMachines. AMD saw this as an opportunity to reopen its relationship with Gateway. Gateway, however, refused to use AMD in its direct internet sales, commercial offerings and server line, creating only one AMD-powered desktop at the request of Circuit City. According to reports, Gateway's executives stated that the defendants' threats beat them into "guacamole."

75. In the fourth quarter of 2004, HP's product with AMD microprocessors sold so well, that they capture nearly 60% of HP's U.S. retail sales for the quarter. As a result, Intel withheld HP's fourth quarter rebate check and refused to waive HP's failure to achieve its targeted rebate goal. HP was forced to make up the difference in succeeding quarters when it promised Intel at least 90% of HP's mainstream retail business.

**B. Defendants' Monopolistic Practices Aimed at Distributors**

76. Defendants use many of the same tactics used on OEMs' on distributors to restrict them from carrying non-Intel processors. Defendants offer marketing bonuses, increased rebates, credit programs for new customers, payment of freight charges and special inventory assistance if a distributor agrees to deal with Intel exclusively. Defendants have gone so far as to bribe distributors to not do business with AMD. According to reports, when a high-ranking Tech Data executive turned down $1 million to stop doing business with AMD, a defendant asked, "How much would it take?"

77. Defendants' monopolistic practices concerning distributors are legion. Defendants have caused Intel to enter into an exclusive arrangement with Synnex Corp., one of the largest distributors to OEMs in the United States. In December 2004, Ingram Micro, Intel's biggest distributor in China, cut off talks to distribute AMD chips. A high ranking Ingram Micro official stated that Intel's loyalty rebates were too lucrative to pass up.

78. Companies that resist the defendants' monopolistic practices are often dealt with harshly by Intel. When ASI, one of the largest computer hardware and software distributors in the United States, accepted master distributor status in January 2005, the defendants began reducing the market development funds Intel provided ASI. When Supercom, another distributor, began providing AMD's products in Canada, Intel pressured Supercom's customers to switch to another distributor.

**C. Defendants' Monopolistic Practices Aimed at Retailers**

79. Approximately one fifth of desktop and notebook computers are purchased at retail stores. In the United States, Best Buy and Circuit City are the two largest retailers.

80. Major retailers demand market development funds ("MDF") in exchange for shelf space, usually consisting of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars - *e.g.*, space in a Sunday circular, an in-store display or an internet training opportunity with the chain's sales staff. The MDF required to secure shelf space can run as high as $25 per box depending on the computer price point and how urgently the competing chipmakers want the shelf space.

81. The defendants use Intel's significant market advantage to suppress competition. For example, until recently Office Depot declined to stock AMD-powered notebooks regardless of the amount of MDF AMD offered, citing its "premier" status with Intel that would be put at risk. When Intel learned that Fry's was very successfully marketing Fujitsu's Athlon XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

82. The defendants use these same methods around the world. Europe's largest computer retailer, Media Markt, which accounts for 35% of Germany's retail sales, will only stock Intel products. This is because the defendants cause Intel to provide Media Markt between $15-$20 million of MDF annually. Intel subsidies also foreclose AMD from Aldi, a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market.

83. In the United Kingdom, the defendants have caused Intel to provide substantially all of the business of Dixon Services Group ("DSG"), operator of three major chains (including Dixon and PC World) that collectively account for two thirds of the U.K. PC market. In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10%. Like Media Markt, DSG reports that Intel penalizes it with reduced MDF because of the business it does with AMD. Toys 'R' Us in the U.K. is also exclusive to Intel. Time, another U.K. retailer took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models. In France, Intel has brought pressure on the largest retailers (including Conforama, Boulanger) causing them to cease dealing with AMD or to drastically reduce their AMD business.

84. The defendants have also caused Intel to institute a rebate program similar to what it employed with OEMs, resulting in similar exclusivity. Under this program, Intel only provides full MDF payments to retailers if AMD platforms do not account for more than 20% of the revenues of the retailer. If AMD's share of revenues exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% ***across all products***.

**DEFENDANTS' MISCONDUCT RESULTED IN SIGNIFICANT LITIGATION AND FINES AGAINST INTEL**

85. Defendants' unlawful conduct has already caused and will continue to cause substantial harm to Intel and its shareholders. The Company has already paid over $10 million in damages to AMD stemming from its alleged breach of the Intel/AMD Exchange Agreement and faces potential liability from several ongoing regulatory investigations, scores of private lawsuits in the United States and Japan, and a private lawsuit brought by AMD in the United States District Court for the District of Delaware, which is scheduled for trial in 2009. Further, on June 6, 2008, the KFTC fined Intel over $25 million for "abuse of dominance."

86. On March 8, 2005, the JFTC issued a recommendation (the "Recommendation") to Japan-based Intel Kabushiki Kaisha ("IJKK"), stating, in part, the following:

> The Fact-Findings in the Recommendation
>
> IJKK, since May 2002, has made the five major Japanese OEMs[1] refrain from adopting competitors' CPUs[2] for all or most of the PCs manufactured and sold by them or all of the PCs that belong to specific groups of PCs referred to as 'series', by making commitments to provide the five OEMs with rebates and/or certain funds referred to as 'MDF' (Market Development Fund) in order to maximize their MSS (MSS is the ratio of the CPUs manufactured and sold by Intel ('Intel's CPUs') in the volume of CPUs to be incorporated into the PCs which are manufactured and sold by an OEM), respectively, on condition that
>
> (a) the Japanese OEMs make MSS at 100% and refrain from adopting competitors' CPUs.

---

[1] Japanese manufacturers of PCs with head offices located in Japan.

[2] x86 series central processing units.

(b) the Japanese OEMs make MSS at 90%, and put the ratio of competitors' CPUs in the volume of CPUs to be incorporated into the PCs manufactured and sold by them down to 10%; or

(c) the Japanese OEMs refrain from adopting competitors' CPUs to be incorporated into PCs in more than one series with comparatively large amounts of production volume to others.

Based on the facts mentioned above, the ratio of the sales volume by AMD Japan and Transmeta USA among Total Domestic CPU Sales Volume decreased from approximately 24% in 2002 to approximately 11 % in 2003.

By means of such conducts, IJKK has substantially restrained the competition in the market of CPUs sold to the Japanese OEMs, by acting to exclude its competitors' business activities related to the sales of CPUs to the five OEMs.

Summary of Measures Recommended

(1) IJKK, when selling Intel's CPUs to the Japanese OEMs, shall terminate such conducts which have been engaged by IJKK since May 2002 as with respect to the CPUs incorporated into the PCs manufactured and sold by the Japanese OEMs, by making commitments to provide the Japanese OEMs with the rebates and/or funds on condition that, as mentioned above, the Japanese OEMs refrain from adopting competitors' CPUs to be incorporated into all or most of the PCs which are manufactured and sold by them.

(2) IJKK shall notify the following matters to all the Japanese OEMs with which IJKK deals, and shall also make them known to its employees thoroughly.

a) Measures taken by IJKK based on (1) above

b) IJKK, when providing the Japanese OEMs with such rebates and/or funds, has no intention to set condition which lead to exclude competitors' CPUs out of the PCs which are manufactured and sold by the Japanese OEMs

c) IJKK has already terminated the conduct to make a Japanese OEM not adopt competitors' CPUs in more than one groups of PCs, each of which has comparatively large amount of production volume to others, thereby making all the PCs in those groups of PCs at that OEM incorporate Intel's CPUs, by making a commitment to provide it with the rebates and/or funds on condition that the Japanese OEM change to Intel's CPUs competitors' CPUs previously incorporated into the PCs in those groups of PCs, and that it keep using Intel's CPUs in all the PCs in those groups of PCs.

(3) IJKK, from now on, shall not exclude the business activities of the competitors for the sales of CPUs by employing following conducts:

a) The conduct to restrict the ratio in the volume of competitors' CPUs to be incorporated into the PCs manufactured and sold by a Japanese OEM at 10 percent or less, by making a commitment to provide the Japanese OEM with the rebates and/or funds on condition that it make MSS at 90% or more and maintain MSS at such level

b) The conduct to, without justification, make a Japanese OEM not adopt competitors' CPUs to be incorporated into PCs in more than one groups of PCs, each

> of which has comparatively large amount of production volume to others, thereby making all the PCs in those groups of PCs at that OEM incorporate Intel's CPUs, by making a commitment to provide the Japanese OEM with the rebates and/or funds on condition that it change to Intel's CPUs competitors' CPUs previously incorporated into the PCs in those groups of PCs, and that it keep using Intel's CPUs in all the PCs in those groups of PCs.
>
> (4) IJKK shall take measures to operate (i) Antimonopoly training for officers of sales department and their staffs [sic] engaged in promoting and selling CPUs, and (ii) periodical audits by legal section, thereby ensuring the conduct mentioned above in (3) shall not be caused hereafter.

87. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to, among other companies, Sony, NEC, Toshiba, Fujitsu and Hitachi. The Japanese authorities demanded that Intel remove all exclusivity arrangements in its contracts.

88. On July 12, 2005, European antitrust investigators from the European Commission and officials from at least four European countries raided Intel's European offices.

89. On February 10, 2006, the KFTC conducted surprise raids of Intel's offices in Korea. It was then that the world learned for the first time that the KFTC had begun an investigation into Intel's practices back in June 2005. Korean officials removed documents and hard drives as part of their evidence collection. Intel's spokesman Chuck Mulloy was quoted as saying all Intel's business practices were "both fair and lawful."

90. On July 27, 2007, the European Commission issued a press release entitled "Competition: Commission Confirms Sending of Statement of Objections to Intel." The press release stated, in relevant part:

> The European Commission can confirm that it has sent a Statement of Objections (SO) to Intel on 26th July 2007. The SO outlines the Commission's preliminary view that Intel has infringed the EC Treaty rules on abuse of a dominant position (Article 82) with the aim of excluding its main rival, AMD, from the x86 Computer Processing Unites (CPU) market.
>
> In the SO, the Commission outlines its preliminary conclusion that Intel has engaged in three types of abuse of a dominant market position. First, Intel has provided substantial rebates to various Original Equipment Manufacturers (OEMs) conditional on them obtaining all or the great majority of their CPU requirements from Intel. Secondly, in a number of instances, Intel made payments in order to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based CPU. Thirdly, in the context of bids against AMD-based products for strategic customers in the server segment of the market, Intel has offered CPU s on average below cost.

> These three types of conduct are aimed at excluding AMD, Intel's main rival, from the market. Each of them is provisionally considered to constitute an abuse of a dominant position in its own right. However, the Commission also considers at this stage of its analysis that the three types of conduct reinforce each other and are part of a single overall anti-competitive strategy.

91. In response to the European Commission's press release, Sewell denied the allegations and stated that Intel did not break any European laws.

92. In September 2007, after a two year probe, South Korea officially charged Intel with violating that country's antitrust laws. In response, the Company's spokesman, Chuck Mulloy, stated he hoped to assure South Korea that "the microprocessor market is functioning normally and that this is an extremely competitive market and that our conduct has been pro-competition and beneficial to consumers."

93. In addition, on January 11, 2008, *The Wall Street Journal* reported that New York State Attorney General Andrew Cuomo served on Intel "a wide ranging subpoena ... to determine whether the Company coerced" customers to refrain from buying AMD chips.

94. *The Wall Street Journal*, article further stated that, "[t]hree other government bodies have sided against Intel after studying the situation. The European Commission issued a 'statement of objections' against the company in July, a preliminary ruling that can lead to fines or other penalties .... In September, authorities in Korea accused Intel of violating the country's antitrust laws. Japan's Fair Trade Commission regulator issued a cease-and-desist order against Intel in March 2005 over tactics that included using rebates and marketing funds to induce Japanese computer makers to buy microprocessors from Intel."

95. On February 12, 2008, *Bloomberg.com* reported that the European Union regulators, in furtherance of their antitrust probe, raided Intel's offices in Munich and computer retailers in the United Kingdom and Germany. Specifically, the officials inspected the offices of Media Markt, DSG International Plc in the United Kingdom and France's PPR SA. The raids targeted "Intel's possible links with computer retailers." The regulators stated that "it has reason to believe that the companies may have violated EU rules on restrictive business practices, abuse of a dominant market position, or both." Commenting on the investigation, a PPR SA representative stated that the company and its companies are concerned about this probe because "it markets products by Intel."

96. On February 13, 2008, commenting on the European regulators' raids of Intel's German offices, *The Wall Street Journal* reported that "[i]t is 'unusual' for the commission to raid companies halfway into its antitrust investigation, one Brussels-based lawyer said. It could mean that the companies have not been straight with the information they have supplied to the commission, or that some new infringement has come to light, he said."

97. Further, recent reports have stated that defendants have failed to ensure that Intel act in good faith and adhere to court orders in the litigation it is involved in due to the monopolistic practices. In March 2007, Intel was forced to admit that it had lost over 21 months of potentially relevant correspondence as a result of "e-mail retention lapses." This included e-mails from some of Intel's highest ranking employees, including defendants Barrett and Otellini, Intel's Chairman and CEO, respectively.

98. On May 30, 3008, Intel disclosed for the first time that it failed to hand over the contents of more than 900 computer folders from backup files in its lawsuit with AMD. Intel's disclosure happened only hours after the Company negotiated a case management order implying compliance with document production cutoff dates. As a result, on June 5, 2008, U.S. District Court Judge for the District of Delaware Joseph J. Farnan ordered Intel to turn over notes from interviews its lawyers conducted with employees in order to identify problems with the Company's evidence-preservation system.

99. On June 6, 2008, the Company revealed that the KFTC fined Intel more than $25 million. Also, on that date the Company announced that the FTC issued Intel a subpoena concerning the Company's business practices related to competitiveness in the microprocessor market. Intel stated that the FTC began its informal investigation in 2006.

**DAMAGES TO INTEL CAUSED BY THE INDIVIDUAL DEFENDANTS**

100. As a result of the Individual Defendants' improprieties, Intel engaged in illegal monopolistic activities. As a direct and proximate result of the Individual Defendants' actions, Intel has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from fines levied against Intel by various governments for breaking their anti-trust laws;

(b) costs incurred in defending Intel and its executives in the consumer class action lawsuit, the AMD lawsuit, and any regulatory or governmental lawsuit filed in connection with the Company's illegal activity; and

(c) compensation and benefits paid to the Individual Defendants who have breached their duties to Intel.

101. Moreover, these actions have irreparably damaged Intel's corporate image and goodwill. For at least the foreseeable future, Intel will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Intel's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

102. Plaintiff brings this action derivatively in the right and for the benefit of Intel to redress injuries suffered, and to be suffered, by Intel as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Intel is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

103. Plaintiff will adequately and fairly represent the interests of Intel in enforcing and prosecuting its rights.

104. Plaintiff is and was an owner of the stock of Intel during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

105. The current Board of Intel consists of the following eleven individuals: defendants Barrett, Otellini, Barshefsky, Bartz, Decker, Hundt, Plummer, Pottruck, Shaw, Thornton and Yoffie.

106. Defendants Barrett, Otellini, Barshefsky, Hundt, Pottruck, Shaw, Thornton, Plummer and Yoffie have all been directors since at least 2005. During that time numerous red flags should have alerted these directors that Intel is engaging or did engage in illegal monopolistic business

practices. These red flags include: (i) the filing in 2005 of AMD's anti-trust complaint against Intel; (ii) the investigation by the KFTC into Intel's business practices, which began in 2005; and (iii) the findings against the Company by the JFTC. In 2006, defendant Decker joined the Board. Red flags that should have alerted the directors to the monopolistic business practices occurring or that did occur at Intel continued. These red flags included (i) the raids that occurred in 2006 on Intel's offices in Korea; (ii) the raids that occurred on Intel's offices in Europe also in 2006; (iii) the filing of a consumer class action complaint against Intel in 2006; and (iv) the findings against Intel by the European Commission in 2007. In 2008, defendant Bartz joined the Board. Evidence of Intel's illegal monopolistic practices has continued even since then, including, (i) the findings against the Company by the KFTC and the subsequent $25 million fine; (ii) the subpoena and investigations into Intel's business practices by the FTC; and (iii) the New York Attorney General's investigation into Intel's business practices. All the events listed were high profile matters that received extensive news coverage in reputable and widely read publications such as *The Wall Street Journal*. Despite this overwhelming amount of evidence, the Board has allowed Intel's spokesman on multiple occasions to assert that Intel did not violate any laws and the microprocessor market is working efficiently and fairly. The Board has not engaged in a sufficient investigation to discover all persons responsible for the illegal monopolistic business practices, and has not brought an action or sought to recover for the harm done to the Company, in violation of their fiduciary duties. Instead, the Board has perilously allowed the harm done to go unpunished and risk being forever time-barred from bringing any action. This conscious disregard for their fiduciary duties cannot be an action done in good faith and in the best interests of the Company and its shareholders. Thus, the entire Board has breached its fiduciary duties, therefore there is a reasonable doubt that the Board faces a substantial likelihood of liability, making a demand upon it futile.

107. Further, the Board has overseen Intel's contentious litigation thus far, and has made no effort to ensure that the Company acts in good faith in the litigation. In fact, in March 2007, it was disclosed that certain evidence has been lost or destroyed in those matters, including 21 months of potentially relevant correspondence, including e-mails by directors Barrett and Otellini, due to their failure to comply with the Company's document retention policy. A year later, Intel disclosed

that it failed to produce to AMD the contents of over 900 computer folders from backup files as required only hours after Intel negotiated a case management order implying compliance with production cutoff dates. This conscious disregard for their fiduciary duties cannot be an action done in good faith and in the best interests of the Company and its shareholders. The entire Board has thus breached its fiduciary duties and therefore there is a reasonable doubt that it faces a substantial likelihood of liability. Thus, demand up the entire Board is futile.

108. According to Intel's Board Guidelines for Significant Corporate Governance Issues, the entire Board is tasked with "[o]verseeing the conduct of the company's business to evaluate whether the business is being properly managed" and "[o]verseeing the processes for maintaining the integrity of the company with regards to its financial statements and other public disclosures, and compliance with law and ethics." Further, Intel's code of conduct states that "Intel follows the letter and spirit of the law," and prohibits putting "inappropriate conditions on purchases or sales." Defendants Barrett, Otellini, Hundt, Pottruck, Shaw, Thornton and Yoffie were all on the Board when the principal monopolistic business practices were occurring. Thus, by knowingly or recklessly causing or allowing the Company to engage in illegal activity, Barrett, Otellini, Hundt, Pottruck, Shaw, Thornton and Yoffie breached their fiduciary duties and therefore, there is a reasonable doubt that they face a substantial likelihood of liability. Thus any demand upon Barrett, Otellini, Hundt, Pottruck, Shaw, Thornton and Yoffie is futile.

109. Defendants Decker, Hundt, Thornton, Yoffie, Barshefsky and Shaw were members of the Company's Corporate Governance and Nominating Committee. According to the Corporate Governance and Nominating Committee's charter, defendants Decker, Hundt, Thornton, Yoffie, Barshefsky and Shaw are charged with "review[ing] and report[ing] to the Board on a periodic basis with regards to matters of corporate governance (which is defined for this purpose as the relationships of the Board, the stockholders and management in determining the direction and performance of the company)." Thus, defendants Decker, Hundt, Thornton, Yoffie, Barshefsky and Shaw had an even higher duty to investigate and ensure that the Company was not engaged in illegal activities. Defendants Decker, Hundt, Thornton, Yoffie, Barshefsky and Shaw consciously or recklessly failed to do their duties as set forth in the Corporate Governance and Nominating

Committee's charter. Thus, there is a reasonable doubt that defendants Decker, Hundt, Thornton, Yoffie, Barshefsky and Shaw face a substantial likelihood of liability. Therefore, demand upon Decker, Hundt, Thornton, Yoffie, Barshefsky and Shaw is futile.

110. The principal professional occupation of defendants Barrett and Otellini is their employment with Intel, pursuant to which they received and continue to receive substantial monetary compensation and other benefits. Specifically, Intel paid Barrett and Otellini the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|---|
| Otellini | 2007 | $770,000 | - | $595,100 | $6,034,700 | $3,964,200 | - | $178,000 |
| | 2006 | $700,000 | - | $352,000 | $6,699,000 | $1,772,700 | $46,000 | $236,700 |
| | 2005 | $608,300 | - | - | $7,600,800 | $2,683,400 | $1,171,000 | $158,500 |
| | 2004 | $450,000 | $1,000 | - | $6,521,400 | $1,358,700 | - | $106,400 |

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|---|
| Otellini | 2003 | $350,000 | $867,600 | 900,000 | $8,219,400 | $77,200 |
| | 2002 | $350,000 | $612,600 | 664,000 | - | $73,000 |
| | 2001 | $300,000 | $561,000 | 357,586 | - | $125,400 |
| | 2000 | $300,000 | $1,293,500 | 120,000 | - | $177,500 |

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|---|
| Barrett | 2007 | $358,300 | - | $409,900 | $3,969,700 | $1,394,100 | $88,000 | $102,100 |
| | 2006 | $463,000 | - | $47,700 | $6,410,200 | $1,110,400 | $36,000 | $222,200 |
| | 2005 | $610,000 | - | - | $6,308,100 | $2,727,800 | $1,898,000 | $196,500 |
| | 2004 | $610,000 | $1,000 | - | $8,004,200 | $1,842,700 | - | $170,700 |

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options (number) | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|---|
| Barrett | 2003 | $610,000 | $1,512,100 | 1,350,000 | $12,499,300 | $134,800 |
| | 2002 | $610,000 | $1,070,400 | 584,000 | - | $134,900 |
| | 2001 | $575,000 | $1,075,300 | 484,696 | - | $264,800 |
| | 2000 | $575,000 | $2,784,700 | 200,000 | - | $397,700 |

The Compensation Committee has the authority to review and approve Barrett and Otellini's base salary, bonus and equity compensation. Accordingly, Otellini and Barrett lack independence from defendants Hundt, Pottruck, Thornton and Yoffie who are not disinterested and/or independent and who exert influence over Barrett and Otellini's compensation by virtue of their positions as members of the Compensation Committee. This lack of independence renders defendant Barrett and Otellini incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, there is a reasonable doubt that defendant Barrett faces a substantial likelihood of liability due to personally flying to Taiwan to threaten Acer not to support AMD's product launch. There is also reasonable doubt that defendants Barrett and Otellini face a substantial likelihood of liability for failing to comply with the Company's document retention policies concerning their e-mails and thus failing to ensure that the Company participated in good faith in the antitrust litigation. This destruction of e-mail correspondence also prevents their production in any investigation by any government or regulatory agency into Intel's business practices, increasing the likelihood that Intel will face stiff penalties as a result of these investigations. Accordingly, demand is futile as to defendants Otellini and Barrett because of their lack of independence and their personal interest in the litigation.

111. Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

112. The Director Defendants of Intel, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Intel's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

113. The acts complained of constitute violations of fiduciary duties owed by Intel's officers and directors and these acts are incapable of ratification.

114. Each of the Director Defendants of Intel authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various

improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

115. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek recovery for Intel for any of the wrongdoing alleged by plaintiff herein.

116. A true and correct copy of the complaint was delivered to Intel prior to being filed with this Court.

**FIRST CAUSE OF ACTION**

**Against All Individual Defendants for Breach of Fiduciary Duty**

117. Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

118. The Individual Defendants owed and owe Intel fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Intel the highest obligation of good faith, fair dealing, loyalty and due care.

119. Each of the Individual Defendants had actual or constructive knowledge that the Company was engaged in illegal monopolistic business practices. At a minimum, to discharge their duties, each Individual Defendant should have exercised reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of Intel, including:

(a) remaining informed as to how Intel was operating and, upon receiving notice or information of an imprudent, questionable, or unlawful decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts necessary to correct the illegal actions and harm done to the Company, including initiating a legal action against those responsible;

(b) ensuring that the affairs of Intel were and are conducted in a lawful manner and in compliance with government rules and regulations; and

(c) ensuring that the Company acted in good faith in litigation and investigations concerning Intel's business practices.

120. Failure to perform these actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests

121. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Intel has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

122. Plaintiff, on behalf of Intel, has no adequate remedy at law.

**SECOND CAUSE OF ACTION**

**Against All Individual Defendants for Waste of Corporate Assets**

123. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by causing Intel to pay OEMs, distributors and retailers hundreds of millions of dollars in furtherance of their illegal plan.

125. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

126. Plaintiff, on behalf of Intel, has no adequate remedy at law.

**THIRD CAUSE OF ACTION**

**Against All Individual Defendants for Unjust Enrichment**

127. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Intel by receiving salaries, bonuses and raises, based on sales and revenues achieved only through using illegal business practices.

129. Plaintiff, as a shareholder and representative of Intel, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B. Directing Intel to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Intel and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1 a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Intel to nominate at least three candidates for election to the Board;

3. a proposal to ensure the accuracy of the qualifications of Intel's directors, executives and other employees; and

4. appropriately test and then strengthen the internal corporate governance and control functions;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Intel has an effective remedy;

D. Awarding to Intel restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: June 26, 2008

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
KEVIN A. SEELY
MARK A. GOLOVACH

MARC M. UMEDA

610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

349025_14.DOC