**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------x

**IN RE INTEL CORP. DERIVATIVE
LITIGATION**

-------------------------------------------------x

**C.A. No. 1:09-cv-867-JJF**

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR FINAL APPROVAL OF SETTLEMENT**

Dated:  July 15, 2010

**BIGGS & BATTAGLIA**

Robert D. Goldberg (ID #631)
921 North Orange Street
Wilmington, Delaware 19899
(302) 655-9677
goldberg@battlaw.com

**Attorneys for Plaintiff Charles Gilman
and Louisiana Municipal Police
Employees' Retirement System**

- AND -

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
60 East 42nd Street—Suite 4600
New York, NY 10165
212-685-0969

**BERMAN DEVALERIO**
Jeffrey C. Block
Bryan A. Wood
Scott A. Mays
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

**Co-Lead Counsel for Plaintiff Charles
Gilman and Louisiana Municipal Police
Employees' Retirement System**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

I.    INTRODUCTION ...................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND.................................4

      A.   Initial Demand is Made to Intel's Board.................................4

      B.   MPERS Makes a Demand on Intel's Board ............................6

      C.   Litigation Ensues ....................................................................7

      D.   The Parties Reach Agreement on Settlement Terms ............8

      E.   The Parties Engage in Confirmatory Discovery .................11

III.  SUMMARY OF PROPOSED RELIEF........................................14

      A.   An Empowered Board Level Compliance Committee
           Will Review the Company's Antitrust Compliance
           Function, Monitor Compliance with Attendant Policies,
           Programs, and Procedures and Work Closely with the
           Global Director of Legal Compliance................................15

      B.   Empowered of the GDLC and Intel's Legal Compliance Group
           in Developing and Enforcing the Company's Antitrust
           Compliance Programs, Policies, and Procedures................16

      C.   Adoption of Additional Antitrust Compliance Programs,
           Policies, and Procedures and Accompanying Enhancement
           of Intel's Existing Antitrust Compliance Function.............19

      D.   Intel's Creation of Senior Management Positions to Assist the
           Compliance Committee in Monitoring the Company's Governance,
           Compliance, and Risk Management Policies and Procedures ..........................21

      E.   Antitrust Compliance Policies Specifically Related to Contracting..................22

      F.   Adoption of Enhanced Compliance Training Programs to
           Strengthen Its Employees' Understanding of Their Legal
           and Ethical Obligations.......................................................23

G.   Intel Agreed to Maintain and Fully Fund the Corporate Governance
     Terms for a Period of Three Years Subsequent to the Approval
     of the Settlement ................................................................................................24

IV.   PRELIMINARY APPROVAL AND NOTICE OF SETTLEMENT ..........................25

V.   THE STANDARDS FOR JUDICIAL APPROVAL ..................................................26

A.   This Arm's Length Settlement is Entitled to a
     Presumption of Fairness .....................................................................................26

B.   The Settlement is Fair, Reasonable, and Adequate,
     and is in the Best Interest of Intel's Shareholders..............................................27

C.   The Risks of Establishing Liability and Damages ..............................................29

     1.   The Risks of Establishing Liability are Very
          Substantial................................................................................................29

     2.   The Risks of Not Establishing Damages are
          Substantial................................................................................................34

D.   The Result is Reasonable Given the Risk of Not Establishing
     Liability and Damages in Light of the Best Possible Recovery ..........................34

E.   The Settlement is Wholly Reasonable in Light of the
     Complexity, Expense, and Likely Duration of
     Continued Litigation ...........................................................................................36

F.   Reaction of Intel Shareholders to the Proposed Settlement.................................37

G.   The Stage of the Proceedings and Discovery ......................................................39

H.   The Experience of Views of Counsel Favor Approval........................................41

VI.   CONCLUSION..........................................................................................................43

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Board of Sch. Dirs.*,
  616 F.2d 305 (7th Cir. 1980) ............................................................ 27

*Bell Atl. Corp. v. Bolger*,
  2 F.3d 1304 (3d Cir. 1993).................................................. 26, 29, 38

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)............................................................ 34

*Bryan v. Pittsburgh Plate Glass Co.*,
  494 F.2d 799 (3d Cir. 1974)............................................................ 27

*Canadian Commercial Workers Indus. Pension Plan v. Alden*,
  No. 1184-N,
  2006 Del. Ch. LEXIS 42 (Del. Ch. Feb. 22, 2006)............................ 31

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)..................................................... *passim*

*Cohn v. Nelson*,
  375 F. Supp. 2d 844 (E.D. Mo. 2005)............................................... 26

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977)........................................................................... 32

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001).......................................................... 29, 40

*David B. Shaev Profit Sharing Account v. Armstrong*,
  No. 1449-N,
  2006 Del. Ch. LEXIS 33 (Del. Ch. Feb. 13, 2006)............................ 33

*Desimone v. Barrows*,
  924 A.2d 908 (Del. Ch. 2007)......................................................... 33

Felzen v. Andreas,
  134 F.3d 873 (7th Cir. 1998) .......................................................... 27

*First State Orthopaedics v. Concentra, Inc.*,
  534 F. Supp. 2d 500 (E.D. Pa. 2007) ......................................... 35, 36

*Fisher Bros. v. Phelps Dodge Indus., Inc.*,
    604 F.Supp. 446 (E.D. Pa. 1985) ........................................................ 42

*Fricke v. Daylin, Inc.*,
    66 F.R.D. 90 (E.D.N.Y. 1975) ........................................................... 28

*Gagliardi v. TriFoods Int'l*,
    683 A.2d 1049 (Del. Ch. 1996) ......................................................... 31

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975) ...................................................... *passim*

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000) ............................................................ 27-28

*Grant v. Bethlehem Steel Corp.*,
    823 F.2d 20 (2d Cir. 1987) ............................................................ 33-34

*Grimes v. Donald*,
    673 A.2d 1207 (Del. 1996) ............................................................... 30

*Hanrahan v. Britt*,
    174 F.R.D. 356 (E.D. Pa. 1997) ........................................................ 27

*In re AOL Time Warner S'holder Derivative Litig.*,
    No. 02-6302,
    2006 WL 2572114  (S.D.N.Y. Sept. 6, 2006) ......................... 26, 35, 39

*In re Caremark Int'l Inc. Derivative Litig.*,
    698 A.2d 959 (Del.  Ch. 1996) .......................................................... 31

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001) ...................................................... 27, 30, 38

*In re Chicken Antitrust Litig.*,
    560 F. Supp. 957 (N.D. Ga. 1980) .................................................... 41

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ............................................................... 26

*In re IKON Office Solutions Sec. Litig.*,
    209 F.R.D. 94 (E.D. Pa. 2002) ......................................................... 36

*In re Intel Corp. Derivative Litig.*,
    621 F. Supp. 2d 165 (D. Del. 2009) ................................................. 33

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ................................................................. 40

*In re National Gen. Student Mktg. Litig.*,
   68 F.R.D. 151 (D.D.C. 1974) ................................................................ 41

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) .......................................................... 41

*In re Ravisent Techs., Inc. Sec. Litig.*,
   No. 00-CV-1014,
   2005 WL 906361 (E.D. Pa. Apr. 18, 2005) .......................................... 29

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
   No. 01-1412,
   2008 U.S. Dist. LEXIS 2569  (D.N.J. Jan. 14, 2008) ........................... 35

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004) .................................................................. 26

*Jones v. Amalgamated Warbasse Houses, Inc.*,
   97 F.R.D. 355 (E.D.N.Y. 1982) ............................................................ 40

*King v. Baldino*,
   648 F. Supp.2d 609  (D. Del. 2009) ...................................................... 33

*Levin v. Mississippi River Corp.*,
   59 F.R.D. 353 (S.D.N.Y. 1973) ............................................................ 28

*Lewis v. Anderson*,
   81 F.R.D. 436 (S.D.N.Y. 1978) ............................................................ 28

*Lyons v. Marrud, Inc.*,
   No. 66 Civ. 415,
   1972 WL 327 (S.D.N.Y. June 6, 1972) ................................................. 41

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) ................................................................ 26

*Marcus v. Putnam*,
   60 F.R.D. 441 (D. Mass. 1973) ............................................................ 28

*Mathes v. Roberts*,
   85 F.R.D. 710 (S.D.N.Y. 1980) ............................................................ 28

*MCI Commc'ns Corp. v. American Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) .............................................. 34

*Miller v. American Tel. & Tel. Co.*,
    507 F.2d 759 (3d Cir. 1974) ................................................ 31

*Milstein v. Werner*,
    57 F.R.D. 515 (S.D.N.Y. 1972) ........................................... 35

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) ............................................... 35

*Reed v. General Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983) .............................................. 41

*Republic Nat'l Life Ins. Co. v. Beasley*,
    73 F.R.D. 658 (S.D.N.Y. 1977) ........................................... 34

*Shlensky v. Dorsey*,
    574 F.2d 131 (3d Cir. 1978) .......................................... 27, 27

*State of New York v. Intel Corp.*,
    Civil Action No. 09-827 (JJF) ............................................. 8

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) ................................................. 33

*TBK Partners, Ltd. v. Western Union Corp.*,
    675 F.2d 456 (2d Cir. 1982) ............................................... 37

*Unite Nat. Ret. Fund v. Watts*,
    No. 04-CV-3603,
    2005 WL 2877899 (D.N.J. Oct. 28, 2005) ...................... 27, 29, 39

*West Virginia v. Chas. Pfizer & Co.*,
    314 F. Supp. 710 (S.D.N.Y. 1970) ...................................... 37

*White v. Panic*,
    783 A.2d 543 (Del. 2001) ................................................. 34

*Williams v. First Nat'l Bank*,
    216 U.S. 582 (1910) ........................................................ 26

**Other Authorities**

Federal Rules of Civil Procedure,
    Rule 23.1 ................................................................... *passim*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------x

IN RE INTEL CORP. DERIVATIVE             C.A. No. 1:09-cv-867-JJF
LITIGATION

------------------------------------------------x

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION FOR FINAL APPROVAL OF SETTLEMENT

Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure ("Rule 23.1"), Lead

Plaintiffs Louisiana Municipal Police Employees' Retirement System ("MPERS"), and Charles

A. Gilman ("Gilman") (collectively, "Lead Plaintiffs"), respectfully submit this memorandum of

law in support of their Motion for Final Approval of Settlement.[1]

## I.        INTRODUCTION

After nearly two years of extensive effort, both before and after the filing of the

underlying derivative actions, the parties reached a superb settlement that is in the best interests

of Intel ("Settlement").[2]  Specifically, the Settlement requires that Intel will implement and

undertake material corporate governance reforms, including compliance and oversight with

---

[1] On November 13, 2009, Plaintiff Gilman filed a derivative action in this Court on behalf of Intel Corporation ("Intel" or the "Company") captioned *Gilman v. Otellini, et al.*, No. 09-cv-867 (JJF) ("Gilman Action").  On December 23, 2009, Plaintiff MPERS filed a derivative action in this Court on behalf of Intel captioned *Louisiana Mun. Police Employees' Ret. Sys. v. Otellini, et al.*, No. 09-cv-993 (JJF) ("MPERS Action").  By this Court's Order dated January 15, 2010, the Gilman Action and the MPERS Action were consolidated for all purposes pursuant to Federal Rule of Civil Procedure 42(a). (*See* Dkt. 34.)  Thus, as used herein, the term "Derivative Action" refers collectively to the Gilman Action and the MPERS Action.

[2] The complete terms and conditions of the Settlement are set forth in the Stipulation of Settlement dated, and filed with this Court on, May 25, 2010 ("Stipulation").  (*See* Dkt. 51.)  In addition to resolving Plaintiffs' claims, the Stipulation, if approved by the Court, shall resolve similar claims asserted by other Intel shareholders ("Related Plaintiffs"), who are presently engaged in litigation with Intel and/or its present and former officers and directors in the Superior Court of the State of California, *Paris v. Otellini, et al.,* Case No. 110CV166850 ("Paris Action"), and in the Delaware Court of Chancery, *Rosenfeld Family Found., et ano. v. Intel Corp.*, Civil Action No. 5070-VCS ("Rosenfeld Action") (collectively, the "Related Actions").  Counsel in the Related Actions are signatories to the Stipulation.  All capitalized terms herein have the same meaning as defined in the Stipulation.

regard to antitrust matters, so that Intel can avoid future antitrust legal entanglements ("Corporate Governance Terms").  The settlement terms reflect hard bargaining by counsel well-versed in the facts and the law, and guided by internationally renowned experts on corporate compliance, and domestic and international antitrust issues.

As described herein, the Corporate Governance Terms provide a substantial benefit to the Company in the form of more than forty (40) distinct corporate governance measures designed to help Intel detect and prevent potential or actual violations of domestic or global competition law and Company policy.  Among many other things, the Settlement requires that: (1) antitrust compliance is overseen by a strong and impartial "Compliance Committee" ("Compliance Committee") consisting of three independent directors; (2) the Compliance Committee will work closely with an empowered Global Director of Legal Compliance ("GDLC"), who will report in executive session to the Compliance Committee; (3) the GDLC cannot be dismissed, replaced or reassigned except with the Compliance Committee's approval; (4) for the first time Intel intends to comply with the provisions of the United States Federal Sentencing Guidelines ("Sentencing Guidelines"); (5) reports on antitrust compliance issues must be made on a regular basis to the Compliance Committee, and must be in writing; (6) compliance procedures will be subject to an "audit" as to their effectiveness, with results reported to both the GDLC and the Compliance Committee; (7) the Compliance Committee has authority and funding (with or without management approval) to launch investigations, with the aid of outside subject matter experts; (8) the Compliance Committee (and not management) will oversee compliance with the terms of both the settlement of litigation with Advanced Micro Devices, Inc. ("AMD") concluded in 2009 and with this Settlement; and (9) any individuals found to have violated Intel's antitrust policies *will* be disciplined.

The Company further agreed to maintain its commitment to the effective implementation of the Corporate Governance Terms for a three-year period ("Agreed Upon Term"). Equally important, the Settlement further provides that, during the Agreed Upon Term, Intel will pay all necessary costs to implement and support the provisions set forth in the Corporate Governance Terms.

The Settlement thus constitutes a very favorable resolution of this vigorously contested and substantially complex derivative action. Lead Plaintiffs encountered significant obstacles to prevailing on their claims, from defeating Defendants' pending motion to dismiss that demand was properly deferred to proving that Intel committed antitrust violations **and** that the independent directors knew of the antitrust violations and permitted them to continue. On balance, the Settlement unquestionably warrants approval. Indeed, reflecting the substantial benefits that the Settlement provides to Intel, Lead Plaintiffs' numerous experts have opined that the institution of the Settlement's terms will place Intel's antitrust compliance function among the most detailed and advanced in the corporate world and, further, will substantially enhance shareholder value over time.[3] Moreover, after consultation with counsel, Lead Plaintiffs, including MPERS, an institutional investor with a significant share ownership in Intel, are in full support of the Settlement.

Lending further support to the Settlement, only two objections have been filed (collectively "Objections"), despite the fact reasonable notice was provided to more than 1.6

---

[3]    In particular, Lead Plaintiffs have filed herewith the following expert reports:  the Written Report of Joseph E. Murphy ("Murphy"), JD, CCEP ("Murphy Report"); the Declaration of Donald I. Baker ("Baker"), JD ("Baker Report"); and the Written Report of Dr. Pradeep K. Yadav, Ph. D. ("Yadav") ("Yadav Report").  Lead Plaintiffs retained each of those experts based on their substantial knowledge and expertise in areas that were the focus of the parties' negotiations, *i.e.,* Mr. Murphy was retained for his expertise in corporate compliance and ethics; Mr. Baker was retained for his expertise in international competition law; and Dr. Yadav was retained for his expertise in increases in shareholder value resulting from corporate governance changes such as those obtained in the Settlement.

million Intel shareholders.[4]   The paucity of objections alone, given the widely-held nature of Intel's stock, reflects the fairness, reasonableness, and adequacy of the Settlement.   Moreover, as argued in detail in Lead Plaintiffs' Response to Objections by Shareholders Christine Del Gaizo and William Kelley Puls (filed herewith), the Objections completely lack merit.   Indeed, they wholly discount the substantial impact that the Derivative Action had in bringing tangible and lasting corporate governance benefits to Intel.   At the same time, they turn a blind eye to the significant risks and hurdles that Lead Plaintiffs would have faced first in stating a valid "demand refused" claim under Rule 23.1 and then, if successful, in proving Defendants' underlying liability for the alleged breaches of fiduciary duty to Intel (including daunting "duty of oversight" claims).

Accordingly, Lead Plaintiffs respectfully request that this Court determine that the Court-ordered notice program was reasonable and grant final approval of the proposed Settlement as fair, reasonable, and adequate.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Initial Demand is Made to Intel's Board

On June 12, 2008, after many years of accusation, lawsuits, and regulatory actions asserting that Intel was involved in antitrust violations that could harm the Company, Intel shareholder Annette Villari, represented by the Paskowitz Firm ("Demand Counsel"), made a demand for action upon the board of directors ("Board") of Intel ("Demand").   *See* Joint Declaration of Jeffrey C. Block and Laurence D. Paskowitz in Support of Motion for Approval of Derivative Settlement and Application for an Award of Attorneys' Fees and Reimbursement of Expenses ("Joint Decl."), ¶ 12.   The Demand outlined this history and demanded that the

---

[4]      One other Intel shareholder, Alexander Mackenzie, did not object to the Settlement, but requested that the Court "take into consideration all factors when awarding attorneys' fees."  *See* Dkt. 56.

4

Board investigate, initiate necessary actions to redress any harm, and "review its own actions and those of its members concerning the manner in which they did or did not appropriately discharge their fiduciary duties with respect to the underlying claims." *Id.* On January 29, 2009, counsel for the Board advised Demand Counsel that the Board concluded that it currently was in the best interests of Intel to defer taking action on the Demand.[5] *Id.*

On May 13, 2009, the EC announced the results of years of investigating Intel's operations in Europe. In imposing a $1.45 billion fine, the EC cited alleged "hidden rebates" to large customers and a major retailer, and payments allegedly made to manufacturers to delay products incorporating rival technologies. *Id.* at ¶13. For its part, Intel vowed to appeal to the European Court of First Instance (proceedings which were instituted on July 22, 2009). *Id.*

On June 8, 2009, Demand Counsel again wrote to the Board, detailing the EC findings and asserting that further deferral of action on the Demand was unwarranted. *Id.* at ¶ 14. Demand Counsel further cited the directors' previous invocation of a statute of limitations defense in connection with the "demand excused" litigation initiated in this District by plaintiff Martin Smilow ("Smilow Action"). *Id.* Although Demand Counsel requested a meeting with counsel for the Audit Committee, no meaningful response was received. *Id.*

On July 29, 2009, Demand Counsel again wrote to demand the opportunity to make an oral presentation to counsel for the Audit Committee and insist that the directors and others enter into tolling agreements. *Id.* at ¶ 15. That letter prompted the scheduling of an in-person meeting in New York City on August 27, 2009, at which time Demand Counsel was to make a full presentation to counsel for the Audit Committee. *Id.* at ¶ 16.

---

[5]     Mr. Gilman, a long-time Intel shareholder, subsequently joined in that demand, incorporating and adopting all demand-related communications made previously by Ms. Villari.

Demand Counsel prepared a comprehensive written and oral presentation for the August 27 meeting concerning:  (1) the history of the charges made against Intel; (2) the proceedings in the Smilow Action and Demand Counsel's interpretation of certain stances taken by the directors in that case; (3) an analysis of the EC's publicly-disseminated conclusions; (4) an analysis of Delaware's law of fiduciary obligations and areas in which Demand Counsel contended the directors had fallen short or had failed to act independently; (5) the need for tolling agreements; and (6) the urgent need for Intel to take remedial action, including corporate governance changes.  *Id.*  Demand Counsel also set forth fourteen (14) discrete types of corporate actions needed for the Company to avoid further antitrust difficulties, stressing the need for greater directorial oversight and independence, strengthened internal compliance and mandatory audits, improved training, and protection for whistleblowers.  The meeting did not spur formal Board action, although Intel did initiate some of the remedial measures discussed at the meeting.  *Id.* at ¶ 17.

On November 30, 2009, counsel for the Board sent a letter to Demand Counsel advising them that the Board would defer taking action on the Demand.  *Id.* at ¶ 18.

## B.     MPERS Makes a Demand on Intel's Board

On November 12, 2009, shortly after the AMD Settlement and the filing of an action against Intel by the New York State Attorney General ("NYAG"), MPERS, an institutional holder of more than 100,000 shares of Intel common stock, acting through its counsel, Berman DeValerio, sent a letter to the Board demanding that it:  (1) investigate alleged anticompetitive business practices that were the subject of various private and regulatory proceedings; (2) initiate appropriate legal action against any Intel Board members or employees responsible for such alleged practices; and (3) take necessary and appropriate remedial measures to ensure that Intel is protected from further harm ("MPERS Demand").  Joint Decl. at ¶ 19.

On December 1, 2009, counsel for the Board wrote to MPERS claiming that the Board would be made aware of the MPERS Demand and would "take up the matter in the near future." *Id.* at ¶20.  In response, on Monday, December 7, 2009, Berman DeValerio wrote to counsel for the Board, stating that MPERS had been in communication with counsel for Mr. Gilman and had been made aware of the Board's continuing position that prior shareholder demands were premature for various reasons.  *Id.* at ¶ 21.  Accordingly, Berman DeValerio demanded immediate assurances on behalf of MPERS that the MPERS Demand would not be met with the same delay tactics with which prior demands met.  *Id.*  The Board responded by stating that it would consider the demand at its January 2010 meeting.  *Id.*

## C.   Litigation Ensues

On November 13, 2009, Mr. Gilman commenced a shareholders' derivative action in this Court ("Gilman Action") on behalf of Intel against its directors[6] and nominal defendant Intel (collectively, the Individual Defendants, the "Defendants").  Joint Decl. at ¶ 22.  Similarly, on December 23, 2009, MPERS commenced a shareholders' derivative action in this Court on behalf of Intel against the Defendants ("MPERS Action").  *Id.* at ¶ 23.

On January 15, 2010, this Court entered an order consolidating the Gilman Action and the MPERS Action, appointing Mr. Gilman and MPERS as Lead Plaintiffs, and the Paskowitz Firm and Berman DeValerio as Co-Lead Counsel ("Lead Counsel") ("Case Management Order").  (*See* Dkt. 34.)  In addition, the Case Management Order bifurcated dismissal motion practice, with motions to dismiss under Rule 23.1 decided prior to Rule 12(b)(6) motions.  *Id.* at ¶ 24.

---

[6]     The named directors included Craig R. Barrett, Carol Bartz, Charlene Barshefsky, Susan L. Decker, John J. Donahoe, D. James Guzy, Sr., Paul S. Otellini, David S. Pottruck, James D. Plummer, Jane E. Shaw, David B. Yoffie, and Frank D. Yeary (collectively, the "Individual Defendants").

On February 12, 2010, Lead Plaintiffs filed a Shareholders' Demand-Made Consolidated Derivative Complaint ("Delaware Complaint"), alleging, *inter alia*, that various Board members and executives had breached fiduciary duties and caused significant damages to Intel by failing rein in, ameliorate, countermand and/or remediate conduct that had been continuously occurring for several years at the Company.[7]  *Id.* at ¶ 25.

On March 12, 2010, Defendants moved to dismiss the Delaware Complaint under Rule 23.1, arguing that the Board's refusal to take action on Lead Plaintiffs' pre-suit demands was protected by the Business Judgment Rule.  *Id.* at ¶ 26.  On April 9, 2010, Lead Plaintiffs served their opposition to the Rule 23.1 motion, arguing that the Board did not act in a disinterested manner in assessing Lead Plaintiffs' pre-suit demand and, therefore, it was not entitled to any of the protections of the Business Judgment Rule.  *Id.* at ¶ 27.  As discussed herein, considering the degree of difficulty of Lead Plaintiffs' opposition argument, the Rule 23.1 Motion posed a serious risk to Lead Plaintiffs' claims and required significant legal analysis concerning "demand refusal" theories for sustaining the Derivative Action.[8]

---

[7]     The proceedings described in the Consolidated Complaint included: (1) a suit commenced by Advanced Micro Devices, Inc. ("AMD"), and AMD International Sales & Services, Ltd., in this District entitled *Advanced Micro Devices, Inc. v. Intel Corp.*, Civil Action No. 05-441 (JJF) ("AMD Action"); (2) a series of class actions brought under state competition laws, consolidated in this District as *In re Intel Corp. Microprocessor Antitrust Litig.*, MDL No. 05-1717 (JJF); (3) an investigation and proceeding brought by the EC, in which the EC issued a decision and imposed a fine against Intel in May 2009 ("EC Action"); (4) an action commenced by the New York Attorney General in this District entitled *State of New York v. Intel Corp.*, Civil Action No. 09-827 (JJF) ("NYAG Action"); (5) a proceeding by the Japan Fair Trade Commission against Intel Kabushiki Kaisha, Intel's Japanese subsidiary, which resulted in a consent decree ordering Intel Kabushiki Kaisha to cease and desist certain actions; (6) a proceeding brought by the Korea Fair Trade Commission, in which the Korea Fair Trade Commission entered a ruling against Intel in June 2008; and (7) an administrative proceeding commenced by the United States Federal Trade Commission ("FTC") against Intel on or about December 16, 2009, Docket No. 9341 ("FTC Action").

[8]     Defendants served their Reply on May 10, 2010.  Joint Decl. at ¶ 27 n.7.

### D.        The Parties Reach Agreement on Settlement Terms

In early February 2010, Defendants contacted Lead Counsel to explore the possibility of settlement. Joint Decl. ¶ 29. An in-person meeting was thus arranged in New York, at which the parties exchanged views. *Id.* Although the parties were far apart, they explored whether a fair settlement could be reached. *Id.*

In the ensuing weeks, Lead Plaintiffs sought guidance in crafting such a proposal from their primary expert on corporate compliance, Joseph E. Murphy, Esq., CCEP ("Murphy").[9] *Id.* at ¶ 30. Lead Plaintiffs transmitted their proposal to Defendants during the week of February 22, 2010. *Id.* On March 25, 2010, Lead Plaintiffs received Defendants' counter-proposal, which unfortunately fell short of incorporating what Mr. Murphy had advised were the essential elements needed to bring Intel into accord with compliance "best practices." *Id.* at ¶ 31. In particular, Lead Plaintiffs were closely focused on ensuring compliance with the Sentencing Guidelines, strengthening an independent Compliance Committee, and bolstering the independence of the GDLC.[10] *Id.*

---

[9]       Mr. Murphy is known internationally as one of the foremost experts on corporate governance, and is the co-author of the leading treatise on the subject. *Id.*

[10]      Although Lead Counsel initially sought a monetary component to this settlement, we came to understand that the greater portion of any such payment would (as in the vast majority of settlements) have to come from a directors' and officers' liability policy. Unfortunately, as Lead Plaintiffs determined, the Intel directors had only "Side A" coverage, which provides for payments only for "non-indemnifiable" conduct – meaning that no funds would be available from the insurance carrier unless and until the carrier was convinced that the directors had violated their oversight duties in bad faith, and had consciously directed Intel to violate the antitrust laws or consciously permitted an inadequate system to exist as to antitrust compliance. *Id.* at ¶ 32. Lead Counsel was aware that they would have to successfully litigate the action to conclusion to meet this standard; moreover, attempts by Intel to "tap" into the Side A coverage at this juncture would quite arguably open the Company up to billions of dollars in liability with respect to other pending litigation as Intel would have to show its own officers and directors acted in bad faith. Finally, the potentially available insurance was only a small fraction of the claimed damages. Given that Intel currently has over $16 billion in cash on hand, any monetary payment obtainable from the insurance would be immaterial to the Company. *Id.* Thus, it appeared that a corporate therapeutics settlement that would benefit Intel now, and could avert billions of dollars in future

At the end of March 2010, having received substantial input from Mr. Murphy, Lead Plaintiffs provided Defendants with a detailed reply proposal, accompanied by a study of certain pertinent "best practices" prevailing at selected Fortune 100 companies considered Intel "peers." *Id.* at ¶ 33. A further in-person meeting of all counsel was held on March 31, 2010 in New York City. *Id.* At that juncture, the parties were close enough on key points to conduct confirmatory discovery to assure that any proposed settlement would be fair.

Accordingly, in early April 2010, Lead Counsel assembled attorneys to review numerous documents from the AMD litigation. *Id.* at ¶ 34. Shortly thereafter, however, the parties fell into a serious disagreement that derailed confirmatory discovery and appeared to end settlement talks. *Id.* Although it seemed for a time that negotiations were at an end, the impasse was broken in mid-April by what were perceived by Lead Plaintiffs to be substantial concessions by Defendants. *Id.* Thereafter, confirmatory discovery resumed and was concluded. *Id.*

As the ultimate Settlement terms began to solidify, Lead Counsel contacted counsel for all related plaintiffs to obtain input and approval of the essential terms of the Settlement. *Id.* at ¶ 35. In addition to Lead Plaintiffs, MPERS and Gilman, Lead Counsel spoke to counsel for: (1) Alan Paris ("Paris"), plaintiff in an action filed in 2010 in California Superior Court; (2) the Rosenfeld Family Trust ("Rosenfeld Trust"), plaintiff in a Section 220 action for inspection for books and records in the Delaware Chancery Court; and (3) Christine Del Gaizo ("Del Gaizo"), whose action filed June 2008 in California Superior Court had been stayed by that court shortly after filing ("Del Gaizo Action"). *Id.* After consultations with counsel, MPERS and Mr. Gilman agreed to support the Settlement. *Id.* Moreover, counsel for both Paris and the Rosenfeld Trust

---

damages was preferable to an extremely difficult to obtain and arguably immaterial future monetary settlement (assuming one could ever be obtained). *Id.*

confirmed that their clients supported the Settlement. *Id.* Only Del Gaizo raised objections (discussed *infra*). *Id.*

The settlement negotiations culminated with the execution of the Stipulation of Settlement and its submission to this Court on May 25, 2010 ("Stipulation"). *Id.* at ¶ 36. It is clear that the presence of MPERS, as an institutional investor, was instrumental in bringing the Defendants to the negotiating table and, ultimately, influencing Defendants to agree to the terms reflected in the Stipulation. *Id.* at ¶ 37. If there was ever doubt that Lead Plaintiffs were prepared to "go the distance" in order to protect the Company's interests and hold the Individual Defendants to their fiduciary duties, that doubt was erased when MPERS came onboard. *Id.* Indeed, settlement talks ensued at Defendants' behest mere months after its involvement in the case. *Id.* MPERS, for its part, was particularly interested in ensuring that significant and meaningful corporate governance reforms were a part of the outcome of this case. *Id.*

### E.   The Parties Engage in Confirmatory Discovery

Even prior to the settlement negotiations, Lead Counsel had sufficient information about the claims and defenses, and Intel's alleged interaction with third party OEM's and others. Lead Plaintiffs, among other things engaged in: (1) a painstaking review of the underlying record in the AMD Action; (2) a thorough examination of the issues and findings in the 517-page, 1,798-footnote EC opinion issued on May 13, 2009; (3) the Complaint and Intel's Answer in the action filed by the NYAG; (4) an examination of "white papers" issued by Intel discussing its claims and defenses in the AMD Action and the EC proceeding; (5) a review of journal articles and antitrust-related websites and articles; (6) an analysis of the action filed by the FTC and Intel's response thereto; (7) a review of prior "demand excused" litigation; (8) a thorough examination of the Delaware law of fiduciary responsibility, especially in the context of "demand refusal" and

directorial duties to exercise oversight over corporate activities and legal strategies; and (9) consultation with corporate governance and antitrust experts.[11]  See Joint. Decl. ¶¶ 4, 38.[12]

As noted, in a further effort to confirm that the Settlement was fair, reasonable, and adequate, prior to entering into a final stipulation of settlement with Defendants, Lead Plaintiffs engaged in extensive confirmatory discovery.  Specifically, over the course of several weeks, Lead Counsel: (1) reviewed the deposition transcripts of twenty-one (21) witnesses in the AMD Action, comprising approximately 11,400 pages of testimony and 700 deposition exhibits totaling approximately 5,400 pages; (2) reviewed additional documents produced by Defendants concerning Intel's refreshed antitrust compliance program; and (3) prepared for, and took, the deposition of an Intel Senior Competition Compliance attorney, interrogating her on, among other things, Intel's recent antitrust compliance efforts.  *Id.* at ¶ 39.

Among the deposition transcripts reviewed were those of Intel's former Chairman of the Board, Chief Executive Officer, General Counsel, Vice President of Sales and Marketing, and Head of Worldwide Sales and Marketing.  *Id.*  The confirmatory discovery, while providing support for Lead Plaintiffs' claims, affirmed the risks associated with continued litigation, including the difficulty in proving the underlying antitrust violations.  *Id.* at ¶ 40.  Specifically, the deposition transcripts illustrated Defendants' stance on the allegations made in this and every

---

[11]     For example, to assist in the preliminary evaluation of the various antitrust issues, Samuel R. Simon, Esq. ("Simon"), was retained as an Of Counsel attorney during an early stage in this matter.  Mr. Simon is an antitrust lawyer with 30 years experience, a former appellate attorney with the Antitrust Division of the U.S. Department of Justice ("DOJ"), and an Adjunct Professor of Antitrust Law at Rutgers University School of Law.  Among other professional activities, he has testified before Congress on behalf of the American Antitrust Institute, and has represented that body as *amicus curiae* before the U.S. Supreme Court.  In addition, Donald I. Baker, Esq. ("Baker"), an attorney with nearly 50 years of international antitrust compliance and enforcement experience in government, private practice, and academia, was retained to provide advice concerning international antitrust and competition law principles.

[12]     Lead Counsel also retained a private investigator, whose efforts yielded valuable information.

other related proceeding:  that they have broken no laws and that the Individual Defendants and the Company have acted entirely appropriately.  *Id.*  Moreover, it was apparent from that discovery that there would be no "smoking gun" that would negate or minimize those risks if these proceedings were to continue in an adversarial manner. *Id.*  Indeed, Intel has already asserted various colorable defenses, arguing in various proceedings that:  (1) no "smoking gun" exists; (2) Intel never threatened any OEM with retaliation; (3) Intel did not retaliate against Dell in 2006 when it began using AMD components; (4) AMD was never foreclosed from competition and, indeed, grew so quickly during the subject period that it even experienced capacity constraints; (5) no consumers suffered any injury;  and (6) the EC applied novel and unexpected analyses and rules, and held Intel liable for "subjective" perceptions of OEM's that even the OEMs denied they had (specifically, Dell).[13]

To provide further confirmation that the Settlement would provide concrete and lasting benefits to Intel, Lead Counsel engaged several experts to analyze the Settlement from the standpoint of international competition law, corporate compliance and ethics, and to the general benefit of corporate governance reforms of these kinds.  Specifically, Lead Counsel engaged the following internationally recognized practitioners to opine on the impact of the Settlement terms on Intel:  (1) Mr. Murphy, who opined that the Settlement's governance enhancements are: "very substantial, indeed essential improvements to Intel's antitrust and competition law compliance and ethics program,…The enhancements to the Compliance and Ethics Program agreed to by Intel will serve to move compliance and ethics to the center of attention for management,

---

[13]     That the EC matter involved uncertain antitrust issues and unexpected rulings is argued by Professor  Damien Geradin, Director of the Global Competition Law Center and Professor of Competition Law and Economics at Tilburg University (Netherlands) in his article, *The Decision Of The Commission Of 13 May 2009 In The Intel Case: Where Is The Foreclosure And Consumer Harm?*, available at: http://www.intel.com/pressroom/legal/docs/Damian_paper.pdf

employee [sic] and the Board of Directors.";[14] (2) Donald I. Baker, former Assistant Attorney General in charge of the Antitrust Division of the DOJ and a former Professor of Law at Cornell University, who opined that the Settlement provisions meet or exceed the antitrust compliance measures he has encountered at similar companies over his fifty (50) years of practice, and that the measures Intel agreed to institute will substantially reduce its exposure to lawsuits, fines and penalties, both domestically and internationally;[15] and (3) Professor Pradeep K. Yadav ("Yadav"), an internationally-renowned economist and Lead Plaintiffs' expert on the valuation and benefit of corporate therapeutic enhancements, who opined that the measures contained therein will likely produce benefits to Intel.[16]  *See* Joint Decl. ¶ 41.

### III.    SUMMARY OF PROPOSED RELIEF

Following the negotiations and litigation detailed above, the parties reached agreement on the governance, compliance, and risk management policies, procedures and provisions set forth

---

[14]     The sworn Written Report of Joseph E. Murphy, JD, CCEP, dated July 8, 2010 ("Murphy Report") is attached as Exhibit A to the Joint Decl.  Among other things, Mr. Murphy has written extensively in the corporate compliance field, including over 100 articles, seven books, and various white papers. He is the co-author of the leading legal treatise on compliance programs, Compliance Programs and the Corporate Sentencing Guidelines: Preventing Criminal and Civil Liability (Thomson West; 1993 & Ann. Supp.), co-edited with Jeffrey Kaplan.

[15]     The sworn Declaration of Donald I. Baker, Esq., dated July 11, 2010 ("Baker Report") is attached as Exhibit B to the Joint Decl.  Mr. Baker was consulted by counsel herein prior to the initiation of litigation.  In addition to his work in government and academia, Mr. Baker is presently a partner at Baker & Miller, P.L.L.C., in Washington, D.C., and is an acknowledged expert on European competition law. He is an advisor to the British Government on international jurisdiction and antitrust questions, and the author of the recent journal article, "*An Enduring Antitrust Divide Across the Atlantic Over Whether to Incarcerate Conspirators and When to Restrain Abusive Monopolists*" 5(1) European Competition Journal 145 (2009).

[16]     The sworn Written Report of Dr. Pradeep K. Yadav dated June 25, 2010 ("Yadav Report") is attached as Exhibit C to the Joint Decl.  The valuation estimate cited above is at Yadav Report, ¶4, and is further discussed throughout his presentation.  Dr. Yadav is, among other things, Professor of Finance at the University Oklahoma, and author or co-author of more than fifty (50) research papers that have been presented at more than seventy (70) major international conferences.

in the Stipulation, which provide the basis for the Settlement.  The key features of such corporate

therapeutics are summarized below.

      **A.**    **An Empowered Board Level Compliance Committee will Review the Company's Antitrust Compliance Function, Monitor Compliance with Attendant Policies, Programs, and Procedures and Work Closely with the Global Director of Legal Compliance**

It is essential for Intel to maintain dedicated Board-level oversight of the Company's

antitrust compliance regime.  The Stipulation thus provides for the Compliance Committee of

Intel's Board of Directors – consisting of independent directors as defined in the application

rules for NASDAQ-traded issuers – to operate in accordance with the following mandate:

> [To] review Intel's policies, programs and procedures with regard to significant pending and [and/or] threatened litigation, monitor the Company's programs to implement legal obligations arising from judgments, settlement agreements and other similar documents that bear upon the Company's effective conduct of its business in a legal and ethical manner, consistent with the Compliance Committee's charter.

*See* Joint Decl., ¶ 46.  The Settlement further provides that the Compliance Committee will have

the following authority and responsibilities:

1.     to review the effectiveness of the Company's antitrust compliance policies and procedures at least annually, including the effectiveness of any new policies and procedures established as part of the Settlement (*Id.*);

2.     to review and approve a risk assessment at least annually with regard to the Company's risk of antitrust or foreign competition law violations (*Id.*);

3.     to review and approve recommended changes to Intel's antitrust compliance policies as it deems appropriate, with such approved changes reported to the Board (*Id.*);

4.     to review and concur in the appointment, replacement, reassignment, or dismissal of a Global Director of Legal Compliance ("GDLC"), a position that Intel agreed to create as part of the Settlement (described below) (*Id.*);

5.     to monitor the Company's compliance with the terms of the Company's settlement with AMD, including contracting procedures specified therein (*Id.*);

6.     to review and, as it deems necessary based on the recommendations of the GDLC, approve the strengthening of Intel's employee training and certification programs

related to antitrust compliance (including those enacted subsequent to demand made in the Derivative Action) (*Id.*);

7.     to monitor Intel's implementation of the terms of the Settlement (*Id.*); and

8.     to determine which records Intel shall keep of its antitrust compliance in an effort to gauge the overall effectiveness of that program (*Id.*).

In addition, the Settlement authorizes the Compliance Committee:  (1) to receive any training and education that it may request; and/or (2) to retain and consult with subject matter experts as it deems appropriate in order to carry out its mission of reviewing and monitoring Intel's antitrust compliance function.  *Id.*

Among other things, Mr. Baker observed that "[t]he Settlement provisions strengthening and empowering the Compliance Committee are quite important."  *See* Baker Report, ¶41 (further noting that "the Compliance Committee, given its mandate, is in a position to provide top down leadership for, and encouragement to, those within the corporation charged with specific responsibilities for implementing [Intel's] Compliance Program").  *Id.*

**B.     Empowerment of the GDLC and Intel's Legal Compliance Group in Developing and Enforcing the Company's Antitrust Compliance Programs, Policies, and Procedures**

Intel must have senior compliance executives with responsibility and authority both to assist with the establishment and enforcement of Intel's antitrust compliance programs, policies, and procedures, and to advise the Compliance Committee accordingly.  The Settlement thus provides that Intel will undertake the following actions in that regard:

1.     empower the GDLC position within the Legal Compliance Group[17] ("LCG") with direct reporting responsibility to Intel's General Counsel, and give both the GDLC and the LCG significant roles and responsibilities for antitrust compliance based upon recommendations made to, and approved by, the newly-formed Compliance Committee of the Board (*See* Joint Decl., ¶ 46);

---

[17]     Importantly, the Settlement also provides that Intel must have a General Counsel with an extensive background in all aspects of antitrust practice. *See* Dkt. No. 51.

2.      review and strengthen the GDLC's role in the design, implementation, and enforcement of a compliance and ethics program directed to antitrust and competition issues, as is deemed appropriate and necessary under the circumstances (*Id.* ¶ 46);

3.      ensure that the GDLC has the authority, experience, skill, training, budget, and staff to carry out his or her responsibilities (*Id.* ¶ 46); and

4.      ensure that the GDLC has input into the design, implementation, and enforcement of a compliance and ethics program directed to antitrust and competition issues, with the Compliance Committee maintaining the right to review and resolve any disagreement concerning the GDLC's recommendations (*Id.* ¶ 46).[18]

Mr. Murphy found the enhanced role of the GDLC to be "a major and sustaining enhancement" that is a "critical driver" of the newly established compliance program. *See* Murphy Report, ¶¶ 9, 20. Indeed, Mr. Murphy observed that "properly positioning and empowering the person responsible for the compliance and ethics program has been a central message of the compliance and ethics profession," *see id.* ¶ 9, and "with the commitment to provide the necessary resources, backed up by control by a board committee, the GDLC is positioned to be able to execute on the Settlement's commitment." *Id.* ¶ 20. Similarly, Mr. Baker concluded that "[t]hese institutional arrangements create a powerful ombudsman role for the GDLC and thus give the GDLC sufficient independence, incentives, and resources to provide the type of broad antitrust oversight called for by the Settlement." *See* Baker Report, ¶ 42.

Significantly, the GDLC will have the responsibility to report directly to Intel's independent directors on a regular basis. The Settlement provides that the GDLC shall meet with the Compliance Committee in executive session at least twice annually, with specific responsibility for discussing antitrust compliance matters and reporting on any material changes

---

[18]     In that regard, the Settlement further provides that the GDLC will receive and review reports and recommendations concerning antitrust compliance matters from other personnel supporting compliance functions within the LCG, Sales and Marketing, Finance, Microprocessor Marketing and Business Planning, and Information Technology groups at Intel. *Id.* ¶ 46.

to Intel's antitrust compliance policies, procedures, and programs.  *Id.* ¶ 46.  The Settlement further provides that the GDLC shall, on an annual basis at least, provide a written report to the Compliance Committee outlining the GDLC's activities regarding antitrust and competition issues.  *Id.* ¶ 46.

According to Mr. Murphy, providing the GDLC with reporting power to the Compliance Committee is "an extraordinarily important level of protection" for Intel's compliance program, because most serious antitrust violations occur among senior managers and empowering the GDLC with regular access to the Compliance Committee provides a safeguard against that from happening at Intel going forward.  *See* Murphy Report, ¶¶ 9, 20 ("[t]his and other provisions give an experience and skilled GDLC the positioning and authority to implement and maintain a truly effective compliance and ethics program.")

Further provisions of the Settlement guarantee that the GDLC will be empowered with the authority to fully investigate any alleged antitrust misconduct.  Namely, the Stipulation provides that the GDLC shall promptly be informed of all credible and material reports of any antitrust or competition issues reported on the Intel employee whistleblower hotline.  *See* Joint Decl. ¶ 46.  Moreover, Intel's personnel shall be required to give the GDLC and his or her delegated staff "full cooperation" promptly in response to any request for information – including access to Company records as reasonably necessary – to further any investigation into alleged antitrust misconduct.  *Id.* ¶ 46.  Furthermore, if the GDLC decides to retain and utilize personnel, outside advisors, or independent consultants who are experienced and knowledgeable in the subject matter being investigated, the Settlement empowers the GDLC to do so.  *Id.*

Both Lead Plaintiffs' corporate compliance and antitrust experts expressed the view that those provisions ensure that the GDLC will have the tools necessary to effectuate the goals of the

Settlement.  *See* Murphy Report, ¶ 22 (noting that access to information and personnel allows GDLC to perform tasks effectively and function as a deterrent to misconduct); Baker Report, ¶ 43 (noting that inclusion in Settlement of combined powers and authority of GDLC "demonstrates that those who negotiated the Settlement understood internal corporate dynamics and were determined to make sure GDLC had the tools and the stature to be effective.")

> **C.**    **Adoption of Additional Antitrust Compliance Programs, Policies, and Procedures and Accompanying Enhancement of Intel's Existing Antitrust Compliance Function**

Intel's antitrust compliance function must contain meaningful policies and procedures to prevent violations of global competition law, as well as provide the Company's compliance officers and directors with sufficient information to detect any violations that have occurred or may potentially occur.  The Settlement thus provides for the implementation and/or enhancement of various policies and procedures described below that are specifically designed to accomplish that goal.

Specifically, the Settlement requires Intel to agree to the following antitrust compliance policies:

1.    that its antitrust compliance policies, procedures and programs will be intended to conform in material respects to the relevant provisions of the U.S. Federal Sentencing Guidelines, and that in implementing such policies, procedures, and programs the Company will not knowingly cause the involved personnel to violate any applicable professional standards (*See* Joint Decl., ¶ 46);

2.    that its Code of Conduct will be further revised to address antitrust compliance in a more particularized fashion, as part of the Antitrust & Competition Law Worldwide Policy and Standards element of the Code of Conduct (*Id.*);

3.    that any personnel found to have violated Intel's antitrust policies will, subject to local laws, be disciplined, up to and including termination of employment (*Id.*);

4.    that any personnel found liable by a court of law in a final, non-appealable judgment for violating United States federal or state antitrust laws will, subject to local laws, be disciplined, up to and including termination of employment (*Id.*);

5.      that any non-independent director so found to have violated federal or state antitrust laws shall also be subject to removal from the Board (*Id.*);

6.      that the Company will give strong weight to any officer's or employee's failure to comply with Intel's antitrust policies in making employment and compensation decisions, and in evaluating performance of all officers and employees of the Company (*Id.*); and

7.      that, consistent with the terms of its Code of Conduct, the Company will discipline any employee found to have retaliated against or threatened retaliation against anyone for: (a) having raised an antitrust or competitive concern; or (b) having objected to a course of action on behalf of the Company on the grounds that such course of action raises antitrust concerns (*Id.*).

As Mr. Murphy opines (Murphy Dec., ¶¶ 10, 17):

The Federal Sentencing Guidelines (the "Sentencing Guidelines" or "Guidelines") are the template against which the effectiveness and *bona fides* of compliance and ethics programs are judged across the board. Although the Guidelines literally speak to criminal conduct, they have been applied throughout industry and government as *the* appropriate standards for any type of compliance program, including those dealing with violations of the civil law...Intel's commitment to conform to these Guidelines means that it *must* use due diligence to have a program that is reasonably designed, implemented, and enforced to prevent violations, including all seven of the steps called for in the Guidelines standards....The types of management steps and new protections called for in the Settlement and incorporated by reference from the Sentencing Guidelines, are designed to have the necessary positive impact on the Company's culture and address underlying issues that were not being addressed by the Company's prior approach.

As a result, Intel's commitment with respect to the Sentencing Guidelines obligated the Company to attempt to meet a wide array of stringent ethical standards. *Id.* at ¶ 28 (citing more than a dozen Sentencing Guidelines standards to which Intel is now with this settlement required to adhere).

In addition, the Settlement establishes the following antitrust compliance protocols to which Intel must adhere:

1.      the creation of a process to audit accounts to assess compliance with Intel's antitrust policy, the results of which must be reported to the GDLC and the Compliance Committee (*See* Joint Decl. ¶ 46);

2.    the creation of a process to monitor individuals' compliance with Intel's antitrust policy, the results of which must be reported to the GDLC and the Compliance Committee (*Id.*); and

3.    the implementation of an "audit" program sufficient to review and consider the effectiveness of the Company's antitrust compliance policies and procedures with respect to senior executives who are significantly involved in OEM contracting activities, the results of which must be provided to the Compliance Committee and the GDLC, and may be provided to Intel's external auditors as necessary to satisfy any financial statement audit procedures (*Id.*).

Mr. Murphy found the Settlement's auditing provisions to be very significant, noting that:

> one of the most important elements of any compliance program, [is] a program to conduct audits. [The Settlement's audit provision] focuses on executives; as noted above, historically and as indicated in the allegations in this case, it is at [the] executive level where the greatest antitrust and competition law risk resides. Audits add value to a program, because unlike training and manuals they do not depend solely on the good faith of managers to follow the rules; rather, by using audits the Company is sending a message that it will dig deeper to ensure that the Company's leaders are, in fact, obeying the law.

*See* Murphy Report ¶ 26; *see also* Baker Report, ¶ 46 ("These arrangements certainly are consistent with what I have seen and recommended in the past . . . .").

**D.    Intel's Creation of Senior Management Positions to Assist the Compliance Committee in Monitoring the Company's Governance, Compliance, and Risk Management Policies and Procedures**

Intel must ensure that other senior executives have responsibility for assisting the Board and the GDLC in monitoring and enforcing Intel's compliance regime. To achieve that goal, the Settlement provides for the creation or continuation of numerous senior level positions whose function is to ensure that Intel remains in compliance with global competition law, and Intel's compliance policies, including:

1.    the addition of attorneys to the various geographic areas in Intel's Sales & Marketing Group ("SMG") to provide counseling and to address compliance issues regarding antitrust and competition laws (*See* Joint Decl. ¶ 46); and

2.      the addition/dedication of non-attorney personnel in the Finance, SMG, Microprocessor Marketing and Business Planning ("MMBP"), and Information Technology ("IT") groups to support antitrust compliance activities (*Id.*).[19]

Mr. Baker opined that, given Intel's global reach, "this is a strong and important institutional feature of the Compliance Program, because it increases the probability that antitrust advice and the antitrust compliance message will be expressed in (or translated into) terms that local employees and managers can understand based on their own cultures and experiences . . . ." *See* Baker Report, ¶ 44.

### E.      Antitrust Compliance Policies Specifically Related to Contracting

The Settlement requires Intel to agree to the following compliance policies related to its contracting activities:

2.      to continue to refine and enhance its pricing procedures to ensure that Intel has reliable pricing tools to enable the Company to set its microprocessor prices at levels that exceed the appropriate measure of costs used to determine when prices constitute anticompetitive conduct or unfair competition (*See* Joint Decl. ¶ 46);

3.      to eliminate the use of retroactive rebates, absent approval by the head of SMG Legal (*Id.*);

4.      to add new controls on requests for Marketing Development Funds ("MDF") and Non-Recurring Engineering Funds ("NRE") with respect to the Company's principal product lines for all customers worldwide (*Id.*);

5.      to move toward a smaller number of standard deal types (*Id.*);

6.      to add a requirement to the contracting process that, absent approval by the head of SMG Legal, all new sales and pricing agreements must: (i) be in writing; (ii) include standard integration and non-exclusivity clauses; and (iii) be kept in a centralized repository (*Id.*); and

7.      to implement the Intel Deal Management System ("IDMS"), an internal deal approval tool to include deal terms, cost guard band data, an agreement/document repository, and rebate forecasting and payment information to assist with

---

[19]     Significantly, in addition to those newly created positions, the Settlement provides for increased attorney and non-attorney resources to be provided across most of Intel geographic areas to support all antitrust compliance efforts. *Id.*

implementation and monitoring compliance with changes to sales process and policies described in this section (*Id.*).[20]

Mr. Baker has opined that "[t]hese arrangements not only provide clearer guidance to people in the field, but also increase the ability of LCG Group and others within Intel to monitor what the Intel sales force is actually doing." *See* Baker Report, ¶ 45. Moreover, he concluded that, "[g]iven Intel's expensive history and the reality that a dominant firm can be held seriously liable for what are essentially discretionary decisions, these restrictions appear to me to be prudent." *Id.*

### F. Adoption of Enhanced Compliance Training Programs to Strengthen Its Employees' Understanding of Their Legal and Ethical Obligations

A foundational precursor to the success of Intel's newly-established corporate therapeutic program is the adoption and implementation of a vigorous employee training program designed to educate the Company's workforce as to its antitrust compliance responsibilities. Accordingly, the Settlement provides for the continuation of the following training program that the Company instituted after the Demand:

1.  approximately 7,500 employees completed a required basic antitrust training course in 2009 (*See* Joint Decl., ¶ 46);

2.  approximately 1,500 employees completed advanced antitrust communications training in 2009 (*Id.*);

3.  all employees in SMG dealing with customers were required to certify that they had reviewed, and would agree to comply with, Intel's antitrust policy (*Id.*);

4.  approximately 1,600 employees (primarily in SMG) involved in negotiating pricing and sales agreements received training on Intel's new sales processes and policies (*Id.*); and

5.  more than 8,000 employees, covering both SMG and its product groups, attended Intel's "Antitrust Awareness 2010" as a required course in 2010. (*Id.*).

---

[20]   IDMS was rolled out in pilot form in 2009; complete implementation for all direct customers is scheduled in 2010 with further implementation for indirect customers in 2010 and 2011. *Id.* at n. 16.

Intel further agreed to enhance its existing antitrust training and education programs for Intel officers and employees, based on the recommendations made to, and approved by, the Compliance Committee, including topics related to compliance with the terms of recently-resolved antitrust proceedings or such future settled antitrust actions and/or proceedings, as the Compliance Committee deems appropriate. *Id.*

As Mr. Baker opines:

> this differentiated approach is, in my judgment, the entirely correct way of dealing with the situation that Intel faces. As the globally dominant firm in semiconductors Intel ought to be focusing [its antitrust compliance training program] on the sales forces that have been offering the payments, devising the rebates, and structuring the sales transactions that have generated so many problems, especially in the EU, Japan, and Korea. The sales group is the logical focus of such efforts. Moreover, it is particularly important to focus Intel's educational programs on those employees operating the markets where the risks are the greatest.

*See* Baker Report, ¶ 48.

### G.   Intel Agreed to Maintain and Fully Fund the Corporate Governance Terms for a Period of Three Years Subsequent to the Approval of the Settlement

The success of Intel's newly established and enhanced antitrust compliance program hinges on the Company's willingness to implement and support the Company's compliance mechanisms for a meaningful period of time. Accordingly, the Settlement provides that Intel will maintain and support all of the Corporate Governance Terms for a period of three years subsequent to this Court's approval of the Settlement. *See* Joint Decl., ¶ 45. The importance of that commitment to the continuance of the compliance structure established by the Settlement cannot be overstated. As Mr. Murphy opined, it:

> will enable the GDLC to become fully positioned and empowered, and for the Compliance Committee to establish its expectations and approaches. During this period of time the board will have become accustomed to receiving the level of detail contemplated by the reporting provisions of the Settlement, and this level of oversight can then continue to energize the program. The three year

> implementation interval also gives the program the conditions necessary to take
> root and become part of the company's culture.

Murphy Report, ¶ 33.

In addition, Intel agreed to fully fund all of the programs instituted by the Settlement. *See* Joint Decl., ¶ 45.  Indeed, Intel has already spent millions of dollars on the program.  *Id.* According to Mr. Murphy, "[t]his commitment of resources helps assure that funding and personnel will be available to get the compliance job done.  Compliance and ethics programs are not self-executing; monetary and personnel resources will help bring the program to life." Murphy Report, ¶ 19.

### IV.   PRELIMINARY APPROVAL AND NOTICE OF SETTLEMENT

This Court entered an order on June 3, 2010, preliminarily approving the settlement and providing for notice of the settlement to be sent to Intel shareholders ("Notice Order").  As set forth in the Affidavit of Mailing filed by Defendants, (*see* Dkt. 62), as of June 30, 2010, 1,602,949 Notices in substantially the same form as approved by this Court were disseminated to record or beneficial owners of Intel common stock as of May 25, 2010 by United States mail, first-class, postage pre-paid.

Pursuant to the Notice, objections to the settlement had to be served and filed by July 6, 2010.   Despite the parties' vigorous notice program, Lead Counsel is aware of only two substantive objections filed with the Court as to the terms of the settlement.  The fact that there have been only two objections out of more than 1.6 million stockholders receiving notice speaks volumes to the fairness of the settlement, especially considering that Intel shareholders include many sophisticated institutions that have large interests and could have easily objected through counsel if it were appropriate to do so.

## V.    THE STANDARDS FOR JUDICIAL APPROVAL

### A.    This Arm's Length Settlement is Entitled to a Presumption of Fairness

Considering that shareholder derivative litigation is "notoriously difficult and unpredictable," courts favor settlements in such cases. *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) (citation omitted); *see also In re AOL Time Warner S'holder Derivative Litig.*, No. 02-6302, 2006 WL 2572114, at *3 (S.D.N.Y. Sept. 6, 2006) ("[T]here are weighty justifications, such as the reduction of litigation and related expenses, for the general public policy favoring the settlement of litigation.") (citation omitted); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) ("Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'") (citation omitted). Indeed, it is well settled that courts favor settlement in all litigation, especially complex litigation such as this. *See Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("There is an overriding public interest in settling class action litigation, and it should therefore be encouraged.");[21] *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"). Accordingly, a settlement negotiated in a representative action at arm's-length by experienced counsel is entitled

---

[21] Settlement standards applicable to the approval of class action settlements are equally applicable to the settlement of shareholder derivative actions. *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) ("In evaluating a district court's determination that a settlement agreement is fair and reasonable, we consider factors applied initially to class action settlement agreements and subsequently to derivative actions ....") (internal citations omitted); *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978) (applying factors for final approval of class action settlement to evaluate proposed settlement of derivative action, but with less rigor).

to an initial "presumption of correctness." *Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997) (quoting *Manual for Complex Litigation (Second)* §30.41 (1985)).

Here, the Settlement was achieved after nearly two years of persistent effort by experienced counsel. *See* Joint Decl., ¶¶ 12-36. The Settlement provides an extraordinarily beneficial result for Intel in the form of meaningful tools for Intel's Board and senior management to use to detect and prevent costly antitrust violations. Consequently, an initial presumption of fairness should attach to the Settlement.

**B.     The Settlement is Fair, Reasonable, and Adequate, and is in the Best Interests of Intel's Shareholders**

In evaluating the final approval of a proposed shareholder derivative settlement, a court must determine whether the Settlement is "fair, reasonable, and adequate." *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001); *see also Armstrong v. Board of Sch. Dirs.*, 616 F.2d 305, 314 (7th Cir. 1980) (citation omitted) (explaining that for final approval, the court must "rule on whether the proposed settlement is 'fair, reasonable, and adequate'"), *overruled on other grounds by sub nom. Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). That evaluation necessarily includes an analysis of "the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Shlensky, v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978); *Unite Nat. Ret. Fund v. Watts*, No. 04-CV-3603, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005).

Because settlement represents an exercise of judgment among the negotiating parties, courts routinely have held that the function of a judge evaluating a settlement is neither to rewrite the settlement agreement nor to try the case by resolving open issues. *See e.g.*, *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 804 (3d Cir. 1974); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res.*,

27

*Inc.*, 209 F.3d 43 (2d Cir. 2000) (explaining that "settlement hearing must not be turned into a trial or a rehearsal of the trial").[22]  Further, it is not the role of the Court to "reopen and enter into negotiations with the litigants in the hope of improving the terms of the settlement . . . ."  *Levin v. Mississippi River Corp.*, 59 F.R.D. 353, 361 (S.D.N.Y. 1973).  Rather, "[t]he role of the Court, however, is limited to the extent that its business judgment is not to be substituted for that of the parties who worked out the settlement (;) . . . the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval."  *Mathes v. Roberts*, 85 F.R.D. 710, 713 (S.D.N.Y. 1980) (citations omitted).

Courts in the Third Circuit look to the factors set forth in *Girsh* and *Grinnell* to evaluate the fairness, reasonableness, and adequacy of a settlement.  Those factors include, among others: (1) risks of establishing liability and damages; (2) the reasonableness of the settlement recovery in light of those risks and in light of the best possible recovery; (3) the complexity, expense and likely duration of the litigation; (4) the reaction of shareholders to the settlement; and (5) stage of the proceedings and discovery.  *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *Grinnell*, 495 F.2d at 463; *see also Lewis v. Anderson*, 81 F.R.D. 436, 438-39, 441-42 (S.D.N.Y. 1978) (approving settlement in derivative action where court reviewed strength of case; avoidance of further expense; parties support of settlement after discovery and arm's-length negotiations); *Fricke v. Daylin, Inc.*, 66 F.R.D. 90, 97 (E.D.N.Y. 1975) (approving settlement in derivative action where court reviewed number of objectors and looked at strength of case); *Marcus v. Putnam*, 60 F.R.D. 441, 445 (D. Mass. 1973) (approving derivative action where court reviewed

---

[22]  The Third Circuit follows the same analysis to evaluate the fairness, reasonableness, and adequacy of complex litigation settlements.  *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

likelihood of success).[23]   As shown below, a review of the *Girsh* and *Grinnell* factors leads inexorably to the conclusion that the Settlement is fair, reasonable, and adequate, and is in the best interests of Intel.

### C.     The Risks of Establishing Liability and Damages

In assessing the fairness, reasonableness, and adequacy of the Settlement, the Court must balance the continuing risks of litigation with the benefits afforded to the nominal defendant and the immediacy and certainty of a substantial recovery.  *See Girsh*, 521 F.2d at 157; *Grinnell*, 495 F.2d at 463; *Unite*, 2005 WL 2877899, at *4 (approving derivative settlement where plaintiffs faced "difficulties inherent in derivative litigation as well as significant procedural and substantive obstacles") (citation omitted); *accord Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1312 (3d Cir. 1993).  A review of those factors tips the balance firmly in favor of approving the Settlement.

### 1.     The Risks of Establishing Liability are Very Substantial

The first *Girsh* factor "survey[s] the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  *In re Ravisent Techs., Inc. Sec. Litig.,* No. 00-CV-1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005), at *8 (citations omitted).  Those factors "attempt[] to measure the expected value

---

[23]      In addition to those factors, *Girsh* and *Grinnell* provide that a court should also consider:  (1) the risks of maintaining the class action through the trial; and (2) the ability of defendants to withstand a greater judgment.  *Girsh*, 521 F.2d at 157; *Grinnell*, 495 F.2d at 463.  The risk of maintaining the class action through trial is irrelevant to this proceeding because the Settlement pertains to derivative claims. As to the ability of Defendants to withstand a greater judgment, the consideration of that factor deserves little weight given the nature of the recovery and the significance of other *Girsh/Grinnell* factors.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001) (acknowledging that "defendants' ability to withstand a higher judgment weighed against the settlement, but explained that this factor, standing alone, does not suggest that the settlement is unfair . . . [when] other *Grinnell* factors weigh heavily in favor of settlement.") (internal citations omitted).

of litigating the action rather than settling it at the current time." *In re Cendant Corp. Litig.*, 264 F.3d at 238 (citations omitted).  Both of those factors weigh in favor of approving the Settlement.

Here, Lead Plaintiffs faced significant risks related to proving that their demands were been improperly refused.  As this Court is aware, Defendants moved to dismiss the Consolidated Complaint under Rule 23.1, arguing, *inter alia*, that the Board's refusal to take action on Lead Plaintiffs' pre-suit demands was protected by the Business Judgment Rule.  Lead Plaintiffs argued in response that the Board was not disinterested when assessing Lead Plaintiffs' pre-suit demands and, therefore, was not entitled to any of the protections of the Business Judgment Rule.  Although that argument is colorable, Lead Plaintiffs are well aware that demonstrating the Individual Defendants' (1) lack of independence, (2) disinterest, and (3) failure to act with due care and in good faith – as Lead Plaintiffs would have been required to show under Delaware law – would have been very difficult.  *See Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996) (holding that primary inquiry in demand refused cases is whether board "in fact **acted** independently, disinterestedly or with due care in response to the demand") (emphasis in original).  Indeed, a finding that a demand was wrongfully refused would be extremely difficult to obtain and, indeed, has never been found under these precise circumstances.  *See* Joint Decl., ¶¶ 27-28.  Accordingly, although Lead Plaintiffs believe they would have prevailed on the Rule 23.1 motion, there is no doubt that they would have faced an uphill battle.[24]

Yet even assuming that Lead Plaintiffs would have prevailed on both the Rule 23.1 Motion and a 12(b)(6) motion, they would still have had to confront the prospect of proving the Individual Defendants failed to exercise effective oversight of the company and either consciously directed or allowed Intel to engage in the underlying violations – a daunting

---

[24]     Moreover, even if they were somehow able to overcome the challenges presented by the Rule 23.1 Motion, they still would have had to overcome a Rule 12(b)(6) motion to dismiss.

challenge.  *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del.  Ch. 1996)

("[O]nly a sustained or systematic failure of the board to exercise oversight – such as an utter

failure to attempt to assure a reasonable information and reporting system exists – will establish

the lack of good faith that is a necessary condition to liability.").  First, Plaintiff would have had

to prove an underlying antitrust violation.  *See, e.g., Miller v. American Tel. & Tel. Co.*, 507 F.2d

759, 765 (3d Cir. 1974) (requiring plaintiff to "shoulder the burden" of proving the underlying

statutory violation "upon which the defendants' breach of fiduciary duty is predicated").

Second, Lead Plaintiffs would then have had to establish that the Board, in bad faith, directed

Intel to engage in the underlying antitrust violations *Canadian Commercial Workers Indus.*

*Pension Plan v. Alden,* No. 1184-N, 2006 Del. Ch. LEXIS 42, at *22 (Del. Ch. Feb. 22, 2006)

(dismissing "*Caremark* claims" and stating that "[t]o state a claim for breach of the duty of

oversight, CCWIPP must allege facts that show (1) that the directors knew or (2) should have

known that violations of law were occurring and, in either event, (3) that the directors took no

steps in a good faith effort to prevent or remedy that situation, and (4) that such failure

proximately resulted in the losses complained of. . . . Such a claim is a difficult one to prove."

(footnotes omitted); *Gagliardi v. TriFoods Int'l,* 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996)

(holding that bad faith may be found where "a transaction that is authorized for some purpose

other than a genuine attempt to advance corporate welfare *or is known to constitute a violation*

*of applicable positive law. There can be no personal liability of a director for losses arising*

*from 'illegal' transactions if a director were financially disinterested, acted in good faith, and*

*relied on advice of counsel reasonably selected in authorizing a transaction*." (emphasis added;

citations omitted).

Meeting that burden of proof would have been no small task in this case. First, proving Intel's alleged underlying antitrust violations would have been exceedingly difficult. As a threshold matter, this case does not concern more straightforward *per se* antitrust violations such as price fixing and tying, but rather any antitrust allegations would have been evaluated under a less predictable "rule of reason" analysis. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977) (The rule of reason inquiry is whether under "all of the circumstances" the conduct at issue "impos[es] an unreasonable restraint on competition."). As Mr. Baker has opined, the outcome in each of the antitrust proceedings against Intel is far from certain. *See* Baker Report, ¶ 32 (noting that Intel had various factual and legal defenses to both EC's and AMD's claims).

Even assuming an underlying violation could have been shown, Lead Plaintiffs would have been in for a rocky road in demonstrating that the Individual Defendants acted in bad faith. Intel's senior executives and Board members likely would have taken the position that the Individual Defendants' conduct was not wrongful. *Joint Decl.* at ¶ 40. As Lead Plaintiffs' confirmatory discovery revealed, there would have been substantial evidence to support that argument, as Defendants steadfastly denied the claims alleged in the AMD Action despite withering cross-examination. *Id.* Moreover, Defendants have similarly lodged spirited denials in the Derivative Action, as well as every other related proceeding out of which Lead Plaintiffs' derivative claims are borne. *Id.* The Board also received advice from highly experienced antitrust counsel, which surely would have formed an important defense by the Individual Directors that they did not engage in bad faith. Defendants also could have relied on this Court's

32

previous ruling as to the Board's presumptive independence.[25]  *Id.* ¶ 28.  In addition, they would have had many other colorable defenses to Lead Plaintiffs' claims.  *Id.* ¶ 27.  They were also likely to have argued that the vast majority of Board members had little or nothing to gain from condoning illegal antitrust activities – a point that would surely resonate with a jury.  On that record, it is thus no surprise that no other private plaintiff or governmental agency has charged any individual Intel executive or director with wrongdoing, much less proven such charges.  *Id.* ¶ 28.  Therefore, although Lead Plaintiffs believe they could have proven the Individual Defendants' culpability, they are well aware that by advancing "[a] lack of oversight claim[,]" they would have been pursuing "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *King v. Baldino,* 648 F. Supp.2d 609, 621, n.53 (D. Del. 2009) (citation omitted).

Indeed, it has been held that the magnitude and duration of allegedly illegal activities or the size of resulting penalties do not establish either deficient controls or a sustained and systematic conscious failure of oversight.  *See Stone v. Ritter,* 911 A.2d 362, 373 (Del. 2006) (stating that "bad outcome" does not equate to "bad faith"); *David B. Shaev Profit Sharing Account v. Armstrong,* No. 1449-N, 2006 Del. Ch. LEXIS 33, at * 19 (Del. Ch. Feb. 13, 2006) ("Absent any facts to show that a board's ignorance can only be explained by a breach of fiduciary duty, . . . the size of any financial loss is not a sufficient basis on which to rest liability."), *aff'd,* 911 A.2d 802 (Del. 2006); *Desimone v. Barrows,* 924 A.2d 908, 940 (Del. Ch. 2007) ("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so.").

---

[25]     *See In re Intel Corp. Derivative Litig.,* 621 F. Supp. 2d 165 (D. Del. 2009) (noting that the Individual Defendants are presumed to be independent because they do not face a "substantial likelihood" of liability).

Accordingly, to say that Lead Plaintiffs would have faced steep odds in proving liability in the Derivative Action is a gross understatement. Given those risks, the Settlement is a very favorable result for all concerned and should be finally approved. *See e.g.*, *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987) (affirming approval of settlement where district court found that potential defenses presented the "possibility of 'a lesser or no recovery after trial.'").

### 2. The Risks of Not Establishing Damages are Substantial

Although Lead Plaintiffs recognize the risk of not establishing liability, they are confident that they could have demonstrated the elements necessary to prevail on each cause of action. Nonetheless, assuming that liability was to have been established, it is not at all clear what amount of damages Lead Plaintiffs could have recovered on behalf of Intel at trial. The EC Decision may yet be overturned and, in any event, is not based on any damages Intel allegedly caused but rather a percentage of Intel's revenues. *See* Baker Report, ¶ 55. A jury may not view the decision to settle the AMD Action as having damaged the corporation; nor is it clear that directors may be personally held liable for settling corporate claims. *See White v. Panic*, 783 A.2d 543, 553 (Del. 2001) (declining to draw inference of wrongdoing or underlying misconduct from company's repeated settlement of lawsuits). Therefore, the very credible risks of establishing damages at trial support the Settlement of the Derivative Action.[26]

---

[26]     It also is clear that even a victory at trial is no guarantee that the judgment would ultimately be sustained on appeal. Even substantial judgments awarded by trial courts have been reversed on appeal. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial); *MCI Commc'ns Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) (remanding $1.8 billion antitrust judgment for a new trial on damages, ultimately producing dramatically smaller award). Add to these the very real appellate risks and the difficulty and unpredictability of a lengthy and complex trial (where witnesses could suddenly become unavailable or the fact finder could react to the evidence in unforeseen ways) and the benefits of the Settlement become all the more apparent.

**D.     The Result is Reasonable Given the Risks of Not Establishing
        Liability and Damages and in Light of the Best Possible Recovery**

The determination of a "fair" settlement is not susceptible to a mathematical equation yielding a particularized sum.  *See Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 668 (S.D.N.Y. 1977).  Rather, as one court explained, "there is a range of reasonableness with respect to a settlement . . . ."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *AOL*, 2006 WL 2572114, at *4.   Courts should not make parties "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."  *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y. 1972).

Here, as described above, Lead Plaintiffs achieved significant corporate governance therapeutics for Intel.   Given the obstacles and uncertainties presented by this complex Derivative Action (detailed above), the Settlement is an excellent result and is unquestionably superior to another "possibility" which certainly exists – little or no recovery.  Accordingly, the substantial benefit achieved in the Settlement through the Corporate Governance Terms is fair, reasonable, and adequate.  *First State Orthopaedics v. Concentra, Inc.*, 534 F. Supp. 2d 500, 520-21 (E.D. Pa. 2007) (stating that relevant inquiry is "whether the settlement represents a good value for a weak case or a poor value for a strong case," and noting that "[d]espite the difficulties they pose to measurement, nonpecuniary benefits may support a class action settlement.").

Many courts in this Circuit have approved settlements of this very type.  *See e.g., In re Schering-Plough Corp. S'holders Derivative Litig.*, No. 01-1412, 2008 U.S. Dist. LEXIS 2569, at *10-11 (D.N.J. Jan. 14, 2008) ("The changes implemented by the settlement will serve to prevent or deter misconduct at the Board and middle-management levels, while also providing mechanisms to indentify [sic] emerging misconduct. . . . These corporate governance changes are

substantial non-pecuniary benefits to Schering . . . ."); *Unite Nat'l Ret. Fund v. Watts,* No. 04-CV-3603, 2005 U.S. Dist. LEXIS 26246, at *18 (D.N.J. Oct. 27, 2005) (recognizing "the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement" that "will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoings"); *In re IKON Office Solutions Sec. Litig.,* 209 F.R.D. 94, 104-105 (E.D. Pa. 2002) (overruling objection which "complains of the lack of monetary relief, but does not acknowledge the nonmonetary relief that will generate tangible benefits"); *First State Orthopaedics*, 534 F. Supp. 2d at 520-21 ("Despite the difficulties they pose to measurement, nonpecuniary benefits to the corporation may support a class action settlement.").

### E. The Settlement is Wholly Reasonable in Light of the Complexity, Expense, and Likely Duration of Continued Litigation

Courts consider the complexity, expense, and likely duration of the litigation in reviewing a settlement for final approval. *See Girsh*, 521 F.2d at 157; *Grinnell*, 495 F.2d at 463. Here, there is no doubt that the continued litigation of the Derivative Action would have been complex, expensive, and lengthy. *See* Joint Decl., ¶ 54. The pending motion to dismiss the Derivative Action addresses only arguments under Rule 23.1. *See* Dkt. No. 40, (Case Management Order, at ¶¶ 7-8). Accordingly, even if successful in defending that motion, Lead Plaintiffs still would have faced substantive arguments to dismiss the Derivative Action under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Moreover, even a successful defense of both sets of motions to dismiss would likely not have ended efforts to dismiss the Derivative Action on the pleadings, as Defendants may have sought to appeal those adverse rulings. *See* Joint Decl., ¶ 54. On the other hand, if either of the pending Rule 23.1 motion to dismiss or the anticipated Rule 12(b)(6) motion were to have been granted, Lead Plaintiffs would likely have sought to amend their

complaint, thereby leading to additional motion practice and further risk and delay of any recovery on behalf of Intel.

Furthermore, even if Lead Plaintiffs ultimately prevailed on all motions to dismiss, the litigation of the Derivative Action would have continued for several more years as the parties engaged in discovery and further motion practice (including motions for summary judgment), trial preparation, and trial.  *Id.*  As shown above, there is no doubt that the summary judgment and trial issues would have been complex.  Courts have consistently held that, unless the proposed settlement is clearly inadequate, its acceptance and approval are preferable to the continuation of lengthy and expensive litigation with uncertain results.  *See TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 463-64 (2d Cir. 1982).

Although Lead Counsel believes that the claims asserted in the Derivative Action are meritorious, they are sufficiently experienced and realistic to know that the risks make the continued prosecution of the Derivative Actions and subsequent outcome uncertain.  Thus, the prospect of continued expensive and uncertain litigation heavily favors settlement approval.  *See West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) (stating that "[i]t is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced").  Accordingly, in light of the evident complexity of the issues involved in this case and likelihood of further litigation being costly and extensive, this factor weighs in favor of approving the Settlement.

**F.     Reaction of Intel Shareholders to the Proposed Settlement**

Under Rule 23.1(c) of the Federal Rules of Civil Procedure, "[n]otice of a proposed settlement . . .  must be given to shareholders or members in the manner that the court orders."

On June 2, 2010, the Notice Order issued by this Court approved the form and content of the proposed notices of the Settlement, and authorized such notices to be mailed to Intel shareholders by first class mail. *See* Dkt. 55. Per the Notice Order, as of June 30, 2010, the parties had disseminated 1,602,949 Notices to record or beneficial owners of Intel common stock as of May 25, 2010 by United States mail, first-class, postage pre-paid in substantially the same form as approved by this Court. *See* Affidavit of Mailing (Dkt. 62.) In addition, Intel made the Notice available to shareholders on the internet at http://www.intc.com/. *See* Joint Decl., ¶ 50.

The Notice advised Intel shareholders that the Settling Parties reached a settlement of the Derivative Action and that a hearing would be held to determine whether the proposed Settlement should be approved. *Id.* ¶ 51. The Notice also provided logistical information to Intel shareholders as to when and where the hearing would take place. *Id.* The Notice further provided shareholders with substantive information concerning, in part: (i) a summary of the allegations in the Derivative Action; (ii) the terms of the Settlement, including the proposed award of attorneys' fees; (iii) an invitation to appear at the hearing and show cause, if any, why the Settlement should not be approved; and (iv) a disclosure that if the Settlement is approved, the claims that were or could have been raised in the Derivative Action will be dismissed with prejudice. *Id.* Finally, the Notice provided the address and phone numbers of Lead Counsel, who were prepared to address any shareholder concerns regarding matters raised in the Notice. *Id.*; *see also In re Cendant Corp. Litig.*, 264 F.3d at 235 (holding that notice was sufficient even though confusing because "notice provided the address and phone numbers for Lead Plaintiff's counsel . . . .") (citation omitted). Under those circumstances, there is no question that the parties conducted a vigorous notice program to reach as many Intel shareholders as reasonably possible.

The deadline for Intel shareholders to object to the Settlement was July 6, 2010. *See* Notice Order at 9-10. According to Intel's Form 10-Q filed with the SEC on May 3, 2010, there were more than 5.5 billion shares of outstanding Intel common stock as of April 23, 2010. *See* Intel Form 10-Q filed with the SEC on May 3, 2010. Nonetheless, Lead Plaintiffs have received only two substantive shareholder objections to the Settlement. *See* Joint Decl., ¶ 52; *see also Bell,* 2 F.3d at 1313-14 (approving settlement where "[l]ess than 30 of approximately 1.1 million shareholders objected…This small proportion of objectors does not favor derailing settlement") (internal citation omitted); *Unite*, 2005 WL 2877899, at *3 (approving settlement where only one objection was received); *Grinnell*, 495 F.2d at 462 ("Any claim by appellants that the settlement offer is grossly and unreasonably inadequate is belied by the fact that . . . [o]nly twenty objectors appeared from the group of 14,156 claimants."); *accord AOL*, 2006 WL 2572114, at *6 (stating that the principle that "'the lack of objections may well evidence the fairness of the Settlement'" applies to shareholder derivative actions). Moreover, as argued in Lead Plaintiffs' Opposition to Shareholder Objections, filed herewith, both of those objections lack merit. Thus, the absence of any significant number of meaningful objections weighs strongly in favor of approving the Settlement.

## G.      The Stage of the Proceedings and Discovery

The stage of the proceedings and the amount of discovery completed is another factor that the court may consider in determining the fairness, reasonableness, and adequacy of the proposed Settlement. *See Girsh*, 521 F.2d at 157; *Grinnell*, 495 F.2d at 463. That factor "captures the degree of case development that . . . counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the

merits of the case before negotiating." *In re Cendant Corp. Litig.*, 264 F.3d at 235 (quotations omitted).

Here, Lead Counsel conducted a thorough and ongoing investigation relating to the claims and the underlying events alleged in the Derivative Action. *Id.* ¶ 53. In addition, Lead Counsel reviewed thousands of pages of public documents, including Intel's public filings with the SEC, press releases, and reports of analysts covering Intel. *Id.* ¶ 4. Lead Counsel also extensively reviewed and analyzed documents concerning the EC Action, the AMD Action, the FTC Action, and the NYAG Action, among other global regulatory actions related to the unlawful conduct alleged in the Derivative Action. *Id.* Lead Counsel's investigation also included consultation with experts concerning the viability of potential derivative claims based on violations of global competition law. *Id.* Moreover, when the parties reached agreement on settlement terms, Defendants had already fully briefed their motion to dismiss under Rule 23.1 and Lead Plaintiffs had drafted and filed responses thereto. *See* Joint Decl., at ¶ 27. Those investigative efforts, coupled with Lead Counsel's research and analysis of the legal principles applicable to Lead Plaintiffs' claims and the potential defenses thereto, provided sufficient information to allow Lead Plaintiffs to make an informed decision about the substantive strength of their derivative claims. *Id.* at ¶ 55.

Moreover, Lead Plaintiffs reviewed approximately 17,000 pages of deposition transcripts and exhibits in the AMD Action, and conducted the deposition of an attorney in Intel's LCG Group, interrogating her on the facts underlying Intel's antitrust compliance program, among other things. *Id.* ¶ 39. Through that process, Lead Plaintiffs gleaned an even sharper understanding of the potential strengths of their case and risks of establishing liability and damages. *See D'Amato v. Deutsche Bank,* 236 F.3d 78, 87 (2d Cir. 2001) ("[T]he district court

properly recognized that, although no formal discovery had taken place, the parties had engaged in an extensive exchange of documents and other information . . . .   Thus, the 'stage of proceedings' factor also weighed in favor of settlement approval.") (citation omitted); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("[F]ormal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement.") (internal quotations omitted); *accord Jones v. Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355, 360 (E.D.N.Y. 1982) (explaining that informal discovery, such as free exchange of information during settlement talks, is encouraged). Considering that Lead Counsel has conducted sufficient investigation and analysis to allow Lead Plaintiffs to make an informed decision as to the relative merits of each side's case and confirm that the Settlement is in the best interests of Intel, this factor weighs in favor of approving the Settlement.

## H.      The Experience and Views of Counsel Favor Approval

Courts attribute significant weight to the belief of experienced counsel that the Settlement is in the best interest of the nominal defendants.  *See In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("[G]reat weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.") (internal quotations omitted); *Lyons v. Marrud, Inc.*, No. 66 Civ. 415, 1972 WL 327, at *2 (S.D.N.Y. June 6, 1972) ("Experienced and competent counsel have assessed these problems and the probability of success on the merits.  They have concluded that compromise is well-advised and necessary. The parties' decision regarding the respective merits of their positions has an important bearing on this case.").[27]

---

[27]      *See also In re Nat'l General Student Mktg. Litig.*, 68 F.R.D. 151, 155 (D.D.C. 1974) (stating that "[t]he opinion and judgment of experienced counsel, whose labors produced the settlement, should also

Here, Lead Counsel is highly experienced in litigating lawsuits similar to the Derivative Action, and is well aware of the legal standards and defenses involved in resolving shareholder derivative actions. *See* Joint Decl., ¶ 55. Lead Counsel has thoroughly analyzed the relevant issues in this case by, among other things: (1) independently reviewing all publicly available documents relating to, or in connection with, the facts and allegations in the Derivative Action; (2) retaining and consulting with four experts concerning the substantive legal principles and factual circumstances underlying the claims alleged in the Derivative Action; (3) extensively reviewing and analyzing documents the EC Action, the AMD Action (including confidential deposition transcripts and exhibits), the FTC Action, and the NYAG Action, among other global regulatory actions (all of which relate to the matters alleged in the Derivative Action); and (4) negotiating extensively with counsel for Defendants concerning the matters alleged in the Derivative Action. *Id*. at ¶¶ 4-5. Consequently, Lead Counsel concluded that: (a) the Settlement is fair, reasonable, and adequate, and in the best interests of Intel; and (b) the benefits to be conferred on Intel upon the consummation of the Settlement will, if approved by the Court: (i) result in a resolution of the shareholder derivative claims and allow Defendants to put these matters to rest; and (ii) far outweigh the potential benefits of continued prosecution. *Id*. at 53.

Moreover, Lead Counsel was opposed by highly experienced counsel affiliated with an internationally recognized law firm, and the Settlement was reached only because counsel for the Settling Parties engaged in protracted, arm's length negotiations after conducting substantial investigation and analysis into their respective claims and/or defenses. *Id*. at ¶¶ 53, 55; *see also*

---

receive due consideration"); *Reed v. General Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983) ("[T]he value of the assessment of able counsel negotiating at arm's length cannot be gainsaid."); *accord In re Chicken Antitrust Litig.*, 560 F. Supp. 957, 962 (N.D. Ga. 1980) ("Notwithstanding the court's substantial involvement in the suit over the last five years, the parties' counsel are best able to weigh the relative strengths and weaknesses of their arguments.").

42

*Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F.Supp. 446, 452 (E.D. Pa. 1985) ("Though the court must independently evaluate the proposed settlement, the professional judgment of counsel involved in the litigation is entitled to significant weight."). Significantly, Defendants' counsel does not contest that the Settlement confers a substantial benefit on them and that it is in the best interests of Intel's shareholders. *See* Joint Decl., ¶ 55.

Taking into account those factors, Lead Counsel's informed opinion – that, given the uncertainty, risk and substantial expense of pursuing Defendants on all claims through trial, the Settlement is fair, reasonable, and adequate, and in the best interests of Intel – should be afforded significant weight. Accordingly, this factor weighs in favor of approving the Settlement.

## VI.   CONCLUSION

For all of the foregoing reasons, Lead Plaintiffs' respectfully request that their Motion for Final Approval of Settlement be granted in its entirety.

Dated: July 15, 2010

**BIGGS & BATTAGLIA**

/s/ Robert D. Goldberg
Robert D. Goldberg (ID #631)
921 North Orange Street
Wilmington, Delaware 19899
(302) 655-9677
goldberg@battlaw.com

**Attorneys for Plaintiff Charles Gilman and Louisiana Municipal Police Employees' Retirement System**

- AND -

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
60 East 42nd Street—Suite 4600
New York, NY 10165
212-685-0969

**BERMAN DEVALERIO**

Jeffrey C. Block
Bryan A. Wood
Scott A. Mays
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

**Co-Lead Counsel for Plaintiff Charles
Gilman and Louisiana Municipal Police
Employees' Retirement System**