IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------x

IN RE INTEL CORP. DERIVATIVE
LITIGATION

----------------------------------------------x

C.A. No. 1:09-cv-867-JJF


## LEAD PLAINTIFFS' RESPONSE TO OBJECTIONS BY SHAREHOLDERS CHRISTINE DEL GAIZO AND WILLIAM KELLEY PULS


Dated: July 15, 2010

**BIGGS & BATTAGLIA**

Robert D. Goldberg (ID #631)
921 North Orange Street
Wilmington, Delaware 19899
(302) 655-9677
goldberg@battlaw.com

**Attorneys for Plaintiff Charles Gilman
and Louisiana Municipal Police
Employees' Retirement System**

- AND -

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
60 East 42nd Street—Suite 4600
New York, NY 10165
212-685-0969

**BERMAN DEVALERIO**
Jeffrey C. Block
Bryan A. Wood
Scott A. Mays
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

**Co-Lead Counsel for Plaintiff Charles
Gilman and Louisiana Municipal Police
Employees' Retirement System**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 6

    A.    The Settlement Provides Substantial and Immediate Relief
          and is not Inadequate Because Lead Plaintiffs Did Not Push
          for an Immaterial Yet Fee-Enhancing Monetary Recovery .................................... 6

    B.    Lead Plaintiffs Obtained Substantial Benefits Through
          Settlement Negotiations ....................................................................... 10

    C.    Lead Plaintiffs Had Sufficient Discovery and Information
          Prior to Settling ................................................................................ 14

    D.    The Requested Attorneys' Fees are Reasonable in Light
          of the Demonstrable Benefits Provided by the Settlement ................................... 15

CONCLUSION ................................................................................................... 17

## TABLE OF AUTHORITIES

*Allied Artists Pictures Corp. v. Baron*,
    413 A.2d 876 (Del. 1980) ........................................................................................ 13

*Bell Atl. Corp. v. Bolger*,
    2 F.3d 1304 (3d Cir.1993).......................................................................................... 7

*Briggs v. Hartford Fin. Servs. Group, Inc.*,
    No. 07-CV-5190,
    2009 U.S. Dist. LEXIS 66777 (E.D. Pa. July 31, 2009)......................................... 15

*Brinckherhoff v. Tex. E. Prods. Pipeline Co., LLC,*
    986 A.2d 370 (Del. Ch. 2010)..................................................................................... 2

*Funke v. Life Fin. Corp.,*
    237 F. Supp. 2d 458 (S.D.N.Y. 2002)......................................................................... 9

*Ehrheart v. Verizon Wireless,*
    No. 08-4323,
    2010 U.S. App. LEXIS 12174 (3d Cir. June 15, 2010) ........................................... 14

*First State Orthopaedics v. Concentra, Inc.*,
    534 F. Supp. 2d 500 (E.D. Pa. 2007) .......................................................................... 7

*In re Caremark Int'l Inc. Deriv. Litig.,*
    698 A.2d 959 (Del. Ch. 1996)...................................................................................... 4

*In re Countrywide Corp. S'holders Litig.*,
    No. 3464-VCN,
    2009 Del. Ch. LEXIS 155 (Del. Ch. Aug. 24, 2009)................................................. 7

*In re IKON Office Solutions Sec. Litig.,*
    209 F.R.D. 94 (E.D. Pa. 2002).................................................................................... 7

*In re NASDAQ Market-Makers Antitrust Litig.,*
    187 F.R.D. 465 (S.D.N.Y. 1998) .............................................................................. 10

*In re Schering-Plough Corp. S'holders Derivative Litig.,*
    No. 01-1412,
    2008 U.S. Dist. LEXIS 2569 (D.N.J. Jan. 14, 2008) ................................................. 6

*In re Zoran Corp. Derivative Litig.,*
    No. C 06-05503 WHA,
    2008 U.S. Dist. LEXIS 48246 (N.D. Cal. Apr. 7, 2008) ........................................... 7

*King v. Baldino,*
    648 F. Supp. 2d 609 (D. Del. 2009) ........................................................................... 9

*Kirby v. Cullinet Software, Inc.,*
    116 F.R.D. 303 (D. Mass. 1987) ................................................................................ 1

*Larson v. Sprint Nextel Corp.,*
    No. 07-5325,
    2010 U.S. Dist. LEXIS 3270 (D.N.J. Jan. 15, 2010) ............................................... 15

*Off v. Ross,*
    No. 3468-VCP,
    2009 Del. Ch. LEXIS 208 (Del. Ch. Dec. 10, 2009) ............................................... 13

*Stone v. Ritter,*
    911 A.2d 362 (Del. 2006) ...................................................................................... 4, 8

*Unite Nat'l Ret. Fund v. Watts,*
    No. 04-CV-3603,
    2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 27, 2005) ............................................... 6

*Zlotnick v. Tie Commc'ns, Inc.,*
    123 F.R.D. 189 (E.D. Pa. 1988) ................................................................................ 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------x

**IN RE INTEL CORP. DERIVATIVE
LITIGATION**

C.A. No. 1:09-cv-867-JJF

-------------------------------------------------x

### LEAD PLAINTIFFS' RESPONSE TO OBJECTIONS BY SHAREHOLDERS
### CHRISTINE DEL GAIZO AND WILLIAM KELLEY PULS

Lead Plaintiffs Louisiana Municipal Police Employees' Retirement System ("MPERS")

and Charles C. Gilman ("Gilman") respectfully submit this response to the objections to the

settlement interposed by shareholders Christine Del Gaizo ("Del Gaizo") and William Kelley

Puls ("Puls").  As demonstrated below, neither objection is well-taken, and both should be

overruled.

## INTRODUCTION

Out of 1,602,949 Intel shareholders who were sent notice of this Settlement and their

right to object, only two have done so.  The most detailed objection has been submitted by Del

Gaizo, represented by Robbins Umeda LLP (the "Robbins Firm").  Del Gaizo, whose son is

employed by the Robbins Firm, filed a "demand futile" derivative case in California Superior

Court in June 2008, which was soon stayed.[1]  Del Gaizo watched on the sidelines as Lead

Plaintiffs ("Lead Plaintiffs") in this Court vigorously asserted Intel's rights in a "demand

refused" derivative case, which settled only after MPERS joined the lawsuit and when a motion

that exerted substantial pressure on the defendant officers and directors was fully briefed, and

awaiting decision.  The Settlement provides for extraordinary and valuable corporate benefits, as

---

[1]  Del Gaizo never actively litigated her case, and probably could not have, for fear of being adjudged an inadequate derivative plaintiff.  A derivative plaintiff must be independent of counsel and have no conceivable monetary interest in the lawyer's fees is a settled principle.  *See e.g., Zlotnick v. Tie Commc'ns, Inc.,* 123 F.R.D. 189, 194 (E.D. Pa. 1988) (holding that plaintiff was inadequate where he hired his son's firm to conduct litigation); *Kirby v. Cullinet Software, Inc.,* 116 F.R.D. 303, 310 (D. Mass. 1987) ("The closeness of the father-son relationship and the active involvement and heavy reliance on the son create an unnecessary risk of conflict between the representative plaintiff and other class members.").

1

verified and attested by Lead Plaintiffs' three internationally renowned experts: one on corporate governance and compliance; a second on domestic and international antitrust law; and a third on the econometric value of corporate remedial measures.[2]  Co-Lead Counsel were overseen in their efforts by Lead Plaintiffs who included a practicing attorney with no conflicting interests, and an institutional investment fund holding 110,000 Intel shares.

The Robbins Firm was invited to join in the Settlement, but brushed past the substantial benefits for *Intel* provided by the Settlement, instead raising the objection that a non-monetary settlement could not produce a large enough fee for the *attorneys*.[3]  It is obvious that this case was brought derivatively to protect Intel, and not to enrich counsel.  It is equally obvious that Del Gaizo has not--and cannot--show that Intel could ever monetarily regain from the individual defendants even a fraction of the billions of dollars it has paid out in settlements, fines and defense costs.  Del Gaizo concedes that defendants and their insurers, even at the end of a long and uncertain course of litigation, could only contribute millions to Intel, an amount plainly *immaterial* to a company which has a $112 billion market cap and $16 billion in cash on hand. The monetary recovery Del Gaizo demands, however, would be highly material to the amount of attorneys' fees that could be requested, and thus the true nature of this objection is unmasked. *Cf. Brinckherhoff v. Tex. E. Prods. Pipeline Co., LLC,* 986 A.2d 370, 397 (Del. Ch. 2010)(Robbins Firm objected to a settlement, obtained minor benefits in order to withdraw its objection, and then brazenly sought a $500,000 fee based on an affidavit claiming a $1,023,000

---

[2]  These three experts are: (1) Joseph E. Murphy, Esq., co-author of the leading treatise on corporate compliance; (2) Donald I. Baker, former Assistant Attorney General in Charge of the Antitrust Division of the U.S. Department of Justice and a lecturer and advisor on European competition law; and (3) Dr. Pradeep K.Yadav, Professor of Finance at the University Oklahoma, and author or co-author of more than fifty (50) research papers that have been presented at more than seventy (70) major international conferences.  Their sworn reports are submitted herewith in support of the Settlement.

[3]  *See* Joint Declaration of Jeffrey C. Block and Laurence D. Paskowitz in Support of Motion for Approval of Derivative Settlement and Application for an Award of Attorneys' Fees and Reimbursement of Expenses ("Joint Decl."), dated July 14, 2010, ¶ 9, submitted herewith.

lodestar the Delaware Vice Chancellor derided as "facially implausible."). Del Gaizo is willing to forfeit immediate remedial benefits that are sorely needed by Intel, and which could prevent billions in future harm, in a quest for higher attorneys' fees for her son's employers.[4]

All of Del Gaizo's objections are ill-taken. Her assertion that Lead Plaintiffs did not have enough discovery or other information prior to settlement (and that Lead Plaintiffs did not evaluate third party evidence) is demonstrably wrong. Not only did Lead Plaintiffs' review 17,000 pages of testimony and exhibits from the AMD Litigation in this District, but also reviewed the voluminous record in the European Community action against Intel, which is set forth in that body's extraordinarily detailed 517-page, 1798 footnote May 13, 2009 decision (the "EC Decision"). The EC Decision is replete with hundreds of references to e-mails, letters, depositions, and submissions by Intel, AMD, Hewlett-Packard, NEC, Lenovo, Media-Saturn, and others. Lead Plaintiffs carefully reviewed these materials, along with similar detailed evidentiary materials submitted by the New York Attorney General, which specifically discuss certain evidence involving Intel CEO Otellini and former Chairman Barrett. Co-Lead Counsel also reviewed Intel's specific and general refutations of this evidence, which have appeared in voluminous and detailed documents. Further, these materials have been reviewed by our antitrust expert, Mr. Baker. Therefore, the assertion that Lead Plaintiffs and their experts did not

---

[4]   Del Gaizo even criticizes that fact that Plaintiffs, in line with demands for a change in corporate compliance measures that began in 2008, bargained hard for and obtained Intel's *immediate* compliance with the proposed settlement terms, so that these crucially needed measures did not have to await delays that may be engendered by district court proceedings, or even an appeal. These measures must only be continued by Intel if the Settlement is approved and Intel is thus court-ordered to proceed with and maintain them. Thus, Del Gaizo's argument that nothing will be lost if the Settlement is disapproved is specious. Indeed, settlements requiring immediate, pre-hearing relief measures that are later court-mandated are commonplace, and have been regularly proposed by the Robbins Firm and others. *See* Declaration of Laurence D. Paskowitz in Response to Objection, dated July 14, 2010, submitted herewith (detailing the Robbins Firm non-monetary settlements constructed in the same manner as the settlement at bar).

have enough information to evaluate the various claims at bar, including claims involving third parties, to enable them to act on a sufficiently informed basis is simply untrue.

Del Gaizo claims that obtaining a monetary recovery is akin to a "slam dunk." This contention is reflective of the fact that Del Gaizo, who had every opportunity over the past two years to review the full public record, apparently has never done so. To assert that there is an open and shut antitrust case against Intel's top executives is as outlandish as are the objections to the settlement. As Mr. Baker attests and the full record shows, Intel had (and still has at the EC appeal level) many colorable defenses. Even assuming *arguendo*, as Del Gaizo does, that proving the antitrust violations are a mere walk in the park, Del Gaizo never addresses the evidence to support the claim **in this case** that Intel's independent directors knew Intel was engaged in antitrust violations and turned a blind eye to them. Thus, the assertion that Lead Plaintiffs here could easily prove that Intel's top officers and directors consciously approved a scheme they knew involved antitrust violations (the Delaware standard under *Caremark* and *Stone*)[5] is plainly not supported by the record.

Finally, Del Gaizo also errs in suggesting that important settlement benefits were not the product of Lead Plaintiffs' hard bargaining or any other efforts by Lead Plaintiffs, but rather that Intel "had already committed to follow many of the reforms before settlement discussions…." Del Gaizo Br. at 28. The record amply shows that the settlement discussions focused on many new measures that were of utmost importance to bringing Intel into accord with "best practices", including: adherence to the federal sentencing guidelines; strengthening of the mandate and role of the independent Compliance Committee in overseeing and enforcing a global compliance

---

[5] *See Stone v. Ritter*, 911 A.2d 362, 364 (Del. 2006) ("'[O]nly a sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists-will establish the lack of good faith that is a necessary condition to liability.'") quoting *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996).

program; creation of measures and methods that ensured the independence of the Global Director of Legal Compliance ("GDLC"), including written report requirements and "in camera" required meetings with the Compliance Committee; provisions which protect the GDLC from retaliatory discharge or demotion;  and measures to enforce personal responsibility through mandated discipline of anyone who violates the antitrust laws.   Additionally, Lead Plaintiffs modified certain other existing measures, and identified still others which will be mandated to continue for years, upon approval of the Settlement.  Lead Plaintiffs were guided by Mr. Murphy throughout the negotiating process, and he has high praise for the final results (as does Mr. Baker and Dr. Yadav).[6]  Thus, as is true of her other arguments, Del Gaizo's intimation that Lead Plaintiffs accomplished little here at negotiating table cannot be squared with the record.

The Puls objection is equally unavailing.  Puls's primary argument is that the Settlement should not be approved because Co-Lead Counsel has provided little or no demonstrable benefit to Intel or its shareholders.  As stated above, nothing could be further from the truth. Over forty (40) distinct corporate governance reforms to Intel derived from negotiations between Co-Lead Counsel and counsel for the Defendants.

Puls's secondary contention is that despite the tremendous expenditures of effort, time, and expense of Co-Lead Counsel, the requested attorneys' fees in this matter are somehow excessive.  Puls's unsupported conclusions regarding fees have no basis in fact and, like the rest of his objections, should be overruled.  Here, Plaintiffs' Counsel's total lodestar is $1,467,703 which is based on 2,976.55 hours expended on this matter.  Total expenses, which are being paid out of the $1.8 million, amount to $102,829.25.  The negotiated fee amounts to a modest 1.16 times lodestar, which is hardly excessive and, in fact as set forth in our memorandum in support of the award of attorneys' fees, falls at the low end of derivative fee awards.

---

[6] *See* Murphy Decl., ¶¶ 7-10, 19; Baker Decl. ¶¶ 22, 37; Yadav Decl., ¶¶ 4, 21.

## ARGUMENT

**A.**  **The Settlement Provides Substantial and Immediate Relief and is Not Inadequate Because Lead Plaintiffs Did Not Push for an Immaterial Yet Fee-Enhancing Monetary Recovery**

In crafting this Settlement, Lead Plaintiffs acted on a fully-informed basis, taking into account the facts, the law, and the practical reality that the goal of derivative litigation is to materially benefit *the corporation*.  It was understood from the very outset that Intel's sheer size (a $122 billion market cap with $16 billion in cash in the corporate till) precluded a monetary benefit from defendants that could materially enrich either Intel or its shareholders.  What was plainly important, however, was protecting Intel from further antitrust exposure, particularly private treble damages actions, and increasingly onerous European fines.

In the past 20 years, Intel has been investigated three times by the FTC and sued twice by that agency; sued twice by AMD; and been subject to regulatory actions on three continents, with increasingly serious consequences.  Since 2008 counsel herein have demanded immediate remedial measures, recognizing that treble damage antitrust actions and governmental actions pose an existential threat to the Company.  In such circumstances, it was most sensible for Lead Plaintiffs to focus on remedial measures that could deliver real and immediate protective benefits, and many courts in this Circuit have approved settlements of this very type.  *See e.g., In re Schering-Plough Corp. S'holders Derivative Litig.,* No. 01-1412, 2008 U.S. Dist. LEXIS 2569, at *10-11 (D.N.J. Jan. 14, 2008) ("The changes implemented by the settlement will serve to prevent or deter misconduct at the Board and middle-management levels, while also providing mechanisms to indentify [sic] emerging misconduct. . . . These corporate governance changes are substantial non-pecuniary benefits to Schering . . . ."); *Unite Nat'l Ret. Fund v. Watts,* No. 04-CV-3603, 2005 U.S. Dist. LEXIS 26246, at *18 (D.N.J. Oct. 27, 2005) (District Court

6

recognizing "the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement" that "will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoings."); *In re IKON Office Solutions Sec. Litig.*, 209 F.R.D. 94, 104-105 (E.D. Pa. 2002) (overruling objection which "complains of the lack of monetary relief, but does not acknowledge the nonmonetary relief that will generate tangible benefits…"); *see also First State Orthopaedics v. Concentra, Inc.*, 534 F. Supp. 2d 500, 520 (E.D. Pa. 2007) ("The absence of money damages does not necessarily mean the settlement is unreasonable or unfair."); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir.1993) ("Despite the difficulties they pose to measurement, nonpecuniary benefits to the corporation may support a settlement.").[7]

As the Delaware Chancery Court recently noted in a similar context: "To the extent SRM takes issue generally with the practice and history of approving class action settlements that surrender arguable claims in exchange for only therapeutic disclosures, the Court overrules that objection because of its predicate: the absence of a monetary benefit is not fatal to a settlement which, almost by definition, confers only a therapeutic benefit." *In re Countrywide Corp. S'holders Litig.*, No. 3464-VCN, 2009 Del. Ch. LEXIS 155, at *10-11 (Del. Ch. Aug. 24, 2009). The benefit provided by the instant settlement is real and substantial by any measure. As noted

---

[7]  This case is nothing like Del Gaizo's primary authority, *In re Zoran Corp. Derivative Litig.*, No. C 06-05503 WHA, 2008 U.S. Dist. LEXIS 48246, at *33-35. (N.D. Cal. Apr. 7, 2008).  There, in a stock options backdating case, counsel *prevailed on a motion to dismiss*, and then proposed a settlement based upon a recovery value the Court determined to be "illusory."  In addition, damages were estimated at only $16 million (signifying that a full monetary recovery was feasible), and Lead Plaintiffs could show no "difficult proof problems on the issue of liability."  Moreover, "many" of the proposed corporate governance reforms were found by the Court to be "purely cosmetic," and there were no apparent substantive improvements that had resulted from arm's-length bargaining.  *Id.* at *31-33.  By contrast here, major innovative improvements were obtained at the bargaining table (*see* Joint Decl. at ¶¶ 46, 53 and *infra*, pp. 10-13), and there can be no serious argument made that there are (as in *Zoran*) *no* "difficult proof problems on the issue of liability."

by one of Lead Plaintiffs' experts, Dr. Yadav, economists have long studied the value of therapeutic settlements, and have noted that corporations do realize a financial benefit from improving corporate governance measures, particularly where such measures will likely reduce the risk of private and governmental litigation.  Yadav Decl., at ¶ 11.

Del Gaizo assumes, without examining the full record or submitting any expert opinion, that obtaining a verdict against Intel's fiduciaries for conscious violations of the antitrust laws would be an easy task.[8]  She relies on snippets of testimony which do not reflect all of the accusations and defenses put forward by the parties in the AMD Litigation, in the EC Litigation, and in the pending litigation between Intel and the New York AG.  Mr. Baker, an antitrust expert of many years experience has reviewed the full record, which contains and addresses a broad spectrum of evidence from Intel and third parties.  He opines:

> I have reviewed several of Intel's responses to the claims against them; and these include factual and legal arguments on which Intel might prevail before the European Courts in the European Commission proceeding against Intel or might have prevailed before the U.S. courts had the *AMD Antitrust Litigation* against Intel not been settled.
>
> Based on my long experience in the antitrust and competition law field, I recognize how difficult it is to predict the result of any particular antitrust litigation.  Thus, in the case of the *AMD Antitrust Litigation*, I am clear that Intel had viable factual defenses that it would have raised before a jury had the case gone to trial and a number of legal issues on which it might prevail on before the District Court or an appellate court.  Accordingly, the *AMD Antitrust Litigation* should not be read as having established that Intel committed Sherman Act violations.  That AMD chose to settle the action rather than risk a jury trial and appeal on these factual and legal issues suggests that [sic] some significant degree of doubt by those well familiar with the record….Intel ... may yet prevail in its appeal of the *Intel EC Decision*….   Baker Decl. at ¶¶ 23, 32, 55 (emphasis in original).

---

[8]  To prove their case, Lead Plaintiffs would have to show "bad faith" at trial which is only established when "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, *where the fiduciary acts with the intent to violate applicable positive law*, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  *Stone*, 911 A.2d at 369 (emphasis added).

Thus, the task before Lead Plaintiffs would be to show that the Intel fiduciaries knew even before the EC decision (and in connection with the AMD Litigation) that the acts at issue would be found to violate antitrust laws.  These fiduciaries would argue in their defense that even experienced antitrust practitioners could make no such prediction.[9]  And they would likely argue that domestic and international counsel assured them on a regular basis that Intel had behaved properly.  Intel has also argued in various proceedings that there is no "smoking gun"; that Intel never threatened any OEM with retaliation; that Intel did not retaliate against Dell in 2006 when it began using AMD components; that AMD was never foreclosed from competition, and indeed grew so quickly during the subject period that it even experienced capacity constraints; that no consumers suffered any injury;  and that the EC applied novel and unexpected analyses and rules, and held Intel liable for "subjective" perceptions of OEM's that even the OEMs denied they had (specifically, Dell).[10]  Intel's Answer to the New York AG action is also highly informative, as Intel offers detailed line-by-line refutations of the allegations, including alternative views of statements made in e-mails by CEO Otellini and former Chairman Barrett.[11]

A duty of oversight case is the most difficult type of case in which liability is ever sought to be established,[12] and the difficulty is magnified in a case like this where the fiduciaries stand

---

[9]  *Cf. Funke v. Life Fin. Corp.,* 237 F. Supp. 2d 458, 468-69 (S.D.N.Y. 2002)(where the accounting rule allegedly violated was ambiguous and there were no SEC clarifications until after the alleged misstatements, circumstances were held to be "entirely antithetical to the notion that defendants engaged in conscious misconduct or reckless behavior").

[10]  That the EC matter involved uncertain antitrust issues and unexpected rulings is argued by Professor Damien Geradin, Director of the Global Competition Law Center and Professor of Competition Law and Economics at Tilburg University (Netherlands) in his article, *The Decision Of The Commission Of 13 May 2009 In The Intel Case: Where Is The Foreclosure And Consumer Harm?*, available at: http://www.intel.com/pressroom/legal/docs/Damian_paper.pdf

[11]  *See generally* Answer dated January 12, 2010 in *New York v. Intel Corp.,* No. 09-827 (D. Del.) (JJF), ¶¶ 130-44.

[12]  *King v. Baldino,* 648 F. Supp. 2d 609, 621 & n.53 (D. Del. 2009) (citation omitted).

9

accused of consciously violating the law in an area which has many uncertainties, and is notoriously unpredictable. In *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 475 (S.D.N.Y. 1998) the Court, in approving a settlement, illustrated the difficulty even the most sophisticated parties and lawyers have in predicting that a particular series of acts constitute antitrust violations:

> Recurrently, when some of the largest members of antitrust classes have opted-out of the class to try to do better than the class, they have failed to establish impact or other elements of liability, and have lost their cases at trial. This occurred, for example, in the *Corrugated Container Antitrust Litigation*, and most recently in the *Carbon Dioxide Antitrust Litigation. See, e.g., In re Corrugated Container Antitrust Litigation,* 1983-2 Trade Cas. (CCH) P65,628 at 69,157 (S.D. Tex. 1983). *Id.* at 475 n.10.

In sum, the immediate and substantial governance benefits justify approval of this settlement. The obstacles Lead Plaintiffs face in establishing ultimate liability are daunting. The Settlement should not be rejected, as Del Gaizo desires, so that an unlikely monetary recovery (that would be immaterial in any event) can be sought at some point in the distant future for the benefit of Ms. Del Gaizo and her son.

> **B.      Lead Plaintiffs Obtained Substantial Benefits**
> **Through Settlement Negotiations**

Del Gaizo is aware (at least through her counsel who were briefed on settlement negotiations as they were occurring) that in the negotiations: (a) Lead Plaintiffs reviewed compliance measures that were largely initiated subsequent to shareholder demands for remedial actions, and insisted these be continued and court-mandated;[13] and (b) Lead Plaintiffs next, in a prolonged and contentious effort, guided by compliance expert Murphy, bargained hard to bring

---

[13] These measures are set forth in Paragraph 2 of the Stipulation of Settlement dated May 25, 2010 (the "Stipulation").

Intel into accord with governance "best practices."[14]   With regard to the latter category of remedial provisions, these post-litigation agreements, obtained only through difficult negotiations, ensure: (1) that antitrust compliance shall be overseen by a strong and impartial "Compliance Committee" (the "Complaince Committee") consisting of three independent directors; (2) that the Compliance Committee will work closely with an empowered GDLC, who will report in executive session to the Committee; (3) that the GDLC cannot be dismissed, replaced or reassigned except with the Compliance Committee's approval; (4) that for the first time Intel will comply with the provisions of the Federal Sentencing Guidelines; (5) that reports on antitrust compliance issues must be made on a regular basis to the Compliance Committee, and must be in writing; (6) that compliance procedures will be subject to an "audit" as to their effectiveness, with results reported to both the GDLC and the Compliance Committee; (7) that the Compliance Committee has authority (with or without management approval) to launch investigations, with the aid of outside subject matter experts;  (8) that the Compliance Committee (and not management) will oversee compliance with both the terms of the settlement of litigation with Advanced Micro Devices, Inc. ("AMD") concluded in 2009 and with this Settlement; and (9) that any individuals found to have violated Intel's antitrust policies *will* be disciplined.  See Joint Decl., ¶¶ 3, 46.

Del Gaizo again attempts to get excessive mileage out of the inapposite *Zoran* case, by complaining that: (a) some of the measures Intel agreed to continue into the future were in place prior to settlement negotiations (as occurred in *Zoran*); and (b) that Lead Plaintiffs exacted a pledge from Intel that important remedial steps go into effect immediately (*i.e.,* as of June 30,

---

[14]   These "new" measures are set forth in Paragraph 3 of the Stipulation.  Some of the new measures involved taking compliance functions that, in Lead Plaintiffs' opinion existed in skeletal or anemic form, and strengthening them so as to create comprehensive and meaningful oversight.

2010), rather than putting them off for an indefinite period of time. Del Gaizo's arguments are completely misguided.

First, as noted, the most important remedial measures here were created at the bargaining table, something that was not the case in *Zoran*. For example, Intel's compliance efforts must now comply with the U.S. Federal Sentencing Guidelines. As Mr. Murphy opines (Murphy Decl., ¶¶ 10, 17):

> The Federal Sentencing Guidelines (the "Sentencing Guidelines" or "Guidelines") are the template against which the effectiveness and bona fides of compliance and ethics programs are judged across the board. Although the Guidelines literally speak to criminal conduct, they have been applied throughout industry and government as *the* appropriate standards for any type of compliance program, including those dealing with violations of the civil law...Intel's commitment to conform to these Guidelines means that it *must* use due diligence to have a program that is reasonably designed, implemented, and enforced to prevent violations, including all seven of the steps called for in the Guidelines standards....The types of management steps and new protections called for in the Settlement and incorporated by reference from the Sentencing Guidelines, are designed to have the necessary positive impact on the Company's culture and address underlying issues that were not being addressed by the Company's prior approach. (Emphasis in original.)

Lead Plaintiffs also fought hard to empower the Compliance Committee and the GDLC, and succeeded on both counts. As to these negotiated measures, Mr. Murphy states (Murphy Decl., ¶ 9):

> The Board of Directors' Compliance Committee (comprised of three independent Intel Directors) will now control the hiring and firing of the GDLC, and will meet with that official in executive session at least twice annually. To support this function, the Settlement provides that the GDLC will have sufficient budget and staff to carry out his or her duties. Moreover, as the name of the position reflects, this position will address Intel's antitrust and competition law compliance world-wide, providing a comprehensive approach to Intel's prior problems. This and other provisions give an experienced and skilled GDLC the positioning and authority to implement and maintain a truly effective compliance and ethics program. The importance of properly positioning and empowering the person responsible for the compliance and ethics program has been a central message of the compliance and ethics profession.... In my opinion having a senior person

with direct access to the Intel directors positioned to drive the antitrust compliance program is a major and sustaining enhancement.

Mr. Murphy's Report and the other materials submitted herewith detail many other important measures which, unlike *Zoran*, came from arm's-length bargaining and nowhere else.[15]   Thus, this is not a case like *Zoran* where the most important remedial measures would have sprung into existence with or without Lead Plaintiffs' efforts.

Second, Del Gaizo's objection to Intel receiving settlement benefits too soon cannot be credited. Lead Plaintiffs had demanded since 2008 that remedial measures be taken to protect Intel from further antitrust exposure.  These measures in our view could not have been taken soon enough, and Lead Plaintiffs therefore sought to benefit the corporation by insisting that these measures go into effect within approximately 30 days of signing the Stipulation, a date set at June 30, 2010.  Of course, Intel will not be obligated to continue these measures, unless and until they are court-ordered through approval of the Settlement.  Thus, Del Gaizo's argument that nothing will be lost if the Settlement is not approved is specious.  The entire carefully-constructed compliance program encompassed in the Stipulation could fall apart completely without approval, especially if Intel finds itself freed of the (anticipated) court-ordered obligation to follow the Federal Sentencing Guidelines.  That the settlement measures will begin protecting

---

[15]   In addition, as described in the Joint Decl. ¶¶ 12-16, prior to the initiation of this litigation, demands were made for corporate therapeutic reforms in various letters and conversations, and in a meeting that was held on August 27, 2009, with counsel for Intel's Audit Committee ("Audit Committee"), which was charged with addressing shareholder demands for action.  At that meeting, Mr. Paskowitz and other Lead Plaintiffs' counsel presented the Audit Committee with a lengthy written presentation, detailing fourteen (14) discrete governance changes that should be undertaken. Mr. Paskowitz proposed additional measures during the ensuing discussion. Lead Plaintiffs believe that these efforts were the root cause of some of the reforms that came into being in the months before settlement negotiations began. Under Delaware law, because these actions were taken after demands to act were conveyed to Intel, Lead Plaintiffs enjoy as presumption of causation. *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 880 (Del. 1980)(presumption exists unless defendants show that plaintiffs' efforts "did not in any way cause their action."). *See Off v. Ross,* No. 3468-VCP, 2009 Del. Ch. LEXIS 208, at *21-22 (Del. Ch. Dec. 10, 2009)(presumption not rebutted).  In *Zoran,* it does not appear that the plaintiffs demanded any remedial actions before they were taken, so this doctrine was not applicable there.

Intel immediately, and will continue to do so even if there is an appeal is a virtue of the Settlement, not a vice.  In sum, that Lead Plaintiffs obtained ready benefits for Intel is certainly no ground to disapprove the Settlement.[16]

**C.      Lead Plaintiffs Had Sufficient Discovery and Information Prior to Settling**

Del Gaizo's assertion that Lead Plaintiffs lacked information about any aspect of this case (especially Intel's interactions with third parties) reflects her unfamiliarity with the voluminous public record.  The EC Decision, for example, which was reviewed by Lead Plaintiffs' counsel and their expert, Mr. Baker, contains thousands of pages and footnotes discussing the third party discovery record, along with the record the EC developed regarding Intel, its actions, and its officers' actions.  Del Gaizo concedes that Lead Plaintiffs reviewed the depositions of top Intel insiders from the AMD Litigation, and the attendant exhibits, which very fully explicate the various claims and defenses.  Thus, Lead Plaintiffs had an abundant record regarding the contentions in this case concerning former Chairman Barrett, CEO Otellini, Intel, AMD, Hewlett-Packard, NEC, Lenovo, and others.  The sources Lead Plaintiffs reviewed recounted the substance of a large volume of e-mails, letters, depositions, interviews, and administrative submissions.  *See* Joint Decl., ¶¶ 38-40,

Moreover, Lead Plaintiffs sought to understand Intel's defenses by reviewing not only the above, but also Intel's "white papers" on its defenses in the AMD action, and its points for appeal in the EC action.  Lead Plaintiffs also reviewed commentaries and journal articles, as well as Intel's point-by-point discussion of the New York AG's allegations contained in its 118 page

---

[16] The immediate benefits are in accord with the Third Circuit's recent observation that a class settlement agreement must be deemed "binding once it is reached."  *Ehrheart v. Verizon Wireless,* No. 08-4323, 2010 U.S. App. LEXIS 12174, at *12 (3d Cir. June 15, 2010).  The agreement, however, can be subject to defeasance if ultimately it is not approved.  *See id.* at *6-7.  This, too, negates any arguments that the Settlement is subject to suspicion because its terms require prompt action, or that disapproval of the Settlement will cause no harm.

Answer.  *See* Joint Decl., ¶ 4.  Thus, no reasonable argument can be made that Lead Plaintiffs'

counsel were not sufficiently well-informed on all issues.  *Cf. Larson v. Sprint Nextel Corp.,* No.

07-5325, 2010 U.S. Dist. LEXIS 3270, at *62 (D.N.J. Jan. 15, 2010)(counsel had sufficient

information to settle where they had access to materials in related cases that "enabled Class

Counsel to assess the strengths and weaknesses of the class claims and damage theories, as well

as the strengths and weaknesses of Sprint's counterclaims."); *Briggs v. Hartford Fin. Servs.*

*Group, Inc*., No. 07-CV-5190, 2009 U.S. Dist. LEXIS 66777, at *37-38 (E.D. Pa. July 31, 2009)

(formal discovery not required where class counsel had sufficient information from other

sources).

### D.    The Requested Attorneys' Fees are Reasonable in Light of the Demonstrable Benefits Provided by the Settlement

Puls makes two primary contentions in his objection: (1) that Co-Lead Counsel and the

negotiated Settlement have provided little benefit in this matter; and (2) the requested attorneys'

fees are excessive.  Both arguments lack merit.

As noted in detail above, the Settlement provides more than forty (40) distinct corporate

governance reforms to Intel designed to help the Company detect and prevent potential or actual

violations of global competition law and Company policy.  *See* Joint Decl. ¶ 46.  Despite Puls's

assertions to the contrary, Co-Lead Counsel engaged in spirited negotiations that centered around

both creating new antitrust compliance measures (*e.g.*, increasing the role and authority of the

Compliance Committee and bringing Intel's compliance program in line with the Federal

Sentencing Guidelines) and substantially strengthening the Company's existing protocols.

Indeed, the value of the Settlement is not "unknown" as Puls suggests, but rather reflects a highly

beneficial improvement in Intel's corporate governance and compliance regimes, matters of real

value as attested by Lead Plaintiffs' three distinguished experts.  Beyond gaining governance

15

reforms with significant value, Intel shareholders will also have the security of knowing that the Company will be required to maintain these measures for the next several years by force of court order. None of these benefits would have been possible without the diligent efforts of Co-Lead Counsel.

Likewise, Puls's allegation that the requested attorneys' fees in this matter are excessive is wholly without merit. For more than two years, the Lead Counsel firms have expended significant time and resources to obtain a substantial settlement in this matter. During this time, Co-Lead Counsel have: (1) conducted a thorough and ongoing investigation relating to the claims and the underlying events alleged in the Derivative Action; (2) reviewed thousands of pages of public documents, including Intel's public filings with the SEC, press releases, and reports of analysts covering Intel; (3) extensively reviewed and analyzed documents concerning the EC litigation, the AMD litigation, the FTC litigation, and the NYAG litigation, among other global regulatory actions related to the unlawful conduct alleged in the Derivative Action; (4) consulted with experts concerning the viability of potential derivative claims based on violations of global competition law; and (5) fully briefed a Rule 23.1 motion to dismiss. *See* Joint Decl. ¶¶ 4-5.

In light of these significant expenditures on the part of Lead Counsel and the significant benefits that the Settlement provides to the Company as noted above, the requested fees in this matter, which reflect a multiple at the lowest end of those regularly awarded in contingent litigation of this type, are more than reasonable.[17]

---

[17] Lead Plaintiffs' Memorandum In Support of an Award of Attorneys' Fees' and the Joint Declaration filed herewith documents how Lead Plaintiffs' efforts resulted in the substantial settlement benefits, and that the requested fees are well within this Circuit's guidelines.

## CONCLUSION

For the foregoing reasons, the objections should be overruled, and the Settlement and fee award approved in full.

Dated:  July 15, 2010                    **BIGGS & BATTAGLIA**

                                        /s/Robert D. Goldberg
                                        Robert D. Goldberg (ID #631)
                                        921 North Orange Street
                                        Wilmington, Delaware 19899
                                        (302) 655-9677
                                        goldberg@battlaw.com

                                        **Attorneys for Plaintiff Charles Gilman
                                        and Louisiana Municipal Police
                                        Employees' Retirement System**

                                        - AND -

                                        **PASKOWITZ & ASSOCIATES**
                                        Laurence D. Paskowitz
                                        60 East 42nd Street—Suite 4600
                                        New York, NY 10165
                                        212-685-0969

                                        **BERMAN DEVALERIO**
                                        Jeffrey C. Block
                                        Bryan A. Wood
                                        Scott A. Mays
                                        One Liberty Square
                                        Boston, MA 02109
                                        Tel: (617) 542-8300
                                        Fax: (617) 542-1194

                                        **Co-Lead Counsel for Plaintiff Charles
                                        Gilman and Louisiana Municipal Police
                                        Employees' Retirement System**

17