IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------x

IN RE INTEL CORP. DERIVATIVE       C.A. No. 1:09-cv-867-JJF
LITIGATION

-------------------------------------------------x

**JOINT DECLARATION OF JEFFREY C. BLOCK AND LAURENCE D.
PASKOWITZ IN SUPPORT OF LEAD PLAINTIFFS' UNOPPOSED MOTION FOR
FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND APPLICATION FOR AN
AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

JEFFREY C. BLOCK and LAURENCE D. PASKOWITZ, under pain and penalty of
perjury under the laws of the United States, hereby declare and say:

1.       Jeffrey C. Block is a partner in Berman DeValerio ("Berman Firm") and Laurence
D. Paskowitz is a partner in Paskowitz & Associates ("Paskowitz Firm"). The statements set
forth in this declaration are true and correct to the best of each declarant's information,
knowledge and belief. Each further declares that he is over the age of twenty-one. This Joint
Declaration is respectfully submitted in support of the settlement ("Settlement") of this
consolidated shareholders' derivative action ("Derivative Action") brought on behalf of Intel
Corp. ("Intel" or the "Company") and for its benefit, and in support of an application for an
award of attorneys' fees and reimbursement of expenses. The terms of the Settlement are set
forth in the Stipulation of Settlement dated May 25, 2010 ("Stipulation"). *In re Intel Corp.
Derivative Litigation,* C.A. No. 1:09-CV-00867 (JJF) (D. Del. Nov. 13, 3009) Docket ("Dkt."
No. 51).

## I.   INTRODUCTION

2.       The Berman Firm and the Paskowitz Firm were appointed by this Court as Co-
Lead Counsel ("Lead Counsel") for the Derivative Action by Order entered January 15, 2010
("Case Management Order"). (Dkt. 34.) The Case Management Order also appointed two Co-

Lead Plaintiffs:  the Louisiana Municipal Police Employees' Retirement System ("MPERS"), an institutional owner of 110,000 Intel shares (represented by the Berman Firm); and Charles C. Gilman ("Gilman"), an attorney and long-time Intel stockholder (represented by the Paskowitz Firm) (collectively, "Lead Plaintiffs").  Both MPERS and Mr. Gilman played an active role in the evaluation, prosecution and settlement of the Derivative Action.  Neither had any interest in this litigation other than to prosecute it vigorously and reach a fair and just conclusion for Intel. The Settlement was entered into following extensive arm's-length negotiations, including protracted discussions between the parties, confirmatory discovery, and consultation with experts in the areas of corporate governance, international antitrust law, and securities valuation related to corporate governance reforms.

3.     As detailed herein, the Settlement provides for extraordinary corporate governance relief that will substantially diminish (if not eliminate) the possibility that Intel will encounter future antitrust troubles of the type that have already cost the Company billions of dollars.  In particular, the Settlement provides for the creation or continuation of more than forty (40) discrete corporate governance measures which, among many other things, ensure: (1) that antitrust compliance is overseen by a strong and impartial "Compliance Committee" ("Compliance Committee") consisting of three independent directors; (2) that the Compliance Committee will work closely with an empowered Global Director of Legal Compliance ("GDLC"), who will report in executive session to the Compliance Committee; (3) that the GDLC cannot be dismissed, replaced or reassigned except with the Compliance Committee's approval; (4) that for the first time Intel's antitrust compliance program will be intended to comply with the provisions of the United States Federal Sentencing Guidelines ("Sentencing Guidelines"); (5) that reports on antitrust compliance issues must be made on a regular basis to

the Compliance Committee, and must be in writing; (6) that compliance procedures will be subject to an "audit" as to their effectiveness, with results reported to both the GDLC and the Compliance Committee; (7) that the Compliance Committee has authority (with or without management approval) to launch investigations, with the aid of outside subject matter experts; (8) that the Compliance Committee (and not management) will oversee compliance with the terms of both the settlement of litigation with Advanced Micro Devices, Inc. ("AMD") concluded in 2009 and with this Settlement; and (9) that any individuals found to have violated Intel's antitrust policies *will* be disciplined.

4.     These excellent results were the product of extensive preparation and aggressive litigation.  Not only did counsel vociferously demand action by Intel's board of directors ("Board") in demand letters and in-person, but they investigated and prepared their case thoroughly.  Before performing any of the confirmatory discovery described *infra*, Lead Plaintiffs, among other things, undertook:  (1) a painstaking review of the underlying record in the AMD litigation; (2) a thorough examination of the issues and findings in the 517-page, 1,798-footnote opinion issued on May 13, 2009 by the European Commission ("EC"); (3)  the Complaint and Intel's Answer in the action filed by the New York State Attorney General ("NYAG"); (4) an examination of "white papers" issued by Intel discussing its claims and defenses in the AMD litigation, and in the EC proceeding; (5) a review of journal articles and antitrust-related websites, and articles; (6) an analysis of the action filed by the United States Federal Trade Commission ("FTC"), and Intel's response thereto; (7) a review of prior "demand excused" litigation; (8) a thorough examination of the Delaware law of fiduciary responsibility, especially in the context of "demand refusal" and directorial duties to exercise oversight over corporate activities and legal strategies; and (9) consultation with corporate governance and

antitrust experts.[1]  Those exacting efforts allowed Lead Counsel to exert maximum pressure on

the Intel directors, while at the same time keeping foremost in their minds that the ultimate goal

as derivative counsel was to help Intel, and do nothing to harm the Company.

5.     The Settlement did not come easily.   It was reached only after contentious

litigation over whether Lead Plaintiffs could proceed on a theory that demand had been refused

in bad faith, such that the action could proceed under Fed. R. Civ. P. 23.1.   At the time the

Settlement was reached, a motion to dismiss on that issue had been fully briefed and was *sub*

*judice* ("Rule 23 Motion").   Moreover, Lead Plaintiffs understood that even if they were

successful in defeating the Rule 23.1 "demand" motion – no small task – they would next be

faced with a Rule 12(b)(6) motion to dismiss with uncertain odds and, if successful on both

motions, the daunting task of ***proving*** that the defendant fiduciaries consciously and in bad faith

directed Intel to engage in antitrust violations.[2]

6.     Despite those obstacles, Lead Plaintiffs were prepared to see this litigation

through to the end.[3]  Indeed, Defendants were the first to raise the possibility of settlement.  The

---

[1]     For example, to assist in the preliminary evaluation of the various antitrust issues, Samuel R. Simon, Esq. ("Simon"), was retained as an Of Counsel attorney during an early stage in this matter.  Mr. Simon is an antitrust lawyer with 30 years experience, a former attorney with the Antitrust Division of the U.S. Department of Justice ("DOJ"), and an Adjunct Professor of Antitrust Law at Rutgers University School of Law.  Among other professional activities, he has testified before Congress on behalf of the American Antitrust Institute, and has represented that body as *amicus curiae* before the U.S. Supreme Court.  In addition, Donald I. Baker, Esq. ("Baker"), an attorney with nearly 50 years of international antitrust compliance and enforcement experience in government, private practice, and academia, was retained to provide advice concerning international antitrust and competition law principles.

[2]     This standard of care for a corporate fiduciary in Delaware is set forth in the Delaware Supreme Court's decision in *Stone v. Ritter*, 911 A.2d 362 (Del. 2006)  The standards governing a Delaware director's fiduciary duty are discussed in detail in Lead Plaintiffs' Memorandum of Law in Support of the Settlement, at p. 34.

[3]     Both Lead Counsel firms are known as tenacious litigators who are not afraid to fight.  The Berman firm has taken a number of actions to trial, and through verdict.  The Berman Firm has also obtained significant corporate governance reforms from other large corporations.  The Paskowitz Firm has, as lead counsel, litigated actions for as long as six years, recently obtained a federal appellate reversal

ensuing negotiations were at arm's-length, protracted and contentious.  Several times it appeared that settlement talks had reached an impasse, only to resume days or weeks later.  For example, at one point, confirmatory discovery was halted and document reviewers sent home when Lead Plaintiffs demanded aggressive settlement terms that Defendants were initially unwilling to meet.

7.      The result of that process is the exemplary Settlement Lead Plaintiffs are pleased to submit for this Court's review.  The Settlement is eminently fair, adequate, and reasonable.  In addition, the request for fees and expenses to be paid by Intel, as is customary in derivative cases, is reasonable and should be granted.  It is important to note that no negotiations concerning fees occurred between Lead Plaintiffs and Defendants until after agreement had been reached on all substantive terms of the Settlement.

8.      The impetus for this excellent result was the hard work and strong advocacy that was undertaken by Lead Counsel.  Lead Counsel actively and zealously litigated this derivative suit and in the process carried out the following litigation tasks:  reviewing and analyzing thousands of pages of documents, deposition transcripts, public filings, press releases and other materials; investigating and preparing the initial complaints on behalf of MPERS and Mr. Gilman; investigating and preparing Lead Plaintiffs' Shareholder Demand Made Consolidated Complaint ("Consolidated Complaint"); researching and briefing opposition to a Rule 23.1 motion to dismiss the Consolidated Complaint; communicating with opposing counsel; conducting extensive confirmatory discovery concerning the facts underlying Lead Plaintiffs' claims, including review of Intel Board and committee minutes, and various internal compliance documents; preparing for and taking a confirmatory deposition concerning Intel's antitrust compliance program; reviewing Intel's applicable directors and officers primary insurance

---

of the dismissal of a derivative action, and has overcome a motion to dismiss by a corporation's Special Litigation Committee.  Both firms have, depending on the circumstances of the case, obtained substantial monetary and non-monetary settlements.

policy, and meeting with Intel's counsel regarding same; consulting with expert witnesses; engaging in intense settlement negotiations; advising Lead Plaintiffs on the course of litigation and the strengths and weaknesses of their claims; and negotiating the complex provisions of the Stipulation..

9.      Significantly, even though over 1.6 million notices were provided to Intel shareholders possessing more than **5.5 billion** shares, only three objections have been filed to date by small shareholders.   The objections are meritless.   Indeed, one of them is plainly motivated by a disgruntled law firm's attempt to obtain an oversized fee award in this matter. Specifically, the law firm of Robbins Umeda (the "Robbins Firm") filed a "demand excused" derivative case on behalf of Intel in California Superior Court in June 2008 that was soon stayed. On its face, that case presents an impermissible conflict as the plaintiff is the mother of one of that firm's associates.   Nevertheless, while the parties we negotiating this agreement, Lead Counsel attempted to include the Robbins Firm, and the partner in charge, Marc Umeda ("Umeda"), in a global settlement.  These efforts were focused on the nature of the case and the benefits of the settlement being negotiated, but were unfortunately met with counter-discussions about how to obtain a $10+ million attorneys' fee, and Mr. Umeda's desire for his firm to receive 30%-40% of such a gargantuan fee.   When Mr. Umeda learned that Lead Counsel planned to negotiate a settlement that would significantly benefit Intel but likely produce a much more reasonable fee than he had hoped for, those talks ended abruptly and the Robbins Firm proceeded on its present path.   Accordingly, the objection filed by the Robbins Firm, which demands a monetary contribution that would be *immaterial* to Intel (which has a **$112 billion** market cap

and *$16 billion* in cash) but highly material to a fee-seeking attorney should be seen for what it is.[4]

10.      Accordingly, it is respectfully requested that this Court grant Lead Plaintiffs' Motion for Final Approval of Settlement and Lead Plaintiffs' Application for an Award of Attorneys' Fees and Expenses in the amount of $1.8 million, which Intel has agreed to pay in connection with the proposed settlement.  The fee and expense award sought represents only a small multiplier of lodestar to account for contingency and other risks, and is eminently reasonable.

## II.      BACKGROUND INVESTIGATION AND LITIGATION

11.      The nature of this derivative action, the principal proceedings in this litigation, the settlement negotiations, the terms of the settlement agreement, and the fairness of the settlement, are described below.

### A.      A Shareholder Demand Is Made On Intel's Board

12.      After many years of accusation, lawsuits, and government actions asserting that Intel was involved in antitrust violations that could harm the Company, on June 12, 2008, Intel shareholder Annette Villari, represented by the Paskowitz Firm, made a demand for action upon the Board ("Demand").   The Demand outlined this history and demanded that the Board investigate, initiate necessary actions to redress any harm, and "review its own actions and those of its members concerning the manner in which they did or did not appropriately discharge their fiduciary duties with respect to the underlying claims."   On January 29, 2009, counsel for the Board sent a letter advising that the Board had deliberated and, for reasons set forth in the letter,

---

[4]      As set forth in Plaintiffs' response to the objectors, the objection of William Kelley Puls likewise has no merit.  Objector Alexander MacKenzie did not object to the settlement, but rather objected to the notice as confusing and asked that this Court take into account all factors when determining an award of attorneys' fees, if any, which he expressed as his main concern.  *See* Dkt. No. 56.

concluded that it currently was in the best interests of Intel to defer taking action on the Demand.[5]

13.     Just weeks later, on May 13, 2009, the EC announced the results of years of investigating Intel's operations in Europe.  In imposing a $1.45 billion fine, the EC cited alleged "hidden rebates" to large customers and a major retailer, and payments allegedly made to manufacturers to delay products incorporating rival technologies.  For its part, Intel has appealed the EC decision to the European Court of First Instance (now known as the General Court of the European Union), proceedings which were instituted on July 22, 2009.

14.     On June 8, 2009, Demand Counsel again wrote to the Board, detailing the EC findings, and asserting that further deferral of action on the Demand was unwarranted.  Demand Counsel was especially concerned by the passage of time in light of the directors' previous invocation of a statute of limitations defense in connection with the "demand excused" litigation initiated in this District by plaintiff Martin Smilow ("Smilow Action").[6]  Demand Counsel thus requested a meeting with counsel for the Audit Committee.  Demand Counsel received no meaningful response to that letter.

15.     When no such meeting was arranged, a letter was dispatched to Intel on July 29, 2009, demanding an opportunity to make an oral presentation to counsel for the Audit Committee, and insisting that the directors and others enter into tolling agreements.  Demand Counsel wrote: "While we do not agree that the relevant limitations periods have already passed, any further substantial delay by Intel could allow many key defendants to advance arguments as to a limitations bar."

---

[5]     Plaintiff Gilman, a long-time Intel shareholder, subsequently joined in that demand, incorporating and adopting all demand-related communications made previously by Ms. Villari.

[6]     *In Re: Intel Corp. Derivative Litig.*, C.A. No. 08-cv-93 (JJF) (D. Del.).

16.     That letter prompted an in-person meeting in New York City on August 27, 2009, at which time Demand Counsel was to make a full presentation to counsel for the Audit Committee.  Demand Counsel prepared a comprehensive written and oral presentation for that meeting, discussing in great detail:  the history of the charges made against Intel; the proceedings in the Smilow Action and Demand Counsel's interpretation of certain stances taken by Intel in that case; an analysis of the EC's publicly-announced conclusions concerning the case against Intel; an analysis of Delaware's law of fiduciary obligations and areas in which Demand Counsel contended the directors had fallen short or had failed to act independently; the need for tolling agreements; and the urgent need for Intel to take remedial action, including corporate governance changes.  To aid the Audit Committee, Demand Counsel set forth fourteen (14) discrete types of corporate actions that could help the Company to avoid further antitrust difficulties, all of which stressed the need for greater directorial oversight and independence, the strengthening and auditing internal compliance, improving training, and the protection for whistleblowers. Demand Counsel's presentation also reiterated the previous demand concerning the initiation of money damages claims.  Following that formal presentation, a colloquy ensued in which further potential remedies were discussed.

17.     The August 27, 2009 meeting did not spur formal Board action, although Intel thereafter initiated a number of the remedial measures discussed at that meeting.  In the ensuing weeks, the EC's extensive decision was released to the public, which Demand Counsel analyzed with the aid of Mr. Simon and, with regard to peculiar aspects of EC law, with our international antitrust expert, Mr. Donald I. Baker.

18.     On November 30, 2009, counsel for the Board sent a letter to Demand Counsel advising that the Board had decided to defer taking action on the Demand.

**B.     MPERS Makes Its Own Demand on Intel's Board**

19.     On November 12, 2009, MPERS, a large institutional holder of more than one hundred thousand shares of Intel common stock, acting through its counsel, Berman DeValerio, sent a letter to the Board demanding that it:  (1) investigate alleged anticompetitive business practices that were the subject of various private and regulatory proceedings; (2) initiate appropriate legal action against any Board members or employees responsible for such alleged practices; and (3) take necessary and appropriate remedial measures to ensure that Intel was protected from further harm ("MPERS Demand").  MPERS determined that its demand was necessary and appropriate after numerous consultations concerning the merits and risks of such action with Berman DeValerio, which had conducted extensive investigations into the underlying conduct and had several conversations with Demand Counsel.

20.     On December 1, 2009, counsel for the Board wrote to MPERS claiming that the Board would be made aware of the MPERS Demand and would "take up the matter in the near future."

21.     In response, on Monday, December 7, 2009, Berman DeValerio wrote to counsel for the Board, stating that MPERS had been in communication with Demand Counsel and had been made aware of the Board's continuing position that prior shareholder demands were premature for various reasons.  Accordingly, Berman DeValerio demanded assurances on behalf of MPERS by Friday, December 11, 2009, that the MPERS Demand would not be met with the same hostility afforded to prior demands.  Counsel for the Board responded simply by stating that the Board would consider the MPERS Demand at its next meeting in January, 2010.

**C.     Lead Plaintiffs' Derivative Complaints and Ensuing Litigation**

22.     Because it strongly appeared that the Board was temporizing, and would not take action on any demand, Plaintiff Gilman commenced a demand-refused shareholder derivative

action in this Court ("Gilman Action") on November 13, 2009 on behalf of Intel against defendants Craig R. Barrett, Carol Bartz, Charlene Barshefsky, Susan L. Decker, John J. Donahoe, D. James Guzy, Sr., Paul S. Otellini, David S. Pottruck, James D. Plummer, Jane E. Shaw, David B. Yoffie, and Frank D. Yeary (collectively, the "Individual Defendants") and nominal defendant Intel (collectively with the Individual Defendants, the "Defendants").   Mr. Gilman's 47-page complaint detailed the allegations made by AMD, the EC, and the NYAG; the demand letters and responses; and the reasons Mr. Gilman believed that demand had been refused in bad faith.

23.     On December 23, 2009, MPERS commenced its own demand-refused shareholder derivative action in this Court on behalf of Intel against Defendants ("MPERS Action"). The MPERS Action similarly detailed the allegations made by AMD, the EC, the NYAG, as well as recently filed allegations made by the FTC; the demand letters and responses; and the reasons MPERS believed that its demand had been refused in bad faith.

24.     On January 15, 2010, this Court entered the Case Management Order that, as previously mentioned, consolidated the Gilman Action and the MPERS Action, appointed Mr. Gilman and MPERS as Lead Plaintiffs, and appointed the Paskowitz Firm and the Berman Firm as Co-Lead Counsel ("Case Management Order").   (*See* Dkt. 34.)   In addition, the Case Management Order bifurcated dismissal motion practice, with motions to dismiss pursuant to Rule 23.1 to be briefed, argued and decided prior to any Rule 12(b)(6) motions, which would only be made and heard if issues remain following the Court's rulings on the threshold Rule 23.1 motion.  (*Id.* at 3.)

25.     On February 12, 2010, Lead Plaintiffs filed the Consolidated Complaint, alleging, *inter alia*, that various Board members and executives had breached their fiduciary duties and

caused significant damages to Intel by failing to rein in, ameliorate, countermand and/or remediate conduct that had been continuously occurring for several years at the Company in violation of global competition law, resulting in civil suits and regulatory investigations and proceedings against Intel, including without limitation:

        a.      a suit commenced by AMD and AMD International Sales & Services, Ltd., in this District entitled *Advanced Micro Devices, Inc. v. Intel Corp.*, Civil Action No. 05-441 (JJF) ("AMD Action");

        b.      an investigation and proceeding brought by the EC, in which the EC issued a decision and imposed a fine against Intel in May 2009 ("EC Action");

        c.      a series of putative class actions brought under state competition laws, consolidated in this District under the caption *In re Intel Corp. Microprocessor Antitrust Litig.*, MDL No. 05-1717 (JJF);

        d.      an action commenced by the NYAG in this District entitled *State of New York v. Intel Corp.*, Civil Action No. 09-827 (JJF) ("NYAG Action");

        e.      a proceeding by the Japan Fair Trade Commission against Intel Kabushiki Kaisha, Intel's Japanese subsidiary, which resulted in a consent decree ordering Intel Kabushiki Kaisha to cease and desist certain actions;

        f.      a proceeding brought by the Korea Fair Trade Commission, in which the Korea Fair Trade Commission entered a ruling against Intel in June 2008; and

        g.      an administrative proceeding commenced by the FTC against Intel on or about December 16, 2009, Docket No. 9341.

      26.    On March 12, 2010, Defendants moved to dismiss the Consolidated Complaint under Rule 23.1, arguing, *inter alia*, that demand had not been refused but merely deferred; that

such deferral was sensible given Intel's exposure to liability from other pending litigation; that the Directors were independent, had acted reasonably and in good faith, and that the Board's refusal to take action on Lead Plaintiffs' pre-suit demands was protected by the Business Judgment Rule.

27.     On April 9, 2010, Lead Plaintiffs served their 40-page opposition to the Rule 23.1 motion, arguing that the Board did not act in a disinterested manner in assessing Lead Plaintiffs' pre-suit demand and, therefore, the Board was not entitled to any of the protections of the Business Judgment Rule.[7]  Although Lead Plaintiffs arguments were colorable, they were under no illusion that prevailing on the Rule 23.1 Motion would be easy.  Lead Plaintiffs were well aware that a finding that a demand was wrongfully refused was a very difficult motion to win and that the non-executive directors lacked motive to take actions that would harm the Company. In fact, the number of cases in which plaintiffs have successfully established wrongful demand refusal can be counted on the fingers of one hand – and none arose in the precise circumstances presented here.[8]

28.     Even assuming that Lead Plaintiffs would have been able to prevail on both the Rule 23.1 Motion and a Rule 12(b)(6) motion, they would still have had to confront the daunting prospect of proving that the defendants, consciously and in bad faith, directed Intel to engage in the underlying antitrust violations – arguably a foundational precursor to Lead Plaintiffs' derivative claims.  Lead Plaintiffs' task was made all the more difficult by the fact that no other private plaintiff or governmental agency had charged any individual Intel executive or director with wrongdoing, let alone proved such charges.  Moreover, we presume that the Board here would have ample evidence to support the contention that its conduct was excusable because it

---

[7]     Defendants replied on May 10, 2010.
[8]     Moreover, even if we were somehow able to overcome the challenges presented by the Rule 23.1 Motion, we still would have had to overcome a Rule 12(b)(6) motion to dismiss.

was advised by domestic and international counsel with expertise in the antitrust laws – a fact that would surely resonate with a jury.  Exacerbating those liability risks, this Court previous ruled as to the presumption of the Board's apparent independence.[9]  Thus, in advancing "[a] lack of oversight claim[,]" Lead Plaintiffs are aware that they were pursuing "the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *King v. Baldino,* 648 F. Supp. 2d 609, 621 & n.53 (D. Del. 2009) (citation omitted).

### D.      The Parties Reach Agreement on Settlement Terms

29.      In early February 2010, Defendants contacted Lead Counsel to determine whether there was any interest in exploring settlement.  Although Lead Plaintiffs were not anticipating any early settlement discussions and were committed to litigating this matter vigorously through every stage, they understood their obligation to explore Defendants' overture.  An in-person meeting was thus arranged in New York, at which the parties exchanged views.  As might be expected, there were substantial disagreements.  Lead Plaintiffs asserted a need for meaningful monetary and therapeutic relief.  Although the parties seemed worlds apart, they decided to explore whether a fair settlement package could be put together to which Defendants would be receptive.

30.      In the ensuing weeks, Lead Plaintiffs sought guidance in crafting such a proposal from their primary expert on corporate governance and compliance, Joseph Murphy, Esq., CCEP ("Murphy").  Mr. Murphy is known internationally as one of the foremost experts on corporate governance, and is the co-author of the leading treatise on the subject.  Through numerous conversations and exchanges of information and ideas, Lead Plaintiffs were able to craft a comprehensive proposal that was transmitted to Defendants during the week of February 22,

---

[9]      *See In re Intel Corp. Derivative Litig.,* 621 F. Supp. 2d 165 (D. Del. 2009) (noting that Individual Defendants are presumed to be independent because they do not face "substantial likelihood" of liability).

2010.  In the meantime, Lead Plaintiffs continued to vigorously move forward with litigation, filing the Consolidated Complaint on February 12, 2010, and preparing to counter the anticipated motions to dismiss.

31.     On March 25, 2010, Lead Plaintiffs received Defendants' counter-proposal, which unfortunately fell far short of incorporating what Mr. Murphy had advised were the essential elements needed to bring Intel into accord with compliance "best practices."  In particular, Lead Plaintiffs were closely focused on ensuring compliance with the Sentencing Guidelines, strengthening an independent Compliance Committee, and ensuring an independent GDLC.

32.     Although Lead Counsel was also concerned with obtaining a monetary component to any shareholder derivative settlement, we came to understand from a review of Intel's applicable directors' and officers' liability policy ("D&O Policy"), and discussions with Intel's outside counsel regarding the same, that any such payment would (as in the vast majority of settlements) have to come from the D&O Policy.  Unfortunately, the Intel directors had only "Side A" coverage, which provides for payments only for "non-indemnifiable" conduct – meaning that no funds would be available from the insurance carrier unless and until the carrier was convinced that the directors and officers had violated their oversight duties in bad faith, and had consciously directed Intel to violate the antitrust laws or consciously permitted an inadequate system to exist as to antitrust compliance.  Lead Counsel was aware that they would have to successfully litigate the action to conclusion; however, attempts by Intel to "tap" into the "Side A" coverage at this juncture would quite arguably open the Company up to billions of dollars in liability with respect to other pending litigation in order to obtain a negotiated portion of the potential coverage.  The potentially available insurance was only a small fraction of the claimed coverage.  Given that Intel has over *$16 billion* in cash on hand, any monetary payment

obtainable from the insurance would be immaterial to the Company (although potentially highly material to an award of attorneys' fees).  As derivative counsel, we were acutely aware of our responsibility not to inflict damage upon Intel to further selfish goals.  Thus, it appeared that a corporate therapeutics settlement that could avert billions of dollars in future damages was preferable to a monetary settlement (assuming one could even have been obtained) that plainly would have been financially immaterial to Intel, but would require Intel to demonstrate that its officers and/or directors had violated their fiduciary duties in allowing Intel to commit wrongdoing.  Considering that Intel has maintained and still vigorously maintains that it has done nothing wrong, it would not admit to such wrongdoing.

33.     At the end of March 2010, having received substantial input from Mr. Murphy, Lead Plaintiffs provided Defendants with a detailed reply proposal, accompanied by a study prepared by counsel and Mr. Murphy of certain pertinent "best practices" prevailing at selected Fortune 100 companies considered Intel "peers."  A further in-person meeting of all counsel was held on March 31, 2010 in New York City.  At that juncture, the parties were seen to be close enough on key points that Lead Plaintiffs deemed it necessary to conduct confirmatory discovery to assure themselves that any settlement on the contemplated terms was fair.

34.     Accordingly, in early April 2010, Lead Counsel assembled attorneys to review numerous depositions and exhibits from the AMD Action, which were made available by Defendants' counsel.  Shortly thereafter, however, the parties fell into a contentious disagreement that derailed confirmatory discovery and seemed to end settlement talks.  In particular, Defendants balked at certain measures that both Mr. Murphy and counsel deemed essential.  Although it seemed for a time that negotiations were at an end, the impasse was

broken in mid-April by what were perceived by Lead Plaintiffs to be substantial concessions by Defendants. Thereafter, confirmatory discovery resumed and was concluded.

35.     As the ultimate Settlement terms began to solidify, Lead Counsel contacted counsel for all related plaintiffs to obtain input and approval of the essential terms of the Settlement. In addition to Lead Plaintiffs, MPERS and Gilman, there are three relevant plaintiffs: (1) Alan Paris ("Paris"), who was actively pursuing an action filed in 2010 in California Superior Court; (2) the Rosenfeld Family Trust ("Rosenfeld Trust"), which was pursuing a Section 220 action for inspection of books and records in the Delaware Chancery Court; and (3) Christine Del Gaizo ("Del Gaizo"), whose action filed June 2008 in California Superior Court had been stayed by that court shortly after filing ("Del Gaizo Action"). After consultations with counsel, MPERS and Mr. Gilman agreed to support the Settlement. Moreover, counsel for both Paris and the Rosenfeld Trust confirmed that their clients supported the Settlement. Only Del Gaizo – who is represented by the Robbins Firm – raised objections (discussed *infra*).

36.     The settlement negotiations culminated with the execution of the Stipulation of Settlement and its submission to this Court on May 25, 2010 ("Stipulation").

37.     It is clear that the presence of MPERS, as an institutional investor, was instrumental in bringing the Defendants to the negotiating table and, ultimately, influencing Defendants to agree to the terms reflected in the Stipulation. If there was ever doubt that Lead Plaintiffs were prepared to "go the distance" in order to protect the Company's interests and hold the Individual Defendants to their fiduciary duties, that doubt was erased when MPERS came onboard. Indeed, settlement talks ensued at Defendants' behest mere months after its involvement in the case. MPERS was particularly interested in ensuring that significant and

17

meaningful corporate governance reforms were part of the outcome of this case.  The corporate governance reforms here are consistent with MPERS's desire to enhance governance practices and improve Company performance in the future.

**E.      Lead Plaintiffs Undertake Efforts to Confirm the Fairness, Adequacy, and Reasonableness of the Proposed Settlement Terms**

*1.   Lead Plaintiffs Engaged in Documentary and Testimonial Confirmatory Discovery*

38.      Even prior to the settlement negotiations, Lead Counsel had very sufficient information about the claims and defenses, and Intel's alleged interaction with third party OEM's and others.  *See supra,* ¶ 4.  Lead Counsel also retained a private investigator, whose efforts yielded valuable information.

39.      In an effort to obtain even more information and confirm that the Settlement was fair, adequate and reasonable prior to entering into a final stipulation of settlement with Defendants, Lead Plaintiffs engaged in extensive confirmatory discovery.  Specifically, over the course of several weeks, Lead Counsel: (1) reviewed the deposition transcripts of twenty (20) witnesses in the AMD Action, comprising approximately 11,400 pages of testimony and 700 deposition exhibits totaling approximately 5,400 pages; (2) reviewed additional documents produced by Defendants concerning Intel's refreshed antitrust compliance program; (3) reviewed certain Board of Directors meeting minutes; and (4) prepared for, and took, the deposition of an Intel Senior Competition Compliance attorney, interrogating her on, among other things, Intel's recent antitrust compliance efforts.  Among the deposition transcripts reviewed were those of Intel's Chairman of the Board, Chief Executive Officer, General Counsel, Vice President of Sales and Marketing, and Head of Worldwide Sales and Marketing.  Lead Plaintiffs also received certain Board of Directors meeting minutes.  Lead Plaintiffs were guided throughout the

confirmatory discovery process by Mr. Murphy, with whom Lead Counsel held meetings by telephone and in-person at his office in Haddonfield, New Jersey.

40.     The confirmatory discovery, while providing some support for Lead Plaintiffs' claims, affirmed the risks associated with continued litigation in this matter, including the difficulty in proving the underlying antitrust allegations and demonstrating that pre-suit demand was wrongfully refused.  Specifically, the deposition transcripts illustrated Defendants' stance on the allegations made in this and every other related proceeding:  that they have broken no laws and that the Individual Defendants and the Company have acted entirely appropriately.  It was thus apparent from that confirmatory discovery that there would be no "smoking gun" to negate or minimize the risks Lead Plaintiffs faced if these proceedings were to continue in an adversarial manner.   Indeed, Intel also has argued in various proceedings that there is no "smoking gun"; that Intel never threatened any OEM with retaliation; that Intel did not retaliate against Dell in 2006 when it began using AMD components; that AMD was never foreclosed from competition, and indeed grew so quickly during the subject period that it even experienced capacity constraints; that no consumers suffered any injury; and that the EC applied novel and unexpected analyses and rules, and held Intel liable for "subjective" perceptions of OEM's that even the OEMs denied they had (specifically, Dell).[10]

### 2.     *Lead Plaintiffs Retained International Antitrust Law, Corporate Compliance, and Valuation Experts to Opine on the Benefits of the Settlement*

41.     To provide further confirmation that the Settlement would provide concrete and lasting benefits to Intel, Lead Counsel engaged several experts to analyze the Settlement from

---

[10]     That the EC matter involved uncertain antitrust issues and unexpected rulings is argued by Professor  Damien Geradin, Director of the Global Competition Law Center and Professor of Competition Law and Economics at Tilburg University (Netherlands) in his article, *The Decision Of The Commission Of 13 May 2009 In The Intel Case: Where Is The Foreclosure And Consumer Harm?*, available at: http://www.intel.com/pressroom/legal/docs/Damian_paper.pdf.

the standpoint of international competition law, corporate compliance and ethics, and securities valuation related to corporate governance reforms.  Specifically, Lead Counsel engaged the following internationally recognized practitioners to opine on the impact of the Settlement terms on Intel:

a.      Joseph E. Murphy, Esq., CCEP (who guided counsel throughout this litigation and was substantially involved in settlement negotiations) submits herewith a report opining, among other things, that the Settlement's governance enhancements are: "very substantial, indeed essential improvements to Intel's antitrust and competition law compliance and ethics program, and will be a key factor in improving the company's ability to comply with antitrust and competition laws and with the terms of the Settlement, and to provide the Intel Board of Directors with timely and necessary information to help prevent serious antitrust and competition law compliance issues in the future . . . .  The enhancements to the Compliance and Ethics Program agreed to by Intel will serve to move compliance and ethics to the center of attention for management, employee and the Board of Directors;" [11] and

b.      Donald I. Baker, former Assistant Attorney General in charge of the Antitrust Division of the DOJ and a Professor of Law at Cornell University, in his report opines that the Settlement provisions meet or exceed the antitrust compliance measures he has encountered at similar companies over his many years of practice in the field, and that the

---

[11]      The sworn Written Report of Joseph E. Murphy, JD, CCEP, dated July 8, 2010 ("Murphy Report") is attached hereto as Exhibit A.  Among other things, Mr. Murphy has written extensively in the corporate compliance field, including over 100 articles, seven books as author or co-author and various white papers. He is the co-author of the leading legal treatise on compliance programs, Compliance Programs and the Corporate Sentencing Guidelines: Preventing Criminal and Civil Liability (Thomson West; 1993 & Ann. Supp.), co-edited with Jeffrey Kaplan.

measures Intel agreed to institute will substantially reduce its exposure to lawsuits, fines and penalties, both domestically and internationally;[12] and

        c.      Professor Pradeep K. Yadav ("Yadav"), an internationally-renowned economist and Lead Plaintiffs' expert on the valuation and benefit of corporate therapeutic enhancements, opines in connection with this Settlement that the measures contained therein, will likely increase long term shareholder value.[13]

### III.    THE SETTLEMENT TERMS

**A.**    <u>The Parties Finalize Agreement on Settlement Terms</u>

42.    As discussed, throughout this litigation, the parties, through their respective counsel, have engaged in good-faith and protracted arm's-length negotiations to resolve the Derivative Action. The settlement negotiations culminated in the Stipulation, which fully sets forth the terms of the proposed settlement and provides that Intel will adopt significant changes to its corporate governance and antitrust compliance policies and procedures to insure that the Company does not again find itself embroiled in a rash of regulatory and private lawsuits alleging violation of various antitrust laws and placing it in peril of incurring huge fines and/or damages awards by aggrieved competitors and consumers.

---

[12]    The sworn Declaration of Donald I. Baker, Esq., dated July 11, 2010 ("Baker Report") is attached hereto as Exhibit B. Mr. Baker was consulted by counsel herein prior to the initiation of litigation. In addition to his work in government and academia, Mr. Baker is presently a partner at Baker & Miller, P.L.L.C., in Washington, D.C., and is an acknowledged expert on European competition law. He is an advisor to the British Government on international jurisdiction and antitrust questions, and the author of the recent journal article, "*An Enduring Antitrust Divide Across the Atlantic Over Whether to Incarcerate Conspirators and When to Restrain Abusive Monopolists,*" 5(1) European Competition Journal 145 (2009). Mr. Baker also opines that Intel had colorable defenses to the AMD claims, and that it has colorable points for appeal in the EC Action, such that an ultimate finding of antitrust liability was difficult ever to predict.

[13]    The sworn Written Report of Dr. Pradeep K. Yadav dated July 14, 2010 ("Yadav Report") is attached hereto as Exhibit B. The valuation estimate cited above is at Yadav Report, ¶ 4, and is further discussed throughout his presentation. Dr. Yadav is, among other things, Professor of Finance at the University Oklahoma, and author or co-author of more than fifty (50) research papers that have been presented at more than seventy (70) major international conferences.

43.     As discussed, Lead Counsel worked extremely hard to reach agreement with Defendants on the corporate governance reforms that comprise the proposed settlement.  Lead Counsel also spent significant time consulting with experts in the areas of international antitrust law, corporate compliance, and valuation to ensure that the proposed reforms were in the Company's best interests.  It took the parties numerous drafts of the Stipulation, especially with regard to the corporate governance reforms, to finalize the documentation related to the settlement.  The parties also spent significant time negotiating a proper scope of release of parties and claims.

44.     Shortly thereafter, the Stipulation was executed and filed with this Court.  The terms set forth in the Stipulation represent significant reforms in corporate governance, compliance, and risk management policies and procedures at Intel.

45.     Significantly, Intel confirmed in the Stipulation that it has already expended millions of dollars to date to implement many of the enhancements enacted after demand was made in the Derivative Action, and agreed to commit the monetary and personnel resources necessary and appropriate to implement and enforce the Company's future antitrust compliance programs, procedures, training and systems, including those outlined herein.  Moreover, Intel agreed to fully support the reforms set forth in the Stipulation for a three-year period subsequent to final approval of the Stipulation.

46.     Specifically, the Settlement provides for the following Intel corporate governance reforms:[14]

---

[14]     These compliance measures are set forth in Paragraphs 2-3 of the Stipulation.  "New" measures, *i.e.,* items which were freshly negotiated at the bargaining table, are set forth in Paragraph 3 of the Stipulation, and are listed first in the text above.  A few of the new measures involved taking compliance functions that, in Plaintiffs' opinion existed in skeletal or anemic form, and strengthening them so as to create comprehensive and meaningful oversight.  Other measures were in place or in progress, and Plaintiffs demanded that they remain in place for a number of years, and that this retention be court-

1.      Paragraph 3 Measures[15]

a.      That an independently-constituted Compliance Committee shall review Intel's policies, programs and procedures with regard to significant pending and threatened litigation, monitor the Company's programs to implement legal obligations arising from judgments, settlement agreements and other similar documents that bear upon the Company's effective conduct of its business in a legal and ethical manner, consistent with the Compliance Committee's charter;

b.      Intel agrees that its antitrust compliance policies, procedures and programs will be intended to conform in material respects to the relevant provisions of the U.S. Federal Sentencing Guidelines, and that in implementing such policies, procedures, and programs the Company will not knowingly cause the involved personnel to violate any applicable professional standards;

c.      Intel will maintain a Legal Compliance Group, which will be headed by the GDLC, and which together will be given increased roles and responsibilities for antitrust compliance based upon recommendations made to and approved by the newly-formed Compliance Committee of the Board;

d.      The Compliance Committee will review and concur in the appointment, replacement, reassignment, or dismissal of the GDLC;

e.      The GDLC shall meet with the Compliance Committee in executive session at least twice annually, or more frequently if the Compliance Committee determines after consultation with the GDLC that additional meetings are necessary, to discuss antitrust compliance matters and to report on any material changes to Intel's antitrust compliance policies, procedures, and programs;

f.      The GDLC shall, on at least an annual basis, provide a written report to the Compliance Committee outlining the GDLC's activities regarding antitrust and competition issues, and any other items that the Committee may request;

g.      The GDLC will have the authority, experience, skill, training, budget, and staff to carry out his or her responsibilities.  The GDLC shall report to Intel's General Counsel;

h.      The Compliance Committee shall consist of independent directors (as defined in the applicable rules for NASDAQ-traded issuers), will review the effectiveness of the Company's antitrust compliance policies and procedures at least annually, including the

---

mandated.  These measures are set forth in Paragraph 2 of the Stipulation.  As discussed in the Brief in Support of Settlement, Plaintiffs believe that many of these measures were spurred by Plaintiffs' continuous demands for action beginning in 2008, and that Plaintiffs are, therefore, entitled to a presumption of causation under Delaware law as to these "continuing" items.  *See Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 880 (Del. 1980) (finding that presumption exists unless defendants show that plaintiffs' efforts "did not in any way cause their action."); *Off v. Ross*, No. 3468-VCP, 2009 Del. Ch. LEXIS 208, at *21-22 (Del. Ch. Dec. 10, 2009) (finding that presumption not rebutted).

[15]     The importance of ensuring the court-ordered continuation of measures already underway is highlighted in Mr. Murphy's Report, where he opines that this creates "the conditions necessary [for these measures] to take root and become part of the Company's culture."  Murphy Report, ¶ 33.

effectiveness of any new policies and procedures established as part of this Settlement, and will review and approve a risk assessment at least annually with regard to the Company's risk of antitrust or foreign competition law violations.  The Compliance Committee shall review and approve recommended changes to Intel's antitrust compliance policies as it deems appropriate, and such approved changes shall be reported to the Board;

i.      The Compliance Committee will review and, as it deems necessary based on the recommendations of the GDLC, approve strengthening the employee training and certification programs related to antitrust compliance;

j.      The Compliance Committee is authorized to retain and consult with subject matter experts as it deems appropriate in order to carry out its review and monitoring function;

k.      The Compliance Committee members shall be given such training and education as they may request regarding antitrust compliance;

l.      The GDLC shall receive and review reports and recommendations concerning antitrust compliance matters from other personnel supporting compliance functions within the Legal Compliance Group, SMG, Finance, MMBP, and IT;

m.      Intel will review and strengthen the GDLC's role in the design, implementation and enforcement of a compliance and ethics program directed to antitrust and competition issues, as is deemed appropriate and necessary under the circumstances;

n.      In reviewing any conduct that raises potential issues regarding antitrust compliance, the GDLC or his or her delegated staff will be given full cooperation by Company personnel, including access to Company records as reasonably necessary to further any investigation into alleged antitrust misconduct, and Company personnel shall promptly respond to inquiries from the GDLC;

o.      If the GDLC determines that such assistance is necessary or desirable, the GDLC may retain and utilize personnel, outside advisors, or independent consultants who are experienced and knowledgeable in the subject matter being investigated.

p.      The GDLC shall have input into the design, implementation and enforcement of a compliance and ethics program directed to antitrust and competition issues. Any disagreement concerning the GDLC's recommendations may be reviewed and resolved by the Compliance Committee;

q.      If a credible and material report of an antitrust or competition issue is received by the Intel employee whistleblower hotline, the GDLC shall promptly be informed of this report except for good cause;

r.      Any personnel found to have violated Intel's antitrust policies will, subject to local laws, be disciplined, up to and including termination of employment;

s.      Intel shall keep records of its antitrust compliance program as the Compliance Committee deems appropriate to gauge the overall effectiveness of such program;

t.      Intel will implement an "audit" program sufficient to review and consider the effectiveness of the Company's antitrust compliance policies and procedures with respect to senior executives who are significantly involved in OEM contracting activities.  The results of

24

this audit program shall be provided to the Compliance Committee and the GDLC, and may be provided to Intel's external auditors as necessary to satisfy any financial statement audit procedures;

u.   Intel agrees that its Code of Conduct will be further revised to address antitrust compliance in a more particularized fashion, as part of the Antitrust & Competition Law Worldwide Policy and Standards element of the Code of Conduct;

v.   Any personnel found liable by a court of law in a final, non-appealable judgment for violating United States federal or state antitrust laws will, subject to local laws, be disciplined, up to and including termination of employment, and any non-independent director so found to have violated federal or state antitrust laws shall also be subject to removal from the Board;

w.   Intel will give strong weight to any officer's or employee's failure to comply with Intel's antitrust policies in making employment and compensation decisions, and in evaluating performance of all officers and employees of the Company;

x.   Consistent with the terms of its Code of Conduct, Intel agrees that any personnel found to have retaliated against or threatened retaliation against anyone for: (a) having raised an antitrust or competitive concern; or (b) having objected to a course of action on behalf of the Company on the grounds that such course of action raises antitrust concerns; shall be disciplined as contemplated by the Code of Conduct;

y.   Intel will continue to enhance its existing antitrust training and education programs for Intel officers and employees, based on the recommendations made to and approved by the Compliance Committee.  Such training and education may include topics related to compliance with the terms of recently-resolved antitrust proceedings, or such future settled antitrust actions or proceedings, as the Compliance Committee deems appropriate; and

z.   The Compliance Committee will monitor Intel's implementation of the terms of this Settlement Agreement.


2.   <u>Paragraph 2 Measures</u>

a.   Continuation of  an attorney position within the Legal Compliance Group (which was formally created in May 2008 and reports to Intel's General Counsel) to focus solely on global antitrust compliance, and the addition of attorney and non-attorney resources across most Intel geographic areas to support antitrust compliance efforts;

b.   Addition of attorneys to the various geographic areas in Intel's Sales & Marketing Group ("SMG") to provide counseling, and address compliance issues regarding antitrust and competition laws;

c.   Addition/dedication of non-attorney personnel in Finance, SMG, the Microprocessor Marketing and Business Planning ("MMBP"), and Information Technology ("IT") groups to support antitrust compliance activities;

d.   Creation of a process to audit accounts to assess compliance with Intel's antitrust policy, the results of which shall be reported to the Global Director of Legal Compliance ("GDLC") and the Compliance Committee;

e.    Creation of a process to monitor individuals' compliance with Intel's antitrust policy, the results of which shall be reported to the GDLC and the Compliance Committee;

f.    Intel will continue to refine and enhance its pricing procedures to ensure that it has reliable pricing tools to enable it to set its microprocessor prices at levels that exceed the appropriate measure of costs used to determine when prices constitute anticompetitive conduct or unfair competition;

g.    Elimination of retroactive rebates, absent approval by the head of SMG Legal;

h.    Addition of new controls on requests for Marketing Development Funds ("MDF") and Non-Recurring Engineering Funds ("NRE") with respect to Intel's principal product lines for all customers worldwide;

i.    Movement to a smaller number of standard deal types;

j.    Addition of a requirement that, absent approval by the head of SMG Legal, all new sales and pricing agreements must: (i) be in writing, (ii) include standard integration and non-exclusivity clauses, and (iii) be kept in a centralized repository;

k.    Implementation of the Intel Deal Management System ("IDMS"), an internal deal approval tool to include deal terms, cost guard band data, agreement/document repository, and rebate forecasting and payment information.  IDMS will assist with implementing and monitoring compliance with changes to sales process and policies described above;[16]

l.    Roll out of required basic antitrust training in 2009 – approximately 7,500 employees completed training in 2009;

m.    Roll out of advanced antitrust communications training course in 2009 – approximately 1,500 employees completed advanced antitrust communications training in 2009;

n.    Launch of Antitrust Awareness 2010 as a required course for over 8,000 employees, covering both SMG and the product groups;

o.    Requirement that in 2009, all employees in SMG dealing with customers certify their review of, and agreement to comply with, Intel's refreshed antitrust policy;

p.    Roll out of training on new sales processes and sales policies in the fall of 2009 to approximately 1,600 employees (primarily in SMG) involved in negotiating pricing and sales agreements.

47.    The corporate governance reforms represent a valuable benefit for Intel, especially given the risks of continuing litigation in this matter.  Lead Counsel has achieved

---

[16]    Intel rolled out IDMS in pilot form in 2009 and complete implementation for all direct customers is scheduled in 2010, with further implementation for indirect customers in 2010 and 2011.

strong corporate safeguards and fundamental changes to Intel's antitrust policies and procedures. The therapeutic value of the adoption of protocols and procedures to prevent future antitrust violations and attendant fines or settlements cannot be overstated.

## B.   Preliminary Approval and Notice of Settlement

48.   This Court entered an order on June 3, 2010, preliminarily approving the settlement and providing for notice of the settlement to be sent to Intel shareholders ("Notice Order").

49.   On June 6, 2010, printed notices describing the terms of the proposed settlement and shareholder rights were sent to 170,143 Intel common stock holders of record as of May 25, 2010 by United States mail, first-class, postage prepaid, as reflected on a list provided by Intel's transfer agent, Computershare ("Notice").  *See* Affidavit of Mailing (Dkt. 62), ¶¶ 3-4.  Moreover, as of June 30, 2010, additional copies of the Notice had been provided to another 1,395,531 beneficial owners of Intel common stock in response to requests from brokerage firms, banks, institutions and other nominee purchasers.  *Id.* ¶ 6.  Similarly, 37,275 additional copies of the Notice were provided to brokers and other nominee holders to forward to their customers.  *Id.* As of June 30, 2010, the United States Postal Service ("USPS") returned 64 such Notices with forwarding address information, each of which was forwarded to the forwarding address received from the USPS.  *Id.* ¶ 7.

50.   In all, as of June 30, 2010, 1,602,949 Notices were disseminated to record or beneficial owners of Intel common stock as of May 25, 2010 by United States mail, first-class, postage pre-paid.[17]

---

[17]   In addition, Intel made the Notice available to shareholders along with the Stipulation on the internet at http://www.intc.com/.

51.     The Notice advised Intel shareholders that the Settling Parties reached a settlement of the Derivative Action and that a hearing would be held to determine whether the proposed Settlement should be approved.   The Notice also provided logistical information to Intel shareholders as to when and where the hearing would take place.   The Notice further provided shareholders with substantive information concerning, in part:  (i) a summary of the allegations in the Derivative Action; (ii) the terms of the Settlement, including the proposed award of attorneys' fees; (iii) an invitation to appear at the hearing and show cause why the Settlement should not be approved; and (iv) a disclosure that if the Settlement is approved, the claims that were or could have been raised in the Derivative Action will be dismissed with prejudice.   Finally, the Notice provided the address and phone numbers of Co-Lead Counsel, who were prepared to address any shareholder concerns regarding matters raised in the Notice.

52.     Pursuant to the Notice, objections to the settlement had to be served and filed by July 6, 2010.   Only two substantive objections were filed with the Court as to the terms of the settlement or the fee and expense award, two of which were entirely non-substantive.[18]   The fact that there have been only one substantive objection out of over 1.6 million stockholders possessing approximately 5.5 billion shares speaks volumes to the fairness of the settlement, especially considering the fact that Intel shareholders include many sophisticated institutions that have large interests and could have easily objected through their in-house counsel if they thought it were appropriate to do so.

---

[18]     Notably, objector Alexander Mackenzie objected to the notice program and not the settlement, but made clear that his main concern was attorneys' fees and, therefore, requested that the Court "take into consideration all factors when awarding attorneys' fees."  *See* Dkt. 56.  All three objections are more fully addressed in a separate brief, Lead Plaintiffs' Response to Objections by Christine Del Gaizo and William Kelley Puls, submitted herewith.

## IV.    THE SETTLEMENT MERITS APPROVAL

53.    The proposed settlement in this case is fair, adequate, and reasonable.  It was negotiated in good faith, at arm's length among experienced counsel, after meaningful confirmatory discovery and other investigation.  It will substantially strengthen Intel's antitrust compliance regime, and will reduce Intel's future exposure to the types of lawsuits, fines and regulatory actions that have been interposed in the last several years.  It has been vetted and approved by Lead Plaintiffs' experts in the areas of corporate governance, international antitrust law, and valuation.  Likewise, after consultation with counsel, Lead Plaintiffs fully support the Settlement.  Moreover, settlement at this stage in the case will also limit the expense of risky, unnecessary, and prolonged litigation and, thus, is in the best interests of the parties.

54.    Indeed, there are significant risks in continuing this litigation.  As an initial matter, the Defendants have moved to dismiss the Consolidated Complaint based upon Rule 23.1.  Notably, this motion has been fully briefed and is still unresolved by the Court.  In addition, Lead Plaintiffs face not only the risks of establishing substantive liability and damages on the counts in the Consolidated Complaint, but Lead Plaintiffs effectively have the added burden of showing intent to violate antitrust laws that are at the heart of this litigation.  There is also the attendant general risk and uncertainty of protracted litigation that, at a minimum, will certainly result in additional expense and delay for all parties.

55.    It is the considered and informed judgment of Lead Counsel, after due consideration given to weighing the risks of continuing litigation against the benefits provided to Intel from the proposed settlement, that the proposed Settlement is fair, adequate and reasonable, and in the best interests of Intel.  Its terms are the result of in-depth negotiations over several months by experienced counsel on both sides who were aware at all times of the relative strengths and weaknesses of their respective cases through their own investigation into the

allegations in the litigation.  In light of the risks of continuing litigation and the benefits of the Settlement, as compared to the very substantial enhancements to Intel's corporate governance and antitrust compliance policies and procedures, the benefits of the Settlement overwhelmingly support approval.  Notably, Defendants' counsel, the internationally recognized law firm of Gibson Dunn, neither opposes this motion nor disputes that the proposed settlement is in the best interests of all parties.

56.    Significantly, only one substantive objection to the Settlement has been interposed.  As described in more detail in an opposition filed simultaneously herewith, one of those objections – that filed by the Robbins Firm, on behalf of Ms. Del Gaizo – is completely without merit and should be overruled.  Ms. Del Gaizo initially filed a "demand futile" lawsuit before this Court dismissed the Smilow Action.  She has never sought to lift the stay in her case and litigate this matter against the Intel directors, as did Lead Counsel.  Indeed, it is doubtful she could have done so, as Ms. Del Gaizo is the mother of one of Robbins Umeda's junior associates and thus is not independent of counsel and not an adequate derivative plaintiff, as is required by Fed. R. Civ. P. 23.1.[19]

57.    Setting aside that fatal deficiency, the substance of Ms. Del Gaizo's objection strains credulity.  At its core, her objection is that: (1) Lead Plaintiffs did not face substantial litigation risks; (2) the record strongly supports Defendants' liability; and (3) Lead Plaintiffs should have obtained a monetary recovery.  None of those arguments has any merit.

---

[19]    That a plaintiff must be independent of counsel and have no conceivable monetary interest in the lawyer's fees has long been established.  *See e.g., Zlotnick v. TIE Commun'ns, Inc.,* 123 F.R.D. 189, 194 (E.D. Pa. 1988) (holding that plaintiff was inadequate where he hired his son's firm to conduct litigation); *Kirby v. Cullinet Software, Inc.,* 116 F.R.D. 303, 310 (D. Mass. 1987) ("The closeness of the father-son relationship and the active involvement and heavy reliance on the son create an unnecessary risk of conflict between the representative plaintiff and other class members.").

58.     As described in detail above and in Lead Plaintiffs' memorandum in support of the Settlement and in Lead Plaintiffs' separate memorandum in response to the objections, although possible, overcoming Defendants' Rule 23.1 Motion on a "demand refused" theory is a difficult task at which very few plaintiffs have succeeded.  That tremendous risk alone could justify the Settlement.  Beyond that, however, Lead Plaintiffs would have faced significant difficulty proving that the Individual Defendants acted in bad faith in directing Intel to violate international competition laws.  None of them has ever been charged with such wrongdoing and they have all consistently maintained their innocence in every proceeding instituted to date. There has been no judicial finding as to their individual guilt.  In fact, the only related judicial finding is that the Board is presumed to have acted in good faith.  *See In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 176 (D. Del. 2009).   Moreover, each Individual Defendant has significant defenses to Lead Plaintiffs' claims, not the least of which is that they were following the advice of corporate counsel.  All that is to say nothing of general litigation risks of time, delay, and the all-too-real prospect of an adverse jury verdict.  Accordingly, the assertion that Lead Plaintiffs did not face significant litigation risks is unreasonable.

59.     As Ms. Del Gaizo describes it, the record in this case reflects an "open and shut" case for Defendants' liability.  That position, however, is not based in reality.  As Lead Plaintiffs' confirmatory discovery revealed, although there is some support for Lead Plaintiffs' claims, Defendants would have been able to cite to significant evidence demonstrating that the Individual Defendants (and others) did not believe any wrongdoing occurred and that they were properly following the informed advice of Intel's legal and compliance departments.  Moreover, the overall record both in the AMD Action and the EC proceedings offer no guarantees of success, as the Baker Declaration attests.  Indeed, Intel is appealing the penalty imposed by the

EC, which could very well be overturned or significantly reduced (demonstrating weaknesses in the EC's allegations).  Moreover, the very fact that AMD settled its case against Intel for what was assuredly a fraction of its alleged damages demonstrates that AMD acknowledged significant risks in its case.  Accordingly, the record in this case establishing that Intel engaged in antitrust violations is less than optimal.  It is even more precarious when it comes to demonstrating the Individual Defendants' bad faith.

60.    As to Del Gaizo last main argument, we disagree with the alleged need for monetary contributions from the Individual Defendants for the reasons stated herein.  Both Mr. Block and Mr. Paskowitz attempted to convince Mr. Umeda in the course of settlement negotiations that the Settlement being negotiated was fair and that it provided significant corporate governance reforms that would inure to the Company's benefit and shareholder value over time.  Although Mr. Umeda agreed to consider the governance changes, negotiations broke down when the subject of attorneys' fees was broached.  Specifically, Mr. Umeda expressed the view that the appropriate fee in this case should be at least $10 million, with $3-4 million of that amount going to his firm.  Lead Counsel expressed to Mr. Umeda that fee negotiations, which had yet to begin, would center on the amount of counsels' lodestar and a perhaps modest multiplier to lodestar, at which point Mr. Umeda balked at any further negotiations.  Nonetheless, attempts were made to convince Mr. Umeda that:  (a) Lead Plaintiffs would be able to obtain corporate therapeutic changes immediately that would have great value to Intel and its shareholders; (b) that the procedural and substantive obstacles to proving liability were daunting; and (c) that the monetary recovery that, in Mr. Umeda's view, was necessary to produce the blockbuster fee he wanted could only be obtained by establishing that the directors acted in conscious bad faith – a finding that would inflict enormous damage on Intel, which still faces

private and government litigation that could cost it billions of dollars; and (d) that the monetary recovery he sought (some fraction of the Company's multi-million dollar D&O insurance policy) would be immaterial to Intel, which has $16 billion in cash on hand, whereas such a recovery from insurance proceeds would expose Intel to *billions* in ancillary liability – the very definition of a "pyrrhic victory." Those arguments, however, fell on deaf ears.[20] In sum, this objection is without merit and thus should be overruled.[21]

## V. APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES

61. Lead Counsel seeks an award of attorneys' fees and reimbursement of expenses in the amount of $1.8 million, which by agreement also encompasses the application of counsel for Plaintiff Alan Paris. Intel has agreed to pay such amount.

62. As detailed in the accompanying memorandum of law, the requested fee award is well within the range of reasonable fees awarded by courts in this jurisdiction and across the United States.

---

[20] In a recent case, the Robbins Firm likewise sought large fees for little work, only to be chastised by Vice Chancellor Laster of the Delaware Chancery Court. *See Brinckherhoff v. Texas E. Prods. Pipeline Co., LLC*, 986 A.2d 370 (Del. Ch. 2010). There, the Robbins Firm objected to a settlement, obtained minor benefits in order to withdraw its objection, and sought a $500,000 fee based on an alleged $1,023,000 fee for doing practically nothing. Finding the firm's sworn affidavit concerning its hours expended to be "facially implausible," the Vice Chancellor instead awarded 8% of the requested sum. *Id.* at 397.

[21] The Robbins Firm has asked for more discovery than was provided to Plaintiffs and, further, to continue the Settlement hearing. Those requests should be denied. First, the discovery sought exceeds the discovery to which an objector is entitled. *See, e.g., In re Community Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 317 (3d Cir. 2005). Second, Ms. Del Gaizo had two full years to seek whatever documents she needed to evaluate and pursue her case (by inspection request under Delaware law, by examining the vast public record as Lead Counsel did, or otherwise), but failed to do so. Third, we have been informed that objector's counsel has neither fully reviewed the materials it received, nor made a good faith attempt to do so. Fourth, the documents Mr. Umeda seeks are cumulative and would tell him nothing about the antitrust and oversight claims and defenses that he does not already know. This exercise in "lodestar building" by a disgruntled law firm should be viewed for what it is, and treated accordingly.

63.     The total hours expended by Lead Counsel in the prosecution of the Derivative Action is 2785.95.  The lodestar, or number of hours worked multiplied by the current billing rates for each paralegal and attorney for Lead Counsel is $1,359,163.  Charts summarizing Lead Counsel's lodestar are attached hereto as Exhibits D and E.

64.     The total expenses incurred by Lead Counsel in the prosecution of the Derivative Action are $100,477.91.  Charts summarizing Lead Counsel's expenses are attached hereto as Exhibits F and G.

65.     Charts summarizing the total hours and expenses incurred by counsel for Alan Paris are attached hereto as Exhibits H and I.

66.     A chart summarizing the total hours and expenses incurred by liaison counsel are attached hereto as Exhibit J.

67.     In sum, the lodestar of Lead Counsel, Paris, and liaison counsel is $1,467,703, while the expenses are $102,829.25, for a total of $1,570,532.25.

68.     Thus, the $1.8 million in requested fees and expenses represents a multiplier of only 1.16 as applied to the total lodestars.

69.     As fully detailed herein, the proposed settlement is the result of extensive fact investigation, legal research and drafting, negotiation, and legal consultation by Lead Counsel in order to maximize the value of the corporate governance reforms.

70.     Specifically, as described above, extensive research was required to develop the factual record.  Further, Lead Counsel performed thorough work on the more conventional litigation tasks, including drafting and filing of the MPERS Complaint, the Gilman Complaint, the Consolidated Complaint, preparing the briefing in opposition to the Rule 23.1 Motion, and negotiating extensively with opposing counsel regarding settlement.  Only after lengthy and

intense negotiations with defense counsel did Lead Plaintiffs agree to resolve the Derivative Action.

71.     In considering Lead Counsel's fee application, it should be noted that there are numerous cases where the plaintiffs' counsel in contingent-fee cases such as this, after expenditures of thousands of hours, have received no compensation at all.  It is unfortunate, but true, that plaintiffs' counsel who litigate cases in good faith and receive no fees are often some of the most diligent members of the plaintiffs' bar.  The reality that Defendants and their counsel know that the leading members of the plaintiffs' bar are actually prepared to, and will, go to trial gives rise to meaningful settlements in actions such as this.  The losses suffered by plaintiffs' counsel in other actions where insubstantial settlement offers are rejected, and plaintiffs' counsel ultimately receive little or no fee, should not be discounted.

72.     Courts throughout this country have repeatedly held that is in the public interest to have experienced and able counsel enforce the fiduciary duties of corporate officers and directors as well as ensure proper corporate governance.   The vigorous private enforcement of shareholders' rights can only occur if private plaintiffs, including groups of both institutional and individual investors, can obtain parity in representation with that available to large corporate interests.  If this important public policy is to be upheld, courts must award fees that will adequately compensate private plaintiffs' counsel, taking into account the risks undertaken with a clear view of the economics of a contingency action.

73.     When Lead Counsel undertook to act as counsel in this matter, it was with the knowledge that they would likely spend thousands of hours of difficult work against some of the best corporate defense attorneys in the United States with no assurance of ever obtaining any compensation for those efforts.   Lead Counsel was well aware that the only way to be

compensated was to achieve a successful outcome.  The corporate governance benefits conferred upon Intel are particularly noteworthy especially given the risks of ongoing litigation.

74.     For the reasons set forth above and in the accompanying memorandum, Lead Plaintiffs respectfully submit that Lead Plaintiffs' Application for an Award of Attorneys' Fees and reimbursement of expenses is fair and reasonable, and should be granted.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that if called as a witness I could and would competently testify thereto.

Executed this 14th day of July, 2010, at Boston, Massachusetts

Jeffrey C. Block

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that if called as a witness I could and would competently testify thereto.

Executed this 14th day of July, 2010 at New York, New York

Laurence D. Paskowitz