# **EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

--------------------------------------------------x

**IN RE INTEL CORP.**
**DERIVATIVE LITIGATION**

--------------------------------------------------x

**C.A. No. 1:09-cv-867-JJF**

## Declaration of Joseph E. Murphy, JD, CCEP

Joseph E. Murphy does hereby declare, under pain and penalty of perjury under the laws of the United States, as follows:

### A.      Introduction and background

1.      I have been retained by Co-Lead Counsel in this matter as an expert in the area of corporate compliance and ethics.  This report provides my considered independent opinion concerning the importance of the changes to be made by Intel Corporation ("Intel" or the "Company") in its corporate compliance and ethics program as a result of the Stipulation of Settlement dated May 25, 2010 ("the Settlement") in the above-captioned litigation.  I worked closely with counsel during the negotiation process which led to the Settlement.  If called to testify regarding the contents of this report I could and would do so.

2.      **Qualifications:** My CV is attached as Appendix 1 to this Report.  I am an attorney, licensed to practice law in New Jersey and Pennsylvania.  I received my BA from Rutgers University and my JD from the University of Pennsylvania Law School.  I am also a Certified Compliance and Ethics Professional as certified by the

1

Society of Corporate Compliance and Ethics. I am of counsel to the law firm of Compliance Systems Legal Group, an advisor to and co-founder of Integrity Interactive Corporation, and an editor and co-owner of ethikos, a bi-monthly journal on corporate compliance and ethics. I am also a member of the advisory board and the Director of Public Policy (pro bono) for the Society of Corporate Compliance and Ethics ("SCCE"), a professional membership organization that champions ethical practice and compliance standards in organizations of all kinds and provides the necessary resources for compliance professionals (www.corporatecompliance.org.). My professional focus is in the field of compliance and ethics regarding programmatic efforts by organizations to prevent and detect violations of law and unethical conduct. The issues in this litigation relating to Intel's violation of antitrust and competition laws are directly within the scope of my professional field and expertise.

3.     I have written extensively in this field including over 100 articles, seven books as author or co-author and various white papers. The books include the first book on the topic of compliance programs, *Interactive Corporate Compliance: An Alternative To Regulatory Compulsion* (Greenwood Press; 1988), with Jay Sigler, and the leading legal treatise on compliance programs: *Compliance Programs and the Corporate Sentencing Guidelines: Preventing Criminal and Civil Liability* (Thomson West; 1993 & Ann. Supp.), co-edited with Jeffrey Kaplan. The white papers include: *Leading Corporate Integrity: Defining the Role of the Chief Ethics and Compliance*

2

*Officer* (August 2007)[1] and *Building Incentives in Your Compliance & Ethics Program* (SCCE; January 2009).[2] I am also one of the drafters of the SCCE Code of Professional Ethics for Compliance and Ethics Professionals[3]

      4.    I have made over 200 presentations at events on six continents, including training as a faculty member for the Compliance and Ethics Academies of the SCCE. I co-chaired the Practising Law Institute's first Corporate Compliance and Advanced Corporate Compliance seminars. I have been an advisor to companies in a broad spectrum of industries including technology, and have given presentations for and provided advice to various government agencies. I have also represented SCCE in Paris as a consultative partner to the Organization for Economic Cooperation and Development's Working Group on Bribery in International Business Transactions which addressed the role of compliance and ethics programs, and have been a witness for the United States in Washington, DC, at the OECD Phase 2 review of compliance with the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions of 21 November 1997, also addressing the role of compliance and ethics programs. I have testified on behalf of the SCCE before the United States Sentencing Commission on the 2010 proposed revisions to the Organizational Sentencing Guidelines' definition of an effective compliance and ethics program.

---

[1] http://www.corporatecompliance.org/Content/NavigationMenu/Resources/Surveys/CECO_Definition_8-13-072.pdf, contributing author,

[2] http://www.corporatecompliance.org/Content/NavigationMenu/Resources/IssuesAnswers/BuildingIncentivesInYourComplianceProgram_NonMemb.pdf, sole author.

[3] http://www.corporatecompliance.org/Content/NavigationMenu/Resources/ProfessionalCode/SCCECodeOfEthics_English.pdf.

5.     In addition to my work, research and writing in the general field of compliance and ethics, much of my practice has been focused specifically on antitrust and competition law compliance.  For twenty years of my career I was an in-house lawyer with responsibilities for antitrust and competition law compliance.  This included participation in litigation and compliance efforts associated with *United States v. AT&T*, then the largest Sherman Act section 2 case.  In private practice I have conducted antitrust training as well as antitrust compliance audits for companies, and have evaluated compliance program efforts.  I have also presented and written on this topic, including presentations for the then Australian Trade Practices Commission and later the Australian Competition and Consumer Commission, and for the American Bar Association Antitrust Section.

## B.     Nature of Retention

6.     I have been retained by plaintiffs' derivative counsel in this litigation to provide advice in assessing certain aspects of Intel's corporate compliance and ethics program, particularly with regard to antitrust and competition law compliance.  I have also been retained to provide input on appropriate improvements to such compliance and ethics procedures.  I have been retained at my usual hourly rate and have been timely paid for my services.

## C.     Summary of Opinions

7.     The changes to Intel's compliance and ethics program agreed to in the Settlement constitute important and substantial benefits to Intel.  Intel has been the subject of multiple lawsuits alleging violations of antitrust and competition laws, the

4

entry of a huge fine in proceedings brought by EU competition authorities, and the payment of a very large settlement in antitrust litigation brought by AMD, Inc. It is also being sued by the Federal Trade Commission and remains a defendant in several additional private antitrust actions.  In addition to the obvious negative effects engendered by these litigations, such proceedings have been accompanied by adverse publicity, with its negative effects on Intel's reputation in the marketplace, and substantial business disruption to the Company.  I have provided guidance on proposed corporate compliance and ethics improvements to plaintiffs' counsel relative to Intel, which I believed were necessary and appropriate to both detect and prevent anticompetitive conduct by Intel and those acting on its behalf going forward. I was asked to opine on the importance of the compliance and ethics program improvements to the Company negotiated as part of this Settlement.

8.      It is my opinion that the changes set forth in the Settlement  are very substantial, indeed essential improvements to Intel's antitrust and competition law compliance and ethics program; they will be a key factor in improving the Company's ability to comply with antitrust and competition laws and in providing the Intel Board of Directors with timely and necessary information to help prevent serious antitrust and competition law compliance issues in the future.

9.      While there are a number of important improvements to Intel's compliance and ethics program provided by the Settlement, there are two in particular that merit special note.  The first is Intel's agreement to designate and empower a Global Director of Legal Compliance ("GDLC").   The Board of Directors' Compliance Committee (comprised of three independent Intel Directors) will now

5

control the hiring and firing of the GDLC, and will meet with that official in executive session at least twice annually. To support this function, the Settlement provides that the GDLC will have sufficient budget and staff to carry out his or her duties. Moreover, as the name of the position reflects, this position will address Intel's antitrust and competition law compliance world-wide, providing a comprehensive approach to Intel's prior problems. This and other provisions give an experienced and skilled GDLC the positioning and authority to implement and maintain a truly effective compliance and ethics program. The importance of properly positioning and empowering the person responsible for the compliance and ethics program has been a central message of the compliance and ethics profession. See *Leading Corporate Integrity: Defining the Role of the Chief Ethics and Compliance Officer* (August 2007),[4] *Perspectives of Chief Ethics and Compliance Officers on the Detection and Prevention of Corporate Misdeeds* (RAND 2009).[5] In my opinion having a senior person with direct access to the Intel directors positioned to drive the antitrust compliance program is a major and sustaining enhancement.

10. The second essential element of the Settlement is Intel's commitment that its compliance and ethics program "is intended to conform in material respects to the relevant provisions of the US Federal Sentencing Guidelines." The Federal Sentencing Guidelines (the "Sentencing Guidelines" or "Guidelines") are the template against which the effectiveness and *bona fides* of compliance and ethics programs are judged across the board. Although the Guidelines literally speak to criminal conduct,

---

[4] http://www.corporatecompliance.org/Content/NavigationMenu/Resources/Surveys/ CECO_Definition_8-13-072.pdf;

[5] http://www.rand.org/pubs/conf_proceedings/CF258/

they have been applied throughout industry and government as *the* appropriate standards for any type of compliance program, including those dealing with violations of the civil law. This approach is also reflected in the language of the Guidelines themselves, which call for "compliance *and ethics* programs" (emphasis added), thus recognizing that effective programs do not stop with a focus solely on criminal law. The provisions of the Guidelines call for strong, aggressive provisions for a program, including steps to "promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law." The terms of the Sentencing Guidelines standards are set forth in Appendix 2. Intel's commitment to conform to these Guidelines means that it *must* use due diligence to have a program that is reasonably designed, implemented, and enforced to prevent violations, including all seven of the steps called for in the Guidelines standards.

### D.      **Materials Reviewed and Considered**

11.      In reaching these opinions I have reviewed the complaint filed by the Derivative Plaintiffs and reviewed materials provided by Intel on the steps it has agreed to take in its antitrust and competition law compliance program as a result of the Settlement. I have reviewed the Intel Code of Conduct (May 2, 2007) and the Charter of the Compliance Committee (as approved January 21, 2010), and the Stipulation of Settlement in this matter. I have also consulted with Derivative Counsel on a number of occasions. I have had reference to my 34 years of practice in compliance and ethics, including 20 years in-house, plus years of familiarity with the literature and presentations in this field.

## E.   The Importance of Corporate Compliance and Ethics

12.   The heart of any compliance and ethics program is management commitment to act legally and ethically, and the use of effective management steps to ensure that this commitment is met.  Company compliance programs had been in existence for decades, but the genesis of compliance and ethics as a field of study and practice dates to the adoption of the United States Sentencing Guidelines for Organizations, Chapter 8 of the Sentencing Guidelines Manual, in 1991.  These Guidelines, issued by the Commission under the Sentencing Reform Act of 1984, 28 U.S.C. sections 991-998, have set the standards for compliance and ethics programs throughout the United States, and extended their influence to enforcement and regulatory agencies around the world. The Guidelines were amended by the Sentencing Commission in 2004, and additional revisions are now pending before Congress.   The Guidelines establish a framework of 7 minimum steps that an organization must follow in order to receive credit in sentencing for federal crimes. In practice, however, they have served as the measurement for enforcement and regulatory authorities in determining how to proceed against companies that have violated the law.  They are, for example, referenced in the US Attorneys Manual as factors to be considered in determining whether to bring charges against a company.

13.   As the Delaware Chancery Court stated in *In re Caremark International Inc. Derivative Litigation,* 698 A.2d 959 (1996), "Any rational person attempting in good faith to meet an organizational governance responsibility would be bound to take into account this development" of the Sentencing Guidelines.  Nor is

8

this emphasis on compliance and ethics programs simply an American phenomenon. Companies like Intel, which operate internationally, need to institute compliance and ethics programs to meet the expectations of enforcement authorities in other jurisdictions as well.   Regulatory and enforcement agencies in countries such as Canada, the UK, Israel, India, Singapore and Australia have all issued guidance documents on the importance of having competition law and antitrust compliance programs. See, *e.g.*, Competition Bureau Canada, Corporate Compliance Programs (2008).[6]

14.      Compliance and ethics programs offer companies a broad list of benefits that any company needs to take into account.   These range from protecting a company's reputation, to reducing the risk that enforcement authorities will bring criminal charges against a company if a violation is discovered, to helping to protect the company itself from waste, fraud, abuse and others' anticompetitive conduct. *See*, e.g., Roach, Snell & Wollschlager, *The Complete Compliance and Ethics Manual* Ch. 2 (SCCE; 2004). Compliance efforts may even uncover opportunities for a company to compete more effectively.   ABA Section of Antitrust Law, Antitrust Compliance: Perspectives and Resources for Corporate Counselors 113 (2005).

## F.      Why Intel's Compliance and Ethics Program Needed Improvement

15.      According to the allegations in this case, Intel's alleged violations of the antitrust laws had their origins in executive management.   Yet the Company's

---

[6] http://www.competitionbureau.gc.ca/eic/site/cb-bc.nsf/vwapj/Compliance-Bulletin-090808-Final-e.pdf/$FILE/Compliance-Bulletin-090808-Final-e.pdf .

9

approach to compliance and ethics was more focused on generalized ethics and to a limited extent conveying information about the law to employees but did not utilize the full range of management techniques called for in the Sentencing Guidelines. Especially important for the program's effectiveness was for the program to have a senior level leader who would have direct access to the Board of Directors and the ability to take steps to prevent and detect at an early stage conduct at the executive level that would be anticompetitive.

16.     Based on the allegations made against it, Intel's prior compliance and ethics program appears to have failed in fact to address the actual compliance and ethics risks it faced.  No one appeared to be empowered in a way that enabled them to object to allegedly improper, anticompetitive conduct and to reach a receptive audience at the Board of Directors level.

17.     General policy statements, and even occasional training, are not sufficient to detect and prevent anticompetitive conduct.  The types of management steps and new protections called for in the Settlement and incorporated by reference from the Sentencing Guidelines, are designed to have the necessary positive impact on the Company's culture and address underlying issues that were not being addressed by the Company's prior approach.

## G.     The Value of the Improvements to Intel's Compliance and Ethics Program

18.     The enhancements to the Compliance and Ethics Program agreed to by Intel will serve to move compliance and ethics to the center of attention for

management, employees and the Board of Directors. Following the standards of the Sentencing Guidelines, the program must be part of a process to promote "an organizational culture that encourages ethical conduct and a commitment to compliance with the law."

19. The changes agreed to by Intel in the Settlement represent substantial steps to prevent future antitrust and competition law violations by Intel. In the Settlement Stipulation (Para. 2.r.), last sentence, it states that the company "agrees to commit the monetary and personnel resources necessary and appropriate to implement and enforce the Company's future antitrust compliance programs, procedures, training and systems." This reflects the message of the Sentencing Guidelines that the person responsible for a compliance program must be given "adequate resources." This commitment of resources helps assure that funding and personnel will be available to get the compliance job done. Compliance and ethics programs are not self-executing; monetary and personnel resources will help bring the program to life.

20. Intel's commitment to the creation of the position of "Global Director of Legal Compliance" ("GDLC") is a critical driver for the program. According to the Settlement, the GDLC will be supported by a Legal Compliance Group. Most importantly the GDLC is to have the "authority, experience, skill, training, budget and staff" to meet his or her responsibilities. This empowerment is buttressed by having the GDLC subject to the control of a committee of the Board of Directors, the Compliance Committee; that committee must "review and concur in the appointment, replacement, reassignment, or dismissal of the GDLC." This is an extraordinarily

11

important level of protection. In the antitrust and competition law field, the most serious violations tend to occur at the executive level. Having compliance under the control of the very managers most likely to engage in violations is certainly problematical. But with the commitment to provide the necessary resources, backed up by control by a Board committee, the GDLC is positioned to be able to execute on the Settlement's commitment.

21.    The Settlement does not leave the GDLC to his or her own devices in obtaining access to the Board. Rather, it directly addresses this issue, stating that the "GDLC shall meet with the Compliance Committee in executive session at least twice annually, or more frequently if the Compliance Committee determines . . . ." (Settlement Stipulation, Para. 3.a.(v)). The use of executive sessions is a best practice step that helps prevent interference by senior management. The GDLC has the Board access necessary to retain his or her credibility and leverage in dealings with senior executives and other powerful persons in the Company. The GDLC is also to provide a written report at least annually regarding the compliance program's activities. This helps meet the Board's obligation to ensure that there is an adequate system to prevent violations.    Jurisdiction over any Company disagreements regarding recommendations by the GDLC is vested in the Compliance Committee (Settlement Stipulation, Para. 3.a.(ix)).

22.    For the GDLC to function effectively he or she and those acting for the GDLC need to be able to determine what is happening throughout the Company. (Settlement Stipulation, Para 3.a.(vii)) covers this by providing that they "will be given full cooperation by Company personnel, including access to Company records

12

as reasonably necessary" and Company personnel are directed to "promptly respond to inquiries from the GDLC." In addition, the existence of this right of access by the GDLC and staff serves as a deterrent to misconduct by others.

23.     For compliance and ethics professionals to be effective it is important that they have access to the advice and expertise they need. (Settlement Stipulation, Para 3.a.(viii)) gives the GDLC the power to "retain and utilize personnel, outside advisors, or independent consultants who are experienced and knowledgeable in the subject matter being investigated." This also means the GDLC does not have to rely on in-house lawyers and experts, who might, in a particular case, have been involved in the matter under investigation and thus potentially be biased about the matter under consideration.

24.     The Settlement Stipulation (Para 3.b.) addresses additional points about the role of the board's Compliance Committee. This Committee is to be composed of independent directors. This follows the model of corporate audit committees which exclude insiders to avoid any appearance of bias. The Committee is to review the compliance and ethics program's effectiveness at least annually. Reviews of effectiveness are an important element in keeping any program dynamic. This was recognized in the Sentencing Guidelines 2004 revisions, U.S.S.G. section 8B2.1(b)(5)(B), which added assessment as an essential element for a compliance program:

> (5) The organization shall take reasonable steps—
> *****
> (B) to evaluate periodically the effectiveness of the organization's compliance and ethics program;

13

The review of the program's effectiveness means more than just determining whether steps, such as training and auditing, were implemented throughout the Company. An effectiveness review requires the Committee to study whether these steps are actually working. To assist the Committee in its evaluation, the Settlement Stipulation (Para. 3.b.(i)) provides that the Company is to keep records of the program.

25.     The Settlement Stipulation (Para. 3.b.) also directs the Compliance Committee to "review and approve a risk assessment at least annually" regarding antitrust and competition law violations. Experience has shown that the risks of violation evolve and change over time, and that an effective compliance and ethics program needs to address the risk environment periodically. This was also a development specifically recognized in the 2004 revisions to the Sentencing Guidelines, which now include periodic risk assessments as an essential program element. U.S.S.G. section 8B2.1(c).

26.     The Settlement Stipulation (Para. 3.b.(ii)) calls for one of the most important elements of any compliance program, a program to conduct audits. The provision focuses on executives; as noted above, historically and as indicated in the allegations in this case, it is at executive level where the greatest antitrust and competition law risk resides. Audits add value to a program, because unlike training and manuals they do not depend solely on the good faith of managers to follow the rules; rather, by using audits the Company is sending a message that it will dig deeper to ensure that the Company's leaders are, in fact, obeying the law. The results of the audits are to be reported to the GDLC and the Compliance Committee, assuring high-

14

level attention.    This auditing feature also follows the Sentencing Guidelines standards, U.S.S.G. section 8B2.1(b)(5)(A), which state that:

> "(5) The organization shall take reasonable steps—
> (A) to ensure that the organization's compliance and
> ethics program is followed, including monitoring
> and auditing to detect criminal conduct"

"Outside antitrust audits provide an invaluable perspective on the overall effectiveness of the organization's antitrust compliance program.  . . . . [A]n audit provides essential signals to management about the true state of antitrust compliance." ABA Section of Antitrust Law, *Antitrust Compliance: Perspectives and Resources for Corporate Counselors* 113 (2005). Including audits also responds to the views of Justice Department Antitrust Division spokespersons, who have said of compliance programs: "[I]f a compliance program boils down essentially to 'we told them not do,' the Division is likely to be less than impressed." Roberts, "Antitrust Compliance Programs Under the Guidelines:    Initial Observations From the Government's Viewpoint," 2 Corp. Conduct Q. 1, 3 (Summer 1992).

27.    Not only is the GDLC empowered by having a direct relationship with the Board's Compliance Committee, but the Committee itself is fully empowered to execute effectively its oversight responsibilities for the compliance and ethics program. In the Stipulation of Settlement (Para. 3.b.(vi)) the Committee is given authorization to retain subject matter experts, so it does not have to rely solely on in-house experts who may have an interest in a matter under review. *Id.* (Para 3.b(vii)) provides that the Committee can obtain any training and education it deems necessary. This helps ensure that its oversight will be meaningful and informed.

15

28.     Para. 3.c. of the Stipulation of Settlement is one of the single-most important commitments by Intel regarding its compliance and ethics program. Here the Company agrees that its program "is intended to conform in material respects to the relevant provisions of the US Federal Sentencing Guidelines." As noted above, the Sentencing Guidelines are the core template for effective programs. An entire literature, including books, white papers and articles and complete conferences and programs have been tied to this standard. Following are only highlights of the Guidelines standards that would apply to Intel:

a.  Companies are to (1) exercise due diligence to prevent and detect criminal conduct; and (2) otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law. U.S.S.G. section 8B2.1(a). This means that mere paper or formalistic efforts do not meet the standards, nor does a legalistic focus on statutory technicalities. A program must be diligent and also affect what happens on a daily basis in the company. To be effective under these standards it must affect a company's corporate culture – what really matters in the company and how things get done in the workplace.

b.  A company must have standards and procedures to prevent violations; "procedures" is defined to include internal controls. U.S.S.G. section 8B2.1(b)(1); U.S.S.G. section 8B2.1 Commentary app. note 1. The company must spell out how it expects those acting for it to comply with the law, and then use preventive measures (controls) to ensure this happens. Examples of controls can be seen in Murphy, 501 Ideas for Your Compliance and Ethics Program 9-10 (SCCE; 2008).

c.  The Board of Directors is to be "knowledgeable about the content and operation of the compliance and ethics program and [is to] exercise reasonable oversight . . . ." U.S.S.G. section 8B2.1(b)(2)(A). This helps assure that the highest authority in the company is connected to what is happening in the company's efforts to prevent violations.

d.  High-level personnel in Intel are responsible for the success of the program; they cannot merely delegate that duty to a separate compliance person or any subordinates. The senior people in the

16

company must support the program and the commitment to compliance and ethics. A high-level person must also be designated responsibility for managing the compliance and ethics program. Thus, not only does the Settlement on its own terms empower the GDLC, but under the Sentencing Guidelines the person must be a high-level person in the company. U.S.S.G. section 8B2.1(b)(2)(B).

e.  A specific person or persons must have operational responsibility for the compliance and ethics person, and this person must report to high-level personnel and the board as appropriate. The person must have "adequate resources, appropriate authority, and direct access to the governing authority or an appropriate subgroup of the governing authority." U.S.S.G. section 8B2.1(b)(2)(C). Again, not only do the express terms of the Settlement direct that the GDLC have the wherewithal to get the job done, but the company's commitment to the Sentencing Guidelines' standards back up this requirement.

f.  Under U.S.S.G. section 8B2.1(b)(3) the company may not delegate substantial discretionary authority to anyone the company knew or should have known "has engaged in illegal activities or other conduct inconsistent with an effective compliance and ethics program." In practice, the company cannot circumvent its Settlement commitments by hiring or promoting people who would likely commit violations.

g.  The company must "communicate periodically and in a practical manner" to its board, management, employees and as appropriate, its agents, its standards and procedures and other aspects of its program. This is to be done by "effective training programs" and "disseminating information" that is appropriate based on individuals' roles and responsibilities. U.S.S.G. section 8B2.1(b)(4). Thus, having mere lawyers' lectures on legal detail, or ephemeral discourse on ethics does not meet this standard. The antitrust and competition law training will need to be practical and tailored to the people being trained. Those being trained will have to include the board and the senior executives.

h.  The Guidelines will require Intel to take reasonable steps to ensure that the compliance and ethics program is followed, including "monitoring and auditing to detect criminal conduct." U.S.S.G. section 8B2.1(b)(5)(A). This is a rigorous standard, requiring the company actually to seek out potential violations. It reminds the company that an antitrust compliance program cannot rely on trust; monitoring and auditing need to be focused on the actual risks of violations and designed to uncover them. They "should include a review of both the paper and computer files (especially e-mails) of employees with competitive decision-making authority or sales and marketing

responsibilities. It is important also to interview employees about their business and their contacts with competitors." Kolasky, "Antitrust Compliance: The Government's Perspective," 16 ethikos 6, 8 (Sept/Oct 2002). The existence of an auditing program also serves as a deterrent to deliberate misconduct.

i.  The company will also need to "evaluate periodically the effectiveness of the organization's compliance and ethics program." U.S.S.G. section 8B2.1(b)(5)(B). This reinforces the requirement of Stipulation of Settlement (para. 3.b.) for the Compliance Committee to review the program's effectiveness. The evaluation process helps assure that the company does not become complacent about the program's operations and effectiveness.

j.  Employees and others acting for Intel will have to have a system available to obtain advice and to report violations, without fear of retaliation. U.S.S.G. section 8B2.1(b)(5)(C). For a company like Intel this typically entails having a helpline system accessible globally. See Kolasky, "Antitrust Compliance: The Government's Perspective," 16 ethikos 6, 8 (Sept/Oct 2002) ("A company also needs to have in place and publicize a reporting system so that employees know to whom to report possible misconduct.") The reference to reporting "without fear of retaliation" calls for action by the company to prevent any backlash against those who raise issues. This is a very important step, because the fear of retaliation can cause those who witness misconduct not to speak up, and allow violations to proceed unchecked.

k.  The Guidelines require companies to use their incentive systems to promote the compliance and ethics program. In the words of the Guidelines there need to be "appropriate incentives to perform in accordance with the compliance and ethics program." U.S.S.G. section 8B2.1(b)(6)(A). There are many steps companies can take to meet this standard; an SCCE white paper that I wrote enumerates a broad range of ways companies can meet this standard; see Murphy, *Building Incentives in Your Compliance & Ethics Program* (SCCE; January 2009).[7] This standard recognizes the important role incentives play in driving corporate behavior, and directs the company to use those same types of incentives to promote commitment to the compliance and ethics program.

l.  Companies must also hold those who act for them accountable through "appropriate disciplinary measures for engaging in criminal conduct

---

[7] http://www.corporatecompliance.org/Content/NavigationMenu/Resources/Issues Answers/BuildingIncentivesInYourComplianceProgram_NonMemb.pdf.

and for failing to take reasonable steps to prevent or detect criminal conduct." U.S.S.G. section 8B2.1(b)(6)(B). Not only does this mean that those who violate the law must be disciplined, but it also extends to "on your watch" responsibility. An executive whose subordinates ignored the compliance and ethics program under the eyes of the executive and engaged in anticompetitive conduct could not simply use subordinates as scapegoats; an executive who does not take reasonable steps to prevent or detect the violations must also be disciplined. This is a powerful reminder to executives that they are responsible for promoting an effective compliance and ethics program, and that it is in their interest to know what their subordinates are doing.

m. If a violation is discovered the company must "respond appropriately" and to prevent recurrence, "including making any necessary modifications to the organization's compliance and ethics program." U.S.S.G. section 8B2.1(b)(7). This would typically include investigating allegations and then examining and fixing any aspects of the compliance and ethics program that were not strong enough to prevent the misconduct. This process of investigating lapses and taking corrective steps to strengthen the program helps keep the compliance and ethics program dynamic.

n. The company must periodically conduct a risk assessment and then factor that into the design of the program. U.S.S.G. section 8B2.1(c). This element reinforces the risk assessment requirement imposed on the Compliance Committee by Stipulation of Settlement (para 3.b.).

o. The Guidelines also state that failure to keep up with "applicable industry practice" weighs against a finding of effectiveness. U.S.S.G. section 8B2.1 Commentary app. note 2 (B). To meet the Sentencing Guidelines standards Intel thus must also be aware of what peer companies are doing in their programs and take steps to keep up with the state of the art. Compliance and ethics professional associations, like the SCCE, provide vehicles for meeting this standard through conferences, literature, training, social networking and other professional activities.[8] This is another important element in preventing complacency and having a program become dormant.

p. The Sentencing Guidelines standards are also currently being enhanced to emphasize the importance of the person responsible for managing the operations of the compliance and ethics program; in Intel's case this would be the GDLC. For company programs to receive credit even if a high level person is involved in a violation, the company must meet

---

[8] See www.corporatecompliance.org.

certain conditions.    One of these requires that the person with operational responsibility "have direct reporting obligations to the governing authority or an appropriate subgroup thereof."   This is explained as meaning "express authority to communicate personally to the governing authority or appropriate subgroup thereof (A) promptly on any matter involving criminal conduct or potential criminal conduct, and (B) no less than annually on the implementation and effectiveness of the compliance and ethics program." USSG Section 8C2.5(f)(3)(C) & Application note 11. This element would serve to reinforce strongly the Settlement's commitment to have the GDLC reporting to the Compliance Committee.

29.    The Stipulation of Settlement (Para. 3.c.) also pledges that the Company will not "knowingly cause the involved personnel to violate any applicable professional standards."   Thus professionals involved in the compliance and ethics program could confidently live up to their professional responsibilities.  If members of Intel's compliance and ethics program join a professional compliance and ethics organization this provision can add great strength to the program.  For example, the SCCE Code of Professional Ethics for Compliance and Ethics Professionals,[9] would require any compliance and ethics professional to "take such steps as are necessary to prevent misconduct by their employing organizations," (Rule 1.2), escalate threatened misconduct to the board, (Rule 1.4), and keep the board informed of the status of the compliance and ethics program, (Rule 2.4).

30.    Pursuant to the Stipulation of Settlement (Para. 3.d). the Company will revise its code of conduct to cover antitrust compliance in a "more particularized fashion."   This is important to remedy the more general, less practical approach in the

---

[9] http://www.corporatecompliance.org/Content/NavigationMenu/Resources/ ProfessionalCode/SCCECodeOfEthics_English.pdf

prior version of the code.  The code then can serve as a resource and reference for all those acting for Intel.

31.     Pursuant to the Stipulation of Settlement (Paras. 3.d.(i)-(iv)) the Settlement provides for accountability under the compliance and ethics program. Violations of the Company's antitrust policies are subject to discipline, including termination.   This provision makes the important point that violations of policy, which precede but can lead to violations of law, are themselves enforced by discipline; the Company will not wait for actual legal violations, although these are also subject to discipline.  Retaliation and threats of retaliation against anyone for raising an antitrust issue or objecting to an action based on antitrust concerns is also subject to discipline.   Failure to comply with the antitrust policies will also be strongly weighed in performance evaluations and in employment and compensation decisions.  This is a recognition that those things drive performance in a company and need to be included as part of the compliance and ethics effort.

32.     Pursuant to the Stipulation of Settlement (Para. 3.e.) the Company will enhance its training and education programs for officers and employees.    This commitment is reinforced by the Sentencing Guidelines provision specifying that communications must be part of an effective program.

33.     The Stipulation of Settlement (Para. 4) provides that the compliance and ethics program provisions extend for a period of three years. This is an important time interval that will enable the GDLC to become fully positioned and empowered, and for the Compliance Committee to establish its expectations and approaches. During this period of time the Board will have become accustomed to receiving the

21

level of detail contemplated by the reporting provisions of the Settlement, and this level of oversight can then continue to energize the program. The three year implementation interval also gives the program the conditions necessary to take root and become part of the Company's culture.

DATED July 8, 2010

Joseph E. Murphy, JD, CCEP

# Appendix 1

## *Curriculum Vitae of Joseph E. Murphy*

**HOME:**

> 57 Chestnut Street
> Haddonfield, NJ 08033
> 856 429-0508

**OFFICE:**

> 30 Tanner Street
> Haddonfield, NJ 08033
> Phone: 856 429-5355
> Fax:    856 429-0866
> E-mail: JEMurphy@voicenet.com

**EDUCATION:**

> University of Pennsylvania Law School
> J.D. 1973
> Honors:  Law Review, 1971-73; Managing Editor, 1973; Order of the
> Coif
>
> Rutgers University
> B.A. 1970  Major: Political Science  Honors: Graduated magna cum
> laude; distinction in political science; member, Athenaeum (college
> honorary society); member, Pi Sigma Alpha (national political science
> honor society).

**EMPLOYMENT:**

> 1996-Present
> Joseph E. Murphy, PC
> Haddonfield, NJ
> President.  This firm provides compliance and ethics advice and
> assistance to companies and other organizations.
>
> 1996-Present
> Compliance Systems Legal Group
> Haddonfield, NJ

Of counsel. This firm provides consulting and legal services to companies and government agencies in the field of business ethics and compliance.

1999-2007
Integrity Interactive Corporation
Haddonfield, NJ
Co-founder; senior advisor; vice-chairman of the board. This corporation provides online compliance training and other compliance-related services.

1984-1996
Bell Atlantic Corporation
Philadelphia, PA
Senior Attorney - Corporate Compliance. Designed corporate-wide compliance program and was the lawyer responsible for the program. This practice covered compliance issues ranging from antitrust to the Foreign Corrupt Practices Act, in places as diverse as Minot, North Dakota, Wellington, New Zealand, and Prague in the Czech Republic. The responsibilities included the full range of compliance activities including training, investigating allegations of misconduct, drafting code and policy documents, and conducting compliance audits.

1976-1984
Philadelphia, PA
Attorney, Bell of Pennsylvania and Diamond State Telephone Companies. Worked on the major Bell System antitrust cases and provided antitrust compliance training. Work also included environmental compliance in response to the Resource Conservation and Recovery Act.

1982-1986
Philadelphia, PA
Institute for Paralegal Training
Part-time instructor in commercial law for corporate and litigation programs.

1973-1976
Philadelphia, PA
Associate, Wolf, Block, Schorr and Solis-Cohen. Commercial and corporate advice and litigation practice.

***PROFESSIONAL AFFILIATIONS:***

Member, New Jersey and Pennsylvania Bars

Member, Philadelphia, Camden County and American Bar Associations

Certified Compliance and Ethics Professional, Society of Corporate Compliance and Ethics, 2006 - present.

Co-Founder and Co-Editor in Chief, Corporate Conduct Quarterly, published by Rutgers University, 1991-1997

Co-Editor in Chief, ethikos and Corporate Conduct Quarterly

Past Member of the Board of Directors, Health Care Compliance Association/

Member of the Advisory Board, Society of Corporate Compliance and Ethics

Director of Public Policy, Society of Corporate Compliance and Ethics

Co-author, HCCA and SCCE Codes of Ethics.

Member, BNA/ACCA Prevention of Corporate Liability Advisory Board

Member, Australasian Compliance Institute

Co-Chair and faculty member, Practising Law Institute Program, Corporate Compliance, 1996-2002, New York, San Francisco and Santa Monica

Antitrust Counsel, Pharmaceutical Compliance Forum

Member, Health Care Compliance Association

Recipient, HCCA's 2005 Compliance Person of the Year Award

Member, Society of Corporate Compliance and Ethics

Member, International Society of Business, Economics, and Ethics

Advisory group member, United States Sentencing Commission, Surveys of Company Compliance Programs

Treasurer, Delaware Valley Chapter, American Corporate Counsel Association, 1994-95

Former Member of the Board, Delaware Valley Chapter, American Corporate Counsel Association

Former instructor on corporate compliance in Corporate Counseling course, Rutgers University School of Law, Camden, NJ

Former chair and founder, Compliance Committee, Delaware Valley Chapter, American Corporate Counsel Association

Member, Ethics Officer Association, 1996

National Center for Preventive Law, Compliance Committee, Task Force Chair

Ethics Resource Center, Fellows Program, Participant in the Employee Confidentiality and Reporting Committee

## *MAJOR NATIONAL AND INTERNATIONAL PRESENTATIONS*

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, 8th Annual
Compliance & Ethics Institute, Sept. 13-16, 2009, Las Vegas, NV.
Workshop with Ann Oglanian and Dan Roach: Becoming a More Effective Ethics
and Compliance Officer
Presentation: 501 Ideas for Your Compliance & Ethics Program:  Communications
and Training

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, The Seventh Annual
Conference for Effective Compliance Systems in Higher Education, May 31-June 3,
2009, Austin, TX.
Presentations: 501 Ideas for Your Compliance & Ethics Program: Compliance Officer
& Infrastructure and Whistleblower Systems: 1-800-RAT FINK or Effective
Compliance Tool?

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance and Ethics
Institute 2009, May 21, 2009, Chicago, IL.  Presentation with Paul Starkman: How to
Perform an Effective Audit/Measuring the Effectiveness of Your Compliance
Program

THE CONFERENCE BOARD, 2009 Business Ethics and Compliance Conference,
April 15, 2009, New York, NY
Panel with Jeff Kaplan: Compliance Programs on Trial

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, 7th Annual
Compliance & Ethics Institute, Sept. 14-16, 2008, Chicago, IL.
Workshop: Compliance 101 for Federal Contractors
Presentation with Rebecca Walker: SCCE's Code of Ethics

THE CONFERENCE BOARD, 2008 Business Ethics and Compliance Conference,
April 7-9, 2008, New York, NY
Panels: Introduction to Ethics and Compliance Management; In-House Surveys –
What they Tell You and What They Don't: Other Forms of Measurement

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, 6th Annual
Compliance and Ethics Institute,  September 9-11, 2007, New Orleans, LA
Presentation:  Incentives, Rewards, Evaluations

UNIVERSITY OF TEXAS SYSTEM, The Fifth Conference for Effective
Compliance Systems in Higher Education, June 3-6, 2007, Austin, TX.
Presentation: Compliance 101 Post Conference Workshop

HEALTH CARE COMPLIANCE ASSOCIATION, Annual Compliance Institute,
April 22-25, 2007, Chicago, IL.
Presentation: <u>Challenges in Compliance & Best Practices:  How Can the CEO Make
the Difference?</u>

ETHICS AND COMPLIANCE OFFICER ASSOCIATION, Annual Business Ethics
& Compliance Conference, Oct. 4-6, 2006, Salt Lake City, UT.
Presentation: <u>The Chief Ethics Officer:  A Call for Independence</u>

PRACTISING LAW INSTITUTE PROGRAM, Advanced Corporate Compliance
Workshop 2006, Sept. 28-29, 2006, San Francisco, CA.
Presentation: <u>Global Compliance Issues</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance & Ethics
Institute, Sept. 11-13, 2006, Chicago, IL.
Workshop: <u>Compliance & Ethics 202</u>
Presentation: <u>Working for Integrity: Protecting and Advancing Your Position as a
Compliance Professional</u>
Panel Discussion: <u>Hotlines-A Global Perspective</u>

THE CONFERENCE BOARD, 2006 Ethics and Compliance Conference, May 11-12.
2006, New York, NY.
Panel Discussion: <u>The Evolving Position of the Ethics Officer</u>

HEALTH CARE COMPLIANCE ASSOCIATION, Annual Compliance Institute,
April 23-25, 2006, Las Vegas, NV.
Presentation: <u>Governance and Global Compliance</u>

HEALTH CARE COMPLIANCE ASSOCIATION, Annual Compliance Institute,
April 17-19, 2005, New Orleans, LA.
Presentations: <u>Is Compliance and Ethics a Career Dead End, or a Field with a Bright
Career Path;</u> and <u>The HCCA Code of Ethics: Why it Matters in a Post-Enron World</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS/HEALTH CARE
COMPLIANCE ASSOCIATION/MICROSOFT CORP., 3RD Annual National
Symposium on Corporate Responsibility, Aug. 23-24, 2004, Redmond, WA.
Panel Discussions:  <u>Balancing Compliance & Ethics</u> and <u>Sarbanes-Oxley
Compliance/Enterprise Risk Management</u>

ETHICS OFFICER ASSOCIATION, Eleventh Annual Conference, Sept. 30-Oct. 3,
2003, Orlando, FL. Workshop: <u>The Compliance and Regulatory Environment: What's
New and What's Next?</u>

HEALTH CARE COMPLIANCE ASSOCIATION/MICROSOFT CORP., National Symposium on Corporate Responsibility, Oct. 2-3, 2003, Redmond, WA. Panel Discussions:  Corporate Compliance & Ethics Programs Panel and Compliance/Corporate Responsibility Officers Panel

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance Institute 2003, June 12-13, 2003, New York, NY.  Presentation: The Tougher Edge of Compliance:  Auditing, Measurement, Discipline and Rewards

AUSTRALIAN COMPLIANCE INSTITUTE, Sixth Annual Conference, Nov. 13-16, 2002, Melbourne, Australia. Presentation: What Business has Learned from September 11 and Enron

PRACTISING LAW INSTITUTE PROGRAM, Advanced Corporate Compliance Workshop 2006, Sept. 28-29, 2006, San Francisco, CA.  Presentation: Global Compliance Issues

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance 2002, June 13-14, 2002, New York, NY.  Presentation: The Tougher Edge of Compliance: Auditing, Measurement, Discipline and Rewards

AMERICAN BAR ASSOCIATION/AMERICAN CORPORATE COUNSEL ASSOCIATION, Conference for Corporate Counsel, June 6-7, 2002, Washington, DC.  Presentation:  Compliance Audits: What's Going On Out There?

PRACTISING LAW INSTITUTE PROGRAM, Advanced Corporate Compliance Workshop, Feb. 11-12, 2002, Santa Monica, CA.  Presentation: The Tougher Edge of Compliance:  Auditing, Measurement and Accountability
Breakout Group Co-Leader: "Best Practices" Session: International

ETHICS OFFICER ASSOCIATION, Ninth Annual Conference, Oct. 25-26, 2001, Nashville, TN.
Panel Discussion: The Regulatory and Legislative Environment – What's Next?
Presentation:  No Good Deed Goes Unpunished: The Legal and Business Risks of Compliance Programs

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance 2001, July 12-13, 2001, San Francisco, CA.  Presentations: The Law of Compliance, The Compliance Professional: What Are my Needs? and Measurement Techniques: Compliance Auditing
Panel Discussion: Shaping Tomorrow's Debate About the Organizational Sentencing Guidelines
Breakout Group Co-leader: Foreign Corrupt Practices Act Compliance

29

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance 2001, June 14-15, 2001, New York, NY.  Presentations: <u>The Law of Compliance</u>, <u>The Compliance Professional: What Are my Needs?</u> and <u>Measurement Techniques: Does Your Compliance Program Work?</u>
Breakout Group Co-leader: <u>Foreign Corrupt Practices Act Compliance</u>

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance 2001, May 10-11, 2001, Atlanta, GA.  Presentations: <u>The Compliance Professional: What Are my Needs?</u> and <u>Measurement Techniques: Does Your Compliance Program Work?</u>
Panel Discussion: <u>Shaping Tomorrow's Debate About the Organizational Sentencing Guidelines</u>
Breakout Group Co-leader: <u>Foreign Corrupt Practices Act Compliance</u>

PRACTISING LAW INSTITUTE PROGRAM, Advanced Corporate Compliance Workshop, Feb. 15-16, 2001, Santa Monica, CA.  Presentation: <u>The Tougher Edge of Compliance:  Auditing, Measurement and Accountability</u>
Breakout Group Co-Leader: <u>"Best Practices" Session: International</u>

ASSOCIATION FOR COMPLIANCE PROFESSIONALS OF AUSTRALIA, Fourth Annual Conference, Nov. 22-24, 2000, Melbourne, Australia. Presentations: <u>Masterclass: Compliance Privilege</u> and <u>International Compliance Review</u>
Breakout Group Leader:  <u>Compliance Tools – Do Electronic Tools Work?</u>
Compliance Forum Group Leader:  <u>Do You Know Whether Your Compliance System Is Effective?</u>

ETHICS OFFICER ASSOCIATION, Eighth Annual Conference, Oct. 26-27, 2000, Chicago, IL.
Panel Discussion: <u>Proposed Legislation to Strengthen Ethics and Compliance Programs</u>
Presentation:  <u>No Good Deed Goes Unpunished:  The Legal and Business Risks of Compliance Programs</u>

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance 2000, May 4-5, 2000, Atlanta, GA.  Presentation: <u>The Legal Risks of Compliance Programs</u>
Breakout Group Co-leader:  <u>Foreign Corrupt Practices Act Compliance</u>

PRACTISING LAW INSTITUTE PROGRAM, Advanced Corporate Compliance Workshop, Feb. 21-22, 2000, San Diego, CA.  Presentation: <u>The Tougher Edge of Compliance:  Auditing, Measurement and Accountability</u>
Breakout Group Leader: <u>How To Empower and Protect the Compliance Organization</u> and <u>"Best Practices" Session: International</u>

ETHICS OFFICER ASSOCIATION, Seventh Annual Conference, Oct. 6-8, 1999, Washington, DC.

Panel Discussion: <u>Creating a Privilege for Good Faith Use of an Organization's Reporting System – Four Models</u>
Presentation:  <u>How Voluntary Self-Policing and Ethics Programs Help When Defending Against Claims for Punitive Damages</u>

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance 1999, June 17-18, 1999, New York, NY.  Presentation: <u>Selling Compliance To Management</u>
Breakout Group Co-leader:  <u>Foreign Corrupt Practices Act Compliance</u>

ABA CONNECTION TELECONFERENCE, Corporate Compliance with Criminal Law, June 16, 1999, Nationwide teleconference.  Presentation: <u>Compliance Auditing</u>

THE CONFERENCE BOARD, Annual Business Ethics Conference, May 17-18, 1999, New York, NY.  Presentation: <u>Update 1999:  Two Views of the Future for Compliance and Business Ethics</u>

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance 1999, May 13-14, 1999, Atlanta, GA.  Presentation: <u>Selling Compliance To Management</u>
Breakout Group Co-leader:  <u>Foreign Corrupt Practices Act Compliance</u>

PRACTISING LAW INSTITUTE PROGRAM, Advanced Corporate Compliance Workshop, Feb. 10-11, 1999, San Diego, CA.  Presentation: <u>A Disciplined Approach to Discipline</u>
Breakout Group Leader:  <u>Due Diligence</u>

ASSOCIATION FOR COMPLIANCE PROFESSIONALS OF AUSTRALIA, Second Annual Conference, Sept. 17-18, 1998, Melbourne, Australia. Presentation: <u>Cost Effective Use of Compliance Resources</u>

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance: <u>Caremark</u> and the Globalization of Good Corporate Conduct, July 27-28, 1998, San Francisco, CA.  Presentation: <u>Discipline: Enforcing Compliance Standards</u>
Panel Discussion:  <u>Compliance Due Diligence as a Defense in Civil Cases</u>
Breakout Group Co-leader:  <u>Foreign Corrupt Practices Act Compliance</u>

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance: <u>Caremark</u> and the Globalization of Good Corporate Conduct, June 11-12, 1998, New York, NY. Presentation: <u>Assign Overall Compliance Responsibility to "High-Level Personnel," Advanced Level</u>
Panel Discussion:  <u>Compliance Due Diligence as a Defense in Civil Cases</u>
Breakout Group Co-leader:  <u>Foreign Corrupt Practices Act Compliance</u>

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance: After <u>Caremark</u>, June 5-6, 1997, New York, NY.  Presentation: <u>Selling Compliance To Management</u>

31

ASSOCIATION FOR COMPLIANCE PROFESSIONALS OF AUSTRALIA, Inaugural Annual Conference, May 29-30, 1997, Sydney, Australia. Presentations: Ensuring Compliance Throughout the Organisation and Ongoing Quality Control of Your Compliance System
Panel Discussion: The Carrot or Stick: What Recognition Should Regulators and Courts Give Compliance Programs?

THE CONFERENCE BOARD, Annual Business Ethics Conference, May 20-21, 1997, New York, NY.  Presentation: Compliance Programs:  Update on Legal and Regulatory Issues

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance, Nov. 18-19, 1996, San Francisco, CA.  Presentation: Training "In a Practical Manner"
Panel Discussion: How to Conduct Internal Investigations

PRACTISING LAW INSTITUTE PROGRAM, Corporate Compliance, June 3-4, 1996, New York, NY. Presentation: Privilege  and Ethical Issues in Conducting Internal Investigations

THE CONFERENCE BOARD, Sixth Annual Business Ethics Conference, May 4-5, 1994, New York, NY. Presentation: The Telecommunications Industry Compliance Roundtable

ALI-ABA PROGRAM, Organizing for Corporate Compliance, Dec. 4, 1992, San Francisco, CA. Presentation:  Fencing In Your Compliance Information

ABA SECTION OF LITIGATION AND ABA SECTION OF NATURAL RESOURCES, ENERGY AND ENVIRONMENTAL LAW, Environmental Enforcement for the 1990s, Sept. 15, 1992, Washington, DC.
Presentation:  The Self-Evaluative Privilege

ABA ANNUAL MEETING,  Business Law Section, Aug. 11, 1992, San Francisco, CA. Presentation:  The Self-Evaluative Privilege

ALI-ABA PROGRAM, Organizing for Corporate Compliance, Jan. 16, 1992, New Orleans, LA. Presentation:  Handling the Risks:  How To Respond To Compliance Failures

AMERICAN CORPORATE COUNSEL ASSOCIATION ANNUAL MEETING, Nov. 8, 1991, Washington, DC. Presentation:  When the Policeman Calls:  Will Your Compliance Program Speak In Your Defense?

ABA ANTITRUST SECTION CLE INSTITUTE, Oct. 23, 1990, New York, NY.

Presentation:  <u>Protecting the Audit: Attorney-Client, Work Product, and Emerging Self-Evaluative Privilege</u>

## *OTHER NATIONAL AND INTERNATIONAL PRESENTATIONS:*

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Webinar, June 24, 2020.
Presentation with Rebecca Walker & Eric Morehead: <u>Changes to the Organizational Sentencing Guidelines</u>

INTEGRITY INTERACTIVE CORPORATION, Webinar, June 23, 2010.
Presentation with Paul Rew & Paul Smith: <u>UK Bribery Act 2010: What it means for you</u>

ASSOCIATION OF CERTIFIED FRAUD EXAMINERS, Webinar, May 27, 2010.
Presentation with Marjorie Doyle:  <u>Compliance 101 for Certified Fraud Examiners</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, May 19, 2010, London, UK.
Presentation:  <u>Conflicts of Interest</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Upper Northeast Compliance & Ethics Conference, May 14, 2010, NY, NY.
Panel Discussion with Phil Crowley & Jude Curtis: <u>Training and Communication</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance & Ethics Workshop, Apr. 29-30, 2010, Sao Paulo, Brazil.
Presentations:  <u>FCPA, Anti-corruption and Bribery;</u> <u>Conflicts of Interest;</u> and <u>Legal Risks, Risk Factors and Disclosure</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, April 14-15, 2010, San Francisco, CA.
Presentations:  <u>Using Incentives in the Compliance and Ethics Program;</u> <u>Compliance Program Effectiveness & Evaluation</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, Feb. 11, 2010, Scottsdale, AZ.
Presentations:  <u>Using Incentives in the Compliance and Ethics Program;</u> <u>Compliance Program Effectiveness & Evaluation</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, Nov. 4-5, 2009, Scottsdale, AZ.
Presentations:  <u>Using Incentives in the Compliance and Ethics Program;</u> <u>Compliance Program Effectiveness & Evaluation</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, Oct. 7-8, 2009, Orlando, FL.

Presentations: Using Incentives in the Compliance and Ethics Program; Compliance Program Effectiveness & Evaluation

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, Apr. 1-2, 2009, Orlando, FL.
Presentations: Using Incentives in the Compliance and Ethics Program; Compliance Program Effectiveness & Evaluation

RAND, CENTER FOR CORPORATE ETHICS AND GOVERNANCE, Perspectives of Chief Ethics and Compliance Officers on the Detection and Prevention of Corporate Misdeeds, What the Policy Community Should Know, Mar. 5. 2009, Arlington, VA.
Presentation: What Government Can Do To Help Prevent Corporate Crime

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, Feb. 12, 2009, Scottsdale, AZ.
Presentation: Using Incentives in the Compliance and Ethics Program

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, Feb. 3, 2009, San Francisco, CA..
Presentation: Organizational Ethics

HEALTH CARE COMPLIANCE ASSOCIATION, Advanced Compliance Academy, Oct. 20, 2008, Dallas, TX.
Presentation: Building Incentives in Your Compliance Program

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Webcast, Oct. 7, 2008.
Presentation with Sheryl Vacca: Compliance 101

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, Sept. 24, 2008, Zurich, Switzerland.
Presentation: Conflicts of Interest

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, Aug. 12, 2008, Chicago, IL.
Presentation: Organizational Ethics

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, Aug. 7, 2008, Chicago, IL.
Presentation: Using Incentives in the Compliance and Ethics Program

WNWR 1540 AM Radio Program with Bob Rovner, June 27, 2008, Philadelphia, PA.
Interview: Building a Career in Compliance & Ethics

35

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Webcast, June 6 & June 24, 2008.
Presentation with Donna Boehme: Leading Integrity: Is Your Compliance & Ethics Function Positioned for Success?

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, 6th Conference for Effective Compliance Systems in Higher Education, June 4, 2008, Austin, TX.
Panel: Compliance Officers Roundtable

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, May 5, 2008, Orlando, FL.
Presentation: Using Incentives in the Compliance and Ethics Program

THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 89th Annual Convention, Mar. 11, 2008. Las Vegas, NV.
Presentation: How To Get Started on an Ethics and Compliance Program.

CENTER FOR AMERICAN AND INTERNATIONAL LAW, Institute for International and Comparative Law, International Corporate Compliance, Feb. 21-22, 2008, Washington, DC.
Panel: Designing and Maintaining an Effective Program: Is Integration Practicable.

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, Feb. 14, 2008, Scottsdale, AZ.
Presentation: Using Incentives in the Compliance and Ethics Program

THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, Surety Bonding and Risk Management Meetings, Feb. 7, 2008, Longboat Key, FL.
Presentation: The Why and How of Compliance Programs

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, Dec. 11, 2007, San Diego, CA.
Presentation: Organizational Ethics

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, Nov. 6, 2007, Orlando, FL
Presentation: Organizational Ethics

HEALTH CARE COMPLIANCE ASSOCIATION, Advanced Compliance Academy, Oct. 22, 2007, Baltimore, MD.
Presentation: Building Incentives in Your Compliance Program

PHARMACEUTICAL COMPLIANCE FORUM, Sept. 18-19, 2007, Pasadena, CA.
Presentation: The Use Of Incentives In Compliance Programs

ETHICS AND COMPLIANCE OFFICER ASSOCIATION and the CENTER FOR BUSINESS ETHICS, Managing Ethics in Organizations, June 12, 2007, Waltham, MA.
Presentation:  Ethics and the Law

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, June 4, 2007,  Scottsdale, AZ
Presentation:  Organizational Ethics

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance Academy, Mar. 29, 2007, Dallas, TX.
Presentation:  Using Incentives in the Compliance and Ethics Program

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, Mar. 20, 2007, Dallas, TX.
Presentation: Organizational Ethics

CENTER FOR AMERICAN AND INTERNATIONAL LAW, Institute for International and Comparative Law, International Corporate Compliance, Feb. 22-23, 2007, Chicago, IL.
Presentation: The US Compliance Landscape Recast:  What Does Effective Compliance Look Like Now?
Workshop leader w/ Jane Wexton: Risk Assessment, Program Audits and M&A Due Diligence

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Webcast, Feb. 20, 2007.
Panel Discussion w/ Karen Paul, Roy Snell and Becky Cornett:  Ethics vs. Compliance

UNIVERSITY OF PRETORIA, Center for Business & Professional Ethics, Workshop on Corporate Culture: Getting it Right, Feb. 8-9, 2007, Johannesburg, South Africa.
Presentations: The Role of the Compliance Professional in Creating and Maintaining an Ethical Culture and Ethics and Compliance Workshop:  Basic Elements and Tips from a Pro
Panel Discussion: Challenges and New Opportunities Facing Compliance Professionals

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, Dec. 5, 2006, San Diego, CA.
Presentation: Organizational Ethics

ETHICS AND COMPLIANCE OFFICER ASSOCIATION, Webcast, Nov. 16, 2006.
Panel Discussion: The Evolving Role of the Ethics and Compliance Professional

HEALTH CARE COMPLIANCE ASSOCIATION, Advanced Compliance Academy,
Oct. 23, 2006, Las Vegas, NV.
Presentation: <u>Building Incentives in Your Compliance Program</u>

CORPORATE SECRETARY, Think Tank, Sept. 13, 2006, Chicago, IL.
Panel discussion: <u>Federal Sentencing Guidelines and Sarbanes-Oxley</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Corporate Compliance
2006 Workshops, June 22, 2006, Chicago, IL.
Presentation: <u>Globalizing Your Compliance Program</u>

THE GROWTH STRATEGIST, Internet radio program with Aldonna Ambler, June
20, 2006.
Presentation: <u>Ethics & Compliance as a Surprise Competitive Advantage</u>

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, June 5,
2006, Scottsdale, AZ.
Presentation: <u>Organizational Ethics</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Corporate Compliance
2006 Workshops, May 18, 2006, Dallas, TX.
Presentation: <u>Globalizing Your Compliance Program</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Compliance and
Ethics Conference, Apr. 25-26, 2006, Las Vegas, NV.
Presentation: <u>Globalization of Compliance Programs</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Corporate Compliance
2005 Workshops, Dec. 2, 2005, Houston, TX.
Presentations: <u>Failure to Comply: The Board's Role</u> and <u>Sarbanes Oxley Challenges</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Corporate Compliance
2005 Workshops, Dec. 1, 2005, Atlanta, GA.
Presentations: <u>Failure to Comply: The Board's Role</u> and <u>Sarbanes Oxley Challenges</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Corporate Compliance
2005 Workshops, Nov. 11, 2005, Redmond, WA.
Presentations: <u>Failure to Comply: The Board's Role</u> and <u>Sarbanes Oxley Challenges</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Corporate Compliance
2005 Workshops, Nov. 10, 2005, Los Angeles, CA.
Presentations: <u>Failure to Comply: The Board's Role</u> and <u>Sarbanes Oxley Challenges</u>

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, Nov. 7, 2005, Orlando, FL.
Presentation: <u>Organizational Ethics</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Audio Conference, Aug. 30, 2005
Presentation w/ Odell Guyton & Marjorie Doyle: <u>Take-Charge Approaches for Global Compliance</u>

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, June 13, 2005, Scottsdale, AZ.
Presentation: <u>Organizational Ethics</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Corporate Compliance 2005 Workshops, May 14, 2005, Chicago, IL.
Presentations: <u>Failure to Comply: The Board's Role</u> and <u>Sarbanes Oxley Challenges</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Corporate Compliance 2005 Workshops, May 23, 2005, Minneapolis, MN.
Presentations: <u>Failure to Comply: The Board's Role</u> and <u>Sarbanes Oxley Challenges</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Corporate Compliance 2005 Workshops, May 17, 2005, Cincinnati, OH.
Presentations: <u>Failure to Comply: The Board's Role</u> and <u>Sarbanes Oxley Challenges</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS, Corporate Compliance 2005 Workshops, May 16, 2005, New York, NY.
Presentations: <u>Failure to Comply: The Board's Role</u> and <u>Sarbanes Oxley Challenges</u>

ETHICS OFFICER ASSOCIATION, Sponsoring Partner Forum, Apr. 6-8, 2005, Atlanta, GA.
Presentation: <u>Sarbanes & the Ethics Program</u>

AMERICAN CONFERENCE INSTITUTE, 13th Annual Foreign Corrupt Practices Act Symposium, Apr. 1, 2005, New York, NY.
Panel Discussion: <u>Effective FCPA Compliance Programs: Innovations to Meet Rising Expectations</u>

ETHICS OFFICER ASSOCIATION, Webcast, Jan. 11, 2005.
Presentation: <u>The Revised Federal Sentencing Guidelines: Important Trends and Issues in Compliance Programs</u>

SOCIETY OF CORPORATE COMPLIANCE AND ETHICS and HEALTH CARE COMPLIANCE ASSOCIATION, National Audio Conference, Dec. 17, 2004.

Presentation: <u>The Revised Federal Sentencing Guidelines</u>

MANUFACTURERS ALLIANCE, Ethics and Compliance Council, Nov. 9, 2004, Miami, FL
Presentation: <u>Important Trends and Issues in Compliance Programs</u>

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, Nov. 8, 2004, Orlando, FL.
Presentation: <u>Organizational Ethics</u>

PUBLIC RELATIONS SOCIETY OF AMERICA, 2004 International Convention, Oct. 24, 2004, New York, NY.
Panel Discussion:  <u>The Trouble at Global Industries: A Business Ethics Problem Simulation</u>

HEALTH CARE COMPLIANCE ASSOCIATION, Annual Compliance Institute, April 26, 2004, Chicago, IL.
Presentation: <u>Update from the US Sentencing Commission</u>

HEALTH CARE COMPLIANCE ASSOCIATION, National Audio Conference, Dec. 9, 2003.
Presentation: <u>Proposed Changes to the US Sentencing Guidelines</u>

DEFENSE INDUSTRY INITIATIVE ON BUSINESS ETHICS AND CONDUCT, 2003 Best Practices Forum, May 28, 2003, Washington, DC.
Panel Discussion: <u>Discussion of current compliance issues</u>

INTERNATIONAL MASS RETAIL ASSOCIATION, Loss Prevention, Auditing and Safety Conference, Mar. 12, 2003, Orlando, FL.
Presentation: <u>Incorporating Effective Compliance Programs into Retail Companies</u>

HEALTH CARE COMPLIANCE ASSOCIATION/MICROSOFT CORP., National Symposium on Corporate Responsibility, Nov. 21, 2002, Redmond, WA.
Panel Discussion:  <u>Legal Profession Reforms Panel</u>

AMERICAN CONFERENCE INSTITUTE, 10th Annual Foreign Corrupt Practices Act Symposium, Nov. 19, 2002, Washington, DC.
Panel Discussion:  <u>State-of-the-Art FCPA Compliance Programs</u>

AMERICAN HEALTH LAWYERS ASSOCIATION/ HEALTH CARE COMPLIANCE ASSOCIATION, Fraud and Compliance Forum, Sept. 30, 2002, Washington, DC.
Presentation:  <u>Compliance and Legal Ethics in the Shadow of Enron</u>

HEALTH CARE COMPLIANCE ASSOCIATION, National Audio Conference, Sept. 4, 2002.
Presentation: Enron and Andersen: Questions and Warnings for the Compliance Practitioner

HEALTH CARE COMPLIANCE ASSOCIATION, Academy for Advanced Compliance Practice, June 4, 2002, New Haven, CT.
Presentation: Emerging Issues in Corporate Ethics

HEALTH CARE COMPLIANCE ASSOCIATION, Annual Compliance Institute, April 23, 2002, Chicago, IL.
Panel Discussion: The Lessons and Warnings of Enron and Andersen

ETHICS OFFICER ASSOCIATION, Sponsoring Partner Forum, Apr. 18, 2002, San Antonio, TX.
Panel Discussion and Presentation: Crisis of Confidence: In the Wake of Enron – The Regulatory and Policy Impact

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, Feb. 18-19, 2002, Los Angeles, CA.
Presentations: Legal and Business Risks of Compliance Programs; Ethics for Ethics Professionals

AMERICAN CONFERENCE INSTITUTE, 9th Annual Foreign Corrupt Practices Act Symposium, Dec. 4, 2001, Washington, DC.
Panel Discussion: State-of-the-Art FCPA Compliance Programs

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, Nov. 12-13, 2001, Dallas, TX.
Presentations: Legal and Business Risks of Compliance Programs; Ethics for Ethics Professionals

HEALTH CARE COMPLIANCE ASSOCIATION, AUDIOCONFERENCE, Integrating Ethics and Compliance, Oct. 31, 2001.
Presentation: The Code of Ethics for Health Care Compliance Professionals

ABA ANNUAL MEETING, SECTION OF BUSINESS LAW, COMMITTEE OF CORPORATE GENERAL COUNSEL, Cutting Edge Issues in Corporate Compliance, Aug. 6, 2001, Chicago, IL.
Presentation: The Legal Risks of Compliance Programs and What To Do About Them

ETHICS OFFICER ASSOCIATION and the CENTER FOR BUSINESS ETHICS, Managing Ethics in Organizations, June 11, 2001, Waltham, MA.

Presentation: Ethics and the Law: What Happens When Companies Break the Law

ETHICS OFFICER ASSOCIATION, Sponsoring Partner Forum, Apr. 20, 2001, Naples, FL.
Presentation: Ethics Officer Personal Concerns: Insurance, Legal Counsel, Ethical Standards, Employment Contracts and Compensation

AMERICAN CONFERENCE INSTITUTE, 8th Annual Foreign Corrupt Practices Act Symposium, Dec. 12, 2000, Washington, DC.
Panel Discussion: Beyond the FCPA: The Latest Trends in Effective General Compliance Programs

ETHICS OFFICER ASSOCIATION and the CENTER FOR BUSINESS ETHICS, Managing Ethics in Organizations, Nov. 6-10, 2000, Waltham, MA.
Presentation: Ethics and the Law: What Happens When Companies Break the Law

ETHICS OFFICER ASSOCIATION and the CENTER FOR BUSINESS ETHICS, Managing Ethics in Organizations, June 11-16, 2000, Waltham, MA.
Presentation: Ethics and the Law: What Happens When Companies Break the Law

SOUTHWESTERN LEGAL FOUNDATION, Advising Transnational Entities in the New Millennium, June 13-14, 2000, Dallas, TX.
Presentation: Compliance Programs for Transnational Enterprises

HEALTH CARE COMPLIANCE ASSOCIATION, Third Annual National Congress on Health Care Compliance, Mar. 8-10, 2000, Washington, DC.
Presentation: Ethics: Integrating it into Your Compliance Program (with Mark Meaney)

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance Academy, Feb. 8-11, 2000, Philadelphia, PA.
Presentations: Legal and Business Risks of Compliance Programs; Ethics for Ethics Professionals; Standards and Procedures, and Audits, Monitoring, Self-Assessments and Measurement

AMERICAN CONFERENCE INSTITUTE, 7th Annual Foreign Corrupt Practices Act Symposium, Dec. 9, 1999, Washington, DC.
Presentation: Discipline, Evaluations and Rewards in Compliance Programs

HEALTH CARE COMPLIANCE ASSOCIATION, Compliance College, Sept. 21-14, 1999, Philadelphia, PA.
Presentations: Audits, Monitoring, Self-Assessments and Measurement; Discipline, Rewards, Evaluations and Objective Setting; Standards and Procedures, and Legal and Business Risks of Compliance Programs

UNIVERSITY OF NEW SOUTH WALES, Corporate Self-Regulation and
Compliance: Designing and Implementing Compliance Systems, Sept. 4, 1999,
Sydney, Australia.
Presentations:  Selling Compliance to Management; Starting Programs from Scratch,
and Compliance Audits

DEFENSE INDUSTRY INITIATIVE ON BUSINESS ETHICS AND CONDUCT,
1999 Best Practices Forum, June 2, 1999, Washington, DC.
Presentation:  Ethics and Business Conduct Training
Panel Discussion:  Report from the ERC Fellows Program Subcommittee on
Employee Confidentiality and Non-Retributory Reporting Systems

HEALTH CARE COMPLIANCE ASSOCIATION, Annual Compliance Institute,
Oct. 12, 1998, New Orleans, LA.
Presentation:  Effective Presentation Techniques

UNIVERSITY OF NEW SOUTH WALES, Corporate Self-Regulation and
Compliance: Theory and Practice, Sept. 19, 1998, Sydney, Australia.
Presentations:  The Human Element of Compliance and Compliance Audits

INSIGHT INFORMATION, Health Care Fraud and Compliance Practices, Apr. 2,
1998, New York, NY.
Presentation:  Tests of Strength in Compliance Programs

FEDERATED PRESS, Corporate Compliance Conference, Feb. 25, 1998, Toronto,
Canada.
Presentation:  Communicating the Compliance Program to Employees

UNITED STATES INFORMATION AGENCY, WORLDNET TELEVISION,
Business Ethics Series, Nov. 20, 1997, video presentation to India, Sri Lanka, Nepal
and Bangladesh, from Washington, DC.
Panel Discussion:  Enforcing Ethical Business Standards

COMPLIANCE OFFICERS' FORUM, ASSOCIATION OF AMERICAN
MEDICAL COLLEGES, Second Professional Education Program, Sept. 25, 1997,
Chicago, IL.
Presentation:  Hotlines

CORPORATE RESPONSIBILITY AND ETHICS COUNCIL, THE CONFERENCE
BOARD OF CANADA, Fourth Meeting, Sept. 18, 1997, Toronto, Canada.
Presentation:  Developing and Implementing Compliance Programs

INTERNATIONAL QUALITY & PRODUCTIVITY CENTER, Transforming the
Role of Financial Control, Dec. 10, 1996, Atlanta, GA.
Presentation:  Integrating Financial and Compliance Controls

CENTER FOR BUSINESS INTELLIGENCE, Complying with the Foreign Corrupt Practices Act, June 24, 1996, Washington, DC.
Presentation:  Reducing FCPA Risk:  An Effective Self-Policing Program

ETHICS OFFICER ASSOCIATION,  Fifth Sponsoring Partner Forum, Apr. 3, 1996, Waltham, MA.
Presentation:  What Should the Government's Role Be In Encouraging Corporate Ethics?

ABA ANTITRUST SECTION SPRING MEETING, Antitrust Compliance Programs Worldwide, Mar. 17, 1996, Washington, DC.
Presentation:  The US Approach to Antitrust Compliance Programs

AMERICAN CORPORATE COUNSEL ASSOCIATION ANNUAL MEETING, Nov. 8-10, 1995, Boston, MA.
Presentation:  In-House Practice: Counselor or Cop?

ALI-ABA PROGRAM, Organizing for Corporate Compliance: Toward Standards, Mar. 2-3, 1995, New Orleans, LA.
Presentation:  Responding to Violations

UNIVERSITY OF COLORADO AT DENVER, Conference on Business Practices Under NAFTA, Dec. 10, 1994, Denver, CO.
Presentation: Ethics Control Systems or Philosopher Kings:  How Multinational Companies Enforce Ethical Standards

ABA ANNUAL MEETING, YOUNG LAWYERS DIVISION, Corporate Counsel Seminar, Aug. 8, 1994, New Orleans, LA.
Presentation:  Monitoring the Effectiveness of Compliance Programs

EDISON ELECTRIC INSTITUTE, Corporate Compliance Programs Conference, July 14-15, 1994, Denver, CO.
Presentations:  Selected Key Components of Compliance Programs and Preserving Confidentiality v. Effective Compliance Programs

ALI-ABA PROGRAM,  Organizing for Corporate Compliance:  The Next Steps, Jan. 20-21, 1994, Washington, DC.
Presentations: Dealing With Government:  The Carrot and Stick and "Interactive Corporate Compliance"  and Dealing With the Government:  Turning Yourself In

MANUFACTURERS' ALLIANCE FOR PRODUCTIVITY AND INNOVATION, Designing, Implementing and Continuously Improving Corporate Compliance Programs, Sept. 20-21, 1993, Arlington, VA.
Presentation:  Making Antitrust Programs Interactive and Effective

ABA ANTITRUST SECTION SPRING MEETING,  Apr. 3, 1992, Washington, DC.
Presentation:  How To Establish An Effective Antitrust Compliance Program Under
the Sentencing Guidelines

AMERICAN CORPORATE COUNSEL ASSOCIATION MID-YEAR MEETING,
June 28, 1990, Denver, CO.
Presentation:  Corporate Compliance: Prospective Action and Program Conclusion

NEW YORK UNIVERSITY SYMPOSIUM,  Apr. 19, 1990, New York, NY.
Presentation:  Beyond In-Bin Compliance Programs

AMERICAN CORPORATE COUNSEL ASSOCIATION/ NATIONAL CENTER
FOR PREVENTIVE LAW SYMPOSIUM, July 21, 1988, Denver, CO.
Presentation:  Interactive Compliance:  Systems To Immunize Preventive Law
Programs From the Litigation Process

## GOVERNMENT PRESENTATIONS:

UNITED STATES SENTENCING COMMISSION, PUBLIC HEARING, Organizational Guidelines, March 17, 2010, Washington, DC. Testimony on behalf of the Society of Corporate Compliance and Ethics.

ORGANIZATION FOR ECONOMIC COOPERATION AND DEVELOPMENT, Seminar on Internal Company Controls and External Audit, March 16, 2009, Paris, France. Session facilitator and meeting participant.

ORGANIZATION FOR ECONOMIC COOPERATION AND DEVELOPMENT, Consultation on the Review of the OECD Anti-Bribery Instruments, June 16, 2008, Paris, France. Meeting participant.

UNITED STATES DEPARTMENT OF JUSTICE, CORPORATE FRAUD/SOPHISTICATED WHITE COLLAR CRIME SEMINAR, Dec.5, 2003, Columbia, SC. Presentation (with Win Swenson): Corporate Compliance Programs

ADVISORY GROUP ON ORGANIZATIONAL GUIDELINES TO THE UNITED STATES SENTENCING COMMISSION, November 14, 2002, Public Hearing, Washington, DC. Testimony (by phone, from Melbourne, Australia): Confidentiality, Internal Reporting, and Whistleblowing

ORGANIZATION FOR ECONOMIC COOPERATION AND DEVELOPMENT, Phase 2 Review of the United States, March 13, 2002, Washington, DC. Presentation: Does Compliance Work?

AUSTRALIAN TAX OFFICE, Staff Seminar, Sept. 2, 1999, Canberra, Australia. Presentation: Tax Misconduct In Organizations: Can Voluntary Compliance Programs Help?

OFFICE OF INSPECTOR GENERAL, DEPARTMENT OF HEALTH AND HUMAN SERVICES, Building a Partnership for Effective Compliance – A Government-Industry Roundtable, March 22, 1999, Washington, DC. Roundtable moderator.

UNITED STATES INFORMATION AGENCY, Office of International Visitors. Presentation for visiting officials of Kyrgyz Republic, March 11, 1999, New York, NY. Presentation: Corporate Compliance Programs

AUSTRALIAN COMPETITION AND CONSUMER COMMISSION, Staff Presentation by nationwide video conference, Sept. 15, 1998, Canberra, Australia. Presentation: Compliance Programs

AUSTRALIAN COMPETITION AND CONSUMER COMMISSION, Staff Seminar, May 26, 1997, Canberra, Australia.  Presentation: <u>Effective Operation of Compliance Programs</u>

UNITED STATES SENTENCING COMMISSION, Corporate Crime in America: Strengthening the "Good Citizen" Corporation, September 7-8, 1995, Washington, D.C.  Presentation:  <u>Beating Them With Carrots and Feeding Them Sticks</u>

NEW YORK STATE, Cornell University Seminar,  November 14, 1995,  Albany NY.  Presentation: <u>Balancing Incentives for Private Initiatives: Occupational, Environmental and Public Health Opportunities for New York State</u>

OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, panel discussion and interactive seminar, May 24, 1995, Washington, D.C.  Presentation: <u>Positive Incentives for Compliance: Balancing New Tools and Their Limits</u>

ENVIRONMENTAL PROTECTION AGENCY, Public Meeting on Auditing, July 27, 1994, Washington, D.C.   Presentation: <u>Testimony on Behalf of Coalition for Improved Environmental Audits</u>

AUSTRALIAN TRADE PRACTICES COMMISSION, Staff Seminar Series, May 26, 1994, Canberra, Australia.  Presentation: <u>Working Co-operatively for Compliance—Corporate Compliance Programmes: The United States Experience</u>

## *REGIONAL PRESENTATIONS:*

SCCE REGIONAL COMPLIANCE & ETHICS CONFERENCE, Upper Northeast, May 15, 2009, New York, NY.
Presentation: 501 Ideas for Your Compliance & Ethics Program: CECO, Infrastructure & USSG's Item 2

CHICAGO REGIONAL BUSINESS ETHICS NETWORK, Meeting, Feb. 10, 2009, Chicago, IL.
Presentation: The Ideal World for Today's Ethics and Compliance Officer

ASSOCIATION OF CORPORATE COUNSEL, Houston Chapter, Half-Day Legal Symposium, International Corporate Compliance for Multinational Firms, Oct. 28, 2008, Houston, TX.
Panel Discussion: Best Practices in Shaping an International Compliance Program

SANTA CLARA UNIVERSITY, Business and Organizational Ethics Partnership, Meeting, Oct. 23, 2008, Santa Clara, CA.
Presentation: Making the Case that Your Program Works

GREATER HOUSTON BUSINESS ETHICS ROUNDTABLE, Breakfast meeting, May 15, 2008, Houston, TX.
Presentation: Building Incentives in Your Compliance Program

PASO DEL NORTE GROUP, Breakfast Roundtable, Feb. 27, 2007, El Paso, TX.
Presentation: Corporate Compliance & Ethics Programs:  What, Why & How

STATE BAR OF GEORGIA, Corporate Counsel Institute, Dec. 3, 2004, Atlanta, GA.
Presentation:  Corporate Compliance Programs

DELAWARE VALLEY CORPORATE COUNSEL ASSOCIATION, Annual Ethics Program, Lessons Learned from the Corporate Scandals - How Does Your Compliance Program Measure Up? Apr. 29, 2004, Philadelphia, PA.
Presentation:  The Enron Era: Questions and Warnings for Compliance Programs

SIOUX VALLEY HOSPITAL, Corporate Responsibility Seminar Series, Mar. 15, 2004, Sioux Falls, SD
Presentation:  Corporate Responsibility and Corporate Compliance

VIRGINIA BAR ASSOCIATION, Fifth Annual Corporate Counsel Fall Forum, Oct. 27, 2003, Richmond, VA.
Presentation: How to Make Your Organization's Compliance Program Effective

GREATER CLEVELAND INTERNATIONAL LAWYERS GROUP, Luncheon
Address, Mar. 18, 2003, Cleveland, OH.
Presentation: Globalizing Your Compliance Program

PENNSYLVANIA BAR INSTITUTE, Business Lawyers' Institute, Oct. 16, 2002,
Philadelphia, PA.
Presentation: Cutting Edge Compliance: The Shadow of Enron

CENTRAL PENNSYLVANIA CHAPTER, AMERICAN CORPORATE COUNSEL
ASSOCIATION, Cutting Edge Issues for In-House Counsel 2002: Good Governance
for Corporate Lawyers, Aug. 15, 2002, Harrisburg, PA
Presentation: How to Implement an Antitrust Compliance Program

BLAKE DAWSON WALDRON, Current Issues in Compliance, Nov. 20, 2000,
Sydney, Australia.
Presentation: Recent US Developments in Compliance

LORMAN EDUCATION SERVICES, Health Care Corporate Compliance Programs
In New Jersey, July 18, 2000, Cherry Hill, NJ
Presentations: Health Care Compliance In the New Millennium and Compliance
Training In a Practical Manner

CHEMICAL INDUSTRY COUNCIL OF NEW JERSEY, 16th Annual Meeting, May
9, 2000, Absecon, NJ.
Presentation: What is a Company Compliance/Ethics Program?

ETHICS OFFICER ASSOCIATION AND UNITED STATES SENTENCING
COMMISSION, Shaping Tomorrow's Debate – Ethics, Compliance and the
Organizational Sentencing Guidelines, June 10, 1999, Lexington, MA.
Panel Discussion: Effective Programs - Challenges Remain

ETHICS OFFICER ASSOCIATION AND UNITED STATES SENTENCING
COMMISSION, Shaping Tomorrow's Debate – Ethics, Compliance and the
Organizational Sentencing Guidelines, Feb. 9, 1999, Atlanta, GA.
Luncheon Presentation: Selling Compliance and Business Ethics Programs to
Management

WPSJ-TV, CAMDEN COUNTY BAR FOUNDATION, Legal Line, May 26, 1998,
television program, Camden County, NJ.
Panel Discussion: Corporate Compliance for Small Businesses

TELECOM NEW ZEALAND, Compliance Presentation, June 3, 1997, Wellington,
New Zealand.
Presentation: Ten Questions to Ask of a Compliance Program

ARCHER & GREINER,  Minimizing the Risk of Criminal and Civil Prosecution of Business Organizations, Nov. 8, 1996, Mt. Laurel, NJ.
Presentation:  Compliance Programs and Codes of Conduct

NEW YORK CHAPTER, AMERICAN CORPORATE COUNSEL ASSOCIATION, Reengineering the Law Department  for the Year 2000, May 31, 1996, New York, NY.
Presentation:  Crystal Ball 1996:  What Does the Future Hold for Voluntary Corporate Compliance Programs?

THE BAR ASSOCIATION OF METROPOLITAN ST. LOUIS, 15th Annual St. Louis Corporate Counsel Institute, Apr. 23, 1996, St. Louis, MO.
Presentation:  The Self-Evaluative Privilege: Protecting the "Good Citizen" Corporation

DELAWARE VALLEY CHAPTER, AMERICAN CORPORATE COUNSEL ASSOCIATION, Compliance Practices Symposium, Apr. 15, 1996, Conshohocken, PA.
Presentation: Antitrust Compliance Programs, breakout group leader.

WESTMORELAND BAR ASSOCIATION, Corporate Legal Counsel Seminar, Oct. 26, 1995, Greensburg, PA.
Presentation:  Corporate Sentencing Guidelines

AMERICAN CORPORATE COUNSEL ASSOCIATION REGIONAL CONFERENCE,  May 11-12, 1995, Philadelphia, PA.
Presentation:  What Does the Future Hold for Voluntary Corporate Compliance Programs?

AMERICAN CORPORATE COUNSEL ASSOCIATION, WESTERN PENNSYLVANIA CHAPTER, Apr. 3, 1995, Pittsburgh, PA.
Presentation:  Practical Pointers for Managing a Corporate Compliance Program

NEW YORK STATE BAR ASSOCIATION, CIVIL PROSECUTION COMMITTEE, Committee Meeting, July 27, 1994, New York, NY.
Presentation:  The Privatization of Corporate Law Enforcement

THE CORPORATE BAR ASSOCIATION OF WESTCHESTER AND FAIRFIELD, INC.,  Dec. 2, 1993, Old Greenwich, CT.
Presentation:  Practical Pointers for an Effective Compliance Program

DELAWARE VALLEY CHAPTER, AMERICAN CORPORATE COUNSEL ASSOCIATION/CCQ, Compliance Programs and the Sentencing Guidelines, Nov. 16, 1992, Philadelphia, PA.

Presentation:  Some Practical Pointers on How To Have an Effective Program Under the Guidelines

ABA SECTION OF NATURAL RESOURCES, ENERGY AND ENVIRONMENTAL LAW PROGRAM, Mar. 6, 1992, Washington, DC.
Presentation:  The Self-Evaluative Privilege: Or, A Tale of Three Carrots

UNIVERSITY OF PENNSYLVANIA LAW SCHOOL/DELVACCA, Compliance Workshop, Oct. 29, 1990, Philadelphia, PA.
Presentation:  Getting Senior Management Actively Involved:  Selling Compliance Programs

VILLANOVA UNIVERSITY, Apr. 16, 1990, Villanova, PA.
Presentation:  Business Ethics and Corporate Compliance:  Is There Really Anything New?

DELAWARE VALLEY CHAPTER, AMERICAN CORPORATE COUNSEL ASSOCIATION, May 28, 1987, Cherry Hill, NJ.
Presentation:  Development and Implementation of Antitrust Compliance Programs

## *BOOKS:*

501 IDEAS FOR YOUR COMPLIANCE AND ETHICS PROGRAM (SCCE; 2008).

BUILDING A CAREER IN COMPLIANCE AND ETHICS (SCCE; 2007). Co-author with Joshua Leet.

WORKING FOR INTEGRITY: FINDING THE PERFECT JOB IN THE RAPIDLY GROWING COMPLIANCE AND ETHICS FIELD (SCCE; 2006). Co-author with Joshua Leet.

GUIDE TO PROFESSIONAL DEVELOPMENT IN COMPLIANCE (Aspen Pub; 2001). Co-editor with Jan Heller and Mark Meaney, author of two chapters.

PAYMENT ERROR PREVENTION PROGRAM/COMPLIANCE WORKBOOK (Texas Medical Foundation; 2000). Contributor of materials.

THE HEALTH CARE COMPLIANCE PROFESSIONAL'S MANUAL (First edition) (Aspen Pub and HCCA; 1999). Co-editor with Elizabeth Ryan, Brent Saunders and Roy Snell; chapter author.

14 GOVERNMENT-ENDORSED HEALTH CARE COMPLIANCE PLANS (Atlantic Information Services; 1997). Overview Co-author with Kirk Jordan.

COMPLIANCE PROGRAMS AND THE CORPORATE SENTENCING GUIDELINES: PREVENTING CRIMINAL AND CIVIL LIABILITY (Clark Boardman Callaghan; 1993 & Ann. Supp.). Co-edited with Jeffrey Kaplan and Win Swenson, former Deputy General Counsel, United States Sentencing Commission.

CORPORATE COMPLIANCE SERIES (Clark Boardman Callaghan; 1993). Series advisor. Series won a national award from the National Center for Preventive Law.

BNA/ACCA COMPLIANCE MANUAL: PREVENTION OF CORPORATE LIABILITY (1993). Chapter author.

CORPORATE LAWBREAKING AND INTERACTIVE COMPLIANCE: RESOLVING THE REGULATION-DEREGULATION DICHOTOMY (Greenwood Press; 1991). Co-author with Professor Jay Sigler.

INTERACTIVE CORPORATE COMPLIANCE: AN ALTERNATIVE TO REGULATORY COMPULSION (Greenwood Press; 1988). Co-author with Rutgers University Professor Jay Sigler.

## *PLI PROGRAM BOOKS:*

ADVANCED CORPORATE COMPLIANCE WORKSHOP 2000 (Practising Law Institute; 2000).  Program Co-Chair with Carole Basri, chapter author.

CORPORATE COMPLIANCE 1999 (Practising Law Institute; 1999).  Program Co-Chair with Carole Basri, Stephen Cowen and Gregory Wallance, author of several chapters.

ADVANCED CORPORATE COMPLIANCE WORKSHOP 1999 (Practising Law Institute; 1999).  Program Co-Chair with Carole Basri and Herbert Zinn, chapter author.

CORPORATE COMPLIANCE: <u>CAREMARK</u> AND THE GLOBALIZATION OF GOOD CORPORATE CONDUCT (Practising Law Institute; 1998).  Program Co-Chair with Carole Basri and Gregory Wallance, author of two chapters.

CORPORATE COMPLIANCE AFTER CAREMARK (Practising Law Institute; 1997).  Program Co-Chair with Carole Basri and Gregory Wallance, author of two chapters.

SUPPLEMENT TO CORPORATE COMPLIANCE: HOW TO BE A GOOD CITIZEN CORPORATION THROUGH SELF-POLICING (Practising Law Institute; 1996).  Program Co-Chair with Carole Basri and Gregory Wallance, author of one chapter.

CORPORATE COMPLIANCE: HOW TO BE A GOOD CITIZEN CORPORATION THROUGH SELF-POLICING (Practising Law Institute; 1996).  Program Co-Chair with Gregory Wallance, and co-author of two chapters.

## *NATIONAL PROFESSIONAL PUBLICATIONS:*

Can the Scandals Teach Us Anything?  Enron, Ethics and Lessons for Lawyers,  12 BUSINESS LAW TODAY 11 (Jan.-Feb. 2003).

Let's Reform Torts Sensibly, 22 NATIONAL LAW JOURNAL A18 (Jan. 10, 2000)(co-author with S. Mark Tuller).

Compliance Programs: What the Government Really Wants,  14 ACCA DOCKET 10 (July/August 1996)(Co-author with Kirk Jordan)(selected as memo of the week by Counsel Connect)(reprinted in Corporate Counsel's Guide to Organizational Sentencing Guidelines, Nov. 1996).

Getting Your Company To Shape Up,  3 BUSINESS LAW TODAY 46 (July-Aug. 1994)(co-panelist with Nancy Loftin, Joel Hoxie and Arthur Furgenson).

Carrots, Sticks, and "Smart Regulation,"  16 NATIONAL LAW JOURNAL 13 (Nov. 29, 1993)(co-author with Jeffrey M. Kaplan).

The Self-Evaluative Privilege and Beyond,  7 INSIGHTS 17 (March 1993)(co-author with Roselee Oyer)(cited in Reichhold, first Federal environmental case to accept self-evaluative privilege).

Protections, Incentives for Self-Policing Lacking,  15 NATIONAL LAW JOURNAL S12 (Mar. 8, 1993).

Compliance Officers:  One Part Ombudsman, Two Parts Watchdog,  15 NATIONAL LAW JOURNAL  S2 (Dec. 14, 1992).

How to Respond to Corporate Compliance Failures,  16 ALI-ABA COURSE MATERIALS JOURNAL 7 (June 1992).

Surviving the Antitrust Compliance Audit,  59 ANTITRUST LAW JOURNAL 953 (1991).

15 Tips for Building a State-of-the-Art Compliance Program,  20 LAWYER'S BRIEF 17 (Jan. 15, 1990).

Corporate Compliance Programs:  Counsel's Role,  7 ACCA DOCKET 32 (Fall 1989)(submitted as an exhibit to ACCA's comments on the draft Organizational Sentencing Guidelines).

Business Ethics: Action Needed,  11 NATIONAL LAW JOURNAL 13 (Nov. 28, 1988)(co-author with Jay A. Sigler).

Risky Business:  The Corporate Self-Evaluation, 7 LEGAL TIMES 15 (Oct. 21, 1985)(co-author with Karen G. Strouse).

## *OTHER PUBLICATIONS:*

Ideas For Enlivening Ethics and Compliance Training, 23 ETHIKOS 12 (May/June 2010).

Revisions Say Give Compliance Officers Direct Access to Board, 18 PREVENTION OF CORPORATE LIABILITY CURRENT REPORT 240 (May 17, 2010) and 25 CORPORATE COUNSEL WEEKLY 160 (May 19, 2010)(Co-author with Win Swenson).

Changes Coming in Company Compliance Programs: The U.S. Sentencing Commission Adjusts the Rules, 5 WHITE COLLAR CRIME REPORT 335 (May 7, 2010)(Co-author with Win Swenson).

Ideas For Ensuring Diligence In Hiring And Promotions, 23 ETHIKOS 13 (Mar./Apr. 2010).

OECD Adds Three Key Words To Its Anti-Bribery Recommendations, 23 ETHIKOS 5 (Mar./Apr. 2010)(co-author with Donna Boehme).

How the Board and Senior Management Can Support A Compliance and Ethics Program, 23 ETHIKOS 12 (Jan./Feb. 2010).

Ideas for Enhancing Your Code of Conduct and Compliance Policies, 23 ETHIKOS 12 (Sept./Oct. 2009).

Good News for the Compliance and Ethics Profession from Canada, COMPLIANCE & REGULATORY JOURNAL (Australia) 55 (Issue 6, 2009).

Why We Do What We Do, 6 COMPLIANCE AND ETHICS MAGAZINE 4 (August 2009)

General Counsel as CECO:  Not an Obvious Answer, 6 COMPLIANCE AND ETHICS MAGAZINE 6 (June 2009)(co-author, with Catherine Finamore Henry, and Ted Banks).

Fighting Corruption Globally: Report from Paris, 22 ETHIKOS 4 (May/June 2009).

The 10 Step Program, CORPORATE SECRETARY 50 (Mar. 2009).

Good News from Canada for the Compliance & Ethics Profession, 6 COMPLIANCE AND ETHICS MAGAZINE 34 (Feb. 2009).

<u>Training and Communications: 24 Ideas for Reaching Your People</u>, 22 ETHIKOS 6 (Jan./Feb. 2009).

<u>Raytheon's EthicSpace: Keeping the Message Current</u>, 22 ETHIKOS 7 (Sept./Oct. 2008).

<u>Antitrust Compliance Programs: Lessons Learned from 30 Years Of Practice (Part 3)</u>, 22 ETHIKOS 14 (Sept./Oct. 2008).

<u>Antitrust Compliance Programs: Lessons Learned from 30 Years Of Practice (Part 2)</u>, 22 ETHIKOS 11 (July/Aug. 2008).

<u>Antitrust Compliance Programs: Lessons Learned from 30 Years Of Practice (Part 1)</u>, 21 ETHIKOS 12 (May/June 2008).

<u>How DPAs, CIAs and Other Settlements Can Have a Lasting Effect</u>, 21 ETHIKOS 9 (May/June 2008).

<u>What Is the HR Leader's Role in Compliance and Ethics?</u>  Society of Human Resource Management web site, http://moss07.shrm.org/hrdisciplines/ethics/articles/Pages/HRLeadersRoleinComplian ce.aspx (May 9, 2008)(co-author with Steve Harrison).

<u>A Canadian Association's Big Tent Approach to C&E</u>, 21 ETHIKOS 14 (Mar./Apr. 2008)(contributing author with Donna Boehme).

<u>Testing Out</u>, 21 ETHIKOS 9 (Jan./Feb. 2008).

<u>The Antitrust Compliance Program and the Chief Ethics and Compliance Officer</u>, 1 ANTITRUST COMPLIANCE BULLETIN 5 (November 2007)

<u>No Place to Hide:  Early Lessons from The Siemens Case</u>, 21 ETHIKOS 10 (Nov./Dec. 2007) (co-author with Donna Boehme)

<u>Defining the Role of Chief Ethics & Compliance Officer:  A Step Forward</u>, 21 ETHIKOS 1 (Nov./Dec. 2007)

<u>What is This Field of Compliance and Ethics?</u> 9 JOURNAL OF HEALTH CARE COMPLIANCE (Sept./Oct. 2007).

<u>How the CEO Can Make the Difference in Compliance and Ethics</u>, 20 ETHIKOS 9 (May/June 2007).

<u>Compliance Guidance From the United Kingdom</u>, 20 ETHIKOS 5 (Mar/Apr 2007).

Compliance Officer on Board:  What Your Audit Committee Is Missing, 20 ETHIKOS 12 (Nov/Dec 2006)(co-author with Daniel Roach). Reprinted as Bringing Compliance to the Board, CORPORATE SECRETARY 51 (February 2007).

The Voices of Experience:  Advice from the Field, 20 ETHIKOS 12 (Sept/Oct 2006)(co-author with Joshua Leet).

Here's How Compliance Officers Can Sell the Program In-House, 14 PREVENTION OF CORPORATE LIABILITY CURRENT REPORT 112 (Aug. 21, 2006).

Industry Practices Groups:  Why and How, 20 ETHIKOS 12 (July/Aug 2006).

"I've Been Waiting For You To Call," 19 ETHIKOS 15 (May/June 2006).

The Latest Muddle in Ethics and Corporate Compliance, 25 PHILADELPHIA BUSINESS JOURNAL 15 (Apr. 21-27, 2006).

Online Compliance Training: The Make/Buy Decision, 3 THE CORPORATE COMPLIANCE & REGULATORY NEWSLETTER 3 (Apr 2006).

Protections for Compliance People, 19 ETHIKOS 1 (Jan/Feb 2006).

The Board Members' Compliance Checklist, 13 PREVENTION OF CORPORATE LIABILITY CURRENT REPORT 112 (Sept. 19, 2005).

"Mandavolent" Compliance, 19 ETHIKOS 8 (Sept/Oct 2005).

The Role of Incentives in Compliance Programs, 18 ETHIKOS 8 (May/June 2005) (co-author with Christopher Vigale).

Questions To Ask About An In-House Compliance and Ethics Job Offer, 18 ETHIKOS 7 (Nov/Dec 2004).

The Measurement Challenge (Part III): Results from the 'Deep Dive,' 18 ETHIKOS 11 (Sept/Oct 2004).

The Measurement Challenge (Part II): Implementing the 'Deep Dive,' 18 ETHIKOS 11 (July/Aug 2004).

Effective Compliance Programs In Higher Education: Report from Texas, 18 ETHIKOS 5 (July/Aug 2004).

The Measurement Challenge (Part I): Introducing the Deep Dive, 17 ETHIKOS 7 (May/June 2004).

Ethics for Ethicists?   A Code for Ethics and Compliance Professionals, 17 ETHIKOS 8 (Mar/Apr 2004).

Australia: A Fertile Source Of Ideas In The World Of Compliance, 17 ETHIKOS 12 (Jan/Feb 2004).

The Lessons of Enron for Corporate Compliance: Power and Professionalism, COMPLIANCE JOURNAL (Australia) 28 (November 2003).

Shields Up:  How Strong Is Your Company's Compliance Program?, 1 D&O ADVISOR 29 (Fall 2003).

20 Questions To Ask About Your Code Of Conduct, 17 ETHIKOS 7 (July/Aug 2003) (co-author with Win Swenson).

The Compliance Investigation:  How to Conduct Effective Interviews, 11 PREVENTION OF CORPORATE LIABILITY CURRENT REPORT 72 (July 21, 2003)(co-author with Margaret Bavuso).

When Starting Your Compliance Program, Survey What's Already in Place – and in Practice, 16 ETHIKOS 5 (Mar/Apr 2003).

Lost Words of the U.S. Sentencing Guidelines, 16 ETHIKOS 5 (Nov/Dec 2002).

The Enron Era: Lessons For Healthcare Compliance Programs, 4 G-2 COMPLIANCE REPORT 5 (Sept. 2002).

FCPA Compliance, 15 ETHIKOS 7 (Mar/Apr 2002).

Enron and Andersen:  Heed the Questions and Warnings They Raise for Your Company's Own Compliance Program, 10 PREVENTION OF CORPORATE LIABILITY CURRENT REPORT 28 (March 18, 2002).

Are Conflicts Of Interest Your Program's Achilles Heel? 15 ETHIKOS 1 (Sept./Oct. 2001)(co-author with Jeff Kaplan and Win Swenson).

A Call to Action: Creating a Voice (And Ears) for the Compliance and Ethics Field, 9 PREVENTION OF CORPORATE LIABILITY CURRENT REPORT 80 (July 16, 2001)(co-author with Win Swenson).

Should the Environment Surrounding Billing Compliance Be Challenged?, 3 JOURNAL OF HEALTH CARE COMPLIANCE 76 (May-June 2001).

Job Aides, Toys or "Tchatchkas:" Getting the Compliance Message to Employees, 14 ETHIKOS 8 (Mar/Apr 2001).

What Works to Prevent and Detect Misconduct in Organizations?, 3 JOURNAL OF HEALTH CARE COMPLIANCE 61 (Jan.-Feb. 2001).

Compliance Training on the Internet, 4 IN-HOUSE PRACTICE & MANAGEMENT FOR THE CORPORATE LAW DEPARTMENT 5 (May 2000).

Internet's Speed, Efficiency Has Raised the Bar for Employee Compliance Training, 8 PREVENTION OF CORPORATE LIABILITY CURRENT REPORT 32 (Apr. 17, 2000).

Taking a Disciplined Approach to Discipline: Enforcing Compliance Standards, 13 ETHIKOS 4 (Mar/Apr 2000).

Examining the Legal and Business Risks of Compliance Programs, 13 ETHIKOS 1 (Jan/Feb. 2000).

Compliance Programs for Universities: Are the Risks Being Addressed? 13 ETHIKOS 12 (Sept/Oct 1999).

Selling Compliance To Management: Ten Tips, 13 ETHIKOS 9 (July/Aug 1999).

Voluntary Compliance Efforts Should Be Considered When Judging Punitive Damages, 14 LEGAL BACKGROUNDER No. 23 (Washington Legal Foundation)(June 25, 1999).

To Reap Full Value of Corporate Compliance Program, Heed Potential It Holds to Parry Punitive Damages Claims, 6 PREVENTION OF CORPORATE LIABILITY CURRENT REPORT 8 (Jan. 18, 1999)(co-author with S. Mark Tuller).

A Proposal: No Punitive Damages for 'Diligent' Companies, 12 ETHIKOS 11 (Nov./Dec. 1998)(co-author with S. Mark Tuller)(reprinted in 3 IN-HOUSE PRACTICE & MANAGEMENT 5 (July 1999)).

Business Ethics and Compliance: What Management Is Doing and Why, BUSINESS AND SOCIETY REVIEW 35 (No. 99 1998)(co-author with Dawn-Marie Driscoll and W. Michael Hoffman).

Tests of Strength in Compliance Programs, 12 ETHIKOS 7 (Sept./Oct. 1998).

Enhancing the Compliance Officer's Authority: Preparing An Employment Contract, 11 ETHIKOS 5 (May/June 1998)(reprinted in THE GAZETTE (COMPLIANCE INSTITUTE, U.K.) 4 (Dec. 1999)).

Court's Denial of Privilege Undermines Corporate Compliance, 13 LEGAL BACKGROUNDER No. 18 (Washington Legal Foundation)(May 15, 1998).

Training as Part of an Effective Compliance Program, 3 HR INTELLIGENCE 2 (1998)(Federated Press; Toronto, Canada).

Training "In a Practical Manner," 6 CORPORATE CONDUCT QUARTERLY 2 (1998).

Are You Buying Trouble?  Ignoring Target Company's Compliance Efforts Could Be Folly, 5 PREVENTION OF CORPORATE LIABILITY CURRENT REPORT 12 (Oct. 20, 1997)(co-author with Kirk S. Jordan).

Compliance Developments in the United States: Directors' Responsibilities, 3 COMPLIANCE NEWS (AUSTRALIA) 7 (May 1997)(co-author with Kirk S. Jordan).

Corporate Compliance Programs: An Effective Shield Against Civil Penalties, 1 BNA HEALTH CARE FRAUD REPORT 98 (Feb. 12, 1997)(co-author with Brenton L. Saunders and Ilise L. Feitshans).

Reducing Foreign Corrupt Practices Act Risk: An Effective Self-Policing Program, 5 CORPORATE CONDUCT QUARTERLY 28 (1996).

So They Want You to Start a Compliance Program, 1 IN-HOUSE LAW PRACTICE & MANAGEMENT 10 (December 1996).

Facility Compliance Coordinator Position Could Help Ensure That Compliance Program Reaches the Field, 4 PREVENTION OF CORPORATE LIABILITY CURRENT REPORT 12 (Dec. 16, 1996).

Communicating "In a Practical Manner:" Bell Atlantic's Report on Integrity, 4 CORPORATE CONDUCT QUARTERLY 59 (1996)(co-author with Douglass J. McCollum)

The Self-Evaluative Privilege:  Where Is It, Now That We Need It? CORPORATE COUNSELING REPORT (ABA Antitrust Section, Corporate Counseling Committee) 2 (Spring 1996).

An FTC View of Compliance Programs: Good Faith Efforts Can Mean No Penalties, 4 CORPORATE CONDUCT QUARTERLY  53 (1996).

Corporations, Crime and Accountability, 4 CORPORATE CONDUCT QUARTERLY 26 (1995)(book review).

Hotlines: An Overview, 4 CORPORATE CONDUCT QUARTERLY 7 (1995).

Evaluations, Incentives and Rewards in Compliance Programs: Bringing the Carrot Indoors, 3 CORPORATE CONDUCT QUARTERLY 40 (1994).

Obvious Legal Risks - Hidden Business Rewards, 3 CORPORATE CONDUCT QUARTERLY 28 (1994)(co-author with Dana Freyer).

Clout and Internal Compliance Systems, 2 CORPORATE CONDUCT QUARTERLY 52 (Spring 1993)(co-author with Professor John Braithwaite, Australian National University)(reprinted in COMPLIANCE NEWS (1997), published by the Association for Compliance Professionals of Australia).

Compliance on Ice:  How Litigation Chills Compliance Programs, 2 CORPORATE CONDUCT QUARTERLY 36 (Winter 1992)(submitted to EPA as an exhibit by the Coalition for Improved Environmental Audits).

From Opposition to Interaction:  What Works?  11 PREVENTIVE LAW REPORTER 24 (Dec. 1992).

Conducting a Guidelines Compliance Review:  Liability Inventories, 2 CORPORATE CONDUCT QUARTERLY 4 (Summer 1992)(co-author with Jeffrey M. Kaplan).

How to Establish an Effective Antitrust Compliance Program Under the Guidelines, 1 CORPORATE CONDUCT QUARTERLY 1 (Spring 1992),

12 Ways to Encourage Voluntary Compliance, 1 CORPORATE CONDUCT QUARTERLY 6 (Winter 1991).

New Ideas for Managing Business Ethics and Legal Compliance, 8 JOURNAL OF COMMERCE AND FINANCE (VILLANOVA) 11 (Fall 1991).

Conducting the Compliance Audit:  18 Hints for Survival, 1 CORPORATE CONDUCT QUARTERLY 4 (Summer 1991).

Fifteen Tips for Preventing Corporate Lawbreaking, 3 CORPORATE CRIMINAL LIABILITY REPORTER 50 (No. 4 1989).

The Corporate Lawyer As Unsung Hero, 11 PENNSYLVANIA LAWYER 12 (June 1989)(co-author with Jay A. Sigler).

Should Government Regulators Try the Carrot Before the Stick?  69 BUSINESS AND SOCIETY REVIEW 51 (Spring 1989)(co-author with Jay A. Sigler).

It's Necessary, but Preventive Law Has Real Costs and Serious Risks,
7 PREVENTIVE LAW REPORTER 3 (1988).

Effective Access to the Law, 10 JOURNAL OF LEGISLATION 313 (1983).

The Duty of the Government to Make the Law Known, 51 FORDHAM LAW
REVIEW 255 (1982).

The Self-Evaluative Privilege, 7 JOURNAL OF CORPORATION LAW 489 (1982),
reprinted in 25 CORPORATE PRACTICE COMMENTATOR 425 (1983).

State Court Assertion of Power to Determine and Demand Its Own Budget, 120
UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1187 (1972)(student author).

The Parole System, 120 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 282
(1971)(one of six student authors).

## *QUOTATIONS ON COMPLIANCE ISSUES:*

Wall Street Journal
DowJones Newswire
National Law Journal
CNBC Closing Bell
American Bar Association Journal
New York Law Journal
CFO Magazine
Corporate Secretary
Revista Ideia Socioambiental (Brazil)
Capital Aberto (Brazil)
Christian Science Monitor
Smart Business
Philadelphia Inquirer
Philadelphia Business Journal
ACCA Docket
Corporate Legal Times
Compliance News (Australia)
Compliance Week
BNA Law Week
BNA Criminal Practice Manual
BNA Prevention of Corporate Liability
BNA Antitrust and Trade Regulation Reporter
BNA Health Care Fraud Report
Journal of Health Care Compliance
Compliance Today
Compliance & Ethics Magazine
Ethical Corporation
Federal Ethics Report
Ethikos
Chicago Lawyer
Courier-Post
Corporate Crime Reporter
Report on Medicare Compliance
Compliance Officer's Report
Compliance Hotline

# Appendix 2

## UNITED STATES SENTENCING GUIDELINES DEFINITION OF AN EFFECTIVE COMPLIANCE AND ETHICS PROGRAM

"2. EFFECTIVE COMPLIANCE AND ETHICS PROGRAM
§8B2.1. Effective Compliance and Ethics Program

(a) To have an effective compliance and ethics program, for purposes of subsection (f) of §8C2.5 (Culpability Score) and subsection (c)(1) of §8D1.4 (Recommended Conditions of Probation - Organizations), an organization shall—

(1) exercise due diligence to prevent and detect criminal conduct; and

(2) otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law.

Such compliance and ethics program shall be reasonably designed, implemented, and enforced so that the program is generally effective in preventing and detecting criminal conduct. The failure to prevent or detect the instant offense does not necessarily mean that the program is not generally effective in preventing and detecting criminal conduct.

(b) Due diligence and the promotion of an organizational culture that encourages ethical conduct and a commitment to compliance with the law within the meaning of subsection (a) minimally require the following:

(1) The organization shall establish standards and procedures to prevent and detect criminal conduct.

(2)      (A) The organization's governing authority shall be knowledgeable about the content and operation of the compliance and ethics program and shall exercise reasonable oversight with respect to the implementation and effectiveness of the compliance and ethics program.

(B) High-level personnel of the organization shall ensure that the organization has an effective compliance and ethics program, as described in this guideline. Specific individual(s) within high-level personnel shall be assigned overall responsibility

for the compliance and ethics program.

    (C) Specific individual(s) within the organization shall
be delegated day-to-day operational responsibility
for the compliance and ethics program.
Individual(s) with operational responsibility shall
report periodically to high-level personnel and, as
appropriate, to the governing authority, or an
appropriate subgroup of the governing authority, on
the effectiveness of the compliance and ethics
program. To carry out such operational
responsibility, such individual(s) shall be given
adequate resources, appropriate authority, and
direct access to the governing authority or an
appropriate subgroup of the governing authority.

(3) The organization shall use reasonable efforts not to include
within the substantial authority personnel of the
organization any individual whom the organization knew,
or should have known through the exercise of due
diligence, has engaged in illegal activities or other conduct
inconsistent with an effective compliance and ethics
program.

(4)  (A) The organization shall take reasonable steps to
communicate periodically and in a practical manner
its standards and procedures, and other aspects of
the compliance and ethics program, to the
individuals referred to in subdivision (B) by
conducting effective training programs and
otherwise disseminating information appropriate to
such individuals' respective roles and
responsibilities.

    (B) The individuals referred to in subdivision (A) are
the members of the governing authority, high-level
personnel, substantial authority personnel, the
organization's employees, and, as appropriate, the
organization's agents.

(5) The organization shall take reasonable steps—
    (A) to ensure that the organization's compliance and
ethics program is followed, including monitoring
and auditing to detect criminal conduct;

    (B) to evaluate periodically the effectiveness of the

organization's compliance and ethics program; and

(C) to have and publicize a system, which may include mechanisms that allow for anonymity or confidentiality, whereby the organization's employees and agents may report or seek guidance regarding potential or actual criminal conduct without fear of retaliation.

(6) The organization's compliance and ethics program shall be promoted and enforced consistently throughout the organization through (A) appropriate incentives to perform in accordance with the compliance and ethics program; and (B) appropriate disciplinary measures for engaging in criminal conduct and for failing to take reasonable steps to prevent or detect criminal conduct.

(7) After criminal conduct has been detected, the organization shall take reasonable steps to respond appropriately to the criminal conduct and to prevent further similar criminal conduct, including making any necessary modifications to the organization's compliance and ethics program.

(c) In implementing subsection (b), the organization shall periodically assess the risk of criminal conduct and shall take appropriate steps to design, implement, or modify each requirement set forth in subsection (b) to reduce the risk of criminal conduct identified through this process.

**Commentary**
*Application Notes:*
*1. Definitions.—For purposes of this guideline:*
*'Compliance and ethics program' means a program designed to prevent and detect criminal conduct.*

*'Governing authority' means the (A) the Board of Directors; or (B) if the organization does not have a Board of Directors, the highest-level governing body of the organization.*

*'High-level personnel of the organization' and 'substantial authority personnel' have the meaning given those terms in the Commentary to §8A1.2 (Application Instructions - Organizations).*

*'Standards and procedures' means standards of conduct and internal controls that are reasonably capable of reducing the likelihood of criminal conduct.*

*2. Factors to Consider in Meeting Requirements of this Guideline.—*
*(A) In General.—Each of the requirements set forth in this guideline shall be met by an organization; however, in determining what specific actions are necessary to meet those requirements, factors that shall be considered include: (i) applicable industry practice or the standards called for by any applicable governmental regulation; (ii) the size of the organization; and (iii) similar misconduct.*

*(B) Applicable Governmental Regulation and Industry Practice.—An organization's failure to incorporate and follow applicable industry practice or the standards called for by any applicable governmental regulation weighs against a finding of an effective compliance and ethics program.*

*(C) The Size of the Organization.—*

*(i) In General.—The formality and scope of actions that an organization shall take to meet the requirements of this guideline, including the necessary features of the organization's standards and procedures, depend on the size of the organization.*

*(ii) Large Organizations.—A large organization generally shall devote more formal operations and greater resources in meeting the requirements of this guideline than shall a small organization. As appropriate, a large organization should encourage small organizations (especially those that have, or seek to have, a business relationship with the large organization) to implement effective compliance and ethics programs.*

*(iii) Small Organizations.—In meeting the requirements of this guideline, small organizations shall demonstrate the same degree of commitment to ethical conduct and compliance with the law as large organizations. However, a small organization may meet the requirements of this guideline with less formality and fewer resources than would be expected of large organizations. In appropriate circumstances, reliance on existing resources and simple systems can demonstrate a degree of commitment that, for a large organization, would only be demonstrated through more formally planned and implemented systems.*

*Examples of the informality and use of fewer resources with which a small organization may meet the requirements of this guideline include the following: (I) the governing authority's discharge of its responsibility for oversight of the compliance and ethics program by directly managing the organization's compliance and ethics efforts; (II) training employees through informal staff*

68

*meetings, and monitoring through regular 'walk-arounds' or
continuous observation while managing the organization; (III)
using available personnel, rather than employing separate staff, to
carry out the compliance and ethics program; and (IV) modeling
its own compliance and ethics program on existing, well-regarded
compliance and ethics programs and best practices of other similar
organizations.*

*(D) Recurrence of Similar Misconduct.—Recurrence of similar misconduct
creates doubt regarding whether the organization took reasonable steps to
meet the requirements of this guideline. For purposes of this subdivision,
'similar misconduct' has the meaning given that term in the Commentary
to §8A1.2 (Application Instructions - Organizations).*

*3. Application of Subsection (b)(2).—High-level personnel and substantial authority
personnel of the organization shall be knowledgeable about the content and
operation of the compliance and ethics program, shall perform their assigned
duties consistent with the exercise of due diligence, and shall promote an
organizational culture that encourages ethical conduct and a commitment to
compliance with the law.*

*If the specific individual(s) assigned overall responsibility for the compliance and
ethics program does not have day-to-day operational responsibility for the
program, then the individual(s) with day-to-day operational responsibility for the
program typically should, no less than annually, give the governing authority or
an appropriate subgroup thereof information on the implementation and
effectiveness of the compliance and ethics program.*

*4. Application of Subsection (b)(3).—*

*(A) Consistency with Other Law.—Nothing in subsection (b)(3) is intended to
require conduct inconsistent with any Federal, State, or local law,
including any law governing employment or hiring practices.*

*(B) Implementation.—In implementing subsection (b)(3), the organization
shall hire and promote individuals so as to ensure that all individuals
within the high-level personnel and substantial authority personnel of the
organization will perform their assigned duties in a manner consistent with
the exercise of due diligence and the promotion of an organizational
culture that encourages ethical conduct and a commitment to compliance
with the law under subsection (a). With respect to the hiring or promotion
of such individuals, an organization shall consider the relatedness of the
individual's illegal activities and other misconduct (i.e., other conduct
inconsistent with an effective compliance and ethics program) to the
specific responsibilities the individual is anticipated to be assigned and
other factors such as: (i) the recency of the individual's illegal activities*

*and other misconduct; and (ii) whether the individual has engaged in other such illegal activities and other such misconduct.*

*5. Application of Subsection (b)(6).—Adequate discipline of individuals responsible for an offense is a necessary component of enforcement; however, the form of discipline that will be appropriate will be case specific.*

*6. Application of Subsection (c).—To meet the requirements of subsection (c), an organization shall:*

*(A) Assess periodically the risk that criminal conduct will occur, including assessing the following:*

*(i) The nature and seriousness of such criminal conduct.*

*(ii) The likelihood that certain criminal conduct may occur because of the nature of the organization's business. If, because of the nature of an organization's business, there is a substantial risk that certain types of criminal conduct may occur, the organization shall take reasonable steps to prevent and detect that type of criminal conduct. For example, an organization that, due to the nature of its business, employs sales personnel who have flexibility to set prices shall establish standards and procedures designed to prevent and detect price-fixing. An organization that, due to the nature of its business, employs sales personnel who have flexibility to represent the material characteristics of a product shall establish standards and procedures designed to prevent and detect fraud.*

*(iii) The prior history of the organization. The prior history of an organization may indicate types of criminal conduct that it shall take actions to prevent and detect.*

*(B) Prioritize periodically, as appropriate, the actions taken pursuant to any requirement set forth in subsection (b), in order to focus on preventing and detecting the criminal conduct identified under subdivision (A) of this note as most likely to occur.*

*(C) Modify, as appropriate, the actions taken pursuant to any requirement set forth in subsection (b) to reduce the risk of criminal conduct identified under subdivision (A) of this note as most likely to occur.*

*Background: This section sets forth the requirements for an effective compliance and ethics program. This section responds to section 805(a)(2)(5) of the Sarbanes-Oxley Act of 2002, Public Law 107–204, which directed the Commission to review and amend, as*

*appropriate, the guidelines and related policy statements to ensure that the guidelines that apply to organizations in this chapter 'are sufficient to deter and punish organizational criminal misconduct.'*

*The requirements set forth in this guideline are intended to achieve reasonable prevention and detection of criminal conduct for which the organization would be vicariously liable. The prior diligence of an organization in seeking to prevent and detect criminal conduct has a direct bearing on the appropriate penalties and probation terms for the organization if it is convicted and sentenced for a criminal offense.".*

*The Commentary to §8C2.4 captioned "Application Notes" is amended in Note 2 by striking "(Larceny, Embezzlement, and Other Forms of Theft)" and inserting "(Theft, Property Destruction, and Fraud)".*

*Section 8C2.5 is amended by striking subsection (f) and inserting the following:*
*"(f) Effective Compliance and Ethics Program*
*(1) If the offense occurred even though the organization had in place at the time of the offense an effective compliance and ethics program, as provided in §8B2.1 (Effective Compliance and Ethics Program), subtract 3 points.*
*(2) Subsection (f)(1) shall not apply if, after becoming aware of an offense, the organization unreasonably delayed reporting the offense to appropriate governmental authorities.*
*(3) (A) Except as provided in subdivision (B), subsection (f)(1) shall not apply if an individual within high-level personnel of the organization, a person within high-level personnel of the unit of the organization within which the offense was committed where the unit had 200 or more employees, or an individual described in §8B2.1(b)(2)(B) or (C), participated in, condoned, or was willfully ignorant of the offense.*
*(B) There is a rebuttable presumption, for purposes of subsection (f)(1), that the organization did not have an effective compliance and ethics program if an individual—*
*(i) within high-level personnel of a small organization; or*
*(ii) within substantial authority personnel, but not within high-level personnel, of any organization,*
*participated in, condoned, or was willfully ignorant of, the offense.".*
*The Commentary to §8C2.5 captioned "Application Notes" is amended by striking Note 1 and inserting the following:*
*"1. Definitions.—For purposes of this guideline, 'condoned', 'prior criminal adjudication', 'similar misconduct', 'substantial authority personnel', and 'willfully ignorant of the offense' have the meaning given those terms in Application Note 3 of the Commentary to §8A1.2 (Application Instructions - Organizations).*
*'Small Organization', for purposes of subsection (f)(3), means an organization*

71

*that, at the time of the instant offense, had fewer than 200 employees.".*

*The Commentary to §8C2.5 captioned "Application Notes" is amended in Note 3 in the last sentence by striking "entire organization" and inserting "organization in its entirety".*

*The Commentary to §8C2.5 captioned "Application Notes" is amended in Note 10 by striking "The second proviso in subsection (f)" and inserting "Subsection (f)(2)"; and by striking "this proviso" and inserting "subsection (f)(2)".*

*The Commentary to §8C2.5 captioned "Application Notes" is amended in Note 12 by adding at the end the following:*

*"Waiver of attorney-client privilege and of work product protections is not a prerequisite to a reduction in culpability score under subdivisions (1) and (2) of subsection (g) unless such waiver is necessary in order to provide timely and thorough disclosure of all pertinent information known to the organization.".*

*Section 8C2.8(a) is amended in subdivision (9) by striking "and"; in subdivision (10) by striking the period at the end of the subdivision and inserting "; and"; and by adding at the end the following:*

*"(11) whether the organization failed to have, at the time of the instant offense, an effective compliance and ethics program within the meaning of §8B2.1 (Effective Compliance and Ethics Program).".*

*The Commentary to §8C2.8 captioned "Application Notes" is amended in Note 4 in the first sentence by inserting "within high-level personnel of" after "organization or".*

*Section 8C4.10 is amended by striking "(Effective Program to Prevent and Detect Violations of Law)" and inserting "(Effective Compliance and Ethics Program)"; and by adding at the end the following paragraph:*

*"Similarly, if, at the time of the instant offense, the organization was required by law to have an effective compliance and ethics program, but the organization did not have such a program, an upward departure may be warranted.".*

*Chapter Eight, Part D, is amended in the "Introductory Commentary" by striking "8D1.5" and inserting "8D1.4, and §8F1.1,".*

*Section 8D1.1(a) is amended by striking subdivision (3) and inserting the following: "(3) if, at the time of sentencing, (A) the organization (i) has 50 or more employees, or(ii) was otherwise required under law to have an effective compliance and ethics program; and (B) the organization does not have such a program;".*

*Section 8D1.4(b)(4) is amended by striking "(1)" and inserting "(A)"; by striking "(2)" and inserting "(B)"; and by striking "(3)" and inserting "(C)".*

*Section 8D1.4(c) is amended by striking subdivision (1) and inserting the following: "(1) The organization shall develop and submit to the court an effective compliance and ethics program consistent with §8B2.1 (Effective Compliance and Ethics Program). The organization shall include in its submission a schedule for implementation of the compliance and ethics program.";*

*and in subdivisions (2), (3), and (4) by striking "to prevent and detect violations of law" each place it appears and inserting "referred to in subdivision (1)".*

*The Commentary to §8D1.4 captioned "Application Notes" is amended by striking "Notes" in the heading and inserting "Note"; and in Note 1 by striking "a program to prevent and detect violations of law" and inserting "a compliance and ethics program"; and by striking the last sentence of the first paragraph and inserting "The court should*

*approve any program that appears reasonably calculated to prevent and detect criminal conduct, as long as it is consistent with §8B2.1 (Effective Compliance and Ethics Program), and any applicable statutory and regulatory requirements.".*