# **EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------X
:
IN RE INTEL CORP. DERIVATIVE LITIG. :  C.A. No. 09-cv-867(JJF)
:
------------------------------------------------------X

## DECLARATION OF DONALD I. BAKER

Donald I. Baker declares as follows, under pain and penalty of perjury under the laws of the United States:

1. I am the senior partner of Baker & Miller PLCC, a Washington D.C. law firm which is heavily engaged in the antitrust and competition field in the United States and internationally. I personally have had approximately 49 years of experience in the antitrust and competition law field.

### SCOPE OF ENGAGEMENT

2. I have been retained by Plaintiffs' Derivative Counsel in this matter to provide my expert opinion on two general issues:

(a) On whether the changes to the corporate therapeutics of Intel Corporation ("Intel") will be likely significantly to reduce the Company's expose to future antitrust liability; and

(b) On whether--having-reviewed the defenses put forward by Intel in the *Advanced Micro Devices, Inc.* case filed in the United States District Court for the District of Delaware, Civil Action No. 05-441 (JJF) (the "*AMD Antitrust Litigation*"), and with regard to the appeal of The European Commission ("EC") Decision, Comp/ 13-990 Intel, May 13, 2009 (the "*Intel EC Decision*")-- (i) Intel might have been successful had the *AMD Antitrust Litigation* proceeded to

1

trial, and (ii) Intel might yet be successful in its appeal to the General Court of the European Union (f/k/a The Court of First Instance).

3.  I have been retained to prepare this declaration on the basis of a fixed compensation arrangement that is not contingent on any result in this case.

### QUALIFICATIONS, BACKGROUND AND EXPERIENCE

4.  Since 1961, I have been involved in the field of antitrust law (or competition law as it is generally known outside the United States) in a wide range of capacities. I have served as: (a) an adviser to U.S. and foreign clients on business practices, mergers, and other transactions and on compliance issues; (b) a public enforcement official; (c) an adviser and advocate for parties subject to government investigations; (d) counsel to plaintiffs and defendants in antitrust litigation; (e) counsel to appellants, appellees, and *amici* in the U.S. Supreme Court and the Courts of Appeals; (f) an advisor to foreign governments on antitrust issues; (g) a professor of law and visiting lecturer at various universities; (h) an arbitrator or mediator in antitrust disputes; and (i) a frequent writer and speaker on antitrust and competition law.

5.  I hold law degrees from Cambridge University (received in 1959 and 2000) and Harvard University (received in 1961). I am a member of the bar in the District of Columbia and the Commonwealth of Massachusetts.

6.  During 1961-62, I worked for the English law firm Slaughter and May in London, where my work included advising the firm's British and American clients on the European system of competition law, which was then in its formative stages.

7.  During 1963-66, I was employed at the law firm of Nutter, McClennen & Fish in Boston, where I worked extensively for defendants in the nationwide *Electrical Equipment* treble

damages cases, and advised a variety of financial, manufacturing, and commercial clients on a wide range of issues, including a number of international antitrust questions.

8. During 1966-75, I worked on the staff of the Antitrust Division of the U.S. Department of Justice ("Antitrust Division"). I began my work at the Justice Department as a staff lawyer on the policy planning staff. From 1970 forward, I had oversight responsibility for the Antitrust Division's Foreign Commerce Section (successively as Deputy Director of Policy Planning, Director of Policy Planning, and Deputy Assistant Attorney General). This meant that I was regularly involved in international enforcement efforts, as well as the periodic conflicts with foreign governments generated by private antitrust litigation and public investigations, most notably the *Uranium Antitrust* litigation.

9. During 1975-76, I was Visiting Professor of Law at Cornell University School of Law, where I was granted tenure toward the end of that academic year. While at Cornell, I was coordinator of a working group of corporate lawyers appointed by the Antitrust Division and, working with them, I was the principal draftsman of what became the Antitrust Guide to International Operations, which the Antitrust Division would issue in early 1977.

10. During 1976-77, I became Assistant Attorney General in Charge of the Antitrust Division. I was nominated by President Gerald Ford, and I believe am the only member of the Division's career staff ever to be made Assistant Attorney General. In this capacity, I represented the United States at the intergovernmental Organization of Economic Cooperation and Development (generally called "OECD") meetings and dealt directly the leaders of the European Commission ("EC") and other national enforcement agencies.

3

11. During 1977-78, I returned to Cornell Law School as Professor of Law and, while there, jointly taught an international business course that covered difficult antitrust and tax issues for international businesses.

12. During 1978-83 and 1992-94, I was a partner in the international law firm of Jones, Day, Reavis & Pogue (now called Jones Day). In this capacity, I worked on a very broad set of antitrust issues—including government investigations, private litigation representing both plaintiffs and defendants, counseling, antitrust compliance, and appellate cases. Some of this work was for foreign clients or for American clients with international problems.

13. During 1983-91, I was a partner in another large law firm, Sutherland, Asbill & Brennan, which was based in Washington and Atlanta. My work during this period continued to be a generally similar mix of advice, government investigations, litigation, and appeals. My largest day-to-day client, Union Carbide Corporation, regularly confronted a broad range of international as well as domestic legal issues.

14. In 1995, W. Todd Miller and I founded Baker & Miller PLLC as an antitrust boutique in Washington, D.C. with a significant international dimension. During 1998-2004, I represented a Canadian defendant in the international *Vitamins Cartel* investigations and follow-on private antitrust litigation, and was involved in presentations on its behalf before the Canadian Competition Bureau, the EC, and the Antitrust Division. In 2003-2005, I was appointed to be the independent investigator of the involvement of an international joint venture, DuPont-Dow Elastomers LLC, in connection with two suspected chemical cartels; in this capacity, I conducted extensive interviews and made presentations to government enforcement agencies in Europe and North America. More recently, I have also done some limited work for Qantas Airways, which

4

Baker & Miller is representing in the current Fuel Surcharge investigations in the U.S. and the European Union ("EU").

15. In the Spring Semester 2010, as an Adjunct Professor of Law, I jointly taught a course called the International Antitrust Environment at George Washington University Law School. The principal focus of this course was U.S. and European antitrust law. In prior years, I have presented lectures or taught classes on international antitrust issues at Oxford University, George Washington University Law School, American University Washington College of Law, George Mason University Law School, Cornell Law School, Kings College London, and University College London.

16. Since at least 2000, I have advised the British Government on international jurisdiction and antitrust questions. In 1994, I spent several weeks in Ukraine advising the national government's Anti-Monopoly Committee on antitrust policies and techniques for organizing antitrust investigations and cases. In 2003, I spent several weeks in Mongolia, advising the national government on how to organize and structure a national agency to enforce the antitrust statute that had been previously enacted by the Mongolian parliament.

17. Since 2006, I have served as a Non-Government Advisor ("NGA") to the International Competition Network ("ICN"), having been nominated by the Antitrust Division and the Federal Trade Commission. The ICN is an intergovernmental network involving over 100 antitrust agencies worldwide. It holds an annual conference which I have been invited to attend in each of the last four years. In between annual conferences, I am in active contact with government officials and other NGAs via regular ICN conference calls and e-mails. As a Non-Government Adviser, I have been particularly involved in the deliberations of the Working Group on Unilateral Conduct, which is principally concerned with narrowing the differences

among various antitrust authorities over how to deal with questionable conduct by dominant firms. Thus, I have had significant, direct, and personal interaction with foreign officials in this area --the area that has created Intel's principal antitrust exposure globally.

18. Throughout my career as a private lawyer, I have made compliance presentations and have been involved in design and implementation of antitrust compliance programs. This is particularly challenging for a global company such as Intel, DuPont Dow Elastomers, or Qantas Airways, where the company has to design a compliance program to inform and influence a work force made up of people with diverse cultural experiences, education, cultural values, and national psychologies.

## MATERIALS AND INFORMATION REVIEWED

19. In addition to the Stipulation of Settlement in the instant matter dated May 25, 2010 (the "Settlement"), among the sources of information I have consulted or drawn upon in connection with my work herein include the following:

    a. European Commission Decision (redacted public version), *In re Intel Corporation*, Case Comp. C 3-337.990/Intel, issued in public from September , 2009.

    b. Intel Response to the EC's "Provisional Non-Confidential Version of the Commission Decision of 13 May 2009" (September 21, 2009).

    c. European Commission Press Release, *In re Intel Corporation*, Case Comp. C 3-337.990/Intel, issued May 13, 2009.

    d. *State of New York v. Intel Corp.*, C.A. No. 1:09-cv-00827 (D. Del.)complaint filed November 3, 2009.

    e. Federal Trade Commission, *In the Matter of Intel Corporation*, Dkt. No. 9341, Complaint dated December 16, 2009.

    f. Memorandum in Support of Intel's Motion, Pursuant to Rules 16 and 56, for a Pretrial Conference to Seek the Court's Determination of Key Issues of Law that Will

Govern Completion of Preparation and Trial in *Intel Corporation Microprocessor Antitrust Litigation*, MDL No. 05-1717-JJF (D.Del.).

       g.    *In re Intel Corp. Derivative Litigation*, C.A. No. 09-cv-867 (JJF) (D.Del.), Shareholders' Demand-Made Consolidated Derivative Complaint, filed February 6, 2010.

       h.    Sir Christopher Bellamy & Graham Child, European Community Law of Competition (6th ed. 2008): Chapter 10 ("Article 82"), and pp. 1615-20 ("Postscript on Microsoft").

       i.    Eleanor Fox, The Competition Law of the European Union in Comparative Perspective (2009): Chapter 3 ("Abuse of a Dominant Position").

       j    Donald I. Baker, *An Enduring Antitrust Divide Across the Atlantic Over Whether to Incarcerate Conspirators and When to Restrain Abusive Monopolists*, 5 European Competition Journal 145 (2009).

       k.    *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc).

       l.    Public version of Intel's Answer dated January 12, 2010 in *State of New York v. Intel Corp.*, C.A. 09-827-JJF (D.Del.)

## SUMMARY OF OPINIONS

20.    Intel faces increasing antitrust risks as a successful, globally dominant participant in a major market because: (a) increasing numbers of countries are adopting antitrust laws and threatening to impose substantial penalties for antitrust infringements; (b) many of the antitrust systems being adopted are modeled on the rules and processes developed by the European Commission; (c) private antitrust litigation is being encouraged and expanded in Europe; and (d) the antitrust rules vis-à-vis dominant firms tend to be considerably more stringent in Europe and other foreign jurisdictions than in the United States.

21. In Paragraphs 2 and 3 of the Stipulation of Settlement, Intel agreed to put in place, or keep in place institutional arrangements (including a Board of Directors Compliance Committee) focusing specifically on antitrust compliance. It has also agreed to certain education and monitoring processes focused on antitrust compliance. Also, notably, Intel has agreed in the Stipulation of Settlement that its compliance and ethics program "is intended to conform in material respects to the relevant provisions of the US Federal Sentencing Guidelines." The Federal Sentencing Guidelines are the gold standard against which the effectiveness and *bona fides* of compliance and ethics programs are adjudged.

22. I have reviewed these particular compliance institutions and processes. I find them among the most comprehensive and effective that I have ever seen. I believe that they are well suited to Intel's needs as a global leader that has already faced costly antitrust investigations and challenges both in the United States and abroad.

23. Based on my long experience in the antitrust and competition law field, I recognize how difficult it is to predict the result of any particular antitrust litigation, especially when one lacks access to the factual record in the case. Thus, in the case of the *AMD Antitrust Litigation*, I am clear that Intel had some viable factual defenses that it would have raised before a jury had the case gone to trial and a number of legal issues on which it might prevail on before the District Court or an appellate court. Accordingly, the *AMD Antitrust Litigation* should not be read as having established that Intel committed Sherman Act violations. That AMD chose to settle the action rather than risk a jury trial and appeal on these factual and legal issues suggests that some significant degree of doubt by those well familiar with the record.

24. In the case of the *EC Intel Decision,* Intel was found liable and fined a very substantial amount of money. However, under the normal judicial processes in Europe, the

8

European Commission's findings of fact, legal conclusions on infringements, procedural and penalties are subject to intensive detailed review by the General Court (formerly the Court of First Instance), as well as possible further review by the European Court of Justice. Thus, EC determinations are subject to much more intensive review than a U.S. administrative agency would receive before a domestic Court of Appeals. The oral hearing before the General Court in an important case such as this one will normally go on for several days, with the Judges deeply probing the Commission's processes and conclusions. Having reviewed an outline of Intel's proposed grounds for appeal, I can clearly see that the Corporation will be presenting the General Court with some facially credible arguments that the Commission's fact finding has been deficient and its processes unfair in the way that it ignored certain sources of evidence. Accordingly, I cannot predict that Intel will ultimately be found liable by the General Court or the ECJ to have infringed Article 82 of the European Treaty in the various ways that the EC had found it to have done so

## DISCUSSION

25. As a globally dominant firm, Intel faces enhanced antitrust risks in almost every jurisdiction where it does business. These risks are often more serious elsewhere than they are in the U.S. The risks are especially serious in the EU, which has a large enforcement agency that attracts many complainants (e.g., "AMD") and can make findings of infringement based on an administrative process that the agency entirely controls.

26. The EU takes a much more stringent view of the permissible conduct of a dominant firm than generally prevails in the United States. The European Commission approach to "abuse of dominance" is generally followed by the enforcement agencies of EU

Member States, and is quite influential among various other countries outside of Europe that use a civil law enforcement model.

27. Moreover, in the EU (and in many non-European countries that use a civil law type administrative system), the enforcement agency/administrator can levy substantial monetary fines via an administrative process in which the rights of defense can be quite limited. Intel's recent experience before the European Commission apparently illustrates this difficult reality and provides *inter alia* a credible basis for Intel's pending appeal the European General Court (formerly the Court of First Instance) in Luxembourg, as noted in Paragraph 24 above..

28. Because such EU fines are generally calculated on the basis of a percentage (up to 10%) of global turnover, they can be absolutely enormous for a global company like Intel, as well as sometimes being quite disproportionate to the seriousness of the violation that the European Commission has found the company to have committed.

29. The fine that the EC levied against Intel in 2009 for infringing Article 82 (now Article 102) of the European Treaty was for EUR 1.06 billion (US $1.45 billion) and is the highest fine ever imposed by the Commission. That decision is now on appeal to the General Court and it might be reversed on the ground that the European Commission made serious errors in reaching its evidentiary conclusions and/or applied incorrect legal principles, as Intel has claimed. Alternatively, the large fine could be reduced even if the Commission's legal position is sustained.

30. In the U.S., Intel also faces antitrust risks, but in the context of a fundamentally different legal system which takes a less stringent view of aggressive tactics by a dominant firm. There is a risk of suit by the Antitrust Division or, as occurred in December 2009, by the Federal Trade Commission, but the remedies are more limited in that the government enforcement

agencies are confined to injunctive remedies. The U.S. enforcement agencies cannot order the types of large administrative fines that Intel, Microsoft, and some other dominant firms have incurred in Europe. Thus Intel's main financial risk in the United States comes from private treble damage litigation (as so well illustrated by Intel's $1.25 billion settlement with AMD in the District Court for the District of Delaware, a result achieved after lengthy litigation).

31. Antitrust enforcement is also becoming an ever more important reality in Asia. While Korea and Japan both have had antitrust agencies in place for quite some time, the agencies are becoming more active and imposing ever larger fines for infringement. Both the Korean Fair Trade Commission and the Japan Fair Trade Commission have asserted that Intel engaged in monopolistic abuses. Meanwhile, India and the People's Republic of China have over the past two years enacted new competition laws and enforcement institutions, thus potentially presenting further longer run antitrust risks to Intel from the world's two largest countries.

32. In recounting the foregoing antitrust risks that Intel faces, I am not presuming that the corporation is guilty of what it has been charged with by government agencies or any private plaintiffs. As noted in Paragraph 19 above, I have reviewed several of Intel's responses to the claims against them; and these include factual and legal arguments on which Intel might prevail before the European Courts in the European Commission proceeding against Intel or might have prevailed before the U.S. courts had the AMD litigation against Intel not been settled. My point is simply that these two very expensive proceedings, taken in conjunction a number of less publicized proceedings, underscore the reality that Intel faces diverse antitrust risks which a prudent corporation would try to mitigate through an enhanced compliance and educational program directed at its officers, directors, and employees. I am pleased to conclude that the

comprehensive antitrust compliance changes embodied in the Settlement will certainly reduce Intel's risk under domestic and international competition laws going forward.

33. In a global enterprise such as Intel, conduct generating antitrust risks may be generated by the conduct of individuals or groups within the company having very different cultural assumptions, education, and experience. This institutional reality means that establishing an ongoing antitrust education, compliance, and monitoring program is even more important and challenging than it is for a company entirely operating in the United States.

34. Based on my experience in investigating potential antitrust infringements and talking to foreign antitrust officials and counsel, I believe that foreign business executives and sales personnel can often be less sensitive to antitrust risks than their average American counterparts. This is an especially serious problem in Europe where antitrust enforcement has become so significant (and sometime draconian) in recent years, with both the European Commission and national competition authorities ("NCAs") of the Member States bringing cases and imposing substantial fines.

35. Moreover, in a large company, some mid-level executives and salesmen may be tempted to engage in covert activities of questionable legality, in order to embellish their performance numbers and hence enhance the wrongdoers' opportunities to earn bonuses and/or promotions. This type of risk to the corporation is forcefully illustrated by the financially disastrous activities of rogue traders in the *Barings* and *Societe Generale* cases. The need for effective monitoring and oversight is essential where, as in the case of Intel, discretionary decisions by sales executives and traders can be so costly for the company.

36. I have advised some international businesses on various sales practices that employed loyalty rebates, exclusivity bonuses, and/or steep volume discounts. Based on

consultation with European counsel whom I retained, I have always advised that more caution was required in Europe than the U.S. if the firm had at least 40-50% of the relevant market. This is particularly true on loyalty rebates and discounts, where the rules tend to be quite different on the two sides of the Atlantic.

## THE SETTLEMENT PROVIDES SIGNIFICANT AND APPROPRIATE ANTITRUST COMPLIANCE PROVISONS TO ASSIST INTEL IN MINIMIZING INTERNATIONAL COMPETITION RISKS

37. The Settlement entered into in the consolidated derivative actions provides for the most detailed antitrust compliance program that I have ever seen. It not only includes institutional mechanisms, which are unusually strong and detailed, but a fairly comprehensive list of "do's and don'ts" to guide Intel's directors, officers, and employees in the discharge of their antitrust responsibilities to the company.

38. The program provided for in the Settlement (the "Compliance Program") involves: (i) significant numbers of dedicated compliance personnel; and (ii) specific procedures that must be followed by a director, officer, or employee. The Compliance Program is necessarily costly for the corporation to establish and manage, but the potential costs incurred are in my opinion more than justified on a cost-benefit analysis, given Intel's past exposure to fines and damage claims, the legal costs incurred in defending such claims, and the future antitrust risks it is likely to face as antitrust enforcement becomes more widespread and often more stringent around the world (as I have already noted in Paragraphs 28 and 37 above).

39. Based on my experience, a successful antitrust compliance program needs to have several different elements: (i) clear articulation of the message in non-technical terms that ordinary people can understand and remember; (ii) clear commitment of the corporate leadership to the antitrust message combined with formal and informal communication of that commitment

to the rank and file employees in the company; (iii) a process of systematic oversight of performance of the compliance program; (iv) an open door for any whistleblower; and (v) serious punishment, including potential dismissal, for anyone found to have infringed the antitrust compliance rules.

40. In a global company, it is generally impossible to have a "one size fits all" approach to antitrust compliance. Among other things, the basic antitrust message may have to be tailored in particular geographic regions to make sure that it is comprehensible and persuasive to employees with different cultural, social, and linguistic backgrounds. Moreover, the monitoring of performance may need to be even more intensive for employees who are dealing with a product in which the company is clearly dominant globally and thus faces enhanced antitrust risks in the EU and numerous other jurisdictions with strong "abuse of dominance" rules.

41. The Settlement provisions strengthening and empowering the Compliance Committee are quite important. Assuming that it consists of experienced and committed Directors, the Compliance Committee, given its mandate, is in a position to provide top down leadership for, and encouragement to, those within the corporation charged with specific responsibilities for implementing the Compliance Program.

42. The Settlement also calls for the greater empowerment of a Global Director of Legal Compliance ("GDLC"), who will report to the General Counsel, but whose appointment or replacement must be approved by the Compliance Committee. This individual is charged with reviewing the work of various units of the company, including the "Legal Compliance Group," which GDLC heads, and which also reports to the General Counsel and is designed specifically to focus on antitrust compliance. The Settlement requires that the GDLC be given adequate

resources and that he/she is to meet at least semi-annually with the Compliance Committee in executive session (i.e., without the General Counsel or other senior managers). These institutional arrangements create a powerful ombudsman role for the GDLC, and thus give the GDLC sufficient independence, incentives, and resources to provide the type of broad antitrust oversight called for by the Settlement.

43. The GDLC is thus given additional power and responsibilities clearly designed to enhance this official's stature, powers, and visibility within Intel. Thus, the GDLC has broad powers to obtain company documents when investigating potential issues involving antitrust compliance; and the GDLC can utilize company personnel and hire outside advisors or independent consultants with experience in the specific matter being investigated. The specification of these powers and rights demonstrates that those who negotiated the Settlement understood internal corporate dynamics and were determined to make sure GDLC had the tools and the stature to be effective.

44. In addition, the Settlement requires additional attorneys in various geographic areas to be added to the company's Sales & Marketing Group ("Sales Group"), to provide antitrust counseling and address compliance issues. I believe that this is a strong and important institutional feature of the Compliance Program, because it increases the probability that antitrust advice and the antitrust compliance message will be expressed in (or translated into) terms that local employees and managers can understand, based on their own cultures and experiences in what may be faraway places.

45. The Compliance Program contains a number of directives designed to limit the discretion of sales personnel to engage in activities and transactions that could well raise significant antitrust risks for a global market leader such as Intel. These include provisions

designed to: (i) avoid sales below "appropriate measures of cost"; (ii) eliminate retroactive rebates; and (iii) reduce the number of "standard deal types." These arrangements not only provide clearer guidance to people in the field, but also increase the ability the Legal Compliance Group and others within Intel to monitor what the Intel sales force is actually doing. Given Intel's expensive antitrust history and the reality that a dominant firm can be held seriously liable for what are essentially discretionary decisions, these restrictions appear to me to be prudent.

46. The Settlement encompasses various additions or reforms to Intel's processes to audit accounts and monitor individuals' performance in adhering to the Compliance Program, with actual results to be reported to the GDLC and the Compliance Committee on a regular and systematic basis. These arrangements are consistent with what I have seen and recommended in the past, except for the Compliance Committee review, which I had not previously encountered.

47. The Intel Deal Management System ("IDMS"), which the company is required by the Settlement to implement, is designed to give management more immediate access to discrete transactions and data, and thus to make the company less dependent on after-the-fact monitoring to assure compliance. While this appears to go beyond anything that I have ever seen, I find it a constructive and useful innovation.

48. The Compliance Program includes basic antitrust training for approximately 7,000-8,000 employees, and advanced antitrust training for approximately 1,600 more, with particular emphasis on the Sales Group. This differentiated approach is, in my judgment, the entirely correct way of dealing with the situation that Intel faces. As the globally dominant firm in semiconductors, Intel ought to be focusing on the sales forces that have been offering the payments, devising the rebates, and structuring the sales transactions that have generated so many problems, especially in the EU, Japan, and Korea. The Sales Group is the logical focus of

such efforts. Moreover, it is particularly important to focus Intel's educational program on those employees operating the markets where the risks are the greatest.

49. The Compliance Program also requires all employees in the Sales Group dealing with customers to certify their review of and adherence to Intel's enhanced antitrust guidelines. This process of periodic review and recertification is a fairly standard feature of most successful antitrust compliance programs, and is a useful and necessary feature of Intel's Compliance Program.

50. As part of the Compliance Program, Intel agrees to take disciplinary action against "any personnel found to have retaliated against or threatened to retaliate against anyone" who has raised "antitrust or competitive concern" or objected to a course of action based on such a concern. I find that having this explicitly stated is a useful component of the Compliance Program agreed to in the Stipulation of Settlement.

51. I have reviewed the institutional arrangements and the processes that have been established to give Intel an antitrust compliance program worthy of such an innovative and commercially successful company. At the same time, I recognize that such institutions and processes may be necessary, but not sufficient, conditions for success in such an undertaking, and that the ultimate success of what has been established will depend on the brains, imagination, determination, and courage of the individual people who are charged with making the Compliance Program work—including the Board members who serve on the Compliance Committee, the General Counsel, the GDLC, the Legal Compliance Group, and others.

## CONCLUSION

**52.** The Compliance Program that Intel has agreed to adopt as a result of the settlement in this case is a pragmatic and even imaginative response to antitrust risks that a

17

successful, globally dominant company faces in a world where many countries have recently adopted strong antitrust prohibitions against "abuse of a dominant position" by a market leader.

53. The empowerment of the Board of Directors Compliance Committee, the GDLC, and the Legal Compliance Group, each charged with quite specific responsibilities to the Corporation and to each other, constitutes a model institutional framework to deal with the kinds of risks that Intel faces over the longer term so long as it continues to be a dynamic and successful innovator of new technology.

54. The training and monitoring provisions of the Compliance Program should both: (i) remind individual officers and employees (especially those in the Sales Group) of the importance of antitrust rules to them and the Corporation; and (ii) enable the Compliance Committee, the GDLC, and the Legal Compliance Group to keep a closer watch on what is going on within the Corporation.

55. Even though Intel might have ultimately prevailed in the *AMD Antitrust Litigation* and may yet prevail in its appeal of the *Intel EC Decision*, Intel has been prudent to immediately implement these compliance measures to stave off and hopefully prevent further antitrust difficulties and uncertainties of the kind Intel has faced in recent years.

Executed this 11th day of July 2010 in Washington D.C.

By: _____
DONALD I. BAKER