# **<u>EXHIBIT C</u>**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

----------------------------------------------------x

In re Intel Corp. Derivative Litig.          C.A. No. 09-cv-867 (JJF)

----------------------------------------------------x

**Written Report of Dr. Pradeep K. Yadav**

**Section 1: Introduction**

1.      This report provides my considered independent opinion concerning the benefits of the changes that are provided for in the Stipulation of Settlement dated May 25, 2010 ("Stipulation of Settlement") for Intel Corporation ("Intel" or the "Company") as a result of the above-mentioned litigation.  If called to testify to the contents hereof, I could and would do so.

2.      Qualifications: My C.V. is attached as Appendix 1 to this Report. I hold a Master's degree in Financial Studies and a Ph.D. in Finance.  I currently hold the W. Ross Johnston Chair in Finance, and I am Professor of Finance and the Director of the Division of Finance in the Price College of Business at the University of Oklahoma. My main research, teaching, and consulting interests are in the microstructure of securities and markets, derivative securities and contracts, corporate governance, agency costs and firm performance, mergers and acquisitions, and risk management. The issues in this litigation fall within the ambit of my specialization within the field of Finance.  I have published extensively in leading finance journals including the *Journal of Finance, the Journal of Financial Economics, the Journal of Banking and Finance, Mathematical Finance, the Journal of Futures Markets and the Journal of Derivatives.*

I have authored or co-authored more than fifty research papers, and these have been presented at more than seventy major international conferences.  I was awarded the New York Stock Exchange Prize for the best research paper on Market Microstructure at the 2003 European Finance Association Annual Conference, the 2002 Robert J. Schwartz Memorial Prize of the Fisher Black Memorial Foundation and the International Association of Financial Engineers for the most original research paper in an area related to derivatives, the Chicago Board of Trade Prize for the Best Research Paper on Futures in the 1993 Eastern Finance Association Annual Conference, and the INQUIRE (UK Q-Group) Prize for the *Best Research Paper* in their 1989 annual conference.  Before coming to Price College at the University of Oklahoma, I served as Professor of Finance at Lancaster University in England; and as full-time Visiting Professor at the Stern School of Business at New York University and at the Anderson Graduate School of Management at the University of California in Los Angeles (UCLA).  I have served as the Vice-President (in 2003) and as the President (in 2004) of the European Finance Association; and I was appointed Academic Fellow of the Institute of Chartered Accountants of England and Wales in 1992.  I currently also serve on the Board of Advisors of the Center for Analytical Finance at the Indian School of Business, and as Research Fellow of the Centre for Finance Research at the University of Cologne in Germany; and have served as the founding Director (and Chief Executive) of the Scottish Institute for Research in Investment and Finance (SIRIF) for more than five years.  I also have extensive experience outside academia.  I was employed in senior public sector management positions including approximately two years as the Managing Director (and Chief Executive Officer) of a public-sector fisheries corporation, and approximately three years as the Deputy Managing Director (and Deputy Chief Executive Officer) of a public-sector industrial and investment corporation. I have also served as a

non-executive Director on the Board of Directors of several companies, and also served as non-executive Chair of the Board of Directors.

3.     I write this report based on my extensive professional specialization in this field as borne out by my qualifications summarized above, a review of the relevant literature, and the application of established principles in this field to the matter before me.   The articles formally referenced in this report are a subset of the literature I have consulted, and are articles that have been published in highly regarded academic or professional journals.  I have also consulted with Plaintiffs' counsel concerning various aspects of this Action. I have also informed myself through other independent sources, including but not limited to regulatory filings, analysis of financial data, and various press releases and news items.

4.     In this report, I examine the impact of the measures provided for in the Stipulation of Settlement on Intel shareholder value and welfare.  The changes proposed in the Stipulation of Settlement can be classified into two broad categories: first, those that directly relate to enhancements to programs, procedures, training and management systems aimed at preventing future antitrust violations, and consequently, future anti-trust litigation against Intel; and second, those that constitute additional broader enhancements in Intel's antitrust compliance related corporate governance procedures through greater power and responsibility conferred on independent directors.  I conclude that the measures provided for in the Stipulation of Settlement will not only significantly increase the likelihood of compliance with antitrust law, they are also very beneficial for shareholders.   More specifically, I conclude that the reduction in the risk of anti-trust litigation as a result of the measures set forth in the Stipulation of Settlement is likely to increase long-term shareholder value, and the enhanced corporate governance measures in the form of greater power and

responsibility of independent directors and increased board independence are further likely to increase shareholder value over time.

5.     The remainder of this Report is organized as follows.   Section 2 highlights issues and evidence that are particularly relevant in the context of the current litigation.   Section 3 provides an overview of the impact of anti-trust litigation on the wealth and welfare of a firm's shareholders.   Section 4 documents the importance and benefits of corporate governance reforms relating to the increase in the role of independent directors in the specific context of the Stipulation of Settlement.   Section 5 provides a concrete quantitative estimate, based on the extant research, of the benefits to Intel in terms of the likely increase in shareholder value as a result of the Stipulation of Settlement.   Finally, Section 6 summarizes salient conclusions.   Lastly, as mentioned above, Appendix 1 is m*y curriculum vitae*.

## Section 2: Issues in the Current Litigation

6.     Competition is the hallmark of the United States economic system and antitrust laws fundamentally govern the framework in which such competition takes place and gets suitably regulated.  The Sherman Act of 1890 prohibits contracts, combinations and conspiracies that restrain trade, and prohibits actions monopolizing or attempting to monopolize markets.  The Clayton Antitrust Act of 1914 prohibits mergers that threaten to substantially reduce competition, and also prohibits various other anticompetitive practices.  The Federal Trade Commission Act of 1914 disallows "unfair methods of competition".  State antitrust laws are an additional part of the regulatory scheme.  In the U.S., there is substantial private antitrust litigation, and antitrust enforcement is also often initiated by the U. S. Department of Justice and the U. S. Federal Trade Commission.  As Intel's regulatory history demonstrates, the European Community also plays a critical role in regulating competitive behavior, and fines levied by the EC are often significant.  In this context, it is not just the

laws that are relevant, but the perspective with which they are interpreted and enforced by the courts.  As emphasized by Jonathan Baker (American University) in his article published in the *Journal of Economic Perspectives* in 2003,[1] the perspective with which these laws have been interpreted and enforced has changed substantially over the course of the last thirty years.  Baker (2003) cited above points out that the U.S. Supreme Court (in *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972)) described antitrust law as the "Magna Carta of free enterprise" and "as important to the preservation of economic freedom and our free enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms"; but "…. antitrust law underwent a revolution starting …. [in mid-1970s] …. when the courts began to replace legal rules predicated in part on advancing social and political goals with rules focused on economic goals".  In addition, he emphasizes that "antitrust practice increasingly relies on econometric analyses".  In this context, it is important to appreciate that ensuring antitrust compliance is a relatively complex matter that requires specialized and nuanced perspectives and the need for management procedures that are kept updated with evolving contemporary practice.  It is also important to appreciate that the costs of non-compliance of antitrust law are not just financially borne by the shareholders of the firm.  These "costs" extend also to other stakeholders, in particular, Directors and managers.  These Directors and managers can go to prison and be otherwise personally financially punished for violation of these antitrust laws.

7.     Alan Beckenstein (University of Virginia, Darden School of Business), Landis Gabel (INSEAD, Paris) and Karlene Roberts (University of California at Berkeley) conducted a survey of 188 Fortune 500 industrial companies and of 2,900 practicing antitrust attorneys, and interviewed officials from two federal enforcement agencies, attorneys from 12 major law firms, and numerous managers from over 50 companies; and summarized their

---

[1]     J. Baker, *The Case for Antitrust Enforcement,* Journal of Economic Perspectives, 17(4): 27–50 (2003).

conclusions in their 1983 article published in the Harvard Business Review (hereafter "Beckenstein et al.").[2]   Beckenstein *et al.* provide an excellent review of the practical managerial and legal strategies involved in actually ensuring antitrust compliance, and these managerial and legal strategies still remain fully relevant and still reasonably represent current thinking on corporate antitrust response strategies even though the article was written more than a quarter century ago, and even though the perspectives of antitrust enforcement have evolved over the period.   In the context of the current litigation, the most important bottom-line conclusion that emerges from Beckenstein *et al.* is the following:

    a. From both a financial and a legal perspective, it is most optimal for a firm to pursue a corporate policy that incorporates highly proactive managerial strategies for ensuring antitrust compliance.   In this context, Beckenstein *et al.* classify corporate strategies into three categories: basic decision enhancing strategies, advanced decision enhancing strategies, and decision restructuring strategies.   Beckenstein *et al.* provide concrete examples of corporate actions that underlie each of these strategies and conclude that the advanced decision enhancing strategies are always beneficial for corporations.

    b. Beckenstein *et al.* describe three stages in the evolution of such a corporate policy:

        i. In Stage 1, antitrust compliance becomes included within the ambit of corporate policy, but the strategies are loosely defined, performance is not formally monitored, the boundaries between compliance and non-compliance are kept ambiguous so as not to sacrifice profit opportunities.

---

[2]     A. Beckenstein, H.L. Gabel, K. Roberts, *An Executive's Guide to Antitrust Compliance,* Harvard Business Review  94 (September/October 1983).

ii. In Stage 2, corporations "develop strategies whose objective is not simply to obey the law" but corporate counsel and legal departments "establish criteria for effective antitrust measures," "add procedural controls and participate in most important meetings", "become the manager's watchdog," and "take the problem as their own."

iii. In Stage 3, "company management integrates compliance with its normal management function," "the legal department becomes a major player in decision making and a critical management resource," "legal controls and manager-attorney contacts are numerous and institutionalized," there are anti-trust audits, "company sanctions for violations are well-known and severe," and "managers understand …. that their professional advancement requires an understanding of the law, the enforcement environment, and the complexity of promoting compliance among subordinates."

c. Beckenstein *et al*. find that antitrust litigation and overall compliance costs are substantially lower for corporations in higher stages of evolution of compliance.

8. The Stipulation of Settlement details major enhancements to Intel's corporate governance and antitrust compliance policies and procedures, some of which are newly mandated, some of which are revised from what they were before, and some of which now exist but are required to continue in existence for a at least a set period of years. These measures include vesting oversight responsibilities with an independent Compliance Committee of independent Directors and a Legal Compliance Group; appointment of a General Counsel with an extensive background in all aspects of antitrust practice with a Global Director of Legal Compliance ("GDLC") reporting to the General Counsel (and bi-

annually to the Compliance Committee in executive session) and having the necessary resources and the organizational power and access; a pledge of compliance with the relevant provisions of the U.S. Federal Sentencing Guidelines; creation of an attorney position within the Legal Compliance Group; addition of attorneys to various geographic areas to provide counseling and address compliance issues regarding, antitrust and competition laws; addition/dedication of non-attorney personnel in important departments to support antitrust compliance activities; comprehensive and effective antitrust audit systems; formulation of appropriate pricing and deal management procedures, extensive training of Directors and managers in antitrust related issues; creation of systems to monitor individuals' compliance with Intel's antitrust policy; and stiff penalties for employees violating antitrust policy.  In addition, these enhancements largely correspond to what Beckenstein *et al.* label as "advanced decision enhancing strategies," and, as discussed in the preceding paragraph, such advanced decision enhancing strategies are clearly beneficial for corporations.  In the context of the different stages of evolving antitrust policy mentioned in the preceding paragraph, these enhancements clearly move Intel from the introductory phase of Stage 2 to Stage 3, and, again in the context of the findings in Beckenstein *et al.,* that evolution to Stage 3 is clearly beneficial for Intel.

9.     It is important to appreciate that proactive antitrust compliance does *not* imply that the monopoly-type profitable opportunities that exist within the company get passed on as additional value to competitor firms. George Bittlingmayer (University of California, Davis) and Thomas Hazlett (University of California, Davis), in research published in 2000 in the *Journal of Financial Economics*, examine the impact of 54 government-initiated antitrust enforcement actions against Microsoft between 1991 and

1997.[3]  They find that each enforcement action not only lowered Microsoft's stock by 1.2% or roughly $3 billion within three days of the announcement, the value of an index of 159 computer industry firms also suffered by 0.7%, or roughly $5 billion dollars.  This indicated that the adverse impact on the shareholders of Microsoft did not concomitantly increase the value of competitor firms within the industry, but instead reduced it as well.  This research highlights the complexities of antitrust law enforcement.  Particularly in technology-intensive cases involving high growth firms, and the case of Intel is just such a case very comparable to that of Microsoft analyzed in the aforementioned research, costs of anti-trust non-compliance and litigation are likely to adversely affect not just the shareholders and stakeholders of Intel, but the shareholders of other firms within the industry; and at least not benefit the competition.

10.     In view of the above, I have absolutely no hesitation in strongly emphasizing that the changes and continuing enhancements required by and detailed in, the Stipulation of Settlement do not just help in ensuring that Intel conforms fully with the law, they are also clearly beneficial to Intel and in the best interests of shareholders.  In the following sections, I will discuss how the reduced antitrust litigation risk and the greater role of independent directors increase Intel shareholder value.

**Section 3: Anti-trust Litigation and Shareholder Value**

11.     There has been extensive empirical research on the impact of litigation and lawsuits on shareholder wealth, and more specifically, on the relationship between antitrust lawsuits and firm performance.  Most of this empirical research is based on the well-established fact that markets are reasonably efficient in as much as they quickly reflect public information and consequent implications.  Hence, changes in expected future cash flow and

---

[3]     G. Bittlingmayer and T. Hazlett, *DOS Kapital: Has Antitrust Action against Microsoft Created Value in the Computer Industry?", Journal of Financial Economics* 55:329-59 (March 2000).

risk as perceived by the market are impounded rapidly in the market value of the securities of the firm.  Therefore, the market reaction to a lawsuit is expected to reflect the sum of the expected legal costs, management time directed to the suit, the possibility of follow-on suits, covenants and constraints that may restrict the defendant's scope and size of business and litigation-related costs of financial distress.  In effect, the defendant's stock price reaction to a lawsuit is the market's *ex ante* forward-looking estimate of the loss to shareholder wealth due to the lawsuit(s).  To the extent that internal firm-based reforms that ensure antitrust compliance will prevent antitrust lawsuits in the future, shareholder value will increase, and we can estimate the value of the reforms generally based on the literature by examining the market-value consequences of lawsuit(s) (and equivalent regulatory proceedings that can lead to significant fines and penalties) that the reforms aim to prevent, with the caveat that establishing and interpreting such a relationship is a complex matter.  I highlight below some of the empirical research:

     a.   John Bizjak (Texas A&M University) and Jeffrey Coles (Arizona State University) in their research published in 1995 in the *American Economic Review,* employ a sample of 1,959 antitrust cases filed in five districts (Atlanta, Chicago, Kansas City, New York, and San Francisco) to examine the impact of private antitrust litigation on shareholder wealth.[4]  More specifically, using standard "event-study" methodology, they analyze the stock-market's reaction to the announcement of a filing of an antitrust suit.  They find that defendants experience an economically and statistically significant loss of 0.6% on the day of the announcement and that 60% of defendants experience negative returns upon the announcement of a lawsuit filing.  They further find

---

[4]     J. Bizak and J. Coles, *An Emperical Analysis of Antitrust Legal Disputes*   The American Economic Review, 85:436-61 (June 1995).

evidence that defendants' stock price reaction is not merely due to the threat of a direct monetary transfer in the lawsuit, but importantly, also due to several other factors:  the expectations of potential loss of their ability to engage in certain business practices, follow-on suits, litigation-induced changes in costs of financial distress, and more generally reputational costs.

b.  Thomas Gilligan (California Institute of Technology, currently Dean of the School of Business at the University of Texas at Austin), in research published in 1986 in the *RAND Journal of Economics* examines the impact of antitrust lawsuits relating to resale price maintenance on stock returns of 43 firms.[5] Resale price maintenance refers to control by an upstream firm of pricing at later stages of product distribution.  Gilligan examines 43 antitrust complaints in his sample.  The mean shareholder wealth impact on a challenged firm was a statistically and economically significant--1.4%.

c.  Jean-Claude Bosch (University of Colorado, Denver) and Woodrow Eckard, Jr. (University of Colorado, Denver) in research published in 1991 in *The Review of Economics and Statistics* examine the stock price reaction to federal indictments of firms for price fixing.[6]  They find that the firm's equity value suffers by 1.08%, which corresponds to a total sample loss in value of $2.18 billion (in 1982 dollars).

d.  Sanjai Bhagat (University of Colarado), John Bizjak (Texas A&M) and Jeffrey Coles (Arizona State University), in research published in 1998 in *Financial*

---

[5]      T. Gilligan, *The Competitive Effects of Resale Price Maintenance*, Rand Journal of Economics, 17: 544-556 (1986).

[6]      J. Bosch and W. Eckerd, *The Profitability of Price Fixing: Evidence from Stock Market Reaction to Federal Indictments,* The Review of Economics and Statistics, 73(2):309-17 (May 1991).

*Management*,[7] analyze a large sample of filings and settlements announced in the Wall Street Journal between 1981 and 1983. They find that the defendant's stock price suffers by 0.97% due to lawsuits in general and by 0.81% due to antitrust lawsuits specifically. They also find that when the government is the plaintiff the defendants suffer a much larger loss of 1.73% on the day if the announcements.

    e. Kenneth Garbade (New York University), William Silber (New York University) and Lawrence White (New York University), in their research published in 1982 in the *Review of Economics and Statistics* examine the impact of Department of Justice and Federal Trade Commission filings of antitrust suits on the stock price of accused firms.[8] They find a statistically significant average drop of 6% in the value of the stock within four trading days after filing of the suit. They also find that when the government is the plaintiff, an antitrust suit reduces the value of such activities by about 7.5%.

12. There is also extensive empirical evidence that indicates that direct legal costs are only a small fraction of the total litigation related erosion of shareholder wealth.

    a. David Cutler (Massachusetts Institute of Technology) and Lawrence Summers (Harvard University and National Bureau of Economic Research, and currently Economic Advisor to the President of the United States), in research published in 1988 in the *RAND Journal of Economics*,[9] and Kathleen Engelmann (affiliation untraceable) and Bradford Cornell (University of California at Los

---

[7]     S. Bhagat, J. Bizjak, J. Coles, *The Shareholder Wealth Implications of Corporate Lawsuits,* Financial Management 27:5-27 (1998).

[8]     K. Garbade, W. Silver, L. White, *Market Reaction to the Filing of Antitrust Suits: An Aggregate and Cross Sectional Analysis,* Review of Economics and Statistics, 64(4): 686-91 (November, 1982).

[9]     D. Cutler and L. Summers, *The Costs of Conflict Resolution and Financial Distress: Evidence from the Texaco-Pennzoil Litigation,* Rand Journal of Economics, 19(2): 157-72, (Summer 1988).

Angeles) in research published in 1988 in the *Journal of Legal Studies*,[10] study the market impact of litigation-related events after the jury ruled against Texaco in the Pennzoil/Texaco lawsuit.  These studies find that the actual legal expenses were only a small fraction of the total loss in shareholder market value of the firm.

b.  Bosch and Eckard (1991) (cited above) find that violations are accompanied by losses that are far greater than direct legal costs.

c.  More recently, consistent with the above, Jonathan Karpoff (University of Washington), Scott Lee (Texas A&M University), and Gerald Martin (American University), in research published in 2008 in the *Journal of Financial and Quantitative Analysis*,[11] find that direct legal penalties account for only 5% of the total decline in shareholder value, and 66% of the total decline in shareholder value is due to reputational losses.

## Section 4: Corporate Governance Reforms and Shareholder Value

13.    Firms are owned by shareholders and are controlled on a day-to-day basis by managers.  The separation of ownership and control that can exist in a company creates the potential for conflicts of interest between the principals (*i.e.,* the shareholders) and the agents (*i.e.* the managers). These are "agency" problems, and, in a 1976 article in the *Journal of Financial Economics,*[12]    Michael Jensen (Harvard University) and William Meckling (University of Rochester) defined "agency problems" as referring to the incentives that managers arguably have to expropriate a firm's assets by indulging in activities that generate

---

[10]      K. Engelmann and B. Cornell, *Measuring the Cost of Corporate Litigation: Five Case Studies,*  Journal of Legal Studies, 17(2): 377-99 (June 1988).

[11]      J. Karpoff, S. Lee, G. Martin, *The Cost to Firms of Cooking the Books,  Journal of Financial and Quantitative Analysis*, 43:581-612 (September 2008).

[12]      M. Jensen and W.H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure,* Journal of Financial Economics 3(4): 305–360 (1976).

personal benefits for themselves at the potential expense of shareholders.  In this "agency" framework, corporate governance mechanisms are the economic and legal frameworks set up to minimize these agency problems and increase the probability of managers investing in projects and managing the firm in ways that result in maximization of shareholder wealth. These corporate governance mechanisms are most valuable to shareholders when they collectively ensure that the interests of managers are fully aligned with those of shareholders. In this context, "valuable" is in the relatively broad sense of the long-term maximization of shareholder wealth and welfare, and need not necessarily be construed narrowly in terms of the traded market value of the shareholders rights at a particular point of time.

14.    Corporate governance is not a one-dimensional characteristic that can be estimated by a single measure, but is a complex totality of a large number of different attributes, and the effect of different attributes can potentially be different.  For example, Paul Gompers (Harvard University), Joy Ishii (Stanford University) and Andrew Metrick (Yale University) in their heavily cited 2003 *Quarterly Journal of Economics* article (hereafter "Gompers, Ishii and Metrick (2003)")[13], construct a corporate governance index using 24 governance factors compiled by the Investor *Responsibility Research Center.*   Lucian Bebchuk (Harvard Law School, National Bureau of Economic Research, European Corporate Governance Institute), Alma Cohen (Harvard Law School, National Bureau of Economic Research) and Allen Ferrell (Harvard Law School, European Corporate Governance Institute), in their research published in 2009 in the *Review of Financial Studies* (hereafter "Bebchuk, Cohen and Ferrell (2009)"),[14] construct an entrenchment index based on just six of these 24 factors which they view most important.  On the other hand, Lawrence Brown (Georgia State University) and Marcus Caylor (University of South Carolina) in research

---

[13]    P. Gompers, J. Ishii, A. Metrick, *Corporate Governance and Equity Prices*, Quarterly Journal of Economics, 118(1): 107-155 (February 2003).
[14]    L. Bebchuck, A. Cohen, A. Ferrell, *What Matters in Corporate Governance?,* Review of Financial Studies 22:783-827 (2009).

papers published in 2006 in the *Journal of Accounting and Public Policy*[15] and in 2009 in the *Review of Quantitative Finance and Accounting* ((hereafter "Brown and Caylor (2006, 2009)")[16] use a more broad-based 51-factor governance index based on *Institutional Shareholder Services* data.

15.     Overall, extant empirical research has convincingly documented a significant positive association between effective governance mechanisms and the performance of a firm.  In this context, I specifically highlight the following:

a.  Gompers, Ishii and Metrick (2003), using their corporate governance index of 24 governance factors to study the relationship between corporate governance and firm performance, find that firms in the top decile of their corporate governance index outperformed those in the bottom decile by approximately 8.5% in market value.  They also find that firms with better governance mechanisms have higher profits and higher sales growth.

b.  Bebchuk, Cohen and Ferrell (2009), using their index based on six of the 24 provisions in Gompers, Ishii and Metrick (2003), find that increases in the level of this index correlate with an increase in firm valuation.

c.  Brown and Caylor (2006, 2009), using their 51-factor governance index to study the relationship between corporate governance, firm performance, and firm value, find that better-governed firms are more profitable, more valuable and pay-out more cash to shareholders.

16.     The Stipulation of Settlement requires the Compliance Committee (the "Committee") of the Intel Board to consist of independent Directors and vests that Committee with considerable oversight and implementation power over antitrust compliance

---

[15]     L. Brown and M. Caylor,  *Corporate Governance and Firm Valuation,* Journal of Accounting and Public Policy 25: 409-434.(July-August 2006).
[16]     L. Brown and M. Caylor,  *Corporate Governance and Firm Operating Performance,* Review of Quantitative Finance and Accounting 32: 129-44 (February 2009).

matters, thereby making it more independent of the managers and facilitating board independence. The Committee will review and concur in the appointment, replacement, reassignment, or dismissal of the GDLC. The Committee also oversees the activities of the GDLC, who is mandated to report to the Committee at least bi-annually in executive session. The GDLC must report in writing to the Committee as to his/her activities regarding antitrust compliance. All this independent committee oversight should be valuable for the shareholders in as much as it should arguably lead to an increase in the actual control exercised on managerial behavior that conflicts with shareholder interests. In the specific context of the effect of the changes related to independent Directors and Board independence in the Stipulation of Settlement, there are at least two empirical studies that have specifically examined the relationship between board independence, shareholder value and firm performance, that have found a significant positive association indicating that reforms facilitating and enhancing board independence should be clearly beneficial to shareholders.

    a. Barry Baysinger (Texas A&M University) and Henry Butler (Texas A&M University), in their 1985 *Journal of Law, Economics and Organization* article,[17] document that firms with higher proportions of independent directors at the beginning of a decade ended up with superior performance records, on average, later in the period.

    b. More recently, and in research that is directly relevant to this litigation, Brown and Caylor (2006,2009) find that firms with boards controlled by more independent outside directors exhibit superior performance. They document strong evidence indicating a positive relationship between firm value and board independence related governance mechanisms. They also find a

---

[17] B. Baysinger and H. Butler, *Corporate Governance and the Board of Directors: Performance Effects of Changes in Board Composition,* Journal of Law, Economics, and Organization 1: 101 (1985).

positive correlation between board independence and return on equity (ROE) and the net profit margin.

**Section 5: Overall Value Relevance of Stipulation of Settlement**

17.     I use the results obtained in the empirical research studies cited above to make an estimate, based on available data, of the effect of the reforms, continuing enhancements and mandates proposed in the Stipulation of Settlement. -It is an "estimate" because the issue is complex and influenced by numerous other factors; and although there is relevant extant research that sheds light on the likely impact, every company and every situation is different and can potentially have an impact different from the average impact of a factor observed in earlier research.

18.     I first estimate the effect on shareholder value from the reduction in anti-trust litigation risk because of the Settlement provisions.  On the basis of the research studies documented in Paragraph 11(a) to 11(d), the estimated gain in shareholder value because of reduction in private antitrust lawsuits should be about 1% on average.  The Garbade, Silber and White study discussed in Paragraph 11 however focuses on anti-trust actions in which the Government is a plaintiff and finds a shareholder value change of 7.5%; and the Bhagat, Bizjak and Coles study discussed in Paragraph 11(d) also finds that the shareholder value change is about double that in private litigation.  In the case of Intel, in addition to private antitrust litigation risk, there is also significant risk of Government-initiated litigation in the absence of strong internal governance controls.  Accordingly, on the basis of the earlier research cited, I estimate the overall increase in value due to reduction (to zero) in the risk of anti-trust litigation from the Stipulation of Settlement should conservatively be at least 2%. Even if we assume that the measures in the Stipulation of Settlement reduce anti-trust litigation risk by just 80% instead of reducing them to zero, the increase in shareholder value

from the reduction in anti-trust litigation risk due to the measures in the Stipulation of Settlement should be approximately 1.6%.

19.     I next estimate the effect on shareholder value from the greater Board independence arising from the terms of the Stipulation of Settlement.  I use the results of Brown and Caylor (2006, 2009).  They construct a governance score based on 51 factors. Based on the analysis set forth in Paragraph 16 above, their governance score for Intel should arguably increase by at least one point due to the Compliance Committee independence and oversight responsibility provided for in the Stipulation of Settlement.  As a proxy for firm value, Brown and Caylor (2006, 2009) employ the "Tobin's Q" measure defined as the market value of assets divided by the book value of assets.  They estimate that a one unit increase in their governance score, *ceteris paribus*, increases "Tobin's Q" by 0.0254, or about 2.54%, indicating this level of positive correlation between improved corporate governance and long-term shareholder value.

20.     Hence, as discussed herein, the reforms provided for in the Stipulation of Settlement should arguably increase Intel's value over time.  However, we need to emphasize the earlier caveat, *i.e.,* we are assuming that the average results of studies mentioned above hold in the same way also for Intel, and the factors modeled are adequate.

### Section 6:    Summary and Conclusions

21.     In summary, as discussed in depth in the foregoing paragraphs, it is my considered opinion that the corporate governance and anti-trust compliance-related policy reforms, continuing enhancements and mandates contained in the Stipulation of Settlement constitute a substantial benefit to Intel and its shareholders.

Executed under pain and penalty of perjury under the laws of the United States this 14th day of July, 2010.

_____
Pradeep K. Yadav

# Appendix 1
# Curriculum Vitae of Dr. Pradeep K. Yadav

## Current Affiliations

- W. Ross Johnston Chair and Professor of Finance, and, Director, Division of Finance, Price College of Business, University of Oklahoma, Norman, OK 73019, USA. E-mail: pyadav@ou.edu. Tel. (405) 325-6640.
- Visiting Professor of Finance, Lancaster University, England.
- Research Fellow, Center for Financial Research, University of Cologne, Germany.
- Member, Board of Advisors (CAF), Indian School of Business, Hyderabad, India.

## Earlier Employment History

- Professor and Finance Chair at Lancaster University, England, Sep 2003 to Aug 2005.
- Visiting Professor (full-time), Anderson School of Management, University of California at Los Angeles (UCLA), Academic year 2002-03 and in Spring Quarter of 2000.
- Visiting Professor (full-time), Stern School of Business at New York University, Academic year 2001-02.
- Founding Director, Scottish Institute for Research in Investment and Finance (SIRIF), Sep 1997 to Aug 2003
- Professor and Finance Chair at University of Strathclyde (UK), Feb 1993 to Aug 2003
- Lecturer and Senior Lecturer, University of Strathclyde (UK), Feb 1988 to Jan 1993
- Other (Part-time) Visiting Professorships:
  - Indian School of Business, 2005;
  - Groupe ESC Toulouse (France) 1993-2000;
  - University of Pretoria (South Africa), 1996;
  - University of Stellenbosch (South Africa) 1996, 1997;
  - Griffiths University (Australia), 1997; and
  - University of Cologne, 2000-2005.
- *Indian Administrative Service*, July 1976 to Feb 1988, the highest echelon of the civil service responsible at key levels for management of public sector corporations, implementation of development programs, regulatory civil administration, and policy formulation and enforcement as part of State and Federal governments. Assignments included *inter-alia*:
  - *District Chief Executive Officer:* Head of the governmental civil, criminal and revenue management for a population of about 2 million, heading a governmental machinery of about 90,000 personnel, and responsible for *all* Governmental activity within the District boundaries, 1985-86.
  - Executive Magistrate and Revenue Law Judge empowered under Federal and State law to decide public order criminal cases and agricultural land cases, 1978-80, 1985-86.
  - *Deputy Managing Director and Deputy Chief Executive Officer of an Industrial Development Bank,* 1982-85.
  - *Managing Director and Chief Executive Officer of a State owned corporation,* 1980-82.
  - *Director on the Board of Directors* of several companies, and *Chairman of the Board of Directors* of a few companies, 1982-87.

## Academic Qualifications

- PhD in Finance, 1992, University of Strathclyde (UK).
- M.Sc. (Financial Studies), 1988, University of Strathclyde (UK), A[+] in each course.
- M.Sc. (Physics), 1975, University of Delhi, First division and University gold medal for first position in the University.
- B.Sc. (Honours in Physics), 1973, University of Delhi, First division and University gold medal for first position in the University.
- Indian School Certificate, Local Examinations Syndicate of the University of Cambridge (England), 1970, First division and in merit list of the first ten students in whole of India.

## Prizes and Awards

- *New York Stock Exchange Prize* for Best Paper on Market Microstructure (2003).
- *Year 2000 Robert J. Schwartz Memorial Prize* given by the *Fisher Black Memorial Foundation* and the *International Association of Financial Engineers* for the most original research paper in area related to derivatives.
  - The $10000 prize was sponsored by the *Chase Manhattan Bank, Morgan Stanley Dean Witter Inc, Deutsche Bank, Lehman Brothers, Citigroup, Goldman, Sachs and Co., and Canadian Imperial Bank of Commerce..*
- *Chicago Board of Trade Prize* for *Best Paper on Futures* (1993).
- *Academic Fellow, Institute of Chartered Accountants of England and Wales*, 1992.
- *Institute of Quantitative and Investment Research (INQUIRE)* Best Research Paper Prize for 1989.

## Grants

- *Institute of Quantitative and Investment Research (INQUIRE)* grant of £10,000 (≈$19,000) for work on *Naked Short Selling* – September 2008.
- UK *Economic and Social Research Council (ESRC)* grant of £52,000 (≈$99,000) for work on Hostile Takeovers – July 2006.
- *Scottish Higher Education Funding Council (SHEFC)* grant of £440,000 (≈$836,000) for Inter-disciplinary Research in Investment Science, May 1997.
  - Supplemented with a grant of £190,000 (≈$361,000) from University Strategy Funds.
  - Supplemented with grants of £300,000 (≈$570,000) from the investment finance industry, e.g., Deutsche Morgan Grenfell (part of Deutsche Bank group), Scottish Equitable (now Aegon Asset Management), Sanwa International, Standard Life, Bank of Scotland, Baillee Gifford, Euromoney, Reuters, Murray Johnstone, I/B/E/S and the London Stock Exchange.
- *Institute of Quantitative and Investment Research (INQUIRE)* grant of £10,000 (≈$19,000) for work on mergers and acquisitions - April 1997.
- UK *Economic and Social Research Council (ESRC)* grant of £30,000 (≈$57,000) for work on Market Microstructure - May 1995.
- *UK Economic and Social Research Council (ESRC)* grant of £30,000 (≈$57,000) for work on financial time series - Aug 1991.
- *Centre for the Study of Futures Markets, USA* grant of $6,000 for work on Stock Index Futures - June 1990.

## Professional Leadership

- President of *European Finance Association* for 2004.
- Vice-President of *European Finance Association* for 2003.
- Member, Executive Committee, *European Finance Association* 2000-2006.
- Member, since 2005, of the Board of Advisors (CAF) of the *Indian School of Business* (ISB), a new Business School set up by *Wharton, Kellogg* and *London Business School,* and now in the top-20 list of the *Financial Times*.
- CFR Research Fellow, University of Cologne (Germany), since 2004.
- Member, Editorial Board, *Review of Finance,* since 2007.
- Chair, 2008 *Securities and Exchange Board of India* and *National Institute of Securities Markets* Conference on "*Structure, Microstructure and Regulation of Securities Markets*" co-sponsored by ICICI Bank, India.
- Chair, 2006 Winter Research Conference, *Indian School of Business,* on "Microstructure of International Financial Markets", and co-sponsored by the *New York Stock Exchange* and the *National Stock Exchange of India*.
- <u>Chair, *30th Annual Conference of the European Finance Association* in 2003</u>, The conference had 505 delegates and received 867 paper submissions, less than 20% of which were accepted. The Program Committee consisted of about 200 leading academics. The keynote speaker included the winner of the 2003 Nobel Prize for Economics. Besides about 200 paper presentations, there were four Panel Discussions featuring leading academics, practitioners and regulators, and an array of social and cultural programs. Besides delegate fees exceeding $200,000, sponsorship monies exceeding $100,000 was raised for the conference from the *New York Stock Exchange, Barclays Global Investors, Bright Capital, Fauchier Partners, Glasgow Glengoyne Distillery, Glasgow City Council, South Lanarkshire Council, LUMS, and the Hedge Fund Centre at the London Business School.*
- Co-Chair, *13th Annual European Futures Research Symposium of the Chicago Board of Trade* (CBOT) in Oct 2000.
- Co-Chair of the following *one-day international conferences* sponsored by the *Scottish Institute for Research in Investment and Finance* (SIRIF), the investment finance industry or leading stock exchanges:
  - *Managing Trading Costs in Electronic Order Matching Systems*
  - *Valuation and Management of Credit Risk*
  - *Use of Derivatives by Pension Funds and Insurance Companies*
  - *Economic Profit in Corporate Management and Financial Analysis*
  - *Interest Rate Modelling and Risk Management with Options*
  - *Hedge Funds: Risk and Performance*
  - *Corporate Governance, Ownership and Control*
  - *State of the Art on Value at Risk*
  - *Dynamic Portfolio Strategies*
  - *Performance of Managed Funds*
  - *Behavioural Finance*
- Co-Chair of the *British Capital Markets Conference* in May 1995 sponsored by the *Journal of Business Finance and Accounting*, *Institute of Chartered Institutes of England and Wales* and the *Association of Certified Accountants.*

- ▪ Referee for several leading journals like *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis, Journal of Banking and Finance*, *Journal of Futures Markets* etc.
- ▪ Referee for UK *Economic and Social Research Council* and the *Hong Kong Research Board*.
- ▪ Member of Program Committee of a large number of conferences including the *European Finance Association* and the *Western Finance Association* Annual Conferences.

## Teaching

- Principal Advisor/Supervisor of more than 25 doctoral students since 1992.
- Principal Advisor/Supervisor of more than 100 Masters dissertations since 1992.
- Extensively taught undergraduate and graduate courses with evaluations exceeding four on a five point scale, and six on a seven point scale. Topics included, in particular:
  - *Investments,*
  - *Asset Pricing,*
  - *Fixed Income Markets,*
  - *Derivatives: Options, Futures and Swaps,*
  - *Financial Markets and Microstructure,*
  - *Empirical Finance Projects,*
  - *International Financial Markets, and,*
  - *Corporate Finance.*
- Extensively taught executive education courses and programmes and given special lectures to practitioners in banks and corporations. This included teaching on the Fully-Employed MBA program (FEMBA) at UCLA, in-house programmes for Kleinwort Benson (UK), Rand Merchant Bank (South Africa), ABSA Bank (South Africa), and National Bank of Australia; Korean Chamber of Commerce, programmes for Stellenbosch Business School, Cape Town, South Africa; several different groups of Turkish Bankers; and other programs in Dubai, Bahrain, Malaysia, Singapore, Hong-Kong, and Tanzania.
- Delivered several public talks and addresses. For example:
  - Inaugural address to the Annual Meeting of the *European Council of Economists* attended by Chief/Senior Executives of major European banks.
  - Delivered a European Commission sponsored address to the Annual Meeting of the Euro-Fiet European Central Banks Task Force and the Trade Union representatives of all major European Banks
  - Delivered "public" lectures to bankers and academics in Hyderabad (India), Cologne (Germany), Dubai, Dar-es-Salaam (Tanzania), Pretoria and Cape Town (South Africa), and Brisbane (Australia).
- *External Examiner* in the UK system for the following:
  - MA (Finance) degree for the University of Manchester each year from 1997 to 2000.
  - MA (Finance) degree for the University of Lancaster each year from 1997 to 2001.
  - PhD at the London Business School in 1997, 1999, and 2001.
  - PhD at the University of Manchester in 1999.
  - PhD at the University of Lancaster in 1997.
  - PhD at Brunel University in 1996.

**Research Interests**
- Market Microstructure
- Risk Management
- Option Pricing: Early Exercise Premiums and Implied Risk Neutral Distributions
- Futures: Index futures pricing
- Ownership Structure and Corporate Governance
- Mergers and Acquisitions

## Publications

1. "The information content of implied volatilities and model-free volatility expectations: Evidence from options written on individual stocks" by S.J. Taylor, P.K. Yadav and Y.Y. Zhang. *Journal of Banking and Finance*, Volume 34, Issue 4, April 2010, pp 871-881.
2. "The Cross-Section of Implied Risk Neutral Skewness" by S.J. Taylor, P.K. Yadav and Y.Y. Zhang. *Journal of Derivatives,* Volume 16, Summer 2009, pp 1-15.
3. "Governance Structures and Real Gains in Corporate Mergers and Acquisitions" by N. Carline, S.C. Linn and P.K. Yadav. *Journal of Banking and Finance*, Volume 33, Issue 10, October 2009, pp 1829-41.
   - Research funded by the *Institute of Quantitative Investment Research* (INQUIRE).
4. "Corporate Governance in India" by R. Chakrabarti, W. Megginson and P.K. Yadav, *Journal of Applied Corporate Finance*, Winter 2008.
5. "Strategic Trading Behavior and Price Distortion in a Manipulated Market: Anatomy of a Squeeze" by J. Merrick, N.Y. Naik and P.K. Yadav, *Journal of Financial Economics*, Volume 77, Issue 1, July 2005, pp 171-218.
6. "Risk Management with Derivatives by Dealers and Market Quality in Government Bond Markets" by N.Y. Naik and P.K. Yadav - *Journal of Finance,* Volume 58, Issue 5, October 2003, pp 1873-1904.
7. "Do Dealers Manage Inventory on a Stock-by-Stock or a Portfolio Basis?" by N.Y. Naik and P.K. Yadav - *Journal of Financial Economics,* Volume 69, Issue 2, August 2003, pp 325-353.
8. "Forward and Futures Markets" by P.F. Pope and P.K. Yadav in the *International Encyclopedia of Business and Management,* 2nd Edition, 2001, edited by M Warner and published by Thomson Learning, ISBN 1-86152-161-8.
9. "An Empirical Analysis of Alternative Parametric ARCH Models" by G F Loudon, W.H. Watt and P.K. Yadav - *Journal of Applied Econometrics*, Vol 15, 2000, pp117-136.
10. "The Early Exercise Premium in American Option Prices: Direct Empirical Evidence" by L. McMurray and P.K. Yadav – *Derivatives Use, Trading & Regulation*, Vol 6 No 1, 2000, pp 411-435.
11. "Non-linear Dependence in Individual Stock Returns: Does Trading Frequency Matter" by P.K. Yadav, K. Paudyal and P.F. Pope - *Journal of Business Finance and Accounting,* Vol 26, 1999, pp 651-679.
12. "The Early Exercise Premium in American Option Prices: Direct Empirical Evidence" by S. Unni and P.K. Yadav - *Chicago Board of Trade Eleventh Annual European Futures Research Symposium Proceedings,* Vol 4, 1998.

13. "Forward and Futures Markets" by P.F. Pope and P.K. Yadav in the *Routledge Dictionary of Finance,* 1997.

14. "Non-linear Dependence in Daily Stock Returns: Evidence from Pacific Basin Markets" by P.K. Yadav, K. Paudyal and P.F. Pope - *Advances in Pacific Basin Financial Markets,* Vol 2 Part B, 1996, pp 349-377.

15. "An Analysis of the Lead-Lag Relationship between OMX Index Forwards and the OMX Cash Index: A Discussion" by P.K. Yadav - *Chicago Board of Trade Seventh Annual European Futures Research Symposium Proceedings,* Vol 1, 1995, pp 39-47.

16. "The Time Series Behaviour of Spot Exchange Rates in the German Hyperinflation Period: Was the process Chaotic?" by D.A. Peel and P.K. Yadav - *Empirical Economics*, Vol 20, 1995, pp 455-471. Research supported by *Leverhulme Trust*.

17. "The Impact of Short Sales Constraints on Stock Index Futures Prices: Direct Empirical Evidence" by P.F. Pope and P.K. Yadav - *Journal of Derivatives* Vol 1 No 4, Summer 1994, pp 15-26.

18. "Threshold Autoregressive Modelling in Finance : The Pricing of Equivalent Assets" by P.K. Yadav, P.F. Pope and K. Paudyal - *Mathematical Finance* Vol 4 No 2, April 1994, pp 205-221.

19. "Stock Index Futures Mispricing : Profit Opportunities or Risk Premia" by P.K. Yadav and P.F. Pope - *Journal of Banking and Finance*, Vol 18 No 5, 1994, pp 921-953.

20. "Discovering Errors in Tracking Error" by P.F. Pope and P.K. Yadav - *Journal of Portfolio Management* Vol 20 No 2, Winter 1994, pp 27-32.

21. "Stock Index Futures Prices in Germany: A Commentary" by P.K. Yadav - *Review of Futures Markets*, Vol 13 No 2, 1993, pp 687-694.

22. "Deregulation and UK Stock Market Volatility" by D.A. Peel, P.F. Pope and P.K. Yadav - *Journal of Business Finance and Accounting* Vol 20 No 3, April 1993, pp 359-372.

23. "Modelling S&P 500 Futures Mispricing Using a Neural Network: A Critical Analysis" by P.K. Yadav - *Review of Futures Markets*, Vol 12 No 2, 1992, pp 543-548.

24. "The Information Content of the Company Meeting Programme of the Society of Investment Analysts of the United Kingdom : 1985-1990" by T. Walmsley, P.K. Yadav and W.P. Rees - *Journal of Business Finance and Accounting* Vol 19 No 4, June 1992, pp 571-584.

25. "The Impact of Option Listing on Underlying Stocks : The UK Evidence" by W.H. Watt, P.K. Yadav and P.R. Draper - *Journal of Business Finance and Accounting* Vol 19 No 4, June 1992, pp 485-503.

26. "Event Studies based on the Volatility of Returns and Trading Volume: A Review" by P.K. Yadav - *British Accounting Review* Vol 24 No 2, June 1992, pp 157-184.

27. "Impact of Option Expiration on Underlying Stocks : The U.K. Evidence"  by P.K. Yadav and P.F. Pope - *Journal of Business Finance and Accounting* Vol 19 No 3, April 1992, pp 329-344.

28. "Intraweek and Intraday Seasonalities in Stock Market Risk Premia : Cash vs Futures" by P.K. Yadav and P.F. Pope - *Journal of Banking and Finance* Vol 16 No 1, February 1992, pp 233-270.

29. "Datastream" by D. McDougall, P.F. Pope and P.K. Yadav in *Databases for Accounting Research,* Institute of Chartered Accountants in England and Wales Monograph edited by J Board, P F Pope and L C L Skerratt, 1991.

30.   "A Consistency Check on Stock Price Data from Datastream and the London Business School Share Price Database" by P F Pope and P K Yadav in *Databases for Accounting Research,* Institute of Chartered Accountants in England and Wales Monograph edited by J. Board, P.F. Pope and L.C.L. Skerratt, 1991.

31.   "Testing Index Futures Market Efficiency using Price Differences : A Critical Analysis" by P.K. Yadav and P.F. Pope - *Journal of Futures Markets* Vol 11 No 2, April 1991, pp 239-252.

32.   "Stock Index Futures Arbitrage: International Evidence" by P.K. Yadav and P.F. Pope - *Journal of Futures Markets* Vol 10 No 6, December 1990, pp 573-603.
- Reprinted in "*Futures Markets*", a book of readings (ISBN 1-858980704) published by Edward Edgar Publishing and edited by A.G. Malliaris, and part of "*Critical Writings in Financial Economics Series*".

33.   "Volatility and the Big Bang Factor - Has the Big Bang made UK Stock Prices more Volatile?" by D.A. Peel, P.F. Pope and P.K. Yadav - *Professional Investor,* May 1990, pp 20-22.
- Reprinted in 2000 in "*Double Takes",* a book of readings edited by J. Goodchild and C. Callow and published by IIMR and Wiley, ISBN 0-471-89313-7, pp 231-235.

## Working Papers

34.   "Naked Short-Selling: The Emperor's New Clothes?" by V. Fotak, V. Raman, and P. K. Yadav.
- Presented at the *Western Finance Association Annual Conference*.
- Presented at the *SEBI/NISM International Conference on Securities Markets*.
- Presented at the July 2009 *Yale/RFS Conference on the Financial Crisis*.
- Presented at the *Financial Management Association Annual Conference*.
- To be Presented: *Conference on Securities Markets Regulation*, Chicago, May, 2010.
- Supported by a grant from INQUIRE, UK.

35.   "The Effects of Market Reforms on the Trading Costs of Public Investors: Evidence from the London Stock Exchange" by N.Y. Naik and P.K. Yadav.
- Presented at the *Western Finance Association Annual Conference*
- Awarded the *New York Stock Exchange Prize* for the Best Paper on Market Microstructure at the European Finance Association Annual Conference.
- Research supported by the *UK Economic and Social Research Council*.

36.   "Informed Trading, Information Asymmetry, and Pricing of Information Risk: Empirical Evidence from the NYSE" by F. Bardong, S.M. Bartram and P.K. Yadav.
- Presented at the *European Finance Association Annual Conference*.
- Presented at the *Western Finance Association Annual Conference*.
- Presented at Euronext Conference in Paris, 2006.

37.   "Hiding Behind the Veil: Informed Traders and Pre-Trade Opacity" by K. Kumar, R. Thirumalai and P.K. Yadav.
- Presented at the 2009 *European Finance Association Annual Conference*.
- Presented at the 2008 *Financial Management Association Annual Conference*.
- Presented at the 2008 *SEBI/NISM International Conference on Securities Markets*.

38. "Does the Early Exercise Premium Contain Information about Future Underlying Returns?" by R. Valkanov, P. K. Yadav and Y. Zhang).
   - Presented at the *European Finance Association Annual Conference*
   - Presented at the *American Finance Association Annual Conference*

39. "Resiliency, a Dynamic View of Liquidity: Empirical Evidence from a Limit Order Book Market" by D. Mayston, A. Kempf and P.K. Yadav.
   - Presented at the *European Finance Association Annual Conference*.
   - Presented at the *American Finance Association Annual Conference*.

40. "How are Short-Sales Different from Regular Trades?" by F. Bardong, S.M. Bartram and P.K. Yadav.
   - Presented at the *European Finance Association Annual Conference*.

41. "Using Announcement and Implementation Event Dates to Disentangle Competing Theories of Stock Splits" by J.W. Dong, M. Shackleton and P.K. Yadav.
   - Presented at the *Financial Management Association Annual Conference*.

42. "Convergence to Market Efficiency: Empirical Evidence from the New York Stock Exchange" by J.W. Dong, A. Kempf and P.K. Yadav.
   - Presented at Euronext Conference in Paris, 2006.
   - Presented at NYSE/NSE/ISB Winter Research Conference, 2006.

43. "The Effect of Corporate Break-ups on Information Asymmetry: A Market Microstructure Analysis" by F. Bardong, S.M. Bartram and P.K. Yadav.
   - Presented at the *Financial Management Association Annual Conference*.

44. "Nature of Resistance Strategies against Takeover Bids: Opposing Motives and Contrasting Outcomes for Stockholders and Managers" by N. Carline and P.K. Yadav.
   - Presented at the *Financial Management Association Annual Conference*.

45. "How Does Privatization Affect Information Asymmetry? Evidence from the European Union" by G. Borisova and P.K. Yadav.
   - Presented at the 2009 *Financial Management Association Annual Conference*.

46. "Empirical Evidence on Ownership Structure, Management Control and Agency Costs" by S. Gogineni, S. C. Linn and P. K. Yadav.
   - Presented at the *Indian School of Business* (ISB) Research Conference, July 2009.
   - Presented at the 2009 *Financial Management Association Annual Conference*.

47. "The Early Exercise Premium in American Option Prices: Direct Empirical Evidence" by S. Unni and P. K. Yadav.
   - Presented at the *American Finance Association Annual Conference* and the *European Finance Association Annual Conference*.

48. "Mean Reversion in Stock Index Futures Mispricing: Evidence from the US and the UK" by P.K. Yadav and P.F. Pope.
   - Presented at the *American Finance Association Conference* and the *World Econometric Congress*.

49. "Pricing of Stock Index Futures Spreads: Theory and Evidence" by P.K. Yadav and P.F. Pope.
   - Presented at the *Western Finance Association Conference*, and the *European Finance Association Conference*.
   - Awarded a *Chicago Board of Trade Prize* for the Best Paper on Futures.

## Major Conference Presentations

1.   *Institute of Quantitative Investment Research (INQUIRE) Annual UK Conference, 1988.*
2.   *Institute of Quantitative Investment Research (INQUIRE) Annual UK Conference, 1989.*
3.   *Western Finance Association Annual Conference, 1991, Wyoming, USA.*
4.   *European Finance Association Annual Conference, 1991, Rotterdam, Holland.*
5.   *Institute of Quantitative Investment Research (INQUIRE) UK-Europe Joint Conference, 1992.*
6.   *French Finance Association Annual Conference, 1992, Paris, France.*
7.   *European Finance Association Annual Conference, 1992, Lisbon, Portugal.*
8.   *Chicago Board of Trade Fifth European Futures Research Symposium, 1992, Belgium.*
9.   *Institute of Quantitative Investment Research (INQUIRE) Annual European Conference, 1992.*
10.  *American Finance Association Annual Conference, 1993, California, USA.*
11.  *Eastern Finance Association Annual Conference, 1993, Richmond, USA.*
12.  *Western Finance Association Annual Conference, 1993, Whistler, Canada.*
13.  *French Finance Association Annual Conference, 1993, La Baule,  two papers.*
14.  *European Finance Association Annual Conference, 1993, Denmark, 3 papers.*
15.  *Chicago Board of Trade Sixth European Futures Research Symposium, 1993, UK.*
16.  *Institute of Quantitative Investment Research (INQUIRE) Annual European Conference, 1993, Portugal.*
17.  *London School of Economics Conference on Stock Index Derivatives, 1994, London.*
18.  *Western Finance Association Annual Conference, 1994, Santa Fe, USA.*
19.  *French Finance Association Annual Conference, 1994, Tunis, Tunisia.*
20.  *Pacific Basin Annual Finance Conference, 1994, Jakarta, Indonesia.*
21.  *European Finance Association Annual Conference, 1994, Brussels, Belgium.*
22.  *European Econometric Association Annual Conference, 1994, Maastricht, Netherlands.*
23.  *Chicago Board of Trade Seventh European Futures Research Symposium, 1994, Bonn.*
24.  *Institute of Quantitative Investment Research (INQUIRE) UK-Europe Conference, 1995.*
25.  *French Finance Association Annual Conference, 1995, Bordeaux, France, 3 papers.*
26.  *European Finance Association Annual Conference, 1995, Milan, Italy.*
27.  *World Econometric Congress held once in four years, 1995, Tokyo, Japan, 3 papers.*
28.  *Chicago Board of Trade Eighth European Futures Research Symposium, 1995, Spain.*
29.  *European Finance Association Annual Conference, 1996, Oslo, Norway.*
30.  *Chicago Board of Trade Ninth European Futures Research Symposium, 1996, Holland.*
31.  *Institute of Quantitative Investment Research (INQUIRE) UK-Europe Joint Annual Conference, 1997, Leeds, England.*
32.  *European Financial Management Association Annual Conference, 1997, Zurich, 3 papers.*
33.  *Quantitative Methods in Finance International Conference, 1997, Cairns, Australia.*
34.  *American Finance Association Annual Conference, January 1998, Chicago, USA.*
35.  *Western Finance Association Annual Conference, June 1998, Monteray, USA.*
36.  *European Finance Association Annual Conference, August 1998, France, 2 papers.*

37. *Chicago Board of Trade Eleventh European Futures Research Symposium, 1998, France.*

38. *New York Stock Exchange and Paris Bourse Global Capital Markets Conference, 1998, Paris.*

39. *NASDAQ Microstructure Conference, April 1999, Notre-Dame, USA.*

40. *European Financial Management Association Annual Conference, 1999, Paris, 2 Papers.*

41. *European Finance Association Annual Conference, August 1999, Finland, 2 papers.*

42. *Institute of Quantitative Investment Research (INQUIRE) UK Annual Conference, 1999.*

43. *Financial Management Association Annual Conference, October 1999, USA.*

44. *Western Finance Association Annual Conference, June 2000, Sun Valley, USA.*

45. *European Financial Management Association Annual Conference, June 2000, Greece.*

46. *European Finance Association Annual Conference, August 2000, London, 2 papers.*

47. *European Finance Association Annual Conference, August 2001, Barcelona, Spain.*

48. *American Finance Association Annual Conference, January 2002, Atlanta, USA.*

49. *Western Finance Association Annual Conference, June 2002, Salt Lake City, USA.*

50. *European Finance Association Annual Conference, August 2002, Berlin. 2 papers.*

51. *Western Finance Association Annual Conference, June 2003, Los Cabos, Mexico.*

52. *European Finance Association Annual Conference, August 2003, Glasgow.*

53. *Western Finance Association Annual Conference, June 2004, Vancouver.*

54. *European Finance Association Annual Conference, August 2004, Maastricht.*

55. *European Finance Association Annual Conference, August 2005, Moscow.*

56. *EURONEXT Microstructure Conference, 2006, Paris, 2 papers.*

57. *European Finance Association Annual Conference, August 2006, Zurich, 2 papers*

58. *New York Stock Exchange/ National Stock Exchange of India/ Indian School of Business Winter Research Conference, December 2006.*

59. *American Finance Association Annual Conference, January 2007, Chicago, USA.*

60. *European Finance Association Annual Conference, August 2007, Slovenia.*

61. *Western Finance Association Annual Conference, June 2008, Hawaii.*

62. *European Finance Association Annual Conference, August 2008, Athens.*

63. *Financial Management Association Annual Conference, October 2008, Dallas, USA, six papers.*

64. *NISM/SEBI International Conference on Securities Markets, Mumbai, India.*

65. *American Finance Association Annual Conference, January 2009, Chicago, USA.*

66. *Western Finance Association Annual Conference, San Diego, June 2009.*

67. *Yale/RFS Financial Crisis Conference, New Haven, July 2009.*

68. *Indian School of Business (ISB) Summer Research Conference, July 2009.*

69. *European Financial Association Annual Conference, August 2009.*

70. *Financial Management Association Annual Conference, October 2009, Reno, 3 papers.*