```
 1                    UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF DELAWARE

 3

 4    IN RE: INTEL CORP.          : C.A. NO. 09-867-JJF
      DERIVATIVE LITIGATION       : July 20, 2010
 5    ...........................: 10:03 a.m.

 6

 7                    TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE JOSEPH J. FARNAN, JR.
 8                UNITED STATES DISTRICT JUDGE

 9

      APPEARANCES:
10
      For the Plaintiff          BRIAN D. LONG, ESQUIRE
11    Rosenfeld Family           Rigrodsky & Long, P.A.
      Foundation:                       -and-
12                               DAVID C. KATZ, ESQUIRE
                                  Weiss & Lurie
13
      For the Plaintiff          ROBERT D. GOLDBERG, ESQUIRE
14    Charles Gilman and         Biggs & Battaglia
      Louisiana Municipal               -and-
15    Police Employees           JEFFREY C. BLOCK, ESQUIRE
      Retirement System:         SCOTT A. MAYS, ESQUIRE
16                               Berman DeValerio
                                      -and-
17                               LAURENCE D. PASKOWITZ, ESQUIRE
                                 ROY J. JACOBS, ESQUIRE
18                               Paskowitz & Associates

19    For the Defendant          DONALD J. WOLFE, JR., ESQUIRE
      Intel:                     STEPHEN C. NORMAN, ESQUIRE
20                               Potter Anderson & Corroon
                                          -and-
21                               JONATHAN C. DICKEY, ESQUIRE
                                 DANIEL FLOYD, ESQUIRE
22                               MARSHALL R. KING, ESQUIRE
                                 Gibson Dunn & Crutcher
23
                                 LARRY ACHORN, ESQUIRE
24                               In-House Counsel

25
```

```
 1      (CAPTION CONTINUED):

 2      For the Defendant      C.J. SEITZ, ESQUIRE
        D. James Guzy, Sr.:    BRADLEY R. ARONSTAM, ESQUIRE
 3                                      -and-
                               KIM D. STASKUS, ESQUIRE
 4                             Law Offices of Kim D. Staskus, P.C.

 5      For the Objectors      KEVIN A. SEELY, ESQUIRE
        Dr. Christine          Robbins Umeda, LLP
 6      DelGaizo:

 7

 8

 9      Court Reporter:        LEONARD A. DIBBS
                               Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2                    P R O C E E D I N G S

 3              (Proceeding commenced at 10:03 o'clock a.m.)

 4              THE COURT:  Good morning, be seated, please.

 5              MR. WOLFE:  Good morning, your Honor.

 6              May it please the Court, Donald Wolfe of Potter

 7    Anderson for all of the Intel defendants except Mr. Guzy.

 8              If the Court, please, I would like like to make a few

 9    introductions --

10              THE COURT:  Sure.

11              MR. WOLFE:  -- since the courtroom is quite full in

12    front of the bar this morning.

13              In addition to my partner, Steve Norman, we have with

14    us today Jonathan Dickey and Marshal King of the New York office

15    of Gibson, Dunn & Crutcher.

16              THE COURT:  Good morning.

17              MR. NORMAN:  Good morning.

18              MR. DICKEY:  Good morning.

19              MR. KING:  Good morning.

20              MR. WOLFE:  And Dan Floyd of the Los Angeles office of

21    Gibson Dunn.

22              THE COURT:  Good morning.

23              MR. FLOYD:  Good morning.

24              MR. WOLFE:  And also with us Larry Achorn who is

25    in-house counsel at Intel.
```

1           THE COURT:  Good morning.

2           MR. ACHORN:  Good morning.

3           MR. WOLFE:  Thank you, your Honor.

4           THE COURT:  Thank you, Mr. Wolfe.

5           MR. SEITZ:  Good morning, Judge Farnan.

6           May it please the court, we represent Mr. Guzy, and my

7     partner, Brad Aronstam is back here.

8           THE COURT:  Good morning.

9           MR. ARONSTAM:  Good morning, your Honor.

10          MR. SEITZ:  Our counsel from California is Mr. Kim

11    Staskus.

12          THE COURT:  Good morning.

13          MR. STASKUS:  Good morning, your Honor.

14          MR. SEITZ:  Thank you.

15          THE COURT:  Thank you, Mr. Seitz.

16          Mr. Goldberg?

17          MR. GOLDBERG:  Good morning, your Honor.

18          On behalf of the plaintiffs, I would like to introduce

19    our counsel, Jeffrey Block of the firm, the DeValerio firm.

20          THE COURT:  Good morning.

21          MR. BLOCK:  Good morning.

22          MR. GOLDBERG:  Laurence Paskowitz of Paskowitz and

23    Associates.

24          MR. PASKOWITZ:  Good morning, your Honor.

25          THE COURT:  Good morning.

1               MR. GOLDBERG:  And we also have Scott Mays who was

2       admitted pro hac.

3               THE COURT:  Good morning.

4               MR. MAYS:  Good morning.

5               MR. GOLDBERG:  He's also with the firm of DeValerio.

6               THE COURT:  Thank you.

7               MR. LONG:  Good morning, your Honor.

8               Brian Long from Rigrodsky & Long.  I'm here on behalf

9       of the related plaintiffs today.

10              I would like to introduce at counsel table, David Katz

11      from the Weiss & Lurie firm.

12              THE COURT:  Good morning.

13              MR. KATZ:  Good morning.

14              MR. LONG:  Last week we moved for Mr. Weiss's admission

15      pro hac vice.

16              THE COURT:  I'll grant it now.  Now, that's a product

17      of my semi-retirement, I think.

18              MR. LONG:  Thank you, your Honor.

19              With your Honor's permission, he'll be making the

20      presentation on behalf of the Rosenfeld plaintiffs.

21              THE COURT:  Absolutely.  All right.

22              I've read the papers, even the ones that are coming in

23      over the transom at the last minute with some claims of

24      untimeliness.  The way I would like to proceed is to kind of

25      give you a little bit of an agenda, and then I have an issue

1        that I think I want to take up separately.

2                Let me start -- what I thought we'd do is have the

3        plaintiffs essentially put on the record what the settlement is

4        and what the applications are with regard to attorneys' fees and

5        costs.  Then, without any argument, just basically getting it on

6        the record.

7                And then I thought I would hear -- is Mr. Seely

8        present?

9                MR. SEELY:  Yes, your Honor.

10               THE COURT:  Good morning.

11               MR. SEELY:  Good morning.

12               THE COURT:  There are any other object ors present?

13               (No response.)

14               THE COURT:  Then I thought we would hear the

15       substantive objections of Mr. Seely's client.

16               Then I thought we'd hear from the directors, if there

17       is anything they want to put on the record, and I think that

18       will give me, or you, unless there is some other suggestion, a

19       record to make a decision on.

20               Now, as I was going through the papers, my attention

21       was drawn, I think is the clearest way to say it, by Docket Item

22       Number 91 by Mr. Umeda.  And in that item, paragraph four, it

23       says that the representation of the Delaware plaintiffs' counsel

24       during our March 11th and 15th, 2010, communications were

25       untrue.  Specifically, the Delaware plaintiffs' counsel did

1      exactly what they had agreed not to do, agreeing to a settlement

2      without our clients' agreement.

3           The terms of their agreement are not acceptable to our

4      client, Dr. DelGaizo, and she has objected.

5           So I have that objection out there that I'm going to

6      hear substantively.

7           Paragraph five says the lead plaintiffs response to

8      objections by shareholders, then it mentions Dr. DelGaizo and

9      William Kelly, includes further misrepresentation by the

10     Delaware plaintiffs' counsel.  Specifically, the statement that

11     their efforts to include our client in a global settlement was

12     quote, "Met with counter-discussions about how to obtain a $10

13     million plus attorneys' fee, and Mr. Ameta's desire for his firm

14     to receive 30 to 40 percent of such a gargantuan fee," unquote,

15     is false.

16          That's in a joint declaration of Mr. Block and Mr.

17     Paskowitz in in support of lead plaintiffs unopposed motion for

18     filing approval of derivative settlement and application for an

19     aware -- I think that's supposed to be an award of attorneys'

20     fees and reimbursement of expenses.

21          Paragraph six, I purposely avoided having any

22     discussions of a fee arrangement with the Delaware plaintiffs'

23     counsel, because we wanted to resolve the substantive materials

24     of the settlement first, if possible.

25          Paragraph 7, instead on or about April 12, 2010, during

1       a telephone conversation that Mr. Seely, who we have with us

2       here today, that I had with Delaware plaintiffs' counsel

3       concerning the motion to dismiss in the Delaware action.  The

4       Delaware plaintiffs' counsel raised for the first time the issue

5       of a fee agreement in the event that we were able to agree upon

6       a global settlement of the Intel shareholder derivative matters.

7       We did not propose any quote, "counter-discussions," unquote

8       concerning a fee agreement.

9              This document is submitted under penalty of perjury.

10             You know, this is serious stuff.  It's what gives

11      lawyers a bad name.  It is what gives this type of litigation a

12      bad name.  It's lawyers saying things to lawyers that in my

13      world they're either a misunderstanding, which I can accept, or

14      there is some serious misconduct, which we very rarely see here.

15             What I'm going to do is to take this and deal with it.

16      It's a paper filed in the case.  And under penalty of perjury,

17      one lawyer accuses another lawyer of being a liar.  I don't know

18      how else to say it when you use the words "untruth" and "false".

19             I find this distasteful, particularly in my last seven

20      days, but I'm going to have to deal with it.  What I'm going to

21      do is go through the hearing on what I consider the substantive

22      issues and then take a recess and let everybody talk.

23             Now, sometimes when they talk, they understand it was a

24      misunderstanding, and I don't have to be concerned about it.

25      But if that isn't what results, then I'll listen to proposals

1          how we can expeditiously get through this paper.

2                  I guess you all can retrieve Docket Number 91 and take

3          a look at it.  There is more surrounding it, but that's the

4          paper that drew my attention when I was reading through the

5          declarations.

6                  All right.  Having put that bit of unpleasantness

7          aside, we can take up the terms of the settlement.

8                  MR. BLOCK:  Good morning, your Honor, Jeffrey Block

9          with the firm of DeValerio.  I represent the Louisiana Municipal

10         Police, one the lead plaintiffs in the case.

11                 What I'll do, your Honor, obviously, I will follow your

12         suggested agenda.

13                 THE COURT:  Feel free to add to it.  I was trying to

14         bring some structure, so we can get through this in a sufficient

15         fashion.

16                 MR. BLOCK:  I will, your Honor.  In response to the

17         Umeda declaration, if your Honor prefers, I can save that until

18         later and not address that during my opening remarks.

19                 THE COURT:  We're going to address that later.  I'm

20         going to give the lawyers a chance to all talk about it.  It may

21         go away.  Then I don't have to addresses it.

22                 So don't worry about that now.  I'll have you back

23         after a recess and we'll talk about that.

24                 MR. BLOCK:  Thank you, your Honor.

25                 First, your Honor, we are here for the approval of the

1    settlement of the Intel Derivative suit that was pending before

2    your Honor.  This is a case that deals with the anti-trust

3    problems that Intel has encountered over the past several years.

4         Just very briefly by way of background, my colleague,

5    Mr. Paskowitz, about two years ago made a demand on the Intel

6    board, requesting that the board that certain remedial actions

7    in response to the anti-trust allegations.

8         After the E.U. decision came down, in which the E.U.

9    proposed finding Intel over a billion dollars, Mr. Paskowitz

10   actually met with outside counsel for the Audit Committee of

11   Intel, provided 14 different suggested remedies that the board

12   could undertake in order to address these anti-trust problems.

13        Thereafter, the AMD case selled, Attorney General

14   /KOUPL owe filed a complaint, my firm investigated the case on

15   behalf of our client and we then made a demand on the board. We

16   then filed our own complaint, and your Honor consolidated those.

17        After our case was consolidated, the defendants

18   contacted us and said, We'd like to see if we can resolve the

19   case.  We then undertook those settlements negotiations.

20        I would submit to your Honor that the terms that we

21   have negotiated and agreed to more than meet the standard that

22   your Honor has to consider on approving a derivative settlement,

23   whether it is fair, reasonable, adequate, and benefits the

24   corporation.

25        I would submit to your Honor here, I think these terms

1    more than substantially benefit Intel.  Some objections have

2    been raised.  Maybe the best way to respond to it is by talking

3    about those objections and talking about the settlement itself.

4          The objections essentially are Intel already agreed to

5    do this any I way, so why are you settling, and why are you guys

6    getting paid a fee for this?

7          And there's quite a number of responses to that.

8          First, a number of the things that Intel has already

9    implemented at the time we started our settlement negotiations,

10    my understanding is weren't necessarily in place prior to Mr.

11    Paskowitz's demand being made and his meeting with the Audit

12    Committee.  The presumption is that under Delaware Law, if a

13    shareholder makes a demand or takes an action, and the board or

14    the company subsequently undertakes those steps, the presumption

15    is the shareholder caused it.  And for the corporation to come

16    in and rebut that presumption and here Intel hasn't even

17    attempted to make a showing.  That's one point.

18          I think the second point, and more importantly, is what

19    we achieved in our negotiations, I think strengthens two very

20    important and critical areas of the corporate governance reform.

21          One is Intel's commitment to intend to comply with the

22    terms of the U.S. Sentencing Guidelines, and the second is the

23    independence of our global director of legal compliance, which

24    we call the GDLC.

25          I don't think it's appropriate to go into the actual

1    settlement negotiations we had, but those were two significant

2    areas of disagreement throughout our negotiations.  And we did

3    reference at one point negotiations seemed to come to an impasse

4    and it was over those two issues.

5        We ultimately are comfortable with the final results of

6    those negotiations, and I will point out that both of our -- two

7    of our experts, Mr. Murphy and Mr. Baker both point to the

8    compliance with the sentencing guidelines and the independence

9    of the GDLC as very important and significant components of the

10   settlement.

11       Those are at least two items that Intel had not agreed

12   to prior to our settlement negotiations, and as our experts

13   state, those are very significant aspects of the settlement.  I

14   think to suggest that we achieved nothing factually is

15   inaccurate.  We did achieve significant and substantial results

16   for Intel.  Those two alone, which our experts are pointing to,

17   are saying will inure to the benefit of the corporation.

18       We submitted an expert declaration from Dr. Udaff who

19   tried to put some real life value to, Well, what does this all

20   mean for the shareholders?

21       What he does is he points to a number of academic

22   studies which all find whether a corporation enhances the

23   corporate governance reform, over time you will see an increase

24   to shareholder value, because in this particular case, one, you

25   have a much higher likelihood that Intel will not fall into any

1    additional anti-trust problems.  And, second, the fact that

2    whether you have a good corporate governance reform, those kinds

3    of companies trade at a high multiple.  So that is a real life

4    value that Intel shareholders are going to see out of the

5    settlements.

6           Another significant aspect of the settlement, your

7    Honor, is the fact that should your Honor approve the settlement

8    now for the next three years, Intel is required by court order

9    to comply with every single one of these terms.  If your Honor

10   rejects the settlement and doesn't approve it, Intel is free to

11   comply or not comply as it sees fit.

12          One of experts have pointed to is once a corporation

13   undertakes these kind of corporate governance changes, it

14   becomes embedded in the corporate culture.  So notwithstanding

15   that after three years, the mandatory requirements for these

16   things elapse, it will became so ingrained in the corporate

17   culture, that the likelihood is they will continue.

18          So, we would submit, your Honor, we think that those

19   terms do exactly what our lawsuit set out to do.  This was a

20   derivative action brought on behalf of the corporation to

21   benefit the corporation and we think that's exactly what we did.

22          We benefitted the corporate entity by strengthening and

23   improving corporate governance terms in a way which will inure

24   to shareholder benefits and increase shareholder value.

25          On that record, your Honor, we think the settlement is

1        more than fair, more than reasonable, and more than adequate.

2            Now, if your Honor would like, I can go into a little

3        bit more of a discussion as to why we think Ms. DelGaizo's

4        objections are without merit?

5            THE COURT:  What is submitted on the record at this

6        point, and what you put out today, let's, at least for purposes

7        of this moment agree that there is clearly an enhanced corporate

8        governance, and it's achieved through the work of your side of

9        the courtroom.  And it's clear the case law doesn't require any

10       kind of pecuniary contribution, but with coverage available, why

11       -- possibly -- can you talk about where that played into the

12       give and take of your negotiations, which I think are set out in

13       your papers, but it would be helpful to hear a little more?

14           MR. BLOCK:  Sure.  We understand that Intel has a D & O

15       policy as most large corporations do.  We went and reviewed the

16       policy.  We sat down and had a meeting with Mr. Dickey to

17       discuss the policy.

18           And I want to be careful, I don't want to reveal any

19       confidences, but as we put in the papers, the coverage that

20       Intel has is known as side A coverage.  So before the policy can

21       be implicated, the carriers have to be convinced that the

22       directors actually engaged in bad faith conduct.

23           And in order to meet that standard either, A,

24       plaintiffs would have to prove that these directors engaged in

25       bad faith conductor, or, B, Intel would have to concede that,

1        yes, these directors engaged in bad faith conduct.

2              Now, not surprisingly, Intel was not about to concede

3        that its Board of Directors engaged in bad faith conduct for the

4        obvious reasons that they don't think they did, but for another

5        reason by making that concession, Intel would now open itself up

6        to billions and billions of dollars of potential liability in

7        all these pending anti-trust cases.  Clearly, not in the best

8        interest of the corporation.

9              Our view was when you looked at the benefits that we

10       achieved through the corporate governance exchanges, and how

11       they will over time substantially benefit shareholders versus

12       what would be a multi-million dollar contribution potentially

13       from an insurance policy to a company, that as we pointed out in

14       the papers, has about a $112 billion market cap, $16 billion in

15       cash on hand.  Getting, you know, a couple million dollars or

16       multiple millions of dollars wouldn't necessarily be that

17       material to Intel.

18             On battles what we concluded, based on our discussions

19       with our experts and our clients, was what would benefit this

20       company was to get the significant corporate governance

21       exchangers now, which over time will improve, at least should

22       improve shareholder value by again trying to making sure the

23       company doesn't get into these kinds of problems in the future,

24       and by better corporate governance, the company will

25       theoretically be managed even that much better than they already

1    are, which will be to enhance shareholder value.

2          So we considered the monetary aspects.  We looked into

3    it.  We investigated it.  We weighed the pros and the cons.  We

4    recognized that in order to try to get a monetary component from

5    the insurance, we would essentially have to take this case

6    almost to the end.  We would have to prevail on the motion that

7    was pending before your Honor which was demand was properly

8    refused.  No easy task.

9          Even if we get past that motion, we would then have to

10   prevail on a 12(b)(6) motion on which the defendants certainly

11   would argue, you have no evidence that the directors here acted

12   in bad faith.  Assuming we got past that motion, what we would

13   have to prove in this case is, one, not only that Intel

14   committed anti-trust violations, but more importantly, and I

15   think a factor that is very important which is not addressed in

16   any of the objections.  We would have to satisfy the Caremark,

17   Stone v. Ritter Standard, which is that the board, in essence,

18   acted in bad faith.  They were aware that there were anti-trust

19   violations and consciously ignored it and allowed them to

20   continue.

21         I think on the facts and the records of this case, your

22   Honor, that would be a very difficult burden for the plaintiffs

23   to prove here.  I will say that some of the discovery that we

24   looked at, and we looked at the Intel board minutes, we do know

25   that there were presentations made to the Intel board by

1    anti-trust attorneys, outside attorneys, both on domestic issues

2    and international issues.  Intel did not waive the privilege,

3    so we don't know the specific advice, but there is no doubt that

4    we would have been met with an advice of counsel defense in any

5    case.

6         We submitted these declarations from Mr. Baker who has

7    got about 50 years of anti-trust experience including a stint, I

8    think it was the first Assistant Attorney General at the

9    Department of Justice who opines Intel certainly had colorable

10   defenses to both the E.U. case and the U.S. anti-trust

11   allegations, and, in essence, it was no sure thing that you were

12   going to prevail.

13        Well, if there's a question, a serious question that

14   you can prevail on an anti-trust case, I think it's an even

15   harder case to prove that the directors actually knew there was

16   an anti-trust violation engaged in bad faith and looked the

17   other way.

18        So, taking that into account, and that's why we decided

19   to abandon what we thought were very significant corporate

20   governance reforms in exchange for taking a real long shot at

21   maybe getting some money from an insurance policy, didn't really

22   seem to make a lot of sense to us.  We thought this was a better

23   settlement.  It would achieve what we wanted to now.  We felt

24   that it would be in the best interests of the company and

25   shareholders not only now, but in the long term.

1          Hopefully, that will address that issue, your Honor, as

2     far as the request for attorneys' fees and costs.

3          We began negotiating with Intel on the attorneys' fees

4     after we reached agreement on all the settlement terms.  So we

5     had signed off, we agreed on all terms, then we brought up the

6     subject of attorneys' fees.

7          The negotiations regarding attorneys' fees, which were

8     clearly at arms-length, because Intel certainly had the

9     incentive to pay or agree to pay the lowest amount possible,

10    really all centered around what was what was plaintiffs' counsel

11    loadstar.

12         We looked at the case law in the Third Circuit.  We

13    looked at the case law from Delaware on what kind of range

14    courts will award in a derivative type case.  It was clear that

15    the range of the multiplier was somewhere 1 and 30.

16         Here our multiplier is a 1.16, which is at the lower

17    end of the range.  I think our loadstar was 1.46 million, which

18    considering the amount of work that we put into this case.  It's

19    a two-year process.  This wasn't just a short term.  It was a

20    two-year process.  There was a lot of investigating.  There was

21    a tremendous record that we reviewed here.  We did a lot of work

22    on confirmatory discovery.  To really satisfy ourselves and to

23    satisfy our clients, and our experts who have a reputation and

24    put in their declarations of what the facts were to make sure

25    that we felt comfortable, and that we would stand up in a

1      Federal Court and advocate for the settlement.

2            So we put a lot of work into making sure that we felt

3      this was a very fair, reasonable, and adequate settlement.  And

4      I think that our request for fees, which will be a 1.16

5      multiplier, plus what would amount to a reimbursement of

6      expenses of about $102,000, under the law is fair, very fair and

7      reasonable, your Honor, and we would request that it be granted.

8            I will note that the few objections that we got to the

9      fee requests, particularly, I think it was Mr. Poll (phonetic)

10     who said it just doesn't seem plausible that you can have

11     generated that kind of loadstar to support $1.8 million.  He did

12     not have the benefit of seeing our submission and the time

13     records.

14           I would submit, your Honor, that based on the actual

15     records, and our time submissions, that the fee request is

16     certainly fair and reasonable.

17           Unless your Honor has anything else, I can respond as

18     necessary?

19           THE COURT:  No, thank you.

20           MR. BLOCK:  Thank, your Honor.

21           MR. KATZ:  Good morning, your Honor.  David Katz from

22     Weiss & Lurie on behalf of the Rosenfeld Family Foundation and

23     Martin Smilow.

24     We're pleased to be presenting the stipulation of settlement to

25     the Court today.  We think it is an outstanding result for Intel

1    that will have lasting benefit to both the corporation and its

2    shareholders.

3         The relief that it presents, and I won't replow the

4    very thorough presentation, replow the ground that Mr. Block

5    plowed detailing the terms itself, but it is tailored to exactly

6    what the plaintiffs brought this matter to court to resolve, and

7    that is perceived deficiencies in internal control structures

8    and corporate governance structures regarding anti-trust

9    compliance and foreign competition law.  So we believe that the

10   settlement reflects years of hard work and is well-deserving of

11   an approval by the Court.

12        We also have an application before the Court with

13   regard to fees and expenses.  This case we have litigated for s

14   two and a half year period and devoted a substantial time and

15   effort to reaching this day of bringing this settlement to the

16   Court.  The fee that was -- the fee request that we had was

17   negotiated with Intel.

18        They have indicated that they believe that we added

19   substantial value to the terms that are being presented today.

20   And the reasonableness of their request is confirmed by both our

21   loadstar and the application of a multiplier of that loadstar,

22   since our loadstar adds up to 791,000, or thereabouts, and with

23   expenses, our loadstar and expenses exceeds our application.  So

24   we would request that that application be approved in

25   conjunction with the settlement that's being presented for

1     approval today.

2              If there is no other questions?

3              THE COURT:  Not at this time.

4              MR. KATZ:  Thank you, your Honor.

5              THE COURT:  Thank you.

6              All right.  This is the time for Mr. Seely, objectors,

7              MR. SEELY:  Good morning.  Thank you, your Honor.

8              For the record, my name Kevin Seely of Robbins Umeda.

9     We represent Dr. Chrstine DelGaizo.  She's an objector in this

10    matter.  She's also a shareholder of Intel and she's objecting

11    to the proposed settlement for the reasons we filed papers on,

12    on her behalf, we filed the objection on July 6th.

13              What I would like to say in response to our objection,

14    as the Court has already noted, we got some pretty fierce, what

15    we thought was pretty fierce attacks that we can address

16    throughout.  I think the Court has already raised one of them.

17              I would like to get us focused on the main reasons for

18    the objection.  I think we're all here and we just feel strongly

19    about it.  We're here for the benefit of the company.  We all

20    purport to represent what is best for the company.

21              And our position -- our objection is fairly

22    straightforward, we think.  We just simply bring out facts that

23    give rise to the derivative actions.

24              And it's undisputed, for example, that Intel has been

25    investigated by numerous domestic and foreign governments and

1    agencies.  There's the Japan and Korean FTC.  We have an exhibit

2    to the Kevin Seely declaration that was filed with the

3    objection, Exhibit 23 that has a power point presentation with

4    several slides in it that goes over these issues.  Slides six as

5    well as seven through 11 showing how this kind of conduct, this

6    anti-trust conduct was pretty pervasive, pretty common course in

7    Japan, and Korea, and in and Europe.

8           In Japan and Korea, even though the fines weren't

9    nearly anything like in Europe, I think in Japan and Korea it

10   was 25 million, and they did find that Intel was violating the

11   anti-trust laws, essentially.

12          Then, of course, we all now about the European

13   Commission's lengthy investigation.  I think that's important to

14   know that they spent a lot of time.  They went into a lot of

15   detail.  They issued a public report that's about 500 pages in

16   length with numerous footnotes.  It took years to complete.  And

17   it resulted in the largest fine ever against Intel for $1.45

18   billion.

19          Intel, as we know, has been subject to other lawsuits

20   such as the AMD action.  Similarly, it took years to litigate to

21   get into discovery, years of discovery.

22          There's a reference of about 200 million pages

23   apparently of documents that was went through discovery in the

24   AMD case, including depositions of numerous Intel officers, yes,

25   but also third parties, which were very critical, as we can tell

1    from reading the redacted version of the European Commission

2    decision.

3         After all that work, they did result in a settlement

4    where Intel agreed to pay $1.2 billion.  1.25 billion, I

5    believe, to AMD.  So we're just bringing up those facts.  We

6    think those are real.

7         THE COURT:  They paid -- actually, that case was cut

8    back, the AMD case, a little bit by one of my rulings, but they

9    paid for injuries, but putting aside, the thrust of this

10   settlement before me is, is that there was more recoupment

11   immediately for Intel and ultimately for the shareholders in the

12   marketplace with the reformed -- with the reformed practicals

13   for Intel rather than taking some money from an insurance policy

14   and sort of backfilling what they had to pay because of this

15   alleged conduct throughout the world.

16        As I read your papers, the question that I kept

17   thinking I needed to have answered, setting aside where this

18   litigation may have gone if it was fully litigated to a trial,

19   which very rarely happens because of all the obstacles to

20   getting to an actual trial, and understanding everything that

21   you put in your papers about all of this evidence that's out

22   there about Intel, what would you suggest should have been

23   negotiated and added to the governance provisions?  What do you

24   think, in other words, you could have got gotten from Intel that

25   these folks didn't get, and then why do you think you could have

1    gotten it and they didn't get it?

2            MR. SEELY:  First, I would like to say as an objector,

3    which I haven't been personally before, it's a unique

4    experience.  I'm normally on this side.  I have a bit of

5    understanding for how difficult it is.  We are not involved in

6    the whole process at all.  We're apart of it, but not involved

7    in it.

8            They set the schedule, and the briefing, and all that.

9    We don't get the access --

10           THE COURT:  You're out in California, right?  You have

11   a state action?

12           MR. SEELY:  Correct.

13           THE COURT:  You're on that side?

14           MR. SEELY:  Correct.

15           You asked me to answer a different question about the

16   corporate governance.  If you would like me to explain to you

17   why we think we are litigating the cases in two very different

18   ways?

19           THE COURT:  Oh, no, I'm not interested in that.

20           MR. SEELY:  Okay.

21           THE COURT:  I just want you to give me a plain answer

22   on what is it that you think you could have gotten that these

23   folks didn't get from these folks?

24           MR. SEELY:  In terms of --

25           THE COURT:  And how you think you would have gotten it?

1          MR. SEELY:  Pardon?

2          THE COURT:  And how do you think you would have gotten

3     it done?  I mean, you must have something in your bag that you

4     think would have gotten something that they didn't get.  What is

5     it that you think they didn't get and how would you have gotten

6     it?

7          MR. SEELY:  Okay.

8          THE COURT:  Is that a hard question?  I meant to make

9     it clearer.

10          MR. SEELY:  Our objection is about the money not so

11     much about the corporate governance.

12          THE COURT:  Yes, your objection is that they didn't get

13     any money.  I've got to tell you, I'm going to buy off on that,

14     because I understand the principal at work here that they think,

15     the plaintiffs, that there's more to be gotten in the

16     marketplace with a reformed company than getting a payout from

17     some insurance company after along fight because of what would

18     have -- what that would have involved.

19          So let's, for the moment, say I understand that.  I get

20     it.  It is non-pecuniary.  I'm really focused on enhanced

21     governance.  So are you telling me you think they got all they

22     could have gotten on that side of the equation?

23          MR. SEELY:  I'm saying that I'm not prepared for that

24     part of the issue.  What we focused on --

25          THE COURT:  They didn't get the money.

```
 1            MR. SEELY:  -- is the money, in terms of where we were
 2     headrf on the corporate governance.
 3            THE COURT:  How much would you have gotten out the
 4     policy then?
 5            MR. SEELY:  Well, we don't know.  We didn't get
 6     anything we asked for.  We didn't get the insurance policies.
 7     We got to look at one of them.  We asked questions about it.
 8     Exhibit 29 shows a string of e-mails.
 9            THE COURT:  You see, you're an experienced attorney in
10     this area, and you have a naive judge here.  I'm trying to
11     understand.
12            You have some idea of how these policies run for
13     independent directors?
14            MR. SEELY:  The one that we looked at appears to have,
15     I believe, is $75 million or so, but there there is some
16     discussion about $300 million.
17            THE COURT:  Right.  What do you think, through your
18     litigation abilities, that you could have gotten from those
19     policies, assuming stack, and you get through all the legal
20     obstacles, what do you think you could have gotten, $2 billion?
21            MR. SEELY:  Two billion?  No, your Honor.
22            THE COURT:  I'm looking for something to understand on
23     the pecuniary side.
24            MR. SEELY:  I would be speculating.  I would --
25            THE COURT:  You just hit on it.  You go on saying,
```

1    Judge, they didn't get a good deal, and you speculate how much

2    money they should have gotten.

3         I'm saying, I have no idea, because I'm hearing about

4    the governance enhancements, I'm hearing about they are going to

5    get it back in the marketplace by being stronger and more

6    ethical, which if that happens, that's probably a good thing.

7    And they are a worldwide company, they have lots of business,

8    and that's attractive.

9         MR. SEELY:  Let me go back to the corporate governance

10   issues.

11        Where we went ahead with corporate governance, was to

12   bring in experts to conduct interviews of the executives and

13   senior executives mentioned in the European Commission Report,

14   where it seemed to be very sensitive and broad about how people

15   in high levels, including lawyers and others, but they were just

16   unnamed, senior executives and others were involved apparently

17   in wrongful conduct.  The people that we talked to suggested

18   that we go in, because corporate governance generally with

19   Intel, even before this case, generally, and I think it's in the

20   papers, is generally is pretty good.

21        So we think that we're going to approach it that it was

22   an internal controls issue, that we really needed to get into

23   Intel and interview those people, and figure out what was going

24   on?  Why wasn't the corporate governance effective?

25        So that was the angle that we were going at, but we

1      never got to take it to fruition.  It's difficult for me to tell

2      you exactly what would have happened.  We could have gone in and

3      interviewed these people and it could have gone in a variety of

4      different ways, but that was the approach that we were taking.

5           If I could, just with regard to the real essence of

6      this case, unless your Honor has a question?

7           THE COURT:  No, I think what you told me is that with

8      discovery, you might have been able to come up with some bright

9      line standards for dishonest people.  In other words, that's a

10     good thing if you can give them bright line.

11          MR. SEELY:  I suppose I'm trying to hold back a little

12     bit more.  Look, it's extensive, is it not?

13          Again, if you look at Exhibit 23, it's a summary of the

14     European Commission.  They list several hundred, I'm guessing, I

15     hope I'm not too far off, names like senior executives in Intel.

16     That could be just two or three people multiple times or it

17     could be, you know, tens of different people.  We don't know,

18     because we don't know their names.

19          If it's the latter, and there's many people opposed to

20     just a few that were referenced numerous times, maybe something

21     else is going on in Intel that needs to be worked out, you know,

22     that we could help fix.

23          THE COURT:  Okay.

24          MR. SEELY:  Just to try to focus, or share our

25     perspective, we really think the sense of this case comes down

1        to this is a demands case.  Everybody has made a demand to

2        Intel.  Please do something about this.  Look into this.

3                Intel properly responded in Exhibit 14 and also the two

4        redacted Exhibits 15 and 16 are particularly critical.

5                If I can just pick one set of exhibits that is critical

6        to look at from our perspective.  It's Exhibits 14 through 16,

7        which is their position about the demands, which is let's defer

8        this thing and let these other cases develop.

9                We talked about the European Commission.  We talked

10       about AMD.  That's nice, you know, billions of dollars.  Very

11       powerful.  But also of several pending litigations going on.

12       That's what derivative cases are often about is you have to

13       observe, and as they say in Exhibit 14, for example, this is a

14       legally and factually complex case and we would benefit.  It

15       actually says the company would benefit.  Not might benefit, but

16       would benefit from additional proceedings.  So they want to see

17       what happens to the New York case, the FTC case, the remaining

18       class action MDL case, to see what damages are going to be

19       caused to the company.

20               I think that ties into the point that was being made

21       about, well, this is a concern.  I see it.  The dilemma of

22       pushing forward right now against Intel can actually cause them

23       more liability.  You have to be careful.  So that's why we took

24       the position that we think the better position is what they

25       stated in Exhibit 14, which is to let's defer this right now,

1      let's watch things develop, and then we'll come around and

2      figure out, and assess liability and damages, and who to pay

3      back if anybody at Intel.

4              Our objection, your Honor, is we don't have it all.  I

5      appreciate and, you know, I wish I could go to your standard of

6      be a better lawyer and all of that.  We're doing the best that

7      we can, I think, as get as far as we can in the case yet still

8      be reasonable.

9              All along our client has been a very, I think, a

10     shareholder derivative plaintiff.  She started with an

11     inspection demand, just seeking documents, no filing.  That

12     caused a delay.  They didn't get the documents.  So she filed a

13     lawsuit to toll the Statute of Limitations, and that's

14     ultimately what the company closely relied on in a Motion to

15     Dismiss that's pending over in this case.

16             They said, It's not a problem.  Even if this Motion to

17     Dismiss, the plaintiffs lose, it won't hurt Intel's claims in

18     this case.  We still have the DelGaizo action.  They preserved

19     it.  It's stayed as it should be, allowing us to watch all these

20     things develop, and then we'll figure out what needs to be done

21     with this case.

22             Instead, because of the pressures of these people over

23     here, I think we're thinking too much about their case and not

24     the company.  Even if this case is dismissed, the company's

25     claims are still preserved.  They say so themselves in Exhibits

1      14, 15, and 16.

2           So she did the right thing by staying it, moving on,

3      getting the documents finally, submitting a demand, presenting

4      the presentation which is the other is exhibit.  I reference the

5      the Court to Exhibit 23, which resulted in Exhibit 14, which is

6      then saying, Thank you very much for the Power Point

7      presentation.  We appreciate the presentation you prepared at

8      the meeting.  We've relayed the concerns.  And basically they

9      say, We've determined it's appropriate to defer.

10          We think that makes sense, because there is all this

11     money.  There are all these allegations.  We think more needs to

12     be developed.

13          And hopefully then, and I'm not suggesting that we get

14     rid of them and let us litigate.  We're super lawyers over here.

15     No.  These guys are in the best position to do that.  We're

16     hopeful that a demand will actually be observed, and they will

17     do that, and they will handle it as they should.

18          And I didn't -- it's a money back for the company.  And

19     we think that, you know, I understand they're a big company, and

20     have a lot of money, and a few million, or ten million, or a

21     hundred middle isn't a lot.  It's something.  It can pay some of

22     the attorneys' fees and hopefully it's a lot more.

23          Just moving through my notes.  I think I got most of my

24     points.

25               THE COURT:  Take your time.

1          MR. SEELY:  As the Court has indicated, we received

2     declarations regarding the marking issue and attorneys' fees

3     issues.  We'll address those separately.  We felt the need to

4     respond, because they likewise raise an issue with declarations.

5          Some of the themes I'll just address that have been

6     raised here with regard to liability.  I think it's important to

7     know this is not a demands futility case.  This is a demand made

8     case, and, so, we don't need to prove demand futility.

9          Liability under those situations can be different.  It

10    doesn't have to involve all the board.  You look for the wrong

11    doers, and, yes, it's a high standard.  We didn't say it was

12    slam dunk, or easy, or things of that nature, but we just

13    pointed out that, Hey, other people or investigations and

14    litigations with time and thoroughness have found some merit,

15    it appears, based on the fine and AMD resolution alone, based on

16    the -- based on the pending New York case, et cetera.

17         There has been some talk about the sufficiency of the

18    evidence.  As objectors we were given access to the same 17,000

19    pages of deposition transcripts that they were.  We reviewed

20    them as best we could.  We think we took a pretty good crack at

21    it.  We made statements on them.

22         Under the pressures of time, we had to sign a

23    confidentiality agreement that was very tight.  We thought it

24    permitted copying, but they construed it as it not permitting

25    copying.  So we had to go their office in Palo Alto.  We don't

1    have copies of the transcripts to show you.  They are consistent

2    with all the other evidence out there, we felt.

3         We asked for other things.  We asked for more time.

4    They didn't want to give it to us.  We asked for access to other

5    deposition transcripts.  The other side of the story if you

6    will.  What was presented for purposes of the settlement was

7    multiple depositions of Intel, but not of the third parties that

8    are so often mentioned in the European Commission.  And, yes, by

9    reading that you can get a lot, but it would also have been

10   helpful to have those transcripts or access to them.

11        There's an issue raised about our clients adequacy, so

12   we filed a declaration of that.  She explained that this is not

13   for any motivation whatsoever, other than to look after the best

14   interests of the company.

15        Likewise, on the attorneys' fees point quickly.  We

16   just think it's kind of obvious that if we really wanted

17   attorneys' fees, that we would be on that side of table, not

18   here where we have no chance of getting attorneys' fees.

19        On the issue of corporate governance, I think they

20   misunderstand our position and seem to think that we're saying

21   corporate governance settlements are only no good.  Absolutely

22   not.  We're just saying in this case there is some pretty

23   powerful evidence out there that this other strategy needs to be

24   done, this settlement should not be approved, and that the

25   deferral approach is the better approach to do in this case.

 1                With regard to the timing of the corporate governance,

 2      we don't criticize them for getting corporate governance

 3      measures going into effect prior to this hearing.  We're just

 4      simply stating that they are already in effect.  And if, as the

 5      plaintiffs say, these reforms will save the company billions of

 6      dollars in the future, we would think the company would keep

 7      them going even if this settlement were not approved.

 8                So we think if you're just looking at the company,

 9      they've gotten a good deal in this situation.  They have gotten

10      whatever corporate governance that they purport is good.  If

11      it's as good as they say, they should hang on to it.  So, in

12      conclusion, we just don't think the plaintiffs consideration

13      support approval.

14                With regard to the factor of litigation risk, we don't

15      think it's that relevant, because there is more than one

16      derivative case.

17                With regard to the merits, obviously, we have a

18      difference of opinion.  We think there's a lot of evidence out

19      there that suggests the merits are strong.

20         Is it going to be a tough case to go to trial? Absolutely.

21                Are there other ways this could be resolved?  Yes.

22                And is it worth, you know, waiting around for it?  We

23      think so.

24                Demand futility, as I said, is an issue that they

25      raised as consideration.  It's really not a factor here.

1          The defenses, don't apply, we think, because the

2     allegations are about a breach of fiduciary duty of loyalty, the

3     allegations are about direct involvement, not indirect Caremark

4     all the way.  There is definitely allegations in the plaintiffs'

5     complaint and out there in the public record of direct

6     involvement.

7          Finally, for all those reasons, we don't think there is

8     substantial risk associated with not settling this case.  We

9     think they got the corporate governance that has been

10    implemented.  The factual record doesn't really support

11    approval.  You've got the public available documents we've

12    talked about ad nauseam.  You've got the 17,000 documents that

13    they provided to both of us that certainly we don't think it is

14    conclusive of a no money settlement.

15         So, your Honor, unless you have any questions, and we

16    look forward to addressing the other issue you raised, I

17    appreciate --

18              THE COURT:  Not at this time.

19              MR. SEELY:  Thank you for your time.

20              THE COURT:  Thank you.

21         We'll hear from defendants.

22              MR. DICKEY:  Good morning, your Honor.  Jonathan Dickey

23    for Gibson, Dunn & Crutcher, for the defendants.

24         Your Honor, I think Mr. Seely's remarks underscore what

25    we believe to be the fundamental weakness of the single merits

1      based objection that your Honor has received in connection with

2      this settlement and underscores why, based on the record before

3      you, we believe on behalf of Intel and the individual

4      defendants, that this settlement is fundamentally fair and

5      reasonable and should be approved.

6              Let me start with something that Mr. Seely said in

7      passing right towards the end of his remarks.

8              He said, The company got a good deal.

9              Well, that's precisely the issue for your Honor to

10     decide today, is there a good deal for the company?

11             And I remind your Honor that we have five known

12     claimants who have brought claims in various courts, four of

13     whom compromise settling plaintiffs, four of whom are

14     represented by extraordinarily competent counsel, and four of

15     whom have all concluded under the Third Circuit nine part factor

16     test under Girsh, that this settlement fully meets the fairness

17     standard that dictates your Honor's decision on this.

18             Only Ms. DelGaizo and her counsel have seen fit of the

19     known claimants to object to the fundamental fairness.  As your

20     Honor heard, however, Mr. Seely concedes that the fact that

21     there is no monetary contribution in and of itself is of no

22     particular moment.  The case law doesn't require it.  Even Mr.

23     Seely, in his own words, doesn't seem to say that it's legally

24     required as opposed to something that went beyond his

25     speculative wish list of things that if he was was given control

1    over the case, you know, he might seek out over a period of

2    years with unknown results.

3         I think your Honor was exactly right that this is in

4    the vein of speculative outcome.  You'll note, your Honor, that

5    unlike the settling plaintiffs' counsel who came before your

6    Honor with multiple declarations of world class experts

7    supporting the settlement, more importantly, supporting the

8    proposition that these governance enhancements are very valuable

9    to Intel and its shareholders, Mr. Seely and his client have no

10   expert, although, apparently according to his remarks to your

11   Honor, they consulted an expert.  We see no expert report.  We

12   see no suggestion from an expert of why these corporate

13   governance enhancements somehow are infirmed or unfair or

14   valueless.

15        So there is simply no record upon which your Honor

16   could conclude that these reforms are anything other than what

17   the litigants who were settling today believe is the case, which

18   is these are extremely positive forward-looking reforms that

19   will enhance Intel's anti-trust compliance efforts going forward

20   and, thereby, enhance shareholder value.

21        Mr. Seely emphasized several times, Well, this is a

22   demands case and somehow that should take the Court's analysis

23   in a different direction.  A demand rejected case that is,

24   unlike a demand futility case.

25        And, your Honor, it's a distinction without a

1    difference, given the record that is before your Honor, which

2    has been fully vetted by competent counsel who have access to

3    copious discovery materials, and even Mr. Seely and his clients

4    were given exactly the same access to the letter of those

5    discovery materials.

6         And it was the judgment of multiple set of plaintiffs'

7    counsel that based upon that factual record, not pleading

8    standards, not demands futility standards, but the evidentiary

9    record that the strength of their case was in doubt, their

10   expert, Mr. Baker, proclaimed that Intel had colorable defenses

11   to both the settled and pending anti-trust claims, both U.S. and

12   foreign, but, more importantly, as Mr. Block said in his opening

13   remarks, that's not really the issue.  The issue is, is there

14   strength to the claim for breach of fiduciary duty against the

15   directors of Intel Corporation?

16        And Mr. Seely sort of belies that issue.  As we've

17   noted in our papers, there is no court in the land that has

18   found any individual director or officer liable for any

19   anti-trust violation.  There is no regulator in the land that

20   has sued any director or officer for anti-trust violations, much

21   less based upon their intentional and knowing participation in

22   the anti-trust misconduct, which would be the standard under

23   Delaware Law to overcome all of the protections that they are

24   afforded under both the business judgements rule, but, more

25   importantly, under the exculpation provisions of Section

1      102(b)(7)of the Delaware General Corporations Law.

2              That subject is not even addressed, quite frankly, by

3      Mr. Seely in his remarks today.

4              He says, Well, that doesn't matter because Messrs.

5      Barrett and Mr. Ottelini, two of Intel's directors who were

6      here, are also officers, so, therefore, they're not protected.

7      We pointed that out in our papers, and I won't elaborate on

8      that, that Delaware Law, on the contrary, fully protects even

9      those two individuals as directors of Intel Corporation, unless

10     and except there is some specific targeted particularized

11     allegation of intentional anti-trust misconduct by those two

12     individuals, and there is none.  Mr. Seely has pointed to none.

13             And although he sent his review team to spend days

14     pouring over the deposition transcript, he has not come before

15     your Honor with any particularized evidence.  Nothing in the

16     confidentiality agreement he referred to prevents him from doing

17     that advising this court, under seal or otherwise, I read this.

18     Here's the smoking gun, your Honor.  Here's why there is a case

19     to be made for personal liability of an individual director or

20     an officer.  That's why we should be able to go after the

21     insurance policy.  There is none of that in this record.

22             And on the insurance policy, I'll simply underscore

23     what I've said in my declaration, your Honor, which is, we spent

24     the time knowing that this might be a question both with the

25     settlement plaintiffs' counsel, and indeed with Mr. Umeda who's

1    not here in court to explain the insurance policy, and how it

2    operates and doesn't operate in the context of a case like this.

3            But the simple fact is that in good conscience, Intel

4    and my individual clients could not in good conscience take a

5    case to these insurance carriers for coverage, given the entire

6    absence of any material facts that would demonstrate that there

7    is coverage, because their conduct was so egregious, so

8    intentional, so bad faith that there might be a case for

9    coverage.

10           And we submit to your Honor, as we said to all of the

11   effected plaintiffs' counsel, it is an irrelevancy for purposes

12   of today.  I think your Honor noted that you understand that

13   this being a non-monetary settlement, does not, in and of

14   itself, is a reason for us to not to have the settlement

15   approved.

16           Mr. Seely also begrudges the inability to access more

17   and more discovery than he's obtained so far.  I'll just take a

18   second on that.

19           The Community Bank case from the Third Circuit 2005

20   makes it absolutely clear that while an objector may have some

21   right to discovery materials, they are not limitless.  And what

22   the Third Circuit has said is whereas here, the settling

23   plaintiffs have had access to discovery materials, then the

24   objector can have access to those those same discovery

25   materials.  That is the controlling precedent that we followed.

1    We told Mr. Seely and Mr. Umeda that that is the precedent that

2    we were following.  And it is entirely consistent with the Third

3    Circuit case law to have provided them what we provided them,

4    although they didn't avail themselves of those materials in

5    full.  I know that because they came to my offices and basically

6    suspended their efforts, not because we said they couldn't

7    continue, but because they chose not to continue their review of

8    those discovery materials, and here they are now, your Honor,

9    complaining that they want more.  I think there is some

10   fundamental disconnects here on the record of what they say

11   they've been prohibited from receiving versus what the reality

12   truly was.

13        I want to say in passing, we take no position on the

14   intermural issues amongst plaintiffs' counsel about who said

15   what and to who with regard to fees.  There is no suggestion or

16   allegation that the settling defendants participated in any of

17   those decisions.  We think it's an issue that should not detain

18   this Court from approving the settlement on the merits.

19   Regardless of the outcome of the bifurcated hearing you're going

20   to hold today on that separate and I think severable issue.

21        With that, I can answer any of your questions, your

22   Honor, but I will simply underscore that from the standpoint of

23   Intel, and the individual defendants, this was an extremely

24   arm's length, hard fought, extended negotiation.

25        As Mr. Block noted at one point, the parties did reach

1      an impasse because of those intense and hard fought

2      negotiations.  We think, therefore, the settlement is the

3      product of extreme good faith.  It bares all the issues of

4      fairness that the Third Circuit standards require.  And there is

5      no material objection here that we believe should lead to any

6      result other than full approval of the settlement.

7              THE COURT:  All right.  Thank you.  I appreciate it.

8              Is there anyone else?

9              MR. SEITZ:  We will stand on his remarks, your Honor.

10             THE COURT:  I'll give you a brief opportunity to reply.

11             MR. BLOCK:  Thank you very much, your Honor.

12             Your Honor, when Mr. Seely was up here and you were

13     asking him some interesting questions, the phrase came to mind,

14     a bird in the hand is worth two in the bush.

15             We certainly have a bird in the hand here.  We've got

16     what we consider to be a very valuable and very beneficial

17     settlement of enhanced corporate governance terms versus the

18     speculation of, Well, if we continue with the litigation, if we

19     continue down what we know is going to be a very difficult path,

20     in terms of prevailing in this kind of a case, which is the

21     better result?  And we chose the bird in the hand.

22             Our experts, we put in, your Honor, all of our experts

23     have all opined that this is an excellent result for Intel.  One

24     of the things that I think as Mr. Dickey pointed out, which I

25     think is an excellent point, is that there is no regulator, no

1      one, no private litigant who has ever brought any claim against

2      any Intel officer or director.  So to suggest that we kind of

3      have an easy case to establish that any officer or director

4      knowingly participated in anti-trust violations is simply not

5      the case.

6              If I can, your Honor, you asked Mr. Seely what I

7      thought was an excellent question.

8              You said to him, What should have been negotiated and

9      added to the governance provision?

10             And I will point out, your Honor, throughout the course

11     of our negotiations with Intel, we contacted and had discussions

12     with Mr. Seely and Mr. Umeda about what we were negotiating.

13     And on numerous occasions, we invited them to participate, and

14     to give us suggestions as to what we should add, what else we

15     should include.

16             Their comments we received back were, We should be

17     getting money.  And we had a lot of discussions about how we

18     didn't think that that would materialize.  So we did ask them to

19     participate and give us their views on what additional corporate

20     governance changes we should try to negotiate from Intel.

21             I will note that there are two other actions that were

22     out there.  One was the Paris action in California.  We did the

23     same thing with the Paris action.  We provided them with the

24     settlement terms and the corporate governance exchanges before

25     we reached the final agreement.  They signed off and approved

1    and thought it was a good deal.  We did the same thing with the

2    Rosenfeld Family Trust, which Mr. Katz just represented.  Not

3    only did they sign off, they actually negotiated a few

4    additional provisions that they added on to the corporate

5    governance terms.  So we really tried to include all the folks

6    out there who had any sort of derivative claim pending against

7    Intel to be part of this process.  To include them and make sure

8    that if they thought something was important than either we

9    would negotiate it, or try to get it from Intel, and they would

10   certainly had some direct negotiations, I understand, with Mr.

11   Dickey on behalf of Intel.

12        Mr. Seely's suggestion that he thinks, Well, we should

13   watch and wait.  Let's see how all these cases play out.  Let's

14   see what happens.  I would submit, your Honor, I don't believe

15   that that's an appropriate way to go, your Honor.  We have a

16   pretty good idea of what the record is.  Again, whether Intel,

17   itself, has committed an anti-trust violation is only the first

18   step in the equation.

19        The real question is, What did the board know and what

20   did the board acquiesce, and based on the evidence that we've

21   seen to date, that's a difficult case.  That's the case that we

22   have to prove.  And, as I said earlier, our feeling was taking

23   the significant corporate governance reforms now versus the

24   speculation of waiting, seeing what develops, maybe some day

25   we'll be able to prove a claim, maybe we won't, didn't really

1      seem like the best compromise or the best thing to do here.

2          Let me end just by saying, again as Mr. Dickey pointed

3      out that Mr. Seely said, The company got a good deal.  We take

4      pride in that, because we were here acting on behalf of the

5      company in a derivative case.  The derivative plaintiff is

6      supposed to step into the shoes and represent the company.

7          So we think we did a terrific job.  We think that your

8      Honor should approve the settlement.  Unless your Honor has

9      anything further, I have nothing else.

10         THE COURT:  No.  Thank you.

11         MR. BLOCK:  Thank you.

12         THE COURT:  First of all, I'm going to put on the

13     record that there's a paper submitted, a stipulation as to a

14     revised proposed order, which I'm going to grant.  I didn't

15     grant it until the hearing.  I didn't want to grant it in the

16     hearing, but I will grant that now.

17         I understand that the directors don't have a position

18     with regard to the issue raised by the paper that I discussed at

19     the commencement of the hearing, but I do want to know where

20     that issue is going before I issue a decision on the settlement

21     itself, which I'm prepared to at least give a ruling today.  I

22     intend to put a memorandum with that ruling, but I only want to

23     do that after I know whether what's asserted under oath in

24     Docket Item 91 and what surrounds it.  I didn't want to get into

25     the detail because I didn't want to beat up anybody.

1          If that's still an open issue, and there's no

2     resolution to it, then I'll have to deal with that with a

3     further hearing.

4          So I'm going to recess for 15 minutes and give the

5     involved attorneys, not the uninvolved attorneys a chance to

6     discuss it.  Then I'm come back in about 15 minutes.

7          THE COURT:  All right.  We'll be in recess.

8          (A recess was taken from 11:15 o'clock a.m. until 11:37

9     o'clock a.m.)

10         THE COURT:  All right.  Be seated, please.

11         All right.  Has the matter been addressed?

12         MR. LONG:  It has, your Honor, and with Mr. Block from

13    the Berman firm.  I spoke to Mr. Seely and he realized that this

14    was a misunderstanding on all of our parts.  On our part in

15    particular for what we put in our declaration with regard to the

16    additional attorneys' fees and the responses by Mr. Udell.  So I

17    think we just really misunderstood each other.

18         THE COURT:  All right.  With that understanding, I'll

19    consider the matter resolved.

20         I'm going to then enter an order, hopefully today, or

21    later today, or tomorrow.  The memorandum will approve the

22    settlement as fair and reasonable and adequate under the Third

23    Circuit standard.  I'm going to approve the stipulated -- well,

24    the attorneys' fees as submitted which have the agreement of the

25    defendants.

1               MR. BLOCK:  Thank you.

2               THE COURT:  Are there any other matters.

3               (No response.)

4               THE COURT:  Thank you.  We'll be in recess.

5               (Court adjourned at 11:37 o'clock a.m.)

6                              *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25